## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **BONITA J. OWENSBY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. CV 2:06 CV796-WKW** |
| ) | |
| **J.F. INGRAM STATE TECHNICAL** ) | |
| **COLLEGE; J. DOUGLAS** ) | |
| **CHAMBERS INDIVIDUALLY** ) | |
| **AND IN HIS OFFICIAL CAPACTIV** ) | |
| **AS PRESIDENT OF J.F. INGRAM** ) | |
| **STATE TECHNICAL COLLEGE;** ) | |
| **AND JAMES WILSON,** ) | |
| **INDIVIDUALLY AND IN HIS** ) | |
| **OFFICIAL CAPACITY AS DEAN** ) | |
| **OF STUDENTS AND SUPPORT** ) | |
| **SERVICES AT J.F. INGRAM** ) | |
| **STATE TECHNICAL COLLEGE,** ) | |
| ) | |
| **Defendants.** ) | |

### MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants **J. F. Ingram State Technical College** (hereinafter referred to as "Ingram"); **J. Douglas Chambers** (hereinafter referred to as "President Chambers"), individually and in his official capacity as president of J.F. Ingram State Technical College; and **James Wilson** (hereinafter referred to as "Dean Wilson"), individually and in his official capacity as Dean of Students and Support Services at J.F. Ingram State Technical College, and, by and through their counsel of record, moves this Honorable Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter a summary judgment in its favor dismissing this action and each count thereof, separately and severally on the grounds that there is no genuine issue of material fact and that this defendant is entitled to a judgment as a matter of law.

This motion is based upon the following:

1.    All pleadings in this case;

2.    Exhibits 1 – 9;

3.    Deposition of Bonita Owensby;

4.    Deposition of Dr. Douglas Chambers;

5.    Deposition of Dean James Wilson;

6.    Deposition of Dr. James Merk; and

7.    Narrative Statement of Undisputed Facts and brief in support of

Motion for Summary Judgment.

Respectfully Submitted,


/s/ Matthew Y. Beam
Matthew Y. Beam (BEA065)
Andrew W. Christman (CHR024)
Attorney for J. F. Ingram State
Technical College, J. Douglas
Chambers, individually and in
his official capacity as President
of J. F. Ingram State Technical
College and James Wilson,
individually and in his official
capacity as Dean of Students and
Support Services at J.F. Ingram
State Technical College

OF COUNSEL:
Gidiere, Hinton, Herndon
  & Christman
P. O. Box 4190
Montgomery, AL 36103
Telephone: (334) 834-9950
Facsimile:  (334) 834-1054

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that the above and foregoing was served on the following by placing a copy of same in the United States mail, postage prepaid and properly addressed this 30th day of August, 2007:


Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
Montgomery, AL  36107


                        /s/ Matthew Y. Beam_____
                        Of Counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **BONITA J. OWENSBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. CV 2:06 CV796-WKW** |
| | ) |
| **J.F. INGRAM STATE TECHNICAL** | ) |
| **COLLEGE; J. DOUGLAS** | ) |
| **CHAMBERS INDIVIDUALLY** | ) |
| **AND IN HIS OFFICIAL CAPACTIY** | ) |
| **AS PRESIDENT OF J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE;** | ) |
| **AND JAMES WILSON,** | ) |
| **INDIVIDUALLY AND IN HIS** | ) |
| **OFFICIAL CAPACITY AS DEAN** | ) |
| **OF STUDENTS AND SUPPORT** | ) |
| **SERVICES AT J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE,** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS' NARRATIVE STATEMENT OF UNDISPUTED FACT**
**AND BRIEF IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGMENT**

COME NOW Defendants **J. F. Ingram State Technical College** (hereinafter referred to as "Ingram"); **J. Douglas Chambers** (hereinafter referred to as "President Chambers"), individually and in his official capacity as president of J.F. Ingram State Technical College; and **James Wilson** (hereinafter referred to as "Dean Wilson"), individually and in his official capacity as Dean of Students and Support Services at J.F. Ingram State Technical College, and, by and through their counsel of record, hereby file this narrative statement of undisputed facts and brief filed in support of its motion for summary judgment.

## <u>INTRODUCTION</u>

Plaintiff Bonita Owensby ("Owensby") is a black female that has been employed at J.F. Ingram State Technical College ("Ingram") continuously for more than twenty years, except for one brief instance in which she resigned and was allowed to return by the President of the college, Douglas Chambers ("Chambers").   Ingram is a State of Alabama two-year technical college that provides occupational training to inmates, male and female, at the adult State correctional institutions in Montgomery and Elmore Counties.  Owensby alleges that during her employment, she has been subjected to ongoing discrimination in pay, promotion, and other benefits of employment on the basis of her sex and race, and that, as a result, she has suffered considerable mental and emotional anguish and lost income.

Owensby attempts to support her claims by naming various present and former employees of Ingram whom she alleges were paid more than she.  She claims that these other employees were paid more than she because she is a black female.  However, the employees identified by Owensby are not similarly situated as they had either dissimilar positions and responsibilities or higher levels of education and/or experience.  The evidence herein will show that Owensby had no real reason to believe that she was the object of discrimination.  She is merely attempting to use this civil lawsuit and this Court as leverage to further enhance her pay.

The two individuals that Owensby has named as defendants, President Chambers and Dean James Wilson ("Wilson"), are both black males.  Wilson is presently the Dean of the College.  The third defendant is the college itself and is the only defendant named as part of her Title VII claims.  The real thrust of Owensby's complaint is that she was not

moved from the "E" Salary Schedule to the "C" Salary Schedule[1] in 2000 when she was given the title "Registration and Admissions Coordinator" and began to perform some of the job responsibilities formerly performed by the Registrar. The C Salary Schedule is for professional personnel and generally requires a college degree. Owensby has no college degree. There is no evidence in the record that these defendants have intentionally discriminated against Owensby because of her race or sex.

Before discussing the details of Owensby's employment history, a few key facts should be noted to help frame and contextualize plaintiff's claims in this case. Owensby's employment at Ingram began in 1985 at annual salary of $10,272. By August 23, 2005, Owensby had been given a raise from an annual salary of $47,527 to $50,379.00 and given the title of Registrar. On August 31, 2006, Owensby was promoted to Director of Registration and Admissions, placed on the C Salary Schedule, and given another raise, to an annual salary of $60,000. Owensby filed her complaint in this Court on September 3, 2006, which means that Owensby accepted her $60,000.00 salary on the C Schedule three days after filing her complaint. Owensby presently makes some 600% more annually than she did when she was first employed at Ingram. Owensby has been given 18 pay raises while an employee at Ingram. Chambers has been President of Ingram since 1996, and during this time, he has approved seven raises for her, including the most recent appointment letter that is dated August 31, 2006.

Moreover, an investigation triggered by Owensby's filing of an institutional Grievance revealed that her salary ranked above average when compared to other Registrars in the two-year college system. Owensby has not demonstrated, and cannot

---

[1] These are two of the five full time employee salary schedules established by the State Board of Education. The schedules and their parameters will be discussed in more detail below.

demonstrate, that there is or has ever been any discriminatory intent associated with decisions made by the defendants concerning Owensby's placement on the pay scale. There are legitimate, non-discriminatory reasons for the promotion and pay decisions made by the defendants affecting Owensby.  As a result, all defendants are entitled to summary judgment.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

### J. F. Ingram State Technical College

J. F. Ingram State Technical College is a two-year Alabama technical college located in Deatsville, Alabama that was established exclusively to provide occupational training to inmates, male and female, at the adult state correctional institutions in Montgomery and Elmore Counties.  (Exhibit 1, Affidavit of Chambers).  All of its students are adult inmates who have been convicted of one or more felonies and who are assigned by the Alabama Department of Corrections to be students at Ingram.  (Exhibit 1).  In addition to occupational training at the associate degree level and the certificate level, Ingram provides remedial education and special education services.  (Exhibit 1).  It is the only college in Alabama whose student body is composed exclusively of student inmates.  (Exhibit 1).

The State Board of Education serves as the board of control for Ingram, and the other community and technical colleges in the Alabama college system.  (Exhibit 1).  The Chancellor of the Alabama Department of Post Secondary Education serves as the chief executive officer for the system.  (Exhibit 1).  All statewide policies that apply to Ingram are adopted by the State Board at the recommendation of the Chancellor.  (Exhibit 1).  Once the state wide policies are adopted, the Chancellor is charged with the responsibility

of interpreting and enforcing those policies.  (Exhibit 1).  The <u>Code of Alabama 1975</u>, Section 16-60-111.5 states: " … the Chancellor shall; 1) execute and enforce the rules and regulations of the State Board of Education governing the junior colleges and trade schools.  2) Interpret the rules and regulations of the Board concerning the junior colleges and trade schools. … 4) Have the authority to take any and all actions necessary and proper to administer policies, rules and regulations of the Board in carrying out its responsibility for the management and operation of the junior colleges and trade schools."

At the institutional level, the president of each college is charged with administering the institution in accordance with the State Board's policies, local institutional policies and applicable federal, state, and local laws.   <u>Code of Alabama</u> Section 16-60-111.6.  The President is also given the authority to "appoint the faculty and staff … according to qualifications prescribed by the Board and such other regulations which may be adopted by the Board in accordance with Section 16-60-111.4."  Chambers is the President of Ingram and has been since May 1, 1996.  (Exhibit 1).

<strong>State Salary Schedules</strong>

The State Board of Education has adopted a Salary Schedule policy for application at community and technical colleges in Alabama.  (Exhibit 1).  Section 160-60-111.4 gives the State Board of Education the Authority, among other powers, to "[m]ake rules and regulations for the government of each junior college and trade school" and "[d]irect and supervise the expenditure of legislative appropriations of each junior college and trade school."  Among the regulatory policies adopted by the State Board of Education for application at community and technical colleges are Salary Schedules.

(Exhibit 1). These Salary Schedules are designated as "A," "B," "C," "D," "E," and "H." The A Salary Schedule is for college Presidents, the B Salary Schedule is for Deans and Dean-level administrators, the C Salary Schedule is designated for "Professional Personnel," D is for college instructors, E Salary Schedule is designated for "Full-time Support Personnel 40 Hours Per Week," and H is for part-time support employees and the (Exhibit 1; Exhibit 2, C Salary Schedules; Exhibit 3, E Salary Schedules). Step placement is based on years of employment already completed (during prior years) with the respective college, and is based on an employee's having already completed at least 9 months of employment during a given academic year. (Exhibit 1). The Salary Schedule designations indicate the Salary Schedule ("E"), the range (i.e."7"), the Step placement, and, in parentheses, the years of credit toward Step placement. (Exhibit 1; Exhibit 3).

The Salary Schedules which are at issue in the present case are the "C" Salary Schedules, which are comprised of C-1, C-2, and C-3 (Exhibit 1; Exhibit 2); and the E Salary Schedule, which is divided into ranges 1 – 5, with 1 being the highest. (Exhibit 1; Exhibit 3). Prior to 2000, the E Salary Schedule had seven ranges. (Exhibit 1). In 2000, the number of steps was reduced to five, but within each range were added grades 01-03, with Grade 01 being the highest. (Exhibit 1). In addition to providing such Schedules, the State Board has adopted guidelines and procedures for assigning personnel to the various Salary Schedules. (Exhibit 1; Exhibit 4, Salary Schedule Guidelines).

### Owensby's Education

Owensby has never completed a four-year college degree. In 1991, Owensby received a two-year degree from Trenholm Technical College in legal stenography. (Owensby deposition p. 20). After finishing at Trenholm, she attended Central Alabama

Community College and obtained an Associate in Arts Degree in 1993. (Owensby p.23) She also attended Auburn University in Montgomery prior to attending Trenholm, and she has completed some course work at Troy State in Montgomery.  (Owensby pp. 20, 22).  She took one course at Athens College in special education titled Introductory to the Exceptional Child in the Classroom in 1992.  (Owensby pp. 23-24).

### Owensby's Employment History at Ingram

Owensby has been employed at J.F. Ingram Technical College since February 13, 1985.  (Exhibit 1).  The first position she held was Office Clerk and her salary for that appointment was $10,272.  (Exhibit 1).  This position is in Range 7, Step 0 on the E Salary Schedule.  (Exhibit 1).  The initial hiring of Owensby was done through an advertised vacancy announcement.  (Exhibit 1).  Ingram's employment records indicate that every employment appointment for Owensby since that date have been made without her having to compete against any other applicant or interested party.  (Exhibit 1).  Her promotions since May 1, 1996, have all been internal adjustments and made at the discretion of President Chambers (a black male).  (Exhibit 1).

Owensby's history of job appointments is as follows:

### EMPLOYMENT HIRING CHART

| POSITION | EFFECTIVE DATE | SALARY PLACEMENT |
|---|---|---|
| Office Clerk | 2/13/85 | E-7, O(0), $10,272 |
| Office Clerk | 9/1/85 | E-7, 1(1), $11,256 |
| Office Clerk | 9/1/86 | E-7, 2(2), $11,718 |
| Secretary to the Dean of Students and Student | | |

| | | |
|---|---|---|
| Services | 7/20/87 | E-6, 2(2), $13,104 |
| Secretary to the Dean of Students and Student Services | 9/1/87 | E-6, 3(3), $13,566 |
| Secretary to the Dean of Students and Student Services | 9/1/88 | E-6, 4(4), $15,101 |
| Secretary to the Dean of Students and Student Services | 9/1/89 | E-5, 5(5), $18,077 |
| Secretary to the Dean of Students and Student Services | 9/1/90 | E-5, 6(6), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/91 | E-5, 6(7), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/92 | E-5, 8(8), $20,600 |
| Secretary to the Dean of Students and Student Services | 9/1/93 | E-5, 8(9), $21,941 |
| Secretary to the Dean of Students and Student Services | 9/1/94 | E-3, 10(10), $30,633 |
| Secretary to the Dean of Students and Student Services | 9/1/95 | E-3, 10(11), $30,633 |
| Secretary to the Dean of Students and Student Services | 9/1/96 | E-3, 10(12), $31,860 |
| Secretary to the Dean of Students and Student Services | 9/1/97 | E-3, 10(13), $31,860 |

| | | |
|---|---|---|
| Secretary | 9/1/98 | E-3, 15(16), $35,970 |
| Secretary | 9/1/99 | E-3, 15(17), $35,970 |
| Secretary | 9/1/00 | E-3-03, 15(18), $37,409 |
| Coordinator of Registration And Admissions | 11/1/00 | E-2-02, 15(18), $41,047 |
| Coordinator of Registration And Admissions | 9/1/01 | E-2-02, 15(19), $41,047 |
| Coordinator of Registration And Admissions | 9/1/02 | E-1-01, 20(20), $47,527 |
| Registrar and Assistant to Dean of Students and Support Services | 9/1/03 | E-1-01, 20(21), $47,527 |
| Registrar and Assistant to Dean of Students and Support Services | 9/1/04 | E-1-01, 20(22), $47,527 |
| Registrar | 9/1/05 | E-1-01, 20(23), $50,379 |
| Director of Registration and Admissions | 8/31/06 | C-3, $60,000 |

(Exhibit 1; Exhibit 5, Appointment Letters).

In late 2000, Chambers decided to collapse the duties formerly held by the Registrar into the office of the Dean of Students. Chambers had been dissatisfied with the level of contribution made by the Registrar's position and determined at that time that the position no longer needed to be a full time professional position. (Exhibit 1). An October 13, 2000, memo to be signed by Chambers and Owensby, stated,

> ***In an effort to improve the efficiency and effectiveness of the J.F. Ingram State Technical College organizational structure***, it is agreed that a reorganization and reassignment of job duties are necessary.

> In the case of Bonita Owensby, the job duties of Secretary to the Dean of Students are being integrated into the position of Coordinator of Registration and Admission.
>
> After meeting with my supervisor and appropriate administrators, wherein we discussed this change, I understand that this position and salary placement is a temporary assignment subject to modifications at the end of the fiscal year and the evaluation of the effectiveness of the reorganization.   In the event that it is necessary, I may revert to my previous job titles, duties, and salary placement.

(Exhibit 6, Memo from Chambers to Owensby) (emphasis added).

The Salary Schedule Steps in question provided for raises after 1, 2, 3, 4, 5, 6, 8, 10, 15, 20, and 21 completed years of employment.  (Exhibit 1).  However, the records of Ingram show that Owensby was actually given credit for more years of service than she had, or has.  (Exhibit 1).  For example, after only seven months of employment, Owensby was moved from Step 0 to Step 1.  (Exhibit 1).  That meant that for academic years 1985-86 through 1990-91, and in academic years 1992-93, and 1993-94, she was paid at one Step higher than she should have been.  (Exhibit 1).  Then, when Owensby was redesignated as a "Secretary" effective September 1, 1998, she was placed at Step 15 and given credit for sixteen years of service, even though she had actually completed only 13 years of service.  (Exhibit 1).  That means that during academic years 1998-99 and 1999-2000, Owensby was paid at Step 15, when she should have been on Step 10.  During academic years 2002-03 and 2003-04, Owensby was paid at Step 20 when she should have been paid at Step 15.  (Exhibit 1).  Those extra Step increases demonstrate that, over the course of Owensby's employment, her employer has been more than generous with setting her salary levels.[2]  (Exhibit 1).

