# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BONITA J. OWENSBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV 2:06 CV796-WKW** |
| | ) | |
| **J.F. INGRAM STATE TECHNICAL** | ) | |
| **COLLEGE; J. DOUGLAS** | ) | |
| **CHAMBERS INDIVIDUALLY** | ) | |
| **AND IN HIS OFFICIAL CAPACTIY** | ) | |
| **AS PRESIDENT OF J.F. INGRAM** | ) | |
| **STATE TECHNICAL COLLEGE;** | ) | |
| **AND JAMES WILSON,** | ) | |
| **INDIVIDUALLY AND IN HIS** | ) | |
| **OFFICIAL CAPACITY AS DEAN** | ) | |
| **OF STUDENTS AND SUPPORT** | ) | |
| **SERVICES AT J.F. INGRAM** | ) | |
| **STATE TECHNICAL COLLEGE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR SUMMARY JUDGMENT
## DISCOVERY ATTACHMENTS

# FREEDOM COURT REPORTING

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   JULIE GIVENS and MONICA )
 6   GREENE,          )
 7        Plaintiffs,  )
 8   vs.              ) CASE NUMBER:
 9   DOUGLAS CHAMBERS,     ) CV:2:06-CV-852-ID
10   Individually, and in his )
11   capacity as President of )
12   INGRAM STATE TECHNICAL )
13   COLLEGE; JAMES WILSON, )
14   Individually, and in his )
15   capacity of Dean of    )
16   Students of INGRAM STATE )
17   TECHNICAL COLLEGE,     )
18        Defendants.   )
19
20
21
22
23
```

Page 3

```
 1   JAMES T. MERK,       )
 2   Individually, and in his )
 3   capacity as Dean of    )
 4   Institution of Ingram   )
 5   State Technical College, )
 6        Defendants.   )
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   BARBARA HENDRIX,     )
 6        Plaintiff,   )
 7   vs              ) CASE NUMBER:
 8   DOUGLAS CHAMBERS,     ) 2:07-CV-21-MHT
 9   Individually, and in his )
10   capacity as President of )
11   Ingram State Technical  )
12   College; JAMES WILSON, )
13   Individually, and in his )
14   capacity as Dean of    )
15   Student and Support    )
16   Services of Ingram State )
17   Technical College;    )
18   MALCOLM MONTGOMERY,     )
19   Individually, and in his )
20   capacity as Coordinator )
21   of Student Support    )
22   Services of Ingram State )
23   Technical College; and  )
```

Page 4

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   BONITA J. OWENSBY,     )
 6        Plaintiff,   )
 7   vs              ) CASE NUMBER:
 8   J.F. INGRAM STATE     ) 2:06-CV-796-WKW
 9   TECHNICAL COLLEGE; J. )
10   DOUGLAS CHAMBERS,     )
11   Individually, and in his )
12   official capacity as    )
13   President of J.F. Ingram )
14   State Technical College; )
15   and JAMES WILSON,     )
16   Individually, and in his )
17   official capacity as Dean)
18   of Student and Support  )
19   Services at J.F. Ingram )
20   State Technical College, )
21        Defendants.   )
22
23     DEPOSITION OF JOHN DOUGLAS CHAMBERS
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1    In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as
3  Amended, effective May 15, 1988, I, Cindy
4  Weldon, am hereby delivering to Jim
5  Debardelaben, the original transcript of the
6  oral testimony taken on the 27th day of
7  June, 2007, along with exhibits.
8    Please be advised that this is the
9  same and not retained by the Court Reporter,
10  nor filed with the Court.
11
12    S T I P U L A T I O N S
13    IT IS STIPULATED AND AGREED, by
14  and between the parties through their
15  respective counsel, that the deposition of
16  JOHN DOUGLAS CHAMBERS, may be taken before
17  Cindy Weldon, Certified Shorthand Reporter,
18  Commissioner and Notary Public, at the
19  office of Jim Debardelaben, 1505 Madison
20  Avenue, Montgomery, Alabama, on June the
21  27th, 2007 at 9:30 a.m.
22    IT IS FURTHER STIPULATED AND
23  AGREED that it shall not be necessary for

Page 7

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    MR. JIM DEBARDELABEN
5    1505 MADISON AVENUE
6    MONTGOMERY, ALABAMA 36107
7
8  FOR THE DEFENDANT:
9    MR. ANDREW W. CHRISTMAN
10    GIDIERE, HINTON, HERNDON & CHRISTMAN
11    60 COMMERCE STREET, SUITE 904
12    MONTGOMERY, ALABAMA 36104
13
14  ALSO PRESENT:
15    MS. JULIE GIVENS
16    MS. MONICA GREENE
17    MS. BARBARA HENDRIX
18
19
20
21
22
23

Page 6

1  any objections to be made by counsel to any
2  questions, except as to form or leading
3  questions, and that counsel for the parties
4  may make objections and assign grounds at
5  the time of trial, or at the time said
6  deposition is offered in evidence, or prior
7  thereto.
8    IT IS FURTHER STIPULATED AND
9  AGREED that notice of filing of the
10  deposition by the Commissioner is waived.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 8

1    I N D E X
2
3  EXAMINATION BY:                PAGE
4  MR. DEBARDELABEN            10, 231
5  MR. CHAMBERS                196
6
7    E X H I B I T S
8                PAGE
9  PLAINTIFF'S EXHIBIT NO. 1        35
10  PLAINTIFF'S EXHIBIT NO. 2        36
11  PLAINTIFF'S EXHIBIT NO. 3        39
12  PLAINTIFF'S EXHIBIT NO. 4        43
13  PLAINTIFF'S EXHIBIT NO. 5        51
14  PLAINTIFF'S EXHIBIT NO. 6        52
15  PLAINTIFF'S EXHIBIT NO. 7        56
16  PLAINTIFF'S EXHIBIT NO. 8        71
17  PLAINTIFF'S EXHIBIT NO. 9        78
18  PLAINTIFF'S EXHIBIT NO. 10 - 16    93
19  PLAINTIFF'S EXHIBIT NO. 17        97
20  PLAINTIFF'S EXHIBIT NO. 18        106
21  PLAINTIFF'S EXHIBIT NO. 19        113
22  PLAINTIFF'S EXHIBIT NO. 20        116
23  PLAINTIFF'S EXHIBIT NO. 21        129

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

| | | |
|---|---|---|
| 1 | PLAINTIFF'S EXHIBIT NO. 22 | 137 |
| 2 | PLAINTIFF'S EXHIBIT NO. 23 | 145 |
| 3 | PLAINTIFF'S EXHIBIT NO. 24 | 145 |
| 4 | PLAINTIFF'S EXHIBIT NO. 25 | 233 |
| 5 | PLAINTIFF'S EXHIBIT NO. 26 | 234 |
| 6 | PLAINTIFF'S EXHIBIT NO. 27 | 236 |
| 7 | PLAINTIFF'S EXHIBIT NO. 28 | 236 |
| 8 | PLAINTIFF'S EXHIBIT NO. 29 | 237 |
| 9 | PLAINTIFF'S EXHIBIT NO. 30 | 238 |
| 10 | PLAINTIFF'S EXHIBIT NO. 31 | 239 |
| 11 | PLAINTIFF'S EXHIBIT NO. 32 | 239 |
| 12 | PLAINTIFF'S EXHIBIT NO. 33 | 239 |
| 13 | PLAINTIFF'S EXHIBIT NO. 34 | 242 |
| 14 | PLAINTIFF'S EXHIBIT NO. 35 | 243 |
| 15 | PLAINTIFF'S EXHIBIT NO. 36 | 243 |
| 16 | PLAINTIFF'S EXHIBIT NO. 37 - 38 | 261 |
| 17 | PLAINTIFF'S EXHIBIT NO. 39 | 262 |
| 18 | PLAINTIFF'S EXHIBIT NO. 40 | 269 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

Page 10

1    JOHN DOUGLAS CHAMBERS,
2    after first being duly sworn, testified
3    as follows:
4    EXAMINATION BY MR. DEBARDELABEN:
5    THE COURT REPORTER:  Usual
6 stipulations?
7    MR. CHRISTMAN:  That's fine.
8    MR. DEBARDELABEN:  Yes.
9    Q.  Mr. Chambers, I'm Jim
10 Debardelaben.  I represent Ms. Monica
11 Greene, Ms. Julie Givens, Ms. Barbara
12 Hendrix and Ms. Bonita Owensby.
13    Now, what we've done here, your
14 lawyer and I have agreed to take one
15 deposition for all three suits.  That saves
16 you time, saves the State money, saves the
17 clients money and saves the lawyers' time.
18    This is a Federal deposition.  You
19 have the right to read and sign to see if
20 the court reporter took down what you said
21 correctly or you can waive reading and
22 signing.
23    You can't change your answer.  You

Page 11

1 can just correct something that you thought
2 she took down incorrectly and she goes back
3 to the transcript and the tape to check it.
4    So you might want to talk to your
5 lawyer to see if you want to read or sign or
6 waive reading and signing.
7    MR. CHRISTMAN:  That's up to you.
8    A.  I would like to read and sign.
9    Q.  Okay.  And she needs to hear you
10 more than me or Mr. Christman because she's
11 taking it down.  One thing we all do, I do,
12 Drew does, everybody does uh-huh and
13 huh-uh.
14    We don't want her -- If you can
15 remember, try to do yes or no.  But we all
16 do the others.  But we try to remind you.
17 Would you state your name, please, sir.
18    A.  John Douglas Chambers.
19    Q.  And what is your address?
20    A.  1743 Pebble Creek Drive,
21 Prattville, Alabama 36066.
22    Q.  How are you employed?
23    A.  I'm employed by the Alabama

Page 12

1 College System as president of J.F. Ingram
2 State Technical College.
3    Q.  Okay.  And when did you become
4 president of J.F. Ingram State Technical
5 College?
6    A.  About ten years ago.
7    Q.  1996?
8    A.  I've been there about ten years,
9 yes.  It may be going on eleven.
10    Q.  Let's go through your -- Let me
11 ask you this question.  Are you married?
12    A.  No.
13    Q.  Do you have any children?
14    A.  Yes.
15    Q.  Do you have any children in the
16 Middle District of Alabama which is
17 basically Autauga and Elmore County,
18 Montgomery south and basically to the east
19 of I-85?
20    MR. CHRISTMAN:  65.
21    Q.  65.  Do you have any relatives in
22 that area?  And it goes over to Lee County.
23    A.  Yes, I have some in Lee County.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1   Q.  Please give me their names,
2   please, sir.
3       A.  It's a lot of them.  It's the
4   Sparks family, the Johnson families in
5   Smith, Alabama.  I mean, it's quite a few.
6   My mother's --
7       Q.  Just give me the last names of
8   your kin people.
9       A.  Chambers.  And my daughter's name
10  is Contraman.
11      Q.  And you're kin to the Sparks'
12  family?
13      A.  Yes.
14      Q.  The Jackson family?
15      A.  Johnson.
16      Q.  Johnson.  Of course, the
17  Chambers.  And your daughter's married -- is
18  it Contraman or Countryman?
19      A.  Contraman.  But it's Contraman.
20  It's one word.
21      Q.  Any other family names?
22      A.  No.
23      Q.  And that's mostly in Lee County?

Page 14

1       A.  Yes.
2       Q.  Okay.  Where does your ex-wife
3   live?
4       A.  Columbus, Georgia.
5       Q.  She's not in Alabama.  Give me
6   your educational background starting with
7   graduating from high school.
8       A.  I graduated from South Girard High
9   School in Phenix City.  I attended Tuskegee
10  then Institute, now University.  I received
11  a B.S. degree in sociology with a minor in
12  psychology.
13      Q.  When did you receive that degree?
14      A.  '71.
15      Q.  When did you graduate from high
16  school?
17      A.  In '67.  And I did further study
18  at Auburn University toward a doctorate
19  degree.  I received a master's degree from
20  Tuskegee in 1972.
21      Q.  What did you get your master's in?
22      A.  Student personnel services.
23      Q.  And you said you did some study at

Page 15

1   Auburn University?
2       A.  Yes, sir.
3       Q.  What study did you do at Auburn?
4   Is that Auburn University in Auburn or AUM
5   in Montgomery?
6       A.  Auburn University in Auburn.
7       Q.  What did you study over there?
8       A.  I was following a doctorate degree
9   in counseling education.
10      Q.  When did you do that?
11      A.  In the time period around '74,
12  '75.
13      Q.  How many courses did you take?
14      A.  Four.
15      Q.  You haven't taken any courses
16  since 1975?
17      A.  That's right.
18      Q.  And isn't it usually approximately
19  a ten year period you have to finish the
20  course of study in?
21      A.  I'm not sure.
22      Q.  Do you have any other educational
23  degrees?

Page 16

1       A.  No.
2       Q.  Do you have any other degrees?
3       A.  Yes.
4       Q.  What are they?
5       A.  I have an honorary doctorate from
6   West Alabama, a doctorate of laws.
7       Q.  How did you get an honorary
8   doctorate from West Alabama, a doctorate of
9   laws?
10      A.  They said an honorary.  And it was
11  bestowed upon you for your services or
12  outstanding services that you do and --
13  whether it's community, political or
14  whatever.  That's the typical way you get an
15  honorary doctorate.  I've been offered
16  several honorary doctorates.
17      Q.  Where is West Alabama located?
18      A.  In Livingston.
19      Q.  Livingston.  What did you do for
20  West Alabama for them to confer an honorary
21  doctorate to you?
22      A.  They didn't do anything.
23      Q.  What does it mean when you get

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

<table>
<tr><td>

Page 17

1  something that says an honorary doctorate?
2     A.  It means several things.  But it
3  was told -- It was told to me in my career
4  that it means that someone is recognizing
5  you for your contribution that you have
6  contributed, and whether it's in education
7  or community or otherwise.
8     Q.  When was that bestowed upon you?
9     A.  About two years ago.
10     Q.  Two years ago?
11     A.  Yes.
12     Q.  It doesn't affect your educational
13  level, does it?
14     A.  No.
15     Q.  It doesn't affect your pay grade,
16  does it?
17     A.  No.
18     Q.  It has no monetary benefit, does
19  it?
20     A.  No.
21     Q.  Let's go through your employment
22  history.  What was your first job you
23  remember having?

</td><td>

Page 19

1     A.  A year.
2     Q.  When you say counselor, what do
3  you mean because there's various --
4     A.  I was serving as a graduate intern
5  and I served as a counselor.  And I was an
6  overseer of one of the dormitories, men
7  dormitories.
8     Q.  What did you do as the counselor
9  or as a counselor?
10     A.  Well, I was a supervisor over a
11  dormitory and I served as a counselor and I
12  dealt with student problems.
13     Q.  So you did this at the dormitory?
14     A.  Yes.
15     Q.  After you got your master's degree
16  from Tuskegee in 1972, what was your next
17  employment?
18     A.  I was employed by Tuskegee.
19     Q.  In what position?
20     A.  As a recruiter in the admission's
21  office.
22     Q.  How long were you employed by
23  Tuskegee as a recruiter in the admission's

</td></tr>
<tr><td>

Page 18

1     A.  After college?
2     Q.  Yes, sir.
3     A.  I was employed in Columbus,
4  Georgia as a case worker with the Muskogee
5  County Family Children Services.
6     Q.  And when was that?
7     A.  In 1972.
8     Q.  How long did you work as a case
9  worker for Muskogee?
10     A.  For four months.
11     Q.  Why did you leave that job?
12     A.  To enroll in graduate school.
13     Q.  Okay.  Did you have a job while
14  you were in graduate school?
15     A.  Yes.
16     Q.  What was that?
17     A.  As a counselor.
18     Q.  For who?
19     A.  For the University.
20     Q.  Tuskegee University?
21     A.  Yes.
22     Q.  And how long were you a counselor
23  for Tuskegee University?

</td><td>

Page 20

1  office?
2     A.  For about eighteen months.
3     Q.  That was '72, '73?
4     A.  Yes.
5     Q.  What was your next position?
6     A.  I left Tuskegee to accept a
7  position at Columbus College, now Columbus
8  State University in Columbus, Georgia.
9     Q.  What was that position?
10     A.  I was a program director for
11  continuing education.
12     Q.  How long did you hold that
13  position?
14     A.  For about a year and a half.
15     Q.  So from '73 to '75?
16     A.  Up to '75.  Because in '75, I took
17  a new position.
18     Q.  What position did you take in '75?
19     A.  July of '75, I started working at
20  Chattahoochee Valley Community College.
21     Q.  Tell me about going to work at the
22  Chattahoochee Valley Community College.  How
23  did you find out about that position?

</td></tr>
</table>

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1    A.   By an announcement that they -- it
2   was a start-up institution.  They were
3   announcing new positions that would be
4   available.
5        Q.   Where is Chattahoochee Valley
6   located?
7        A.   Phenix City.
8        Q.   Did you apply for that job?
9        A.   Yes, I did.
10       Q.   Go through an application process?
11       A.   Yes.
12       Q.   Who did you interview?
13       A.   Who did I interview?
14       Q.   Yes, sir.  Do you remember?
15       A.   A Dr. John, Dr. Ralph Savage and
16  the dean then, Mr. Noem Shubert.
17       Q.   And what position did you get for
18  Chattahoochee Valley?
19       A.   I was hired as a counselor.
20       Q.   What were your duties?
21       A.   I worked in student personnel.
22  And my duties were to serve as a counselor
23  for the students.

Page 22

1        Q.   Help the students with problems?
2        A.   Yes.
3        Q.   How long did you hold that
4   position?
5        A.   I was there for eighteen years.
6   But I held that position for about three or
7   four years.
8        Q.   What was your next position at
9   Chattahoochee Valley?
10       A.   I was assistant Dean of Students.
11       Q.   How did you get the assistant Dean
12  of Students?
13       A.   They created a position and I
14  applied for it and I was selected.
15       Q.   So you made application, you
16  competed for it?
17       A.   No.  I made an application.  At
18  that time, they did not have positions and
19  they were creating positions as they went
20  along in building the college.  It was --
21  The college started in 1974.  And so we did
22  a lot of multi -- while I was a counselor, I
23  was also a part-time instructor.

Page 23

1        Q.   But to become assistant Dean of
2   Students, you filled out an application?
3        A.   I can't recall filling out an
4   application.
5        Q.   Okay.  Who appointed you as
6   assistant Dean of Students?
7        A.   The Dean of Students.
8        Q.   The Dean of Students.  I thought
9   the president was the one that made those
10  selections?
11       A.   Well, he did eventually.  But I
12  was recommended by the Dean of Students.
13       Q.   Who was that?
14       A.   Who was the Dean of Students?
15       Q.   Yes, sir.
16       A.   Noem Shubert.
17       Q.   How long were you assistant Dean
18  of Students?
19       A.   Probably about three or four
20  years.
21       Q.   Is that 1982, '83, until then?
22       A.   I can't be exact.  But it was
23  about three or four years.

Page 24

1        Q.   After you were assistant Dean of
2   Students, what was your next position?
3        A.   I became the Dean of Students.
4        Q.   How did you get that position?
5        A.   I was appointed by the president
6   at the retirement of the Dean of Students.
7        Q.   Did you fill out an application or
8   was it just appointed?
9        A.   Appointed.
10       Q.   And when was that, if you
11  remember?
12       A.   I can't recall the exact date.
13       Q.   Let's see.  If you went there in
14  '75 as a counselor and you had that three
15  or four years, that was '78, '79.  Then you
16  were assistant Dean of Students three or
17  four years.  That would be '81, '82.  And
18  how long -- So was this in the early '80's,
19  mid '80's?
20       A.   I would think it was around that
21  time.  I cannot be exact.  I have it in my
22  records.  But I cannot be exact.
23       Q.   What was your next position?

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  A. From Dean of Students?
2  Q. Yes, sir.
3  A. Interim president at J.F. Ingram.
4  Q. How did you get to interim
5  president at J.F. Ingram?
6  A. I was asked by the Chancellor to
7  go to that institution and serve as interim
8  president.
9  Q. And when was that?
10  A. I want to say 1996.
11  Q. Dr. Gainus was the Chancellor
12  then?
13  A. Yes.
14  Q. Now, interim president, you were
15  just appointed by -- as an interim basis
16  until they filled the slot; correct?
17  A. Right.
18  Q. Did you make application to be
19  president?
20  A. Not the first time, no.
21  Q. How long were you interim
22  president?
23  A. I think about six months.

Page 26

1  Q. I find it interesting. You said
2  you didn't make application the first time.
3  What do you mean the first time?
4  A. When they advertised for the
5  position, I did not make an application for
6  the position.
7  Q. Okay. And when was that, when you
8  were interim president?
9  A. When I was interim president, yes.
10  Q. Did they subsequently not fill the
11  position?
12  A. That's right.
13  Q. They re-advertised?
14  A. Yes.
15  Q. Did you make an application when
16  it was re-advertised?
17  A. Yes.
18  Q. Were you still serving as interim
19  president?
20  A. No.
21  Q. Okay. After you were interim
22  president, where did you go?
23  A. Back to Chattahoochee Valley.

Page 27

1  Q. As what position?
2  A. As the Dean of Students.
3  Q. How long did you stay there as the
4  Dean of Students when you went back?
5  A. For about a month and a half.
6  Q. When did you make application to
7  become president of J.F. Ingram?
8  A. I can't give you the exact date.
9  But it was during the few months before '96,
10  before I was appointed and recommended to
11  the Board. I came in '96. So it was a few
12  months before that when the application
13  process had started.
14  Q. What caused you to make the
15  application for president the second time
16  and not the first time?
17  A. Well, the first time, I was not
18  sure I wanted to stay there. The second
19  time, I decided I wanted to stay there. So
20  I made an application.
21  Q. Okay. The State Board of
22  Education appoints you or the Chancellor?
23  A. The Chancellor makes the

Page 28

1  recommendation after you complete the
2  process. Then he makes a recommendation to
3  the Board for Board approval.
4  Q. When you were appointed as
5  president, was Ms. Monica Greene the Dean of
6  Fiscal?
7  A. Yes.
8  Q. Looking at some of the letterhead,
9  it appears to show at the present time y'all
10  have Mr. -- excuse me -- Dr. Merk as a
11  dean. I think he's -- what's he dean of?
12  A. Dean of Instruction.
13  Q. Okay. You have Mr. Bill Wilson as
14  the Dean of Students and Support Services, I
15  guess. And he's also college -- Dean of the
16  College now, isn't he?
17  A. Yes.
18  Q. So he holds two positions?
19  A. Yes.
20  Q. And you have Ms. Monica J. Greene
21  as Dean of Fiscal affairs. Is that all your
22  deans?
23  A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    Q.  And the only person that's the
2  dean now that was a dean when you came on
3  board is Ms. Greene; is that correct?
4    A.  That's correct.
5    Q.  And all the other deans, you have
6  appointed?
7    A.  That's right.
8    Q.  Okay.  But she's a hold over from
9  Dr. Gregg's presidency?
10   A.  Yes.
11   Q.  And at the present time, Ms.
12 Greene is the only female dean?
13   A.  Yes.
14   Q.  In your position as president, are
15 you her supervising official?
16   A.  Yes.
17   Q.  Nobody else supervises her except
18 you?
19   A.  The Dean of the College has the
20 authority as Dean of the College to act as
21 second in command.  So there are times that
22 the Dean of the College is in charge of the
23 institution.

Page 30

1    Q.  And that's when you're gone?
2    A.  That's when he's playing the role
3  of second in command.  But as Dean of the
4  College, he's equivalent to a
5  vice-president.
6    Q.  But under the structure of the
7  college, he has no direct authority over the
8  other deans if you're on campus, does he?
9    A.  Yes, he does.
10   Q.  Okay.  So would the structure be
11 you up top as president, it comes down to
12 the Dean of the College, and then under the
13 Dean of the College, would it be the other
14 deans?
15   A.  Well, that's not the way we have
16 it structured.  But theoretically, yes.
17   Q.  How do you have it structured?
18   A.  With all the deans being on an
19 equal level.
20   Q.  Oh, okay.
21   A.  And in some cases, we have two
22 blocks with the dean filling two blocks.
23   Q.  I want to show you what has been

Page 31

1  presented to me to be the J.F. Ingram State
2  Technical College manual.  I'll let you look
3  at it.
4         And this has been introduced
5  before as a Plaintiff's exhibit.  I think we
6  introduced it as Plaintiff's Exhibit 1 to
7  Mr. Merk's deposition.  Is that the present
8  policies and procedures manual for Ingram?
9    A.  I can't tell you whether that's
10 the present one or not.  But I can tell you
11 from the cover that it is one.
12   Q.  Okay.  Has Ingram updated its
13 policies and procedures manual since 2002?
14   A.  We have been -- We've received
15 policies that has been passed on to the
16 appropriate people who work on the policy.
17 Now, whether they've been implemented or
18 not, I can't say.  Whether they've been
19 included in the manual, I cannot say.
20   Q.  Mr. Chambers, whose responsibility
21 is it to see that policies and procedures
22 are included in the manual?
23   A.  It's mine.

Page 32

1    Q.  It's yours.  What procedure do you
2  follow to see that updated policies and
3  procedures are included in the manual?
4    A.  When we come up with a new policy
5  or I receive a policy mandate from the
6  Chancellor's office, I send a copy to all
7  deans and I ask one -- and for the official
8  files and ask them to update policies and to
9  remove the old policies.  That's a standard
10 procedure.
11   Q.  Okay.  So all deans should get a
12 copy?
13   A.  Yes.
14   Q.  And there is -- Could we use the
15 word a master policies and procedures
16 manual?
17   A.  That's usually kept in the office
18 of the Dean of Instruction.
19   Q.  And that would be at this time Dr.
20 Merk?
21   A.  Yes.
22   Q.  Okay.  Should something that's
23 been adopted in 1998 be reflected if it's a

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1 policy and procedure in the 2002 manual?
2     MR. CHRISTMAN: Object to the
3 form. The question is vague. Answer if you
4 know what he's talking about.
5     A. Well, I don't know what you're
6 talking about.
7     Q. If there was a rule or regulation
8 or a policy adopted in 1998 at Ingram, that
9 should be reflected in the 2002 policies and
10 procedure manual, shouldn't it?
11     A. I would think so.
12     Q. Thank you. Now, what is the
13 purpose of annual evaluations?
14     A. To serve as a tool to examine the
15 work of an employee.
16     Q. Now, are they supposed to be
17 accurate?
18     A. To the best of your ability.
19     Q. And are they supposed to be able
20 to be relied on by the employee?
21     A. I'm not sure I understand your
22 question.
23     Q. Well, if you evaluate an employee,

Page 34

1 should the employee be able to look at their
2 annual evaluation to see how they are doing?
3     A. Yes.
4     Q. What training is an employee given
5 to be able to fill out an annual evaluation?
6     A. We have a policy manual that we're
7 governed to follow by.
8     Q. Who adopted that policy manual?
9 Is this the policy manual we're talking
10 about, Plaintiff's Exhibit 1?
11     A. No. The Alabama State Board of
12 Education policy manual.
13     Q. So y'all have to follow the
14 Alabama State Board of Education policy
15 manual. It's not something that J.F. Ingram
16 makes to follow; is that correct?
17     A. That's right.
18     Q. And that means that -- Is that in
19 an effort to make all the -- maybe you don't
20 know the answer to this question -- to make
21 all the evaluations in the entire system to
22 be alike?
23     A. I can't -- I don't know.

Page 35

1     Q. You don't know. I want to show
2 you what I have marked as Plaintiff's No. 1
3 to your deposition.
4     (Whereupon, Plaintiff's Exhibit
5 No. 1 was marked for identification and
6 attached to the original transcript.)
7     Q. I'll ask if you recognize that
8 document?
9     MR. CHRISTMAN: Before you
10 continue, Jim, when you gave him the
11 policies and procedure manual, this was
12 Exhibit 1 to somebody elses deposition.
13     MR. DEBARDELABEN: To Dr. Merk's
14 deposition.
15     MR. CHRISTMAN: You did not intend
16 that to be Exhibit 1 to this deposition?
17     MR. DEBARDELABEN: No. I referred
18 to it as Exhibit 1 to Dr. Merk's deposition.
19     Q. Can you identify Plaintiff's
20 Exhibit 1?
21     A. Can I identify the plaintiff?
22     Q. Can you identify that exhibit?
23 What is this?

Page 36

1     A. Yes. This is an evaluation on Ms.
2 Monica Greene.
3     Q. And what year is it?
4     A. 1996.
5     Q. And who signed that evaluation as
6 the evaluator?
7     A. I did.
8     Q. What did you put in the comments?
9     A. Excellent. Very caring person.
10     Q. Okay. Did she completely meet
11 standards?
12     A. At that particular time, yes.
13     Q. Okay. And that's 1996?
14     A. Yes.
15     Q. Okay.
16     (Whereupon, Plaintiff's Exhibit
17 No. 2 was marked for identification and
18 attached to the original transcript.)
19     Q. Show you what I have marked as
20 Plaintiff's Exhibit 2. Can you identify
21 that document for me?
22     A. Yes.
23     Q. What is that document?

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A.  An evaluation for Ms. Monica
2  Greene.
3    Q.  What is the date of that document?
4    A.  August 28th, 1997.
5        MR. CHRISTMAN:  Talking about the
6  date on the front?  It's dated on the front
7  and the back.
8        MR. DEBARDELABEN:  Right.  I'm
9  going to ask him both dates.
10    Q.  And who signed that document?
11    A.  I did.
12    Q.  What date did you sign that
13  document?
14    A.  On September the 2nd, '97.
15    Q.  And what was your title at that
16  time?
17    A.  President or -- interim or
18  president.  I'm not really sure.
19    Q.  How did you sign that document?
20    A.  President.
21    Q.  Okay.  Now, what was her overall
22  performance appraisal?
23    A.  Outstanding, excellent

Page 38

1  performance.
2    Q.  And what were the comments?
3    A.  You mean you want me to read
4  them?
5    Q.  Yes, sir.
6    A.  Employee is very friendly and
7  works well with others.  She could improve
8  on her self-confidence when dealing with her
9  workers.  Tends to allow others to attach
10  her when she is in charge.
11        That's supposed to be attack her.
12  Her knowledge is most valuable to the
13  college.  She is an outstanding worker.
14    Q.  Did you go over this appraisal
15  with Ms. Greene?
16    A.  I can't recall.  But I normally
17  do.
18    Q.  I noticed she signed the 1996
19  appraisal on 9-20 of '96.  And I noticed
20  there is no signature on the 1997
21  appraisal.  Do you know why?
22    A.  No, I don't.
23    Q.  Have you ever made an appraisal

Page 39

1  and not gone over them with your deans?
2    A.  I can't recall.
3        (Whereupon, Plaintiff's Exhibit
4  No. 3 was marked for identification and
5  attached to the original transcript.)
6    Q.  Show you what I have marked as
7  Exhibit No. 3 and ask you if you can
8  identify that?
9    A.  Yes.  This is an evaluation for
10  Ms. Monica Greene.
11    Q.  And for what year is that?
12    A.  The date is July 15, 1998.
13        MR. CHRISTMAN:  The date on the
14  front again is what we're talking about;
15  right?
16        MR. DEBARDELABEN:  Yes.
17    Q.  And what was her overall rating
18  there?
19    A.  Two, which is very good.  Above
20  average.
21    Q.  What did you say about Ms. Greene
22  in the comments?
23    A.  I said employee continues to

Page 40

1  develop good leadership skills.  Tends to
2  get down when confronted by other workers.
3  She continues to grow stronger each day.
4  Very knowledgeable on the business area --
5  in the business area.
6    Q.  And she signed that document on --
7  apparently on August the 5th, '98, didn't
8  she?
9    A.  That's right.
10    Q.  And you signed it on 7-27-98?
11    A.  Yes.
12    Q.  And on the front, you checked her
13  -- What's this with comment, provides
14  effective leadership in areas of primary
15  responsibility?  What is meant by this
16  comment?
17    A.  This is -- This supports the
18  comments that we have on the back.
19    Q.  Is that -- When you have with
20  comment, what does that mean?
21    A.  That means that number one, if
22  it's checked with comment, it's included in
23  the comment statement that I would make on

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1 the back.
2    Q.  Oh, okay.  So with comment is not
3 necessarily negative?
4    A.  No.
5    Q.  Okay.  Mr. Chambers, is there a
6 requirement in the Alabama College System
7 for a yearly evaluation?
8    A.  Yes.
9    Q.  Where do you put somebody's
10 evaluation when it's done?  Where is it
11 kept?
12    A.  Where do I keep my copies?  I keep
13 a copy in my office and a copy is turned
14 over to personnel.
15    Q.  Is it required for a copy to be
16 turned over to personnel?
17    A.  No.
18    Q.  It's not required for the -- I'm
19 calling it the annual evaluation.
20 Administrative personnel evaluation.  It's
21 not required to be kept by personnel?
22    A.  From my understanding, it's only
23 to be -- I'm required to keep a copy.

Page 42

1    Q.  Okay.  So do you have a file on
2 every one that works for Ingram State
3 Technical College in your office?
4    A.  No.
5    Q.  Is there a separate file
6 maintained in your office for everyone's
7 evaluation, yearly evaluation?
8    A.  No.
9    Q.  Where would the file be
10 maintained?
11    A.  That would be in personnel and the
12 Dean of Instruction and Dr. Merk's office.
13    Q.  Now, you said in the personnel.
14 Does Dean Merk keep a separate file or is
15 that because he's also the director of
16 personnel?
17    A.  It's also because he's director of
18 personnel.
19    Q.  Okay.  So when you say Dean Merk's
20 office, you mean under his hat as director
21 of personnel?
22    A.  Yes.
23    Q.  Do you keep a copy of the yearly

Page 43

1 evaluations in your office in any way of
2 employees?
3    A.  For the deans.
4    Q.  For the deans?
5    A.  Yes.
6    Q.  Is it in a file marked for the
7 deans?
8    A.  Yes.
9    Q.  Okay.  And it's your understanding
10 it does not have to be placed in the
11 personnel file?
12    A.  It needs to be placed with the
13 personnel director.
14    Q.  Okay.  Well, the reason I asked
15 you those series of questions is I was
16 provided this by your attorney as the
17 personnel file of Ms. Monica Greene.
18        And going through it, I found '96,
19 '97 and '98 evaluations.  The next
20 evaluation I found, it is dated 2002.
21        (Whereupon, Plaintiff's Exhibit
22 No. 4 was marked for identification and
23 attached to the original transcript.)

Page 44

1    Q.  I'll mark this as Plaintiff's
2 Exhibit No. 4.  I'll ask you if you
3 recognize that document?
4    A.  Yes.
5    Q.  What is that?
6    A.  It's an evaluation of Ms. Monica
7 Greene.
8    Q.  When is it dated?
9    A.  April the 3rd, 2002.
10    Q.  And is her -- Did Ms. Greene sign
11 that document?
12    A.  No, she did not.
13    Q.  Do you know why she didn't sign
14 it?
15    A.  No, I do not.
16    Q.  You had no comments, did you?
17    A.  That's right.
18    Q.  And you found on April the 3rd,
19 2002, she met standard as is in all areas?
20    A.  That's right.
21    Q.  And that's your signature on the
22 back?
23    A.  That's right.

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    Q.  Will you look through Ms. --
2  what's been presented to me as Ms. Monica
3  Greene's personnel file and see if you can
4  find a '99, 2000 and 2001 evaluation?
5        MR. CHRISTMAN: For the record, I
6  will double-check our production, my
7  production of this file to you and make sure
8  -- For some reason if we have not made a
9  complete production, we will make sure you
10  get a complete copy.
11        MR. DEBARDELABEN: Drew, it was
12  not in the file you produced either.
13        MR. CHRISTMAN: I'm sorry?
14        MR. DEBARDELABEN: The personnel
15  file, it was not in that personnel file
16  either.
17        MR. CHRISTMAN: I'll take a look.
18        MR. DEBARDELABEN: That I could
19  find.
20        MR. CHRISTMAN: We'll find out
21  what the college has in terms of evaluations
22  and make sure -- if there are evaluations
23  that have not been produced, they will be

Page 46

1  produced immediately.
2        A. Okay.
3        Q. Mr. Chambers, did you see any
4  annual evaluations for '99, 2000 and 2001 in
5  the personnel file of Ms. Monica Greene?
6        A. I was not looking -- I was looking
7  at the evaluation form. I was not looking
8  at the date. But I did not recall seeing
9  any.
10        Q. Okay. If there's any in there,
11  would you please pull them out and we'll
12  mark them.
13        A. Go back to where I first saw
14  them. No, I do not.
15        Q. Okay. Whose job is it to see that
16  the personnel files are maintained?
17        A. Mine.
18        Q. Would the personnel evaluations be
19  any place else besides the personnel file?
20        A. Yes.
21        Q. And where would that be?
22        A. It could very well be in the
23  minutes of the cabinet meeting where I gave

Page 47

1    -- made the statement that they would not
2  be receiving an evaluation and the minutes
3  would reflect on what we needed to improve
4  on.
5        Q. Mr. Chambers, when I started this,
6  you told me that the Alabama College System
7  required evaluations every year?
8        A. That's true.
9        Q. Is there -- Did you get any
10  exception from the counselor not to do the
11  evaluations?
12        MR. CHRISTMAN: You mean the
13  Chancellor.
14        Q. Excuse me. The Chancellor.
15        A. I did do evaluations.
16        Q. You said the minutes might reflect
17  that they did not -- wasn't going to receive
18  evaluations?
19        A. A written evaluation.
20        Q. Does the Alabama College System
21  require a written evaluation each year?
22        A. I'm not sure.
23        Q. Are there rules and regulations of

Page 48

1  the Alabama College System on evaluations?
2        A. Yes.
3        Q. And that would be in the
4  Chancellor's office?
5        A. I'm not clear what --
6        Q. The rules and regulations of the
7  Alabama College System, do you maintain a
8  copy of that at Ingram State Technical
9  College?
10        A. And the State Board policy manual,
11  yes.
12        Q. And it's there at the school?
13        A. Yes.
14        Q. Any deviation from that manual --
15  strike that. Are there provisions for the
16  deviation from the State Board of Education
17  manual?
18        A. Yes.
19        Q. Okay. And any deviation you made
20  from that manual, do you have permission
21  from the Chancellor to make it?
22        A. By the authority that's granted me
23  as president, yes.

12  (Pages 45 to 48)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1    **Q.  Okay. And there is something --**
2  **Well, we'll just have to get those manuals.**
3  **But if you deviated, there's a specific**
4  **section in that manual that allows you to**
5  **deviate?**
6    A.  I'm not sure I understand your
7  question.
8    **Q.  If you deviate from the State**
9  **Board of Education manual, is there a**
10  **specific section in that manual that allows**
11  **a president to deviate?**
12    A.  Well, that's included in my job
13  description. But the word deviate is not
14  used. It's overseeing the operation of the
15  college.
16    **Q.  Yes, sir. And the State Board of**
17  **Education sets up certain rules to follow?**
18    A.  Right.
19    **Q.  Okay.**
20    MR. CHRISTMAN:  In fairness,
21  before you go into your next line of
22  questioning, I do need to state for the
23  record that Mr. Debardelaben pointed out in

Page 50

1  a prior deposition that the personnel files
2  I produced for him in this litigation were
3  not certified personnel files by the
4  Department of Personnel at the college.
5    And I'm saying that for the
6  record. To the extent there are evaluations
7  which could exist that are not part of the
8  personnel file that I produced, that's my
9  responsibility to make sure that I produce
10  complete documents to you, Jim.
11    So if there are more evaluations
12  that aren't in here -- because this is what
13  I produced to you -- you'll get them.
14    MR. DEBARDELABEN:  Yes, sir. And
15  if you produce different material, we'll
16  probably have to redo some depositions. I
17  mean, you know, I depended on them to be
18  complete. And I don't know if they are
19  complete until I ask the questions.
20    And we're finding out that
21  unfortunately what appears to -- what might
22  have been produced to you --
23    MR. CHRISTMAN:  Right.

Page 51

1    MR. DEBARDELABEN:  I have no doubt
2  that their attorney produced me everything
3  that was produced to him. And he has to
4  rely on that. But unfortunately, we
5  apparently are finding out that what was
6  produced to you for you to produce to me was
7  not complete.
8    MR. CHRISTMAN:  I will agree for
9  you to reserve the right to question that
10  witness on any documents that were not
11  produced by my office. They should have
12  been produced.
13    MR. CHRISTMAN:  Off the record
14  just a second.
15    (Whereupon, there was a brief
16  off-the-record discussion.)
17    (Whereupon, Plaintiff's Exhibit
18  No. 5 was marked for identification and
19  attached to the original transcript.)
20    **Q.  I want to show you what I have**
21  **marked as Plaintiff's Exhibit No. 5 and ask**
22  **you to identify that document for me,**
23  **please, sir.**

Page 52

1    A.  It's an evaluation of Ms. Monica
2  Greene.
3    **Q.  And what is that overall**
4  **evaluation?**
5    A.  Meets standards as is.
6    **Q.  And what year is that?**
7    A.  2003.
8    **Q.  And did Ms. Greene sign that**
9  **evaluation?**
10    A.  No, she didn't.
11    **Q.  And did you sign that evaluation?**
12    A.  Yes, I did.
13    **Q.  And what's the date that you**
14  **signed it?**
15    A.  March 31st '03.
16    (Whereupon, Plaintiff's Exhibit
17  No. 6 was marked for identification and
18  attached to the original transcript.)
19    **Q.  I want to show you what's been**
20  **marked as Plaintiff's Exhibit No. 6 and ask**
21  **you if you can identify that?**
22    A.  It's an evaluation for Ms. Monica
23  Greene.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1  Q.  And what year is that?
2  A.  2004.
3  Q.  And what's the evaluation?
4  A.  Meets standard as is.
5  Q.  And what date did you sign that?
6  A.  April 1st, '04.
7  Q.  April 1st, '04?
8  A.  Yes.
9  Q.  And what's the date of the
10 evaluation?
11 A.  April 1st, '04.
12 Q.  You signed it on the same date
13 that you gave it.  And did you give it to
14 Ms. Greene?
15 A.  Yes, I did.
16 Q.  What date did she sign it?
17 A.  She didn't.  She signed it on the
18 26th.
19 Q.  How do you go about giving these
20 evaluations to your employees?
21     MR. CHRISTMAN:  Object to the
22 form.  That's vague.  You talking about in
23 this instant?

Page 54

1     MR. DEBARDELABEN:  Yes.
2  Q.  Well, generally, how do you go
3  about giving evaluations to the deans?
4  A.  I would complete the evaluation
5  and give them a copy of it and ask them to
6  read it.  And in cases where we need to talk
7  about things, we will talk about it.
8     And I will ask them to sign it,
9  informing them that their signature is
10 certifying that they received it, not that
11 they agree with it.
12 Q.  I notice -- and I don't know why
13 -- but the form on No. 5, which is the
14 2003, is different from the form on the 2004
15 evaluation.  Do you know why?
16 A.  Well, it could be because the
17 State Board was changing -- they were trying
18 to get a unified evaluation system going
19 across the State.  So we were having to
20 change our evaluation forms to include
21 several items.
22 Q.  And the 2002, it's the same form
23 as the 2003, isn't it?

Page 55

1     MR. CHRISTMAN:  Take a look at
2  them before you answer, Dr. Chambers.
3  A.  When you're saying the same form,
4  you mean the same information?
5  Q.  Yes, sir.  The form itself, not
6  what's written on it.  But the form itself
7  is the same.  And when I say written, I mean
8  by you.  But basically what's written by you
9  is the same, isn't it, on 2003 and 2002?
10    MR. CHRISTMAN:  You talking about
11 Exhibits 4 and 5.
12    MR. DEBARDELABEN:  Yes, sir.
13 Q.  But Exhibit 4 and 5 have no place
14 for the employee to sign; correct?
15 A.  That's right, sir.
16 Q.  Okay.
17    MR. CHRISTMAN:  Do you withdraw
18 your question about whether they are the
19 same or not?
20 Q.  Are they the same?  Are 4 and 5
21 the same form?
22 A.  No, they are not.
23 Q.  What's different about them?

Page 56

1  A.  Different print.
2  Q.  Okay.
3  A.  Different format.
4  Q.  Different format.  But the wording
5  on them are the same?
6  A.  Yes.
7     (Whereupon, Plaintiff's Exhibit
8  No. 7 was marked for identification and
9  attached to the original transcript.)
10 Q.  I want to show you what I have
11 marked as Plaintiff's Exhibit No. 7 and ask
12 you --
13    MR. DEBARDELABEN:  And I don't
14 have a copy of that, Drew.
15    MR. CHRISTMAN:  That's fine.
16    MR. DEBARDELABEN:  I had a copy.
17    MR. CHRISTMAN:  I've seen it.
18 Q.  I'll ask you if you know what that
19 form is?
20 A.  Yes.
21 Q.  What is that form?
22 A.  It's an evaluation for Ms. Monica
23 Greene.

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1    Q.  Okay.  Now, let's look at this.
2  Number one, you put she meets standards as
3  is.  What's the date of Plaintiff's Exhibit
4  7?
5    A.  July the 14th, 2005.
6    Q.  Okay.
7      MR. CHRISTMAN:  You're on the
8  front page?
9      MR. DEBARDELABEN:  Yes, sir.
10    Q.  I want you to look at her
11  personnel file.  Is that the same evaluation
12  that is in Ms. Greene's personnel file for
13  2005 dated July the 14th?
14    A.  Yes.
15    Q.  Okay.  And I want you to look at
16  what was Defendant's Exhibit 2 to the Greene
17  deposition and see if it is the same
18  evaluation as Defendant's Exhibit 2 to
19  Greene's deposition?
20    A.  Yes.
21    Q.  Okay.  Does the front page of
22  Defendant's Exhibit 7 appear to be the same
23  form as the front page of Defendant's

Page 58

1  Exhibit 6?  On that I mean, the form page
2  and the writings on it?  Are the wording the
3  same?
4    A.  Yes.
5    Q.  Is it, from what you can tell, the
6  same form?
7    A.  Yes.
8    Q.  Can you explain to me why the back
9  page is not there on Defendant's Exhibit 7
10  as it is on Defendant's Exhibit 6?
11    A.  No, I cannot.  Other than we put a
12  -- I attached the comments on the back.
13    Q.  Does your signature appear any
14  place on Defendant's Exhibit 7?
15    A.  No.
16    Q.  To be an official evaluation,
17  isn't it necessary for your signature to
18  appear?
19    A.  It normally appears on the second
20  page which is not here.
21    Q.  Yes, sir.  And you've looked at
22  the personnel file.  And the second page is
23  not in her personnel file, is it?

Page 59

1    A.  That's right.
2    Q.  And you looked at Defendant's
3  Exhibit 2 to Ms. Greene's deposition and the
4  second page wasn't on that.  Here, sir.  I
5  think I took that back.
6    A.  That's right.
7    Q.  And your signature is not on
8  Defendant's Exhibit 2 to Ms. Greene's
9  deposition, is it?
10    A.  That's right.
11    Q.  Okay.  Where would the complete
12  document be if there is one?
13    A.  With Dr. Merk or with personnel.
14    Q.  It wouldn't be in your possession
15  any place?
16    A.  I can't recall.  I do have a copy
17  of this.
18    Q.  Did you go over this with Ms.
19  Greene?
20    A.  Yes.
21    Q.  Let's look at this.  Number two,
22  you checked with comment, provides effective
23  leadership in areas of primary

Page 60

1  responsibility.  And reading up here it
2  said, comments may either be positive or
3  negative as needed.  What's your comment in
4  number two?
5    A.  It's included in the attachment
6  that I have.
7    Q.  Yes, sir.  Will you read number
8  two comment that goes with it.  Is there a
9  specific comment for number two?
10    A.  There is not a specific comment.
11  The comment page is in the narrative form
12  that we put here.  And it could apply to
13  more than one.  It could apply to more than
14  one when you check it off.
15    Q.  Now, is this comment positive or
16  negative?
17    A.  Negative.
18    Q.  Okay.  Now, let's go to number
19  three.  It says does not create problems by
20  using excessive amount of leave.  Does not
21  habitually arrive late or leave early.  And
22  that's meets standards; correct?
23    A.  Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 61 | Page 63 |
|---|---|
| 1    Q.  Number four, works effectively<br>2 with employees at all levels to achieve<br>3 common goal.  And that's with comment.  Is<br>4 that a positive or a negative comment?<br>5    A.  It's a negative.<br>6    Q.  And you don't have a specific<br>7 comment at that.  It's just included in what<br>8 you attached?<br>9    A.  In my comments, yes.<br>10    Q.  Number five, maintains appropriate<br>11 balance between professional role and<br>12 personal relationships with employees.  And<br>13 that's a --<br>14    A.  A positive and a negative.<br>15    Q.  That's a positive and a negative?<br>16    A.  Yes.<br>17    Q.  Okay.  How is it positive?<br>18    A.  Because she's a very professional<br>19 person.<br>20    Q.  How is it negative?<br>21    A.  Well, it's stated in here about<br>22 that she -- I want to make sure I'm looking<br>23 at this.  When I said -- Some of the | 1 positive?<br>2    A.  That's a negative.<br>3    Q.  Which administrator that she<br>4 doesn't have an appropriate working<br>5 relationship with?<br>6    A.  Both deans.<br>7    Q.  And that would be Dean Wilson and<br>8 Dean Merk?<br>9    A.  Yes.<br>10    Q.  What's inappropriate about her<br>11 relationship with Dean Wilson and Dean Merk?<br>12    A.  They have a problem working with<br>13 her office as far as financing.  And they<br>14 both need finances in order to carry out<br>15 their program.<br>16    Q.  If they have testified they work<br>17 well with Ms. Greene, you would say they<br>18 were -- that's wrong?<br>19    A.  I would say one of us is telling a<br>20 lie.  And I don't think it would be me.<br>21    Q.  We can only go by what they say,<br>22 can't we?<br>23    A.  I guess so. |

| Page 62 | Page 64 |
|---|---|
| 1 statements I entered, that she would never<br>2 refuse to do an assignment, but she rarely<br>3 completes them.  So that's a positive and a<br>4 negative.<br>5    Q.  Okay.  Number six, communicates<br>6 effectively in oral and written form.  You<br>7 have with comment.  Is that a positive or a<br>8 negative comment?<br>9    A.  That's a negative comment.<br>10    Q.  Okay.  Tell me what's negative.<br>11    A.  I'm having to read the entire<br>12 document so I can pull out -- This way, I<br>13 have to go back and look at it.<br>14    In the evaluation on the last page<br>15 it's stated that she must seek ways to<br>16 improve in her oral communication.  She must<br>17 also acknowledge that she has weaknesses and<br>18 that recognizing them is the first step<br>19 toward improving them.<br>20    Q.  Number seven, develops and<br>21 maintains appropriate and efficient working<br>22 relationships with administrators and it's<br>23 with comment.  Is that a negative or a | 1    Q.  How has she failed to develop and<br>2 maintain an efficient working relationship<br>3 with other administrators?<br>4    A.  Well, it's included in my<br>5 comments.  But if you're asking me for<br>6 examples of what I have in the comments --<br>7    Q.  I'm asking you how she's done<br>8 that.  Why did you put that comment?<br>9    A.  Because we continue to have<br>10 problems with other administrators getting<br>11 what they want from the business office.<br>12    Q.  You've been the president for<br>13 approximately ten years or eleven years?<br>14    A.  Yes.<br>15    Q.  During this entire period of time,<br>16 has Ingram State Technical College as an<br>17 entity ever been cited by the examiner's of<br>18 public account for the illegal or wrongful<br>19 expenditure of public funds?<br>20    A.  Not that I know of.<br>21    Q.  No one has -- Anybody, the<br>22 Chancellor's office or any other<br>23 organization has never questioned how the |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  funds at Ingram were spent by being either
2  inappropriate or illegal, have they?
3      A.  Yes.  But not illegal.
4      Q.  Okay.  What inappropriate spending
5  has there been?
6      A.  Well, for example, we've been
7  questioned about whether we should have paid
8  a vendor an amount or a past due amount.
9  We've been -- We've had some questions about
10 whether we were paying late charges, things
11 like that.  But not anything of an illegal
12 nature.
13     Q.  Not inappropriate.  But where you
14 were paying late charges.  Wouldn't you
15 agree with me, since you're the president,
16 that it's better to wait and get all your
17 documents and have everything in line and be
18 sure it meets the requirements of the State
19 before you pay a bill, even though if the
20 bill might be paid late?
21     A.  From a personal standpoint, yes.
22 But I'm not sure whether that is allowed by
23 State Board policy.

Page 66

1      Q.  Well, State Board policy don't
2  want you paying a bill that's not properly
3  documented, does it?
4      A.  No.
5      Q.  Mr. Chambers, do you have any
6  accounting background?
7      A.  No.
8      Q.  I don't either.  Are you
9  knowledgeable enough to read the financial
10 statement and really know what it means?
11     A.  Not to the fullest extent, no.
12     Q.  Who at your school today besides
13 Ms. Greene is knowledgeable enough to read a
14 financial statement and has training in that
15 area?
16     A.  Ms. Greene and probably a couple
17 of her staff members.
18     Q.  So it's all in the fiscal office?
19     A.  Right.
20     MR. CHRISTMAN:  Talking about
21 today.
22     MR. DEBARDELABEN:  Today.
23     Q.  Number eight, is that a positive

Page 67

1  or a negative comment on Defendant's Exhibit
2  7?
3      A.  That's a positive.
4      Q.  Okay.  So she cooperates with the
5  supervisor, accepts direction and receives
6  assignments willingly?
7      A.  That's right.
8      Q.  And that's you; you're the
9  supervisor?
10     A.  Right.
11     Q.  So she accepts direction from you?
12     A.  Yes.
13     Q.  Okay.  Is sensitive to problems or
14 changes within the work place and responds
15 appropriately is number nine.  You have that
16 checked.  Is that a positive or a negative?
17     A.  A negative.
18     Q.  So she's not sensitive to problems
19 in the work place?
20     A.  Repeat your question, please.
21     Q.  Number nine says that she is
22 sensitive to problems or changes within the
23 work place and responds appropriately and

Page 68

1  you said that's a negative comment?
2      A.  That's right.
3      Q.  How is it negative?
4      A.  Because of what it says.  That
5  she's -- I feel that she's sensitive and she
6  responds appropriately.
7      Q.  And that's a negative?
8      A.  Is sensitive to problems or
9  changes within -- she responds
10 appropriately.
11     Q.  Well, you said that was a negative
12 comment.
13     A.  After I read it, that's a
14 negative.
15     Q.  So it's negative to be -- she is
16 not sensitive to problems or changes in the
17 work place and does not respond
18 appropriately?  Is that what you're --
19     A.  That's right.
20     Q.  Okay.  How is she insensitive to
21 problems or changes?
22     A.  Well, if you go back and look at
23 the comments that I made, there are several

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  cases where I said she tends to blame other
2  employees for problems related to her area
3  and never addresses whether she, being the
4  dean, should have had controls in place to
5  avoid possible breakdowns, confusion or
6  conflicts related to financial matters.
7      If you go a little higher, you'll
8  see where I say when she is asked about the
9  status of an assignment or a directive, she
10 always is -- she's always in the, quote, I
11 was fixing to stage. And there are other
12 examples of -- to support this as a
13 negative.
14     **Q. I noticed, as you were reading**
15 **that, I saw the word internal controls of**
16 **the business office are vague and**
17 **ineffective. How did you come to that**
18 **conclusion if you're not trained in**
19 **accounting?**
20     A. Because of the confusion and the
21 mishaps that continue to happen in the
22 business office.
23     **Q. Now, let's look at number ten. It**

Page 70

1  **says makes an effort to be a team player and**
2  **works effectively as a member of the**
3  **administrative team. And you've got that**
4  **checked with comment. Is that a positive or**
5  **a negative comment?**
6      A. That's a negative.
7      **Q. Okay. Now, let's turn to your --**
8  **It says the president directed employee.**
9  **You see that?**
10     A. Yes.
11     **Q. To develop a how to use the**
12 **business office manual or brochure. And you**
13 **put she didn't do it?**
14     A. That's right.
15     **Q. Have you ever seen this document?**
16     A. I haven't seen this document in
17 this form.
18     **Q. But you have seen the document?**
19     A. I saw a draft of the document
20 about a year ago, first time and last time.
21     **Q. And this is your 2005. When did**
22 **you direct her to use -- to develop a how to**
23 **use a business office manual or brochure?**

Page 71

1      A. About a year after I was employed
2  at J.F. Ingram.
3      **Q. So in 1997?**
4      A. Somewhere around that time, yes.
5          MR. CHRISTMAN: I don't think I
6  have ever seen this, Jim.
7      **Q. Now --**
8          MR. CHRISTMAN: Would you attach
9  this as an exhibit, please.
10         MR. CHRISTMAN: Okay.
11     **Q. What happened between -- We can**
12 **make that the next exhibit. It will be**
13 **Plaintiff's Exhibit No. 8.**
14         **(Whereupon, Plaintiff's Exhibit**
15 **No. 8 was marked for identification and**
16 **attached to the original transcript.)**
17     **Q. Mr. Chambers, did you direct her**
18 **in writing to do that, how to document how**
19 **to use the business office?**
20     A. In writing and several cabinet
21 meetings.
22     **Q. So there should be written**
23 **documentation?**

Page 72

1      A. There could be, yes.
2      **Q. Can you provide that to your**
3  **lawyer?**
4      A. I'm not sure I can provide it.
5  But I do have it documented in cabinet
6  notes.
7      **Q. Okay. Now, let me ask you about**
8  **those cabinet notes. Who types those?**
9      A. My administrative assistant.
10     **Q. Who is that?**
11     A. I've had three. Ms. Sylvia
12 Murphrey, Donna Wisman and now Ms. Julie
13 Wood.
14     **Q. These minutes -- Is there a taping**
15 **of the cabinet meetings?**
16     A. Sometimes, yes.
17     **Q. And you have -- Do you still have**
18 **those recordings?**
19     A. I'm not for sure. I know we have
20 some. We used to keep them for a while. We
21 would only use them so that we could
22 document accurately. The copies would be
23 distributed to the cabinet for the file.

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1   And I do know that on a few
2   occasions, once we had signed off on them,
3   they used tapes over and over again.
4   Q. When you say sign off, does that
5   mean all the members of the cabinet reads
6   the minutes of the meeting and signs like
7   counsel members do a document that's true
8   and correct?
9   MR. CHRISTMAN: Object to the
10  form.
11  A. No.
12  Q. What do you mean by sign off on
13  them?
14  A. When they are typed up, I sign off
15  that this was the meeting that I held. And
16  then I distribute it to the cabinet.
17  Q. Okay. So only you sign off on it?
18  A. Right. Sometimes they are given a
19  sheet on the top.
20  Q. Have you ever looked at the
21  cabinet meetings minutes and gone to either
22  Ms. Murphrey, Ms. Wisman or Ms. Wood and say
23  you need to make a change here, that's not

Page 75

1   MR. CHRISTMAN: Let's take a
2   break.
3   MR. DEBARDELABEN: Okay.
4   (Whereupon, a short recess was
5   taken.)
6   Q. Mr. Chambers, would you please
7   look at Plaintiff's Exhibit No. 8. Take it
8   out of the package. You stated you had
9   never seen that document before?
10  A. That's right.
11  Q. Okay. There's a note there to you
12  from Ms. Greene; right?
13  A. Right.
14  MR. CHRISTMAN: You're talking
15  about on the first page?
16  MR. DEBARDELABEN: Yes.
17  Q. I'm just flipping through here.
18  Do you recognize whose handwriting that is?
19  A. Yes.
20  Q. Whose is it?
21  A. It looks like mine.
22  Q. Okay. And that's on the purpose?
23  A. Right.

Page 74

1   what I meant?
2   A. No. There have been cases where I
3   have asked her to review her tape or to
4   review her notes.
5   Q. So whatever is in the cabinet
6   meetings is what's on the tapes or the
7   notes?
8   A. Yes.
9   Q. And you haven't changed any of
10  that?
11  A. No. There are cases where we
12  would read the minutes and I will see how I
13  said something and I would follow-up with a
14  memo making sure that they did not
15  misinterpret what I had just read or what I
16  said.
17  Q. Now, would the memo be attached to
18  the cabinet minutes?
19  A. No. No. Sometimes we would put a
20  form letter on the top saying these were the
21  things you were assigned to do and dead
22  lines.
23  Q. Okay.

Page 76

1   Q. Do you recognize whose handwriting
2   that is on fiscal division staff?
3   A. That's mine.
4   Q. You sure?
5   A. Yes.
6   Q. So apparently you've reviewed some
7   of this document, haven't you?
8   A. In a draft form, yes.
9   Q. Did you ever get your draft form
10  back to -- I noticed it said for your
11  review. Thank you Monica. Did you ever get
12  the form back to her or do you remember?
13  A. Those few pages that you just
14  showed me, yes.
15  Q. Okay. You got the entire book,
16  didn't you?
17  A. No, I did not.
18  Q. So you didn't get the entire book?
19  A. No, I did not.
20  Q. And if Ms. Greene said you did,
21  you'd say she's not telling the truth?
22  A. Yes.
23  Q. Okay. And if the cabinet meeting

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1 showed that was represented in the cabinet
2 meeting, you'd still say she wasn't telling
3 the truth?
4     A.  She presented a draft and she
5 stated -- and the minutes will reflect --
6 that she said this is a draft.  When I get
7 the completed copy, I will present it to the
8 cabinet for discussion.
9     Q.  And you have to approve the
10 completed copy, don't you, before it's
11 presented to the cabinet?
12     A.  Yes.
13     Q.  Okay.
14     A.  Let me clear up something.  I do
15 not have to approve it before it's presented
16 to the cabinet.  I have to approve it before
17 it becomes an accepted publication of the
18 college.
19     Q.  Now, was that a college
20 publication or just a publication for your
21 people at J.F. Ingram or -- I'm sorry.  I
22 called it -- I've seen both, J.F. Ingram
23 State Technical College and Ingram State

Page 78

1 Technical College.  I don't know which one
2 it is.
3     A.  It's both of them.
4     Q.  It's both of them.  Was that a
5 manual to be put out by the college or just
6 for your people at the college to use?
7     A.  Just for the people at the college
8 to use.
9     Q.  Okay.
10         (Whereupon, Plaintiff's Exhibit
11 No. 9 was marked for identification and
12 attached to the original transcript.)
13     Q.  Did you go over the evaluation
14 with Ms. Greene?
15         MR. CHRISTMAN:  Object to the
16 form.  What evaluation?
17     Q.  The evaluation -- I'm sorry.  No.
18 7.
19     A.  I gave it to her and told her to
20 read it and asked her if she had any
21 questions or concerns, to come discuss them
22 with me.  And I also indicated to her that
23 her signature was to acknowledge that she

Page 79

1 received it, but not that she -- it does not
2 indicate that she agreed with it.
3     Q.  I want you to look at No. 6.  What
4 happened in that year between 6 and 7 to
5 make her evaluations go down so low?
6     A.  Say that again.  Between No. 6.
7     Q.  Between No. 6 and 7.  It's the
8 very next year for 2004 where she got
9 everything checked acceptable and signed
10 it.
11         And I think No. 6 is dated -- by
12 you, it's signed April 1st, '04 and by her,
13 it's signed April 26th, '04.  And the 2005
14 evaluation -- what's the date on that?
15     A.  2005, July 14th.
16     Q.  What happened in that period of
17 time?
18     A.  Well, if you look at the comments
19 on the previous -- a couple of the previous
20 evaluations, I did a narrative.  I made
21 comments.  And this time I decided to get
22 positive results, I would try to identify
23 these things as opposed to just making

Page 80

1 general statements.
2     Q.  Well, let me show you all the
3 previous evaluations we've been provided and
4 ask -- which is Exhibit No. -- it starts
5 with Exhibit No. 1, Plaintiff's Exhibit 1
6 through 6 there.
7         MR. CHRISTMAN:  We'll look at
8 these, Jim, just to make sure we're looking
9 at the right exhibits.
10     Q.  Now, which evaluation are you
11 talking about?
12     A.  What was your question, please?
13     Q.  Your answer to my question was if
14 I look at the previous evaluations.  And I
15 asked you where you check things.  And I'm
16 looking at the previous evaluations, sir.
17         Let's kind of go through them in
18 order.  And the only evaluation I see where
19 anything is checked besides as is, is
20 evaluation 1998 where it says provides
21 effective leadership in areas of primary
22 responsibility and you told me that was a
23 positive.  Now, which evaluations do you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  want me to look at?
2     A.  You asked me when did the change
3  take place?
4     Q.  Yes, sir.  Then you made a comment
5  that if I looked at the previous evaluation
6  where you would check, you decided to --
7     A.  No, I didn't say check.  I said if
8  you look where I made the comments.  I made
9  statements indicating negative activity.
10       And this -- And what I started
11 doing then is not just making general
12 statements.  I started identifying them as
13 on the evaluation.
14    Q.  So I can take the -- where you
15 said the president directed the employee to
16 and you've got eighteen items there?
17    A.  Yes.
18       MR. CHRISTMAN:  Now we're talking
19 about Exhibit 7?
20       MR. DEBARDELABEN:  7.
21    Q.  All that happened within the 2005
22 evaluation period?
23    A.  No.

Page 82

1     Q.  It didn't happen from 2004 of
2  April?
3     A.  It started happening when we --
4  when I started making the comments.  When I
5  put employee tends to develop good
6  leadership, tends to get down when
7  confronted, all of this is including -- it
8  was building up to this.
9     Q.  Well, that is -- The comment
10 you're referring to is Plaintiff's Exhibit
11 No. 3 for '98, isn't it?
12    A.  Right.
13    Q.  Well, if we look at Plaintiff's
14 Exhibit No. 4 for 2002, which is the next
15 one we have been provided, everything is
16 meets standards as is, isn't it?
17    A.  Yes.
18    Q.  And when we look at Plaintiff's
19 Exhibit No. 5, which is 2003, it's meets
20 standards as is.  All that's checked.  So if
21 an employee is reading this, everything is
22 fine, isn't it?
23    A.  Yes.

Page 83

1     Q.  And even 2004 is meets standards
2  as is.  So what happened between the 2004
3  evaluation and the 2005 evaluation?
4     A.  Well, I tried to resolve issues in
5  the cabinet meetings and have meetings with
6  the administrative staff as opposed to
7  trying to put everything in writing
8        We've met and we've discussed
9  weaknesses.  We discussed things that we
10 needed to improve in.  So I was trying a new
11 technique.
12    Q.  Do you have any memos that you put
13 in Ms. Greene's file, personnel file that
14 showed she wasn't doing her job?
15    A.  Not that I recall.
16    Q.  You have memorandums you sent her
17 between 2004 of -- April the 1st, 2004, July
18 of 2005 that pointed out she wasn't doing
19 her job?
20    A.  I would think so, yes.
21    Q.  Okay.  Can you provide all those
22 to your attorney so he can provide them to
23 me?  All your memorandums you sent Ms.

Page 84

1  Greene from 2000 -- April 1st, 2004 through
2  -- what's the date on No. 7, July 15th?
3     A.  July 14th.
4     Q.  July 14th.
5     A.  2005.
6     Q.  2005.  And you have -- Are you
7  telling me you have memorandums to support
8  all these eighteen items?
9     A.  Yes.  But not necessarily during
10 that period of time.  Some of them goes
11 before that and some goes after that.
12    Q.  Well, certainly if they are after
13 this, it could be written up on the July
14 '05, couldn't it?
15    A.  Well, today, yes.  But not then.
16    Q.  But not then?
17    A.  I know what you're saying.
18    Q.  Okay.  And if it was prior to
19 April of '04, then she wouldn't know to
20 change.  You told her in April of '04 that
21 everything was fine, wasn't it?
22    A.  On the evaluation, yes.
23    Q.  Yes, sir.  An employee is supposed

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  to be able to rely on an evaluation, isn't
2  she, any employee?
3      A.  Yes.
4          MR. CHRISTMAN:  Object to the
5  form.
6      Q.  Any employee?
7      A.  Yes.
8      Q.  Examiners of public accounts are
9  -- they come in every year and evaluate
10  J.F. Ingram, don't they?
11     A.  Yes, sir.
12     Q.  Or every two years?
13     A.  Some every two years.  But mostly
14  every year.
15     Q.  And they give you an audit report;
16  correct?
17     A.  Right.
18     Q.  And Mr. Ronald L. Jones, he's the
19  chief examiner, isn't he?
20     A.  Right.
21     Q.  Been the chief examiner since the
22  '70's, hasn't he?
23     A.  I'm not sure of that.

Page 86

1      Q.  And they audit everything the
2  business office does, don't they?
3      A.  To the best of my knowledge, yes.
4      Q.  They're the experts?
5      A.  Right.
6      Q.  And they -- If Ms. Greene is not
7  doing something by the acceptable accounting
8  standards, they certainly point that out,
9  don't they?
10     A.  Usually, yes.
11     Q.  Or somebody else at the college is
12  not doing something right and it impacts on
13  the finances, they point that out, don't
14  they?
15     A.  Yes.  Usually.
16     Q.  They're pretty strict, aren't
17  they?
18     A.  Most times.
19     Q.  Mr. Jones is a pretty tough task
20  master, isn't he?
21         MR. CHRISTMAN:  Form.
22     Q.  Do you know Ronald Jones?
23     A.  Yes, I know him.  But I've never

Page 87

1  worked with him individually.
2      Q.  I have.  And I believe you came in
3  1996, didn't you?
4      A.  I think so.
5      Q.  So this October of '95 through
6  September 30th of '96, would that involve
7  you any?
8      A.  It might have involved me in
9  transition.  I'm not sure.
10     Q.  But it definitely involved Ms.
11  Greene, didn't it?
12     A.  It should have, yes.
13     Q.  Now, when you get an audit, aren't
14  you basically looking for your audit to get
15  something called an unqualified audit?
16     A.  Yes.
17     Q.  Now, do you know where to look in
18  here and see if they are unqualified?  And
19  so far as audits go, unqualified is the best
20  that can be hoped for, isn't it?
21     A.  Yes.
22     Q.  Let's start at 2004.  We'll go
23  backward from 2004.  Do you recognize this

Page 88

1  as being the audit from the J.F. Ingram
2  State Technical College from October 1st,
3  2003 to September 30th, 2004?  I'm opening
4  to that page.
5      A.  Yes, I do.
6      Q.  And who was the president then?
7      A.  I was president.
8      Q.  Who was the fiscal officer?
9      A.  Ms. Monica Greene.
10     Q.  Was that -- Did they have a
11  finding that that was an unqualified audit?
12     A.  No, they did not according to
13  this.
14     Q.  What did they find?
15     A.  What did they find?
16     Q.  Yes, sir.
17     A.  On page twenty-eight, they showed
18  that there was -- the audit did not disclose
19  any findings or questioned costs required to
20  be reported.
21     Q.  So there was nothing --
22         MR. CHRISTMAN:  For the record,
23  where are you reading from, Dr. Chambers?

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 89 | Page 91 |
|---|---|

**Page 89**

1    MR. CHRISTMAN: Page twenty-eight.
2    MR. CHRISTMAN: Under what
3 section? There's more than one section.
4    THE WITNESS: Section two.
5    **Q. I'm looking at the summary of the**
6 **examiners results.**
7    MR. CHRISTMAN: All right.
8 Section two says financial statement
9 findings. Let's see where we can find where
10 he's looking at.
11    MR. DEBARDELABEN: It should be on
12 page twenty-eight. It should be the summary
13 of examiners results.
14    MR. CHRISTMAN: All right. Make
15 sure we're talking about the same thing.
16 What's your question?
17    MR. DEBARDELABEN: Was it an
18 unqualified audit.
19    MR. CHRISTMAN: Okay.
20    **Q. Did they find anything wrong?**
21    A. On page twenty-eight of the
22 financial statement, it's no.
23    **Q. Okay. So there was no problem**

**Page 90**

1 **with finances? Is that --**
2    MR. CHRISTMAN: Well, read the
3 document, President Chambers.
4    A. It says financial statement
5 findings. And it say the audit did not
6 disclose any findings or questioned costs
7 required to be reported. And that was under
8 financial statement findings, section two.
9    Section three, which is Federal
10 awards findings, it say that the audit did
11 not disclose any findings or questioned
12 costs required to be reported.
13    **Q. And that was your 2004 audit,**
14 **2003, 2004; correct?**
15    A. 2003, 2004, yes.
16    **Q. Okay. And you were the president**
17 **and Ms. Greene was the fiscal officer that**
18 **year?**
19    A. That's right.
20    **Q. Now, let's look at -- and this**
21 **might help us.**
22    MR. CHRISTMAN: We're going to
23 attach this as an exhibit?

**Page 91**

1    MR. DEBARDELABEN: We can. No, I
2 wasn't going to attach them as an exhibit.
3    MR. CHRISTMAN: If we're going to
4 talk about it in the deposition, I would ask
5 that you attach that.
6    MR. DEBARDELABEN: I will be happy
7 to. He's got a copy. These are just copies
8 I got from the examiners.
9    MR. CHRISTMAN: Yes, sir.
10    **Q. I'm going to ask you about the**
11 **2002 and 2003 audit. And I think I got it**
12 **over to the page that will help you. The**
13 **summary of the examiners results.**
14    **Did the examiners find anything**
15 **the matter with the fiscal part of it?**
16    A. No, they didn't.
17    **Q. And you were the president?**
18    A. Yes.
19    **Q. And Ms. Greene was the fiscal**
20 **officer?**
21    A. Right.
22    **Q. Is that a good audit? They didn't**
23 **identify any material weaknesses, did they?**

**Page 92**

1    A. We need to clear up something.
2 There are parts in an audit where questions
3 are asked that you would have a yes or no.
4 And then there are findings which requires a
5 response and a corrective action.
6    So that's the reason I'm looking
7 through the entire booklet because you're
8 looking at part of it where it say no. I
9 wanted to make sure that this has -- this is
10 in line with the findings or if there were
11 any findings. So according to your
12 question, I didn't see any findings.
13    **Q. Okay.**
14    MR. CHRISTMAN: I'm going to --
15 Jim, if you don't mind -- if you don't want
16 to mark these -- I am going to ask these to
17 be marked. I will mark '03, '04 as
18 Defendant's Exhibit 1 if you don't want to
19 mark those as Plaintiff's exhibits.
20    MR. DEBARDELABEN: We'll mark them
21 as Plaintiff's exhibits. I have no problem
22 with that.
23    **Q. Okay. I'm going to show you '01**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 93 | Page 95 |
|---|---|
| 1  and '02. What we'll do is, we'll just start | 1     MR. DEBARDELABEN: And the three |
| 2  and mark them from backwards. Let's do it | 2  questions will be, show me each and every |
| 3  this way. The '03, '04 we've marked that as | 3  place in these audits where the examiners |
| 4  Plaintiff's Exhibit No. 9. | 4  found internal control over financial |
| 5      That's examiners of public | 5  reporting contained material weaknesses |
| 6  accounts audit. The '02, '03, we'll mark as | 6  identified, reportable conditions identified |
| 7  No. 10. The '01, '02, we'll mark as No. | 7  that were not considered to be material |
| 8  11. 2000 to '01, we'll mark this as 12. | 8  weaknesses, and noncompliance material to |
| 9  The '99 to 2000, we'll mark as No. 13. The | 9  financial statements was noted. |
| 10  '98 to '99, we'll mark as No. 14. | 10     MR. DEBARDELABEN: Okay. You're |
| 11     The '97 to '98, we'll mark as No. | 11  looking at the financial statements. There |
| 12  15. And the '96 to '97, we'll mark as 16. | 12  are also Federal awards that have those same |
| 13  And I don't think since you came in at the | 13  categories. |
| 14  last, you weren't there all of '95, this | 14     MR. DEBARDELABEN: Either |
| 15  September of '96. We'll just leave that one | 15  financial statements or Federal awards. |
| 16  out. That doesn't cover your entire term, | 16     MR. CHRISTMAN: Okay. |
| 17  did it? | 17     MR. DEBARDELABEN: And if y'all |
| 18     A.  No, I don't think so. | 18  want to go over these and review them for it |
| 19     (Whereupon, Plaintiff's Exhibits | 19  might take a little while, I'll be happy for |
| 20  No. 10 through 16 were marked for | 20  you to do it. And we'll even agree on the |
| 21  identification and attached to the original | 21  record for you to take these along with you |
| 22  transcript.) | 22  if you prefer doing it at your office. |
| 23     Q.  On all these audits, '97 through | 23     MR. CHRISTMAN: Okay. |

| Page 94 | Page 96 |
|---|---|
| 1  2004, do you know of any places that they | 1     MR. DEBARDELABEN: We'll let you |
| 2  found -- had an opinion that there were -- | 2  have custody of the exhibits. Is that |
| 3  material weaknesses were identified, | 3  agreeable? |
| 4  reportable conditions that are not | 4     MR. CHRISTMAN: Sure. We'll take |
| 5  considered to be material weaknesses are | 5  a break and come back. |
| 6  identified or there was noncompliance with | 6     MR. DEBARDELABEN: Okay. But I |
| 7  financial statements? | 7  have exhibits on that from '94 through '95 |
| 8     MR. CHRISTMAN: Compound question. | 8  and '95 through '96. But Mr. Chambers |
| 9  Object to the form. Answer it if you can. | 9  wasn't the president during that period of |
| 10     Q.  I'll put it this way. On any of | 10  time. |
| 11  these audits, do you know whether the | 11     MR. CHRISTMAN: Do you have '05, |
| 12  examiners found that the -- identified | 12  '06? |
| 13  internal control over financial reporting | 13     MR. DEBARDELABEN: I don't have |
| 14  contained material weaknesses? | 14  '05, '06 yet. I couldn't get them. If you |
| 15     A.  Yes. But I cannot specifically | 15  have it, I'd like to have it. |
| 16  say which ones until I have examined them. | 16     MR. CHRISTMAN: I think I do. |
| 17     Q.  Well, sir, take all the time you | 17     MR. DEBARDELABEN: And if you have |
| 18  need and examine them. | 18  it, we'd like to mark it, also. |
| 19     MR. DEBARDELABEN: Drew, we can do | 19     MR. CHRISTMAN: I'll see if I can |
| 20  this two ways. We can take a break for | 20  get my hands on it before we come back. |
| 21  lunch and let y'all both go over them | 21     MR. DEBARDELABEN: Let's make a |
| 22  because I want to ask you three questions. | 22  note on the record that you're taking |
| 23     MR. CHRISTMAN: Okay. | 23  exhibits -- |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 97 | Page 99 |
|---|---|

**Page 97**

1     MR. CHRISTMAN: No. 9, 10, 11, 12,
2   13, 14, 15, and 16.
3       MR. DEBARDELABEN: Okay.
4       (Whereupon, a lunch recess was
5   taken.)
6     Q. We're going to mark '04, '05 as
7   Plaintiff's Exhibit 17. That's the '04,
8   '05, Department of Public Accounts report.
9       (Whereupon, Plaintiff's Exhibit
10  No. 17 was marked for identification and
11  attached to the original transcript.)
12    Q. Mr. Chambers, during lunchtime,
13  did you have a chance to review all the
14  reports of examiners of public accounts from
15  I think '97 through '04, '05?
16    A. Yes, sir.
17    Q. Okay. How many reports did you
18  find on the summary of examiners results
19  where it said type of opinion issued in
20  section one where it said internal control
21  over financing reporting a material weakness
22  identified?
23    A. I think we found one.

**Page 98**

1     Q. And which one was that?
2     A. Let me go back and find which one.
3       MR. CHRISTMAN: He was referring
4   to this one right here. Material weakness
5   identified.
6     A. Yes. A report --
7       MR. CHRISTMAN: One of these.
8     A. It might have been in the wrong
9   place that said yes. But the majority of
10  them said no. Nearly all of them said no.
11    Q. Said no. And you say there's one
12  that might have said yes. Let's look at
13  those real quick.
14      MR. CHRISTMAN: Look at the most
15  recent one, Jim.
16    Q. '04, '05?
17      MR. CHRISTMAN: You just marked
18  it.
19    Q. It's 17. Let's look at '04, '05.
20  And I think it says -- here's '04, '05.
21  What does '04, '05 say? Let's go through
22  that one real quick. What does it say under
23  summary of examiner's results, type of

**Page 99**

1   opinion issued, internal over financial
2   reporting, material weakness identified, the
3   first one?
4     A. No.
5     Q. Reportable condition identified
6   that are not considered to be a material
7   weakness?
8     A. Yes.
9     Q. And noncompliance material to
10  financial statement noted?
11    A. No.
12    Q. Do you know what it meant by
13  reportable weakness -- excuse me -- a
14  reportable condition identified that are not
15  considered to be a material weakness?
16    A. Yes.
17    Q. What was that?
18    A. Do I know what it was?
19    Q. Yes, sir.
20    A. I'll have to go through the report
21  to see that.
22    Q. Okay. But it's whatever is in the
23  report. Let's go down -- Is there anything

**Page 100**

1   under Federal award that was checked yes
2   that you found?
3     A. No.
4     Q. Okay. So that's the only one that
5   you know of that was checked yes?
6     A. Yes.
7     Q. Okay. Didn't that have something
8   to do with a car or a tractor being found on
9   campus that didn't have a work order?
10    A. It was one of the findings. If
11  I'm not mistaken, that was related to one of
12  the findings about a tractor.
13      MR. CHRISTMAN: Are you talking
14  about the most recent?
15      MR. DEBARDELABEN: Yes, sir. '04,
16  '05.
17    Q. And wasn't the person -- Who's in
18  charge of live work at that point in time?
19    A. Let me make sure for clarification
20  now which one we're -- Are we talking about
21  --
22    Q. '04, '05.
23    A. '04, '05. I'm not sure if that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1  was related to the tractor.
2  **Q. Okay.**
3  A. That was related to something
4  else.
5  **Q. Do you know what it was related**
6  **to?**
7  A. Yes. That was a finding about
8  five checks.
9  **Q. Five checks?**
10  A. That was not properly deposited.
11  **Q. And where did those checks come**
12  **from?**
13  A. I'm not sure where they came
14  from. I know some of them came from the
15  State Department.
16  **Q. Okay. Now, it also has something**
17  **to do on one of them with the -- a vehicle**
18  **being found, didn't it, on campus?**
19  A. I don't think it was in that one.
20  **Q. Okay. But it wasn't considered --**
21  **It was not considered to be a material**
22  **weakness, was it?**
23  A. According to that, yes.

Page 102

1  **Q. Yes, sir. And these are the**
2  **examiners of public accounts doing it?**
3  A. Right.
4  **Q. Okay. When the examiners come in**
5  **and make an examination of the records of**
6  **Ingram, they examine inventory and the bank**
7  **accounts and work orders and all that, don't**
8  **they?**
9  A. They do a test to that, yes.
10  **Q. They examine everything that's**
11  **related to the fiscal office of receiving**
12  **money and spending money and keeping**
13  **inventory of the J.F. Ingram College?**
14  A. They do not examine everything.
15  They do a test, a cross section of a test on
16  everything.
17  **Q. Right. And they usually have an**
18  **auditor that comes and stays on campus any**
19  **place from four weeks to four months, don't**
20  **they?**
21  A. Sometimes longer, yes, sir.
22  **Q. So those auditors have access to**
23  **every file on campus, don't they?**

Page 103

1  A. Yes.
2  **Q. And they are allowed -- If they've**
3  **got questions, they can have anything**
4  **pulled?**
5  A. Yes.
6  **Q. And then they file this report and**
7  **make it available to the public?**
8  A. Yes.
9  **Q. And they report back to their**
10  **legislative committee that they are a branch**
11  **of, don't they?**
12  A. I'm not familiar with that step.
13  **Q. Did you know that the examiners of**
14  **public accounts is not a cabinet agency,**
15  **it's a legislative agency of the State of**
16  **Alabama?**
17  A. No. I'm not familiar with that.
18  **Q. Okay. And the chief examiner of**
19  **public accounts is appointed by the**
20  **legislature instead of the governor? Did**
21  **you know that?**
22  A. No, I did not.
23  **Q. Do you know a Mr. Leo Miller?**

Page 104

1  A. Yes, I do.
2  **Q. How do you know Mr. Miller?**
3  A. From being an inmate and then
4  became an employee at the college.
5  **Q. Do you know a Mr. — Tell me**
6  **this. I might have asked you this. I don't**
7  **think so. Who can get work done by J.F.**
8  **Ingram? Is it a special group of people?**
9  A. Yes.
10  **Q. Who are they?**
11  A. State employees, retired or
12  present. Two year -- Alabama two-year
13  college students, employees at Ingram. I
14  think I'm missing somebody.
15  **Q. Charitable organizations?**
16  A. Charitable. Non-profit charitable
17  organizations.
18  **Q. State agencies?**
19  A. Non-profit charitable
20  organizations. It doesn't necessarily have
21  to be a state agency.
22  **Q. But can a state agency have work**
23  **done?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1    A.   Yes.  An Alabama state agency,
2  yes.
3    Q.   Right.  What about a county
4  agency?
5    A.   Yes.
6    Q.   Any governmental -- Can we say any
7  governmental agency?
8    A.   Yes.
9    Q.   Mr. Tim Leonard, do you know who
10  he works for?
11    A.   No, I do not.  I know he works for
12  a beverage company.
13    Q.   A beverage company?
14    A.   Uh-huh.
15    Q.   Is he in any way connected with a
16  state agency?
17    A.   I'm not sure.  I would have no
18  knowledge of that.
19    Q.   Do you know how he qualifies to
20  get work done by J.F. Ingram?
21    A.   No.
22    Q.   Do you know Mr. -- Did you ever
23  ask Mr. Leo Miller to do work for Mr. Tim

Page 106

1  Leonard?
2    A.   No.
3    Q.   And if Mr. Miller said you asked
4  him to deliver his file cabinets for Mr. Tim
5  Leonard, that would be wrong?
6    A.   That's right.
7    Q.   And if he said that you told him
8  to do this and told him that even though Mr.
9  Leonard would not be expected to pay out of
10  his own pocket, that I would be compensated
11  for the hours I claim on my hours turned in
12  for working at J.F. Ingram?
13    A.   What's your question?
14    Q.   Did you know he said that the work
15  -- in essence, the work he was doing for
16  Mr. Leonard would be paid by J.F. Ingram?
17    A.   No, I did not know he said that.
18    Q.   And if Mr. Miller said that, he
19  would be lying?
20    A.   That's correct.
21        (Whereupon, Plaintiff's Exhibit
22  No. 18 was marked for identification and
23  attached to the original transcript.)

Page 107

1    Q.   Mr. Chambers, on leave requests,
2  are leave requests supposed to be done for
3  annual leave in advance?
4    A.   Yes.
5    Q.   And I forgot to ask you this.  Are
6  you a member of any organizations?
7    A.   Several.
8    Q.   What are you a member of?
9    A.   I'm a member of the Correction
10  Education Association.  I'm a member of the
11  SACS, the Southern Association of Colleges
12  and Schools.  I'm a member of the
13  Association of American Community College.
14        I'm a member of the Presidential
15  Round Table and some others, quite a few
16  others that I'm a member of as part of my
17  job.
18    Q.   Are you a member of any social
19  organizations?
20    A.   Yes.
21    Q.   What social organizations are you
22  a member of?
23    A.   I'm a member of the Montgomery

Page 108

1  Chapter of the One Hundred Black Men
2  Association.  I'm a member of the local
3  graduate college fraternity, Omega Phi Si
4  Fraternity.  And that's it.
5    Q.   Are you on any board of directors
6  of any organization?
7    A.   Yes, I am.
8    Q.   Which organization is that?
9    A.   I'm on the Phenix City local board
10  of Colonial Bank in Phenix City.
11    Q.   Colonial Bank in Phenix City?
12    A.   Yes.
13    Q.   Is that in any way connected with
14  your duties at the college?
15    A.   No.
16    Q.   Are you paid for that?
17    A.   Yes, I am.
18    Q.   And how often do you meet with the
19  Board of directors of Colonial Bank over in
20  Phenix City?
21    A.   Four times per year.
22    Q.   And are you paid for each of those
23  four times you meet?

27  (Pages 105 to 108)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 109 | Page 111 |
|---|---|
| 1  A. Yes, I am. | 1  **Q. During that time period --** |
| 2  **Q. Is that scheduled in advance?** | 2  MR. CHRISTMAN: Wait just a |
| 3  A. Is what scheduled in advanced? | 3  minute. We're not going to talk about |
| 4  **Q. The meetings?** | 4  that. That has nothing to do with this |
| 5  A. Yes. | 5  lawsuit. And we're not going to ask |
| 6  **Q. Is it during the week?** | 6  questions about that unless it has some |
| 7  A. Yes. | 7  relevance to your client's claim. We're not |
| 8  **Q. I want to show you what's marked** | 8  going to talk about -- |
| 9  **as Plaintiff's Exhibit 18. Is that a leave** | 9  MR. DEBARDELABEN: It does. |
| 10  **form for you?** | 10  MR. CHRISTMAN: -- whether he was |
| 11  A. Yes. | 11  at a gambling casino. |
| 12  **Q. For November 13th, 14th, 15th,** | 12  MR. DEBARDELABEN: It does. Are |
| 13  **16th?** | 13  you going to direct him not to answer? You |
| 14  A. Yes. | 14  can direct him not to answer, but I'll get |
| 15  **Q. Of 2006?** | 15  the answer to the question. |
| 16  A. Yes. | 16  MR. CHRISTMAN: I'm going to give |
| 17  **Q. And when did you file that?** | 17  you some latitude to go into some of this. |
| 18  A. It's showing that was -- it was | 18  When I feel like we're out of bounds, we're |
| 19  signed by him on the 29th. | 19  stopping. |
| 20  **Q. Okay. When did you submit it?** | 20  **Q. I just asked was a report made to** |
| 21  A. I don't see it showing. November | 21  **the Department of Postsecondary Education** |
| 22  the 20th is when it was sent down. | 22  **and/or the Governor's office about that?** |
| 23  **Q. Sent down?** | 23  A. Not to my knowledge. |

| Page 110 | Page 112 |
|---|---|
| 1  A. Uh-huh. | 1  **Q. You have no knowledge of that?** |
| 2  **Q. For you to get leave approved, the** | 2  A. No, sir. |
| 3  **Chancellor has to approve it?** | 3  **Q. And if somebody reported that,** |
| 4  A. The Chancellor has to have not | 4  **they would be wrong?** |
| 5  approve, but a record of it. | 5  A. Yes. I go there. But to say it |
| 6  **Q. A record of it?** | 6  was on this particular day when I was on |
| 7  A. Like we keep records of the | 7  leave or not on leave, I could not say. |
| 8  employees. I keep records of employees and | 8  **Q. Okay. That's fine. You said** |
| 9  the Chancellor keeps records of mine. | 9  **before we asked that, that those annual** |
| 10  **Q. And what time were you off on** | 10  **leaves should be filed in advance?** |
| 11  **November the 13th?** | 11  A. Yes. |
| 12  A. The entire day. | 12  **Q. And it appears that you filed that** |
| 13  **Q. Okay. What about the 14th?** | 13  **annual leave after you took it; is that** |
| 14  A. Two hours. | 14  **correct?** |
| 15  **Q. Two hours. Wasn't there an** | 15  A. It was -- yes. But it was with an |
| 16  **instance on the 14th where there was a** | 16  understanding of the Chancellor's office. |
| 17  **report made to the Governor's office and to** | 17  **Q. Okay. I think I asked you about** |
| 18  **the Chancellor's office that you were seen** | 18  **the 17th. And I'm just going to -- And you** |
| 19  **at a gambling casino, a Creek gambling** | 19  **answered, I believe, you were off on the** |
| 20  **casino here in Montgomery?** | 20  **17th. And that only goes through the 16th.** |
| 21  MR. CHRISTMAN: Object to the form | 21  **But here's -- I think this one is** |
| 22  of the question and the relevance of that | 22  **the same answer. I don't want to get** |
| 23  question. | 23  **confused. 19 takes you through the 17th,** |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1  doesn't it?
2      (Whereupon, Plaintiff's Exhibit
3  No. 19 was marked for identification and
4  attached to the original transcript.)
5      MR. CHRISTMAN:  Your question was,
6  was he off on the 17th?
7      MR. DEBARDELABEN:  Yes.
8      A.  Yes.
9      Q.  And the only reason I put that one
10  in is -- and I think we asked you questions
11  about the 17th and it was my understanding
12  that you responded that you were off on the
13  17th?
14      A.  I'm not -- You mean a few minutes
15  ago?
16      Q.  Yes, sir.
17      A.  I'm not sure what you're asking
18  me, sir.
19      Q.  Just if you were off on the 17th.
20      A.  Yes, I was off on the 17th.
21      Q.  Do you know who Mr. J.L. Griswold
22  is?
23      A.  Yes.

Page 114

1      Q.  Who is he?
2      A.  He's an employee at J.F. Ingram.
3      Q.  What was his position?
4      A.  He's had several.  But he's an
5  assistant to the Dean of Instruction.
6      Q.  J.L. Griswold?
7      A.  Oh, that's -- this is his uncle.
8  I'm not sure which Griswold.  We've had
9  three associated with the Department of
10  Corrections.
11      Q.  I'm talking about Captain
12  Griswold.
13      A.  Oh, okay.  He used to be a
14  part-time employee at the college.
15      Q.  Okay.  And I used the words
16  Captain Griswold.  Was he a retired captain
17  to your knowledge from the Department of
18  Corrections?
19      A.  Yes.
20      Q.  And did he work at one time at
21  Franklin Youth Center and have supervision
22  of security for J.F. Ingram trade school?
23      A.  Yes.

Page 115

1      Q.  And I said trade school.  It's
2  really a technical college, isn't it?
3      A.  That's all right.
4      Q.  People refer to J.F. Ingram as a
5  trade school because it used to be one,
6  didn't it?
7      A.  Yes.
8      Q.  And I think it's been a trade
9  school, a community college or a technical
10  college?
11      A.  All of the above.
12      Q.  All of the above at one time or
13  another.  Now, were you aware that Mr. J.L.
14  Griswold was concerned about Ms. Hendrix's
15  safety?
16      A.  Was I aware?
17      Q.  Yes, sir.
18      A.  In what way?
19      Q.  Well, let me show you this.  We'll
20  mark this as 20.
21      (Whereupon, Plaintiff's Exhibit
22  No. 20 was marked for identification and
23  attached to the original transcript.)

Page 116

1      Q.  Have you ever seen that letter by
2  Mr. Griswold?
3      A.  Not that I recall.
4      Q.  Are you familiar with the incident
5  that happened with Ms. Hendrix that she
6  reported to Mr. Malcolm Montgomery
7  concerning an inmate?
8      A.  Yes.
9      Q.  Are you familiar that Ms. Hendrix
10  filed a complaint and then a grievance
11  concerning that matter?
12      A.  Yes.
13      MR. CHRISTMAN:  We're talking
14  about Inmate Pruitt.
15      MR. DEBARDELABEN:  Inmate Pruitt,
16  yes.
17      A.  Yes.
18      Q.  Okay.  And you appointed Dean Merk
19  to conduct an investigation?
20      A.  Yes.
21      Q.  Okay.  Did you know prior to your
22  appointment of Dean Merk to conduct that
23  investigation, that he had already been in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  meetings with Ms. Hendrix, Mr. Montgomery,
2  Mr. Wilson and Ms. Bonita Owensby concerning
3  the very issue he was to investigate?
4      A. No.
5      Q. Did he not inform you of that?
6      A. Only after he had completed his
7  investigation.
8      Q. If you had known that he had
9  personal knowledge of what went on, would
10 you have still appointed him to investigate?
11     MR. CHRISTMAN: Object to the
12 form. The personal knowledge component has
13 not been proven. It's not in evidence.
14     Q. If you had known he had
15 participated in meetings where this matter
16 was discussed and could be a potential
17 witness to it, would you have appointed him
18 to do the investigation?
19     A. Yes.
20     Q. So you don't think it was improper
21 to appoint him to do the investigation even
22 though he had some knowledge of the matter
23 prior to that?

Page 118

1      A. No.
2      Q. Okay. Were you aware that what
3  Ms. Hendrix complained about was that Mr.
4  Montgomery asked her to show him what the
5  inmate did?
6      A. Well, I was not aware of it. I
7  was told that that was what she had said
8  happened to her.
9      Q. To her?
10     A. Yes.
11     Q. And were you aware that Mr.
12 Montgomery was only asked if he requested
13 Ms. Hendrix to demonstrate how the inmate
14 was masturbating?
15     MR. CHRISMAN: Object to the
16 form. Vague.
17     A. Repeat your question one more
18 time.
19     Q. Were you aware that Mr. Montgomery
20 was not asked if he requested Ms. Hendrix to
21 show him what she saw?
22     A. Asked by whom?
23     MR. CHRISTMAN: Form.

Page 119

1      Q. Mr. Merk.
2      A. No, I was not.
3      Q. Dean Merk.
4      A. No.
5      Q. Were you aware that Mr. Montgomery
6  denied asking Ms. Hendrix to show him how
7  the inmate was masturbating?
8      A. At the end -- Well, at the end of
9  Dr. Merk's report.
10     Q. Were you also aware that Ms.
11 Hendrix stated that he said and kept on
12 stating he asked me to show him what I saw
13 him doing?
14     A. Only at the end of his report when
15 he was giving me the information of what she
16 alleged happened.
17     Q. Did you not see those two
18 statements as being in conflict with each
19 other?
20     A. Yes.
21     Q. You saw them being conflicting?
22     MR. CHRISTMAN: You talking about
23 the statements of Hendrix and Montgomery?

Page 120

1      MR. DEBARDELABEN: Correct.
2      A. Yes.
3      Q. So were you aware that the
4  grievance procedure requires if there is
5  conflicting material facts, that a hearing
6  be conducted?
7      A. Yes.
8      Q. Did you consider the two
9  statements that Ms. Hendrix said he asked me
10 to show him what I saw the inmate doing and
11 Mr. Montgomery saying I didn't ask her to
12 show me how he was masturbating, that those
13 two statements showed a difference in
14 material fact?
15     MR. CHRISTMAN: Form.
16     A. Yes. I'd use the same answer.
17 Yes.
18     Q. So you realized there was a
19 difference in -- they couldn't agree on the
20 facts?
21     A. Right.
22     Q. And if you can't agree on the
23 facts, doesn't the procedure call for a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  hearing?
2      A.  If a hearing -- If a grievance
3  procedure has been filed, yes.  At the time
4  that it was brought to my attention, a
5  complaint had been levied against Mr.
6  Montgomery.
7      Q.  So you don't think a grievance was
8  ever filed in this by Ms. Hendrix?
9      A.  Yes.  Eventually.  Once I assigned
10 Dr. Merk to investigate it and then put it
11 on the right steps.
12     Q.  Okay.  Now, did you ever get a
13 report from Dr. Merk on the grievance?
14     A.  Yes.
15     Q.  Did you find that his report had
16 conflicting -- excuse me -- had material
17 differences in the facts by what Ms. Hendrix
18 saw -- said happened and Mr. Malcolm
19 Montgomery said happened?
20     A.  Yes.  That never changed.
21     Q.  Well, sir, you're in charge of
22 seeing that the regulations are followed,
23 aren't you?

Page 122

1      A.  Yes.
2      Q.  And, I mean, you're kind of like
3  President Truman, the buck stops with you up
4  there?  I mean, if it's -- When it gets down
5  to it, you're the one that has to be sure
6  the rules are followed, aren't you?
7      A.  Right.
8      Q.  Okay.  Are you familiar with the
9  grievance procedure?
10     A.  Yes, I am.
11     Q.  And it's employee grievance
12 procedure number 620.02, isn't it?
13     A.  I'm not sure which number it is.
14     Q.  Right.  Do you recognize that as
15 the grievance procedure, sir?
16     A.  Yes.
17        MR. CHRISTMAN:  We're looking at
18 Exhibit 2 to another deposition.
19     Q.  We're looking at Exhibit 2 to Dean
20 Merk's deposition.  Will you look at part
21 three of that.  It says investigative
22 procedures.
23     A.  Okay.

Page 123

1      Q.  The second paragraph.  You see
2  where it says if there is any dispute
3  between the parties as to factual
4  allegations?
5      A.  Uh-huh.
6      Q.  The coordinator shall schedule a
7  hearing which will be.  You see that part?
8      A.  Yes.
9      Q.  And as you read the report that
10 Dean Merk did for you, did you find there
11 was dispute between the parties as to the
12 factual allegations?
13     A.  That never changed throughout the
14 entire process.
15     Q.  Yes, sir.  There was a dispute of
16 those factual allegations, wasn't there?
17     A.  There was a difference of what Ms.
18 -- There was a difference between what both
19 parties said.  And it started that way and
20 that never changed.
21     Q.  Yes, sir.  And this procedure
22 that's been adopted by the college said the
23 coordinator shall schedule a hearing,

Page 124

1  doesn't it?
2      A.  Yes.
3      Q.  Now, however, it goes on down,
4  that if both or all of the parties, if more
5  than two, agree to waive a hearing, the
6  hearing will be waived.
7         Have you seen any indication or
8  any information that either Ms. Hendrix or
9  Mr. Malcolm Montgomery agreed to waive the
10 hearing?
11     A.  I haven't seen anything to that
12 effect.
13     Q.  Did anybody ever inform you they
14 had agreed to waive the hearing?
15     A.  No.
16     Q.  So in this case, shouldn't there
17 have been a hearing?
18     A.  It was not -- It was not at a
19 level to be presented to me at that point.
20     Q.  But --
21     A.  If you go back to the third part
22 on there, it tells you.  It says that -- the
23 grievance said -- It says should the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1    president, the grievance coordinator or
2    other designated official which to assist in
3    submitting a report. And it goes on to talk
4    about steps to be taken to get to that
5    point.
6        Q. Yes, sir. I understand.
7        A. So --
8        Q. But I asked you earlier if it was
9    your job to make sure the process is
10   followed and I thought you told me yes?
11       A. Yes. And it's also my job to make
12   sure that they have properly followed the
13   appropriate steps. And at this particular
14   level, it was not at the step where I was
15   supposed to be involved.
16       Q. So you're telling me that it's not
17   your job to look and see if your coordinator
18   followed the appropriate steps?
19       A. Only at the end of the report when
20   he's presenting it to me as being -- as his
21   work is being complete.
22       Q. Okay. And at the end of the
23   report, it never changed, that there was

Page 126

1    dispute of material fact?
2        A. Right. That's right.
3        Q. Mr. Chambers, do you have a habit
4    of yelling at your employees?
5        A. No.
6        Q. Do you ever raise your voice at
7    your employees?
8        A. Yes.
9        Q. Under what circumstances do you
10   raise your voice at your employees?
11       A. Usually when I'm disappointed or
12   we have a problem.
13       Q. Aren't you a trained counselor?
14       A. Yes.
15       Q. Have you been trained when to
16   discuss a problem with people that you
17   shouldn't be raising your voice?
18       A. Yes.
19       Q. So you know that when you raise
20   your voice, based on your training, that it
21   can cause more problems, don't you?
22       A. Sometimes.
23       Q. Okay. And you can take a

Page 127

1    situation that could be diffused or
2    resolved, but when you raise your voice, it
3    creates more animosity in another person?
4    You knew that, didn't you?
5        A. Sometimes.
6        Q. Based on your training?
7        A. Sometimes.
8        Q. Okay. Have you ever raised your
9    voice at Ms. Greene?
10       A. I'm sure I have.
11       Q. Have you ever raised your voice at
12   Ms. Greene in front of her employees?
13       A. I'm sure I have.
14       Q. Why doesn't Ingram State Technical
15   College have a dress code?
16       A. Say why?
17       Q. Why don't you have a dress code?
18       A. Because there seems to be conflict
19   as to whether you can actually have one or
20   not statewide.
21       Q. Conflict of what?
22       A. Some agencies say you can and some
23   say you can't.

Page 128

1        Q. As I understand, your student
2    population is one of the most unique in the
3    State of Alabama because they are all
4    felons, aren't they?
5        A. That's right.
6        Q. Each and every student you have at
7    that college is a felon?
8        A. Right.
9        Q. Now, over at the main campus, they
10   are all male felons; correct?
11       A. That's right.
12       Q. At the Tutwiler campus, they are
13   all female felons?
14       A. That's right.
15       Q. And at the other campus -- is it
16   Draper?
17       MR. CHRISTMAN: Staton, Draper.
18       Q. At the Staton, Draper campus, they
19   are all male felons, aren't they?
20       A. That's right.
21       Q. And in both areas, you have men
22   and women working, don't you?
23       A. Yes.

32 (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1    MR. CHRISTMAN: You talking about
2  non-inmate.
3    MR. DEBARDELABEN: Yes.
4    **Q. Working employees?**
5    A. That's right.
6    **Q. Your employees in both areas are**
7  **men and women?**
8    A. Right.
9    **Q. Would you agree or disagree that**
10 **over the years there has been some confusion**
11 **over what is appropriate attire for either**
12 **the men or women to wear at your campuses?**
13   A. I know you said that's a agree or
14 disagree. No, I don't think there's been
15 any confusion.
16   **Q. Okay. Now, have you put out**
17 **memorandums concerning what people should**
18 **wear?**
19   A. Yes.
20   (Whereupon, Plaintiff's Exhibit
21 No. 21 was marked for identification and
22 attached to the original transcript.)
23   **Q. Now, you put this memorandum out**

Page 130

1  **in 1998 for all people to wear proper dress**
2  **code, didn't you?**
3    A. Yes.
4    **Q. And that was directed at males as**
5  **well as females, wasn't it?**
6    A. Yes.
7    **Q. There have been situations from**
8  **time to time at your main campus and at the**
9  **Staton, Draper campus of male inmates having**
10 **relations with each other, haven't there?**
11   A. There have been some alleged.
12   **Q. Homosexual --**
13   A. Oh, well, there's been some
14 alleged. I haven't witnessed any
15   **Q. Right.**
16   A. But there's been some reports,
17 yes.
18   **Q. Been some reports. So what you**
19 **have, at least at the Draper Staton and the**
20 **main campus, you have apparently men that**
21 **are attracted to men in some instances?**
22   MR. CHRISTMAN: Object to the
23 form. Not established.

Page 131

1    **Q. Or reports of that?**
2    A. There's been reports of that, yes.
3    **Q. At the Draper Staton or at the**
4  **main campus, has there ever to your**
5  **knowledge been an attack by a male inmate**
6  **upon a female?**
7    A. Not that I know of. Not that I
8  recall.
9    **Q. Has there ever been any complaints**
10 **about a male attacking a female inmate -- I**
11 **mean a female that worked there or visited?**
12   A. Not physical attack, no.
13   MR. CHRISTMAN: You talking about
14 ever in the history of --
15   MR. DEBARDELABEN: To his
16 knowledge.
17   MR. CHRISTMAN: Answer what you
18 know.
19   A. Well, since I've been there, no.
20   **Q. You can only state about when**
21 **you've been there. And the person out of**
22 **all your deans, present deans, who has been**
23 **there the longest is Ms. Greene, isn't she?**

Page 132

1    A. Yes. No. Mr. Wilson has been
2  there the longest.
3    **Q. He hasn't been the dean as long,**
4  **has he?**
5    A. No.
6    **Q. Have you ever called Ms. Greene**
7  **into your office and told her she was weak?**
8    A. Yes.
9    **Q. Because she wants everybody to**
10 **like her?**
11   A. Not in the sense that you just
12 said it. But, yes.
13   **Q. In January of 2000, have you ever**
14 **called Ms. Greene -- did you call Ms. Greene**
15 **into your office, said I want you to get**
16 **real mad and curse?**
17   A. No. Not in that sense. I've
18 heard that. But, no.
19   **Q. Have you ever told her that she**
20 **needed to be and I, quote, a bitch?**
21   A. No.
22   **Q. You've never used those words?**
23   A. No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1    Q.  And if she says you did, you would
2  deny that?
3    A.  Yes, I would.
4    Q.  Have you ever, when Ms. Green was
5  not present on campus, have you ever called
6  Ms. Givens into your office along with Mr.
7  Bridgeman and discussed Ms. Greene?
8    A.  Yes.
9    Q.  Have you ever told them she was
10 weak?
11   A.  Yes.
12   Q.  And ineffective?
13   A.  Yes.
14   Q.  And not a good manager?
15   A.  I don't know about all the other
16 things you're addressing.  But I have had a
17 conversation to the first things that you
18 asked.
19   Q.  And did you do this in 2001?
20   A.  I can't recall the exact date.
21 But it did occur.
22   Q.  Have you done it more than once?
23   A.  Yes.

Page 134

1    Q.  And you're a trained counselor?
2    A.  Yes.
3    Q.  And you know that when you
4  criticize, don't you, a person's superior to
5  their subordinates, that you weaken that
6  person?
7    A.  Sometimes.
8    Q.  And you were aware of that
9  situation when you were doing it?
10   A.  That was not my focus at that
11 time.
12   Q.  That wasn't your focus?
13   A.  No.
14   Q.  But you were aware that when a
15 person's superior criticizes that person to
16 that person's subordinate, that it can
17 create a very adverse situation for both the
18 subordinates and their immediate superior?
19   A.  Like I said, that was not my focus
20 at that time.
21   Q.  Yes, sir.
22   A.  And our meetings were to do -- to
23 reach another end.  It was not designed to

Page 135

1  criticize her.  It was designed to --
2    Q.  But you did do --
3      MR. CHRISTMAN:  Hold on just a
4  second.
5    A.  It was designed to get the work
6  completed.  And they were two people who
7  were capable of doing that work.  And that's
8  why they were called in.
9    Q.  But you did criticize Ms. Greene
10 to them?
11   A.  I did not call it criticism at
12 that time.  I was trying to get to an end.
13   Q.  Why did you pick times when Ms.
14 Greene wasn't on campus?
15   A.  So that I could get the work
16 completed.
17   Q.  But as I look at the examiners
18 reports of about approximately a ten-year
19 period that we've gone through, you've only
20 given me one example where the Department of
21 Examiners of Public Accounts found a
22 criticism that wasn't considered a major
23 weakness?

Page 136

1    A.  But I could give you several
2  examples in these where they've had
3  findings.  If you were to read my responses,
4  my -- not one of my responses addressed what
5  they found other than in the findings.
6    Q.  Now, in March of 2002, did you
7  tell Mr. Bridgeman and Ms. Givens that he
8  knew Ms. Greene was weak and ineffective,
9  and that if they needed to talk with you
10 concerning this, to please feel free to come
11 forward and come in and see him?
12   A.  Not in those terms.  But it's in
13 the same content of the question you asked
14 me previous.
15   Q.  And, in fact, you have told Ms.
16 Givens, didn't you, if she's ever asked
17 about these conversations, just to tell the
18 truth?
19   A.  I don't recall.  But -- I don't
20 recall.  I will say that I've even informed
21 Ms. Greene after she would return to work
22 that I had met with her employees.
23     (Whereupon, Plaintiff's Exhibit

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  No. 22 was marked for identification and
2  attached to the original transcript.)
3      **Q. Let me show you what I have marked**
4  **as Plaintiff's Exhibit 22. And this appears**
5  **to be a memorandum from Sandy Caylor to you**
6  **dated February 16th, 2006. Do you recall**
7  **getting that memorandum from Ms. Caylor?**
8      A. Yes, I do.
9      **Q. Do you recall the conversations**
10 **she refers to?**
11     A. Yes, I do.
12     **Q. Do you recall Dean Wilson making**
13 **comments as that letter states?**
14     A. No.
15     **Q. Did Ms. Caylor misunderstand?**
16     A. Yes.
17     **Q. But how many times have you gotten**
18 **a memorandum written like that?**
19         MR. CHRISTMAN: Object to the form
20 of the question.
21     **Q. If you can remember.**
22         MR. CHRISTMAN: I don't know what
23 like that means.

Page 138

1      **Q. Concerning a conversation with you**
2  **and another dean.**
3      A. Very seldom. I don't get a lot of
4  memorandums from instructors or employees.
5      **Q. That's highly unusual. Let's just**
6  **say that's unusual for you to get a**
7  **memorandum such as Ms. Caylor sent you,**
8  **isn't it?**
9      A. Well, it's in a small number. I
10 don't get -- I wouldn't say highly unusual,
11 because I do get notes from people.
12     **Q. I corrected that and said**
13 **unusual.**
14     A. Well, no, I get them. But not in
15 large quantities.
16     **Q. What did you do after you got that**
17 **memorandum?**
18     A. I read it. The next morning she
19 came and I asked her, I said, I read your
20 memorandum, but did we have a
21 misunderstanding. I told her what I thought
22 I heard and she told me what she thought she
23 was hearing. When she left my office, I

Page 139

1  thought everything was cleared up.
2      **Q. But she felt uncomfortable enough**
3  **about the -- for whatever reason to write**
4  **that memorandum to you, to make sure that you**
5  **would understand what --**
6         MR. CHRISTMAN: I object to the
7  form as to whether he knows how she felt.
8  Answer if you know how she felt.
9      A. I don't know how she felt.
10     **Q. Okay. Now, I've heard claims**
11 **about Ms. Greene not paying bills on time.**
12 **And I've read that in your complaints -- I**
13 **mean your write-up. Can you give me an**
14 **example of one bill she hasn't paid on time?**
15     A. I can't recall any one in
16 particular. But there are a lot of them.
17 We have those on file. I can get whatever
18 you need.
19     **Q. Does the examiners of public**
20 **accounts audit that?**
21     A. They do a test of that, yes.
22     **Q. Yes, sir. And if it's -- Aren't**
23 **there tests designed to find problems with**

Page 140

1  colleges or any institution they audit?
2         MR. CHRISTMAN: Form.
3      A. I'm sure there are. But I
4  wouldn't have any knowledge of that.
5      **Q. Right. They are the professionals**
6  **and they're charged with auditing it to make**
7  **sure that the money is handled right, isn't**
8  **it?**
9      A. From my understanding, yes.
10     **Q. And I think in the front of their**
11 **book, I think they certify, don't they -- if**
12 **you want to read it -- the audit was**
13 **conducted in accordance with the generally**
14 **accepted governmental auditing standards for**
15 **financial audits?**
16         MR. CHRISTMAN: What are you
17 reading from there, Mr. Debardelaben?
18         MR. DEBARDELABEN: The scope and
19 objective of the audit. And it's usually on
20 the index page A.
21         MR. CHRISTMAN: Are you looking at
22 an exhibit?
23         MR. DEBARDELABEN: I'm reading

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1  from particularly Plaintiff's Exhibit 10.
2  But I believe it will say the same thing on
3  all examiners exhibits. When I say
4  examiners, I'm talking about the State
5  Department -- I mean the Department of
6  Examiners of Public Accounts of the State of
7  Alabama.
8      **Q. And it says the objectives of the**
9  **audits were to determine whether the**
10 **financial statements presented fairly the**
11 **financial position and results of financial**
12 **operation and whether the college has**
13 **complied with the applicable laws and**
14 **regulations. That's their purpose, isn't**
15 **it?**
16     A. According to that, yes, sir.
17     **Q. Yes. And, Mr. Chambers, would you**
18 **defer to the examiners of public accounts'**
19 **expertise in the auditing of the financial**
20 **records of Ingram State Technical College?**
21         MR. CHRISTMAN: Form.
22     A. I'm not sure I understand your
23 question. Would I defer?

Page 142

1      **Q. Would you think the examiners of**
2  **public accounts has more expertise in the**
3  **auditing of financial records in determining**
4  **if anything was wrong of Ingram than you**
5  **would?**
6      A. Yes.
7      **Q. And you would expect them to defer**
8  **to your ability in education, wouldn't you?**
9          MR. CHRISTMAN: Form.
10     A. Sometimes.
11         MR. DEBARDELABEN: Could y'all
12 excuse me for a minute.
13         (Whereupon, a short recess was
14 taken.)
15     **Q. Mr. Chambers, do you remember when**
16 **Mr. Bridgeman retired?**
17     A. Yes.
18     **Q. He was a, what, senior accountant?**
19     A. I don't know whether they called
20 him a senior accountant. But he was a --
21     **Q. He was an accountant?**
22     A. He was the top accountant.
23     **Q. And was he the assistant to the**

Page 143

1  fiscal dean?
2      A. I don't know whether his title was
3  assistant to her. But he was next in line.
4      **Q. Okay. When he retired, do you**
5  **remember telling Dean Greene that Ms. Givens**
6  **could have Mr. Bridgeman's job?**
7      A. No.
8      **Q. You never told her she could have**
9  **the job, but couldn't get paid for it?**
10     A. No.
11     **Q. No raise in pay?**
12     A. No.
13     **Q. If Mr. Greene says that, it's**
14 **wrong?**
15     A. That's right.
16     **Q. Okay. So it's your testimony**
17 **today that that job was never offered by you**
18 **to Ms. Givens through Dean Greene?**
19         MR. CHRISTMAN: Talking about
20 Bridgeman's job.
21         MR. DEBARDELABEN: Right.
22     A. That's right.
23     **Q. And a person was subsequently**

Page 144

1  hired to replace Mr. Bridgeman, wasn't
2  there?
3      A. Not to my knowledge.
4      **Q. Nobody has been hired to replace**
5  **Mr. Bridgeman?**
6      A. Not to replace Mr. Bridgeman, no.
7      **Q. What about Mr. Bridgeman's**
8  **position?**
9      A. Ms. Greene reorganized that.
10     **Q. Okay. Now, do you know a Ms.**
11 **Bonita Owensby?**
12     A. Yes.
13     **Q. How do you know Ms. Owensby?**
14     A. From meeting her when I started
15 working at Ingram.
16     **Q. Okay. And what was Ms. Owensby's**
17 **position?**
18     A. When I came to Ingram?
19     **Q. Yes.**
20     A. I'm not sure.
21     **Q. Who does Ms. Owensby work under,**
22 **which dean?**
23     A. Dean Wilson.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 145

1    Q.  And do you know what job she has
2  now?
3    A.  No.  Not by title I don't.
4      (Whereupon, Plaintiff's Exhibits
5  No. 23 - 24 were marked for identification
6  and attached to the original transcript.)
7    Q.  Show you what we've marked as
8  Plaintiff's Exhibit 23 and ask if you
9  recognize that document?
10    A.  Yes.
11    Q.  What's that document?
12    A.  This is a memorandum of contracts
13  agreement for Ms. Bonita Owensby from me.
14    Q.  And what position did you appoint
15  her to?
16    A.  Registrar, assistant to the Dean
17  of Students and Student Support Services.
18    Q.  Okay.  So she is the registrar?
19    A.  Yes.
20    Q.  What are the duties of the
21  registrar?
22    A.  Well, they vary.  She's in charge
23  of records and maintenance of the admissions

Page 146

1  office.
2    Q.  Who was registrar before her?
3    A.  Mr. Tim Robinson.
4    Q.  And Ms. Owensby is a black female,
5  isn't she?
6    A.  Yes.  To the best of my knowledge,
7  yes.
8    Q.  Appears to be, doesn't she?
9    A.  Yes.
10    Q.  And Mr. Tim Robinson was a black
11  male?
12    A.  Yes.
13    Q.  And do you recognize this as a job
14  description for Mr. Robinson?
15      MR. CHRISTMAN:  Form.
16    A.  No, I do not.
17    Q.  Okay.  Who would be the best one
18  to ask about that?
19    A.  He's retired.  But it would be the
20  past Dean of Students.  What was his name?
21  I can't answer your -- Reeder.
22    Q.  Dean Reeder?
23    A.  Dean Reeder.

Page 147

1    Q.  And what about -- When did -- Who
2  was the personnel director before Dean Merk
3  became personnel director?  Was it Mr. Greg
4  Wright?
5    A.  Yes.
6    Q.  Would he have knowledge of that,
7  too, being a personnel director?
8    A.  He should.
9    Q.  Does Ms. Owensby perform
10  approximately the same job as Mr. Robinson
11  as registrar?
12    A.  She does some of the work.  But to
13  say that they did the exact same thing --
14  because Mr. Robinson also taught classes.
15  He had other duties I know she's not doing.
16    Q.  And Ms. Owensby is the assistant
17  to the Dean of Students that Mr. --
18    A.  Wilson.
19    Q.  Mr. Robinson wasn't?
20    A.  Pardon me?
21    Q.  Mr. Robinson was not the assistant
22  to the Dean of Students, was she?
23    A.  Was he.

Page 148

1    Q.  Was he.
2    A.  Not to my knowledge, no.
3    Q.  So they were both registrars and
4  they have other jobs?
5    A.  He was registrar and had other
6  jobs.
7    Q.  And she's registrar and has other
8  jobs?
9    A.  As assistant to the dean, yes.
10    Q.  All right.  Are you aware that Ms.
11  Owensby is paid substantially less now than
12  Mr. Robinson was when he left the job?
13    A.  Yes.
14    Q.  And he left the job in 1999,
15  didn't he?
16    A.  Around that time, yes.
17    Q.  And at that time, he was paid
18  approximately sixty-seven thousand dollars,
19  wasn't he?
20    A.  I could not tell you.  I don't
21  know.
22    Q.  And are you aware that Ms. Owensby
23  is only paid sixty thousand dollars today?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 149 |
|---|

1  A. Yes.
2  Q. And since '99, which has been
3 about seven years, there's been several pay
4 increases by the State, hasn't there?
5  A. Yes.
6  Q. But she still is not as high as
7 where Mr. Robinson was when he left the job,
8 is she?
9  A. That's right.
10  Q. What's the reason for that?
11  A. I can't answer why she's not where
12 he was. I can answer why where she is now.
13  Q. Who would be able to answer the
14 question as to why she's not on the same pay
15 scale as Mr. Robinson?
16  A. I don't know.
17  Q. You're the president, aren't you?
18  A. Yes, I am.
19  Q. And if you send Ms. Greene a
20 memorandum to put somebody on a certain pay
21 scale, she has to do that, doesn't she?
22  A. Yes. But I wouldn't be saying it
23 because of Mr. Robinson. I would be saying

| Page 150 |
|---|

1 it because this is where the person is
2 placed and this is the salary that goes with
3 that placement.
4  Q. Now, you would agree with me that
5 if Ms. Greene saw you doing something that
6 is improper or illegal, she should say no,
7 President Chambers, I'm not going to do
8 that, it could get us both in trouble?
9  A. I would certainly hope so.
10  Q. That's her job?
11  A. Yes. That's all employees job.
12  Q. One of her main jobs, one of her
13 main jobs is to make sure that the money
14 expended by J.F. Ingram is properly
15 expended, isn't it?
16  A. Yes.
17  Q. And that's probably number one,
18 isn't it?
19  A. Yes.
20  Q. You can get in all kinds of
21 trouble if that money is improperly spent,
22 isn't it?
23  A. Yes.

| Page 151 |
|---|

1  Q. And she has all the deans all the
2 time wanting her to spend money for things,
3 doesn't she?
4  A. Yes.
5  Q. And it's -- When I say her, it's
6 her and her staff's job to make sure that
7 all the i's are dotted and all the t's are
8 crossed, so to speak, and all legal
9 requirements are met before that money is
10 spent?
11  A. Yes.
12  Q. And if it's not spent correctly,
13 it's her fault, isn't it?
14  A. And mine.
15  Q. Right. But you depend on her to
16 make sure it's spent legally, don't you?
17  A. Yes.
18  Q. Because quite frankly, you're not
19 trained in that area, are you?
20  A. No.
21  Q. And you have to depend on her?
22  A. Yes.
23  Q. Okay. And in the entire time

| Page 152 |
|---|

1 you've been there, nobody has questioned how
2 your money was spent in the sense that it's
3 been spent improperly or illegally?
4  A. Yes.
5  Q. When did they say it's been spent
6 improperly or illegally?
7  A. I can't give you an exact date or
8 time. But there's been some question as to
9 whether a purchase was appropriate and
10 whether travel was -- should have been
11 billed under one budget. But not anything
12 of a major issue.
13  MR. CHRISTMAN: You talking about
14 up to today?
15  MR. DEBARDELABEN: Yes. Up to
16 today.
17  A. Well, we have one in our audit now
18 about -- we're talking about not in
19 appropriate spending. But we have some
20 question about spending related to the
21 checks.
22  We also have a situation now
23 that's -- where we've allowed some charges

# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1  that were over and beyond that should have
2  been closed out in last year's budget.
3     **Q. Did they find a major -- what's**
4  **that word?**
5     A. Finding?
6     **Q. Yes.**
7     A. Yes.
8     **Q. What do they call that thing?**
9     A. Material weakness.
10    **Q. A material weakness identified**
11 **that was -- yes. That would make it a**
12 **qualified audit.**
13    A. You have training as an auditor.
14 You've already said that. But you keep
15 referring to that part. My responses are
16 only to the findings.
17    **Q. Okay. No, sir. I do not have**
18 **training as an auditor. I was their legal**
19 **counsel.**
20    A. Oh, okay. Well, you hear enough
21 of it then.
22    **Q. Are you aware that Ms. Owensby**
23 **filed a grievance concerning her pay?**

Page 154

1     A. A grievance to me or to the
2  college?
3     **Q. To the college. I assume all**
4  **grievances go to you?**
5     A. But she also filed some other
6  issues, too.
7     **Q. Yes, sir. But she filed an issue**
8  **on her pay. Were you aware of that?**
9     A. Yes.
10    **Q. Tell me about this pay schedule.**
11 **I'm fairly confused about it. You have an A**
12 **to E?**
13    A. Right.
14    **Q. And the E is the lowest and A is**
15 **the highest?**
16    A. Yes.
17    **Q. Okay.**
18    A. Full-time.
19    **Q. Okay. Mr. Griswold, Bill**
20 **Griswold, what's his title?**
21    A. Assistant to the Dean of
22 Instruction.
23    **Q. Okay. And that's Dean Merk;**

Page 155

1  **correct?**
2     A. Right.
3     **Q. And is his title assistant to the**
4  **dean or assistant to the college, college**
5  **dean? Is he assistant to the dean of**
6  **instruction or assistant to the Dean of the**
7  **College?**
8     A. He's Dr. Merk's assistant. He
9  could have been assistant to the Dean of the
10 College at one time because that was the
11 Dean of Instruction, also.
12    **Q. Because at one time, until it was**
13 **rearranged, Dr. Huffstutler was Dean of the**
14 **College?**
15    A. Right.
16    **Q. And if memory serves me correct,**
17 **Dr. Huffstutler came to Ingram when you came**
18 **to Ingram?**
19    A. Right.
20    **Q. You brought him with you from**
21 **Chattahoochee Valley?**
22    A. No. He didn't come with me. He
23 came later.

Page 156

1     **Q. Later. But he talked with you and**
2  **worked with you at Chattahoochee Valley?**
3     A. Right.
4     **Q. Now, did Dr. Huffstutler have to**
5  **apply for that and go through an application**
6  **process or did you appoint him?**
7     A. No. He went through an
8  application process.
9     **Q. And he came over as Dean of the**
10 **College?**
11    A. Dean of Instruction.
12    **Q. Dean of Instruction. When did he**
13 **become Dean of the College?**
14    A. I can't give you an exact time.
15 But it was after he had been there for a
16 while.
17    **Q. Who was Dean of the College when**
18 **you got there?**
19    A. I think Mr. Bruce Thomas. I don't
20 know whether he was titled the Dean of the
21 College, but he was academic dean in charge.
22    **Q. And Mr. Thomas, he retired shortly**
23 **thereafter, didn't he?**

39 (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1   A.  Yes.
2   Q.  Medical reasons?
3   A.  Yes.
4   Q.  And you knew he has since
5   deceased?
6   A.  Right.
7   Q.  Who is Dean Wilson's assistant?
8   Does he have an assistant?
9   A.  No, he does not.  You mean as
10  assistant dean?
11  Q.  Yes.
12  A.  No.
13  Q.  But Ms. Owensby is assistant to
14  the Dean of Students, isn't she?
15  A.  Yes.  Assistant to the Dean of
16  Students, not assistant Dean of Students.
17  There's a difference.
18  Q.  Okay.  So what is the difference
19  between assistant to the dean and like Mr.
20  Griswold is?  Is he a dean's assistant or
21  assistant to the dean?
22  A.  Assistant to the dean.
23  Q.  So there's no difference?

Page 158

1       MR. CHRISTMAN:  Between the two of
2   them.
3   Q.  Between the two of them in the
4   position they hold?
5   A.  As far as titles, no.  But the
6   role in duties -- job duties and
7   responsibilities, they are different.
8   Q.  That's what I'm getting at.  On
9   salary scale, do you have a salary scale for
10  the assistant to the dean that all
11  assistants to the dean are on?
12  A.  No.
13  Q.  Is the salary scale of the person
14  for the position or for the person occupying
15  the position?
16      MR. CHRISTMAN:  I object to the
17  form of that question.  I don't understand
18  it.
19  Q.  Is the salary set by position or
20  is it set by the person occupying the
21  position?
22  A.  For the position.
23  Q.  Okay.  So do you have a salary

Page 159

1   scale for assistants to the deans?
2   A.  No.
3   Q.  Do you have a particular salary
4   scale for assistants to Dean of Students and
5   Support Services?
6   A.  No.
7   Q.  And you have no salary scale for
8   assistants to the Dean of Instruction?
9   A.  No.
10  Q.  So how is it determined what the
11  salary of Ms. Owensby and/or Mr. Griswold is
12  that occupies those two positions?
13  A.  Well, they are usually looked upon
14  as years at the college.  That involves
15  steps that they are placed on.  And in
16  particular cases, if it's on a C scale,
17  there's one scale that will allow for a
18  negotiable salary based on duties, jobs,
19  roles, responsibilities.
20  Q.  What about an E scale?
21  A.  E scale has three levels.  And
22  it's left up to the supervisor to determine
23  and evaluate the employees and recommend

Page 160

1   that they go up on the scale or whether they
2   go to another step once they complete the
3   three that's available for them.
4   Q.  Have you ever had a budget meeting
5   with Ms. Greene?
6   A.  Yes.
7   Q.  And one of the things she has to
8   do besides pay the bills and keep up with
9   the money is to figure out what the budget
10  will be for the next year; correct?
11  A.  Yes.
12  Q.  Now, does J.F. Ingram have a
13  surplus budget?
14  A.  I don't know.
15  Q.  Would that be a good thing to
16  have?
17  A.  Yes.
18  Q.  Is that something that Ms. Greene
19  should strive to create for J.F. Ingram?
20  A.  Yes.
21  Q.  Have you ever asked her to strive
22  to keep a surplus budget for J.F. Ingram?
23  A.  Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1    Q.  And you don't know if she has one
2  or not?
3    A.  That's right.
4    Q.  What would be a good size surplus
5  budget for your school?  Would a million
6  dollars?
7    A.  Two would be good.
8    Q.  Two.  And if there's anything over
9  two million dollars, it's exceptional, isn't
10  it?
11    A.  In our particular case, yes.
12    Q.  Do you recall in September of '02
13  yelling at Ms. Greene about a Home Depot
14  bill?
15    A.  I don't recall that date or
16  particular setting.
17    Q.  Are you denying you did that?
18    A.  No, I am not denying that I did
19  it.  I'm saying I do not recall that
20  particular date or setting.
21    Q.  Have you ever asked Ms. Greene to
22  resign her job?
23    A.  Not in the sense that you just

Page 162

1  stated, no.
2    Q.  Have you asked her in any sense to
3  resign her job?
4    A.  Yes.
5    Q.  What sense have you asked her to
6  resign?
7    A.  If she did not want to do her job,
8  then she should resign.
9    Q.  What part of her job is she not
10  doing?
11        MR. CHRISTMAN:  You talking about
12  in any sense or just one that let it all go?
13    A.  I'm sorry.  I thought I was
14  waiting.  Running the business office in an
15  effective way.
16    Q.  Now, didn't you just tell me that
17  if she had a surplus at the end of the year
18  of two million dollars, that would be
19  excellent?
20    A.  Yes.  As a surplus, yes.
21        MR. CHRISTMAN:  You said surplus
22  budget.
23    Q.  And if it's anything over two

Page 163

1  million, it would be extremely good?
2    A.  Yes.  That two million you're
3  looking at is only for in case we have a
4  crisis.  That would carry us for two to
5  three six months.
6    Q.  Do you realize in 2003 it was two
7  point nine million and 2004 it was two point
8  one million surplus?
9    A.  Yes.
10    Q.  At the end of the year?
11    A.  Yes.
12    Q.  That's extremely good, isn't it?
13    A.  No, it's not.  It's only -- That
14  would only carry the college -- if we have a
15  crisis, that would only carry the college
16  anywhere from three to six months.
17    Q.  So when you told me earlier that
18  if you had two million --
19    A.  You said surplus budget.  I do not
20  consider that as a surplus.  That is a --
21  I'm trying to bring that even higher.  The
22  State requires us to have a three year plan
23  for emergencies.

Page 164

1        I think that would carry us until
2  about six months.  And I'm trying to get it
3  up to a year.  So that does not leave us any
4  funds for buildings or any type of major
5  projects.
6    Q.  Let me understand how you get your
7  money.  Your money is appropriated by the
8  legislature, isn't it?
9    A.  Right.
10    Q.  And to get the money appropriated
11  by the legislature, you have to submit a
12  budget to the Chancellor's office; is that
13  correct?
14    A.  Not exactly.
15    Q.  Okay.  Do you submit a budget
16  directly to the State legislature?
17    A.  No.  We only submit a budget once
18  so they can get a picture as to what we're
19  requesting.  But our appropriation is based
20  on -- it comes out of the Chancellor's
21  office.
22    Q.  Comes out of your Chancellor's
23  office?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 165

1    A.  They give us a figure as to how
2  much money we're going to get.  And then we
3  base the budget on that.
4    Q.  And you don't give the
5  Chancellor's office input into the amount of
6  money you need every year to run your
7  operation?
8    A.  No.
9    Q.  They just give you a figure and
10  say you have to run your operation on this?
11    A.  That's right.
12    Q.  And they've always done it that
13  way?
14    A.  Ever since I've been there.
15    Q.  And you have no input into
16  determining how much money -- when I say
17  you, the college -- has no input in
18  determining how much money its going to get?
19    A.  That's right.
20    Q.  Okay.  But you get it once a year?
21    A.  Right.  We get it appropriated
22  once a year.
23    Q.  How often is money sent in to the

Page 166

1  college?
2    A.  Some of it is sent in monthly and
3  some of it is sent in quarterly.  I can't
4  tell you exactly when or where.  But it
5  comes through the year during the year.
6    Q.  And in some, you get Federal funds
7  and some you get State funds?
8    A.  Right.
9    Q.  And does Ms. Greene -- is she
10  responsible for keeping up with all the
11  budgets including the Federal funds?
12    A.  Yes.
13    Q.  Is she responsible for getting the
14  Federal grants?
15    A.  No.
16    Q.  Are different people at the
17  college responsible for getting Federal
18  grants?
19    A.  Yes.
20    Q.  On those grants, the Federal
21  grants you get, is it designated who the
22  funds will go through?
23    A.  Yes.

Page 167

1    Q.  Now, is Ms. Greene the designee
2  for those funds?
3    A.  She's the receiver of those funds.
4    Q.  She's the receiver?
5    A.  Yes.
6    Q.  And she's the one responsible for
7  those funds and grants?
8    A.  Yes.
9    Q.  And how many grants do y'all have
10  getting Federal funds?
11    A.  We have several.  But the major
12  ones are the Student Support Services and
13  the Transitional Youth Offender grant.
14    Q.  And Ms. Greene has complete
15  control of all that paperwork getting those
16  -- dealing with those grants?
17    A.  No.
18    Q.  Who does?
19    A.  The director along with Ms.
20  Greene.  You said the complete paperwork?
21    Q.  Yes.
22    A.  The director and Ms. Greene.
23    Q.  Where does Ms. Greene get her

Page 168

1  information about the grants from the
2  director?
3    A.  No.  She gets it from Washington
4  D.C., or she gets it from the State
5  Department where the grant is coming from.
6    Q.  Okay.  Are you telling me today
7  that all the information should go directly
8  to Ms. Greene?
9    A.  We receive a notification about
10  whether we've received an award or not and
11  it will tell us how much the award will be
12  and how we can expect to get it.  That
13  information goes directly to Ms. Greene and
14  the director.
15    Q.  And the director?
16    A.  Yes.
17    Q.  And if it's not going to Ms.
18  Greene, then something is wrong?
19    A.  It should be, yes.
20    Q.  And whose responsibility is it to
21  see that it goes to Ms. Greene?
22    A.  Well, those that are sent directly
23  to me, it's my responsibility.  If it's sent

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  through notification, it's sent directly to
2  a director, it's their responsibility to get
3  that information to her.
4      Q.  And you would agree with me,
5  wouldn't you, that Ms. Greene's office can
6  be only as effective as the information she
7  receives?
8      A.  Yes.
9      Q.  Do you recall requesting Ms.
10 Givens to get a string off of Shannon
11 Cherry's behind?
12     A.  No.
13     Q.  Do you recall making a remark to
14 Ms. Givens about Ms. Cherry, that if those
15 pants weren't so tight on her ass, you
16 wouldn't notice those type things?
17     A.  No.
18     Q.  Are you saying you didn't make
19 that remark?
20     A.  That's right.
21     Q.  If Ms. Givens says you did, then
22 that's an incorrect comment?
23     A.  That's right.

Page 170

1      Q.  And Ms. Givens is lying?
2      A.  That's right.
3      Q.  Okay.  Did you ever make the
4  comment to Ms. Julie Wood that Mr. Wilson
5  talks about women wearing their pants too
6  tight, but that Mr. Wilson doesn't say
7  anything about Tonya Trimble's pants going
8  up her butt crack?
9      A.  No.
10     Q.  You never made that statement?
11     A.  No, I did not.
12     Q.  If such statements like that were
13 made, that would be improper, wouldn't it?
14 That wouldn't be proper statements to make
15 in the work place by a male to a female
16 employee, would it?
17     A.  The way you stated it, I would
18 agree.
19     Q.  Did you ever ask an inmate student
20 words or words to the effect that Ms. Beth
21 White does not look four months pregnant?
22     A.  No.
23     Q.  Did you ever comment to an inmate

Page 171

1  about Ms. White's looks when she was
2  pregnant?
3      A.  Yes.
4      Q.  What did you say?
5      A.  That she was talking about her
6  size and I simply said you don't even look
7  like you're pregnant.  And she went on to
8  discuss how small she is and knowing she is
9  not showing the sign until she's about to
10 give birth.
11     Q.  Did you discuss that with an
12 inmate?
13     A.  No, I did not.
14     Q.  Okay.  That would be improper,
15 wouldn't it?
16     A.  It depends.
17     Q.  You think discussing a female
18 employee's body with an inmate would be
19 proper?
20     A.  I didn't say I discussed a female
21 body with an inmate.
22     Q.  Well, you said depends.  We
23     A.  Well, that does depend.  We

Page 172

1  discuss a lot with inmates.  We have inmates
2  as aides and everything else.  But the way
3  you stated it, that would be improper if it
4  occurred.
5      Q.  Mr. Chambers, have you ever called
6  a meeting of the ladies at the main campus
7  and discussed with them that they could no
8  longer wear jeans or tennis shoes to work?
9      A.  Yes.
10     Q.  Did you call a meeting with the
11 men and tell them the same thing?
12     A.  Not by themselves, no.
13     Q.  Why did you call a separate
14 meeting with the ladies?
15     A.  Because the ladies are the ones
16 that I was concerned about.
17     Q.  Okay.  Again, there's never been
18 any attack on the ladies while you've been
19 there, have there?
20     A.  No, there haven't.
21     Q.  Did you have a meeting with the
22 ladies over at the Staton Draper campus?
23     A.  We've had some individually, yes.

43  (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1    Q.  Okay.  Did you have a meeting with
2    the men over at the Staton Draper campus?
3        A.  Yes.  On an individual, yes.
4    Q.  What about at the Tutwiler campus?
5        A.  We've never had a problem with
6    dressing over at the Tutwiler campus.  The
7    answer is no.
8    Q.  Have you ever had any male inmates
9    at the main campus filing any complaints
10   against the female employees at the main
11   campus for harassment or anything?
12       MR. CHRISTMAN:  Form.
13       A.  No.  Not that I recall.
14   Q.  Now, over at the Tutwiler campus,
15   haven't you had some complaints filed by
16   female inmates concerning sexual harassment
17   by male instructors?
18       A.  Yes.
19   Q.  In fact, you've even had to call
20   ABI in to investigate, haven't you?
21       A.  No.
22   Q.  Who investigated it?
23       A.  The Department of Corrections.

Page 174

1    Q.  The Department of Corrections.
2    But you never had such an investigation of
3    that over at J.F. Ingram campus concerning
4    females, have you?
5        A.  Not an investigation.  But
6    interviews by the Department of Corrections.
7    Q.  Okay.  Do you have any idea what
8    percentage of male employees you've hired as
9    opposed to the percent of female employees
10   since you've been there?
11       A.  No, I don't.
12   Q.  Do you have any idea of the
13   percentage of black employees you've hired
14   as opposed to white employees since you've
15   been at J.F. Ingram?  I said there a while
16   ago.  You understood J.F. Ingram, didn't
17   you?
18       A.  No, I don't.
19   Q.  Who would be the best source to
20   get that information from?
21       A.  Dr. Merk or employee personnel
22   staff.
23   Q.  Okay.  Now, what about the

Page 175

1    salaries that are paid to people who are
2    hired?  Who would be the proper source to
3    get that from?
4        A.  From Dr. Merk and from the
5    business office.
6    Q.  The business office would be the
7    best source for the salaries, wouldn't it?
8        A.  Yes.
9    Q.  And as I understand, the salary
10   clerk for -- if that's what you call it --
11   the clerk that does the salary is Ms. Julie
12   Givens, isn't it?
13       A.  I don't know whether she is a
14   clerk.
15   Q.  Well, she's --
16       A.  When you say does the salary --
17   Q.  Ms. Givens does the payroll,
18   doesn't she?
19       A.  Right.
20   Q.  She's in charge of the payroll.
21   And I think at most businesses -- and I
22   don't know if this is the proper title.
23   They refer to it as payroll clerk.  Is that

Page 176

1    true?
2        A.  Well, we don't call it that.  But
3    those are some of the duties that falls
4    under that.
5    Q.  Okay.  But actually Ms. Givens'
6    title is assistant to the fiscal dean, isn't
7    it?
8        A.  I think so, yes.
9    Q.  Okay.  And under that, she has
10   various duties?
11       A.  Right.
12   Q.  Okay.
13       MR. DEBARDELABEN:  Let's take a
14   small break.
15       MR. CHRISTMAN:  Sure.
16       (Whereupon, a short recess was
17   taken.)
18   Q.  Mr. Chambers, what's the purpose
19   of an employee's personnel file?
20       A.  To keep their files so they would
21   have a record.
22   Q.  A record of what?
23       A.  Of various things that's required

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1    by the State Board and to know who they are.
2        Q.  Okay.  And it should be -- Should
3    it be a record of their employment?
4        A.  Should be, yes.
5        Q.  And what they're doing right and
6    what they're doing wrong?
7            MR. CHRISTMAN:  Form.
8        A.  Other than the evaluation form?
9        Q.  Uh-huh.
10       A.  No.  It's --
11       Q.  Let me put it this way and ask you
12   this way.  Maybe I can get a document and
13   find out.  Is there a policy and procedure
14   of J.F. Ingram State Technical College or
15   the State Board of Education that requires
16   certain things to be in the personnel file?
17       A.  Yes.
18       Q.  Now, is it a policy and procedure
19   of the State Board?
20       A.  Yes.
21       Q.  Is there a policy and procedure of
22   J.F. Ingram on personnel files?
23       A.  No.

1        Q.  So if I want to find out what's
2    required in the personnel file, I can get
3    the policy and procedure book produced by
4    the State Board of Education?
5        A.  No.
6        Q.  What do I get?
7        A.  You will get what we have in the
8    personnel file that's put in by personnel.
9    They get their -- most of their guidance and
10   direction from the human resources, from the
11   Chancellor's office.
12       Q.  From the Chancellor's office.  So
13   do I need to look at the Department of
14   Postsecondary Education for the requirements
15   of what's to be in a personnel file?
16       A.  Those mandated things, yes.
17       Q.  Okay.  And whose responsibility is
18   it to see that the mandated items are in the
19   personnel file at the various colleges?
20       A.  Personnel.
21       Q.  Personnel?
22       A.  Yes.
23       Q.  Okay.  So if it's not in there,

1    the personnel director is held responsible?
2        A.  Right.
3        Q.  By whom?
4        A.  By me.
5        Q.  Who holds you responsible?
6            MR. CHRISTMAN:  You talking by him
7    at -- who at his college?
8            MR. DEBARDELABEN:  Yes.
9            MR. CHRISTMAN:  You talking about
10   --
11       Q.  Who holds you responsible?
12       A.  The Chancellor.
13       Q.  Okay.  Is it a fair statement, Mr.
14   Chambers, to say that you are responsible
15   for everything that goes on at J.F. Ingram?
16       A.  Yes.
17       Q.  Excuse me.  I don't think that's a
18   fair statement.  I think it's a better or
19   fair statement to say that you are held
20   responsible for everything that goes on at
21   J.F. Ingram?
22       A.  Yes.
23           MR. CHRISTMAN:  Form.

1        Q.  And you allocate responsibilities
2    to your various deans, don't you?
3        A.  Yes.
4            MR. CHRISTMAN:  Form.
5        Q.  And are you -- Do you expect your
6    various deans to allocate responsibilities
7    to people within their department?
8        A.  Yes.
9        Q.  And when something in the
10   department goes wrong, your contact -- you
11   look to the dean, don't you?
12       A.  Yes.
13       Q.  Do you ever look to the people
14   within the department?
15       A.  Only when it's with involvement of
16   the dean.
17       Q.  Okay.
18           MR. CHRISTMAN:  I presume your
19   question is not addressing in there security
20   and DOC policy and all those things.
21           MR. DEBARDELABEN:  That's not part
22   of J.F.I.
23       Q.  Now, inmate security.  Let's talk

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  about that since Mr. Christman brought it
2  up. What is Dean Wilson's responsibility
3  for security?
4      A.  As Dean of Students, he's -- one
5  of his major responsibilities deal with
6  student behavior. So by virtue of his
7  position, he is involved in security to the
8  point that it becomes a security control
9  situation.
10     Q.  And once it becomes a security
11 control situation, it goes to the Department
12 of Corrections?
13     A.  That's right.
14     Q.  Is basically Dean Wilson's
15 responsibility to determine through you, I
16 guess, or you to determine through Dean
17 Wilson's recommendation whether a student
18 stays on campus or has to leave?
19     A.  Unless it's an issue that involves
20 a security breach with DOC.
21     Q.  And when there's a security
22 breach, that's no tolerance, isn't it?
23     A.  That's a --

Page 182

1      Q.  Automatic gone?
2      A.  Not an automatic. But it becomes
3  -- it becomes -- now it becomes a
4  Department of Corrections. So they would be
5  in control at that point.
6      Q.  Right. And all -- J.F. Ingram has
7  no punishment imposes on students; that's
8  all done by the Department of Corrections,
9  isn't it?
10     A.  No.
11     Q.  Y'all have punishment?
12     A.  Yes.
13     Q.  What kind of punishment does J.F.
14 Ingram have?
15     A.  We place students on probation,
16 suspension, expulsion just like any other
17 two-year college.
18     Q.  How often do you get back to the
19 horticulture area of J.F. Ingram's main
20 campus?
21     A.  Not very often.
22     Q.  Okay. Is it in the back part of
23 the campus?

Page 183

1      A.  Yes, it is.
2      Q.  Is it a rather large area?
3      A.  Yes.
4      Q.  Is it -- So far as work area,
5  space covered, is it about the largest one
6  at J.F. Ingram?
7      A.  I would think so, yes.
8      Q.  Is the horticulture department on
9  its location -- due to its location in kind
10 of an isolated part of the campus?
11         MR. CHRISTMAN: Form. Isolated
12 from what?
13     Q.  The rest of the campus?
14     A.  I wouldn't say isolated. It's
15 just located in the rear.
16     Q.  Located in the rear?
17     A.  Yes.
18     Q.  And the other shops, they are
19 located between the horticulture department
20 and the main administrative buildings,
21 aren't they?
22     A.  That's right.
23     Q.  Insofar as employees being close

Page 184

1  by -- when I say employees, I'm not talking
2  about students -- the other instructors have
3  more free world people close by than it
4  would in horticulture, wouldn't they?
5      A.  As far as space, yes.
6      Q.  Yes, sir. And if something God
7  forbid happened, an attack or something by a
8  student in the other shops, there would be
9  people closer by than it would be in
10 horticulture, wouldn't there?
11     A.  No.
12     Q.  What you have in horticulture, you
13 have a couple of guards on towers down at
14 the back, don't you?
15     A.  Directly a few feet from the
16 building.
17     Q.  Yes, sir. And then you have your
18 three greenhouses and a classroom area?
19     A.  Right.
20     Q.  And a storage area. And I know
21 you have three or four buses that park down
22 in that area, don't you?
23     A.  They are not in the area where

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1 horticulture is. They are on the other side
2 of the campus.
3    **Q.  Is there a fence between**
4 **horticulture and the buses?**
5    A.  No.
6    **Q.  Do the buses park on the inside of**
7 **a fence?**
8    A.  Yes.
9    **Q.  Is that -- The area where they**
10 **park is right next to horticulture?**
11    A.  No.  It's the -- There's some
12 buildings between the buses and
13 horticulture, temporary buildings.
14    **Q.  Is there any fence between those**
15 **buildings and --**
16    A.  No.
17    **Q.  -- horticulture?**
18    A.  No.
19    **Q.  Would you agree that the**
20 **horticulture area probably covers a little**
21 **over an acre approximately of property?**
22       MR. CHRISTMAN:  If you know.
23    A.  I don't have any -- I really don't

Page 186

1 know that.
2    **Q.  If Ms. Hendrix has written Dr.**
3 **Huffstutler a memorandum pointing out that**
4 **it covers a little over an acre, you**
5 **wouldn't disagree with that, would you?**
6    A.  I wouldn't think she would make it
7 up.
8    **Q.  And you know she has two**
9 **greenhouses back there that are**
10 **approximately three thousand square feet a**
11 **piece, don't you?**
12    A.  I'm not familiar with the size.
13    **Q.  They are pretty big, aren't they?**
14    A.  Yes.
15    **Q.  Dr. Chambers, who recommended the**
16 **Access system?**
17    A.  Who recommended?
18    **Q.  Yes, sir.  That y'all purchase it?**
19    A.  Yes.
20    **Q.  Who recommended that?**
21    A.  The recommendation came from the
22 Chancellor's office.
23    **Q.  From the Chancellor's office?**

Page 187

1    A.  Yes.
2    **Q.  Is it a required system for all**
3 **two-year colleges to have?**
4    A.  Yes and no.  Yes, we were told
5 that we were all going that way as soon as
6 we could get the finances and get it on
7 board.  I think all the colleges with the
8 exception of maybe three or four have gotten
9 on board.  The others are having financial
10 problems.
11    **Q.  In fact, Ms. Renae Colinhouse**
12 **(spelled phonetically) -- one of the -- she**
13 **doesn't have it, does she?**
14    A.  I'm not familiar with the ones
15 that don't.  But I know there are three or
16 four that don't have it.
17    **Q.  And was the -- Would you say it**
18 **was a recommendation from the Chancellor's**
19 **office to go on Access or a directive from**
20 **the Chancellor's office to go on Access?**
21    A.  A directive.
22    **Q.  So you basically as president of**
23 **J.F. Ingram had no choice but to go to**

Page 188

1 **Access?**
2    A.  I was led to believe that, yes.
3    **Q.  Are you aware that there's certain**
4 **allegations now concerning the former**
5 **Chancellor's connection with Access?**
6       MR. CHRISTMAN:  Before you answer
7 that question, off the record.
8       (Whereupon, there was a brief
9 off-the-record discussion.)
10       MR. CHRISTMAN:  Go ahead and ask
11 your question.
12    **Q.  Mr. Chambers, are you aware that**
13 **there are some allegations concerning the**
14 **former Chancellor Mr. Johnson's connection**
15 **with the company or the people that run the**
16 **Access system?**
17       MR. CHRISTMAN:  I'm going to
18 object to that question on two grounds.  One
19 is it's not material to the allegations of
20 this complaint and second, Mr. Chambers has
21 been a witness to the Grand Jury and I'm
22 instructing him not to answer any questions
23 associated with matters regarding former

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 189

1  Chancellor Johnson or the Access system or
2  the propriety of that system.
3      Q.  Now, Mr. Chambers, one of your
4  complaints concerning Ms. Greene was that
5  she was resisting going to the Access system
6  for J.F. Ingram; is that correct?
7      A.  Yes.
8      Q.  And Mr. Bridgeman who has since
9  retired, he just wouldn't -- he really
10  resisted it, didn't he?
11      A.  Yes.
12      Q.  And they -- Was there a basic
13  complaint that the Access system did not do
14  the job that their system they had did?
15      A.  No.
16      Q.  What were basically their
17  complaints?
18      A.  That they had a system set up in
19  place that was producing what they felt was
20  comfortable for what we needed at J.F.
21  Ingram.
22      Q.  But you felt you had no choice but
23  to go where you were directed to go, didn't

Page 190

1  you?
2      A.  That's right.
3      Q.  And so what they were concerned
4  about, although it might have concerned you
5  -- I'm not saying it did or didn't -- for
6  you to go in the direction you were directed
7  to go?
8      A.  That's right.
9      Q.  Okay.  And that was whether it was
10  a better system or a worse system, you still
11  felt you had to go, didn't you?
12      A.  That's right.
13      Q.  Okay.  That in and of itself
14  created some friction between you and Ms.
15  Greene, didn't it?
16      A.  It didn't create friction.  It
17  just -- It was delaying us going there.
18      Q.  She just kind of fought you on
19  that, didn't she?
20      A.  Yes.
21      Q.  And Mr. Bridgeman also fought you
22  on that, didn't he?
23      A.  We didn't fight.

Page 191

1      Q.  I'm talking about resisted you.
2  I'm using fight in the word of resisting.
3      A.  Yes.  But we didn't make an issue
4  out of that.  We just felt like at the right
5  time everybody would be there and we would
6  have to be there, too.
7      Q.  And it was when Mr. Bridgeman
8  left, the system -- they got the Access
9  system up and running, didn't they?
10      A.  Yes.
11      Q.  And there has been some problems
12  between payroll and personnel on the Access
13  system, hasn't there?
14      A.  Yes.
15      Q.  And there's been some problem with
16  Ms. Givens filling the payroll as being
17  called upon to key in contract information
18  that personnel is supposed to have, isn't
19  it?
20      A.  Yes.
21      Q.  And Ms. Givens has written you
22  memorandums or notes to the effect that
23  she's been asked to do personnel work, in

Page 192

1  essence, hasn't she?
2      A.  Yes.
3      Q.  That the personnel system has not
4  gotten their end of the -- their end of the
5  duties for Access up and running?
6      A.  I don't know about up and
7  running.  But she has indicated to me that
8  there's been problems, that she's been doing
9  their work, yes.
10      Q.  Okay.  Have you gotten involved in
11  that?
12      A.  Yes.
13      Q.  And what have you found out?
14      A.  Very little.  I've gotten the
15  deans involved and asked them to sit down
16  with the employees on more than three
17  occasions.  They've come back and told me it
18  was worked out until Ms. Givens would let me
19  know again that it was not working.
20      Q.  But the deans are trying to work
21  with each other?
22      A.  Yes.
23      Q.  And they are having no problem

48 (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

1  working with each other?
2      MR. CHRISTMAN: Form.
3      Q. Apparently?
4      MR. CHRISTMAN: Form.
5      A. Well, for three times, they didn't
6  have any problems working with each other.
7  But they didn't resolve the issue.
8      Q. President Chambers, would you
9  think that maybe if what I call the worker
10 bees doing the work got together, they might
11 could resolve the issues a little bit
12 quicker than the deans?
13     MR. CHRISTMAN: Form.
14     A. In some cases.
15     Q. You know what I'm saying when I
16 say worker bees?
17     A. Yes.
18     Q. Do you think it might be a good
19 idea to put the people who are actually
20 doing the crunching together and say y'all
21 work it out?
22     A. We've tried that.
23     Q. Okay. Has Ms. Givens refused to

Page 194

1  try to work with anybody?
2      A. No.
3      Q. As a matter of fact, she goes and
4  tries to get everything done, doesn't she?
5      A. Most of the time.
6      Q. Do you have a complaint about Ms.
7  Givens' work?
8      A. No.
9      Q. Is she a good employee?
10     A. Yes.
11     Q. But you have a complaint about Ms.
12 Greene's work?
13     A. Yes.
14     Q. And you do admit, don't you, that
15 you have no training in accounting?
16     A. Yes. I admitted that.
17     Q. And if Ms. Greene said come in and
18 do my job, you wouldn't know really where to
19 start, would you?
20     A. I would know first not to go in
21 there to do her job.
22     Q. Okay. And would you agree that
23 probably her job is the most technical on

Page 195

1  campus? When I say Ms. Greene, I'm talking
2  about any fiscal dean's job is probably the
3  most technical job on campus?
4      A. Probably. I mean, she has a very
5  technical job. One of the most serious jobs
6  on the college campus.
7      Q. And it's the one job on any
8  college campus that can get the college and
9  the administrators in the most trouble with
10 the public and the legislatures and --
11     MR. CHRISTMAN: Object to the
12 form. You can give your opinion if you
13 know.
14     A. It's a high priority job that
15 would cause problems for the college. But
16 so is my job and other deans.
17     Q. Right. And in her job, she has to
18 not only know accounting procedures, she has
19 to know State bid law?
20     A. Yes.
21     Q. And State purchasing procedures?
22     A. Yes.
23     Q. And ensure that all the deans and

Page 196

1  instructors follow them?
2      A. Yes.
3      MR. DEBARDELABEN: I have no more
4  questions.
5  EXAMINATION BY MR. CHRISTMAN:
6      Q. I have a few. Dr. Chambers, I
7  want to show you Exhibit 9, the 2003, 2004
8  audit report that was covered with you by
9  Mr. Debardelaben.
10     He directed your attention to page
11 twenty-seven and asked you a series of
12 questions regarding summary of the examiners
13 results, particularly regarding the internal
14 control or financial reporting. Do you
15 remember that line of questions?
16     A. Yes.
17     Q. And he asked you whether there was
18 a marking on here as to whether material
19 weakness was identified. Do you recall
20 that?
21     A. Yes.
22     Q. And whether there was a reportable
23 condition identified that are not considered

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 197

1  to be material weaknesses. Do you recall
2  that?
3      A. Yes.
4      Q. And whether there was a
5  noncompliance material to financial
6  statements noted.
7      A. Right.
8      Q. Do you recall that?
9      A. Yes, sir.
10     Q. What he wanted to know was
11 basically whether any of these boxes were
12 checked yes or any of these boxes were
13 checked no. That's what his question was
14 about; right?
15     A. Right.
16     Q. Is there anything in this 2003,
17 2004 audit record that caused you concern
18 other than those check marked boxes that the
19 plaintiff's lawyer referred you to in his
20 line of questioning?
21     A. Yes, there is.
22     Q. What were you concerned about in
23 this audit other than the summary?

Page 198

1      A. I was mostly concerned, like I am
2  with most audits, of the findings.
3      Q. Okay. Well, let's turn to the
4  findings and discuss your concerns. On page
5  C, subtitle audit finding, I'll direct your
6  attention to the last paragraph. If you'd
7  read that for the record, please.
8      A. The last paragraph?
9      Q. The last paragraph under the
10 section that is labeled audit finding on
11 page C.
12     A. The last paragraph says, a
13 comparison of live work revenue and costs
14 was done for the instructional departments.
15 The comparison indicated that costs exceeded
16 revenues in the furniture refinishing
17 department by eighteen thousand eight
18 hundred and sixty-four dollars and
19 ninety-eight cents.
20         Also, a review of work in process
21 on June 21st, 2005, revealed that deposits
22 had not been collected on four live work
23 projects that were in process.

Page 199

1         In another instance, the Dean of
2  the College delivered a tractor to the
3  diesel shop. The dean went on vacation on
4  May 31st and returned to work on July 12th.
5  The work order for the tractor was dated
6  June 21st, 2005.
7      Q. What section again were those
8  comments noted under in this audit report?
9      A. Under audit findings.
10     Q. Does the audit finding mean
11 anything to you as president of the college?
12     A. Yes.
13     Q. What does it mean to you?
14     A. That means that they have
15 discovered a irregularity and the college
16 must give a response on how to -- the
17 college must give a response of corrective
18 action that's going to be taken to correct
19 the problem and ensure -- keep it from
20 happening again.
21     Q. So there is something required of
22 the president of the college if there's a
23 finding?

Page 200

1      A. Yes.
2      Q. Okay. And what was your
3  responsibility associated with this finding
4  in this report that Mr. Debardelaben didn't
5  cover with you?
6      A. In my discussion with the
7  auditors, the auditors indicated to me that
8  there was a possibility there could be some
9  legal action.
10     Q. What kind of legal action?
11     A. They referenced that a dean in
12 North Alabama has had a similar situation
13 and they had turned it over to the District
14 Attorney's Office.
15         They also referenced that the Dean
16 of the College had violated -- had again
17 violated a policy of having live work on
18 campus without the appropriate paperwork and
19 they were thinking about turning it over to
20 the Commission and some of the other files.
21     Q. Who told that to you?
22     A. Ms. Carol Nichols and Harold -- I
23 can't remember Harold's last name.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    Q.   Who does Caroline work for?
2    A.   She works for the State Department
3  -- a supervisor auditor for the State
4  Department.
5    Q.   And Hal?
6    A.   He's an auditor with the State
7  Department.
8    Q.   Okay.  You don't prepare --
9    A.   Hal Brasswell.  I think it's
10  Brasswell.
11    Q.   You don't prepare these audit
12  reports, do you, Dr. Chambers?
13    A.   No, I do not.
14    Q.   You don't categorize the summary
15  of examiners results, do you?
16    A.   No, I do not.
17    Q.   Do you come up with the verbiage
18  used to characterize these results?
19    A.   No, I do not.
20    Q.   When it refers to an internal
21  control over financial reporting, do you
22  know what they're talking about when they
23  say financial reporting?

Page 202

1    A.   Yes.
2    Q.   What are they talking about there?
3    A.   They are talking about the fact
4  that -- the forms and reports that we have
5  to submit.
6    Q.   Do you know if they are talking
7  about live work or whether there are
8  problems with live work would appear as a
9  weakness in financial reporting?  Do you
10  know one way or the other about that?
11    A.   No, I do not.
12    Q.   Okay.  What is live work?
13    A.   Live work is a description of a
14  process that we use at the school to
15  practice some of the technical programs that
16  we have in place.
17    Q.   Do you know why the auditors would
18  be concerned about problems in the live work
19  process at Ingram?
20    A.   Yes.
21    Q.   Why?
22    A.   Well, because we are required by
23  State Board policy to do things as far as --

Page 203

1  and make a certain percentage off it.  We
2  also can use it as a lab or a practical
3  experience and we're not supposed to make a
4  profit off of it.
5    Q.   Did any of that DA stuff you were
6  talking about have anything to do with live
7  work in those other contexts in terms of
8  your understanding of what the auditors were
9  saying to you?
10    A.   Yes.
11    Q.   Were you at all concerned when the
12  auditor brought to your attention
13  discrepancies in the live work process at
14  Ingram?
15    A.   Yes.
16    Q.   What did you do in response to the
17  auditor's findings on the live work
18  discrepancies noted in the auditor's report
19  under audit findings?
20    A.   First, I investigated it to see
21  what they were telling me -- whether it was
22  accurate or not.  And I validated what they
23  told me.  And I discussed it with all of the

Page 204

1  parties involved, instructors, the Dean of
2  the College and the Dean of Fiscal Affair.
3    Afterwards, I met with the
4  auditors and I asked them if they would
5  allow me an opportunity to take appropriate
6  penalties or steps to correct this problem.
7  And they, in essence, they said they would
8  give me an opportunity to do so.
9    Q.   So after doing your investigation
10  and discussing with the auditors whether
11  they would allow you an opportunity to fix
12  this, what was your next course of action?
13    A.   I made an attempt to try to show
14  the auditors that I could correct the
15  measures by taking strong actions against
16  all of the parties involved with the
17  process.
18    Q.   Did you ultimately submit anything
19  to the examiners of public accounts
20  associated with your effort in response to
21  their findings?
22    A.   Yes, I did.
23    Q.   What did you submit?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 205

1    A.  I submitted a letter to the
2  auditors telling them these were the steps
3  that I was going to take.  They reviewed it
4  and sent it back to me and told me anything
5  like that would be appropriate and get the
6  attention of the employees to correct the
7  problem.
8    Q.  Let's back up just a minute.  You
9  submitted a draft response to the auditors?
10    A.  Yes.
11    Q.  Who specifically did you send that
12  response to?
13    A.  To Mr. Larry Willard.
14    Q.  And did he review that response
15  that you proposed to him?
16    A.  Yes, I did.
17    Q.  What was his -- What were his
18  comments regarding the propriety or
19  effectiveness of the comments that you had
20  provided to him?
21    A.  He indicated to me he felt that
22  was strong.  If I could take those actions
23  and make sure that all the employees took it

Page 206

1  as a serious step, he felt like that would
2  not occur again.
3    Q.  Was it your opinion that the fact
4  that all of these three areas were checked
5  no on page twenty-seven meant that you could
6  disregard or ignore the findings associated
7  with the live work discrepancies at the
8  college?
9    A.  No.
10    Q.  After you submitted your draft and
11  received word back from the examiners
12  concerning your response to findings, what
13  did you do next?
14    A.  Well, I submitted a copy to the
15  Chancellor's office.  I met with the
16  Chancellor and the vice-chancellor and told
17  them why I was doing it this way, what I was
18  attempting to do.  And he told me he felt
19  like that would serve the purpose.
20    Q.  What were you attempting to do?
21    A.  I was trying to do two things.  I
22  was trying to get the attention of the
23  employees, that we were about to have a

Page 207

1  major finding, and we were also trying to
2  correct a procedure that I was trying to get
3  in the right perspective as it related to
4  live work.
5    Q.  How did the Chancellor respond to
6  your suggested response?
7    A.  He told me he thought that would
8  be strong enough.
9    Q.  Did you ever ultimately submit
10  your response in an official form to the
11  examiners of public accounts?
12    A.  Yes, I did.
13    Q.  Does that appear in Exhibit 9?
14    A.  Yes.
15    Q.  Mr. Debardelaben didn't cover this
16  part with you, did he?
17    A.  No.
18    Q.  But on the last five pages appears
19  your response, is that true?
20    A.  That's true.
21    Q.  Did you prepare this response all
22  by yourself?
23    A.  No.  Most of it was prepared by

Page 208

1  the Dean of Fiscal Affair.
2    Q.  Did she do that at your request or
3  just on her own?
4    A.  At my request.
5    Q.  What part did she prepare in this
6  response?
7    A.  Well, she responded to all of it.
8  But most of it -- the first couple of pages
9  is just about exactly like she presented it
10  to me.
11    Q.  Okay.  The accounting provisions
12  of particularly response one?
13    A.  Yes.
14    Q.  Okay.  Response one is associated
15  with the eighteen thousand eight hundred and
16  sixty-four dollar and ninety-eight cent cost
17  overage in the furniture refinishing
18  department for live work; is that right?
19    A.  That's right.
20    Q.  There appears to be an accounting
21  here that was done as to why that -- those
22  overages appear to the auditors; is that
23  right?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 209

1  A.  Right.
2  Q.  And Ms. Greene -- Is it my
3  understanding that Ms. Greene is the one who
4  explained how all that happened?
5  A.  Yes.
6  Q.  Did she explain it to your
7  satisfaction?
8  A.  I mistook what she was saying.  So
9  I presented it like she said.  I took what
10  she said.
11  Q.  Did you name any people's names in
12  this audit report?
13  A.  Yes, I did.
14  Q.  Why did you do that?
15  A.  Well, at that particular time, I
16  thought I was trying to get their attention
17  and I was also trying to impress upon the
18  auditors that they did not have to take
19  major steps, that I was going to impress
20  upon them that we could correct the
21  problem.
22      Also in the past -- This is
23  nothing new.  This had occurred before.  And

Page 210

1  what I was trying to do is stop just getting
2  -- sending out the same warnings and I was
3  trying to impress upon the auditors that we
4  had corrected without them having to go
5  forward with what they were intending to do.
6  Q.  Are you aware of any other audit
7  responses that called names?
8  A.  Yes.  There's several.  I looked
9  at one recently from John C. Calhoun and
10  there was a name mentioned.
11      MR. DEBARDELABEN:  Object to
12  anything unless it has to do with J.F.
13  Ingram.
14      MR. CHRISTMAN:  You can object.
15  But your client testified that this was
16  never done.
17  Q.  My question to you, Dr. Chambers,
18  is, do you know whether this -- whether what
19  you did in naming peoples names has ever
20  been done other than this case?
21  A.  Oh, yes.
22  Q.  Do you know if the Chancellor
23  approved of your naming names?

Page 211

1  A.  He did at that time.
2  Q.  At what time?
3  A.  When I presented him the draft of
4  my response to Mr. Ron Jones.
5  Q.  Do you know if his opinion
6  changed?
7  A.  Something changed because
8  afterwards, I received a letter from -- a
9  letter with his signature on it, that I did
10  not have to use the employees to some --
11  what degree to make my point like it was a
12  personal thing that I did.
13  Q.  And what, if anything, was your
14  response to that letter from the Chancellor?
15  A.  Well, I had a meeting with him and
16  took his letter and my letter.  And when I
17  approached him, he denied even having
18  written that letter or didn't even know the
19  content of that letter.
20  Q.  Do you believe there are any
21  problems with the business office anymore?
22  A.  Yes.
23  Q.  Do you get -- Do you base your

Page 212

1  opinion regarding the problems at the
2  business office solely on the examiner's
3  report that you received from the Department
4  of Examiners of Public Accounts?
5  A.  No.  The audit reports really just
6  put a stamp on what was occurring.  I get
7  complaints from instructors of purchase
8  requisitions, payments, orders, all types of
9  stuff.
10      And I have -- So that audit just
11  really kind of came in and told me that they
12  saw some of the things, too.  So the audit
13  was not the ultimate reason I made my
14  decision to respond that way.
15      The audit was just really
16  identifying what I already knew.
17  Q.  Well, some of the audits were
18  good, isn't that true?
19  A.  Yes.
20  Q.  Did the fact that those audits
21  were good mean that there weren't any
22  problems at Ingram in the business office?
23  A.  No.

53 (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 213

1    Q.  Were there any other sources other
2    than the audit reports outside of Ingram
3    that indicated to you that there might be
4    serious problems in the business office?
5    A.  Vendors saying that they were not
6    being paid on time.
7    Q.  Any other official reports from
8    anybody elses office associated with the
9    functioning of the business office?
10   A.  Well, we have one that's -- one
11   that's ongoing at this present time from
12   Washington D.C. as it relates to Federal
13   monies.  And I received an e-mail last week
14   about a problem that we're having with
15   student support services.  And I expect a
16   big letter to be coming pretty soon.
17   Q.  Has the Chancellor's office ever
18   addressed problems with --
19       MR. DEBARDELABEN:  Objection to
20   leading.
21   Q.  You can answer.  Has the
22   Chancellor's office ever addressed problems
23   with the business office at Ingram?

Page 214

1    A.  Yes.  They've sent two review
2    teams in twice that I recall.
3    Q.  Did you get a report from those
4    review teams?
5    A.  Yes.
6    Q.  Was that report favorable
7    regarding the business office's functioning
8    efficiency?
9    A.  No.
10   Q.  What did you think about those
11   reports?  How did it affect your perception
12   of the business office?
13   A.  That we had a -- we were having
14   some problems in the business office and
15   they needed to be corrected.  And they were
16   just not identifying one or two things.
17   They were identifying from mistakes to
18   employment morale, relationships, co-workers
19   and what have you.
20   Q.  Is the fact that you don't have an
21   education sufficient to run the business
22   office disqualify you from understanding
23   whether there is or is not a problem in that

Page 215

1    office?
2    A.  No.  Because we've had -- you just
3    mentioned a review team.  Dr. Huffstutler
4    who worked with us had over seventeen years
5    of experience as a Dean of Finance.  We've
6    had other people in the fields to indicate
7    that we had problems.
8    Q.  Did you ever have any discussions
9    with Mr. Willard about the business office?
10   A.  Yes, I have.
11   Q.  Were those favorable or
12   unfavorable in terms of disfunctioning?
13   A.  Most of them were unfavorable.
14   Q.  Why do you care how the women
15   dress at Ingram State Technical College?
16   A.  It's my responsibility at the
17   college to be concerned about the safety of
18   the employees.  I never forget that we work
19   in a prison environment.
20       When I got there, one of the major
21   problems that they had in the prison system
22   were men masturbating.  And they would put
23   them on the field in orange suits.  Tried to

Page 216

1    use embarrassment as a technique.
2        One of the major problems that
3    exist today where we're taking students out
4    of their classes, masturbation is at the
5    top.  Those young men being incarcerated and
6    masturbating -- if they see a baby or if
7    they see a lady eighty years old.
8        And the wardens have reminded me
9    and reminded employees that their presence
10   and how they look on campus can easily cause
11   a riot or can cause inmates to be out of
12   control and subject them to discipline
13   problems and things that we have to deal
14   with.
15   Q.  Well, as you pointed out to Mr.
16   Debardelaben in response to his questions,
17   there's never been a lady attacked to your
18   knowledge on the Ingram campus.  So why does
19   it matter?
20   A.  Well, I think it's my
21   responsibility to try to keep it from
22   happening.  I listen to the students
23   talking.  They can tell me what people have

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 217

1  on when they get there. They can tell me
2  exactly how people are sitting.
3      They can tell me everything about
4  a female. And so I'll try to be -- take
5  steps in advance to prevent any type of
6  things from happening. I don't think that
7  just because it hasn't happened, it won't
8  happen.
9      So I try to make every effort to
10  make people conscious of their attire and
11  try to keep them in a safer environment.
12  **Q. Have you only addressed your**
13  **comments regarding dress to females?**
14  A. No. I have addressed them to both
15  males and females.
16  **Q. Have there ever been any**
17  **complaints associated with female dress at**
18  **the Ingram State Technical College main**
19  **campus?**
20  A. Yes.
21  **Q. By who?**
22  A. By some employees and by some
23  correctional officers.

Page 218

1  **Q. How about anybody higher than**
2  **correctional officers such as wardens or**
3  **anything else?**
4  A. I wouldn't say correctional
5  officers. I was putting them all in one.
6  The wardens have threatened to terminate and
7  ban a couple of people as a result of their
8  dressing.
9  **Q. Were they males or females?**
10  A. Females.
11  **Q. Does anything besides campus**
12  **security motivate your position regarding**
13  **the way females dress?**
14  A. No.
15  **Q. At the Ingram campus?**
16  A. No. Can I add something to that
17  answer I just gave you?
18  **Q. Sure.**
19  A. When I came to Ingram ten years
20  ago -- and I think you alluded to something
21  a few minutes ago -- we were firing
22  weapons. I would hear things inappropriate
23  like employee student relationships, phone

Page 219

1  calls being made.
2      A lot of things that -- We have a
3  policy at -- in the system where an employee
4  is banned from contact with students. That
5  constitutes termination. And all the
6  Department of Corrections has to do is bring
7  about charges.
8      They don't have to prove any of
9  their charges. They can just ban an
10  employee. I recently had a meeting with the
11  director of special education with a young
12  lady who was about to be banned from Kilby
13  for the same reason, that she came in and
14  said that I know that my dressing causes
15  problems, but you don't have to worry about
16  it anymore.
17      It's been a continuous problem.
18  But my ultimate goal is to try to get people
19  to dress appropriately so that they will not
20  encourage or entice or do all those things
21  that DOC describes as a hinderance to their
22  ability to keep people safe.
23  **Q. Are you aware of any inmates**

Page 220

1  shootings on campus?
2  A. Not on campus, no.
3  **Q. Do you have a policy regarding the**
4  **employees bringing firearms on campus?**
5  A. It's prohibited.
6  **Q. Well, why have a policy regarding**
7  **prohibiting firearms and no one has ever**
8  **been shot?**
9  A. Well, because of the potential of
10  someone getting shot.
11  **Q. Do you recall Mr. Debardelaben's**
12  **questions associated with Ms. Hendrix's**
13  **grievance procedure? Do you recall some of**
14  **that?**
15  A. Yes.
16  **Q. I want to direct you back to some**
17  of his questions associated with the hearing
18  **procedure. Do you remember those questions?**
19  A. Yes.
20  **Q. And didn't he ask you a question**
21  **about whether disputed facts result in the**
22  **necessity of a hearing? Do you recall that?**
23  A. Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 221

1    Q.  Do you know whether Ms. Hendrix
2  got a hearing?
3    A.  According to my understanding, she
4  did.
5    Q.  Do you know if there is a process
6  in place for her to do something about it if
7  she doesn't get a hearing?
8    A.  Yes.
9    Q.  What is the process?
10   A.  If she doesn't get a hearing, she
11 can appeal it to the Chancellor.  She can
12 appeal to me first.  And then if she's not
13 satisfied there, I do not take action.  She
14 can appeal it to the Chancellor.
15   Q.  Well, did she appeal it?
16   A.  To me?
17   Q.  To anybody.
18   A.  Yes.
19   Q.  What did she say?
20   A.  She wrote to some degree that she
21 wanted to appeal and asked me to review it.
22   Q.  Well, how did you respond?
23   A.  I reviewed it and told her that I

Page 222

1  had looked at the evidence and I didn't have
2  any reason to change what had been decided.
3    Q.  Was there some correspondence
4  associated with the timeliness of her
5  appeal?
6    A.  Yes.  She had -- The time for her
7  appeal had expired.  But we did try to look
8  at it and make sure everything was in order.
9    Q.  Do you know if the policies and
10 procedures have any provision for what
11 happens to a complainant's grievance if she
12 does not file a timely appeal?
13   A.  Yes.  It's clearly stated in the
14 policy that it must be appealed within an
15 allotted time.  And if not --
16   Q.  Let me show you the policy here.
17 If you'll look under section four of
18 available appeals.  I'm referring to Exhibit
19 2 to James Merk's deposition.
20      Section four, the paragraph
21 directly below the number two paragraph
22 starting with if the appeal.  Would you read
23 that for the record, please.

Page 223

1    A.  If the appeal is not filed by the
2  close of business day on the fifteenth day
3  following the grievant's receipt of the
4  report, the grievant's right to appeal shall
5  be forfeited.
6    Q.  So what is your understanding of
7  the results of a complainant failing to
8  file her appeal in a timely manner?
9    A.  Well, it means that no action will
10 be taken.
11   Q.  And is it her appeal will be
12 forfeited according to this; right?
13   A.  Right.
14   Q.  Is there any provision in here
15 alleviating the forfeiture of that appeal if
16 it is filed untimely?
17   A.  No.
18   Q.  Do you know whether Ms. Hendrix's
19 appeal effort was timely filed?
20   A.  Yes.
21   Q.  Was it timely?
22   A.  No.
23   Q.  Did you inform her of that?

Page 224

1    A.  Yes.
2    Q.  Did she go over your head
3  regarding the untimely appeal that she
4  filed?
5    A.  Yes.
6    Q.  What did she do, to your
7  knowledge?
8    A.  She appealed it to the
9  Chancellor's office.
10   Q.  How did he respond?
11   A.  They responded that she did not
12 appeal within a time that were allowed, and
13 therefore, they were not going to take any
14 action on it.
15   Q.  What was Mr. Tim Robinson's
16 education level; do you know?
17   A.  To the best of my knowledge, he
18 had a master's degree.
19   Q.  Did Ms. Owensby have a master's
20 degree?
21   A.  No, she did not.
22   Q.  Does she have a bachelor's degree?
23   A.  I don't think so.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 225 | Page 227 |
|---|---|
| 1    **Q.  Do you know whether her job duties** | 1    **female?** |
| 2    **as they currently are described are the same** | 2    A.  No. |
| 3    **job duties occupied by Tim Robinson when he** | 3    **Q.  Have you ever created hostility** |
| 4    **was registrar?** | 4    **for her because she's white?** |
| 5    A.  To the best of my knowledge, some | 5    A.  No. |
| 6    of them are not.  But not all of the duties | 6    **Q.  Have you ever treated her any** |
| 7    that Tim Robinson had. | 7    **differently than anybody else because she's** |
| 8    **Q.  So it's your understanding that** | 8    **white?** |
| 9    **they are different in some respect?** | 9    A.  No. |
| 10    A.  Yes. | 10    **Q.  How about because she's a female?** |
| 11    **Q.  Do you know whether they had the** | 11    A.  No. |
| 12    **same level of education?** | 12    **Q.  Have you ever treated Ms. Givens** |
| 13    A.  They did not have the same level | 13    **differently than anybody else because she's** |
| 14    of education. | 14    **white?** |
| 15    **Q.  How about the same level of** | 15    A.  No. |
| 16    **experience?** | 16    **Q.  How about because she's female?** |
| 17    A.  I'm not familiar -- I'm not sure | 17    A.  No. |
| 18    of that. | 18    **Q.  Have you ever created a hostile** |
| 19    **Q.  Who would know that?** | 19    **place for her to work in because she's** |
| 20    A.  Well, we can find it in their | 20    **white?** |
| 21    personnel file. | 21    A.  No. |
| 22    **Q.  Would James Merk be a good witness** | 22    **Q.  How about because she's female?** |
| 23    **to testify regarding the similarity between** | 23    A.  No. |

| Page 226 | Page 228 |
|---|---|
| 1    **Owensby and Robinson in terms of their** | 1    **Q.  Did you have anything to do with** |
| 2    **education, experience and qualifications for** | 2    **whether -- Did you have anything to do with** |
| 3    **their respective jobs?** | 3    **Mr. Montgomery's exchange between he and** |
| 4    A.  Yes. | 4    **Hendrix associated with an inmate's behavior** |
| 5    **Q.  If he testified that they were not** | 5    **in the horticulture department on February** |
| 6    **similarly situated or associated with their** | 6    **14th, 2006?** |
| 7    **experience, would you disagree with that?** | 7    A.  No. |
| 8    A.  No. | 8    **Q.  Did you know what Mr. Montgomery** |
| 9    **Q.  How about education?  Would you** | 9    **was telling or asking Ms. Hendrix in any of** |
| 10    **disagree with me if he said they did not** | 10    **their meetings?** |
| 11    **have a similar education?** | 11    A.  No. |
| 12    A.  No. | 12    **Q.  Did he come to you and counsel** |
| 13    **Q.  If he said they did not have the** | 13    **with you about how to address Ms. Hendrix's** |
| 14    **same job duties, would you disagree with** | 14    **concerns regarding an inmate that she** |
| 15    **that?** | 15    **believed to be masturbating?** |
| 16    A.  No. | 16    A.  No. |
| 17    **Q.  Have you ever discriminated** | 17    **Q.  Were you aware of any misconduct** |
| 18    **against Ms. Greene based upon her race?** | 18    **on his part?** |
| 19    A.  No. | 19    A.  No. |
| 20    **Q.  How about her gender?** | 20    **Q.  Let me rephrase that question.** |
| 21    A.  No. | 21    **Were you aware of any misconduct on Mr.** |
| 22    **Q.  Have you ever created a difficult** | 22    **Montgomery's part?** |
| 23    **place for her to work in because she's a** | 23    A.  No. |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 229

1  Q.  Were you aware of any misconduct
2  on the part of James Wilson in addressing
3  Inmate Pruitt's misbehavior?
4      A.  No.
5      Q.  Did you have anything to do with
6  the initial process involving interviews
7  between Wilson, Montgomery, Merk, Owensby
8  and a student named Paul Edwards and Ms.
9  Hendrix?
10     A.  No.
11     Q.  Were you advised at all about that
12  incident on the day in question which would
13  be February 14th, 2006?
14     A.  You mean on that particular day?
15     Q.  Yes, sir.
16     A.  No.
17     Q.  Are you aware of James Wilson
18  refusing to respond to complaints about
19  students submitted by Ms. Hendrix?
20     A.  No, I'm not.
21     Q.  Has it ever been reported to you
22  that he has a pattern of not backing her up
23  when she complains about a student's

Page 230

1  behavior?
2      A.  After this process had started.
3      Q.  Only after the complaints and the
4  EEOC charges were filed; is that right?
5      A.  Right.
6      Q.  Before that time, had you ever
7  been made aware that Ms. Hendrix believed
8  that Wilson was not backing her up?
9      A.  No.
10     Q.  Do you know whether Mr. Merk
11  followed the grievance procedure in dealing
12  with Ms. Hendrix's complaint against
13  Montgomery and Wilson associated with her
14  reports of misconduct by Inmate Pruitt?
15     A.  Yes.
16     Q.  Did he follow the guidelines?
17     A.  According to my understanding,
18  yes.
19     Q.  Do you have any reason to believe
20  that he didn't?
21     A.  No.
22     Q.  Do you have any reason to believe
23  that his adherence or non-adherence to those

Page 231

1  guidelines had anything to do with Ms.
2  Hendrix's race?
3      A.  No.
4      Q.  How about her gender?
5      A.  No.
6      MR. CHRISTMAN:  That's all I have.
7  EXAMINATION BY MR. DEBARDELABEN:
8      Q.  Mr. Chambers, have you ever called
9  any of Dean Wilson's people that he
10 supervised in your office and told them Dean
11 Wilson was weak?
12     A.  No.
13     Q.  That he's ineffective?
14     A.  No.
15     Q.  Have you ever called them in his
16 office, his people in your office and
17 criticized Dean Wilson?
18     A.  No.
19     Q.  But you did call Ms. Greene's two
20 top people and criticized Ms. Greene, didn't
21 you?
22     A.  You're using the term criticized.
23 I came in to discuss getting to the end of a

Page 232

1  problem we were having.
2      Q.  Did you ever call Dean Merk's
3  people -- Dr. Merk's people working under
4  him into your office when Dr. Merk was out
5  of town and discussed problems you were
6  having with Dr. Merk?
7      A.  No.
8      Q.  But you did do it with Dean
9  Greene's people she supervised, didn't you?
10     A.  Yes.
11     Q.  Now, you referred to Exhibit 9,
12 page C -- I guess it's page C -- on the
13 findings; correct?  Who was -- Who's in
14 charge of live work on the campus?
15     A.  The Dean of Instruction in
16 conjunction with the Dean of Fiscal
17 Affairs.  But the activities are approved by
18 -- they kind of work hand in hand.  But the
19 projects itself is an instructional part.
20     Q.  That was Dr. --
21     A.  Huffstutler.
22     Q.  -- Huffstutler, wasn't it?
23     A.  Right.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1    Q.  He was in charge of it.  And Ms.
2    Greene has been concerned about live work on
3    that campus for some time, hasn't she?
4          MR. CHRISTMAN:  Object to the
5    form.  If you know what she's concerned
6    about.  Answer what you know.
7          (Whereupon, Plaintiff's Exhibit
8    No. 25 was marked for identification and
9    attached to the original transcript.)
10    Q.  Show you Plaintiff's Exhibit No.
11    25, a letter -- a memo to Rickey Huffstutler
12    from Monica Greene, June 19, 2001.  I
13    believe you put a handwritten note on that
14    one, didn't you?
15    A.  Yes.
16    Q.  Concerned about -- We won't go
17    into details unless you want to.  That's
18    concerned about live work, isn't it?
19    A.  Yes, it is.
20    Q.  And that is Ms. Greene writing
21    Dean Huffstutler a letter seeking his help,
22    isn't it?
23    A.  Yes.

Page 234

1    Q.  Show you Plaintiff's Exhibit No.
2    26.
3          (Whereupon, Plaintiff's Exhibit
4    No. 26 was marked for identification and
5    attached to the original transcript.)
6    Q.  It's July 18th, 2001.  That's Dean
7    Greene writing Dr. Huffstutler.  Did you get
8    a copy of that?  Well, you wrote a note on
9    the 25, didn't you?  Exhibit 25, what did
10    your note say?
11    A.  You said did I get a copy of it.
12    Q.  Yes, sir.  You got a copy of
13    Exhibit 25, didn't you?
14    A.  Not that -- You just handed it to
15    me.
16    Q.  Excuse me.  I mean when she wrote
17    it.
18    A.  Oh.  Yes.
19    Q.  As a matter of fact, you wrote a
20    note on it, didn't you?
21    A.  Yes, I did.
22    Q.  And what does that note say?
23    A.  It says thank you informing Dr.

Page 235

1    Huffstutler about this.  Very good.  I will
2    follow this to see what happens.
3    Q.  Did you?
4    A.  Yes, I did.
5    Q.  Okay.  So Dean Greene has been
6    concerned about live work we know since
7    2001, hasn't she?
8    A.  Yes.
9    Q.  And what's the -- The July 18th,
10    2001 is another letter to Dr. Huffstutler
11    with a copy going to you, isn't it?
12    A.  Right.
13    Q.  And that's again concerned about
14    live work, isn't it?
15    A.  Yes.
16    Q.  Okay.  I'm going to show you a
17    letter dated April 22nd, 2002.  That's
18    another memo to Dr. Huffstutler.  Isn't that
19    a copy to you concerned about live work and
20    live work deposits?
21    A.  That's right.
22          (Whereupon, Plaintiff's Exhibit
23    No. 27 was marked for identification and

Page 236

1    attached to the original transcript.)
2    Q.  So Dean Greene is concerned in
3    2002, isn't she?
4    A.  Yes.
5    Q.  And she brought it to your
6    attention?
7    A.  That's true.
8          (Whereupon, Plaintiff's Exhibit
9    No. 28 was marked for identification and
10    attached to the original transcript.)
11    Q.  Okay.  Show you Plaintiff's
12    Exhibit No. 28.  There's another example of
13    Dean Greene being concerned about live work
14    and sent it to Dr. Huffstutler requesting
15    his help, isn't it?
16    A.  That's right.
17    Q.  Pointing out the problem that the
18    fiscal office is catching; correct?
19    A.  Yes.
20    Q.  Okay.  That's all she can do,
21    isn't it?
22    A.  No.
23    Q.  She's telling Dr. Huffstutler and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 237

1  she's telling you, isn't she?
2     A.  Yes.
3        Q.  And asking for guidance?
4     A.  Are you asking me a question?
5        Q.  Wasn't she asking for guidance
6  from Dr. Huffstutler?
7     A.  Yes.
8        MR. CHRISTMAN:  Which memo?
9        MR. DEBARDELABEN:  All of them.
10       MR. CHRISTMAN:  Read them all if
11 he's going to ask you a broad question about
12 what they all say, whether they all say the
13 same thing.  Make sure you know what they
14 all say.
15    A.  Yes.  They basically are asking
16 for help.
17       (Whereupon, Plaintiff's Exhibit
18 No. 29 was marked for identification and
19 attached to the original transcript.)
20       Q.  Show you another one, Plaintiff's
21 Exhibit No. 29.  It's a letter from Monica
22 Greene or a memorandum to Rickey Huffstutler
23 dated December the 18th, 2002 pointing out

Page 238

1  that Mr. Keahey is violating some policies;
2  is that correct?  And it has the information
3  attached to it to back up the memo, doesn't
4  it?
5     A.  Right.
6        Q.  Didn't you get a copy of that one,
7  too, sir?
8     A.  Yes.
9        Q.  Okay.  And again, she's asking Dr.
10 Huffstutler to look into the problem for one
11 of his instructors, isn't she?
12    A.  Yes.
13       Q.  And Dr. Huffstutler is the one
14 over Mr. Keahey, isn't he?
15    A.  Yes.
16       (Whereupon, Plaintiff's Exhibit
17 No. 30 was marked for identification and
18 attached to the original transcript.)
19       Q.  Okay.  Here's another one to Dr.
20 Huffstutler dated February 27th, 2004.  It's
21 to Dr. Huffstutler concerning invoices in
22 auto mechanics, Plaintiff's Exhibit No. 30.
23 Again, she's concerned about live work,

Page 239

1  isn't she?
2     A.  That's right.
3        (Whereupon, Plaintiff's Exhibit
4  No. 31 was marked for identification and
5  attached to the original transcript.)
6        Q.  Show you Plaintiff's Exhibit No.
7  31.  I think this is concerning Mr. Benton
8  on a live work project he's not doing right.
9  She said this must stop.  And it's Dr.
10 Huffstutler again, isn't it?
11    A.  That's right.
12       Q.  And that's pointing out about the
13 same thing that was pointed out in the
14 examiner's report, isn't it?  A lot of that
15 is similar?
16    A.  Yes.
17       (Whereupon, Plaintiff's Exhibit
18 No. 32 was marked for identification and
19 attached to the original transcript.)
20       Q.  Okay.  Here's a memorandum to Ms.
21 Gloria Knox on live work with a copy to Dr.
22 Huffstutler concerning problems with a live
23 work project dated -- when is that dated--

Page 240

1  June 24th, 2004.
2        Just another little problem with
3  live work, isn't it?  And she's writing one
4  of Dr. Huffstutler's instructors to resolve
5  the problem; is that correct?
6     A.  That's not correct.
7        Q.  What does it do?  Don't let me put
8  words in your mouth.
9     A.  It clearly emphasizes that she's
10 asking him to help look into the problems
11 that she's having.
12       Q.  Right.  And they're creating
13 problems for the fiscal office, not doing it
14 right; is that correct?
15    A.  No, that's not correct.
16       Q.  Okay.  What does that say?  Let's
17 look at that one.  It's telling them the
18 customers, to pay in cash because it had to
19 -- they took a check and it obviously
20 bounced and they had to decrease their
21 deposit by three hundred dollars.
22       That was -- Don't you have a rule
23 and regulation that y'all only take cash or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 241

1  money orders?
2      A.  We take up to seventy-five percent
3  in cash -- I mean in check or money order or
4  whatever.  But you must pay the last
5  twenty-five percent in cash.
6      Q.  And she's trying to get them to
7  follow that policy, isn't she?
8          MR. CHRISTMAN:  He hasn't
9  responded to the question.
10      Q.  She's trying to get Ms. Gloria
11  Knox to follow the policy of the college?
12      A.  Right.
13      Q.  Okay.  And when it wasn't
14  followed, it had to collect three hundred
15  dollars, take it off, because somebody paid
16  three hundred dollars in cash and it appears
17  the check bounced, didn't it?
18      A.  Yes.
19          (Whereupon, Plaintiff's Exhibit
20  No. 33 was marked for identification and
21  attached to the original transcript.)
22      Q.  Okay.  I want you to look at
23  Plaintiff's Exhibit No. 33, September 22nd,

Page 242

1  2005.  Talking about to Ms. Gloria Knox
2  again on live work deposits.  That she's not
3  apparently timely -- making timely
4  deposits.
5          (Whereupon, Plaintiff's Exhibit
6  No. 34 was marked for identification and
7  attached to the original transcript.)
8      Q.  Here's another memorandum that you
9  got a copy of to Mr. Huffstutler dated
10  November the 16th, 2001 about automobiles
11  being taken out of the auto mechanic shop
12  and the invoice has not been billed out and
13  paid; is that correct?
14      A.  Is that correct?
15      Q.  That automobiles have been taken
16  out of the automobile mechanic shop and the
17  invoices haven't been paid?
18      A.  That's what she's saying in this
19  document.
20      Q.  And she sent it to Dr.
21  Huffstutler?
22      A.  Right.
23      Q.  And who has the control over the

Page 243

1  automobile mechanic shop?
2      A.  The Dean of Instruction and the
3  Dean of Fiscal Affairs.
4      Q.  And who is that?
5      A.  At this particular time, it was
6  Dr. Huffstutler and Dean Greene.
7      Q.  Now, Dean Greene, she didn't have
8  physical control over the people running the
9  shop, did she, that was Dr. Huffstutler?
10      A.  Physical control?
11      Q.  Yes, sir.  They reported to Dr.
12  Huffstutler?
13      A.  That's right.
14      Q.  And he's the one that grades them
15  and annual reports and supervises them,
16  isn't he?
17      A.  Right.
18      Q.  Okay.
19          (Whereupon, Plaintiff's Exhibits
20  No. 35 - 36 were marked for identification
21  and attached to the original transcript.)
22      Q.  Here's another one to Dr.
23  Huffstutler dated July 25th, 2005.  It's

Page 244

1  concerning Mr. Benton again not collecting
2  money on auto mechanics.  And it's Dr.
3  Huffstutler with a copy to you, isn't it?
4      A.  That's right.
5      Q.  Who is Ms. Jacquelyn McDuffie?
6      A.  She's the receptionist, clerk over
7  at the Tutwiler campus.
8      Q.  Okay.  And is she under Mr. Wilson
9  and Dr. Huffstutler?
10      A.  She has a dual role.  She's under
11  the Dean of Fiscal Affairs and the Center
12  Director.
13      Q.  Well, were you aware that Ms.
14  Greene has sent her a memorandum concerning
15  problems with accounts receivable and
16  deposits?
17      A.  No, sir.
18      Q.  Now, Mr. Christman didn't ask you
19  about any of that, did he?
20      A.  No, he did not.
21      Q.  Okay.  Let me see that Exhibit 9
22  again.  It says instructors prepare a
23  contact form and estimate for all proposed

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 245

1 live work projects. Ms. Greene had been
2 complaining some of them weren't doing that,
3 hadn't she? And this is before this time?
4    A. Right.
5    Q. Okay. And if you look through
6 there, she's complaining about some of those
7 work orders being written up for less than
8 fifty dollars where they didn't get their
9 seventy-five percent deposit, wasn't she?
10    A. I think I saw that, yes, sir.
11    Q. So some of the very same things
12 the audit found, Ms. Greene was complaining
13 about prior to that time to Dr. Huffstutler
14 and sending you memorandums about; correct?
15    A. That's right.
16    Q. Some of the very same practices
17 that you felt necessary to address when you
18 got the audit; correct?
19    A. Right.
20    Q. President Chambers, what more can
21 this lady do than inform you and inform the
22 Dean of the College and the Dean of
23 Instruction that we've got a problem,

Page 246

1 fellows, we need to correct it? What else
2 can she do?
3    A. She can stop the money.
4    Q. Stop the money how, sir?
5    A. She can stop the money from the
6 beginning. She can stop purchasing. She
7 can stop ordering stuff for people until she
8 gets the appropriate paperwork.
9    Q. But, sir, one of your complaints
10 about Dean Greene is she wouldn't purchase
11 and order?
12    A. That's right.
13    Q. And now you're telling me she
14 should stop purchasing and ordering until
15 they do right?
16    A. Yes.
17    Q. And if she does that, then you'd
18 complain --
19    A. You're not hollering, are you?
20    Q. -- then you'd raise -- I'm just
21 talking like Mr. Christman. Then you'd
22 raise another issue?
23    A. No. The issue is, if you would go

Page 247

1 back and look at this, with the exception of
2 maybe one or two, there were some materials
3 ordered. There were some purchase
4 requisitions approved.
5    And we have in our documents --
6 and the minutes will reflect -- that she has
7 been directed by me that if she does not
8 have the paperwork, do not allow the process
9 to continue. That has been said over and
10 over and over.
11    And all she had to do was stop
12 purchasing. Stop allowing people to come in
13 and bring stuff in because that was her
14 responsibility.
15    Q. And when people don't pay for the
16 materials when they pick it up, y'all ban
17 her from campus, don't you?
18    A. We try as much as we can to
19 penalize them so they can't come back.
20    Q. Yes, sir.
21    A. But they cannot start a process or
22 end a process without our approval. They
23 cannot bring a car in there to be worked on.

Page 248

1 Yes, they've slipped a few in. But when
2 we found them, we dealt with them.
3    But we do not have to order a
4 spark plug for a car if the paperwork is not
5 right. We do not have to pay a bill for a
6 -- to a vendor if the paperwork is not
7 right.
8    Q. Correct.
9    A. So they could have stopped the
10 process.
11    Q. And when you talk about late
12 payments, you agree with me that the
13 paperwork has to be right before that bill
14 is paid?
15    A. But the paperwork had an
16 opportunity to be right before the bill was
17 allowed to happen.
18    Q. Well, sometimes it's billed to you
19 incorrectly?
20    A. You're right. Sometimes.
21    Q. Now, let's go to another issue
22 here. Now, I wrote this down. And you said
23 in response to Mr. Christman's questions

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 249

1  about Ms. Hendrix, according to my
2  understanding, Ms. Hendrix got a hearing.
3      A.  At that time, yes, I thought she
4  had.  I thought the process had gone through
5  according to the policy.  When I got the
6  report from Dr. Merk when he said he had
7  gone through the steps according to State
8  Board policy and according to his
9  recommendation or resolution, he had gone
10  through the procedures he had gone through
11  and he was making a recommendation that the
12  problem had been resolved and no further
13  action was needed.
14      Q.  So you were under the impression
15  she had her public hearing?
16      A.  I was under the impression that
17  she had been provided all of those steps
18  that were provided as outlined, which could
19  --
20      Q.  But you know --
21      MR. CHRISTMAN:  Hold on.  Which
22  could.
23      A.  Which could have included a

Page 250

1  hearing.  It could have been used as
2  investigative information.  They could have
3  used a lot of things in that.
4      Q.  You know now she didn't have a
5  hearing, don't you?
6      A.  I still don't know that she did
7  not have a hearing.  I'm hearing this in
8  these type of meetings and discussions.
9      Q.  If Dr. Merk admitted she didn't
10  have a hearing --
11      A.  I would believe him.
12      Q.  Right.  If he admitted that under
13  oath especially?
14      A.  Whether he admitted it under oath
15  or not, I would believe him.
16      Q.  Okay.  Did you say you got a
17  letter signed by the Chancellor that
18  criticized your response?
19      A.  Yes.
20      MR. CHRISTMAN:  Talking about his
21  response to the audit report?
22      MR. DEBARDELABEN:  Report number
23  -- Plaintiff's Exhibit No. 9.

Page 251

1      A.  Yes.
2      Q.  Okay.  When did you get that
3  letter?
4      A.  I can't give you the exact time.
5  But it was after he had received our report
6  back from the audit.
7      Q.  Okay.  Now, did Dr. Huffstutler
8  leaving J.F. Ingram have anything to do with
9  that audit report?
10      A.  No.  But it was good timing
11  because I also indicated to the auditors
12  that he probably would be no longer at the
13  institution, which would help us to resolve
14  some of the problems we've had with him.
15      Q.  And some of those problems, it
16  appears from reading Dean Greene's
17  memorandum to him and from what's in the
18  audit report, is that he was pretty loose
19  about letting people bring equipment in to
20  get repaired, not getting work orders, or
21  not having his people prepare their work
22  orders correctly.  Would that be a bad
23  statement?

Page 252

1      A.  No.  That's a pretty accurate
2  statement.
3      Q.  And Ms. Greene kept on sending him
4  memorandums to tighten up apparently, didn't
5  she?
6      A.  Yes.  According to what I'm
7  reading here.
8      Q.  And she sent you a lot of those
9  memorandums, didn't she?
10      A.  That's right.
11      Q.  And she's kind of caught between a
12  devil and the deep blue see if she cuts off
13  the funds and shops can't get any of their
14  work done?
15      A.  So.  If they're doing it
16  incorrectly why would --
17      Q.  But if she doesn't cut off the
18  funds --
19      A.  Then she's going to get in
20  trouble.
21      Q.  -- they'd disagree with it
22  indirectly.  So either way she goes --
23      A.  No.  I disagree with you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 253

1    Q.   -- she can get in trouble?
2    A.   I disagree with you.
3    Q.   But you are complaining about Ms.
4    Greene getting purchase orders out, aren't
5    you?
6    A.   Yes.
7    Q.   And Dean Wilson is complaining
8    about purchase orders, isn't he?
9    A.   Yes.
10    Q.   And Dean Merk is complaining about
11    purchase orders?
12    A.   That's right.
13    Q.   And Dean Huffstutler has
14    complained about purchase orders?
15    A.   That's right.
16    Q.   But on the other hand, if it's
17    done wrong, according to you, she's supposed
18    to cut it off?
19    A.   Ms. Greene will never be able to
20    tell you or anyone else that I have told her
21    to disregard policies, don't worry about
22    whether we have the money.  Go in and buy,
23    purchase it, order it.

Page 254

1    She will never tell you or anyone
2    else that I have told her to circumvent
3    policies to make sure that someone was
4    happy.
5    Q.   Right.  But she's got to work with
6    those people to be a team player, doesn't
7    she?  You want her to be a team player?
8    A.   It's not important as to whether
9    she's a team player or she's doing things
10    right.  I want to be a team player, too.
11    And look where I'm at today.
12    Q.   And if she is a team player, she
13    should try to -- and you wrote her up about
14    not getting along with people, didn't you?
15    A.   That has nothing to do with the
16    paperwork and stuff we're talking about.
17    Q.   Let's see.  You said she was not
18    sensitive to the problems or changes within
19    the work place.  I think that was No. 10.
20    You said, in essence, I asked you -- I'm
21    paraphrasing -- and it was a negative.  She
22    makes an effort to be a team player and
23    works effectively as a member of the college

Page 255

1    administrative team.
2    So what -- if she gets along with
3    them, she violates policy.  If she's a team
4    player, she's a team player.  But if she
5    cuts it out and cuts off the money and don't
6    buy stuff, she gets criticized because she's
7    not a team player.
8    A.   That's a good paraphrase if we
9    were doing it that way.  But that has
10    nothing to do with what we're talking about.
11    Q.   Yes, sir.
12    A.   No, sir, it doesn't.
13    Q.   We disagree on that.
14    A.   Well, you have a right to disagree
15    and so do I because what we're talking about
16    here is a money trail.
17    Q.   Yes, sir, we're talking about a
18    money trail.
19    A.   She's asking Dr. Huffstutler here
20    to stop the teachers from violating policy.
21    Q.   Yes, sir.
22    A.   I'm saying that the teachers
23    cannot violate policy to this degree if they

Page 256

1    can't purchase and they can't have the
2    equipment to work with.  And I have said
3    that over a hundred times.
4    That if you do not order it, they
5    will get in line with what you're trying to
6    do.  I'm not disagreeing with what she is
7    saying here.  She's asking the dean to tell
8    the people that he supervises to stop
9    violating policy.
10    But she holds the money.  You said
11    earlier in this interview that I expect for
12    Dean Greene to spend the money, to save the
13    money, all those money questions you asked
14    me.  And they were leading to one thing,
15    that Dean Greene was the money person.
16    You also asked me about her
17    priority.  And I said she has the number one
18    priority on this campus including my job.
19    Q.   Now, let me ask you --
20    MR. CHRISTMAN:  Wait a minute.
21    He's not finished.
22    A.   No, I'm not through.
23    MR. DEBARDELABEN:  I haven't asked

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1  him a question. He started that comment. I
2  asked a question.
3       MR. CHRISTMAN: You're not going
4  to cut him off then.
5       MR. DEBARDELABEN: Okay. You ask
6  the question. We'll be here until ten
7  o'clock tonight. I'm going to stay here.
8  And I'm fixing to get some more stuff.
9       MR. CHRISTMAN: Just hold on.
10  Let's go off the record for a second.
11       (Whereupon, there was a brief
12  off-the-record discussion.)
13   **Q. If you'd just answer the question**
14  **and don't editorialize, I'll be fine.**
15       MR. CHRISTMAN: You answer it
16  fully, Dr. Chambers. Answer it fully.
17   **Q. Let me ask you this. You**
18  **mentioned the report from the Chancellor's**
19  **office concerning Ms. -- well, the review of**
20  **the business office function of Ingram State**
21  **Technical College; correct?**
22   A. Correct.
23   **Q. Now, I want to show you what was**

Page 258

1  **introduced in Dean Greene's deposition as**
2  **Exhibit No. 13 and ask you if this is the**
3  **report?**
4   A. Yes.
5   **Q. Now, flip that page, please, sir.**
6  **Up in the upper right-hand corner, what's**
7  **the date on it?**
8   A. February 10, 2004.
9   **Q. Is that when you got it?**
10   A. I don't know when I got it. But I
11  know I received it.
12   **Q. And that's the date of the report,**
13  **isn't it? You got it pretty quickly after**
14  **that, didn't you?**
15   A. I don't know when I got it because
16  they had been over twice. But I got -- I
17  received this report.
18   **Q. How did you receive that report?**
19   A. Well, I believe it was mailed to
20  me. But I'm not sure.
21   **Q. Mailed to you. Did you get a**
22  **cover letter with it?**
23   A. I'm not sure.

Page 259

1   **Q. Okay.**
2   A. Normally I do. But I'm not sure
3  whether I did or not.
4   **Q. Okay. Did you put a copy of that**
5  **in Dean Greene's personnel file?**
6   A. No.
7   **Q. Do you think you got it before the**
8  **month of March was out?**
9   A. I would only be speculating. I'm
10  not sure when I received it.
11   **Q. So you don't know. But you got a**
12  **cover letter going with it?**
13   A. No, I didn't say that. I said
14  normally I do.
15   **Q. But what's the date of that**
16  **report?**
17   A. February 10, 2004.
18   **Q. And that was something that was**
19  **requested of -- that the Chancellor did,**
20  **didn't it?**
21   A. Yes.
22   **Q. But you do agree on -- look at**
23  **Plaintiff's Exhibit No. 6.**

Page 260

1   A. Okay.
2   **Q. You do have to agree, even after**
3  **that report was written on February the**
4  **10th, '04, you gave her an evaluation on**
5  **April 1st, 2004 that says she met standards,**
6  **didn't you?**
7   A. Yes.
8   **Q. Even after that report was**
9  **written?**
10   A. Yes.
11   **Q. So it didn't affect your**
12  **evaluation of her in 2004, did it?**
13   A. Not on paper it didn't.
14   **Q. And this is what she has to rely**
15  **on, isn't it?**
16   A. Yes.
17   **Q. What the State Department has to**
18  **rely on; is that correct?**
19   A. Not necessarily.
20   **Q. Is there a -- You mentioned**
21  **purchases. Is there a phenomenon at the end**
22  **of the year that people try to purchase and**
23  **use up their budget?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 261 | Page 263 |
|---|---|
| 1  A. Yes. | 1  A. From time to time, yes. |
| 2  Q. And that creates problems with the | 2  Q. What percentage of them? |
| 3  finance office, doesn't it? | 3  A. I wouldn't have any idea. I |
| 4  A. Yes. | 4  wouldn't have any idea. |
| 5  Q. You're aware of that? | 5  Q. And this is also during the time |
| 6  A. Yes. | 6  period y'all are going through that Access, |
| 7  Q. And you're aware that when people | 7  getting that up and running and correct? |
| 8  send in a lot of purchases at one time, that | 8  A. It's been requested from time to |
| 9  they are not going to be processed | 9  time ever since I've been there. |
| 10  immediately, are they? | 10  Q. Have you ordered it done? |
| 11  A. I would expected that. I wouldn't | 11  A. No. |
| 12  think so. | 12  Q. Do you consider that a priority? |
| 13  Q. And from time to time, Ms. Greene | 13  A. No. |
| 14  has to send a memorandum out to the | 14  Q. I mean, that's just kind of a it |
| 15  employees reminding them of that? | 15  would be nice if we had it, but we're just |
| 16  A. That's right. | 16  not ready to function like that; right? |
| 17  (Whereupon, Plaintiff's Exhibits | 17  A. Well, according to the information |
| 18  No. 37 and 38 were marked for identification | 18  I received from the business office, that's |
| 19  and attached to the original transcript.) | 19  right. But I didn't disagree with it. |
| 20  Q. And she does that every year as | 20  Q. Now, another thing I think they've |
| 21  shown by Plaintiff's Exhibit 37 and 38 for | 21  showed to criticizing in that report is the |
| 22  the years of 2004 and 2005, basically by the | 22  deduction from employees' checks. |
| 23  end of the year, it's going to be slow | 23  You might have one or two |

| Page 262 | Page 264 |
|---|---|
| 1  processing. I'm paraphrasing. But that's | 1  employees that money is deducted and sent to |
| 2  what they say, isn't it? | 2  one company or maybe only one employee. And |
| 3  A. Right. | 3  that report is criticizing that J.F. Ingram |
| 4  (Whereupon, Plaintiff's Exhibit | 4  goes to the effort of deducting only one or |
| 5  No. 39 was marked for identification and | 5  two employees and sending it to a company. |
| 6  attached to the original transcript.) | 6  And they said it should be a |
| 7  Q. And she even tries -- It's not | 7  minimum amount. That was a criticism in |
| 8  unusual as shown by Plaintiff's Exhibit 39 | 8  that report, too, wasn't it? |
| 9  that she tries to tell employees we have a | 9  A. I'm not for sure if it was in the |
| 10  close out on purchasing, to get your | 10  report. I would have to look at it. But |
| 11  purchase dates -- purchasing by this date? | 11  I'm not sure. |
| 12  A. Right. | 12  Q. Let me see. I think I can find |
| 13  Q. I think one of the criticisms in | 13  that thing. Do y'all have a vice-president? |
| 14  that Chancellor's report is concerning | 14  A. The college? |
| 15  direct deposits of the check into a bank. | 15  Q. Yes. |
| 16  Were you familiar with that? | 16  A. No. |
| 17  MR. CHRISTMAN: Criticism or the | 17  Q. So y'all don't have anything |
| 18  practice? | 18  that's a vice-president? |
| 19  Q. They criticized J.F. Ingram for | 19  A. No. |
| 20  not having direct deposits? | 20  Q. Do other colleges? |
| 21  A. Yes. What's your -- | 21  A. Technical colleges are only |
| 22  Q. Have any of your employees | 22  allowed to have a Dean of the College. A |
| 23  requested direct deposit? | 23  community college can have a vice-president. |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 265

1    Q.  These people who are doing this
2    review, were they junior college people or
3    technical college people?
4        A.  I don't know how they were
5    selected.  They were selected from the
6    Chancellor's office.  I have think they were
7    a cross section of people.  I'm not sure.
8    Q.  Would you agree with me or
9    disagree with me -- I think you'll agree
10   with me - that there's no other school in
11   the system that operates like J.F. Ingram?
12       MR. CHRISTMAN:  Form.
13       A.  You mean as related to --
14   Q.  As related to almost anything.
15   Y'all have a captive student body of
16   inmates?
17       A.  But there are some similarities
18   that we have with other schools that we are
19   to conform to.
20   Q.  Yes, sir.  You have a good many
21   similarities.  But even those similarities,
22   you have differences within, don't you?
23       A.  Well, yes.

Page 266

1    Q.  So what might be good for John
2    Patterson here in Montgomery certainly
3    wouldn't work for J.F.I, would it?
4        A.  Well, it's depending on what we're
5    looking at.  The live work procedure is
6    similar.  The reporting procedure is
7    similar.  The purchasing is similar.  We're
8    dealing with a different clientele.  But the
9    procedures are not all that different.
10   Q.  Right here.  The college does not
11   offer direct deposits to employees.  That's
12   the weakness.  You don't consider that a
13   weakness, do you?
14       A.  No.
15   Q.  Okay.  And it says do not begin
16   any new payroll deduction unless a certain
17   number of employees sign up for the
18   deduction.  That's a recommendation.
19       I guess they're saying optional
20   deduction number around twenty which seems
21   excessive and causing much work to be
22   performed by payroll in keeping up with
23   these deductions and submitting them to the

Page 267

1    proper vendors.  Do you consider that a
2    weakness?
3        A.  No.
4        MR. CHRISTMAN:  What are you
5    reading from there?
6        MR. DEBARDELABEN:  I'm reading
7    from the payroll section of this report
8    where they point out weaknesses that --
9        MR. CHRISTMAN:  Just for the
10   record --
11       MR. DEBARDELABEN:  -- that Mr.
12   Chambers don't agree with.
13   Q.  And at the time -- Now, it says
14   the Access payroll contract module is not
15   used -- y'all still having some problems
16   getting the payroll module for contracts on
17   Access, aren't you, but it's being worked
18   on?
19       A.  I think we're just about there, if
20   we're not there already.
21   Q.  Is that a weakness or just a
22   situation y'all are working on?
23       A.  A situation we're working on.

Page 268

1    Q.  But you wouldn't consider that a
2    weakness, would you?
3        A.  No.  And I didn't consider it as a
4    weakness.
5    Q.  Right.  So is it fair to say that
6    everything that this -- I'm going to call it
7    the Chancellor's office report pointed out
8    as a weakness, you didn't necessarily agree
9    it was a weakness?
10       A.  Not necessarily.
11   Q.  And you and Ms. Greene got
12   together and basically implemented anything
13   that y'all thought was a weakness within
14   J.F. Ingram, didn't you?  Y'all changed it?
15       MR. DEBARDELABEN:  Form.
16   Q.  Let's put it this way.  Y'all
17   started a process to make changes?
18       A.  Yes.
19   Q.  And sometimes a process to make
20   changes can take months to years?
21       A.  That's right.
22   Q.  Okay.  Did you know on September
23   the 30th, 2006 -- and that's just about the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1   last of the fiscal year, isn't it?
2       A.  Right.
3       Q.  -- y'all had a cash -- J.F. Ingram
4   State Technical had a cash balance at
5   Alliant Bank in Alex City of two million
6   five hundred and eighty-four thousand six
7   hundred and seventy-six dollars and
8   eighty-seven cents?
9       A.  I don't know the exact figure.
10          (Whereupon, Plaintiff's Exhibit
11  No. 40 was marked for identification and
12  attached to the original transcript.)
13      Q.  I'll show you Plaintiff's Exhibit
14  40.  Would you disagree with that?
15      A.  No, I would not disagree with it.
16      Q.  Now, from the other figures we
17  saw, that's an increase over 2004, isn't
18  it?  I think it was two point --
19  approximately two point one million?
20      A.  Something like that, yes.
21      Q.  And J.F. Ingram has to get that
22  cash budget by being very shrewd with its
23  funds.

Page 270

1       A.  You could say that, yes.
2       Q.  It shows basically y'all not
3   having any wasted spending, doesn't it?
4       A.  Well, it shows that we're not
5   spending as much as we had been spending.
6       Q.  Right.  That might be why some of
7   the -- let me ask the question this way.  Do
8   you know any program at J.F. Ingram that's
9   not getting enough material to do what they
10  are supposed to be doing?
11      A.  No.
12      Q.  And every instructor at J.F.
13  Ingram and every dean wants more money and
14  more material, don't they?
15      A.  Most of them, yes.
16      Q.  And if each instructor had a
17  million dollars to spend and each dean had
18  ten million, they would still want more
19  money, wouldn't they?
20      A.  Not necessarily.  They don't ask
21  for a lot of money.
22      Q.  But they always want more than
23  they've got, don't they?

Page 271

1       A.  You'd be surprised, but they
2   don't.
3           MR. DEBARDELABEN:  I have no
4   further questions at this time.
5           MR. CHRISTMAN:  We're good.

Page 272

1           C E R T I F I C A T E
2
3   STATE OF ALABAMA )
4   MONTGOMERY COUNTY)
5
6           I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14          I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in any wise
17  interested in the result of said cause.
18
19
20  ------------------
21          CINDY WELDON
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**A**

ABI 173:20
ability 33:18
  142:8 219:22
able 33:19 34:1
  34:5 85:1
  149:13 253:19
academic
  156:21
accept 20:6
acceptable 79:9
  86:7
accepted 77:17
  140:14
accepts 67:5,11
access 102:22
  186:16 187:19
  187:20 188:1,5
  188:16 189:1,5
  189:13 191:8
  191:12 192:5
  263:6 267:14
  267:17
account 64:18
accountant
  142:18,20,21
  142:22
accounting 66:6
  69:19 86:7
  194:15 195:18
  208:11,20
accounts 85:8
  93:6 97:8,14
  102:2,7 103:14
  103:19 135:21
  139:20 141:6
  141:18 142:2
  204:19 207:11
  212:4 244:15
accurate 33:17
  203:22 252:1
accurately 72:22
achieve 61:2
acknowledge

62:17 78:23
acre 185:21
  186:4
act 29:20
action 92:5
  199:18 200:9
  200:10 204:12
  221:13 223:9
  224:14 249:13
  272:16
actions 204:15
  205:22
activities 232:17
activity 81:9
add 218:16
address 11:19
  228:13 245:17
addressed 136:4
  213:18,22
  217:12,14
addresses 69:3
addressing
  133:16 180:19
  229:2
adherence
  230:23
administrative
  41:20 70:3
  72:9 83:6
  183:20 255:1
administrator
  63:3
administrators
  62:22 64:3,10
  195:9
admissions
  145:23
admission's
  19:20,23
admit 194:14
admitted 194:16
  250:9,12,14
adopted 32:23
  33:8 34:8

123:22
advance 107:3
  109:2 112:10
  217:5
advanced 109:3
adverse 134:17
advertised 26:4
advised 5:8
  229:11
Affair 204:2
  208:1
affairs 28:21
  232:17 243:3
  244:11
affect 17:12,15
  214:11 260:11
agencies 104:18
  127:22
agency 103:14
  103:15 104:21
  104:22 105:1,4
  105:7,16
ago 12:6 17:9,10
  70:20 113:15
  174:16 218:20
  218:21
agree 51:8 54:11
  65:15 95:20
  120:19,22
  124:5 129:9,13
  150:4 169:4
  170:18 185:19
  194:22 248:12
  259:22 260:2
  265:8,9 267:12
  268:8
agreeable 96:3
agreed 5:13,23
  6:9 10:14 79:2
  124:9,14
agreement
  145:13
ahead 188:10
aides 172:2

Alabama 1:2 2:2
  4:2 5:2,20 7:6
  7:12 11:21,23
  12:16 13:5
  14:5 16:6,8,17
  16:20 34:11,14
  41:6 47:6,20
  48:1,7 103:16
  104:12 105:1
  128:3 141:7
  200:12 272:3
Alex 269:5
alike 34:22
allegations
  123:4,12,16
  188:4,13,19
alleged 119:16
  130:11,14
alleviating
  223:15
Alliant 269:5
allocate 180:1,6
allotted 222:15
allow 38:9
  159:17 204:5
  204:11 247:8
allowed 65:22
  103:2 152:23
  224:12 248:17
  264:22
allowing 247:12
allows 49:4,10
alluded 218:20
Amended 5:3
American
  107:13
amount 60:20
  65:8,8 165:5
  264:7
ANDREW 7:9
and/or 111:22
  159:11
animosity 127:3
announcement

21:1
announcing
  21:3
annual 33:13
  34:2,5 41:19
  46:4 107:3
  112:9,13
  243:15
answer 10:23
  33:3 34:20
  55:2 80:13
  94:9 111:13,14
  111:15 112:22
  120:16 131:17
  139:8 146:21
  149:11,21,3
  173:7 188:6,22
  213:21 218:17
  233:6 257:13
  257:15,16
answered
  112:19
answers 272:9
anybody 64:21
  124:13 194:1
  213:8 218:1
  221:17 227:7
  227:13
anymore 211:21
  219:16
apparently 40:7
  51:5 76:6
  130:20 193:3
  242:3 252:4
appeal 221:11
  221:12,14,15
  221:21 222:5,7
  222:12,22
  223:1,4,8,11
  223:15,19
  224:3,12
appealed 222:14
  224:8
appeals 222:18

# FREEDOM COURT REPORTING

Page 274

appear 57:22
58:13,18 202:8
207:13 208:22
appears 28:9
50:21 58:19
112:12 137:4
146:8 207:18
208:20 241:16
251:16
applicable
141:13
application
21:10 22:15,17
23:2,4 24:7
25:18 26:2,5
26:15 27:6,12
27:15,20 156:5
156:8
applied 22:14
apply 21:8 60:12
60:13 156:5
appoint 117:21
145:14 156:6
appointed 23:5
24:5,8,9 25:15
27:10 28:4
29:6 103:19
116:18 117:10
117:17
appointment
116:22
appoints 27:22
appraisal 37:22
38:14,19,21,23
approached
211:17
appropriate
31:16 61:10
62:21 63:4
125:13,18
129:11 152:9
152:19 200:18
204:5 205:5
246:8

appropriated
164:7,10
165:21
appropriately
67:15,23 68:6
68:10,18
219:19
appropriation
164:19
approval 28:3
247:22
approve 77:9,15
77:16 110:3,5
approved 110:2
210:23 232:17
247:4
approximately
15:18 64:13
135:18 147:10
148:18 185:21
186:10 269:19
April 44:9,18
53:6,7,11
79:12,13 82:2
83:17 84:1,19
84:20 235:17
260:5
area 12:22 40:4
40:5 66:15
69:2 151:19
182:19 183:2,4
184:18,20,22
184:23 185:9
185:20
areas 40:14
44:19 59:23
80:21 128:21
129:6 206:4
arrive 60:21
asked 25:6
43:14 69:8
74:3 78:20
80:15 81:2
92:3 104:6

106:3 111:20
112:9,17
113:10 118:4
118:12,20,22
119:12 120:9
125:8 133:18
136:13,16
138:19 160:21
161:21 162:2,5
191:23 192:15
196:11,17
204:4 221:21
254:20 256:13
256:16,23
257:2
asking 64:5,7
113:17 119:6
228:9 237:3,4
237:5,15 238:9
240:10 255:19
256:7
ass 169:15
assign 6:4
assigned 74:21
121:9
assignment 62:2
69:9
assignments
67:6
assist 125:2
assistant 22:10
22:11 23:1,6
23:17 24:1,16
72:9 114:5
142:23 143:3
145:16 147:16
147:21 148:9
154:21 155:3,4
155:5,6,8,9
157:7,8,10,13
157:15,16,19
157:20,21,22
158:10 176:6
assistants

158:11 159:1,4
159:8
associated 114:9
188:23 200:3
204:20 206:6
208:14 213:8
217:17 220:12
220:17 222:4
226:6 228:4
230:13
Association
107:10,11,13
108:2
assume 154:3
attach 38:9 71:8
90:23 91:2,5
attached 35:6
36:18 39:5
43:23 51:19
52:18 56:9
58:12 61:8
71:16 74:17
78:12 93:21
97:11 106:23
113:4 115:23
129:22 137:2
145:6 233:9
234:5 236:1,10
237:19 238:3
238:18 239:5
239:19 241:21
242:7 243:21
261:19 262:6
269:12
attachment 60:5
attack 38:11
131:5,12
172:18 184:7
attacked 216:17
attacking
131:10
attempt 204:13
attempting
206:18,20

attended 14:9
attention 121:4
196:10 198:6
203:12 205:6
206:22 209:16
236:6
attire 129:11
217:10
attorney 43:16
51:2 83:22
Attorney's
200:14
attracted 130:21
Auburn 14:18
15:1,3,4,4,6,6
audit 85:15 86:1
87:13,14,15
88:1,11,18
89:18 90:5,10
90:13 91:11,22
92:2 93:6
139:20 140:1
140:12,19
152:17 153:12
196:8 197:17
197:23 198:5
198:10 199:8,9
199:10 201:11
203:19 209:12
210:6 212:5,10
212:12,15
213:2 245:12
245:18 250:21
251:6,9,18
auditing 140:6
140:14 141:19
142:3
auditor 102:18
153:13,18
201:3,6 203:12
auditors 102:22
200:7,7 202:17
203:8 204:4,10
204:14 205:2,9

# FREEDOM COURT REPORTING

208:22 209:18
210:3 251:11
**auditor's** 203:17
203:18
**audits** 87:19
93:23 94:11
95:3 140:15
141:9 198:2
212:17,20
**August** 37:4
40:7
**AUM** 15:4
**Autauga** 12:17
**authority** 29:20
30:7 48:22
**auto** 238:22
242:11 244:2
**automatic** 182:1
182:2
**automobile**
242:16 243:1
**automobiles**
242:10,15
**available** 21:4
103:7 160:3
222:18
**Avenue** 5:20 7:5
**average** 39:20
**avoid** 69:5
**award** 100:1
168:10,11
**awards** 90:10
95:12,15
**aware** 115:13,16
118:2,6,11,19
119:5,10 120:3
134:8,14
148:10,22
153:22 154:8
188:3,12 210:6
219:23 228:17
228:21 229:1
229:17 230:7
244:13 261:5,7

**a.m** 5:21

---
**B**

**B** 8:7
**baby** 216:6
**bachelor's**
224:22
**back** 11:2 26:23
27:4 37:7
40:18 41:1
44:22 46:13
58:8,12 59:5
62:13 68:22
76:10,12 96:5
96:20 98:2
103:9 124:21
182:18,22
184:14 186:9
192:17 205:4,8
206:11 220:16
238:3 247:1,19
251:6
**background**
14:6 66:6
**backing** 229:22
230:8
**backward** 87:23
**backwards** 93:2
**bad** 251:22
**balance** 61:11
269:4
**ban** 218:7 219:9
247:16
**bank** 102:6
108:10,11,19
262:15 269:5
**banned** 219:4,12
**Barbara** 2:5
7:17 10:11
**base** 165:3
211:23
**based** 126:20
127:6 159:18
164:19 226:18

**basic** 189:12
**basically** 12:17
12:18 55:8
87:14 181:14
187:22 189:16
197:11 237:15
261:22 268:12
270:2
**basis** 25:15
**bees** 193:10,16
**beginning** 246:6
**behavior** 181:6
228:4 230:1
**believe** 87:2
112:19 141:2
188:2 211:20
230:19,22
233:13 250:11
250:15 258:19
**believed** 228:15
230:7
**benefit** 17:18
**Benton** 239:7
244:1
**best** 33:18 86:3
87:19 146:6,17
174:19 175:7
224:17 225:5
**bestowed** 16:11
17:8
**Beth** 170:20
**better** 65:16
179:18 190:10
**beverage** 105:12
105:13
**beyond** 153:1
**bid** 195:19
**big** 186:13
213:16
**bill** 28:13 65:19
65:20 66:2
139:14 154:19
161:14 248:5
248:13,16

**billed** 152:11
242:12 248:18
**bills** 139:11
160:8
**birth** 171:10
**bit** 193:11
**bitch** 132:20
**black** 108:1
146:4,10
174:13
**blame** 69:1
**blocks** 30:22,22
**blue** 252:12
**board** 27:11,21
28:3,3 29:3
34:11,14 48:10
48:16 49:9,16
54:17 65:23
66:1 108:5,9
108:19 177:1
177:15,19
178:4 187:7,9
202:23 249:8
**body** 171:18,21
265:15
**Bonita** 4:5 10:12
117:2 144:11
145:13
**book** 76:15,18
140:11 178:3
**booklet** 92:7
**bounced** 240:20
241:17
**bounds** 111:18
**boxes** 197:11,12
197:18
**branch** 103:10
**Brasswell** 201:9
201:10
**breach** 181:20
181:22
**break** 75:2
94:20 96:5
176:14

**breakdowns**
69:5
**Bridgeman**
133:7 136:7
142:16 144:1,5
144:6 189:8
190:21 191:7
**Bridgeman's**
143:6,20 144:7
**brief** 51:15
188:8 257:11
**bring** 163:21
219:6 247:13
247:23 251:19
**bringing** 220:4
**broad** 237:11
**brochure** 70:12
70:23
**brought** 121:4
155:20 181:1
203:12 236:5
**Bruce** 156:19
**buck** 122:3
**budget** 152:11
153:2 160:4,9
160:13,22
161:5 162:22
163:19 164:12
164:15,17
165:3 260:23
269:22
**budgets** 166:11
**building** 22:20
82:8 184:16
**buildings** 164:4
183:20 185:12
185:13,15
**buses** 184:21
185:4,6,12
**business** 40:4,5
64:11 69:16,22
70:12,23 71:19
86:2 162:14
175:5,6 211:21

# FREEDOM COURT REPORTING

212:2,22 213:4
213:9,23 214:7
214:12,14,21
215:9 223:2
257:20 263:18
**businesses**
175:21
**butt** 170:8
**buy** 253:22
255:6
**B.S** 14:11

_____

**C**

**C** 7:1 159:16
198:5,11 210:9
232:12,12
272:1,1
**cabinet** 46:23
71:20 72:5,8
72:15,23 73:5
73:16,21 74:5
74:18 76:23
77:1,8,11,16
83:5 103:14
**cabinets** 106:4
**Calhoun** 210:9
**call** 120:23
132:14 135:11
153:8 172:10
172:13 173:19
175:10 176:2
193:9 231:19
232:2 268:6
**called** 77:22
87:15 132:6,14
133:5 135:8
142:19 172:5
191:17 210:7
231:8,15
**calling** 41:19
**calls** 219:1
**campus** 30:8
100:9 101:18
102:18,23

128:9,12,15,18
130:8,9,20
131:4 133:5
135:14 172:6
172:22 173:2,4
173:6,9,11,14
174:3 181:18
182:20,23
183:10,13
185:2 195:1,3
195:6,8 200:18
216:10,18
217:19 218:11
218:15 220:1,2
220:4 232:14
233:3 244:7
247:17 256:18
**campuses**
129:12
**capable** 135:7
**capacity** 1:11,15
2:10,14,20 3:3
4:12,17
**captain** 114:11
114:16,16
**captive** 265:15
**car** 100:8 247:23
248:4
**care** 215:14
**career** 17:3
**caring** 36:9
**Carol** 200:22
**Caroline** 201:1
**carry** 63:14
163:4,14,15
164:1
**case** 1:8 2:7 4:7
18:4,8 124:16
161:11 163:3
210:20
**cases** 30:21 54:6
69:1 74:2,11
159:16 193:14
**cash** 240:18,23

241:3,5,16
269:3,4,22
**casino** 110:19,20
111:11
**catching** 236:18
**categories** 95:13
**categorize**
201:14
**caught** 252:11
**cause** 126:21
195:15 216:10
216:11 272:17
**caused** 27:14
197:17
**causes** 219:14
**causing** 266:21
**Caylor** 137:5,7
137:15 138:7
**cent** 208:16
**Center** 114:21
244:11
**cents** 198:19
269:8
**certain** 49:17
149:20 177:16
188:3 203:1
266:16
**certainly** 84:12
86:8 150:9
266:2
**certified** 5:17
50:3
**certify** 140:11
272:6,14
**certifying** 54:10
**Chambers** 1:9
2:8 4:10,23
5:16 8:5 10:1,9
11:18 13:9,17
31:20 41:5
46:3 47:5 55:2
66:5 71:17
75:6 88:23
90:3 96:8

97:12 107:1
126:3 141:17
142:15 150:7
172:5 176:18
179:14 186:15
188:12,20
189:3 193:8
196:6 201:12
210:17 231:8
245:20 257:16
267:12
**chance** 97:13
**Chancellor** 25:6
25:11 27:22,23
47:13,14 48:21
110:3,4,9
179:12 188:14
189:1 206:16
207:5 210:22
211:14 221:11
221:14 250:17
259:19
**Chancellor's**
32:6 48:4
64:22 110:18
112:16 164:12
164:20,22
165:5 178:11
178:12 186:22
186:23 187:18
187:20 188:5
206:15 213:17
213:22 224:9
257:18 262:14
265:6 268:7
**change** 10:23
54:20 73:23
81:2 84:20
222:2
**changed** 74:9
121:20 123:13
123:20 125:23
211:6,7 268:14
**changes** 67:14

67:22 68:9,16
68:21 254:18
268:17,20
**changing** 54:17
**Chapter** 108:1
**characterize**
201:18
**charge** 29:22
38:10 100:18
121:21 145:22
156:21 175:20
232:14 233:1
**charged** 140:6
**charges** 65:10
65:14 152:23
219:7,9 230:4
**charitable**
104:15,16,16
104:19
**Chattahoochee**
20:20,22 21:5
21:18 22:9
26:23 155:21
156:2
**check** 11:3
60:14 80:15
81:6,7 197:18
240:19 241:3
241:17 262:15
**checked** 40:12
40:22 59:22
67:16 70:4
79:9 80:19
82:20 100:1,5
197:12,13
206:4
**checks** 101:8,9
101:11 152:21
263:22
**Cherry** 169:14
**Cherry's** 169:11
**chief** 85:19,21
103:18
**children** 12:13

# FREEDOM COURT REPORTING

12:15 18:5
**choice** 187:23
189:22
**CHRISMAN**
118:15
**Christman** 7:9
7:10 10:7 11:7
11:10 12:20
33:2 35:9,15
37:5 39:13
45:5,13,17,20
47:12 49:20
50:23 51:8,13
53:21 55:1,10
55:17 56:15,17
57:7 66:20
71:5,8,10 73:9
75:1,14 78:15
80:7 81:18
85:4 86:21
88:22 89:1,2,7
89:14,19 90:2
90:22 91:3,9
92:14 94:8,23
95:16,23 96:4
96:11,16,19
97:1 98:3,7,14
98:17 100:13
110:21 111:2
111:10,16
113:5 116:13
117:11 118:23
119:22 120:15
122:17 128:17
129:1 130:22
131:13,17
135:3 137:19
137:22 139:6
140:2,16,21
141:21 142:9
143:19 146:15
152:13 158:1
158:16 162:11
162:21 173:12

176:15 177:7
179:6,9,23
180:4,18 181:1
183:11 185:22
188:6,10,17
193:2,4,13
195:11 196:5
210:14 231:6
233:4 237:8,10
241:8 244:18
246:21 249:21
250:20 256:20
257:3,9,15
262:17 265:12
267:4,9 271:5
**Christman's**
248:23
**Cindy** 5:3,17
272:21
**circumstances**
126:9
**circumvent**
254:2
**cited** 64:17
**City** 14:9 21:7
108:9,10,11,20
269:5
**Civil** 5:2
**claim** 106:11
111:7
**claims** 139:10
**clarification**
100:19
**classes** 147:14
216:4
**classroom**
184:18
**clear** 48:5 77:14
92:1
**cleared** 139:1
**clearly** 222:13
240:9
**clerk** 175:10,11
175:14,23

244:6
**client** 210:15
**clientele** 266:8
**clients** 10:17
**client's** 111:7
**close** 183:23
184:3 223:2
262:10
**closed** 153:2
**closer** 184:9
**code** 127:15,17
130:2
**Colinhouse**
187:11
**collect** 241:14
**collected** 198:22
**collecting** 244:1
**college** 1:13,17
2:12,17,23 3:5
4:9,14,20 12:1
12:2,5 18:1
20:7,20,22
22:20,21 28:15
28:16 29:19,20
29:22 30:4,7
30:12,13 31:2
38:13 41:6
42:3 45:21
47:6,20 48:1,7
48:9 49:15
50:4 64:16
77:18,19,23
78:1,5,6,7
86:11 88:2
102:13 104:4
104:13 107:13
108:3,14
114:14 115:2,9
115:10 123:22
127:15 128:7
141:12,20
154:2,3 155:4
155:4,7,10,14
156:10,13,17

156:21 159:14
163:14,15
165:17 166:1
166:17 177:14
179:7 182:17
195:6,8,8,15
199:2,11,15,17
199:22 200:16
204:2 206:8
215:15,17
217:18 241:11
245:22 254:23
257:21 264:14
264:22,23
265:2,3 266:10
**colleges** 107:11
140:1 178:19
187:3,7 264:20
264:21
**Colonial** 108:10
108:11,19
**Columbus** 14:4
18:3 20:7,7,8
**come** 32:4 69:17
78:21 85:9
96:5,20 101:11
102:4 136:10
136:11 155:22
192:17 194:17
201:17 228:12
247:12,19
**comes** 30:11
102:18 164:20
164:22 166:5
**comfortable**
189:20
**coming** 168:5
213:16
**command** 29:21
30:3
**comment** 40:13
40:16,20,22,23
41:2 59:22
60:3,8,9,10,11

60:15 61:3,4,7
62:7,8,9,23
64:8 67:1 68:1
68:12 70:4,5
81:4 82:9
169:22 170:4
170:23 257:1
**comments** 36:8
38:2 39:22
40:18 44:16
58:12 60:2
61:9 64:5,6
68:23 79:18,21
81:8 82:4
137:13 199:8
205:18,19
217:13
**COMMERCE**
7:11
**Commission**
200:20
**Commissioner**
5:18 6:10
**committee**
103:10
**common** 61:3
**communicates**
62:5
**communication**
62:16
**community**
16:13 17:7
20:20,22
107:13 115:9
264:23
**company** 105:12
105:13 188:15
264:2,5
**comparison**
198:13,15
**compensated**
106:10
**competed** 22:16
**complain** 246:18

# FREEDOM COURT REPORTING

Page 278

complained
  118:3 253:14
complaining
  245:2,6,12
  253:3,7,10
complains
  229:23
complaint
  116:10 121:5
  188:20 189:13
  194:6,11
  230:12
complaintant
  223:7
complaintant's
  222:11
complaints
  131:9 139:12
  173:9,15 189:4
  189:17 212:7
  217:17 229:18
  230:3 246:9
complete 28:1
  45:9,10 50:10
  50:18,19 51:7
  54:4 59:11
  125:21 160:2
  167:14,20
completed 77:7
  77:10 117:6
  135:6,16
completely
  36:10
completes 62:3
complied 141:13
component
  117:12
Compound 94:8
computer-aided
  272:10
concern 197:17
concerned
  115:14 172:16
  190:3,4 197:22

198:1 202:18
203:11 215:17
233:2,5,16,18
235:6,13,19
236:2,13
238:23
concerning
  116:7,11 117:2
  129:17 136:10
  138:1 153:23
  173:16 174:3
  188:4,13 189:4
  206:12 238:21
  239:7,22 244:1
  244:14 257:19
  262:14
concerns 78:21
  198:4 228:14
conclusion
  69:18
condition 99:5
  99:14 196:23
conditions 94:4
  95:6
conduct 116:19
  116:22
conducted 120:6
  140:13
confer 16:20
conflict 119:18
  127:18,21
conflicting
  119:21 120:5
  121:16
conflicts 69:6
conform 265:19
confronted 40:2
  82:7
confused 112:23
  154:11
confusion 69:5
  69:20 129:10
  129:15
conjunction

232:16
connected
  105:15 108:13
connection
  188:5,14
conscious
  217:10
consider 120:8
  163:20 263:12
  266:12 267:1
  268:1,3
considered 94:5
  95:7 99:6,15
  101:20,21
  135:22 196:23
constitutes
  219:5
contact 180:10
  219:4 244:23
contained 94:14
  95:5
content 136:13
  211:19
contexts 203:7
continue 35:10
  64:9 69:21
  247:9
continues 39:23
  40:3
continuing
  20:11
continuous
  219:17
contract 191:17
  267:14
contracts 145:12
  267:16
Contraman
  13:10,18,19,19
contributed
  17:6
contribution
  17:5
control 94:13

95:4 97:20
167:15 181:8
181:11 182:5
196:14 201:21
216:12 242:23
243:8,10
controls 69:4,15
conversation
  133:17 138:1
conversations
  136:17 137:9
cooperates 67:4
coordinator
  2:20 123:6,23
  125:1,17
copies 41:12
  72:22 91:7
copy 32:6,12
  41:13,13,15,23
  42:23 45:10
  48:8 54:5
  56:14,16 59:16
  77:7,10 91:7
  206:14 234:8
  234:11,12
  235:11,19
  238:6 239:21
  242:9 244:3
  259:4
corner 258:6
correct 11:1
  25:16 29:3,4
  34:16 55:14
  60:22 73:8
  85:16 90:14
  106:20 112:14
  120:1 128:10
  155:1,16
  160:10 164:13
  189:6 199:18
  204:6,14 205:6
  207:2 209:20
  232:13 236:18
  238:2 240:5,6

240:14,15
242:13,14
245:14,18
246:1 248:8
257:21,22
260:18 263:7
272:11
corrected
  138:12 210:4
  214:15
Correction
  107:9
correctional
  217:23 218:2,4
Corrections
  114:10,18
  173:23 174:1,6
  181:12 182:4,8
  219:6
corrective 92:5
  199:17
correctly 10:21
  151:12 251:22
correspondence
  222:3
cost 208:16
costs 88:19 90:6
  90:12 198:13
  198:15
counsel 5:15 6:1
  6:3 73:7
  153:19 228:12
  272:15
counseling 15:9
counselor 18:17
  18:22 19:2,5,8
  19:9,11 21:19
  21:22 22:22
  24:14 47:10
  126:13 134:1
Countryman
  13:18
county 12:17,22
  12:23 13:23

# FREEDOM COURT REPORTING

18:5 105:3
272:4
**couple** 66:16
79:19 184:13
208:8 218:7
**course** 13:16
15:20 204:12
**courses** 15:13,15
**court** 1:1 2:1 4:1
5:9,10 10:5,20
**cover** 31:11
93:16 200:5
207:15 258:22
259:12
**covered** 183:5
196:8
**covers** 185:20
186:4
**co-workers**
214:18
**crack** 170:8
**create** 60:19
134:17 160:19
190:16
**created** 22:13
190:14 226:22
227:3,18
**creates** 127:3
261:2
**creating** 22:19
240:12
**Creek** 11:20
110:19
**crisis** 163:4,15
**criticism** 135:11
135:22 262:17
264:7
**criticisms**
262:13
**criticize** 134:4
135:1,9
**criticized** 231:17
231:20,22
250:18 255:6

262:19
**criticizes** 134:15
**criticizing**
263:21 264:3
**cross** 102:15
265:7
**crossed** 151:8
**crunching**
193:20
**currently** 225:2
**curse** 132:16
**custody** 96:2
**customers**
240:18
**cut** 252:17
253:18 257:4
**cuts** 252:12
255:5,5
**CV:2:06-CV-...**
1:9

————————

**D**

**D** 8:1
**DA** 203:5
**date** 24:12 27:8
37:3,6,12
39:12,13 46:8
52:13 53:5,9
53:12,16 57:3
79:14 84:2
133:20 152:7
161:15,20
258:7,12
259:15 262:11
**dated** 37:6 43:20
44:8 57:13
79:11 137:6
199:5 235:17
237:23 238:20
239:23,23
242:9 243:23
**dates** 37:9
262:11
**daughter's** 13:9

13:17
**day** 5:6 40:3
110:12 112:6
223:2,2 229:12
229:14
**dead** 74:21
**deal** 181:5
216:13
**dealing** 38:8
167:16 230:11
266:8
**dealt** 19:12
248:2
**dean** 1:15 2:14
3:3 4:17 21:16
22:10,11 23:1
23:6,7,8,12,14
23:17 24:1,3,6
24:16 25:1
27:2,4 28:5,11
28:11,12,14,15
28:21 29:2,2
29:12,19,20,22
30:3,12,13,22
32:18 42:12,14
42:19 63:7,8
63:11,11 69:4
114:5 116:18
116:22 119:3
122:19 123:10
132:3 137:12
138:2 143:1,5
143:18 144:22
144:23 145:16
146:20,22,23
147:2,17,22
148:9 154:21
154:23 155:4,5
155:5,6,9,11
155:13 156:9
156:11,12,13
156:17,20,21
157:7,10,14,15
157:16,19,21

157:22 158:10
158:11 159:4,8
176:6 180:11
180:16 181:2,4
181:14,16
199:1,3 200:11
200:15 204:1,2
208:1 215:5
231:9,10,17
232:2,8,15,16
233:21 234:6
235:5 236:2,13
243:2,3,6,7
244:11 245:22
245:22 246:10
251:16 253:7
253:10,13
256:7,12,15
258:1 259:5
264:22 270:13
270:17
**deans** 28:22
29:5 30:8,14
30:18 32:7,11
39:1 43:3,4,7
54:3 63:6
131:22,22
151:1 159:1
180:2,6 192:15
192:20 193:12
195:16,23
**dean's** 157:20
195:2
**Debardelaben**
5:5,19 7:4 8:4
10:4,8,10
35:13,17 37:8
39:16 45:11,14
45:18 49:23
50:14 51:1
54:1 55:12
56:13,16 57:9
66:22 75:3,16
81:20 89:11,17

91:1,6 92:20
94:19 95:1,10
95:14,17 96:1
96:6,13,17,21
97:3 100:15
111:9,12 113:7
116:15 120:1
129:3 131:15
140:17,18,23
142:11 143:21
152:15 176:13
179:8 180:21
196:3,9 200:4
207:15 210:11
213:19 216:16
231:7 237:9
250:22 256:23
257:5 267:6,11
268:15 271:3
**Debardelaben's**
220:11
**deceased** 157:5
**December**
237:23
**decided** 27:19
79:21 81:6
222:2
**decision** 212:14
**decrease** 240:20
**deducted** 264:1
**deducting** 264:4
**deduction**
263:22 266:16
266:18,20
**deductions**
266:23
**deep** 252:12
**DEFENDANT**
7:8
**Defendants** 1:18
3:6 4:21
**Defendant's**
57:16,18,22,23
58:9,10,14

59:2,8 67:1
92:18
defer 141:18,23
142:7
definitely 87:10
degree 14:11,13
14:19,19 15:8
19:15 211:11
221:20 224:18
224:20,22
255:23
degrees 15:23
16:2
delaying 190:17
deliver 106:4
delivered 199:2
delivering 5:4
demonstrate
118:13
denied 119:6
211:17
deny 133:2
denying 161:17
161:18
department
50:4 97:8
101:15 111:21
114:9,17
135:20 141:5,5
168:5 173:23
174:1,6 178:13
180:7,10,14
181:11 182:4,8
183:8,19
198:17 201:2,4
201:7 208:18
212:3 219:6
228:5 260:17
departments
198:14
depend 151:15
151:21 171:23
depended 50:17
depending

266:4
depends 171:16
171:22
deposit 240:21
245:9 262:23
deposited
101:10
deposition 4:23
5:15 6:6,10
10:15,18 31:7
35:3,12,14,16
35:18 50:1
57:17,19 59:3
59:9 91:4
122:18,20
222:19 258:1
272:7
depositions
50:16
deposits 198:21
235:20 242:2,4
244:16 262:15
262:20 266:11
Depot 161:13
described 225:2
describes 219:21
description
49:13 146:14
202:13
designated
125:2 166:21
designed 134:23
135:1,5 139:23
designee 167:1
details 233:17
determine 141:9
159:22 181:15
181:16
determined
159:10
determining
142:3 165:16
165:18
develop 40:1

64:1 70:11,22
82:5
develops 62:20
deviate 49:5,8
49:11,13
deviated 49:3
deviation 48:14
48:16,19
devil 252:12
diesel 199:3
difference
120:13,19
123:17,18
157:17,18,23
differences
121:17 265:22
different 50:15
54:14 55:23
56:1,3,4 158:7
166:16 225:9
266:8,9
differently
227:7,13
difficult 226:22
diffused 127:1
direct 30:7
70:22 71:17
111:13,14
198:5 220:16
262:15,20,23
266:11
directed 70:8
81:15 130:4
189:23 190:6
196:10 247:7
direction 67:5
67:11 178:10
190:6
directive 69:9
187:19,21
directly 164:16
168:7,13,22
169:1 184:15
222:21

director 20:10
42:15,17,20
43:13 147:2,3
147:7 167:19
167:22 168:2
168:14,15
169:2 179:1
219:11 244:12
directors 108:5
108:19
disagree 129:9
129:14 186:5
226:7,10,14
252:21,23
253:2 255:13
255:14 263:19
265:9 269:14
269:15
disagreeing
256:6
disappointed
126:11
discipline
216:12
disclose 88:18
90:6,11
discovered
199:15
discrepancies
203:13,18
206:7
discriminated
226:17
discuss 78:21
126:16 171:8
171:11 172:1
198:4 231:23
discussed 83:8,9
117:16 133:7
171:20 172:7
203:23 232:5
discussing
171:17 204:10
discussion 51:16

77:8 188:9
200:6 257:12
discussions
215:8 250:8
disfunctioning
215:12
dispute 123:2,11
123:15 126:1
disputed 220:21
disqualify
214:22
disregard 206:6
253:21
distribute 73:16
distributed
72:23
District 1:1,2
2:1,2 4:1,2
12:16 200:13
division 1:3 2:3
4:3 76:2
DOC 180:20
181:20 219:21
doctorate 14:18
15:8 16:5,6,8,8
16:15,21 17:1
doctorates 16:16
document 35:8
36:21,23 37:3
37:10,13,19
40:6 44:3,11
51:22 59:12
62:12 70:15,16
70:18,19 71:18
72:22 73:7
75:9 76:7 90:3
145:9,11
177:12 242:19
documentation
71:23
documented
66:3 72:5
documents
50:10 51:10

65:17 247:5
**doing** 34:2 81:11
83:14,18 86:7
86:12 95:22
102:2 106:15
119:13 120:10
134:9 135:7
147:15 150:5
162:10 177:5,6
192:8 193:10
193:20 204:9
206:17 239:8
240:13 245:2
252:15 254:9
255:9 265:1
270:10
**dollar** 208:16
**dollars** 148:18
148:23 161:6,9
162:18 198:18
240:21 241:15
241:16 245:8
269:7 270:17
**Donna** 72:12
**dormitories**
19:6,7
**dormitory** 19:11
19:13
**dotted** 151:7
**double-check**
45:6
**doubt** 51:1
**Douglas** 1:9 2:8
4:10,23 5:16
10:1 11:18
**Dr** 21:15,15
25:11 28:10
29:9 32:19
35:13,18 42:12
55:2 59:13
88:23 119:9
121:10,13
155:8,13,17
156:4 174:21

175:4 186:2,15
196:6 201:12
210:17 215:3
232:3,4,6,20
234:7,23
235:10,18
236:14,23
237:6 238:9,13
238:19,21
239:9,21 240:4
242:20 243:6,9
243:11,22
244:2,9 245:13
249:6 250:9
251:7 255:19
257:16
**draft** 70:19 76:8
76:9 77:4,6
205:9 206:10
211:3
**Draper** 128:16
128:17,18
130:9,19 131:3
172:22 173:2
**dress** 127:15,17
130:1 215:15
217:13,17
218:13 219:19
**dressing** 173:6
218:8 219:14
**Drew** 11:12
45:11 56:14
94:19
**Drive** 11:20
**dual** 244:10
**due** 65:8 183:9
**duly** 10:2
**duties** 21:20,22
108:14 145:20
147:15 158:6,6
159:18 176:3
176:10 192:5
225:1,3,6
226:14

**D.C** 168:4
213:12

_____
**E**
**E** 7:1,1 8:1,7
154:12,14
159:20,21
272:1,1
**earlier** 125:8
163:17 256:11
**early** 24:18
60:21
**easily** 216:10
**east** 12:18
**editorialize**
257:14
**education** 15:9
17:6 20:11
27:22 34:12,14
48:16 49:9,17
107:10 111:21
142:8 177:15
178:4,14
214:21 219:11
224:16 225:12
225:14 226:2,9
226:11
**educational** 14:6
15:22 17:12
**Edwards** 229:8
**EEOC** 230:4
**effect** 124:12
170:20 191:22
**effective** 5:3
40:14 59:22
80:21 162:15
169:6
**effectively** 61:1
62:6 70:2
254:23
**effectiveness**
205:19
**efficiency** 214:8
**efficient** 62:21

64:2
**effort** 34:19 70:1
204:20 217:9
223:19 254:22
264:4
**eight** 66:23
198:17 208:15
**eighteen** 20:2
22:5 81:16
84:8 198:17
208:15
**eighty** 216:7
**eighty-four**
269:6
**eighty-seven**
269:8
**either** 45:12,16
60:2 65:1 66:8
73:21 95:14
124:8 129:11
252:22
**eleven** 12:9
64:13
**Elmore** 12:17
**elses** 35:12
213:8
**embarrassment**
216:1
**emergencies**
163:23
**emphasizes**
240:9
**employed** 11:22
11:23 18:3
19:18,22 71:1
**employee** 33:15
33:20,23 34:1
34:4 38:6
39:23 55:14
70:8 81:15
82:5,21 84:23
85:2,6 104:4
114:2,14
122:11 170:16

174:21 194:9
218:23 219:3
219:10 264:2
**employees** 43:2
53:20 61:2,12
69:2 104:11,13
110:8 126:4
126:7,10
127:12 129:4,6
136:22 138:4
150:11 159:23
173:10 174:8,9
174:13,14
183:23 184:1
192:16 205:6
205:23 206:23
211:10 215:18
216:9 217:22
220:4 261:15
262:9,22
263:22 264:1,5
266:11,17
**employee's**
171:18 176:19
**employment**
17:21 19:17
177:3 214:18
**encourage**
219:20
**enroll** 18:12
**ensure** 195:23
199:19
**entered** 62:1
**entice** 219:20
**entire** 34:21
62:11 64:15
76:15,18 92:7
93:16 110:12
123:14 151:23
**entity** 64:17
**environment**
215:19 217:11
**equal** 30:19
**equipment**

# FREEDOM COURT REPORTING

251:19 256:2
**equivalent** 30:4
**especially**
  250:13
**essence** 106:15
  192:1 204:7
  254:20
**established**
  130:23
**estimate** 244:23
**evaluate** 33:23
  85:9 159:23
**evaluation** 34:2
  34:5 36:1,5
  37:1 39:9 41:7
  41:10,19,20
  42:7,7 43:20
  44:6 45:4 46:7
  47:2,19,21
  52:1,4,9,11,22
  53:3,10 54:4
  54:15,18,20
  56:22 57:11,18
  58:16 62:14
  78:13,16,17
  79:14 80:10,18
  80:20 81:5,13
  81:22 83:3,3
  84:22 85:1
  177:8 260:4,12
**evaluations**
  33:13 34:21
  43:1,19 45:21
  45:22 46:4,18
  47:7,11,15,18
  48:1 50:6,11
  53:20 54:3
  79:5,20 80:3
  80:14,16,23
**evaluator** 36:6
**eventually** 23:11
  121:9
**everybody** 11:12
  132:9 191:5

**everyone's** 42:6
**evidence** 6:6
  117:13 222:1
**exact** 23:22
  24:12,21,22
  27:8 133:20
  147:13 152:7
  156:14 251:4
  269:9
**exactly** 164:14
  166:4 208:9
  217:2
**examination** 8:3
  10:4 102:5
  196:5 231:7
**examine** 33:14
  94:18 102:6,10
  102:14
**examined** 94:16
**examiner** 85:19
  85:21 103:18
**examiners** 85:8
  89:6,13 91:8
  91:13,14 93:5
  94:12 95:3
  97:14,18 102:2
  102:4 103:13
  135:17,21
  139:19 141:3,4
  141:6,18 142:1
  196:12 201:15
  204:19 206:11
  207:11 212:4
**examiner's**
  64:17 98:23
  212:2 239:14
**example** 65:6
  135:20 139:14
  236:12
**examples** 64:6
  69:12 136:2
**exceeded** 198:15
**excellent** 36:9
  37:23 162:19

**exception** 47:10
  187:8 247:1
**exceptional**
  161:9
**excessive** 60:20
  266:21
**exchange** 228:3
**excuse** 28:10
  47:14 99:13
  121:16 142:12
  179:17 234:16
**exhibit** 8:9,10,11
  8:12,13,14,15
  8:16,17,18,19
  8:20,21,22,23
  9:1,2,3,4,5,6,7
  9:8,9,10,11,12
  9:13,14,15,16
  9:17,18 31:5,6
  34:10 35:4,12
  35:16,18,20,22
  36:16,20 39:3
  39:7 43:21
  44:2 51:17,21
  52:16,20 55:13
  56:7,11 57:3
  57:16,18,22
  58:1,9,10,14
  59:3,8 67:1
  71:9,12,13,14
  75:7 78:10
  80:4,5,5 81:19
  82:10,14,19
  90:23 91:2
  92:18 93:4
  97:7,9 106:21
  109:9 113:2
  115:21 122:18
  122:19 129:20
  136:23 137:4
  140:22 141:1
  145:8 196:7
  207:13 222:18
  232:11 233:7

233:10 234:1,3
  234:9,13
  235:22 236:8
  236:12 237:17
  237:21 238:16
  238:22 239:3,6
  239:17 241:19
  241:23 242:5
  244:21 250:23
  258:2 259:23
  261:21 262:4,8
  269:10,13
**exhibits** 5:7
  55:11 80:9
  92:19,21 93:19
  96:2,7,23
  141:3 145:4
  243:19 261:17
**exist** 50:7 216:3
**expect** 142:7
  168:12 180:5
  213:15 256:11
**expected** 106:9
  261:11
**expended**
  150:14,15
**expenditure**
  64:19
**experience**
  203:3 215:5
  225:16 226:2,7
**expertise** 141:19
  142:2
**experts** 86:4
**expired** 222:7
**explain** 58:8
  209:6
**explained** 209:4
**expulsion**
  182:16
**extent** 50:6
  66:11
**extremely** 163:1
  163:12

**ex-wife** 14:2
**e-mail** 213:13

___

**F**

**F** 272:1
**fact** 120:14
  126:1 136:15
  173:19 187:11
  194:3 202:3
  206:3 212:20
  214:20 234:19
**facts** 120:5,20
  120:23 121:17
  220:21
**factual** 123:3,12
  123:16
**failed** 64:1
**failing** 223:7
**fair** 179:13,18
  179:19 268:5
**fairly** 141:10
  154:11
**fairness** 49:20
**falls** 176:3
**familiar** 103:12
  103:17 116:4,9
  122:8 186:12
  187:14 225:17
  262:16
**families** 13:4
**family** 13:4,12
  13:14,21 18:5
**far** 63:13 87:19
  158:5 183:4
  184:5 202:23
**fault** 151:13
**favorable** 214:6
  215:11
**February** 137:6
  228:5 229:13
  238:20 258:8
  259:17 260:3
**Federal** 10:18
  90:9 95:12,15

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 100:1 166:6,11 | 83:13,13 | 89:20 91:14 | 232:16 236:18 | 86:21 94:9 |
| 166:14,17,20 | 102:23 103:6 | 97:18 98:2 | 240:13 243:3 | 109:10 110:21 |
| 167:10 213:12 | 106:4 109:17 | 121:15 123:10 | 244:11 269:1 | 117:12 118:16 |
| **feel** 68:5 111:18 | 139:17 176:19 | 139:23 153:3 | **five** 61:10 101:8 | 118:23 120:15 |
| 136:10 | 177:16 178:2,8 | 177:13 178:1 | 101:9 207:18 | 130:23 137:19 |
| **feet** 184:15 | 178:15,19 | 225:20 264:12 | 269:6 | 139:7 140:2 |
| 186:10 | 222:12 223:8 | **finding** 50:20 | **fix** 204:11 | 141:21 142:9 |
| **fellows** 246:1 | 225:21 259:5 | 51:5 88:11 | **fixing** 69:11 | 146:15 158:17 |
| **felon** 128:7 | **filed** 5:10 112:10 | 101:7 153:5 | 257:8 | 173:12 177:7,8 |
| **felons** 128:4,10 | 112:12 116:10 | 198:5,10 | **flip** 258:5 | 179:23 180:4 |
| 128:13,19 | 121:3,8 153:23 | 199:10,23 | **flipping** 75:17 | 183:11 193:2,4 |
| **felt** 139:2,7,8,9 | 154:5,7 173:15 | 200:3 207:1 | **focus** 134:10,12 | 193:13 195:12 |
| 189:19,22 | 223:1,16,19 | **findings** 88:19 | 134:19 | 207:10 233:5 |
| 190:11 191:4 | 224:4 230:4 | 89:9 90:5,6,8 | **follow** 32:2 34:7 | 244:23 265:12 |
| 205:21 206:1 | **files** 32:8 46:16 | 90:10,11 92:4 | 34:13,16 49:17 | 268:15 |
| 206:18 245:17 | 50:1,3 176:20 | 92:10,11,12 | 196:1 230:16 | **format** 56:3,4 |
| **female** 29:12 | 177:22 200:20 | 100:10,12 | 235:2 241:7,11 | **former** 188:4,14 |
| 128:13 131:6 | **filing** 6:9 173:9 | 136:3,5 153:16 | **followed** 121:22 | 188:23 |
| 131:10,11 | **fill** 24:7 26:10 | 198:2,4 199:9 | 122:6 125:10 | **forms** 54:20 |
| 146:4 170:15 | 34:5 | 203:17,19 | 125:12,18 | 202:4 |
| 171:17,20 | **filled** 23:2 25:16 | 204:21 206:6 | 230:11 241:14 | **forward** 136:11 |
| 173:10,16 | **filling** 23:3 | 206:12 232:13 | **following** 15:8 | 210:5 |
| 174:9 217:4,17 | 30:22 191:16 | **fine** 10:7 56:15 | 223:3 | **fought** 190:18 |
| 227:1,10,16,22 | **finance** 215:5 | 82:22 84:21 | **follows** 10:3 | 190:21 |
| **females** 130:5 | 261:3 | 112:8 257:14 | **follow-up** 74:13 | **found** 43:18,20 |
| 174:4 217:13 | **finances** 63:14 | **finish** 15:19 | **forbid** 184:7 | 44:18 94:2,12 |
| 217:15 218:9 | 86:13 90:1 | **finished** 256:21 | **foregoing** 272:7 | 95:4 97:23 |
| 218:10,13 | 187:6 | **firearms** 220:4,7 | 272:11 | 100:2,8 101:18 |
| **fence** 185:3,7,14 | **financial** 66:9 | **firing** 218:21 | **forfeited** 223:5 | 135:21 136:5 |
| **field** 215:23 | 66:14 69:6 | **first** 10:2 17:22 | 223:12 | 192:13 245:12 |
| **fields** 215:6 | 89:8,22 90:4,8 | 25:20 26:2,3 | **forfeiture** | 248:2 |
| **fifteenth** 223:2 | 94:7,13 95:4,9 | 27:16,17 46:13 | 223:15 | **four** 15:14 18:10 |
| **fifty** 245:8 | 95:11,15 99:1 | 62:18 70:20 | **forget** 215:18 | 22:7 23:19,23 |
| **fight** 190:23 | 99:10 140:15 | 75:15 99:3 | **forgot** 107:5 | 24:15,17 61:1 |
| 191:2 | 141:10,11,11 | 133:17 194:20 | **form** 6:2 33:3 | 102:19,19 |
| **figure** 160:9 | 141:19 142:3 | 203:20 208:8 | 46:7 53:22 | 108:21,23 |
| 165:1,9 269:9 | 187:9 196:14 | 221:12 | 54:13,14,22 | 170:21 184:21 |
| **figures** 269:16 | 197:5 201:21 | **fiscal** 28:6,21 | 55:3,5,6,21 | 187:8,16 |
| **file** 42:1,5,9,14 | 201:23 202:9 | 66:18 76:2 | 56:19,21 57:23 | 198:22 222:17 |
| 43:6,11,17 | **financing** 63:13 | 88:8 90:17 | 58:1,6 60:11 | 222:20 |
| 45:3,7,12,15 | 97:21 | 91:15,19 | 62:6 70:17 | **Franklin** 114:21 |
| 45:15 46:5,19 | **find** 20:23 26:1 | 102:11 143:1 | 73:10 74:20 | **frankly** 151:18 |
| 50:8 57:11,12 | 45:4,19,20 | 176:6 195:2 | 76:8,9,12 | **fraternity** 108:3 |
| 58:22,23 72:23 | 88:14,15 89:9 | 204:2 208:1 | 78:16 85:5 | 108:4 |

# FREEDOM COURT REPORTING

free 136:10 184:3
friction 190:14 190:16
friendly 38:6
front 37:6,6 39:14 40:12 57:8,21,23 127:12 140:10
fullest 66:11
fully 257:16,16
Full-time 154:18
function 257:20 263:16
functioning 213:9 214:7
funds 64:19 65:1 164:4 166:6,7 166:11,22 167:2,3,7,10 252:13,18 269:23
furniture 198:16 208:17
further 5:22 6:8 14:17 249:12 271:4 272:14

_____

G

Gainus 25:11
gambling 110:19,19 111:11
gender 226:20 231:4
general 80:1 81:11
generally 54:2 140:13
Georgia 14:4 18:4 20:8
getting 64:10 137:7 158:8 166:13,17

167:10,15 210:1 220:10 231:23 251:20 253:4 254:14 263:7 267:16 270:9
GIDIERE 7:10
Girard 14:8
give 13:1,7 14:5 27:8 53:13 54:5 85:15 111:16 136:1 139:13 152:7 156:14 165:1,4 165:9 171:10 195:12 199:16 199:17 204:8 251:4
given 34:4 73:18 135:20 272:12
Givens 1:5 7:15 10:11 133:6 136:7,16 143:5 143:18 169:10 169:14,21 170:1 175:12 175:17 176:5 191:16,21 192:18 193:23 194:7 227:12
giving 53:19 54:3 119:15
Gloria 239:21 241:10 242:1
go 12:10 17:21 21:10 25:7 26:22 38:14 46:13 49:21 53:19 54:2 59:18 60:18 62:13 63:21 68:22 69:7 78:13 79:5 80:17 87:19,22

94:21 95:18 98:2,21 99:20 99:23 111:17 112:5 124:21 154:4 156:5 160:1,2 162:12 166:22 168:7 187:19,20,23 188:10 189:23 189:23 190:6,7 190:11 194:20 210:4 224:2 233:16 246:23 248:21 253:22 257:10
goal 61:3 219:18
God 184:6
goes 11:2 12:22 60:8 84:10,11 112:20 124:3 125:3 150:2 168:13,21 179:15,20 180:10 181:11 194:3 252:22 264:4
going 12:9 20:21 37:9 43:18 47:17 54:18 90:22 91:2,3 91:10 92:14,16 92:23 97:6 111:3,5,8,13 111:16 112:18 150:7 165:2,18 168:17 170:7 187:5 188:17 189:5 190:17 199:18 205:3 209:19 224:13 235:11,16 237:11 252:19 257:3,7 259:12 261:9,23 263:6

268:6
good 39:19 40:1 82:5 91:22 133:14 160:15 161:4,7 163:1 163:12 193:18 194:9 212:18 212:21 225:22 235:1 251:10 255:8 265:20 266:1 271:5
gotten 137:17 187:8 192:4,10 192:14
governed 34:7
governmental 105:6,7 140:14
governor 103:20
Governor's 110:17 111:22
grade 17:15
grades 243:14
graduate 14:15 18:12,14 19:4 108:3
graduated 14:8
graduating 14:7
Grand 188:21
grant 167:13 168:5
granted 48:22
grants 166:14 166:18,20,21 167:7,9,16 168:1
Green 133:4
Greene 1:6 7:16 10:11 28:5,20 29:3,12 36:2 37:2 38:15 39:10,21 43:17 44:7,10 46:5 52:2,8,23 53:14 56:23

57:16 59:19 63:17 66:13,16 75:12 76:20 78:14 84:1 86:6 87:11 88:9 90:17 91:19 127:9,12 131:23 132:6 132:14,14 133:7 135:9,14 136:8,21 139:11 143:5 143:13,18 144:9 149:19 150:5 160:5,18 161:13,21 166:9 167:1,14 167:20,22,23 168:8,13,18,21 189:4 190:15 194:17 195:1 209:2,3 226:18 231:20 233:2 233:12,20 234:7 235:5 236:2,13 237:22 243:6,7 244:14 245:1 245:12 246:10 252:3 253:4,19 256:12,15 261:13 268:11
Greene's 45:3 57:12,19 59:3 59:8 83:13 169:5 194:12 231:19 232:9 251:16 258:1 259:5
greenhouses 184:18 186:9
Greg 147:3
Gregg's 29:9
grievance

# FREEDOM COURT REPORTING

116:10 120:4
121:2,7,13
122:9,11,15
124:23 125:1
153:23 154:1
220:13 222:11
230:11
**grievances**
154:4
**grievant's** 223:3
223:4
**Griswold** 113:21
114:6,8,12,16
115:14 116:2
154:19,20
157:20 159:11
**grounds** 6:4
188:18
**group** 104:8
**grow** 40:3
**guards** 184:13
**guess** 28:15
63:23 181:16
232:12 266:19
**guidance** 178:9
237:3,5
**guidelines**
230:16 231:1

_____
**H**
_____
**H** 8:7
**habit** 126:3
**habitually** 60:21
**Hal** 201:5,9
**half** 20:14 27:5
**hand** 232:18,18
253:16
**handed** 234:14
**handled** 140:7
**hands** 96:20
**handwriting**
75:18 76:1
**handwritten**
233:13

**happen** 69:21
82:1 217:8
248:17
**happened** 71:11
79:4,16 81:21
83:2 116:5
118:8 119:16
121:18,19
184:7 209:4
217:7
**happening** 82:3
199:20 216:22
217:6
**happens** 222:11
235:2
**happy** 91:6
95:19 254:4
**harassment**
173:11,16
**Harold** 200:22
**Harold's** 200:23
**hat** 42:20
**head** 224:2
**hear** 11:9
153:20 218:22
**heard** 132:18
138:22 139:10
**hearing** 120:5
121:1,2 123:7
123:23 124:5,6
124:10,14,17
138:23 220:17
220:22 221:2,7
221:10 249:2
249:15 250:1,5
250:7,7,10
272:13
**held** 22:6 73:15
179:1,19
**help** 22:1 90:21
91:12 233:21
236:15 237:16
240:10 251:13
**Hendrix** 2:5

7:17 10:12
116:5,9 117:1
118:3,13,20
119:6,11,23
120:9 121:8,17
124:8 186:2
221:1 228:4,9
229:9,19 230:7
249:1,2
**Hendrix's**
115:14 220:12
223:18 228:13
230:12 231:2
**HERNDON**
7:10
**high** 14:7,8,15
149:6 195:14
**higher** 69:7
163:21 218:1
**highest** 154:15
**highly** 138:5,10
**hinderance**
219:21
**HINTON** 7:10
**hired** 21:19
144:1,4 174:8
174:13 175:2
**history** 17:22
131:14
**hold** 20:12 22:3
29:8 135:3
158:4 249:21
257:9
**holds** 28:18
179:5,11
256:10
**hollering** 246:19
**Home** 161:13
**Homosexual**
130:12
**honorary** 16:5,7
16:10,15,16,20
17:1
**hope** 150:9

**hoped** 87:20
**horticulture**
182:19 183:8
183:19 184:4
184:10,12
185:1,4,10,13
185:17,20
228:5
**hostile** 227:18
**hostility** 227:3
**hours** 106:11,11
110:14,15
**Huffstutler**
155:13,17
156:4 186:3
215:3 232:21
232:22 233:11
233:21 234:7
235:1,10,18
236:14,23
237:6,22
238:10,13,20
238:21 239:10
239:22 242:9
242:21 243:6,9
243:12,23
244:3,9 245:13
251:7 253:13
255:19
**Huffstutler's**
240:4
**huh-uh** 11:13
**human** 178:10
**hundred** 108:1
198:18 208:15
240:21 241:14
241:16 256:3
269:6,7

_____
**I**
_____
**idea** 174:7,12
193:19 263:3,4
**identification**
35:5 36:17

39:4 43:22
51:18 52:17
56:8 71:15
78:11 93:21
97:10 106:22
113:3 115:22
129:21 137:1
145:5 233:8
234:4 235:23
236:9 237:18
238:17 239:4
239:18 241:20
242:6 243:20
261:18 262:5
269:11
**identified** 94:3,6
94:12 95:6,6
97:22 98:5
99:2,5,14
153:10 196:19
196:23
**identify** 35:19
35:21,22 36:20
39:8 51:22
52:21 79:22
91:23
**identifying**
81:12 212:16
214:16,17
**ignore** 206:6
**illegal** 64:18
65:2,3,11
150:6
**illegally** 152:3,6
**immediate**
134:18
**immediately**
46:1 261:10
**impacts** 86:12
**implemented**
31:17 268:12
**important** 254:8
**imposes** 182:7
**impress** 209:17

# FREEDOM COURT REPORTING

impression
    249:14,16
improper
    117:20 150:6
    170:13 171:14
    172:3
improperly
    150:21 152:3,6
improve 38:7
    47:3 62:16
    83:10
improving 62:19
inappropriate
    63:10 65:2,4
    65:13 218:22
incarcerated
    216:5
incident 116:4
    229:12
include 54:20
included 31:19
    31:22 32:3
    40:22 49:12
    60:5 61:7 64:4
    249:23
including 82:7
    166:11 256:18
incorrect 169:22
incorrectly 11:2
    248:19 252:16
increase 269:17
increases 149:4
index 140:20
indicate 79:2
    215:6
indicated 78:22
    192:7 198:15
    200:7 205:21
    213:3 251:11
indicating 81:9
indication 124:7
indirectly
    252:22
individual 173:3

individually
    1:10,14 2:9,13
    2:19 3:2 4:11
    4:16 87:1
    172:23
ineffective 69:17
    133:12 136:8
    231:13
inform 117:5
    124:13 223:23
    245:21,21
information
    55:4 119:15
    124:8 168:1,7
    168:13 169:3,6
    174:20 191:17
    238:2 250:2
    263:17
informed 136:20
informing 54:9
    234:23
Ingram 1:12,16
    2:11,16,22 3:4
    4:8,13,19 12:1
    12:4 25:3,5
    27:7 31:1,8,12
    33:8 34:15
    42:2 48:8
    64:16 65:1
    71:2 77:21,22
    77:23 85:10
    88:1 102:6,13
    104:8,13
    105:20 106:12
    106:16 114:2
    114:22 115:4
    127:14 141:20
    142:4 144:15
    144:18 150:14
    155:17,18
    160:12,19,22
    174:3,15,16
    177:14,22
    179:15,21

182:6,14 183:6
    187:23 189:6
    189:21 202:19
    203:14 210:13
    212:22 213:2
    213:23 215:15
    216:18 217:18
    218:15,19
    251:8 257:20
    262:19 264:3
    265:11 268:14
    269:3,21 270:8
    270:13
Ingram's 182:19
initial 229:6
inmate 104:3
    116:7,14,15
    118:5,13 119:7
    120:10 131:5
    131:10 170:19
    170:23 171:12
    171:18,21
    180:23 228:14
    229:3 230:14
inmates 130:9
    172:1,1 173:8
    173:16 216:11
    219:23 265:16
inmate's 228:4
input 165:5,15
    165:17
insensitive 68:20
inside 185:6
Insofar 183:23
instance 110:16
    199:1
instances 130:21
instant 53:23
Institute 14:10
institution 3:4
    21:2 25:7
    29:23 140:1
    251:13
instructing

188:22
instruction
    28:12 32:18
    42:12 114:5
    154:22 155:6
    155:11 156:11
    156:12 159:8
    232:15 243:2
    245:23
instructional
    198:14 232:19
instructor 22:23
    270:12,16
instructors
    138:4 173:17
    184:2 196:1
    204:1 212:7
    238:11 240:4
    244:22
intend 35:15
intending 210:5
interested
    272:17
interesting 26:1
interim 25:3,4,7
    25:14,15,21
    26:8,9,18,21
    37:17
intern 19:4
internal 69:15
    94:13 95:4
    97:20 99:1
    196:13 201:20
interview 21:12
    21:13 256:11
interviews 174:6
    229:6
introduced 31:4
    31:6 258:1
inventory 102:6
    102:13
investigate
    117:3,10
    121:10 173:20

investigated
    173:22 203:20
investigation
    116:19,23
    117:7,18,21
    174:2,5 204:9
investigative
    122:21 250:2
invoice 242:12
invoices 238:21
    242:17
involve 87:6
involved 87:8,10
    125:15 181:7
    192:10,15
    204:1,16
involvement
    180:15
involves 159:14
    181:19
involving 229:6
irregularity
    199:15
isolated 183:10
    183:11,14
issue 117:3
    152:12 154:7
    181:19 191:3
    193:7 246:22
    246:23 248:21
issued 97:19
    99:1
issues 83:4
    154:6 193:11
items 54:21
    81:16 84:8
    178:18
i's 151:7
I-85 12:19

_____
          J
_____

J 4:5,9 28:20
Jackson 13:14
Jacquelyn 244:5

# FREEDOM COURT REPORTING

**James** 1:13 2:12
3:1 4:15
222:19 225:22
229:2,17
**January** 132:13
**jeans** 172:8
**Jim** 5:4,19 7:4
10:9 35:10
50:10 71:6
80:8 92:15
98:15
**job** 17:22 18:11
18:13 21:8
46:15 49:12
83:14,19
107:17 125:9
125:11,17
143:6,9,17,20
145:1 146:13
147:10 148:12
148:14 149:7
150:10,11
151:6 158:6
161:22 162:3,7
162:9 189:14
194:18,21,23
195:2,3,5,7,14
195:16,17
225:1,3 226:14
256:18
**jobs** 148:4,6,8
150:12,13
159:18 195:5
226:3
**John** 4:23 5:16
10:1 11:18
21:15 210:9
266:1
**Johnson** 13:4,15
13:16 189:1
**Johnson's**
188:14
**Jones** 85:18
86:19,22 211:4

**Julie** 1:5 7:15
10:11 72:12
170:4 175:11
**July** 20:19 39:12
57:5,13 79:15
83:17 84:2,3,4
84:13 199:4
234:6 235:9
243:23
**June** 5:7,20
198:21 199:6
233:12 240:1
**junior** 265:2
**Jury** 188:21
**J.F** 4:8,13,19
12:1,4 25:3,5
27:7 31:1
34:15 71:2
77:21,22 85:10
88:1 102:13
104:7 105:20
106:12,16
114:2,22 115:4
150:14 160:12
160:19,22
174:3,15,16
177:14,22
179:15,21
182:6,13,19
183:6 187:23
189:6,20
210:12 251:8
262:19 264:3
265:11 268:14
269:3,21 270:8
270:12
**J.F.I** 180:22
266:3
**J.L** 113:21 114:6
115:13

_____

## K

**Keahey** 238:1
238:14

**keep** 41:12,12
41:23 42:14,23
72:20 110:7,8
153:14 160:8
160:22 176:20
199:19 216:21
217:11 219:22
**keeping** 102:12
166:10 266:22
**keeps** 110:9
**kept** 32:17 41:11
41:21 119:11
252:3
**key** 191:17
**Kilby** 219:12
**kin** 13:8,11
272:15
**kind** 80:17
122:2 182:13
183:9 190:18
200:10 212:11
232:18 252:11
263:14
**kinds** 150:20
**knew** 127:4
136:8 157:4
212:16
**know** 33:4,5
34:20,23 35:1
38:21 44:13
50:17,18 54:12
54:15 56:18
64:20 66:10
72:19 73:1
78:1 84:17,19
86:22,23 87:17
94:1,11 99:12
99:18 100:5
101:5,14
103:13,21,23
104:2,5 105:9
105:11,19,22
106:14,17
113:21 116:21

126:19 129:13
131:7,18
133:15 134:3
137:22 139:8,9
142:19 143:2
144:10,13
145:1 147:15
148:21 149:16
156:20 160:14
161:1 175:13
175:22 177:1
184:20 185:22
186:1,8 187:15
192:6,19
193:15 194:18
194:20 195:13
195:18,19
197:10 201:22
202:6,10,17
210:18,22
211:5,18
219:14 221:1,5
222:9 223:18
224:16 225:1
225:11,19
228:8 230:10
233:5,6 235:6
237:13 249:20
250:4,6 258:10
258:11,15
259:11 265:4
268:22 269:9
270:8
**knowing** 171:8
**knowledge**
38:12 86:3
105:18 111:23
112:1 114:17
117:9,12,22
131:5,16 140:4
144:3 146:6
147:6 148:2
216:18 224:7
224:17 225:5

**knowledgeable**
40:4 66:9,13
**known** 117:8,14
**knows** 139:7
**Knox** 239:21
241:11 242:1

_____

## L

**L** 5:12 85:18
**lab** 203:2
**labeled** 198:10
**ladies** 172:6,14
172:15,18,22
**lady** 216:7,17
219:12 245:21
**large** 138:15
183:2
**largest** 183:5
**Larry** 205:13
**late** 60:21 65:10
65:14,20
248:11
**latitude** 111:17
**law** 195:19
**laws** 16:6,9
141:13
**lawsuit** 111:5
**lawyer** 10:14
11:5 72:3
197:19
**lawyers** 10:17
**leadership** 40:1
40:14 59:23
80:21 82:6
**leading** 6:2
213:20 256:14
**leave** 18:11
60:20,21 93:15
107:1,2,3
109:9 110:2
112:7,7,13
164:3 181:18
**leaves** 112:10
**leaving** 251:8

led 188:2
Lee 12:22,23
  13:23
left 20:6 138:23
  148:12,14
  149:7 159:22
  191:8
legal 151:8
  153:18 200:9
  200:10
legally 151:16
legislative
  103:10,15
legislature
  103:20 164:8
  164:11,16
legislatures
  195:10
Leo 103:23
  105:23
Leonard 105:9
  106:1,5,9,16
letter 74:20
  116:1 137:13
  205:1 211:8,9
  211:14,16,16
  211:18,19
  213:16 233:11
  233:21 235:10
  235:17 237:21
  250:17 251:3
  258:22 259:12
letterhead 28:8
letting 251:19
let's 12:10 17:21
  24:13 57:1
  59:21 60:18
  69:23 70:7
  75:1 80:17
  87:22 89:9
  90:20 93:2
  96:21 98:12,19
  98:21 99:23
  138:5 176:13

180:23 198:3
205:8 240:16
248:21 254:17
257:10 268:16
level 17:13
  30:19 124:19
  125:14 224:16
  225:12,13,15
levels 61:2
  159:21
levied 121:5
lie 63:20
line 49:21 65:17
  92:10 143:3
  196:15 197:20
  256:5
lines 74:22
listen 216:22
litigation 50:2
little 69:7 95:19
  185:20 186:4
  192:14 193:11
  240:2
live 14:3 100:18
  198:13,22
  200:17 202:7,8
  202:12,13,18
  203:6,13,17
  206:7 207:4
  208:18 232:14
  233:2,18 235:6
  235:14,19,20
  236:13 238:23
  239:8,21,22
  240:3 242:2
  245:1 266:5
Livingston
  16:18,19
local 108:2,9
located 16:17
  21:6 183:15,16
  183:19
location 183:9,9
long 18:8,22

19:22 20:12
22:3 23:17
24:18 25:21
27:3 132:3
longer 102:21
  172:8 251:12
longest 131:23
  132:2
look 31:2 34:1
  45:1,17 55:1
  57:1,10,15
  59:21 62:13
  68:22 69:23
  75:7 79:3,18
  80:7,14 81:1,8
  82:13,18 87:17
  90:20 98:12,14
  98:19 122:20
  125:17 135:17
  170:21 171:6
  178:13 180:1
  180:13 216:10
  222:7,17
  238:10 240:10
  240:17 241:22
  245:5 247:1
  254:11 259:22
  264:10
looked 58:21
  59:2 73:20
  81:5 159:13
  210:8 222:1
looking 28:8
  46:6,6,7 61:22
  80:8,16 87:14
  89:5,10 92:6,8
  95:11 122:17
  122:19 140:21
  163:3 266:5
looks 75:21
  171:1
loose 251:18
lot 13:3 22:22
  138:3 139:16

172:1 219:2
239:14 250:3
252:8 261:8
270:21
low 79:5
lowest 154:14
lunch 94:21 97:4
lunchtime 97:12
lying 106:19
  170:1

——————— M ———————
mad 132:16
Madison 5:19
  7:5
mailed 258:19
  258:21
main 128:9
  130:8,20 131:4
  150:12,13
  172:6 173:9,10
  182:19 183:20
  217:18
maintain 48:7
  64:2
maintained 42:6
  42:10 46:16
maintains 61:10
  62:21
maintenance
  145:23
major 135:22
  152:12 153:3
  164:4 167:11
  181:5 207:1
  209:19 215:20
  216:2
majority 98:9
making 74:14
  79:23 81:11
  82:4 137:12
  169:13 242:3
  249:11
Malcolm 2:18

116:6 121:18
124:9
male 128:10,19
  130:9 131:5,10
  146:11 170:15
  173:8,17 174:8
males 130:4
  217:15 218:9
manager 133:14
mandate 32:5
mandated
  178:16,18
manner 223:8
manual 31:2,8
  31:13,19,22
  32:3,16 33:1
  33:10 34:6,8,9
  34:12,15 35:11
  48:10,14,17,20
  49:4,9,10
  70:12,23 78:5
manuals 49:2
March 52:15
  136:6 259:8
mark 44:1 46:12
  92:16,17,19,20
  93:2,6,7,8,9,10
  93:11,12 96:18
  97:6 115:20
marked 35:2,5
  36:17,19 39:4
  39:6 43:6,22
  51:18,21 52:17
  52:20 56:8,11
  71:15 78:11
  92:17 93:3,20
  97:10 98:17
  106:22 109:8
  113:3 115:22
  129:21 137:1,3
  145:5,7 197:18
  233:8 234:4
  235:23 236:9
  237:18 238:17

# FREEDOM COURT REPORTING

239:4,18
241:20 242:6
243:20 261:18
262:5 269:11
**marking** 196:18
**married** 12:11
13:17
**master** 32:15
86:20
**master's** 14:19
14:21 19:15
224:18,19
**masturbating**
118:14 119:7
120:12 215:22
216:6 228:15
**masturbation**
216:4
**material** 50:15
91:23 94:3,5
94:14 95:5,7,8
97:21 98:4
99:2,6,9,15
101:21 120:5
120:14 121:16
126:1 153:9,10
188:19 196:18
197:1,5 270:9
270:14
**materials** 247:2
247:16
**matter** 91:15
116:11 117:15
117:22 194:3
216:19 234:19
**matters** 69:6
188:23
**McDuffie** 244:5
**mean** 13:5 16:23
19:3 26:3 38:3
40:20 42:20
47:12 50:17
55:4,7 58:1
73:5,12 113:14

122:2,4 131:11
139:13 141:5
157:9 195:4
199:10,13
212:21 229:14
234:16 241:3
263:14 265:13
**means** 17:2,4
34:18 40:21
66:10 137:23
199:14 223:9
272:9
**meant** 40:15
74:1 99:12
206:5
**measures**
204:15
**mechanic**
242:11,16
243:1
**mechanics**
238:22 244:2
**Medical** 157:2
**meet** 36:10
108:18,23
**meeting** 46:23
73:6,15 76:23
77:2 144:14
160:4 172:6,10
172:14,21
173:1 211:15
219:10
**meetings** 71:21
72:15 73:21
74:6 83:5,5
109:4 117:1,15
134:22 228:10
250:8
**meets** 52:5 53:4
57:2 60:22
65:18 82:16,19
83:1
**member** 70:2
107:6,8,9,10

107:12,14,16
107:18,22,23
108:2 254:23
**members** 66:17
73:5,7
**memo** 74:14,17
233:11 235:18
237:8 238:3
**memorandum**
129:23 137:5,7
137:18 138:7
138:17,20
139:4 145:12
149:20 186:3
237:22 239:20
242:8 244:14
251:17 261:14
**memorandums**
83:16,23 84:7
129:17 138:4
191:22 245:14
252:4,9
**memory** 155:16
**memos** 83:12
**men** 19:6 108:1
128:21 129:7
129:12 130:20
130:21 172:11
173:2 215:22
216:5
**mentioned**
210:10 215:3
257:18 260:20
**Merk** 3:1 28:10
32:20 42:14
59:13 63:8,11
116:18,22
119:1,3 121:10
121:13 123:10
147:2 154:23
174:21 175:4
225:22 229:7
230:10 232:4,6
249:6 250:9

253:10
**Merk's** 31:7
35:13,18 42:12
42:19 119:9
122:20 155:8
222:19 232:2,3
**met** 44:19 83:8
136:22 151:9
204:3 206:15
260:5
**mid** 24:19
**Middle** 1:2 2:2
4:2 12:16
**Miller** 103:23
104:2 105:23
106:3,18
**million** 161:5,9
162:18 163:1,2
163:7,8,18
269:5,19
270:17,18
**mind** 92:15
**mine** 31:23
46:17 75:21
76:3 110:9
151:14
**minimum** 264:7
**minor** 14:11
**minute** 111:3
142:12 205:8
256:20
**minutes** 46:23
47:2,16 72:14
73:6,21 74:12
74:18 77:5
113:14 218:21
247:6
**misbehavior**
229:3
**misconduct**
228:17,21
229:1 230:14
**mishaps** 69:21
**misinterpret**

74:15
**missing** 104:14
**mistaken** 100:11
**mistakes** 214:17
**mistook** 209:8
**misunderstand**
137:15
**misunderstan...**
138:21
**module** 267:14
267:16
**monetary** 17:18
**money** 10:16,17
102:12,12
140:7 150:13
150:21 151:2,9
152:2 160:9
164:7,7,10
165:2,6,16,18
165:23 241:1,3
244:2 246:3,4
246:5 253:22
255:5,16,18
256:10,12,13
256:13,15
264:1 270:13
270:19,21
**Monica** 1:5 7:16
10:10 28:5,20
36:2 37:1
39:10 43:17
44:6 45:2 46:5
52:1,22 56:22
76:11 88:9
233:12 237:21
**monies** 213:13
**Montgomery**
2:18 5:20 7:6
7:12 12:18
15:5 107:23
110:20 116:6
117:1 118:4,12
118:19 119:5
119:23 120:11

# FREEDOM COURT REPORTING

Page 290

| | | | | |
|---|---|---|---|---|
| 121:6,19 124:9 | necessary 5:23 | 163:7 | 122:12,13 | 20:1 32:6,17 |
| 228:8 229:7 | 58:17 245:17 | ninety-eight | 138:9 150:17 | 41:13 42:3,6 |
| 230:13 266:2 | necessity 220:22 | 198:19 208:16 | 222:21 250:22 | 42:12,20 43:1 |
| 272:4 | need 49:22 54:6 | Noem 21:16 | 256:17 266:17 | 48:4 51:11 |
| Montgomery's | 63:14 73:23 | 23:16 | 266:20 | 63:13 64:11,22 |
| 228:3,22 | 92:1 94:18 | noncompliance | | 66:18 69:16,22 |
| month 27:5 | 139:18 165:6 | 94:6 95:8 99:9 | **O** | 70:12,23 71:19 |
| 259:8 | 178:13 246:1 | 197:5 | O 5:12 | 86:2 95:22 |
| monthly 166:2 | needed 47:3 | non-adherence | oath 250:13,14 | 102:11 110:17 |
| months 18:10 | 60:3 83:10 | 230:23 | object 33:2 | 110:18 111:22 |
| 20:2 25:23 | 132:20 136:9 | non-inmate | 53:21 73:9 | 112:16 132:7 |
| 27:9,12 102:19 | 189:20 214:15 | 129:2 | 78:15 85:4 | 132:15 133:6 |
| 163:5,16 164:2 | 249:13 | Non-profit | 94:9 110:21 | 138:23 146:1 |
| 170:21 268:20 | needs 11:9 43:12 | 104:16,19 | 117:11 118:15 | 162:14 164:12 |
| morale 214:18 | negative 41:3 | normally 38:16 | 130:22 137:19 | 164:21,23 |
| morning 138:18 | 60:3,16,17 | 58:19 259:2,14 | 139:6 158:16 | 165:5 169:5 |
| mother's 13:6 | 61:4,5,14,15 | North 200:12 | 188:18 195:11 | 175:5,6 178:11 |
| motivate 218:12 | 61:20 62:4,8,9 | NORTHERN | 210:11,14 | 178:12 186:22 |
| mouth 240:8 | 62:10,23 63:2 | 1:3 2:3 4:3 | 233:4 | 186:23 187:19 |
| multi 22:22 | 67:1,16,17 | Notary 5:18 | Objection | 187:20 200:14 |
| Murphrey 72:12 | 68:1,3,7,11,14 | note 75:11 96:22 | 213:19 | 206:15 211:21 |
| 73:22 | 68:15 69:13 | 233:13 234:8 | objections 6:1,4 | 212:2,22 213:4 |
| Muskogee 18:4 | 70:5,6 81:9 | 234:10,20,22 | objective 140:19 | 213:8,9,17,22 |
| 18:9 | 254:21 | noted 95:9 99:10 | objectives 141:8 | 213:23 214:12 |
| | negotiable | 197:6 199:8 | obviously | 214:14,22 |
| **N** | 159:18 | 203:18 | 240:19 | 215:1,9 224:9 |
| N 5:12 7:1 8:1 | neither 272:15 | notes 72:6,8 | occasions 73:2 | 231:10,16,16 |
| name 11:17 13:9 | never 62:1 64:23 | 74:4,7 138:11 | 192:17 | 232:4 236:18 |
| 146:20 200:23 | 69:3 75:9 | 191:22 | occupied 225:3 | 240:13 257:19 |
| 209:11 210:10 | 86:23 121:20 | notice 6:9 54:12 | occupies 159:12 | 257:20 261:3 |
| named 229:8 | 123:13,20 | 169:16 | occupying | 263:18 265:6 |
| names 13:1,7,21 | 125:23 132:22 | noticed 38:18,19 | 158:14,20 | 268:7 |
| 209:11 210:7 | 143:8,17 | 69:14 76:10 | occur 133:21 | officer 88:8 |
| 210:19,23 | 170:10 172:17 | notification | 206:2 | 90:17 91:20 |
| naming 210:19 | 173:5 174:2 | 168:9 169:1 | occurred 172:4 | officers 217:23 |
| 210:23 | 210:16 215:18 | November | 209:23 | 218:2,5 |
| narrative 60:11 | 216:17 253:19 | 109:12,21 | occurring 212:6 | office's 214:7 |
| 79:20 | 254:1 | 110:11 242:10 | October 87:5 | official 4:12,17 |
| nature 65:12 | new 20:17 21:3 | number 1:8 2:7 | 88:2 | 29:15 32:7 |
| Nearly 98:10 | 32:4 83:10 | 4:7 40:21 57:2 | Offender 167:13 | 58:16 125:2 |
| necessarily 41:3 | 209:23 266:16 | 59:21 60:4,7,9 | offer 266:11 | 207:10 213:7 |
| 84:9 104:20 | nice 263:15 | 60:18 61:1,10 | offered 6:6 | off-the-record |
| 260:19 268:8 | Nichols 200:22 | 62:5,20 66:23 | 16:15 143:17 | 51:16 188:9 |
| 268:10 270:20 | nine 67:15,21 | 67:15,21 69:23 | office 5:19 19:21 | 257:12 |

# FREEDOM COURT REPORTING

**Oh** 30:20 41:2
114:7,13
130:13 153:20
210:21 234:18
**okay** 11:9 12:3
14:2 18:13
23:5 26:7,21
27:21 28:13
29:8 30:10,20
31:12 32:11,22
36:10,13,15
37:21 41:2,5
42:1,19 43:9
43:14 46:2,10
46:15 48:19
49:1,19 55:16
56:2 57:1,6,15
57:21 59:11
60:18 61:17
62:5,10 65:4
67:4,13 68:20
70:7 71:10
72:7 73:17
74:23 75:3,11
75:22 76:15,23
77:13 78:9
83:21 84:18
89:19,23 90:16
92:13,23 94:23
95:10,16,23
96:6 97:3,17
99:22 100:4,7
101:2,16,20
102:4 103:18
109:20 110:13
112:8,17
114:13,15
116:18,21
118:2 121:12
122:8,23
125:22 126:23
127:8 129:16
139:10 143:4
143:16 144:10

144:16 145:18
146:17 151:23
153:17,20
154:17,19,23
157:18 158:23
164:15 165:20
168:6 170:3
171:14 172:17
173:1 174:7,23
176:5,9,12
177:2 178:17
178:23 179:13
180:17 182:22
190:9,13
192:10 193:23
194:22 198:3
200:2 201:8
202:12 208:11
208:14 235:5
235:16 236:11
236:20 238:9
238:19 239:20
240:16 241:13
241:22 243:18
244:8,21 245:5
250:16 251:2,7
257:5 259:1,4
260:1 266:15
268:22
**old** 32:9 216:7
**Omega** 108:3
**once** 73:2 121:9
133:22 160:2
164:17 165:20
165:22 181:10
**ones** 94:16
167:12 172:15
187:14
**ongoing** 213:11
**opening** 88:3
**operates** 126:23
**operation** 49:14
141:12 165:7
165:10

**opinion** 94:2
97:19 99:1
195:12 206:3
211:5 212:1
**opportunity**
204:5,8,11
248:16
**opposed** 79:23
83:6 174:9,14
**optional** 266:19
**oral** 5:6 62:6,16
**orange** 215:23
**order** 63:14
80:18 100:9
199:5 222:8
241:3 246:11
248:3 253:23
256:4
**ordered** 247:3
263:10
**ordering** 246:7
246:14
**orders** 102:7
212:8 241:1
245:7 251:20
251:22 253:4,8
253:11,14
**organization**
64:23 108:6,8
**organizations**
104:15,17,20
107:6,19,21
**original** 5:5 35:6
36:18 39:5
43:23 51:19
52:18 56:9
71:16 78:12
93:21 97:11
106:23 113:4
115:23 129:22
137:2 145:6
233:9 234:5
236:1,10
237:19 238:18

239:5,19
241:21 242:7
243:21 261:19
262:6 269:12
**outlined** 249:18
**outside** 213:2
**outstanding**
16:12 37:23
38:13
**overage** 208:17
**overages** 208:22
**overall** 37:21
39:17 52:3
**overseeing**
49:14
**overseer** 19:6
**Owensby** 4:5
10:12 117:2
144:11,13,21
145:13 146:4
147:9,16
148:11,22
153:22 157:13
159:11 224:19
226:1 229:7
**Owensby's**
144:16
**o'clock** 257:7

_____
**P**
**P** 5:12 7:1,1
**package** 75:8
**page** 8:3,8 57:8
57:21,23 58:1
58:9,20,22
59:4 60:11
62:14 75:15
88:4,17 89:1
89:12,21 91:12
140:20 196:10
198:4,11 206:5
232:12,12
258:5
**pages** 76:13

207:18 208:8
**paid** 65:7,20
106:16 108:16
108:22 139:14
143:9 148:11
148:17,23
175:1 213:6
241:15 242:13
242:17 248:14
**pants** 169:15
170:5,7
**paper** 260:13
**paperwork**
167:15,20
200:18 246:8
247:8 248:4,6
248:13,15
254:16
**paragraph**
123:1 198:6,8
198:9,12
222:20,21
**paraphrase**
255:8
**paraphrasing**
254:21 262:1
**Pardon** 147:20
**park** 184:21
185:6,10
**part** 50:7 91:15
92:8 107:16
122:20 123:7
124:21 153:15
162:9 180:21
182:22 183:10
207:16 208:5
228:18,22
229:2 232:19
**participated**
117:15
**particular** 36:12
112:6 125:13
139:16 159:3
159:16 161:11

# FREEDOM COURT REPORTING

161:16,20
209:15 229:14
243:5
**particularly**
141:1 196:13
208:12
**parties** 5:14 6:3
123:3,11,19
124:4 204:1,16
272:16
**parts** 92:2
**part-time** 22:23
114:14
**passed** 31:15
**pattern** 229:22
**Patterson** 266:2
**Paul** 229:8
**pay** 17:15 65:19
106:9 143:11
149:3,14,20
153:23 154:8
154:10 160:8
240:18 241:4
247:15 248:5
**paying** 65:10,14
66:2 139:11
**payments** 212:8
248:12
**payroll** 175:17
175:20,23
191:12,16
266:16,22
267:7,14,16
**Pebble** 11:20
**penalize** 247:19
**penalties** 204:6
**people** 13:8
31:16 77:21
78:6,7 104:8
115:4 126:16
129:17 130:1
135:6 138:11
166:16 175:1
180:7,13 184:3

184:9 188:15
193:19 215:6
216:23 217:2
217:10 218:7
219:18,22
231:9,16,20
232:3,3,9
243:8 246:7
247:12,15
251:19,21
254:6,14 256:8
260:22 261:7
265:1,2,3,7
**peoples** 210:19
**people's** 209:11
**percent** 174:9
241:2,5 245:9
**percentage**
174:8,13 203:1
263:2
**perception**
214:11
**perform** 147:9
**performance**
37:22 38:1
**performed**
266:22
**period** 15:11,19
64:15 79:16
81:22 84:10
96:9 111:1
135:19 263:6
**permission**
48:20
**person** 29:1 36:9
61:19 100:17
127:3 131:21
134:6,15
143:23 150:1
158:13,14,20
256:15
**personal** 61:12
65:21 117:9,12
211:12

**personnel** 14:22
21:21 41:14,16
41:20,21 42:11
42:13,16,18,21
43:11,13,17
45:3,14,15
46:5,16,18,19
50:1,3,4,8
57:11,12 58:22
58:23 59:13
83:13 147:2,3
147:7 174:21
176:19 177:16
177:22 178:2,8
178:8,15,19,20
178:21 179:1
191:12,18,23
192:3 225:21
259:5
**person's** 134:4
134:15,16
**perspective**
207:3
**Phenix** 14:9
21:7 108:9,10
108:11,20
**phenomenon**
260:21
**Phi** 108:3
**phone** 218:23
**phonetically**
187:12
**physical** 131:12
243:8,10
**pick** 135:13
247:16
**picture** 164:18
**piece** 186:11
**place** 46:19
55:13 58:14
59:15 67:14,19
67:23 68:17
69:4 81:3 95:3
98:9 102:19

170:15 182:15
189:19 202:16
221:6 226:23
227:19 254:19
**placed** 43:10,12
150:2 159:15
**placement** 150:3
**places** 94:1
**plaintiff** 2:6 4:6
7:3 35:21
**Plaintiffs** 1:7
**plaintiff's** 8:9,10
8:11,12,13,14
8:15,16,17,18
8:19,20,21,22
8:23 9:1,2,3,4
9:5,6,7,8,9,10
9:11,12,13,14
9:15,16,17,18
31:5,6 34:10
35:2,4,19
36:16,20 39:3
43:21 44:1
51:17,21 52:16
52:20 56:7,11
57:3 71:13,14
75:7 78:10
80:5 82:10,13
82:18 92:19,21
93:4,19 97:7,9
106:21 109:9
113:2 115:21
129:20 136:23
137:4 141:1
145:4,8 197:19
233:7,10 234:1
234:3 235:22
236:8,11
237:17,20
238:16,22
239:3,6,17
241:19,23
242:5 243:19
250:23 259:23

261:17,21
262:4,8 269:10
269:13
**plan** 163:22
**player** 70:1
254:6,7,9,10
254:12,22
255:4,4,7
**playing** 30:2
**please** 5:8 11:17
13:1,2 46:11
51:23 67:20
71:9 75:6
80:12 136:10
198:7 222:23
258:5
**plug** 248:4
**pocket** 106:10
**point** 86:8,13
100:18 124:19
125:5 163:7,7
181:8 182:5
211:11 267:8
269:18,19
**pointed** 49:23
83:18 216:15
239:13 268:7
**pointing** 186:3
236:17 237:23
239:12
**policies** 31:8,13
31:15,21 32:2
32:8,9,15 33:9
35:11 222:9
238:1 253:21
254:3
**policy** 31:16
32:4,5 33:1,8
34:6,8,9,12,14
48:10 65:23
66:1 177:13,18
177:21 178:3
180:20 200:17
202:23 219:3

# FREEDOM COURT REPORTING

220:3,6 222:14
222:16 241:7
241:11 249:5,8
255:3,20,23
256:9
political 16:13
population
128:2
position 19:19
20:5,7,9,13,17
20:18,23 21:17
22:4,6,8,13
24:2,4,23 26:5
26:6,11 27:1
29:14 114:3
141:11 144:8
144:17 145:14
158:4,14,15,19
158:21,22
181:7 218:12
positions 21:3
22:18,19 28:18
159:12
positive 60:2,15
61:4,14,15,17
62:3,7 63:1
66:23 67:3,16
70:4 79:22
80:23
possession 59:14
possibility 200:8
possible 69:5
Postsecondary
111:21 178:14
potential 117:16
220:9
practical 203:2
practice 202:15
262:18
practices 245:16
Prattville 11:21
prefer 95:22
pregnant 170:21
171:2,7

prepare 201:8
201:11 207:21
208:5 244:22
251:21
prepared 207:23
presence 216:9
present 7:14
28:9 29:11
31:7,10 77:7
104:12 131:22
133:5 213:11
presented 31:1
45:2 77:4,11
77:15 124:19
141:10 208:9
209:9 211:3
presenting
125:20
presidency 29:9
president 1:11
2:10 4:13 12:1
12:4 23:9 24:5
25:3,5,8,14,19
25:22 26:8,9
26:19,22 27:7
27:15 28:5
29:14 30:11
37:17,18,20
48:23 49:11
64:12 65:15
70:8 81:15
88:6,7 90:3,16
91:17 96:9
122:3 125:1
149:17 150:7
187:22 193:8
199:11,22
245:20
Presidential
107:14
presume 180:18
pretty 86:16,19
186:13 213:16
251:18 252:1

258:13
prevent 217:5
previous 79:19
79:19 80:3,14
80:16 81:5
136:14
primary 40:14
59:23 80:21
print 56:1
prior 6:6 50:1
84:18 116:21
117:23 245:13
priority 195:14
256:17,18
263:12
prison 215:19
215:21
probably 23:19
50:16 66:16
150:17 185:20
194:23 195:2,4
251:12
probation
182:15
problem 63:12
89:23 92:21
126:12,16
173:5 191:15
192:23 199:19
204:6 205:7
209:21 213:14
214:23 219:17
232:1 236:17
238:10 240:2,5
245:23 249:12
problems 19:12
22:1 60:19
64:10 67:13,18
67:22 68:8,16
68:21 69:2
126:21 139:23
187:10 191:11
192:8 193:6
195:15 202:8

202:18 211:21
212:1,22 213:4
213:18,22
214:14 215:7
215:21 216:2
216:13 219:15
232:5 239:22
240:10,13
244:15 251:14
251:15 254:18
261:2 267:15
procedure 5:2
32:1,10 33:1
33:10 35:11
120:4,23 121:3
122:9,12,15
123:21 177:13
177:18,21
178:3 207:2
220:13,18
230:11 266:5,6
procedures 31:8
31:13,21 32:3
32:15 122:22
195:18,21
222:10 249:10
266:9
process 21:10
27:13 28:2
123:14 125:9
156:6,8 198:20
198:23 202:14
202:19 203:13
204:17 221:5,9
229:6 230:2
247:8,21,22
248:10 249:4
268:17,19
processed 261:9
processing
262:1
produce 50:9,15
51:6
produced 45:12

45:23 46:1
50:2,8,13,22
51:2,3,6,11,12
178:3
producing
189:19
production 45:6
45:7,9
professional
61:11,18
professionals
140:5
profit 203:4
program 20:10
63:15 270:8
programs
202:15
prohibited
220:5
prohibiting
220:7
project 239:8,23
projects 164:5
198:23 232:19
245:1
proper 130:1
170:14 171:19
175:2,22 267:1
properly 66:2
101:10 125:12
150:14
property 185:21
proposed 205:15
244:23
propriety 189:2
205:18
prove 219:8
proven 117:13
provide 72:2,4
83:21,22
provided 43:16
80:3 82:15
205:20 249:17
249:18

provides 40:13
59:22 80:20
provision
222:10 223:14
provisions 48:15
208:11
Pruitt 116:14,15
230:14
Pruitt's 229:3
psychology
14:12
public 5:18
64:18,19 85:8
93:5 97:8,14
102:2 103:7,14
103:19 135:21
139:19 141:6
141:18 142:2
195:10 204:19
207:11 212:4
249:15
publication
77:17,20,20
pull 46:11 62:12
pulled 103:4
punishment
182:7,11,13
purchase 152:9
186:18 212:7
246:10 247:3
253:4,8,11,14
253:23 256:1
260:22 262:11
purchases
260:21 261:8
purchasing
195:21 246:6
246:14 247:12
262:10,11
266:7
purpose 33:13
75:22 141:14
176:18 206:19
put 36:8 41:9

57:2 58:11
60:12 64:8
70:13 74:19
78:5 82:5 83:7
83:12 94:10
113:9 121:10
129:16,23
149:20 177:11
178:8 193:19
212:6 215:22
233:13 240:7
259:4 268:16
putting 218:5

―――――――
**Q**
qualifications
226:2
qualified 153:12
qualifies 105:19
quantities
138:15
quarterly 166:3
question 12:11
33:3,22 34:20
49:7 51:9
55:18 67:20
80:12,13 89:16
92:12 94:8
106:13 110:22
110:23 111:15
113:5 118:17
136:13 137:20
141:23 149:14
152:8,20
158:17 180:19
188:7,11,18
197:13 210:17
220:20 228:20
229:12 237:4
237:11 241:9
257:1,2,6,13
270:7
questioned
64:23 65:7

88:19 90:6,11
152:1
questioning
49:22 197:20
questions 6:2,3
43:15 50:19
65:9 78:21
92:2 94:22
95:2 103:3
111:6 113:10
188:22 196:4
196:12,15
216:16 220:12
220:17,18
248:23 256:13
271:4 272:8
quick 98:13,22
quicker 193:12
quickly 258:13
quite 13:5
107:15 151:18
quote 69:10
132:20

―――――――
**R**
R 7:1 272:1
race 226:18
231:2
raise 126:6,10
126:19 127:2
143:11 246:20
246:22
raised 127:8,11
raising 126:17
Ralph 21:15
rarely 62:2
rating 39:17
reach 134:23
read 10:19 11:5
11:8 38:3 54:6
60:7 62:11
66:9,13 68:13
74:12,15 78:20
90:2 123:9

136:3 138:18
138:19 139:12
140:12 198:7
222:22 237:10
reading 10:21
11:6 60:1
69:14 82:21
88:23 140:17
140:23 251:16
252:7 267:5,6
reads 73:5
ready 263:16
real 98:13,22
132:16
realize 163:6
realized 120:18
really 37:18
66:10 115:2
185:23 189:9
194:18 212:5
212:11,15
rear 183:15,16
rearranged
155:13
reason 43:14
45:8 92:6
113:9 139:3
149:10 212:13
219:13 222:2
230:19,22
reasons 157:2
recall 23:3 24:12
38:16 39:2
46:8 59:16
83:15 116:3
131:8 133:20
136:19,20
137:6,9,12
139:15 161:12
161:15,19
169:9,13
173:13 196:19
197:1,8 214:2
220:11,13,22

receipt 223:3
receivable
244:15
receive 14:13
32:5 47:17
168:9 258:18
received 14:10
14:19 31:14
54:10 79:1
168:10 206:11
211:8 212:3
213:13 251:5
258:11,17
259:10 263:18
receiver 167:3,4
receives 67:5
169:7
receiving 47:2
102:11
receptionist
244:6
recess 75:4 97:4
142:13 176:16
recognize 35:7
44:3 75:18
76:1 87:23
122:14 145:9
146:13
recognizing 17:4
62:18
recommend
159:23
recommendati...
28:1,2 181:17
186:21 187:18
249:9,11
266:18
recommended
23:12 27:10
186:15,17,20
record 45:5
49:23 50:6
51:13 88:22
95:21 96:22

# FREEDOM COURT REPORTING

110:5,6 176:21
176:22 177:3
188:7 197:17
198:7 222:23
257:10 267:10
**recordings**
72:18
**records** 24:22
102:5 110:7,8
110:9 141:20
142:3 145:23
**recruiter** 19:20
19:23
**redo** 50:16
**Reeder** 146:21
146:22,23
**refer** 115:4
175:23
**referenced**
200:11,15
**referred** 35:17
197:19 232:11
**referring** 82:10
98:3 153:15
222:18
**refers** 137:10
201:20
**refinishing**
198:16 208:17
**reflect** 47:3,16
77:5 247:6
**reflected** 32:23
33:9
**refuse** 62:2
**refused** 193:23
**refusing** 229:18
**regarding**
188:23 196:12
196:13 205:18
212:1 214:7
217:13 218:12
220:3,6 224:3
225:23 228:14
**registrar** 145:16

145:18,21
146:2 147:11
148:5,7 225:4
**registrars** 148:3
**regulation** 33:7
240:23
**regulations**
47:23 48:6
121:22 141:14
**related** 69:2,6
100:11 101:1,3
101:5 102:11
152:20 207:3
265:13,14
**relates** 213:12
**relations** 130:10
**relationship**
63:5,11 64:2
**relationships**
61:12 62:22
214:18 218:23
**relatives** 12:21
**relevance**
110:22 111:7
**relied** 33:20
**rely** 51:4 85:1
260:14,18
**remark** 169:13
169:19
**remember** 11:15
17:23 21:14
24:11 76:12
137:21 142:15
143:5 196:15
200:23 220:18
**remind** 11:16
**reminded** 216:8
216:9
**reminding**
261:15
**remove** 32:9
**Renae** 187:11
**reorganized**
144:9

**repaired** 251:20
**Repeat** 67:20
118:17
**rephrase** 228:20
**replace** 144:1,4
144:6
**report** 85:15
97:8 98:6
99:20,23 103:6
103:9 110:17
111:20 119:9
119:14 121:13
121:15 123:9
125:3,19,23
196:8 199:8
200:4 203:18
209:12 212:3
214:3,6 223:4
239:14 249:6
250:21,22
251:5,9,18
257:18 258:3
258:12,17,18
259:16 260:3,8
262:14 263:21
264:3,8,10
267:7 268:7
**reportable** 94:4
95:6 99:5,13
99:14 196:22
**reported** 88:20
90:7,12 112:3
116:6 229:21
243:11
**reporter** 5:9,17
10:5,20
**reporting** 94:13
95:5 97:21
99:2 196:14
201:21,23
202:9 266:6
**reports** 97:14,17
130:16,18
131:1,2 135:18

201:12 202:4
212:5 213:2,7
214:11 230:14
243:15
**represent** 10:10
**represented**
77:1
**represents**
272:11
**request** 208:2,4
**requested**
118:12,20
259:19 262:23
263:8
**requesting**
164:19 169:9
236:14
**requests** 107:1,2
**require** 47:21
**required** 41:15
41:18,21,23
47:7 88:19
90:7,12 176:23
178:2 187:2
199:21 202:22
**requirement**
41:6
**requirements**
65:18 151:9
178:14
**requires** 92:4
120:4 163:22
177:15
**requisitions**
212:8 247:4
**reserve** 51:9
**resign** 161:22
162:3,6,8
**resisted** 189:10
191:1
**resisting** 189:5
191:2
**resolution** 249:9
**resolve** 83:4

193:7,11 240:4
251:13
**resolved** 127:2
249:12
**resources**
178:10
**respect** 225:9
**respective** 5:15
226:3
**respond** 68:17
207:5 212:14
221:22 224:10
229:18
**responded**
113:12 208:7
224:11 241:9
**responds** 67:14
67:23 68:6,9
**response** 92:5
199:16,19
203:16 204:20
205:9,12,14
206:12 207:6
207:10,19,21
208:6,12,14
211:4,14
216:16 248:23
250:18,21
**responses** 136:3
136:4 153:15
210:7
**responsibilities**
158:7 159:19
180:1,6 181:5
**responsibility**
31:20 40:15
50:9 60:1
80:22 168:20
168:23 169:2
178:17 181:2
181:15 200:3
215:16 216:21
247:14
**responsible**

# FREEDOM COURT REPORTING

166:10,13,17
167:6 179:1,5
179:11,14,20
**rest** 183:13
**result** 218:7
220:21 272:17
**results** 79:22
89:6,13 91:13
97:18 98:23
141:11 196:13
201:15,18
223:7
**retained** 5:9
**retired** 104:11
114:16 142:16
143:4 146:19
156:22 189:9
**retirement** 24:6
**return** 136:21
**returned** 199:4
**revealed** 198:21
**revenue** 198:13
**revenues** 198:16
**review** 74:3,4
76:11 95:18
97:13 198:20
205:14 214:1,4
215:3 221:21
257:19 265:2
**reviewed** 76:6
205:3 221:23
**re-advertised**
26:13,16
**Rickey** 233:11
237:22
**right** 10:19
15:17 25:17
26:12 29:7
34:17 37:8
39:15 40:9
44:17,20,23
49:18 50:23
51:9 55:15
59:1,6,10

60:23 66:19
67:7,10 68:2
68:19 70:14
73:18 75:10,12
75:13,23 80:9
82:12 85:17,20
86:5,12 89:7
89:14 90:19
91:21 98:4
102:3,17 105:3
106:6 115:3
120:21 121:11
122:7,14 126:2
126:2 128:5,8
128:11,14,20
129:5,8 130:15
140:5,7 143:15
143:21,22
148:10 149:9
151:15 154:13
155:2,15,19
156:3 157:6
161:3 164:9
165:11,19,21
166:8 169:20
169:23 170:2
175:19 176:11
177:5 179:2
181:13 182:6
183:22 184:19
185:10 190:2,8
190:12 191:4
195:17 197:7
197:14,15
207:3 208:18
208:19,23
209:1 223:4,12
223:13 230:4,5
232:23 235:12
235:21 236:16
238:5 239:2,8
239:11 240:12
240:14 241:12
242:22 243:13

243:17 244:4
245:4,15,19
246:12,15
248:5,7,13,16
248:20 250:12
252:10 253:12
253:15 254:5
254:10 255:14
261:16 262:3
262:12 263:16
263:19 266:10
268:5,21 269:2
270:6
**right-hand**
258:6
**riot** 216:11
**Robinson** 146:3
146:10,14
147:10,14,19
147:21 148:12
149:7,15,23
225:3,7 226:1
**Robinson's**
224:15
**role** 30:2 61:11
158:6 244:10
**roles** 159:19
**Ron** 211:4
**Ronald** 85:18
86:22
**Round** 107:15
**rule** 5:1 33:7
240:22
**rules** 5:2 47:23
48:6 49:17
122:6
**run** 165:6,10
188:15 214:21
**running** 162:14
191:9 192:5,7
243:8 263:7

_____
**S**
_____
**S** 5:12,12 7:1 8:7

**SACS** 107:11
**safe** 219:22
**safer** 217:11
**safety** 115:15
215:17
**salaries** 175:1,7
**salary** 150:2
158:9,9,13,19
158:23 159:3,7
159:11,18
175:9,11,16
**Sandy** 137:5
**satisfaction**
209:7
**satisfied** 221:13
**Savage** 21:17
**save** 256:12
**saves** 10:15,16
10:16,17
**saw** 46:13 69:15
70:19 118:21
119:12,21
120:10 121:18
150:5 212:12
245:10 269:17
**saying** 50:5 55:3
74:20 84:17
120:11 149:22
149:23 161:19
169:18 190:5
193:15 203:9
209:8 213:5
242:18 255:22
256:7 266:19
**says** 17:1 60:19
67:21 68:4
70:1,8 80:20
89:8 90:4
98:20 122:21
123:2 124:22
124:23 133:1
141:8 143:13
169:21 198:12
234:23 244:22

260:5 266:15
267:13
**scale** 149:15,21
158:9,9,13
159:1,4,7,16
159:17,20,21
160:1
**schedule** 123:6
123:23 154:10
**scheduled** 109:2
109:3
**school** 14:7,9,16
18:12,14 48:12
66:12 114:22
115:1,5,9
161:5 202:14
265:10
**schools** 107:12
265:18
**scope** 140:18
**second** 27:15,18
29:21 30:3
51:14 58:19,22
59:4 123:1
135:4 188:20
257:10
**section** 49:4,10
89:3,3,4,8 90:8
90:9 97:20
102:15 198:10
199:7 222:17
222:20 265:7
267:7
**security** 114:22
180:19,23
181:3,7,8,10
181:20,21
218:12
**see** 10:19 11:5
24:13 31:21
32:2 34:2 45:3
46:3,15 57:17
69:8 70:9
74:12 80:18

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 87:18 89:9 | 236:14 242:20 | 242:11,16 | 73:4,12,14,17 | 141:16 153:17 |
| 92:12 96:19 | 244:14 252:8 | 243:1,9 | 171:9 266:17 | 154:7 184:6,17 |
| 99:21 109:21 | 264:1 | **shops** 183:18 | **signature** 38:20 | 186:18 197:9 |
| 119:17 123:1,7 | **separate** 42:5,14 | 184:8 252:13 | 44:21 54:9 | 229:15 234:12 |
| 125:17 136:11 | 172:13 | **short** 75:4 | 58:13,17 59:7 | 238:7 243:11 |
| 168:21 178:18 | **September** | 142:13 176:16 | 78:23 211:9 | 244:17 245:10 |
| 203:20 216:6,7 | 37:14 87:6 | **Shorthand** 5:17 | **signed** 36:5 | 246:4,9 247:20 |
| 235:2 244:21 | 88:3 93:15 | **shortly** 156:22 | 37:10 38:18 | 255:11,12,17 |
| 252:12 254:17 | 161:12 241:23 | **shot** 220:8,10 | 40:6,10 52:14 | 255:21 258:5 |
| 264:12 | 268:22 | **show** 28:9 30:23 | 53:12,17 73:2 | 265:20 |
| **seeing** 46:8 | **series** 43:15 | 35:1 36:19 | 79:9,12,13 | **sit** 192:15 |
| 121:22 | 196:11 | 39:6 51:20 | 109:19 250:17 | **sitting** 217:2 |
| **seek** 62:15 | **serious** 195:5 | 52:19 56:10 | **signing** 10:22 | **situated** 226:6 |
| **seeking** 233:21 | 206:1 213:4 | 80:2 92:23 | 11:6 | **situation** 127:1 |
| **seen** 56:17 70:15 | **serve** 21:22 25:7 | 95:2 109:8 | **signs** 73:6 | 134:9,17 |
| 70:16,18 71:6 | 33:14 206:19 | 115:19 118:4 | **similar** 200:12 | 152:22 181:9 |
| 75:9 77:22 | **served** 19:5,11 | 118:21 119:6 | 226:11 239:15 | 181:11 200:12 |
| 110:18 116:1 | **serves** 155:16 | 119:12 120:10 | 266:6,7,7 | 267:22,23 |
| 124:7,11 | **services** 2:16,22 | 120:12 137:3 | **similarities** | **situations** 130:7 |
| **seldom** 138:3 | 4:19 14:22 | 145:7 196:7 | 265:17,21,21 | **six** 25:23 62:5 |
| **selected** 22:14 | 16:11,12 18:5 | 204:13 222:16 | **similarity** | 163:5,16 164:2 |
| 265:5,5 | 28:14 145:17 | 233:10 234:1 | 225:23 | 269:6 |
| **selections** 23:10 | 159:5 167:12 | 235:16 236:11 | **similarly** 226:6 | **sixty** 148:23 |
| **self-confidence** | 213:15 | 237:20 239:6 | **simply** 171:6 | **sixty-four** |
| 38:8 | **serving** 19:4 | 257:23 269:13 | **sir** 11:17 13:2 | 198:18 208:16 |
| **send** 32:6 | 26:18 | **showed** 76:14 | 15:2 18:2 | **sixty-seven** |
| 149:19 205:11 | **set** 158:19,20 | 77:1 83:14 | 21:14 23:15 | 148:18 |
| 261:8,14 | 189:18 | 88:17 120:13 | 25:2 38:5 | **size** 161:4 171:6 |
| **sending** 210:2 | **sets** 49:17 | 263:21 | 49:16 50:14 | 186:12 |
| 245:14 252:3 | **setting** 161:16 | **showing** 109:18 | 51:23 55:5,12 | **skills** 40:1 |
| 264:5 | 161:20 | 109:21 171:9 | 55:15 57:9 | **slipped** 248:1 |
| **senior** 142:18,20 | **seven** 62:20 | **shown** 261:21 | 58:21 59:4 | **slot** 25:16 |
| **sense** 132:11,17 | 149:3 | 262:8 | 60:7 80:16 | **slow** 261:23 |
| 152:2 161:23 | **seventeen** 215:4 | **shows** 270:2,4 | 81:4 84:23 | **small** 138:9 |
| 162:2,5,12 | **seventy-five** | **shrewd** 269:22 | 85:11 88:16 | 171:8 176:14 |
| **sensitive** 67:13 | 241:2 245:9 | **Shubert** 21:16 | 91:9 94:17 | **Smith** 13:5 |
| 67:18,22 68:5 | **seventy-six** | 23:16 | 97:16 99:19 | **social** 107:18,21 |
| 68:8,16 254:18 | 269:7 | **Si** 108:3 | 100:15 102:1 | **sociology** 14:11 |
| **sent** 83:16,23 | **sexual** 173:16 | **side** 185:1 | 102:21 112:2 | **solely** 212:2 |
| 109:22,23 | **Shannon** 169:10 | **sign** 10:19 11:5 | 113:16,18 | **somebody** 35:12 |
| 138:7 165:23 | **sheet** 73:19 | 11:8 37:12,19 | 115:17 121:21 | 86:11 104:14 |
| 166:2,3 168:22 | **shoes** 172:8 | 44:10,13 52:8 | 122:15 123:15 | 112:3 149:20 |
| 168:23 169:1 | **shootings** 220:1 | 52:11 53:5,16 | 123:21 125:6 | 241:15 |
| 205:4 214:1 | **shop** 199:3 | 54:8 55:14 | 134:21 139:22 | **somebody's** 41:9 |

soon 187:5
213:16
sorry 45:13
77:21 78:17
162:13
source 174:19
175:2,7
sources 213:1
south 12:18 14:8
Southern 107:11
space 183:5
184:5
spark 248:4
Sparks 13:4,11
speak 151:8
special 104:8
219:11
specific 49:3,10
60:9,10 61:6
specifically
94:15 205:11
speculating
259:9
spelled 187:12
spend 151:2
256:12 270:17
spending 65:4
102:12 152:19
152:20 270:3,5
270:5
spent 65:1
150:21 151:10
151:12,16
152:2,3,5
square 186:10
staff 66:17 76:2
83:6 174:22
staff's 151:6
stage 69:11
stamp 212:6
standard 32:9
44:19 53:4
standards 36:11
52:5 57:2

60:22 82:16,20
83:1 86:8
140:14 260:5
standpoint
65:21
start 87:22 93:1
194:19 247:21
started 20:19
22:21 27:13
47:5 81:10,12
82:3,4 123:19
144:14 230:2
257:1 268:17
starting 14:6
222:22
starts 80:4
start-up 21:2
state 1:12,16
2:11,16,22 3:5
4:8,14,20
10:16 11:17
12:2,4 20:8
27:21 31:1
34:11,14 42:2
48:8,10,16
49:8,16,22
54:17,19 64:16
65:18,23 66:1
77:23,23 88:2
101:15 103:15
104:11,18,21
104:22 105:1
105:16 127:14
128:3 131:20
141:4,6,20
149:4 163:22
164:16 166:7
168:4 177:1,14
177:15,19
178:4 195:19
195:21 201:2,3
201:6 202:23
215:15 217:18
249:7 257:20

260:17 269:4
272:3
stated 61:21
62:15 75:8
77:5 119:11
162:1 170:17
172:3 222:13
statement 40:23
47:1 66:10,14
89:8,22 90:4,8
99:10 170:10
179:13,18,19
251:23 252:2
statements 62:1
80:1 81:9,12
94:7 95:9,11
95:15 119:18
119:23 120:9
120:13 141:10
170:12,14
197:6
states 1:1 2:1 4:1
137:13
statewide
127:20
stating 119:12
Staton 128:17
128:18 130:9
130:19 131:3
172:22 173:2
status 69:9
stay 27:3,18,19
257:7
stays 102:18
181:18
stenotype 272:8
step 62:18
103:12 125:14
160:2 206:1
steps 121:11
125:4,13,18
159:15 204:6
205:2 209:19
217:5 249:7,17

STIPULATED
5:13,22 6:8
stipulations
10:6
stop 210:1 239:9
246:3,4,5,6,7
246:14 247:11
247:12 255:20
256:8
stopped 248:9
stopping 111:19
stops 122:3
storage 184:20
STREET 7:11
strict 86:16
strike 48:15
string 169:10
strive 160:19,21
strong 204:15
205:22 207:8
stronger 40:3
structure 30:6
30:10
structured
30:16,17
student 2:15,21
4:18 14:22
19:12 21:21
128:1,6 145:17
167:12 170:19
181:6,17 184:8
213:15 218:23
229:8 265:15
students 1:16
21:23 22:1,10
22:12 23:2,6,7
23:8,12,14,18
24:2,3,6,16
25:1 27:2,4
28:14 104:13
145:17 146:20
147:17,22
157:14,16,16
159:4 181:4

182:7,15 184:2
216:3,22 219:4
229:19
student's 229:23
study 14:17,23
15:3,7,20
stuff 203:5
212:9 246:7
247:13 254:16
255:6 257:8
subject 216:12
submit 109:20
164:11,15,17
202:5 204:18
204:23 207:9
submitted 205:1
205:9 206:10
206:14 229:19
submitting
125:3 266:23
subordinate
134:16
subordinates
134:5,18
subsequently
26:10 143:23
substantially
148:11
subtitle 198:5
sufficient
214:21
suggested 207:6
SUITE 7:11
suits 10:15
215:23
summary 89:5
89:12 91:13
97:18 98:23
196:12 197:23
201:14
superior 134:4
134:15,18
supervised
231:10 232:9

| | | | | |
|---|---|---|---|---|
| **supervises** 29:17 | 258:23 259:2 | 199:18 223:10 | 2:23 3:5 4:9,14 | 231:22 |
| 243:15 256:8 | 259:10 264:9 | 242:11,15 | 4:20 12:2,4 | **terminate** 218:6 |
| **supervising** | 264:11 265:7 | 272:7 | 31:2 42:3 48:8 | **termination** |
| 29:15 | **surplus** 160:13 | **takes** 112:23 | 64:16 77:23 | 219:5 |
| **supervision** | 160:22 161:4 | **talk** 11:4 54:6,7 | 78:1 88:2 | **terms** 45:21 |
| 114:21 | 162:17,20,21 | 91:4 111:3,8 | 115:2,9 127:14 | 136:12 203:7 |
| **supervisor** | 163:8,19,20 | 125:3 136:9 | 141:20 177:14 | 215:12 226:1 |
| 19:10 67:5,9 | **surprised** 271:1 | 180:23 248:11 | 194:23 195:3,5 | **test** 102:9,15,15 |
| 159:22 201:3 | **suspension** | **talked** 156:1 | 202:15 215:15 | 139:21 |
| **support** 2:15,21 | 182:16 | **talking** 33:4,6 | 217:18 257:21 | **testified** 10:2 |
| 4:18 28:14 | **sworn** 10:2 | 34:9 37:5 | 264:21 265:3 | 63:16 210:15 |
| 69:12 84:7 | **Sylvia** 72:11 | 39:14 53:22 | 269:4 | 226:5 |
| 145:17 159:5 | **system** 12:1 | 55:10 66:20 | **technique** 83:11 | **testify** 225:23 |
| 167:12 213:15 | 34:21 41:6 | 75:14 80:11 | 216:1 | **testimony** 5:6 |
| **supports** 40:17 | 47:6,20 48:1,7 | 81:18 89:15 | **tell** 20:21 31:9 | 143:16 272:12 |
| **supposed** 33:16 | 54:18 186:16 | 100:13,20 | 31:10 58:5 | **tests** 139:23 |
| 33:19 38:11 | 187:2 188:16 | 114:11 116:13 | 62:10 104:5 | **thank** 33:12 |
| 84:23 107:2 | 189:1,2,5,13 | 119:22 129:1 | 136:7,17 | 76:11 234:23 |
| 125:15 191:18 | 189:14,18 | 131:13 141:4 | 148:20 154:10 | **theoretically** |
| 203:3 253:17 | 190:10,10 | 143:19 152:13 | 162:16 166:4 | 30:16 |
| 270:10 | 191:8,9,13 | 152:18 162:11 | 168:11 172:11 | **thereto** 6:7 |
| **sure** 15:21 27:18 | 192:3 215:21 | 171:5 179:6,9 | 216:23 217:1,3 | 272:9 |
| 33:21 37:18 | 219:3 265:11 | 184:1 191:1 | 253:20 254:1 | **they'd** 252:21 |
| 45:7,9,22 | ———————— | 195:1 201:22 | 256:7 262:9 | **thing** 11:11 |
| 47:22 49:6 | **T** | 202:2,3,6 | **telling** 63:19 | 89:15 141:2 |
| 50:9 61:22 | **T** 3:1 5:12,12 | 203:6 216:23 | 76:21 77:2 | 147:13 153:8 |
| 65:18,22 72:4 | 8:7 272:1,1 | 242:1 246:21 | 84:7 125:16 | 160:15 172:11 |
| 72:19 74:14 | **Table** 107:15 | 250:20 254:16 | 143:5 168:6 | 211:12 237:13 |
| 76:4 80:8 | **take** 10:14 15:13 | 255:10,15,17 | 203:21 205:2 | 239:13 256:14 |
| 85:23 87:9 | 20:18 45:17 | **talks** 170:5 | 228:9 236:23 | 263:20 264:13 |
| 89:15 92:9 | 55:1 75:1,7 | **tape** 11:3 74:3 | 237:1 240:17 | **things** 17:2 54:7 |
| 96:4 100:19,23 | 81:3,14 94:17 | **tapes** 73:3 74:6 | 246:13 | 65:10 74:21 |
| 101:13 105:17 | 94:20 95:19,21 | **taping** 72:14 | **tells** 124:22 | 79:23 80:15 |
| 113:17 114:8 | 96:4 126:23 | **task** 86:19 | **temporary** | 83:9 133:16,17 |
| 122:5,13 125:9 | 176:13 204:5 | **taught** 147:14 | 185:13 | 151:2 160:7 |
| 125:12 127:10 | 205:3,22 | **teachers** 255:20 | **ten** 12:6,8 15:19 | 169:16 176:23 |
| 127:13 139:4 | 209:18 217:4 | 255:22 | 64:13 69:23 | 177:16 178:16 |
| 140:3,7 141:22 | 221:13 224:13 | **team** 70:1,3 | 218:19 257:6 | 180:20 202:23 |
| 144:20 150:13 | 240:23 241:2 | 215:3 254:6,7 | 270:18 | 206:21 212:12 |
| 151:6,16 | 241:15 268:20 | 254:9,10,12,22 | **tends** 38:9 40:1 | 214:16 216:13 |
| 176:15 205:23 | **taken** 5:6,16 | 255:1,3,4,7 | 69:1 82:5,6 | 217:6 218:22 |
| 218:18 222:8 | 15:15 75:5 | **teams** 214:2,4 | **tennis** 172:8 | 219:2,20 |
| 225:17 237:13 | 97:5 125:4 | **technical** 1:12 | **ten-year** 135:18 | 245:11 250:3 |
| 254:3 258:20 | 142:14 176:17 | 1:17 2:11,17 | **term** 93:16 | 254:9 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **think** 24:20 | 218:6 | 211:1,2 213:6 | 253:20 254:2 | 272:10 |
| 25:23 28:11 | **three** 10:15 22:6 | 213:11 222:6 | **tolerance** 181:22 | **transition** 87:9 |
| 31:5 33:11 | 23:19,23 24:14 | 222:15 224:12 | **tonight** 257:7 | **Transitional** |
| 59:5 63:20 | 24:16 60:19 | 230:6 233:3 | **Tonya** 170:7 | 167:13 |
| 71:5 79:11 | 72:11 90:9 | 243:5 245:3,13 | **tool** 33:14 | **travel** 152:10 |
| 83:20 87:4 | 94:22 95:1 | 249:3 251:4 | **top** 30:11 73:19 | **treated** 227:6,12 |
| 91:11 93:13,18 | 114:9 122:21 | 261:8,13,13 | 74:20 142:22 | **trial** 6:5 |
| 96:16 97:15,23 | 159:21 160:3 | 263:1,1,5,8,9 | 216:5 231:20 | **tried** 83:4 |
| 98:20 101:19 | 163:5,16,22 | 267:13 271:4 | **tough** 86:19 | 193:22 215:23 |
| 104:7,14 | 184:18,21 | **timeliness** 222:4 | **towers** 184:13 | **tries** 194:4 262:7 |
| 112:17,21 | 186:10 187:8 | **timely** 222:12 | **town** 232:5 | 262:9 |
| 113:10 115:8 | 187:15 192:16 | 223:8,19,21 | **tractor** 100:8,12 | **Trimble's** 170:7 |
| 117:20 121:7 | 193:5 206:4 | 242:3,3 | 101:1 199:2,5 | **trouble** 150:8,21 |
| 129:14 140:10 | 240:21 241:14 | **times** 29:21 | **trade** 114:22 | 195:9 252:20 |
| 140:11 142:1 | 241:16 | 86:18 108:21 | 115:1,5,8 | 253:1 |
| 156:19 164:1 | **tight** 169:15 | 108:23 135:13 | **trail** 255:16,18 | **true** 47:8 73:7 |
| 171:17 175:21 | 170:6 | 137:17 193:5 | **trained** 69:18 | 176:1 207:19 |
| 176:8 179:17 | **tighten** 252:4 | 256:3 | 126:13,15 | 207:20 212:18 |
| 179:18 183:7 | **Tim** 105:9,23 | **timing** 251:10 | 134:1 151:19 | 236:7 272:11 |
| 186:6 187:7 | 106:4 146:3,10 | **title** 37:15 143:2 | **training** 34:4 | **Truman** 122:3 |
| 193:9,18 201:9 | 224:15 225:3,7 | 145:3 154:20 | 66:14 126:20 | **truth** 76:21 77:3 |
| 214:10 216:20 | **time** 6:5,5 10:16 | 155:3 175:22 | 127:6 153:13 | 136:18 |
| 217:6 218:20 | 10:17 15:11 | 176:6 | 153:18 194:15 | **try** 11:15,16 |
| 224:23 239:7 | 22:18 24:21 | **titled** 156:20 | **transcribed** | 79:22 194:1 |
| 245:10 254:19 | 25:20 26:2,3 | **titles** 158:5 | 272:9 | 204:13 216:21 |
| 259:7 261:12 | 27:15,16,17,19 | **today** 66:12,21 | **transcript** 5:5 | 217:4,9,11 |
| 262:13 263:20 | 28:9 29:11 | 66:22 84:15 | 11:3 35:6 | 219:18 222:7 |
| 264:12 265:6,9 | 32:19 36:12 | 143:17 148:23 | 36:18 39:5 | 247:18 254:13 |
| 267:19 269:18 | 37:16 64:15 | 152:14,16 | 43:23 51:19 | 260:22 |
| **thinking** 200:19 | 70:20,20 71:4 | 168:6 216:3 | 52:18 56:9 | **trying** 54:17 |
| **third** 124:21 | 79:17,21 84:10 | 254:11 | 71:16 78:12 | 83:7,10 135:12 |
| **Thomas** 156:19 | 94:17 96:10 | **told** 17:3,3 47:6 | 93:22 97:11 | 163:21 164:2 |
| 156:22 | 100:18 110:10 | 78:19 80:22 | 106:23 113:4 | 192:20 206:21 |
| **thought** 11:1 | 111:1 114:20 | 84:20 106:7,8 | 115:23 129:22 | 206:22 207:1,2 |
| 23:8 125:10 | 115:12 118:18 | 118:7 125:10 | 137:2 145:6 | 209:16,17 |
| 138:21,22 | 121:3 130:8,8 | 132:7,19 133:9 | 233:9 234:5 | 210:1,3 241:6 |
| 139:1 162:13 | 134:11,20 | 136:15 138:21 | 236:1,10 | 241:10 256:5 |
| 207:7 209:16 | 135:12 139:11 | 138:22 143:8 | 237:19 238:18 | **turn** 70:7 198:3 |
| 249:3,4 268:13 | 139:14 148:16 | 163:17 187:4 | 239:5,19 | **turned** 41:13,16 |
| **thousand** | 148:17 151:2 | 192:17 200:21 | 241:21 242:7 | 106:11 200:13 |
| 148:18,23 | 151:23 152:8 | 203:23 205:4 | 243:21 261:19 | **turning** 200:19 |
| 186:10 198:17 | 155:10,12 | 206:16,18 | 262:6 269:12 | **Tuskegee** 14:9 |
| 208:15 269:6 | 156:14 191:5 | 207:7 212:11 | 272:12 | 14:20 18:20,23 |
| **threatened** | 194:5 209:15 | 221:23 231:10 | **transcription** | 19:16,18,23 |

# FREEDOM COURT REPORTING

20:6
**Tutwiler** 128:12
  173:4,6,14
  244:7
**twenty** 266:20
**twenty-eight**
  88:17 89:1,12
  89:21
**twenty-five**
  241:5
**twenty-seven**
  196:11 206:5
**twice** 214:2
  258:16
**two** 17:9,10
  28:18 30:21,22
  39:19 59:21
  60:4,8,9 85:12
  85:13 89:4,8
  90:8 94:20
  104:12 110:14
  110:15 119:17
  120:8,13 124:5
  135:6 158:1,3
  159:12 161:7,8
  161:9 162:18
  162:23 163:2,4
  163:6,7,18
  186:8 188:18
  206:21 214:1
  214:16 222:21
  231:19 247:2
  263:23 264:5
  269:5,18,19
**two-year** 104:12
  182:17 187:3
**type** 97:19 98:23
  164:4 169:16
  217:5 250:8
**typed** 73:14
**types** 72:8 212:8
**typical** 16:14
**t's** 151:7

**————— U —————**
**U** 5:12
**uh-huh** 11:12
  105:14 110:1
  123:5 177:9
**ultimate** 212:13
  219:18
**ultimately**
  204:18 207:9
**uncle** 114:7
**uncomfortable**
  139:2
**understand**
  33:21 49:6
  125:6 128:1
  139:5 141:22
  158:17 164:6
  175:9
**understanding**
  41:22 43:9
  112:16 113:11
  140:9 203:8
  209:3 214:22
  221:3 223:6
  225:8 230:17
  249:2
**understood**
  174:16
**unfavorable**
  215:12,13
**unfortunately**
  50:21 51:4
**unified** 54:18
**unique** 128:2
**UNITED** 1:1 2:1
  4:1
**University** 14:10
  14:18 15:1,4,6
  18:19,20,23
  20:8
**unqualified**
  87:15,18,19
  88:11 89:18
**untimely** 223:16

224:3
**unusual** 138:5,6
  138:10,13
  262:8
**update** 32:8
**updated** 31:12
  32:2
**upper** 258:6
**use** 32:14 70:11
  70:22,23 71:19
  72:21 78:6,8
  120:16 202:14
  203:2 211:10
  216:1 260:23
**Usual** 10:5
**usually** 15:18
  32:17 86:10,15
  102:17 126:11
  140:19 159:13

**————— V —————**
**vacation** 199:3
**vague** 33:3
  53:22 69:16
  118:16
**validated** 203:22
**Valley** 20:20,22
  21:5,18 22:9
  26:23 155:21
  156:2
**valuable** 38:12
**various** 19:3
  176:10,23
  178:19 180:2,6
**vary** 145:22
**vehicle** 101:17
**vendor** 65:8
  248:6
**vendors** 213:5
  267:1
**verbiage** 201:17
**vice-chancellor**
  206:16
**vice-president**

30:5 264:13,18
  264:23
**violate** 255:23
**violated** 200:16
  200:17
**violates** 255:3
**violating** 238:1
  255:20 256:9
**virtue** 181:6
**visited** 131:11
**voice** 126:6,10
  126:17,20
  127:2,9,11
**vs** 1:8 2:7 4:7

**————— W —————**
**W** 7:9
**wait** 65:16 111:2
  256:20
**waiting** 162:14
**waive** 10:21
  11:6 124:5,9
  124:14
**waived** 6:10
  124:6
**want** 11:4,5,14
  25:10 30:23
  35:1 38:3
  51:20 52:19
  56:10 57:10,15
  61:22 64:11
  66:2 79:3 81:1
  92:15,18 94:22
  95:18 109:8
  112:22 132:15
  140:12 162:7
  178:1 196:7
  220:16 233:17
  241:22 254:7
  254:10 257:23
  270:18,22
**wanted** 27:18,19
  92:9 197:10
  221:21

**wanting** 151:2
**wants** 132:9
  270:13
**wardens** 216:8
  218:2,6
**warnings** 210:2
**Washington**
  168:3 213:12
**wasn't** 47:17
  59:4 77:2
  83:14,18 84:21
  91:2 96:9
  100:17 101:20
  110:15 123:16
  130:5 134:12
  135:14,22
  144:1 147:19
  148:19 232:22
  237:5 241:13
  245:9 264:8
**wasted** 270:3
**way** 16:14 30:15
  43:1 62:12
  93:3 94:10
  105:15 108:13
  115:18 123:19
  162:15 165:13
  170:17 172:2
  177:11,12
  187:5 202:10
  206:17 212:14
  218:13 252:22
  255:9 268:16
  270:7
**ways** 62:15
  94:20
**weak** 132:7
  133:10 136:8
  231:11
**weaken** 134:5
**weakness** 97:21
  98:4 99:2,7,13
  99:15 101:22
  135:23 153:9

# FREEDOM COURT REPORTING

Page 302

153:10 196:19
202:9 266:12
266:13 267:2
267:21 268:2,4
268:8,9,13
**weaknesses**
62:17 83:9
91:23 94:3,5
94:14 95:5,8
197:1 267:8
**weapons** 218:22
**wear** 129:12,18
130:1 172:8
**wearing** 170:5
**week** 109:6
213:13
**weeks** 102:19
**Weldon** 5:4,17
272:21
**went** 22:19
24:13 27:4
117:9 156:7
171:7 199:3
**weren't** 93:14
169:15 212:21
245:2
**West** 16:6,8,17
16:20
**we'll** 45:20
46:11 49:2
50:15 80:7
87:22 92:20
93:1,1,6,7,8,9
93:10,11,12,15
95:20 96:1,4
115:19 257:6
**we're** 34:6,9
39:14 50:20
80:8 81:18
89:15 90:22
91:3 97:6
100:20 111:3,5
111:7,18,18
116:13 122:17

122:19 152:18
164:18 165:2
203:3 213:14
216:3 254:16
255:10,15,17
263:15 266:4,7
267:19,20,23
270:4 271:5
**we've** 10:13
31:14 65:6,9,9
80:3 83:8,8
93:3 114:8
135:19 145:7
152:23 168:10
172:23 173:5
193:22 215:2,5
245:23 251:14
**white** 170:21
174:14 227:4,8
227:14,20
**White's** 171:1
**Willard** 205:13
215:9
**willingly** 67:6
**Wilson** 1:13
2:12 4:15
28:13 63:7,11
117:2 132:1
137:12 144:23
147:18 170:4,6
229:2,7,17
230:8,13
231:11,17
244:8 253:7
**Wilson's** 157:7
181:2,14,17
231:9
**wise** 272:16
**Wisman** 72:12
73:22
**withdraw** 55:17
**witness** 51:10
89:4 117:17
188:21 225:22

272:13
**witnessed**
130:14
**women** 128:22
129:7,12 170:5
215:14
**Wood** 72:13
73:22 170:4
**word** 13:20
32:15 49:13
69:15 153:4
191:2 206:11
**wording** 56:4
58:2
**words** 114:15
132:22 170:20
170:20 240:8
**work** 18:8 20:21
31:16 33:15
63:16 67:14,19
67:23 68:17
100:9,18 102:7
104:7,22
105:20,23
106:14,15
114:20 125:21
135:5,7,15
136:21 144:21
147:12 170:15
172:8 183:4
191:23 192:9
192:20 193:10
193:21 194:1,7
194:12 198:13
198:20,22
199:4,5 200:17
201:1 202:7,8
202:12,13,18
203:7,13,17
206:7 207:4
208:18 215:18
226:23 227:19
232:14,18
233:2,18 235:6

235:14,19,20
236:13 238:23
239:8,21,23
240:3 242:2
245:1,7 251:20
251:21 252:14
254:5,19 256:2
266:3,5,21
**worked** 21:21
87:1 131:11
156:2 192:18
215:4 247:23
267:17
**worker** 18:4,9
38:13 193:9,16
**workers** 38:9
40:2
**working** 20:19
62:21 63:4,12
64:2 106:12
128:22 129:4
144:15 192:19
193:1,6 232:3
267:22,23
**works** 38:7 42:2
61:1 70:2
105:10,11
201:2 254:23
**world** 184:3
**worry** 219:15
253:21
**worse** 190:10
**wouldn't** 59:14
65:14 84:19
138:10 140:4
142:8 149:22
169:5,16
170:13,14
171:15 175:7
183:14 184:4
184:10 186:5,6
189:9 194:18
218:4 246:10
261:11 263:3,4

266:3 268:1
270:19
**Wright** 147:4
**write** 139:3
**write-up** 139:13
**writing** 71:18,20
83:7 233:20
234:7 240:3
**writings** 58:2
**written** 47:19,21
55:6,7,8 62:6
71:22 84:13
137:18 186:2
191:21 211:18
245:7 260:3,9
**wrong** 63:18
89:20 98:8
106:5 112:4
142:4 143:14
168:18 177:6
180:10 253:17
**wrongful** 64:18
**wrote** 221:20
234:8,16,19
248:22 254:13

**X**

**X** 8:1,7

**Y**

**year** 15:19 19:1
20:14 36:3
39:11 47:7,21
52:6 53:1
70:20 71:1
79:4,8 85:9,14
90:18 104:12
108:21 160:10
162:17 163:10
163:22 164:3
165:6,20,22
166:5,5 260:22
261:20,23
269:1
**yearly** 41:7 42:7

# FREEDOM COURT REPORTING

42:23
**years** 12:6,8
17:9,10 22:5,7
23:20,23 24:15
24:17 64:13,13
85:12,13
129:10 149:3
159:14 215:4
216:7 218:19
261:22 268:20
**year's** 153:2
**yelling** 126:4
161:13
**young** 216:5
219:11
**Youth** 114:21
167:13
**y'all** 28:9 34:13
94:21 95:17
142:11 167:9
182:11 186:18
193:20 240:23
247:16 263:6
264:13,17
265:15 267:15
267:22 268:13
268:14,16
269:3 270:2

**0**
**01** 92:23 93:7,8
**02** 93:1,6,7
**03** 52:15 92:17
93:3,6
**04** 53:6,7,11
79:12,13 84:19
84:20 92:17
93:3 97:6,7,15
98:16,19,20,21
100:15,22,23
260:4
**05** 84:14 96:11
96:14 97:6,8

97:15 98:16,19
98:20,21
100:16,22,23
**06** 96:12,14

**1**
**1** 8:9 31:6 34:10
35:2,5,12,16
35:18,20 80:5
80:5 92:18
**1st** 53:6,7,11
79:12 83:17
84:1 88:2
260:5
**10** 8:4,18 93:7
93:20 97:1
141:1 254:19
258:8 259:17
**10th** 260:4
**106** 8:20
**11** 93:8 97:1
**113** 8:21
**116** 8:22
**12** 93:8 97:1
**12th** 199:4
**129** 8:23
**13** 93:9 97:2
258:2
**13th** 109:12
110:11
**137** 9:1
**14** 93:10 97:2
**14th** 57:5,13
79:15 84:3,4
109:12 110:13
110:16 228:6
229:13
**145** 9:2,3
**15** 5:3 39:12
93:12 97:2
**15th** 84:2 109:12
**1505** 5:19 7:5
**16** 8:18 93:12,20
97:2

**16th** 109:13
112:20 137:6
242:10
**17** 8:19 97:7,10
98:19
**17th** 112:18,20
112:23 113:6
113:11,13,19
113:20
**1743** 11:20
**18** 8:20 106:22
109:9
**18th** 234:6 235:9
237:23
**19** 8:21 112:23
113:3 233:12
**196** 8:5
**1972** 14:20 18:7
19:16
**1974** 22:21
**1975** 15:16
**1982** 23:21
**1988** 5:3
**1996** 12:7 25:10
36:4,13 38:18
87:3
**1997** 37:4 38:20
71:3
**1998** 32:23 33:8
39:12 80:20
130:1
**1999** 148:14

**2**
**2** 8:10 36:17,20
57:16,18 59:3
59:8 122:18,19
222:19
**2nd** 37:14
**2:06-CV-796-...**
4:8
**2:07-CV-21-...**
2:8
**20** 8:22 115:20

115:22
**20th** 109:22
**2000** 45:4 46:4
84:1 93:8,9
132:13
**2001** 45:4 46:4
133:19 233:12
234:6 235:7,10
242:10
**2002** 31:13 33:1
33:9 43:20
44:9,19 54:22
55:9 82:14
91:11 136:6
235:17 236:3
237:23
**2003** 52:7 54:14
54:23 55:9
82:19 88:3
90:14,15 91:11
163:6 196:7
197:16
**2004** 53:2 54:14
79:8 82:1 83:1
83:2,17,17
84:1 87:22,23
88:3 90:13,14
90:15 94:1
163:7 196:7
197:17 238:20
240:1 258:8
259:17 260:5
260:12 261:22
269:17
**2005** 57:5,13
70:21 79:13,15
81:21 83:3,18
84:5,6 198:21
199:6 242:1
243:23 261:22
**2006** 109:15
137:6 228:6
229:13 268:23
**2007** 5:7,21

**21** 8:23 129:21
**21st** 198:21
199:6
**22** 9:1 137:1,4
**22nd** 235:17
241:23
**23** 9:2 145:5,8
**231** 8:4
**233** 9:4
**234** 9:5
**236** 9:6,7
**237** 9:8
**238** 9:9
**239** 9:10,11,12
**24** 9:3 145:5
**24th** 240:1
**242** 9:13
**243** 9:14,15
**25** 9:4 233:8,11
234:9,9,13
**25th** 243:23
**26** 9:5 234:2,4
**26th** 53:18 79:13
**261** 9:16
**262** 9:17
**269** 9:18
**27** 9:6 235:23
**27th** 5:6,21
238:20
**28** 9:7 236:9,12
**28th** 37:4
**29** 9:8 237:18,21
**29th** 109:19

**3**
**3** 8:11 39:4,7
82:11
**3rd** 44:9,18
**30** 9:9 238:17,22
**30th** 87:6 88:3
268:23
**31** 9:10 239:4,7
**31st** 52:15 199:4
**32** 9:11 239:18

# FREEDOM COURT REPORTING

Page 304

| | | |
|---|---|---|
| **33** 9:12 241:20<br>241:23<br>**34** 9:13 242:6<br>**35** 8:9 9:14<br>243:20<br>**36** 8:10 9:15<br>243:20<br>**36066** 11:21<br>**36104** 7:12<br>**36107** 7:6<br>**37** 9:16 261:18<br>261:21<br>**38** 9:16 261:18<br>261:21<br>**39** 8:11 9:17<br>262:5,8 | **7**<br>**7** 8:15 56:8,11<br>57:4,22 58:9<br>58:14 67:2<br>78:18 79:4,7<br>81:19,20 84:2<br>**7-27-98** 40:10<br>**70's** 85:22<br>**71** 8:16 14:14<br>**72** 20:3<br>**73** 20:3,15<br>**74** 15:11<br>**75** 15:12 20:15<br>20:16,16,18,19<br>24:14<br>**78** 8:17 24:15<br>**79** 24:15 | 93:23 97:15<br>**98** 40:7 43:19<br>82:11 93:10,11<br>**99** 45:4 46:4<br>93:9,10 149:2 |
| **4**<br>**4** 8:12 43:22<br>44:2 55:11,13<br>55:20 82:14<br>**40** 9:18 269:11<br>269:14<br>**43** 8:12 | **8**<br>**8** 8:16 71:13,15<br>75:7<br>**80's** 24:18,19<br>**81** 24:17<br>**82** 24:17<br>**83** 23:21 | |
| **5**<br>**5** 8:13 51:18,21<br>54:13 55:11,13<br>55:20 82:19<br>**5th** 40:7<br>**5(d)** 5:1<br>**51** 8:13<br>**52** 8:14<br>**56** 8:15 | **9**<br>**9** 8:17 78:11<br>93:4 97:1<br>196:7 207:13<br>232:11 244:21<br>250:23<br>**9-20** 38:19<br>**9:30** 5:21<br>**904** 7:11<br>**93** 8:18<br>**94** 96:7<br>**95** 87:5 93:14<br>96:7,8<br>**96** 27:9,11 38:19<br>43:18 87:6<br>93:12,15 96:8<br>**97** 8:19 37:14<br>43:19 93:11,12 | |
| **6**<br>**6** 8:14 52:17,20<br>58:1,10 79:3,4<br>79:6,7,11 80:6<br>259:23<br>**60** 7:11<br>**620.02** 122:12<br>**65** 12:20,21<br>**67** 14:17 | | |