---

[2]As previously stated, in 2000, a new E Salary Schedule was adopted that reduced the number of ranges from 7 to 5, but added grades 01-03 within the ranges.

The records of Ingram and Owensby's deposition testimony indicate that Owensby has had her various positions upgraded without having to compete with any other applicants. (Exhibit 1; Owensby depo. p.161). She received pay upgrades from E-7 to E-6 when she was appointed to be Secretary to the Dean of Students and Student Affairs, and she received upgrades from E-6 to E-3 while holding that position. (Exhibit 1). In addition, when she was designated to be the Coordinator of Registration and Admissions (again without having to compete for the position), her salary was upgraded from E-3 to E-2. (Exhibit 1;Exhibit 5). The redesignation of Owensby's position to "Coordinator" was the result of an agreement between Owensby and Chambers that included a provision that the redesignation was "a temporary assignment subject to modifications at the end of the fiscal year. . ." and that "[i]n the event that it is necessary, I may revert to my previous job title, duties, and salary placement." (Exhibit 1, Exhibit 6). Ultimately, the position was not temporary; and the title of that position was later changed to "Registrar/Assistant to Dean of Students and Student Services," without any significant change in duties. (Exhibit 1).

Owensby is unsure as to exactly when this discrimination against her began. Owensby has testified that she believes she should have been put on the C Salary Schedule when her title was changed to Coordinator of Registration and Admission and this occurred in October of 2000. (Owensby depo. p. 104; Exhibit 5). She also stated she should have been put on the C Salary Schedule when she assumed the added responsibilities of the previous Registrar. (Owensby depo. p. 77). This would have been immediately upon his retirement in 1999. (Owensby depo. p. 71). When asked about the discrimination that is the basis of her complaint and when it began, she answered October

of 2000, when I was given the title of Coordinator of Registration and Admissions. (Owensby depo. p. 269). She did not mention the time period preceding this appointment that would have constituted from April of 1999 until October of 2000. (Owensby depo. p. 269).

On October 13, 2000, Owensby received a letter from Chambers appointing her to Coordinator of Registration and Admission. (Owensby p. 98). She received about a $4,000 annual raise. (Owensby depo. 100). Owensby acknowledges that, when she was named Coordinator of Registration and Admission in October of 2000, she was compensated for these extra duties. (Owensby depo p. 101). Owensby alleges that she should have been named "Registrar" or been paid on the C Salary Schedule the same as the previous Registrar. (Owensby depo. p. 103).

Owensby received another appointment letter on September 1, 2001, for the period ending 2002. (Owensby p. 106). Owensby testified that the volume of her work increased and the scope of her responsibility changed because "we started taking the special education program. We started actually keeping records on the computer for the special education students as well. That increased the student population, and it increased by contact with the instructors because there were added instructors for the program." (Owensby pp. 107-108). Owensby still did not have to work longer hours. (Owensby p. 109).

After this appointment, Owensby reported to Wilson that she was unhappy with where she was on the pay scale. (Owensby p. 113). Wilson referred her to Dr. Merk, she wrote a letter to Dr. Merk, and Dr. Merk responded to her in writing. (Owensby pp. 113-114). She then complained about her pay to Chambers, and he responded, "we'll

look into it and get back with you." (Owensby p. 114).  Owensby testified: "I was on the wrong position on the Salary Scale because I believe I should have been at C, where other coordinators were, or at C where the previous Registrar were [sic], since my duties were incorporated with the previous duties of the Registrar."  (Owensby pp. 115-116).

On September 1, 2003, Owensby was given the position of Registrar/Assistant to the Dean of Students and Support Services.  (Owensby p. 128).  Owensby believes she got this title change because she "was performing the duties of the Registrar, and maybe they just decided they would finally give [her the] just title."  (Owensby p. 129). Owensby was pleased with this change in title.  (Owensby p. 13).  However, Owensby still claimed that she was being discriminated against with regard to her pay, but not her title.  (Owensby p. 130).  According to Owensby, she was discriminated against based on her race and gender because "the former position as Registrar was a C salary position when a black male had it, for some reason, and **I don't know what their reason was**, they wouldn't place me there."  (emphasis added)(Owensby depo. pp. 130-131).  In her deposition, Owensby also addressed the changes in the Student Services Department:

Q:  It continues to change today, is that what you are saying?

A:  Yes.

Q:  Okay.  And these changes have occurred after the retirement of Mr. Robinson?

A:  Resignation.

Q:  I'm sorry, resignation of Mr. Robinson, at the direction of Dean Wilson, I believe you said and who else?

A:  At the direction of Dean Wilson and I guess the President.  I'm, you know .. administration.  **Whatever decisions that were best for the college was handed down from the head to whatever department head the situation involved**."

13

(Owensby pp. 137-138) (emphasis added).  Despite her own concessions regarding "what's best for the college," Owensby believes that she was discriminated against based on her race and gender.  (Owensby p. 138).

Owensby then received another appointment letter effective September 1, 2005 and ending October 31, 2006.  (Exhibit 5).  In this appointment letter, she was appointed as Registrar.  (Owensby p. 140).  She was given another raise with this appointment reflecting an approximately $2,500 increase in annual salary.  (Exhibit 5).  Chambers gave her this raise.  (Owensby p. 141).  This made Owensby unhappy because she still felt she deserved to be on the C Salary Schedule.  (Owensby p. 141).  Owensby bases her belief that she was discriminated against based on her race and gender because she was appointed as the Registrar at an annual salary of $50,379.00 and the previous Registrar had resigned making approximately $67,000.00 in 1999.  (Owensby p. 142).

On September 1, 2006, for the period ending August 31, 2007, Owensby was appointed Director of Registration and Admissions, placed on the C-3 Schedule by Chambers, and given a raise to $60,000.00.  (Owensby pp. 144-145).  Owensby acknowledged that she has been rewarded for the additional duties that she has taken over that were Robinson's, but still not to her satisfaction.  (Owensby p. 165).  **Keep in mind, Owensby has been complaining all along that she was not paid from the C Schedule. Having now been moved to the C Schedule, she still is dissatisfied.**

The C-3 Salary Schedule provides that the salary for any employee on that schedule is negotiable each year, up or down, so long as the salary does not exceed the maximum C-3 salary designated for the respective academic year.  (Exhibit 1; Exhibit 2). Note 4 of the Notes on the C Salary Schedule states that "Placement on Schedule C-3

14

presumes negotiation between the individual and the president for salary determination."
(Exhibit 2)  An Ingram employee can be placed on the C-3 Salary Schedule at a salary
lower than what Owensby is receiving, with no guarantee of any increase (or even the
same salary) for subsequent years.  (Exhibit 1).

### Owensby's Comparison to former Registrar Tim Robinson

Owensby's predecessor as Registrar, Mr. Timothy Robinson (a black male), was
selected in 1989 after a competitive search.  The position of Registrar had been
considered by the previous President of Ingram, Dr. Murry Gregg (a white male), to be a
"professional" position at the Master's Degree level.  (Exhibit 1).  A five-person search
committee established pursuant to the Shuford Partial Consent Decree selected Mr.
Robinson as a finalist for the position.  (Exhibit 1).  Mr. Robinson had a Master's Degree
and a teaching certificate.  (Exhibit 1).  He had also been a full-time instructor at Ingram
for five years prior to his appointment as Registrar.  (Exhibit 1).  At the time of Mr.
Robinson's appointment, President Gregg was in the process of seeking certification for
Ingram to become a community college that would serve "free-world" students as well as
student-inmates.  (Exhibit 1).  After Chambers was appointed, the Chancellor determined
that the best and most cost-effective use of Ingram would be for it to remain a technical
college serving only student-inmates.  (Exhibit 1).

In terms of compensation, Mr. Robinson's beginning salary as Registrar was
$32,970 annually, which was only $393 a year more than he would have made that year
had he continued as a full-time instructor.  (Exhibit 1).  While a full-time instructor, Mr.
Robinson had also served as Ingram's Coordinator of Displaced Homemakers (1988-89),
Coordinator of Special Services (1984-86), and he developed the G.E.D. Testing Program

at Ingram.  (Exhibit 1).  While serving as Registrar, Mr. Robinson also served on the

Ingram Budget Planning Review Committee, the Ingram Administrative Council, and as

Chairman of the Ingram Sick Leave Bank Committee.  (Exhibit 1).

  Even prior to Mr. Robinson's resignation from the Registrar position, Chambers

expressed dissatisfaction with the level of contributions made by the Registrar's position

to the operations of the college.  (Exhibit 1).  When Mr. Robinson vacated the position,

Chambers determined that it no longer needed to be a full-time professional position,

because the duties could be handled within the Office of Dean of Students using existing

employees.  (Exhibit 1).  That decision was made on the basis of what was best for the

institution and had nothing to do with anyone's race or sex.  (Exhibit 1).

  Owensby even acknowledges that the decisions to restructure her department

(Student Services) over the course of several years, after the resignation of Mr. Robinson,

by Chambers and other administrators at Ingram was made with the best interests of the

college in mind. (Owensby depo.  pp. 138, 255)  She admitted that among the decisions

made in the best interests of the college were decisions regarding her own promotions

and raises. (Owensby depo. pp. 255, 256).

  As a result of the Office of Dean of Students having absorbed the Registrar duties,

most of which were in essence divided between Owensby, Wilson, and Ms. Toxey,

Chambers promoted Owensby to the position of Coordinator of Registration and

Admissions.  (Exhibit 1).  Owensby's salary position was raised from E-3 to E-2,

effective November 11, 2000 (which included a $4,000 a year annual raise), and then

from E-2 to E-1 effective September 1, 2002.  (Exhibit 1).  Those promotions were made

without a competitive search or anyone else being considered for the position.  (Exhibit

1; Owensby depo p. 161).  Effective September 1, 2003, Owensby's title was changed to

Registrar/Assistant to the Dean of Students and Student Services.  (Exhibit 1).  Her duties

remained essentially the same, and her work hours were not changed.  (Exhibit 1).

Owensby was unaware of her alleged comparator's (Robinson's) educational

background. (Owensby p. 164).  Owensby was also unfamiliar with the requirements to

be on the C Salary Schedule.  (Owensby p. 164).

> "Q:  Do you know what the requirements are to be on the C Salary
> Schedule in the Alabama Department of Post Secondary Education?
>
> A:  The only requirements I know of is the fact that a person who
> holds a doctorate degree will be paid a set amount over what is on the
> scale.
>
> Q:  To your knowledge?
>
> A:  Any other requirements I am not familiar with.
>
> Q:  To you knowledge is it a requirement that you have a four-year
> college degree to be on the C Salary Schedule?
>
> A:  No, not to my knowledge.
>
> Q:  **Okay.  Do you think that your educational background was
> similar to Mr. Robinson's?**
>
> **A:  No."**

(Owensby pp. 164-165) (emphasis added).  Owensby expressly concedes that her

educational experience was not comparable or similar to Robinson's.

Owensby does not and has never performed the same responsibilities as Mr.

Robinson.  (Chambers depo. p. 147; Owensby depo p.72).  Mr. Robinson and Owensby

are the only two people to have served as Registrars at Ingram.  (Wilson depo. p. 162).

Upon Mr. Robinson's resignation, Wilson took over some of his job duties.  (Wilson

depo. p. 134).

The position of Registrar changed after Mr. Robinson left.  (Merk depo. p. 180). Robinson had far greater responsibilities than Owensby, and he had a much more developed education background.  (Merk depo. p. 180).  Much of the reduction in responsibilities was due to the implementation of the ACCESS software system in 1998. This new software automated many of the functions of the Registrar and resulted in a diminished need for hands-on administration and manpower. (Exhibit 1; Exhibit 7, Wilson's Affidavit).  Further, a review of the other Registrars across the two-year college system revealed that about two-thirds of the Registrars had higher responsibilities than Owensby. (Merk pp. 186-187).  In other words, about two-thirds of the Registrars had duties with higher responsibilities and one-third had duties of lower or equal responsibilities.  (Merk pp. 186-187).

Owensby admitted that she did not take over all of Tim Robinson's responsibilities at the time that he resigned. (Owensby depo. p.85) Ms. Elaine Toxey also took over some of Robinson's duties.  (Owensby depo. p. 85).  Owensby testified that Robinson's duties were spread out between her, Toxey, and Wilson. (Owensby depo. pp. 85-87).

There are differences in the job description for Owensby when she served as Registration and Admissions Coordinator and the list of responsibilities in Mr. Robinson's job description.  (Owensby depo. pp. 150-151).  Owensby acknowledged that she got new responsibilities that were added to her job description after she absorbed some of Mr. Robinson's job responsibilities.   (Owensby depo. pp. 150-151).  Owensby also admitted that she has never competed against anyone else for a promotion that she has received at Ingram.  (Owensby p. 161).

**Owensby's Resignation**

On April 18, 2001, Owensby resigned her position and submitted a letter of resignation. (Owensby depo. p. 209; Exhibit 8, Owensby Resignation and Rescission Documentation). Chambers subsequently forwarded a letter to Owensby acknowledging her resignation. (Owensby depo. p. 210; Exhibit 8). A letter from Wilson was also forwarded to Owensby acknowledging her resignation and complimenting her on her work. (Owensby depo. pp. 210, 211; Exhibit 8). Owensby then requested to rescind her job resignation and submitted this request in writing. (Owensby depo p. 12; Exhibit 8). Owensby requested the rescission because she got married, and she was going to have to relocate to Georgia. (Owensby depo. p. 212; Exhibit 1). Her husband was activated to go on military leave and she decided she wanted to stay, because he was going to be gone for over a year. (Owensby depo. p. 212). She then asked Chambers whether she could have her job back. (Owensby depo p. 212). He granted this request. (Owensby depo. p. 213; Exhibit 8). She acknowledges that it was within his discretion to grant or deny her request. (Owensby p. 213). There was no ill will when she left, and Chambers allowed her to come back because she was a good employee. (Owensby p. 214). It was during this time that Owensby alleges she was being discriminated against, and, despite this belief, she came back to work for Ingram. (Owensby p. 216).

**Alleged Comparators**

Owensby's job responsibilities and titles since 1999 are unique in the history of Ingram. (Owensby depo. p. 196). Owensby admitted that the exact scope of her responsibilities has been unprecedented at Ingram. (Owensby depo. p. 197). Nevertheless, Owensby names two comparators in her interrogatory response, Gene

19

Bridgman and Julie Givens.  (Owensby depo. p. 198).  The first comparator Owensby

names, Ms. Givens, was also a secretary at Ingram. (Owensby depo. p. 198)  However,

Givens worked in a different department, the Department of Fiscal Affairs. (Owensby

depo. p 199).  Owensby admitted that Given's job duties and responsibilities in the Fiscal

department are different than her own. (Owensby depo. p. 199) According to Chambers,

the staff in the Fiscal Department perform accounting, payroll, requisition, purchase

order, and other common fiscal functions. (Exhibit 1).  Owensby performs none of these

functions. (Exhibit 1).

      Gene Bridgman was an accountant and Assistant to the Dean of Fiscal Affairs at

Ingram.  (Owensby depo. p. 200).  Owensby believes that Gene Bridgman was treated

more favorably than her "because, at the time, as accountant and Assistant to the Dean of

Fiscal Affairs, Gene was being paid at the C-2 Salary Schedule.  And he had an

Associates Degree, just as I did, from the same college."  Owensby does not know

specifically what Bridgman's or Given's responsibilities were.  (Owensby depo. p. 202).

Gene Bridgman was a senior accountant in the Fiscal Department.  Although Bridgman

had a two-year associate degree like Owensby, he did not even work in the same

department or field as Owensby.  Bridgman had extensive experience in accounting, was

a senior accountant, and performed the various functions of a high ranking fiscal officer

for the College.  Owensby had no experience or responsibilities associated with financial

management or fiscal dealings for the College.  (Owensby depo. p. 78).

      Owensby failed to identify Bill Griswold's successor (a white female) as a

comparator in her discovery responses, but she alluded to her as a comparator in her

deposition.  Bill Griswold worked in the same department as Owensby.  However,

Griswold was in charge of job placement.  Owensby's responsibilities were secretarial for the Dean of Students and related to registering students with the College.  She had no responsibilities associated with job placement and no experience in that field.  (Chambers depo. pp. 157-58; Owensby depo. pp. 157, 199; Exhibit 1).  Again, Griswold's responsibilities bore no relation or resemblance to Owensby's.  Therefore, neither Griswold nor his successor could not have been similarly situated.

### No Direct Evidence of Discrimination

Owensby described two conversations with Chambers that she believes reflected his bias against her because of her race and sex.  (Owensby depo. p. 170-171: 173).  In the first conversation with Chambers, Owensby believes that she was made to feel worthless for asking for a pay raise because she thought that Chambers was playing games.  (Owensby depo. p. 170).  She felt humiliated in his office and felt that she was given the run around between he and Wilson.  (Owensby depo. p. 170).  She also bases this belief on the fact that he said, "Wilson said that you don't do anything."  (Owensby depo. p. 171).  There was no mention of race or gender in this exchange.  (Owensby depo. p 274).

The second conversation she describes with Chambers is when he presented her with an appointment letter temporarily appointing her to Coordinator of Admissions and Registration. (Owensby depo. p. 173).  She believes it was discriminatory against her because of her race and sex because it was a temporary appointment that would resort to being secretary's pay if she could not do the job. (Owensby depo. pp. 173-174).  Again, there was no reference or mention of race or gender of any kind. (Owensby depo. pp. 173-174).

Owensby has had no conversations with Wilson that she believes would reflect discrimination against her based on sex or race. (Owensby depo. pp. 174-175). It should be noted that Wilson and Chambers are both black. (Owensby depo. p. 176). Owensby is still unclear as to whether Wilson recommended her for a promotion and that this recommendation was the subject of the first conversation she had with Chambers in which she believes she was discriminated against because of her race and sex. (Owensby depo. p. 180). Owensby never told Chambers that she thought she was being discriminated against because she was black and female. (Owensby depo. p. 180). She could not articulate a reason why. (Owensby depo. p. 181). Owensby never complained in person to Chambers or Wilson that she was being discriminated against because of her race or gender. (Owensby depo. pp. 180, 181).

Owensby also testified that the gist of her complaint is that she did not receive enough of a raise. (Owensby depo. p. 182). Owensby acknowledged that Chambers has a responsibility to run the college in an efficient way, to spend tax dollars in an efficient way and that she has never been a college president. (Owensby depo. p. 183). Owensby testified that she does not know what the Registrars at other schools in the two-year college system do. (Owensby depo. p. 184). She is also not sure if their functions are different. (Owensby depo. p. 185). Owensby is unaware as to where should would fall in a survey of other Registrars across the two-year college system in terms of pay. (Owensby depo. pp. 185-186).

Owensby admitted that the intent of the changes in the Student Services Department since 1999 was efficiency. (Owensby p. 254). In addition, Owensby is now

incorrect in her contention that there are no other black females on the C Salary Schedule.

(Exhibit 9, Ingram Personnel Chart by Race and Gender).

## SUMMARY JUDGMENT PROCEDURE AND STANDARD

Defendants in this case bear the initial burden of demonstrating the basis for their

motion for summary judgment, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions that they believe show an absence

of any genuine issue of material fact.  Hairston v. Gainesville Publ'g Co., 9 F.3d 913, 918

(11th Cir. 1993).  In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the United States

Supreme Court held that if a party opposing summary judgment "fails to make a showing

sufficient to establish the existence of an element essential to their party's case, and on

which their party will bear the burden of proof at trial," summary judgment is due to be

granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a
> dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go
> beyond the pleadings and by . . . affidavits, or by the "depositions, answers
> to interrogatories, and admissions on file," designate "specific facts
> showing that there is a genuine issue for trial . . . .  We do not mean that
> the nonmoving party must produce evidence in a form that would be
> admissible at trial in order to avoid summary judgment . . . .  Rule 56(e)
> permits a proper summary judgment motion to be opposed by any of the
> kinds of evidentiary materials listed in Rule 56 except the mere pleadings
> themselves . . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal

element of the claim, as identified by the substantive law governing the case, such that its

presence or absence might affect the outcome of the suit.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must review the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). But, "[I]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Anderson, 477 U.S. at 240-50 (citations omitted). When responding to a motion for summary judgment, the non-movant "may not rely on bare allegations of wrongdoing, but must come forward with some evidence of specific facts." Pennington v. City of Huntsville, 93 F. Supp.2d 1201, 1206 (N.D. Ala. 2000).

## LEGAL ARGUMENT

### I.    Defendants Chambers and Wilson, in their Individual Capacities, are Entitled to Qualified Immunity on the Plaintiff's Section 1983 Claims.

President Chambers and Dean Wilson are entitled to qualified immunity as to the plaintiff's Section 1983 claims of discrimination. "Qualified immunity shields public officials from civil damages 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' The doctrine does not, however, shield officials who violated individual's 'clearly established' constitutional rights." Griffin Industries v. Irvin, __ F.3d __ , 2007 WL 2363343 (11th Cir. August 21, 2007) (internal citations omitted). "An official asserting that he is entitled to the protection of qualified immunity must initially establish that he was acting within the scope of his discretionary authority when the allegedly wrong acts occurred." Id. at *6. "Once the defendant has made this showing, the burden shifts to the plaintiff." Id.

The plaintiff is then required to prove two elements in order to defeat the public official's qualified immunity defense:  (1) the plaintiff must establish that the defendant

violated a constitutional right, and (2) the plaintiff must show that the violation was clearly established.  Id. at *7.  The Eleventh Circuit recently held in Irvin that this inquiry must be conducted in the proper order.  "Although a court deciding a qualified immunity issue often might find it easier to skip the question of whether there was a constitutional violation and dispose of the case simply on the grounds that the law was not clearly established, this approach is prohibited."  Id.  "If the official did not violate the law, the inquiry ends."  Id. (citing Scott v. Harris, 127 S. Ct. 1769, 1774 (2007)).  It must also be recognized that qualified immunity is "immunity from suit" rather than a mere defense to liability.  Id.  "Like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1995)).

The Eleventh Circuit has also recognized that, in cases involving mixed motives, "a public official is not immunized from liability for an otherwise objectively valid act if the complained of act was undertaken *only* based on improper motive."  McMillan v. DeKalb County, Georgia, 211 Fed. Appx. 821, 823 (11th Cir. 2006) (citing Crawford-El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 1594 (1997)).  "[A] defendant is entitled to qualified immunity only when, among other things, 'the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations.'"  Id. (quoting Stanley v. City of Dalton, Georgia, 219 F.3d 1280, 1296 (11th Cir. 2000)) (emphasis in original).

The Eleventh Circuit has applied a heightened pleading standard to Section 1983 actions brought against individuals to whom qualified immunity is available as a defense.  Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir. 2004).  Under this heightened pleading requirement, the plaintiff must allege with some specificity the facts

that make out his claim. "The Supreme Court has held that a 'necessary concomitant' to the question of whether a plaintiff has alleged a violation of a clearly established federal right is 'the determination of whether the plaintiff has asserted a violation of a constitutional right at all.' If a plaintiff has not sufficiently alleged a violation of any constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a 'clearly established' right." GJR Invs. v. County of Escambia, 132 F.3d 1359, 1366-67 (11th Cir. 1998) (citations omitted).

In the present case, it is unclear what constitutional right plaintiff Owensby alleges was violated by Chambers and Wilson. It is a well known principal of law that Section 1983 does not provide the source of any substantive rights. Section 1983 is merely the vehicle by which to vindicate rights elsewhere conferred. Whiting v. Traylor, 85 F.3d 581, 583 (11th Cir. 1996) (citing Albright v. Oliver, 510 U.S. 266,__ , 114 S.Ct. 807, 811 (1994); Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "Instead, to state a section 1983 claim, a plaintiff must point to a violation of a specific federal right." Id.

The plaintiff in this case has utterly failed to allege what constitutional right Chambers and Wilson supposedly violated. There is no reference to a constitutional clause, statutory section, or other law of the United States in plaintiff's Complaint. While the defendants may surmise or assume which constitutional arguments are being asserted by Owensby in this case, it is not the obligation of the defendant to craft the Complaint for the plaintiff or hypothecate various constitutional violations that the plaintiff may or may not be asserting. The plaintiff merely alleges that she suffered discrimination in violation of Section 1983. Since 1983 does not provide the source of any substantive rights, she has failed to meet the heightened pleading requirement recognized in the

Eleventh Circuit.  Therefore, her Section 1983 allegations against Chambers and Wilson should be dismissed.

To the extent Owensby's allegations survive the heightened pleading requirement of the Eleventh Circuit, defendants Chambers and Wilson are still entitled to qualified immunity.  It is undisputed that Chambers and Wilson were, at all times, acting within the scope of their discretionary authority.  (See Complaint, Exhibit 1, Exhibit 7).  Since the plaintiff does not dispute, and in fact alleges in her own Complaint, that the defendants were acting within the scope of their discretionary authority, the burden shifts to the plaintiff to prove that the defendants violated a constitutional right.  If this Court determines that the defendants did not violate the law, the inquiry ends.

Defendant Chambers testified that his decisions regarding the plaintiff's job duties and placement on the pay schedule were based on the best interests of the College. (Exhibit 1).  Chambers testified that Owensby was regularly given raises and situated on the pay scale in a very generous fashion. (Exhibit 1)   Chambers further testified that the duties of the Registrar prior to Owensby's assumption of those duties were directly related to the College transitioning into a community college.  (Exhibit 1).  The Registrar's responsibilities in a community college would have been significantly different and required more administration and educational experience.  (Exhibit 1). When the Chancellor decided not to make Ingram into a community college, Chambers determined that the position of Registrar was not being utilized in the most efficient manner.  (Exhibit 1).  Further, Chambers determined that the duties of the Registrar could more efficiently be absorbed within the Student Services Department.  (Exhibit 1).  It was perfectly legitimate and reasonable for Chambers to assign to Owensby the

administrative duties of Registrar, despite her lack of education and experience, where her appointment would constitute a more efficient use of college resources.

Owensby admitted in her deposition that the decisions regarding the use of college resources, efficiency, and even the pay scales of the people in her department were made by Chambers in the best interest of the college. (Owensby depo. pp. 138; 255). Based upon Owensby's own admissions, the record indisputably establishes that Chambers was in fact motivated, at least in part, by lawful considerations in determining Owensby's pay – that is, the efficient and economical use of college resources. The law is clear that Chambers is entitled to qualified immunity where he was acting within his discretionary authority and where his decision was in fact undisputedly motivated by a lawful consideration, even if only in part. Stanley v. City of Dalton, GA, 219 F.3d at 1296. Therefore, to the extent Owensby's claims survive the heightened pleading requirement of the Eleventh Circuit, the undisputed evidence demonstrates that Chambers was motivated by legitimate and lawful considerations and is, therefore, entitled to qualified immunity.

As to defendant Wilson, there is absolutely no evidence that he violated any clearly established right of Owensby. Owensby admitted in her deposition that Wilson can only recommend her for a promotion, but has no authority to promote her. (Owensby depo. p. 278). Further, Wilson affirmed that he did not have the authority to determine Owensby's pay. (Wilson p. 145-146, Affidavit of Wilson). Likewise, President Chambers testified both in deposition and in his affidavit that he is ultimately responsible for deciding the rate of pay and the schedule from which employees are paid. Since Wilson was not a decision maker regarding Owensby's pay, he could not have violated

any clearly established right with respect to Owensby's claim of disparate pay. Since there is absolutely no evidence that Wilson violated a clearly established right of Owensby, he is entitled to qualified immunity.

## II.    Owensby's Title VII Claims are Time Barred

Owensby's Title VII claims of discriminatory pay are time barred as they are based on an employment decision that was made outside of the 180 day charge period. An individual wishing to challenge an employment practice under Title VII must first file a charge with the EEOC under Section 2000e-5 (e)(1). This charge must be filed within a specified period of 180 days "after the alleged unlawful employment practice occurred." Ledbetter v. Goodyear Tire and Rubber Company, Inc., __ S. Ct. __, 2007 WL 1528298, *4 (May 29, 2007). If the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court. Section 2000e-5(f)(1). The United States Supreme Court has continually stressed the need to identify with care the specific employment practice that is at issue. National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 110-111 (2002).

Owensby asserts a disparate treatment claim concerning her pay, [3] the central element of which is discriminatory intent. Chardon v. Fernandez, 454 U.S. 6, 8 (1981); Watson v. Fort Worth Bank and Trust, 487 U.S. 997, 1002 (1998) ([a] "disparate treatment challenge focuses exclusively on the intent of the employer"). The United States Supreme Court in Ledbetter v. Goodyear Tire and Rubber Company, Inc., has recently addressed the issue of timeliness concerning pay decisions made outside the 180

---

[3] Although plaintiff's complaint alludes to discrimination in pay, promotions, and benefits, the only allegation supported by her testimony is one for discriminatory pay. She admits in her complaint that she received the promotion she sought, just not the pay. She offers no testimony or evidence of discrimination concerning benefits. In fact, plaintiff admits in her deposition that the gist of her lawsuit is about her pay. (Owensby depo. p. 182).

day charge period.  The Court held that each decision with regard to pay constitutes a discrete act.  2007 Westlaw 1528298 (May 29, 2007).

In <u>Ledbetter</u>, the plaintiff alleged that past discriminatory pay decisions outside the charge period had continuing effects during the charge period rendering the previous decisions actionable.  <u>Id</u>.  The Court rejected this argument, and looked to prior precedent including <u>United Airlines, Inc. v. Evans</u>, 431 U.S. 553 (1977).  As the Court stated in <u>United Airlines</u>, "a discriminatory act which is not made the basis for a timely charge … is merely an unfortunate event in history which has no present legal consequences." <u>United Airlines</u> 431 U.S. at 558.

The Court also noted, in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002), the statutory term "employment practice" generally refers to "a discrete act or a single 'occurrence'" that takes place at a particular point in time.  <u>Id.</u> at 110-111. Examples of discrete acts are termination, failure to promote, denial of transfer, and refusal to hire.  <u>Id</u>.  Under Title VII, a plaintiff can only file a charge to cover discrete acts that occurred within the appropriate time period (i.e. 180 days).  <u>Id</u>. at 114.

The Court in <u>Ledbetter</u> summarized its holding as follows:  "The EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.  Of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed."  <u>Id</u>. at 2169.

The Court in <u>Ledbetter</u> also recognized and emphasized the need for adherence to filing deadlines and statutes of limitation.  The Supreme Court has noted that the EEOC filing deadline protects employers from "the burden of defending claims arising from employment decisions that are long past."  <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 256-257 (1980).  The short deadlines contained in the EEOC statute (180 days) reflects Congress' strong preference for "the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation."  <u>Id</u>. at 2164. The Court explained the policy considerations for the deadlines:

> A disparate treatment claim comprises two elements:  an employment practice, and discriminatory intent.  Nothing in Title VII supports treating the intent element of [the plaintiff's claim] any differently from the employment practice element.  If anything, concerns regarding stale claims weigh more heavily with respect to proof of the intent associated with employment practices than with the practices themselves.  For example, in a case such as this in which the plaintiff's claim concerns the denial of raises, the employer's challenged acts (the decisions not to increase the employee's pay at the times in question) will almost always be documented and will typically not even be in dispute.  By contrast, the employers intent is almost always disputed, and evidence related to intent may fade quickly with time.  In most disparate treatment cases, much if not all of the evidence of intent is circumstantial.  Thus, the critical issue in a case involving a long past performance evaluation will often be whether the valuation was so far off the mark that a sufficient inference of discriminatory intent can be drawn.  This can be a settled termination and the passage of time may seriously diminish the ability of the parties and the fact finder to reconstruct what actually happened.

<u>Id</u>. at 2171.

Ledbetter further stands for the proposition that a single, free standing violation can be charged within its own charging period regardless of its connection to other

violations.  In <u>Morgan,</u> the Court had reached a similar conclusion and held:  "[t]he existence of past acts and the employee's prior knowledge of their occurrence … does not bar employees from filing charges about related discrete acts so long as the acts are not independently discriminatory and charges addressing those acts are themselves timely filed."  <u>Morgan</u>, 536 U.S. at 113.  When an employee alleges serial violations, i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation.  <u>Ledbetter,</u> 127 S. Ct. at 2175 (quoting <u>Morgan</u>, 536 U.S. at 113).  Plaintiff in <u>Ledbetter</u> failed to allege discriminatory conduct and intent regarding pay decisions within the charge period, but instead argued that each paycheck she received based on the discriminatory decision outside the charging period shifted the intent to paychecks inside the period.  The Court rejected that argument and dismissed all of her claims as untimely.

In the present case, Owensby claims that she should have been placed on the Salary Schedule in October of 2000.  (Owensby p. 103).  This allegedly discriminatory pay decision was made far outside the applicable charge period.  Owensby filed her EEOC Complaint on November 17, 2005.  Therefore, any alleged discriminatory pay decisions prior to May 21, 2005, are outside of the requisite charging period.  To the extent that Owensby's allegations of discriminatory pay are triggered by the October 2000 decision to not place her on the C Schedule, any attempt to shift to allegedly discriminatory intent associated with that pay decision to pay decisions occurring inside the charging period would be prohibited by the Supreme Court's decision in <u>Ledbetter</u>.

Owensby's own deposition reveals that she received regular pay increases and promotions following the October 2000 promotion to Coordinator of Registration (when

she claims she was denied placement on the C Schedule based upon her race and gender).
(Owensby depo. *Passim*).  It was October 2000 that Owensby's complaints regarding her
placement on the Salary Schedule began.  Further, it is this pay decision that forms the
basis of her disparate treatment claims.

According to Owensby, when she was promoted to Coordinator of Registration
and Admissions, she was not paid as favorably as the individuals she identifies as
comparators.[4]  The fact that Owensby's comparator analysis was triggered by the
October 2000 promotion demonstrates that any subsequent pay decisions were merely
derivative of the October 2000 promotion.  As a result, Owensby's claims are similar to
those addressed by the Supreme Court in Ledbetter.  Every time she was not placed on
the C Salary Schedule while performing her duties as the Registrar Owensby claims she
suffered discrimination.  This argument bears a striking resemblance to Ledbetter's
argument that the discriminatory intent of the original pay decision shifted to later
instances of allegedly substandard pay.  Since the Supreme Court's decision in Ledbetter
makes it clear that Owensby is not entitled to shift the intent of a pay decision made
outside of the charge period because of deleterious and ongoing effects of that decision
inside the charge period, her claims (like Ledbetter's) are time barred and must fail.

To the extent that any of Owensby's claims of discriminatory pay survive the
Supreme Court's mandates under Ledbetter, the only pay decisions at issue would be
those within the 180 day charge period.  The only pay decision made within the 180 day
charge period was Owensby's appointment as Registrar on September 1, 2005.  At this
appointment Owensby's title was changed from "Registrar and Assistant to Dean of

---

[4] For reasons stated below, the individuals identified are not comparators at all in that they work in
completely different departments, had completely different job responsibilities, and had different
educational backgrounds.

Students and Student Affairs" to simply "Registrar."  Her pay was increased from $47,527.00 to $50,379.00.  Owensby claims that her more than $3,000.00 pay raise was not sufficient because she was still not on the C Salary Schedule.  Again, Owensby relates this pay decision back to 1999 when the former Registrar resigned and Owensby took over some of those duties in October of 2000.  (Owensby pp. 140-142).  The basis for Owensby's claim is clearly derivative of the October 2000 pay decision by Chambers to not place Owensby on the C Salary Schedule.  To the extent this Court allows the September 2005 promotion to Registrar and her pay increase of more than $3,000.00 to survive dismissal under Ledbetter, Owensby has still failed to demonstrate discriminatory intent or offered any evidence that the pay decision was based upon her race or gender.  Those issues will be addressed below.

### III.     Defendant's Ingram Technical College, Chambers, and Wilson are all Entitled to Summary Judgment on the Plaintiff's Discriminatory Pay Claims Brought Pursuant to both Title VII and Section 1983.

The defendants are entitled to summary judgment as to plaintiff's discriminatory pay claims brought under Title VII and 42 U.S.C § 1983.  Owensby has alleged no direct evidence of discriminatory pay.  Similarly, there is no circumstantial evidence of discriminatory pay.  Owensby has not and cannot demonstrate a prima facie case of discrimination in compensation in that the evidence demonstrates that the plaintiff did not receive low wages, that there are no comparators with whom Owensby is similarly situated, and that Owensby was not qualified to receive placement on the C Salary Schedule at the time she claims she should have been placed on the Schedule.  Further, even if the plaintiff was able to establish a prima facie case of discriminatory compensation, the College and President Chambers had legitimate nondiscriminatory

reasons for reorganizing the Registrar position and continuing to give raises to Owensby on the E Salary Schedule.

According to 42 U.S.C. § 1983: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law … ." However, the Supreme Court has made it clear that "neither a state nor its officials acting in their official capacities are 'persons' under Section 1983." Will v. Michigan Department of State Police, 109 Supreme Ct. 2310, 2312 (1989). Furthermore, the named officials are entitled to qualified immunity in their individual capacities for discretionary actions taken in good faith. McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995).

Owensby's claims brought under Title VII and § 1983 will be analyzed under the same legal framework. When a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under § 1983, the legal elements of the claims are identical. Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir.1985). Intentional discrimination is required under both Title VII and § 1983. Vessels v. Atlanta Ind. Sch. Sys., 408 F.3d 763, 767 (11th Cir.2005). 42 U.S.C. 2000e *et seq.*, Title VII of the Civil Rights Act of 1964 as amended makes it unlawful for an employer: 1) "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin; or 2) to limit, segregate, or classify his employees or applicants for employment in any way which

would deprive or tend to deprive any individual of employment opportunities or otherwise adversely effect his status as an employee, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. Section 2000e-2.

Under Title VII, there are three theories under which an employer may be held liable: disparate treatment, pattern and practice, or disparate impact. EEOC v. Joe's Stone Crab, 220 F.3d 1263, 1273 (11th Cir. 2000). The first two theories require proof of discriminatory intent. Id at 1273. If a plaintiff alleges that he or she has been treated differently than other employees, as Owensby has in the present case, courts have construed this claim as a disparate treatment claim. Ricky Grider v. Alabama Department of Corrections, 2007 WL 2254405 (M.D.Ala. 2007). When alleging discrimination under the disparate treatment or pattern and practice theories, the plaintiff has the burden of proving discriminatory intent. EEOC at 1273. See also Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997). ("In a disparate treatment case, the plaintiff bears the burden of proving that the employer intentionally discriminated against him because of his race.") The plaintiff in the instant case is bringing her complaint under the disparate treatment theory and must prove discriminatory intent.

Discriminatory intent can be established through either direct or circumstantial evidence. To allege intentional discrimination, a plaintiff must show that a defendant acted in a way that: "…implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker…selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects…" Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979). The applicable standard for direct evidence of discriminatory intent is "when it is sufficient to prove

discrimination without inference or presumption.  Only the most blatant remarks whose intent could be nothing other then to discriminate constitute direct evidence." <u>Clarks v. Coats and Clark, Inc.</u>, 990 F.2d 1217, 1223 (11th Cir. 1993).  Direct evidence has also been characterized as evidence "composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir.1999).

> **A.** **There is no direct evidence of discrimination by Chambers, Wilson, or the College.**

Owensby admits in her deposition that neither Chambers nor Wilson ever mentioned race or gender in a derogatory fashion to her.  Although Owensby describes two conversations that she had with Chambers which she believed reflected his bias against her based upon her race and sex, neither of those conversations involved any references to either her gender or her race.  (Owensby depo. pp. 170-173).  In the first conversation, Owensby simply says that she was made to feel worthless and humiliated for asking for a raise because Chambers told her "Wilson said that you don't do anything."  Obviously, this comment is directed at Owensby's performance, not at her race or gender.

The second conversation relates to what was initially a temporary appointment for Owensby to the position of Coordinator of Admissions and Registration.  Owensby alleged that she was discriminated against because the appointment was temporary rather than permanent.  Again, there were no references to race or gender in this exchange.  The appointment may have been temporary for reasons associated purely with Owensby's lack of education, lack of experience, or questionable work ethic.  There is no direct evidence in the record of discriminatory intent on the part of defendant Chambers.

As to defendant Wilson, Owensby admitted that she has had no conversations with Wilson that she believes will reflect discrimination against her based upon race or gender. (Owensby depo. pp 174-175). Therefore, there is obviously no direct evidence of discrimination on the part of Wilson.

**B.    Plaintiff has not and cannot establish a Prima Facie case of discriminatory pay.**

There is also no circumstantial evidence of discriminatory intent on the part of Chambers or Wilson. Circumstantial, or indirect, evidence is evidence "of a quality that leads to an inference that a provable event did or did not occur." Commentary to Weissenberger's Federal Evidence, 2003 Courtroom Edition. The framework for establishing discriminatory intent through indirect or circumstantial evidence is described by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). Under this framework, Owensby must first establish a prima facie case of discrimination. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007). In McDonnell Douglas, the United States Supreme Court set out the requirements a plaintiff must fulfill in order to establish a prima facie case of discrimination in promotion: (1) he or she belongs to a racial minority; (2) he or she was qualified for and applied for a position the employer was trying to fill; (3) he or she was denied the position despite his or her qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. 411 U.S. 792, 802 (1973) (See also Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000)).

The Eleventh Circuit has further refined the above referenced requirements to state a prima facie case of intentional discrimination specifically in the context of discriminatory pay. A plaintiff must establish that (1) she belongs to a racial minority;

(2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage. Cornelius Cooper, Michael Edwards, et al. v. Southern Company, Georgia Power Company, et al., 390 F.3d 695 (11th Cir. 2004).  See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir. 1992).

In Miranda, the Court held that a named comparator employee must "share[] the same type of tasks."  Miranda at 1529.  If the plaintiff is able to meet these requirements, a presumption of discrimination is created. "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reasons for the employee's rejection … .  If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual."  Lee at 1253.  The defendants must produc[e] evidence that the plaintiff "was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason" in order to rebut the presumption. U.S. Postal Serv. Bd. Of Governors v. Aikens, 460 U.S. 711, 714, 103 S. Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (citation and internal quotation marks omitted).  The United States Supreme Court has made it clear that the burden of proof at all times remains with the plaintiff. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

At this point in the legal analysis, the obligation placed on the defendants to provide evidence of legitimate, non-discriminatory reasons for the employment actions taken is easily established. "It is important to bear in mind … that *the defendant's burden of rebuttal is exceedingly light*….  At this state of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is

merely one of production, not proof." <u>Perryman v. Johnson Prods. Co.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983) (citation and internal quotation marks omitted) (emphasis added). If the offered reason by the defendant employer is one that might motivate a reasonable employer, a plaintiff must confront and address it directly. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000).   If the plaintiff only quarrels with that reason, a pretext has not been established. <u>Id</u>.

        In a recent Eleventh Circuit case, the Court analyzed whether the plaintiff had established a prima facie case of discrimination regarding pay where the plaintiff could not identify a similarly situated employee who received higher wages than she. <u>Sumerlin v. Amsouth Bank</u>, 2007 WL 2209457 (11th Cir., August 2, 2007).  The plaintiff claimed that another employee with her same job title (payroll representative) was similarly situated, was outside of her protected class, and was paid at a higher rate.  The Eleventh Circuit disagreed that the comparator was similarly situated.  The Court noted "an employee is similarly situated if she performs 'the same type of tasks' as the plaintiff." <u>Id</u>. at *3 (internal citations omitted). "The plaintiff must establish that the employee is 'similarly situated in all relevant respects.'"  <u>Id</u>. (quoting <u>Wilson v. B-E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004)).  "The comparator employee 'must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.'"  <u>Id</u>.  The <u>Sumerlin</u> Court concluded that the plaintiff's comparator was not similarly situated because she performed different tasks than the plaintiff.  "Sumerlin handled overtime and advanced pay and entered data, such as name and address changes, but Hilton balanced payroll accounts and verified employment.  Sumerlin even admitted that all of the payroll representatives 'had different duties.'"  <u>Id</u>.  Because the Court

concluded that the plaintiff was not similarly situated with her alleged comparator, the

plaintiff's lower wage was determined to not be circumstantial evidence of

discrimination.

In the present case, Owenby cannot demonstrate a prima facie case of

discrimination in compensation because 1) there is no evidence that the plaintiff received

low wages, 2) there are no similarly situated comparators outside of Owensby's protected

class who were treated more favorably than she, and 3) Owensby was not qualified to be

placed on the C Salary Schedule as she alleges.

### (1) Owensby did not receive low wages.

First, it is undisputed by Owensby's own deposition testimony that she

consistently received raises throughout her tenure with Ingram.  More specifically,

Owensby admitted that she received several raises from President Chambers and received

at least two promotions.  The records indicate that Owensby also received unmerited step

increases and pay considerations for which she was not entitled.  (Exhibit 1).  Owensby

received raises in the amount of  $4,000.00 and more.  Owensby started her position at

Ingram making $10,000.00.  As of the date of this filing, Owensby makes in excess of

$60,000.00 a year.  Over the years, Owensby has enjoyed a 600% increase in her salary.

(Exhibit 1).  Owensby has consistently been given raises despite the fact that she has no

college degree, has been warned by her supervisor about making personal telephone calls

while at work, and has been warned about persistent tardiness.  (Owensby depo. pp. 20-

24, 223, 221).  Owensby admits that she was promoted regularly, received raises, and

even was rewarded with higher pay for accepting additional responsibilities.  It is simply

her testimony that the pay is not enough.  Since the evidence indisputably establishes that

Owensby did not receive a low wage, she cannot make a prima facie case.  Therefore, defendants are entitled to summary judgment.

### (2) Owensby cannot identify a similarly situated employee outside of her protected class who was paid more than she.

Owensby can identify no similarly situated comparators outside of her protected class who was paid better than she.  It should first be noted that Owensby admitted that her job trajectory starting in 1999 was unique to the College.  She admitted in deposition that no one at Ingram has ever performed the duties that she performed after taking over many other responsibilities of the former Registrar.  The comparators named by Owensby in her responses to discovery requests were Julie Givens and Gene Bridgman.  Ms. Givens is not similarly situated with Owensby as she works in the Fiscal Department.  Owensby works in the Student Services Department.  Owensby does not perform the same functions as Givens in that Givens is involved in accounting, payroll, requisitions, purchase orders, and other general financial management functions.  Owensby performed none of these functions in her position as Registrar or Assistant to the Dean of Students and Student Support Services.

Likewise, Gene Bridgman was a senior accountant in the Fiscal Department.  Although Bridgman had a two-year associate degree like Owensby, he did not even work in the same department or field as Owensby.  Bridgman had extensive experience in accounting, was a senior accountant, and performed the various functions of a high ranking fiscal officer for the College.  Owensby had no experience or responsibilities associated with financial management or fiscal dealings for the College.  Clearly, neither Givens nor Bridgman were even remotely similar to Owensby in their job functions, responsibilities, or duties.  (Owensby depo. pp. 198-200; Exhibit 1).

42

Owensby also claims that Robinson was a similarly situated comparator in that she should have been placed on the C Schedule the same as him.  However, Owensby admitted that Robinson had, not only a four-year college degree, but also a Master's Degree.  Further, Robinson had five years of experience as an instructor with the College prior to becoming the Registrar.  Owensby does not have a four-year college degree, does not have a Master's Degree, and has never served as an instructor.  Owensby, prior to taking on some of Robinson's Registrar duties, had served only as a secretary.  Neither Owensby's education nor work experience were in any way comparable to Robinson's.  Therefore, Owensby cannot assert that Robinson is a similarly situated comparator.

Finally, Owensby alludes in her deposition to Bill Griswold's successor as a similarly situated comparator.  Bill Griswold worked in the same department as Owensby.  However, Griswold was in charge of job placement.  Owensby's responsibilities were secretarial for the Dean of Students and related to registering students with the College.  She had no responsibilities associated with job placement and no experience in that field.  (Owensby depo. pp. 157, 199; Exhibit 1).  Again, Griswold's responsibilities bore no relation or resemblance to Owensby's.  Therefore, neither Griswold nor his successor could not have been similarly situated.[5]

It should be noted here that the comparators identified by Owensby were not outside of her protected class (depending upon which protected class she is referring to).  Although Owensby claims that Givens was treated more favorably than she, Givens is a female.  To the extent Givens received higher pay than Owensby, she would not be a proper comparator with respect to the gender discrimination claim.  Similarly, Robinson

---

[5] Owensby testified that she did not know whether Griswold's successor took over his job duties.  Since she cannot prove what the successor's job duties were, she cannot establish that she was similarly situated.

was a black male.  To the extent Owensby alleges that Robinson was a comparator and treated more favorably than she, he would not be properly comparable since he is not outside of the protected class of race.  Owensby appears to be carving out something of a combination classification of "black female."   In other words, although Owensby has to admit that blacks and females are not outside of her protected class, the comparators are somehow legitimized because they were not both black and female.  To the extent plaintiff is attempting to assert a new combination classification of "black female," such classification has no antecedent in Eleventh Circuit jurisprudence.  Because Owensby cannot point to a similarly situated employee outside her protected class who was paid more than she, defendants are entitled to summary judgment.

### (3) Owensby was not qualified to be placed on the C Schedule in October of 2000.

Lastly, Owensby cannot establish a prima facie case in that she cannot present evidence that she was qualified to be placed on the C Salary Schedule in October 2000.  Although Robinson was placed on the C Salary Schedule when he took the Registrar position, he had a Master's Degree and experience as an instructor.  By Owensby's own admission, she had no college degree and only had secretarial experience at the time she took over some of Robinson's duties.  Further, Owensby conceded that Robinson's duties were disbursed between Owensby, Wilson and Ms. Toxey.  In other words, Owensby did not even take over all of the duties formerly held by Robinson.  As a result, there is absolutely no evidence in the record that Owensby was qualified to be placed on the C Salary Schedule for taking over only part of the Registrar duties with no college education and no instructional experience.

As Chambers pointed out, the C Schedule is generally reserved for professionals. Because Owensby cannot demonstrate a prima facie case in that there is no evidence that she received low wages, there are no similarly situated comparators outside of her protected class that were treated better than she, and there is no evidence that she was qualified to be placed on the C Salary Schedule, the defendants are entitled to summary judgment.

> **C.    The defendants had legitimate nondiscriminatory reasons for their decisions regarding plaintiff's pay.**

To the extent this Court determines that Owensby has made a prima facie case, there is ample evidence of legitimate nondiscriminatory reasons for why Chambers did not place Owensby on the C Salary Schedule.  First, it should be noted that defendant Wilson undisputedly had no decision-making authority with respect to Ms. Owensby's pay.  Obviously, since Wilson had no decision-making authority, he cannot be held liable for any allegations of discriminatory compensation.

As to President Chambers, there were numerous reasons set forth in his deposition and his affidavit as to why Owensby was not placed on the C Salary Schedule.  First, the position of Registrar was reorganized after Robinson resigned.  Chambers had, even before Robinson's resignation, expressed his dissatisfaction with the productivity of the position of Registrar.  When Robinson vacated the Registrar position, Chambers determined that the position no longer needed to be a full-time professional position because the duties could be handled within the office of the Dean of Students using existing employees.  This decision was based upon efficiency and economical management of resources was made within the best interests of the College, not based upon anyone's race or gender.  (Exhibit 1).

Further, Chambers testified that Ingram was at one time on track to become a community college. It was during this timeframe that Mr. Robinson was hired as the Registrar. If Ingram had transitioned into a traditional community college, the position of Registrar would have been more demanding and required a higher level of education and experience for that position. Traditional community colleges have more diverse student populations and more diverse curriculum. Community colleges are also involved with the transfer of students from other schools, which is an added responsibility for the Registrar. However, when the transition of Ingram into a community college was abandoned, the need for a Registrar with a higher level of educational experience was no longer as necessary. (Exhibit 1).

Finally, Chambers and Wilson testified that the implementation of the ACCESS Software around 1999 lightened the administrative load on the Registrar. Many of the job functions that were previously performed by hand through the Registrar's office were integrated into an automated system. The new software resulted in a reduced administrative workload and played a part in Chamber's decision to reallocate the Registrar's duties to other support personnel. (Exhibit 1).

All of these legitimate nondiscriminatory reasons defeat the plaintiff's prima facie case of discriminatory compensation, to the extent such a prima facie case has been made. However, the more powerful testimony regarding the legitimate nondiscriminatory reasons for pay decisions in the Office of the Dean of Students was Owensby's own testimony. Owensby admitted twice in her deposition that decisions regarding pay in her department were made to further the best interests of the College. Owensby testified; "[w]hatever decisions that were best for the college was handed down

from the head to whatever department head the situation involved."  (Owensby depo. p.

138).  She further testified:

> "Q:  And is it your belief that some of the changes, or all of the changes, in the Student Services Department since this memo have reflected a commitment to efficiency?
>
> MR. DEBARDELABEN:  Object to the form.
>
> Q:  You can answer.  A commitment to the efficiency of the department?
>
> A:  I would say that would be the intent, if, you know …
>
> Q:  Okay.  So the intent is efficiency.  How do you know that the job responsibilities that you've been given since Tim Robinson resigned were not based on efficiency?
>
> A:  Because – how would I know that they were not based on efficiency?
>
> Q:  Yes.
>
> A:  They were based on what they felt was at the best interest of the college.
>
> Q:  And when you say the decisions, what decisions are you talking about?
>
> A:  The decision that President Chambers made, and I guess Dean Wilson, to the restructuring or whatever – the changes in the Student Services Department.
>
> Q:  And would the changes in the Student Services Department also include changes in your responsibilities?
>
> A:  Yes.
>
> Q:  And would it also include the scope of your duties?
>
> A:  Yes.
>
> Q:  And would the changes in the Student Services Department also reflect who is on what pay scale?

A:  Yes.

Q:  And would those changes also reflect how much people make?

A:  Yes."

(Owensby depo. pp. 254-56).

On another occasion in her deposition, Owensby testified that she did not know why Chambers made the pay decisions that were made with respect to her placement on the Salary Schedule.  (Owensby depo. pp. 130-131).  Clearly, Owensby's own testimony undermines her own prima facie case by affirmatively identifying legitimate nondiscriminatory reasons for the decisions that were made with respect to her salary.  What is more, her admissions totally foreclose any argument of pretext associated with the asserted legitimate nondiscriminatory reasons for the pay decisions.

Finally, Owensby was not placed on the C Salary Schedule because she simply did not have the education and experience necessary to be placed on the C Schedule when she first took over some of the duties of the Registrar.  In October of 2000, Owensby had no experience performing the duties of Registrar and had no four-year college degree.  She was taking over the position from someone with ten years of experience as the Registrar, a Master's Degree, and five years of instructional experience prior to taking the position himself.  Owensby's dearth of education and experience were also legitimate nondiscriminatory reasons for Chambers not placing her on the C Salary Schedule as early as she would have liked.

### D.     Other evidence dispelling allegations of discriminatory intent

It should be noted that Chambers allowed Owensby to rescind her resignation and return to her previous position at Ingram with no decrease in pay or responsibility.  This

sequence of events occurred in April 2001, which is precisely during the time that

Owensby alleges that Chambers discriminated against her.  Under Alabama law,

Chambers had no obligation to allow Owensby to rescind her resignation.

> "An unconditional resignation of a public office, to take effect
> immediately, cannot be withdrawn, even with the consent of the
> power authorized to accept it, and it does not seem to be material
> that the resignation had not been accepted.-State (ex rel. Williams)
> v. Fitts, 49 Ala. 402; 23 Am. & Eng.Ency.Law, 424. A contingent
> or a prospective resignation, however, can be withdrawn at any
> time before it is accepted.-29 Cyc. 1404."

City of Dothan v. Lucas  254 So.2d 341, 348 (Ala. Civ. App. 1971).

Chamber's actions in allowing Owensby to return to her job can hardly be

described as discriminatory.  This expression of good will towards Owensby wholly

undercuts the assertion that his decisions regarding her employment were colored by

discriminatory animus.  Further, his actions do not reflect the attitude or conduct of a

supervisor seeking to discriminate against a subordinate.  It is clear from the above

evidence, and indeed Owensby's own testimony, that she had no reason to believe that

she was the object of discrimination.  Her unfounded lawsuit is nothing more than a

thinly veiled attempt to enhance her pay through the federal courts.

## CONCLUSION

For the foregoing reasons, Ingram State Technical College, President Douglas

Chambers, and Dean James Wilson respectfully request this Honorable Court to enter

summary judgment in their favor and against the plaintiff on all claims and dismiss this

case with prejudice, costs taxed against the plaintiff.

/s/ Matthew Y. Beam_____
Matthew Y. Beam (BEA065)
Andrew W. Christman (CHR024)
Attorney for J. F. Ingram State
Technical College, J. Douglas
Chambers, individually and in
his official capacity as President
of J. F. Ingram State Technical
College and James Wilson,
individually and in his official
capacity as Dean of Students and
Support Services at J.F. Ingram
State Technical College

OF COUNSEL:
Gidiere, Hinton, Herndon
  & Christman
P. O. Box 4190
Montgomery, AL 36103
Telephone: (334) 834-9950
Facsimile:  (334) 834-1054

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was served on the following by placing a copy of same in the United States mail, postage prepaid and properly addressed this 30th day of August, 2006:

Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
Montgomery, AL  36107                    /s/ Matthew Y. Beam_____
                                         Of Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **BONITA J. OWENSBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. CV 2:06 CV796-WKW** |
| | ) |
| **J.F. INGRAM STATE TECHNICAL** | ) |
| **COLLEGE; J. DOUGLAS** | ) |
| **CHAMBERS INDIVIDUALLY** | ) |
| **AND IN HIS OFFICIAL CAPACTIY** | ) |
| **AS PRESIDENT OF J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE;** | ) |
| **AND JAMES WILSON,** | ) |
| **INDIVIDUALLY AND IN HIS** | ) |
| **OFFICIAL CAPACITY AS DEAN** | ) |
| **OF STUDENTS AND SUPPORT** | ) |
| **SERVICES AT J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE,** | ) |
| | ) |
| **Defendants.** | ) |

## AFFIDAVIT OF J. DOUGLAS CHAMBERS

Before me, the undersigned notary public in and for said county and state, personally appeared J. Douglas Chambers, who upon being duly sworn on oath deposed and said as follows:

1.　　My name is J. Douglas Chambers.  I have been President of J. F. Ingram State Technical College since May 1, 1996.  In this capacity, I am responsible for administering the institution in accordance with the State Board's policies, local institutional policies and applicable federal, state and local laws.  I am also given the authority to appoint the faculty and staff according to qualifications prescribed by the Board and such other regulations that may be adopted by the Board.

2.     J. F. Ingram State Technical College is a two-year Alabama technical college located in Deatsville, Alabama that was established exclusively to provide occupations training to inmates, male and female, at the adult state correctional institutions in Montgomery and Elmore Counties.  All of its students are adult inmates who have been convicted of one or more felonies and who are assigned by the Alabama Department of Corrections to be students at Ingram.  In addition to occupations training at the associate degree level, and the certificate level, Ingram provides remedial education and special education services.  It is the only college in Alabama whose student body is composed exclusively of student inmates.  The State Board of Education serves as the Board of Control for Ingram, and the other community and technical colleges in the Alabama college system.  The Chancellor of the Alabama Department of Post Secondary Education serves as the Chief Executive Officer for the system.  All statewide policies that apply to Ingram are adopted by the State Board at the recommendation of the Chancellor.  Once the state wide policies are adopted, the Chancellor is charged with the responsibility of interpreting and enforcing those policies.

3.     The State Board of Education has adopted a Salary Schedule policy for application at community and technical colleges in Alabama.  These Salary Schedules are designated as "A," "B," "C," "D," "E," and "H."  The A Salary Schedule is for college Presidents, the B Salary Schedule is for Deans and Dean-level administrator, the C Salary Schedule is designated for "Professional Personnel," D is for college instructors, and H is for part-time support employees and the E Salary Schedule is designated for "Full-time Support Personnel 40 Hours Per Week."  The Salary Schedules which are at issue here are the "C" Salary Schedules, which are comprised of C-1, C-2, and C-3; and the E

Salary Schedule, which is divided into ranges 1 – 5, with 1 being the highest. Step placement is based on years of employment already completed (during prior years) with the respective college, and is based on an employee's having already completed at least 9 months of employment during a given academic year. The Salary Schedule designations indicate the Salary Schedule ("E"), the range (i.e."7"), the Step placement, and, in parentheses, the years of credit toward Step placement. Prior to 2000, the E Salary Schedule had seven ranges. In 2000, the number of steps was reduced to five, but within each range were added grades 01-03, with Grade 01 being the highest. In addition to providing such Schedules, the State Board has adopted guidelines and procedures for assigning personnel to the various Salary Schedules.

4.      Ms. Owensby is a black female that has been employed at J.F. Ingram State Technical College ("Ingram") continuously since February 13, 1985, except for one brief instance in which she resigned for personal reasons and was allowed to return.

5.      The record shows that in Owensby's case, she has been promoted by, and received pay raises from, the President of Ingram on at least two occasions. She also received three other pay increases from the President of Ingram in addition to the two promotional increases and all the normal increases in pay that she would have otherwise received based on years of service.

6.      The first position Owensby held was Office Clerk, and her salary for that appointment was $10,272. This position is in Range 7, Step 0 on the E Salary Schedule. The initial hiring of Owensby was done through an advertised vacancy announcement. Ingram's employment records indicate that every employment appointment for Owensby since that date have been made without her having to compete against any other applicant

or interested party.  These promotions, since May 1, 1996, have all been internal

adjustments and promotions made at the discretion of the President of the College.

    7.    Owensby's history of job appointments is as follows:

### EMPLOYMENT HIRING CHART

| POSITION | EFFECTIVE DATE | SALARY PLACEMENT |
| --- | --- | --- |
| Office Clerk | 2/13/85 | E-7, O(0), $10,272 |
| Office Clerk | 9/1/85 | E-7, 1(1), $11,256 |
| Office Clerk | 9/1/86 | E-7, 2(2), $11,718 |
| Secretary to the Dean of Students and Student Services | 7/20/87 | E-6, 2(2), $13,104 |
| Secretary to the Dean of Students and Student Services | 9/1/87 | E-6, 3(3), $13,566 |
| Secretary to the Dean of Students and Student Services | 9/1/88 | E-6, 4(4), $15,101 |
| Secretary to the Dean of Students and Student Services | 9/1/89 | E-5, 5(5), $18,077 |
| Secretary to the Dean of Students and Student Services | 9/1/90 | E-5, 6(6), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/91 | E-5, 6(7), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/92 | E-5, 8(8), $20,600 |

| | | |
|---|---|---|
| Secretary to the Dean of Students and Student Services | 9/1/93 | E-5, 8(9), $21,941 |
| Secretary to the Dean of Students and Student Services | 9/1/94 | E-3, 10(10), $30,633 |
| Secretary to the Dean of Students and Student Services | 9/1/95 | E-3, 10(11), $30,633 |
| Secretary to the Dean of Students and Student Services | 9/1/96 | E-3, 10(12), $31,860 |
| Secretary to the Dean of Students and Student Services | 9/1/97 | E-3, 10(13), $31,860 |
| Secretary | 9/1/98 | E-3, 15(16), $35,970 |
| Secretary | 9/1/99 | E-3, 15(17), $35,970 |
| Secretary | 9/1/00 | E-3-03, 15(18), $37,409 |
| Coordinator of Registration And Admissions | 11/1/00 | E-2-02, 15(18), $41,047 |
| Coordinator of Registration And Admissions | 9/1/01 | E-2-02, 15(19), $41,047 |
| Coordinator of Registration And Admissions | 9/1/02 | E-1-01, 20(20), $47,527 |
| Registrar and Assistant to Dean of Students and Support Services | 9/1/03 | E-1-01, 20(21), $47,527 |
| Registrar and Assistant to Dean of Students and Support Services | 9/1/04 | E-1-01, 20(22), $47,527 |
| Registrar | 9/1/05 | E-1-01, 20(23), $50,379 |
| Director of Registration | | |

and Admissions          8/31/06                    C-3, $60,000

8.      In accordance with the applicable Salary Schedules, Owensby has been

provided raises after 1, 2, 3, 4, 5, 6, 8, 10,15, 20 and 21 completed years of employment.

Owensby has, at times, been given credit for more years than she had, or has.  After only

seven months of employment, Owensby was moved from Step 0 to Step 1.  That meant

that for academic years 1985-86 through 1990-91, and in academic years 1992-93, and

1993-94, she was paid at one Step higher than she should have been.  When Owensby

was redesignated as a "Secretary" effective September 1, 1998, she was placed at Step 15

and given credit for sixteen years of service, even though she had actually completed

only 13 years of service.  As a result, during academic years 1998-99 and 1999-2000,

Owensby was paid at Step 15, when she should have been on Step 10; and during

academic years 2002-03 and 2003-04, Owensby was paid at Step 20 when she should

have been paid at Step 15.  Those extra Step increases demonstrate, once more, that over

the course of Owensby's employment, the college has been more than generous with

setting her salary levels.  Since Chambers became President of the College, Owensby's

pay has gone from $31,800.00 per year to $60,000.00 per year – nearly double.

9.      Owensby has, at times, had her various positions upgraded without having

to compete with any other applicants.  She received pay upgrades from E-7 to E-6 when

she was appointed to be Secretary to the Dean of Students and Student Affairs, and she

received upgrades from E-6 to E-3 while holding that position.  In addition, when she

was designated to be the Coordinator of Registration and Admissions (again without

having to compete for the position), her salary was upgraded from E-3 to E-2.  The re-

designation of Owensby's position to "Coordinator" was the result of an agreement

between Owensby and myself that included a provision that the redesignation was "a temporary assignment subject to modifications at the end of the fiscal year. . ." and that "[i]n the event that it is necessary, I may revert to my previous job title, duties, and salary placement." The position did not turn out to be temporary; and the title of that position was later changed to "Registrar/Assistant to Dean of Students and Student Services," without any significant change in duties. The position was initially temporary because Owensby had only secretarial experience. She was assuming some duties that were held by Robinson who had a Master's Degree and several years experience as an instructor. The temporary nature of the appointment had nothing to do with her gender or race.

10.     On or about October 12, 2004, Owensby filed a Grievance under Ingram's institutional grievance procedures. In accordance with college procedures, Owensby's Grievance was investigated by the College's Grievance Coordinator, who in that case was Dr. James Merk, Personnel Director. Dr. Merk thoroughly investigated Owensby's contentions and filed his Findings and Conclusions on October 25, 2004. Dr. Merk conducted an extensive review of her claims and found that her salary ranked her *above the average* when compared to other Alabama college system registrars. Thus, Dr. Merk determined that there was no evidence to support her claims that her salary does not commensurate with the average base salary.

11.     The C-3 Salary Schedule provides that the salary for any employee on that schedule is negotiable each year, up or down, so long as the salary does not exceed the maximum C-3 salary designated for the respective academic year. Note 4 of the Notes on the C Salary Schedule states that "Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination." An Ingram employee

can be placed on the C-3 Salary Schedule at a salary lower than what Owensby was receiving on the E Salary Schedule, with no guarantee of any increase (or even the same salary) for subsequent years.  The President determines the salary level and whether to move an employee to the C Schedule at his sole discretion.  Although recommendations are made by the employee's supervisor, the President may or may not follow those recommendations.

12.    Owensby's predecessor as Registrar, Mr. Timothy Robinson, a black male, was selected in 1989 after a competitive search, because the position of Registrar had been considered by the previous President of Ingram, Dr. Murray Gregg (a white male) to be a "professional" position at the Masters Degree level.  A five-person search committee established pursuant to the Shuford Partial Consent Decree selected Mr. Robinson as a finalist for the position.  Mr. Robinson had a Masters Degree and a teaching certificate.  He had also been a full-time instructor at Ingram for five years prior to his appointment as Registrar.  At the time of Mr. Robinson's appointment, President Gregg was in the process of seeking certification for Ingram to become a community college that would serve "free-world" students as well as student-inmates.  After I was appointed, the Chancellor determined that the best and most cost-effective use of Ingram would be for it to remain a technical college serving only student-inmates.

13.    If Ingram had transitioned into a traditional community college, the position of registrar would have been more demanding and required a higher level of education and experience.  A traditional community college would have a more diverse student population with a more diverse curriculum.  A traditional community college Registrar would also have to oversee student transfers from other schools.

14.    In terms of compensation, Mr. Robinson's beginning salary as Registrar was $32,970 annually, which was only $393 a year more than he would have made that year had he continued as a full-time instructor. While a full-time instructor, Mr. Robinson also served as Ingram's Coordinator of Displaced Homemakers (1988-89), Coordinator of Special Services (1984-86), and he developed the G.E.D. Testing Program at Ingram. While serving as Registrar, Mr. Robinson also served on the Ingram Budget Planning Review Committee, the Ingram Administrative Council, and as Chairman of the Ingram Sick Leave Bank Committee.

15.    Even prior to Mr. Robinson's resignation from the Registrar position, I expressed dissatisfaction with the level of contributions made by the Registrar's position to the operations of the college. When Mr. Robinson vacated the position, I determined that the position no longer needed to be a full-time professional position, because the duties could be handled within the Office of Dean of Students using existing employees. That decision was made on the basis of what was best for the institution, and had nothing to do with anyone's race or sex.

16.    The implementation of the ACCESS software in 1998 reduced the administrative workload in the Student Services department and impacted my decisions with regard to the re-allocation of the Registrar duties after the retirement of Tim Robinson. The ACCESS system automated many functions formerly performed "by hand" by the Registrar.

17.    As a result of the Office of Dean of Students having absorbed the Registrar duties, most of which were in essence divided between Owensby, Wilson (a black male), and Ms. Toxey (a black female). I promoted Owensby to the position of

Coordinator of Registration and Admissions. Owensby's salary position was raised from E-3 to E-2, effective November 11, 2000 (which included a $4,000 a year annual raise), and then from E-2 to E-1 effective September 1, 2002. Those promotions were made without a competitive search or anyone else being considered for the position. Effective September 1, 2003, Owensby's title was changed to Registrar/Assistant to the Dean of Students and Student Services. Her duties remained essentially the same, and her work hours were not changed. In terms of duty hours, Owensby's present duties require forty hours per week, which is the same schedule that she was working when she was a clerk, then a secretary, and then Coordinator of Registration and Admissions.

18.     After Owensby filed an unsuccessful internal Grievance alleging race and sex discrimination, I had the Dean of Students review her position to determine whether it could, and should, be restructured into a professional position that could be placed on the C Salary Schedule with the Chancellor's approval.

19.     Owensby's alleged comparators (Gene Bridgman, Julie Givens and Bill Griswold) did not and have never had the same job responsibilities as Owensby.

20.     Bridgman and Givens worked in the Department of Fiscal Affairs. Bridgman was a senior accountant with more than fifteen years experience, and Givens assisted in all accounting and financial management functions of the fiscal department. The staff in the Fiscal Department performs accounting, payroll, requisition, purchase order, and other common fiscal functions. Owensby does not perform and has never performed these functions. Owensby's duties relate to student registration and class scheduling.

21.    Owensby has never had any discussion, or requested to have any
discussion with me regarding conduct perceived by her as discrimination against her on
the basis of her race or sex.

22.    I have never intentionally discriminated against Owensby because of her
race or her gender regarding her pay or any other aspect of her employment.

_J. Douglas Chambers_
J. Douglas Chambers

STATE OF ALABAMA          )
                          )
COUNTY OF _Montgomery_    )

    I, the undersigned, authority, a notary public in and for said county and state, hereby certify that J. Douglas Chambers, whose name as President of J. F. Ingram State Technical College is signed to the foregoing and who is known to me, acknowledged before me on this day that the foregoing is true and correct to the best of his knowledge, information and belief and that he has executed the same as such officer and with full authority for and as the act of said corporation.

    Given under my hand and seal this _19th_ day of August, 2007.

_Erin E. Gross_
Notary Public
My Commission Expires _10|23|10_

# Alabama Community and Technical Colleges

## Schedule C
## Professional Personnel
## 2006-2007

Action Item
05/25/2006
Page 3 of 11

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 67,622 | 69,254 | 70,886 | 72,518 | 74,150 | 75,782 | 77,414 | 79,046 | 80,678 | 85,574 | 90,470 | 95,366 | 96,998 |
| 2 | 59,281 | 60,913 | 62,545 | 64,177 | 65,809 | 67,441 | 69,073 | 70,705 | 72,337 | 77,233 | 82,129 | 87,025 | 88,657 |

3   Maximum Salary    75,386

**Notes:**
1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.
2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.
3. If a person holds an earned doctorate, add $2,000 to salary.
4. Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination.

Printed at 05/18/2006 9:47 AM

AUG-21-2007(TUE) 14:03    ISTC - Office of the President    (FAX)334 285 2521    P.014/015

Case 2:06-cv-00796-WKW-CSC    Document 25-4    Filed 08/30/2007    Page 2 of 6

## Alabama Community and Technical Colleges

### Schedule C
### Professional Personnel
### For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 3 of 11

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 64,402 | 65,956 | 67,510 | 69,064 | 70,618 | 72,172 | 73,726 | 75,280 | 76,834 | 81,496 | 86,158 | 90,820 |
| 2 | 56,458 | 58,012 | 59,566 | 61,120 | 62,674 | 64,228 | 65,782 | 67,336 | 68,890 | 73,552 | 78,214 | 82,876 |

3   Maximum Salary   71,796

Notes:
1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.
2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.
3. If a person holds an earned doctorate, add $1,000 to salary.
4. Placement on Schedule C-3 presures negotiation between the individual and the president for salary determination.
5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

AUG-21-2007  14:24          334 285 2521          97%          P.14

Alabama Community and Technical Colleges

## Schedule C
## Professional Personnel
## For Fiscal Year 2004-2005

Action Item
5/27/2004
Page 3 of 11

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 60,757 | 62,223 | 63,689 | 65,155 | 66,621 | 68,087 | 69,553 | 71,019 | 72,485 | 76,883 | 81,281 |
| 2 | 53,262 | 54,728 | 56,194 | 57,660 | 59,126 | 60,592 | 62,058 | 63,524 | 64,990 | 69,388 | 73,786 |

3   Maximum Salary $63,734

Notes:

1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.

2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at this institution.

3. If a person holds an earned doctorate, add $1,000 to salary.

4. Placement on Schedule C is pursuant to negotiation between the individual and the president for salary determination.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2004-2005 year only and may not be awarded in subsequent years.

Action Item _____
05/23/2002
Page 3 of 11

**Alabama Community, Junior, and Technical Colleges**

## Schedule C
### Professional Personnel
### For Fiscal Year 2002-2003

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 60,757 | 62,223 | 63,689 | 65,155 | 66,621 | 68,087 | 69,553 | 71,019 | 72,485 | 76,883 | 81,281 |
| 2 | 53,262 | 54,728 | 56,194 | 57,660 | 59,126 | 60,592 | 62,058 | 63,524 | 64,990 | 69,388 | 73,786 |

3   Maximum Salary: $63,334

**note:**

Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.

Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.

If a person holds an earned doctorate, add $1,000 to salary.

Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination.

Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2002-2003 year only and may not be awarded in subsequent an.

Action Item
06/28/2001
Page 3 of 11

## Alabama Community, Junior, and Technical Colleges
### Schedule C
### Professional Personnel
### For Fiscal Year 2001-2002

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 58,987 | 60,410 | 61,833 | 63,256 | 64,679 | 66,102 | 67,525 | 68,948 | 70,371 | 74,640 | 78,909 |
| 2 | 51,711 | 53,134 | 54,557 | 55,980 | 57,401 | 58,826 | 60,249 | 61,672 | 63,095 | 67,364 | 71,633 |

3    Maximum Salary: $61,489

Notes:

1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.
2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.
3. If a person holds an earned doctorate, add $1,000 to salary.
4. Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination.
5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2001-2002 year only and may not be awarded in subsequent years.

**Alabama Community, Junior and Technical Colleges**

Action Item
05/25/2000
Page 3 of 11

## Schedule C
### Professional Personnel
#### For Fiscal Year 2000-2001

| Salary Step | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 58,987 | 60,410 | 61,833 | 63,256 | 64,679 | 66,102 | 67,525 | 68,948 | 70,371 | 74,640 | 78,909 |
| 2 | 51,711 | 53,134 | 54,557 | 55,980 | 57,403 | 58,826 | 60,249 | 61,672 | 63,095 | 67,364 | 71,633 |

3  Maximum Salary: $61,489

Notes:

1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.

2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.

3. If a person holds an earned doctorate, add $1,000 to salary.

4. Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2000-2001 year only and may not be awarded in subsequent years.

# Alabama Community and Technical Colleges

## Schedule E1 to E5
## Full-Time Support Personnel 40 Hours Per Week
## 2006-2007

Action Item
05/25/2006
Page 7 of 11

| Salary Schedule | Grade | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 42,881 | 43,716 | 44,551 | 45,386 | 46,221 | 47,056 | 47,891 | 48,726 | 49,561 | 51,231 | 52,901 | 54,571 | 55,406 |
| E1 | 02 | 38,710 | 39,545 | 40,380 | 41,215 | 42,050 | 42,885 | 43,720 | 44,555 | 45,390 | 47,060 | 48,730 | 50,400 | 51,235 |
| E2 | 02 | 38,710 | 39,545 | 40,380 | 41,215 | 42,050 | 42,885 | 43,720 | 44,555 | 45,390 | 47,060 | 48,730 | 50,400 | 51,235 |
| E2 | 03 | 34,540 | 35,375 | 36,210 | 37,045 | 37,880 | 38,715 | 39,550 | 40,385 | 41,220 | 42,890 | 44,560 | 46,230 | 47,065 |
| E3 | 03 | 34,540 | 35,375 | 36,210 | 37,045 | 37,880 | 38,715 | 39,550 | 40,385 | 41,220 | 42,890 | 44,560 | 46,230 | 47,065 |
| E3 | 04 | 30,368 | 31,203 | 32,038 | 32,873 | 33,708 | 34,543 | 35,378 | 36,213 | 37,048 | 38,718 | 40,388 | 42,058 | 42,893 |
| E3 | 05 | 26,198 | 27,033 | 27,868 | 28,703 | 29,538 | 30,373 | 31,208 | 32,043 | 32,878 | 34,548 | 36,218 | 37,888 | 38,723 |
| E4 | 05 | 26,198 | 27,033 | 27,868 | 28,703 | 29,538 | 30,373 | 31,208 | 32,043 | 32,878 | 34,548 | 36,218 | 37,888 | 38,723 |
| E4 | 06 | 22,026 | 22,861 | 23,696 | 24,531 | 25,366 | 26,201 | 27,036 | 27,871 | 28,706 | 30,376 | 32,046 | 33,716 | 34,551 |
| E5 | 06 | 22,026 | 22,861 | 23,696 | 24,531 | 25,366 | 26,201 | 27,036 | 27,871 | 28,706 | 30,376 | 32,046 | 33,716 | 34,551 |
| E5 | 07 | 21,194 | 22,029 | 22,864 | 23,699 | 24,534 | 25,369 | 26,204 | 27,039 | 27,874 | 29,544 | 31,214 | 32,884 | 33,719 |

**Notes:**

1.  Grade placement of positions on the above salary schedule shall be based on the DPE Uniform Job Title (Personnel File) Handbook.
2.  Initial step placement of an employee on the appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a level is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.

Printed at 05/18/2006 9:47 AM

## Alabama Community and Technical Colleges

### Schedule E1 to E5
### Full-Time Support Personnel 40 Hours Per Week
### For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 7 of 11

| Salary Schedule | Grade | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 40,839 | 41,634 | 42,429 | 43,224 | 44,019 | 44,814 | 45,609 | 46,404 | 47,199 | 48,789 | 50,379 | 51,969 |
| E1 | 02 | 36,867 | 37,662 | 38,457 | 39,252 | 40,047 | 40,842 | 41,637 | 42,432 | 43,227 | 44,817 | 46,407 | 47,997 |
| E2 | 02 | 36,867 | 37,662 | 38,457 | 39,252 | 40,047 | 40,842 | 41,637 | 42,432 | 43,227 | 44,817 | 46,407 | 47,997 |
| E2 | 03 | 32,895 | 33,690 | 34,485 | 35,280 | 36,075 | 36,870 | 37,665 | 38,460 | 39,255 | 40,845 | 42,435 | 44,025 |
| E3 | 03 | 32,895 | 33,690 | 34,485 | 35,280 | 36,075 | 36,870 | 37,665 | 38,460 | 39,255 | 40,845 | 42,435 | 44,025 |
| E3 | 04 | 28,922 | 29,717 | 30,512 | 31,307 | 32,102 | 32,897 | 33,692 | 34,487 | 35,282 | 36,872 | 38,462 | 40,052 |
| E3 | 05 | 24,950 | 25,745 | 26,540 | 27,335 | 28,130 | 28,925 | 29,720 | 30,515 | 31,310 | 32,900 | 34,490 | 36,080 |
| E4 | 05 | 24,950 | 25,745 | 26,540 | 27,335 | 28,130 | 28,925 | 29,720 | 30,515 | 31,310 | 32,900 | 34,490 | 36,080 |
| E4 | 06 | 20,977 | 21,772 | 22,567 | 23,362 | 24,157 | 24,952 | 25,747 | 26,542 | 27,337 | 28,927 | 30,517 | 32,107 |
| E5 | 06 | 20,977 | 21,772 | 22,567 | 23,362 | 24,157 | 24,952 | 25,747 | 26,542 | 27,337 | 28,927 | 30,517 | 32,107 |
| E5 | 07 | 20,185 | 20,980 | 21,775 | 22,570 | 23,365 | 24,160 | 24,955 | 25,750 | 26,545 | 28,135 | 29,725 | 31,315 |

Notes:
1. Grade placement of positions on the above salary schedule shall be based on the DPE Uniform Job Title (Personnel File) Handbook.
2. Initial step placement of an employee on the appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a level is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.
3. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

Action Item
5/27/2004
Page 7 of 11

## Alabama Community and Technical Colleges
### Schedules E1 to E5
### Full-Time Support Personnel 40 Hours Per Week
### For Fiscal Year 2004-2005

| Salary Schedule | Grade | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 38,527 | 39,277 | 40,027 | 40,777 | 41,527 | 42,277 | 43,027 | 43,777 | 44,527 | 46,027 | 47,527 |
| E1 | 02 | 34,780 | 35,530 | 36,280 | 37,030 | 37,780 | 38,530 | 39,280 | 40,030 | 40,780 | 42,280 | 43,780 |
| E2 | 02 | 34,780 | 35,530 | 36,280 | 37,030 | 37,780 | 38,530 | 39,280 | 40,030 | 40,780 | 42,280 | 41,780 |
| E2 | 03 | 31,033 | 31,783 | 32,533 | 33,283 | 34,033 | 34,783 | 35,533 | 36,283 | 37,033 | 38,533 | 40,033 |
| E3 | 03 | 37,033 | 31,783 | 32,533 | 33,283 | 34,033 | 34,783 | 35,533 | 36,283 | 37,033 | 38,533 | 40,033 |
| E3 | 04 | 27,285 | 28,035 | 28,785 | 29,535 | 30,285 | 31,035 | 31,785 | 32,535 | 33,285 | 34,785 | 36,285 |
| E3 | 05 | 23,538 | 24,288 | 25,038 | 25,788 | 26,538 | 27,288 | 28,038 | 28,786 | 29,538 | 31,038 | 32,538 |
| E4 | 05 | 23,538 | 24,288 | 25,038 | 25,788 | 26,538 | 27,288 | 28,038 | 28,788 | 29,538 | 31,038 | 32,538 |
| E4 | 06 | 19,790 | 20,540 | 21,290 | 22,040 | 22,790 | 23,540 | 24,290 | 25,040 | 25,790 | 27,290 | 28,790 |
| E5 | 05 | 19,790 | 20,540 | 21,290 | 22,040 | 22,790 | 23,540 | 24,290 | 25,040 | 25,790 | 27,290 | 28,790 |
| E5 | 07 | 19,042 | 19,792 | 20,542 | 21,292 | 22,042 | 22,792 | 23,542 | 24,292 | 25,042 | 26,542 | 28,042 |

Notes:

1. Grade placement of position on the above salary schedule shall be based on the DPA Uniform Job Title (Personnel File) Handbook.

2. Initial step placement of an employee on the appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a level is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.

3. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2004-2005 year only and may not be awarded in subsequent years.

Action Item
05/23/2002
Page 6 of 11

## Alabama Community, Junior, and Technical Colleges
### Schedules E1 to E5
### Full-Time Support Personnel 40 Hours Per Week
### For Fiscal Year 2002-2003

| Salary Schedule | Grade | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 38,527 | 39,277 | 40,027 | 40,777 | 41,527 | 42,277 | 43,027 | 43,777 | 44,527 | 46,027 | 47,527 |
| E1 | 02 | 34,780 | 35,530 | 36,280 | 37,030 | 37,780 | 38,530 | 39,280 | 40,030 | 40,780 | 42,280 | 43,780 |
| E2 | 02 | 34,780 | 35,530 | 36,280 | 37,030 | 37,780 | 38,530 | 39,280 | 40,030 | 40,780 | 42,280 | 43,780 |
| E2 | 03 | 31,033 | 31,783 | 32,533 | 33,283 | 34,033 | 34,783 | 35,533 | 36,283 | 37,033 | 38,533 | 40,033 |
| E3 | 03 | 31,033 | 31,783 | 32,533 | 33,283 | 34,033 | 34,783 | 35,533 | 36,283 | 37,033 | 38,533 | 40,033 |
| E3 | 04 | 27,285 | 28,035 | 28,785 | 29,535 | 30,285 | 31,035 | 31,785 | 32,535 | 33,285 | 34,785 | 36,285 |
| E4 | 05 | 23,538 | 24,288 | 25,038 | 25,788 | 26,538 | 27,288 | 28,038 | 28,788 | 29,538 | 31,038 | 32,538 |
| E4 | 06 | 19,790 | 20,540 | 21,290 | 22,040 | 22,790 | 23,540 | 24,290 | 25,040 | 25,790 | 27,290 | 28,790 |
| E5 | 06 | 19,790 | 20,540 | 21,290 | 22,040 | 22,790 | 23,540 | 24,290 | 25,040 | 25,790 | 27,290 | 28,790 |
| E5 | 07 | 19,042 | 19,792 | 20,542 | 21,292 | 22,042 | 22,792 | 23,542 | 24,292 | 25,042 | 26,542 | 28,042 |

##

Grade placement of positions on the above salary schedule shall be based on the DPE Uniform Job Title (Personnel File) Handbook.

Initial step placement of an employee on the appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a schedule is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.

Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2002-2003 year only and may not be awarded in subsequent

### Alabama Community, Junior and Technical Colleges
### Schedules E1 through E5
### Full-Time Support Personnel 40 Hours Per Week
### For Fiscal Year 2000-2001

| Salary Schedule | Grade | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 37,405 | 38,133 | 38,861 | 39,589 | 40,317 | 41,045 | 41,773 | 42,501 | 43,229 | 44,685 | 46,141 |
| E1 | 02 | 33,767 | 34,495 | 35,223 | 35,951 | 36,679 | 37,407 | 38,135 | 38,863 | 39,591 | 41,047 | 42,503 |
| E2 | 02 | 33,767 | 34,495 | 35,223 | 35,951 | 36,679 | 37,407 | 38,135 | 38,863 | 39,591 | 41,047 | 42,503 |
| E2 | 03 | 30,129 | 30,857 | 31,585 | 32,313 | 33,041 | 33,769 | 34,497 | 35,225 | 35,953 | 37,409 | 38,865 |
| E3 | 03 | 30,129 | 30,857 | 31,585 | 32,313 | 33,041 | 33,769 | 34,497 | 35,225 | 35,953 | 37,409 | 38,865 |
| E3 | 04 | 26,490 | 27,218 | 27,946 | 28,674 | 29,402 | 30,130 | 30,858 | 31,586 | 32,314 | 33,770 | 35,226 |
| E3 | 05 | 22,852 | 23,580 | 24,308 | 25,036 | 25,764 | 26,492 | 27,220 | 27,948 | 28,676 | 30,132 | 31,588 |
| E4 | 05 | 22,852 | 23,580 | 24,308 | 25,036 | 25,764 | 26,492 | 27,220 | 27,948 | 28,676 | 30,132 | 31,588 |
| E4 | 06 | 19,214 | 19,942 | 20,670 | 21,398 | 22,126 | 22,854 | 23,582 | 24,310 | 25,038 | 26,494 | 27,950 |
| E5 | 06 | 19,214 | 19,942 | 20,670 | 21,398 | 22,126 | 22,854 | 23,582 | 24,310 | 25,038 | 26,494 | 27,950 |
| E5 | 07 | 18,487 | 19,215 | 19,943 | 20,671 | 21,399 | 22,127 | 22,855 | 23,583 | 24,311 | 25,767 | 27,223 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on the DPE Uniform Job Title (Personnel File) Handbook.

2. Initial step placement of an employee on the appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a level is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.

3. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2000-2001 year only and may not be awarded in subsequent years.

UNIFORM GUIDELINES FOR ADVANCEMENT

SALARY SCHEDULE E

Advancement within a level for a position on Salary Schedule E shall be based on several components, as listed below.

A.   Individuals seeking advancement within a level on Salary Schedule E **must** have the following:

  1.   Written request to the President from the individual desiring advancement; and

  2.   Written recommendation(s) from appropriate administrator(s), with appropriate documentation; and

  3.   Job performance, as demonstrated by a series of performance evaluations, with the individual scoring "above average" or "exceeding expectations" on the last two annual job performance evaluations, with no major weaknesses, liabilities, or problems noted; and

  4.   Incumbency in the position at the current salary grade for at least three years, absent unusual and extenuating circumstances documented by the appropriate administrator(s); and

  5.   Adherence to a written Professional Development Plan, which must include the following: (a) Addition to the position of higher order compensable factors, including but not limited to addition to the position of increased supervisory responsibility; (b) Attainment of appropriate education and/or professional development which is job related and which increases the individual's knowledge or skills germane to the position, resulting in the individual becoming more valuable in helping the organization to meet stated goals or objectives; and (c) Attainment of increased technical competence through certification, licensing, or training which is job related and which expands the ability of the individual to perform critical job functions.

B.   In addition to the above requirements, for individuals seeking advancement within a level on Salary Schedule E, the President may also consider the following factors:

  1.   Market conditions in the area served by the institution;

  2.   Existence of unique circumstances or situations at individual institutions, justifying advancement, including demonstration of ingenuity, creativity, etc.

## SALARY SCHEDULE GUIDELINES
## THE ALABAMA COLLEGE SYSTEM
### 2005-2006

1. The attached Salary Schedules are effective September 1, 2005, for employees on Salary Schedules A, B, C, D-3, E, and H, and are effective for Salary Schedule D-1 and D-2 employees on the first faculty duty day of the Fall Semester as indicated on each College's 2005-2006 academic calendar.

2. The attached Salary Schedules are designed to include all personnel except "temporary" support employees, hourly employees working less than twenty (20) hours per week, and part-time instructors.

3. Appropriate job descriptions shall be developed and maintained for all personnel.

4. Full-time professional personnel, other than instructors, will not be paid additional monies for extra work. Under extreme circumstances, the Chancellor may approve an exception to this policy.

5. All community and technical college and Adult Education employees shall be given full credit for prior work experience in the public schools, colleges, and adult education programs of Alabama. Placement on the Salary Schedules shall be in accordance with the employee's length of service in public education. After initial step placement, if an employee moves from one salary schedule to another, the employee retains the same step placement for the new salary schedule.

6. Permanent support employees who work from twenty (20) to forty (40) hours per week but less than fifty-two weeks per year shall be paid amounts which equate on a *pro rata* basis to appropriate salaries contained in Salary Schedules E and H.

7. For the purposes of the attached Salary Schedules, a "year completed" shall equate to at least nine months of full-time employment during the respective Salary Schedule/ Academic Year (beginning either with the Fall Semester or September 1). Full-time college employees on leaves of absence for more than three months during the Salary Schedule/Academic Year are not eligible for step increases.

8. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these Salary Schedules are awarded for the 2005-2006 year only and may not necessarily be awarded in subsequent years.

9. Instructors, counselors, and librarians employed on Salary Schedules D-1 or D-2 on full-time contracts shall work the minimum number of days required by Board policies. Duty days and work hours for counselors and librarians shall be determined by the President of each institution, based upon the needs of the institution.





*Ingram State Technical College*

:ISTC:

* Developing Responsible Citizens *

# INGRAM STATE TECHNICAL COLLEGE

August 31, 2006

**MEMORANDUM**

**TO:**           Bonita Owensby

**FROM:**      J. Douglas Chambers, President

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month
Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as **Director of Registration and Admissions**, beginning effective September 1, 2006, for the period ending August 31, 2007.  Pay will be determined from **Salary Schedule C3**.  Annual salary for this (12) month appointment is **$60,000.00**. MJ@ ꝗᵐ

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature  *Bonita J. Owensby*   Date  *09/06/2006*

cc:           Personnel file
              Dean of Fiscal Affairs

*J. Douglas Chambers, President*
*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177   Fax: 334-285-2521*



*Ingram*
*State*
*Technical*
*College*

**ISTC**

• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 23, 2005

## MEMORANDUM

**TO:**         Bonita Owensby

**FROM:**      J. Douglas Chambers, President

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as **Registrar**, beginning effective September 1, 2005 and ending August 31, 2006. Pay will be determined from **Salary Schedule <u>E1</u>, Grade <u>1</u> Step <u>20 (23)</u>**. Salary for this appointment will be based on the annual rate of **<u>$50,379.00</u>**.  MJG 7VW

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature _Bonita J. Owensby_          Date _09/20/2005_

cc:       Personnel file
          Dean of Fiscal Affairs



**Ingram State Technical College**

• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 23, 2004

## MEMORANDUM

**TO:**      **Bonita J. Owensby**

**FROM:**      J. Douglas Chambers, President

*J. Douglas Chambers*

**SUBJECT:**      Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as Registrar/Assistant to the Dean of Students & Support Services, beginning effective September 1, 2004, for the period ending August 31, 2005. Pay will be determined from Salary Schedule E1 at Grade 1, Step 20 (22). Annual salary for this twelve (12) month appointment is $47,527.00. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

I understand that my employment with J.F. Ingram State Technical College is contingent upon the College receiving sufficient funds. I understand and agree that the failure of the College to receive adequate amounts of such funds is just cause for the termination of my employment or for a reduction in my salary and/or weekly work hours.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*    Date 09/03/2004

cc:      Personnel file
      Dean of Fiscal Affairs

*P.O. Box 220350 • Deatsville, Alabama 36022*

*Phone: 334-285-5177 • Fax: 334-285-2521*



Ingram
State
Technical
College

**ISTC**
• Developing Responsible Citizens •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 25, 2003

## MEMORANDUM

**TO:**      **Bonita J. Owensby**

**FROM:**      J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate…."

The purpose of this memo is to confirm your appointment as Registrar/Assistant to the Dean of Students and Support Services, beginning effective September 1, 2003, for the period ending August 31, 2004. Pay will be determined from Salary Schedule E1 at Grade 1, Step 20 (21). Annual salary for this twelve (12) month appointment is $47,527.00.

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*      Date 08/25/03

cc:      Personnel file
        Dean of Fiscal Affairs

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-2521*



**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
August 28, 2002

**MEMORANDUM**

**TO:**          **Bonita J. Owensby**

**FROM:**       J. Douglas Chambers

                *J. Douglas Chambers*

**SUBJECT:**    Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate…."

The purpose of this memo is to confirm your appointment as <u>Coordinator of Registration and Admission</u>, beginning effective September 1, 2002, for the period ending August 31, 2003. Pay will be determined from <u>Salary Schedule E 1 at Grade 01, Step 20 (20)</u>. Annual salary for this twelve (12) month appointment is <u>$47,527.00</u>. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*    Date 09/11/2002

cc:       Personnel file



**INGRAM STATE TECHNICAL COLLEGE**

August 17, 2001

Ingram
State
Technical
College
• Developing Responsible Citizens •

J. Douglas Chambers
President

Rickey A. Huffstutler, Ph.D
Dean of the College

Monica J. Greene
Dean of
Fiscal Affairs

James E. Wilson
Dean of Students
and Support Services

**MEMORANDUM**

**TO:**       **Bonita J. Owensby**

**FROM:**     J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**  Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as <u>Coordinator of Registration and Admission</u>, beginning effective September 1, 2001, for the period ending August 31, 2002. Pay will be determined from <u>Salary Schedule E2 at Grade 02, Step 15 (19)</u>. Annual salary for this twelve (12) month appointment is <u>$41,047.00</u>. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*  Date *10/04/2001*

cc:       Personnel file

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



*Ingram*
*State*
*Technical*
*College*

**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

October 13, 2000

## MEMORANDUM

**TO:**         Bonita J. Owensby

**FROM:**      J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**    Temporary Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your temporary appointment as Coordinator of Registration and Admission, beginning effective November 1, 2000, for the period ending August 31, 2001. Pay will be determined from Salary Schedule E2 at Grade 02, Step 15 (18). Annual salary for twelve (12) month appointments at this level is $41,047. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*    Date *11/29/00*

cc:         Personnel file

P.O. Box 220350  •  Deatsville, Alabama 36022
Phone: 334-285-5177  •  Fax: 334-285-5328



Ingram
State
Technical
College
**ISTC**
• Developing Responsible Citizens •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
July 28, 2000

## MEMORANDUM

**TO:**          Bonita J. Lewis

**FROM:**       J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**    Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate…."

The purpose of this memo is to confirm your appointment as Secretary, beginning effective September 1, 2000, for the period ending August 31, 2001. Pay will be determined from Salary Schedule E3 at Grade 03, Step 18. Annual salary for this twelve (12) month appointment is $37,409. *MJG*

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Lewis*          Date *8/16/00*

cc:          Personnel file



*Ingram*
*State*
*Technical*
*College*

**ISTC**

* Developing Responsible Citizens *

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
## MEMORANDUM

**TO:**           **Bonita J. Lewis**

**FROM:**      J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**    Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as Secretary, beginning effective September 1, 1999, for the period ending August 31, 2000. Pay will be determined from Salary Schedule E at Rank E3, Step 15. Annual salary for this twelve (12) month appointment is $35,970. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature _____     Date _____

cc:        Personnel file

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



*Ingram*
*State*
*Technical*
*College*
**ISTC**
• *Developing Responsible Citizens* •

J. Douglas Chambers
President

Rickey A. Huffstutler, Ph.D
Dean of Instruction

Paul Reeder
Dean of Students

Monica J. Greene
Dean of
Fiscal Affairs

# INGRAM STATE TECHNICAL COLLEGE

## MEMORANDUM

**TO:**    Mrs. Bonita J. Lewis

**FROM:**  Mr. J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:** Appointment

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed <u>**Secretary**</u>, effective <u>**September 1, 1998**</u>, for the period ending <u>**August 31, 1999**</u>. Pay will be determined from Salary Schedule E at <u>**E3, Step 15 (16 yrs.) at $35,970**</u>. MJG

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or by J.F. Ingram State Technical College.

Please sign below as your acceptance of this appointment.

*Bonita J. Lewis*                    9/30/98
**Signature**                        **Date**

c:        Personnel Director



**Ingram**
**State**
**Technical**
**College**
**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of Instruction

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of
Fiscal Affairs

**INGRAM STATE TECHNICAL COLLEGE**

September 1, 1997

## MEMORANDUM

**TO:**   Mrs. Bonita J. Lewis

**FROM:**   Mr. J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:** Appointment

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed <u>Secretary to the Dean of Students</u>, effective <u>September 1, 1997</u>, for the period ending <u>August 31, 1998</u>. Pay will be determined from Salary Schedule E at <u>E3, Step 10</u>.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or by J.F. Ingram State Technical College.

Please sign below as your acceptance of this appointment.

**Signature:**   *Bonita J. Lewis*

cc:      Personnel Director

• *P.O. Box 220350* • *Deatsville, Alabama 36022-0350*
*Phone: 334-285-5177* • *Fax: 334-285-5328*



J. F. Ingram
State
Technical
College

‹ Developing Responsible Citizens ›

**J. Douglas Chambers**
Interim President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Monica J. Greene**
Dean of Fiscal Affairs

**Ron Shum**
Dean of Educational
Support Services

# J. F. INGRAM STATE TECHNICAL COLLEGE

September 1, 1996

## MEMORANDUM

**TO:**    Mrs. Bonita J. Lewis

**FROM:**  Mr. J. Douglas Chambers, Interim President

**SUBJECT:** Appointment

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **<u>Secretary to the Dean of Students</u>**, effective **<u>September 1, 1996</u>**, for the period ending **<u>August 31, 1997</u>**. Pay will be determined from Salary Schedule E at **<u>E3, Step 10</u>**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or by J.F. Ingram State Technical College.

Please sign below as your acceptance of this appointment.

Signature:

cc:        Personnel Director

5375 Ingram Road  P. O. Box 209  Deatsville, Alabama 36022
Phone: 334-285-5177      Fax: 334-285-5328



*Ingram*
*State*
*Community*
*College*
• *Developing Responsible Citizens* •

**Murry C. Gregg, Ed.D.**
President

**J. M. Mulder**
Dean of Technical &
Literacy Education

**Paul Reeder**
Dean of Students

**Ron Shum, Ed.D.**
Dean of Academics &
Educational Support Services

**Monica J. Greene**
Dean (Interim)
Fiscal Affairs

## INGRAM STATE COMMUNITY COLLEGE

September 1, 1995

### MEMORANDUM

**TO:**    Mrs. Bonita J. Lewis

**FROM:**   Dr. Murry C. Gregg, President

**SUBJECT:**    Appointment

Sections 602 and 603 of <u>The Alabama College System Policy Manual</u> state, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed **<u>Secretary to the Dean of Students</u>**, effective **<u>September 1, 1995</u>**, for the period ending **<u>August 31, 1996</u>**. Pay will be determined from Salary Schedule E at **<u>E3, Step 10</u>**.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education or Ingram State Community College.

Please sign below as your acceptance of this appointment.

**Signature:**

cc:    Personnel Director

*5375 Ingram Road  •  P.O. Box 209  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



Ingram
State
Community
College
ISCC
• Developing Responsible Citizens •

Murry C. Gregg, Ed. D.
President

Freddie Powell
Vice President

J. M. Mulder
Dean of Technical &
Literacy Education

Paul Reeder
Dean of Students

Ron Shum, Ed. D.
Dean of Academics &
Educational Support Services

# INGRAM STATE COMMUNITY COLLEGE
September 1, 1994

## MEMORANDUM

**TO:**   Mrs. Bonita J. Lewis

**FROM:**   Dr. Murry C. Gregg, President

**SUBJECT:**          Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contracts as appropriate..."

Therefore, you are appointed <u>**Secretary to the Dean of Students**</u>, effective <u>**September 1, 1994**</u>, for the period ending <u>**August 31, 1995**</u>. Pay will be determined from Salary Schedule E at <u>**E3, Step 10**</u>.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education or Ingram State Community College.

Please sign below as your acceptance of this appointment.

**Signature:**   *Bonita J. Lewis*

cc:      Personnel Director

*5375 Ingram Road   •   P. O. Box 209   •   Deatsville, Alabama 36022*
*Phone: 205-285-5177   •   Fax: 205-285-5328*





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

Murry C. Gregg, Ed.D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

September 1, 1993

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

**MEMORANDUM**

TO:      Mrs. Bonita J. Lewis

FROM:    Dr. Murry C. Gregg, President

SUBJECT: Appointment


        Sections 602 and 603 of <u>Policies, Procedures, and
Regulations Governing Alabama Technical Colleges</u>, states that,
"The President is authorized to appoint all faculty and staff at
the local level," and further, " . . . may offer twelve, nine, or
three months contract as appropriate . . . "

        Therefore, you are appointed <u>**Secretary to Dean of
Students**</u> effective <u>**September 1, 1993**</u>, for the year ending <u>**August
31, 1994**</u>.  Pay will be determined from Salary Schedule E at <u>**E-5,
Step 8**</u>.  This employment is subject to all employment policies,
conditions, and standards now or hereafter adopted by the Alabama
State Board of Education.

        Please sign below as your acceptance of this
appointment.

Signature: _____

cc:  Mr. Freddie Powell
     Mr. Greg Wright, Personnel Director







# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

September 1, 1992

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

## MEMORANDUM

TO:      Mrs. Bonita J. Lewis

FROM:    Dr. Murry C. Gregg, President

SUBJECT: Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, " . . . may offer twelve, nine, or three months contract as appropriate . . . "

Therefore, you are appointed <u>Secretary to Dean of Students</u> effective <u>September 1, 1992,</u> for the year ending <u>August 31, 1993</u>. Pay will be determined from Salary Schedule E at <u>E-5, Step 8</u>. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature:

cc:  Mr. Freddie Powell
     Dean of Business Affairs





Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1991



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

**MEMORANDUM**

**TO:**       Mrs. Bonita J. Lewis

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:**  Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, ". . . may offer twelve, nine, or three months contract as appropriate . . . "

Therefore, you are appointed <u>Secretary to Dean of Students</u> effective <u>September 1, 1991,</u> for the year ending <u>August 31, 1992</u>. Pay will be determined from Salary Schedule E at <u>E-5, Step 6</u>. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _____

cc: Mr. Freddie Powell
    Dean of Business Affairs






# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

Murry C. Gregg, Ed.D.
PRESIDENT
J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS
Paul Reeder
DEAN OF STUDENTS

September 1, 1990

**MEMORANDUM**

**TO:**      Mrs. Bonita J. Lewis

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:** Appointment

        Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, " . . . may offer twelve, nine, or three months contract as appropriate . . . "

        Therefore, you are appointed **Secretary to Dean of Students** effective **September 1, 1990,** for the year ending **August 31, 1991.** Pay will be determined from Salary Schedule E at **E-5, Step 6.** This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

        Please sign below as your acceptance of this appointment.

Signature: _____

cc: Mr. Freddie Powell





Murry C. Gregg, Ed.D
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177
September 1, 1989



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

**MEMORANDUM**

**TO:**      Mrs. Bonita J. Lewis

**FROM:**    Dr. Murry C. Gregg, President

**SUBJECT:**  Appointment


Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contract as appropriate..."

Therefore, you are appointed **Secretary to Dean of Students** effective **September 1, 1989**, for the year ending **August 31, 1990**. Pay will be determined from Salary Schedule E at **E-5, Step 5**. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature:  _Bonita J. Lewis_

cc:  Mr. Freddie Powell





**J. F. INGRAM STATE TECHNICAL COLLEGE**
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177



Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

September 1, 1988

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

**MEMORANDUM**

**TO:**        Mrs. Bonita J. Lewis

**FROM:**      Dr. Murry C. Gregg, President

**SUBJECT:**   Appointment

Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u>, states that, "The President is authorized to appoint all faculty and staff at the local level," and further, "...may offer twelve, nine, or three months contract as appropriate..."

Therefore, you are appointed <u>Secretary to Dean of Students</u> effective <u>September 1, 1988</u>, for the year ending <u>August 31, 1989</u>. Pay will be determined from Salary Schedule E at <u>E-6, Step 4</u>. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

**Signature:**  _Bonita J. Lewis_







# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1987

Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:        Mrs. Bonita J. Lewis

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges, states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary to the Dean of Students effective September 1, 1987, for period ending August 31, 1988. Pay will be determined from Salary Schedule E at E-6, Step 3, $13,566 annually. This is in accordance with our commitment to you in your interview for this position.

This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _Bonita J. Lewis_
Bonita J. Lewis

cc: Mr. Freddie Powell





Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

July 20, 1987



Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:        Mrs. Bonita J. Lewis

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Secretary to the Dean of Students effective August 1, 1987 for period ending August 31, 1987. Pay will be determined from Salary Schedule E at E-6, Step 2, $13,104 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment.

Signature: _Bonita J. Lewis_

cc: Mr. Freddie Powell







# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

September 1, 1986

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:         Mrs. Bonita J. Lewis

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment

      Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

      Therefore, you are appointed Office Clerk for the year ending August 31, 1987. Pay will be determined from Salary Schedule E at E-7 , Step 2 , $11,718 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

      Please sign below as your acceptance of this appointment.

Signature: _Bonita J. Lewis_

cc: Mr. Freddie Powell





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

September 1, 1985

Murry C. Gregg, Ed.D.
PRESIDENT
J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:        Mrs. Bonita J. Lewis

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment

       Sections 602 and 603 of <u>Policies, Procedures, and Regulations Governing Alabama Technical Colleges</u> states that, "The President is authorized to appoint all faculty and staff at the local level."

       Therefore, you are appointed <u>Office Clerk</u> for the year ending August 31, 1986. Pay will be determined from Salary Schedule E at <u>E-7</u>, Step <u>1</u>, <u>$11,256</u> annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

       Please sign below as your acceptance of this appointment.

Signature: _Bonita J. Lewis_

cc: Mr. Freddie Powell





# J. F. INGRAM STATE TECHNICAL COLLEGE
P. O. BOX 209
DEATSVILLE, ALABAMA 36022
Phone: 285-5177

February 11, 1985

Murry C. Gregg, Ed.D.
PRESIDENT

J. M. Mulder
DEAN OF INSTRUCTION

Freddie Powell
DEAN OF BUSINESS AFFAIRS

Paul Reeder
DEAN OF STUDENTS

MEMORANDUM

TO:        Mrs. Bonita J. Lewis

FROM:      Dr. Murry C. Gregg, President

SUBJECT:   Appointment – Office Clerk

Sections 602 and 603 of Policies, Procedures, and Regulations Governing Alabama Technical Colleges states that, "The President is authorized to appoint all faculty and staff at the local level."

Therefore, you are appointed Office Clerk for the period ending September 30, 1985. Pay will be determined from Salary Schedule E at E-7, Step 0, $10,272 annually. This employment is subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education.

Please sign below as your acceptance of this appointment which is effective  February 13, 1985  .

Signature:  *Bonita J. Lewis*

Bonita J. Lewis

cc:  Mr. Freddie Powell



**INGRAM STATE TECHNICAL COLLEGE**

October 13, 2000

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

## MEMORANDUM OF UNDERSTANDING

In an effort to improve the efficiency and effectiveness of the J.F. Ingram State Technical College organizational structure, it is agreed that a reorganization and reassignment of job duties are necessary.

In the case of **Bonita Owensby**, the job duties of **Secretary to the Dean of Students** are being integrated into the position of **Coordinator of Registration and Admission.**

After meeting with my supervisor and appropriate administrators, wherein we discussed this change, I understand that this position and salary placement is a temporary assignment subject to modifications at the end of the fiscal year and the evaluation of the effectiveness of the reorganization.  In the event that it is necessary, I may revert to my previous job title, duties, and salary placement.

Bonita Owensby                    J. Douglas Chambers, President

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-5328*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **BONITA J. OWENSBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV 2:06 CV796-WKW** |
| | ) | |
| **J.F. INGRAM STATE TECHNICAL** | ) | |
| **COLLEGE; J. DOUGLAS** | ) | |
| **CHAMBERS INDIVIDUALLY** | ) | |
| **AND IN HIS OFFICIAL CAPACTIY** | ) | |
| **AS PRESIDENT OF J.F. INGRAM** | ) | |
| **STATE TECHNICAL COLLEGE;** | ) | |
| **AND JAMES WILSON,** | ) | |
| **INDIVIDUALLY AND IN HIS** | ) | |
| **OFFICIAL CAPACITY AS DEAN** | ) | |
| **OF STUDENTS AND SUPPORT** | ) | |
| **SERVICES AT J.F. INGRAM** | ) | |
| **STATE TECHNICAL COLLEGE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF JAMES WILSON

Before me, the undersigned notary public in and for said county and state, personally appeared James Wilson, who upon being duly sworn on oath deposed and said as follows:

1.      My name is James Wilson, and, from 1980 until 2006, I served as Director of Student Support Services at J.F. Ingram State Technical College (Ingram).  In addition, during that time frame, I also served as Director of the Neglected and Delinquent Student Program at Ingram.  From 1998 until the present, I have served as Dean of Students at Ingram, and, since 2007, I have also served as Dean of the College at Ingram.

2.    The Plaintiff, Bonita Owensby, presently works under my supervision. At times during her employment at Ingram, I have recommended her for promotions. I have never considered Ms. Owensby's race or gender when making a determination as to whether to recommend her for a promotion.

3.    Prior to 1998, there was a non-computerized, rudimentary student record keeping system with limited student scheduling and grade tracking capabilities in place at Ingram. At that time, Ingram only met the minimum record keeping requirements of the Alabama Department of Post Secondary Education.

4.    In 1998, the Student Services Division at Ingram began automating many different functions formerly performed by the Registrar and began using the ACCESS software. This software facilitated more sophisticated functions that could be performed including analysis of student records, scheduling and progress towards completion of a program. A wide variety of people had access to student records and could use this software. This utilization of technology further reduced the need for a full time registrar.

5.    I have no ultimate decision making authority associated with promotions and raises at J.F. Ingram.

6.    I have never spoken in a derogatory fashion to Ms. Owensby in any context regarding her race or gender, or the race and gender of any other employee.

7.    I have never intentionally discriminated against Ms. Owensby because of her race or her gender.

8.    At all times relevant to this case, I have acted within the line and scope of my authority.

James E. Wilson

STATE OF ALABAMA          )
                          )
COUNTY OF Montgomery      )

I, the undersigned, authority, a notary public in and for said county and state, hereby certify that James E. Wilson, Dean of Students and Support Services of J. F. Ingram State Technical College is signed to the foregoing and who is known to me, acknowledged before me on this day that the foregoing is true and correct to the best of his knowledge, information and belief and that he has executed the same as such officer and with full authority for and as the act of said corporation.

Given under my hand and seal this 29th day of August, 2007.

Notary Public
My Commission Expires_____

Shana T. Proctor
Notary Public, AL State at Large
My Commission expires 08/01/2010

TO:          Mr. James E. Wilson
             Dean of Students and Support Services
             J. F. Ingram State Technical College

RE:          Letter of Resignation

      Circumstances require that I resign my position at J. F. Ingram State Technical College, effective May 31, 2001.

      My duties and responsibilities at Ingram have meant more to me than just a job; I've considered them as being my charge to help support the mission of the institution. My sixteen-year tenure at Ingram has given me the opportunity to grow and has enhanced my ability to meet future challenges.

      I've enjoyed my work, as well as the people with whom I've worked. I wish I could stay; but since I cannot, my friendship will always remain.

      Sincerely,

      Bonita J. Owensby
      Admissions Coordinator

cc: Mr. J. Douglas Chambers



# INGRAM STATE TECHNICAL COLLEGE

*Ingram*
*State*
*Technical*
*College*
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President


**Rickey A. Huffstutler, Ph.D**
Dean of the College


**Monica J. Greene**
Dean of
Fiscal Affairs


**James E. Wilson**
Dean of Students
and Support-Services

## <u>MEMORANDUM</u>

TO:             Bonita J. Owensby
                Admissions Coordinator

FROM:           J. Douglas Chambers
                President

RE:             Letter of Resignation

DATE:           April 20, 2001

This is to acknowledge receipt of your memorandum informing Dean
Wilson that you wish to resign your position effective 3:00 p.m.,
Thursday, May 31, 2001.  By this letter, I am accepting your
resignation.

Please arrange to have an exit interview with Dean Wilson prior to the
close of business, Thursday, May 31, 2001.  Dean Greene will also be
available to assist you in handling matters related to insurance,
disposition of leave, and other business matters you might have.

I wish you the very best in all your future endeavors.  Please let me
know if I, or any of the Ingram staff, can assist you in any way.

JDC/dlm

cc:    Dean Greene
       Dr. Huffstutler
       Dr. Merk

*P.O. Box 220350  •  Deatsville, Alabama 36022*

*Phone: 334-285-5177  •  Fax: 334-285-5328*



J. F. Ingram
State
Technical
College

ISTC

• Developing Responsible Citizens •

**J. F. ING**

April 25, 2001

**J. Douglas Chambers**
President

Rickey A. Huffstutler, Ph.D.
Dean of the College

James E. Wilson
Dean of Students &
Support Services

Monica J. Greene
Dean of Fiscal Affairs

**MEMORANDUM**

**TO:**        Mrs. Bonita Owensby
               Admissions Coordinator

**FROM:**   James Wilson, Dean of Students
               & Support Services

**RE:**        Letter of Resignation

        This memorandum is to acknowledge, with great sadness, your letter of resignation.   Your performance of duties as both Secretary and Coordinator to the Division of Student & Support Services has surely enhanced not only the student body, but also the entire college.  You've been an access who no doubt will be extremely hard to replace.  I applaud your self-confidence, which has helped to cultivate and maintain a caring relationship with the Department of Corrections, students, staff, and faculty in spite of discouragement and negative influence of others.

        Your knowledge of the affairs of college students has helped me personally to gain the necessary skills and knowledge to function here at Ingram as its Dean of Students, and for that, I am most grateful.  Mrs. Owensby, you are surely a **Keeper Of The Springs**.

        Please know when the time arrives and it is your desire to pursue employment, we at Ingram stand ready, without hesitation, to positively attest to your abilities.

        On behalf of the entire staff of Students & Support Services, we wish you all the best.

P. O. Box 220350  Deatsville, Alabama 36022
Phone: 334-285-5177        Fax: 334-285-5328

` May 11, 2001

MEMORANDUM

TO:       Mr. J. Douglas Chambers
          President

FROM:     Bonita J. Owensby
          Admissions Coordinator

RE:       Request to Rescind Job Resignation

          This letter is to request a rescission of my decision to resign as
Admissions Coordinator.

          After much discussion with Mr. Wilson, understanding and carefully
considering the situation at hand, I am convinced that this is an appropriate decision to
make at this time.

          Your consideration for approval of this request will be greatly appreciated.

/bjo

cc: Mr. James Wilson

5-11-01

approved/jdc

CC. Dean Wilson
    Dean Greene
    Dr. Merk

May 16, 2001

MEMORANDUM

TO:        All Employees
           J. F. Ingram State Technical College

FROM:      Bonita J. Owensby

       This memorandum is being sent to announce my decision to continue working at Ingram and to express my gratitude to everyone for the kind efforts made towards a farewell celebration for me.

       All persons who contributed to the luncheon at the Draper/Staton Center and would like to be reimbursed can make their request through Mrs. Knox. Mrs. Harrell will return all monies to the people who made contributions for the May 25th event.

       Again, I appreciate your kindness and I apologize for any inconvenience.

/bjo

Ingram has only a limited number of C Salary Schedule positions: fawn L. Burrus-Romine, (White Female) Life Tech Coordinator; Stanley Carter (Black Male), Director of the Tutwiler Campus; Patricia Graves, (White Female), Accountant; Julie K Givens, (White Female), Secretary and Administrative Assistant to the Dean of Fiscal Affairs; Hubert L Griffin (Black Male), Information Technology Manager; William D. Griswold (White Male), Assistant to the Dean of Instruction; Buford J. Lambert (White Male), Draper Center Director; Conrad Lassiter (Black Male), Assistant to the Dean of the College; Arthur Martin (White Male), Resource Center Specialist; Malcolm Montgomery (Black Male), Director of Student Support Services; Bonita Owensby (Black Female), Registrar and Assistant to the Dean of Student Services; Erica Turner (Black Female), Coordinator of Human Resources; Katrina Watson (White Female), Adult Education Instructor.

