## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **BONITA J. OWENSBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. CV 2:06 CV796-WKW** |
| | ) |
| **J.F. INGRAM STATE TECHNICAL** | ) |
| **COLLEGE; J. DOUGLAS** | ) |
| **CHAMBERS INDIVIDUALLY** | ) |
| **AND IN HIS OFFICIAL CAPACTIY** | ) |
| **AS PRESIDENT OF J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE;** | ) |
| **AND JAMES WILSON,** | ) |
| **INDIVIDUALLY AND IN HIS** | ) |
| **OFFICIAL CAPACITY AS DEAN** | ) |
| **OF STUDENTS AND SUPPORT** | ) |
| **SERVICES AT J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE,** | ) |
| | ) |
| **Defendants.** | ) |

## MOTION FOR SUMMARY JUDGMENT
## DISCOVERY ATTACHMENTS

# FREEDOM COURT REPORTING

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5   JULIE GIVENS and MONICA )
 6   GREENE,            )
 7        Plaintiffs,  )
 8   vs.            ) CASE NUMBER:
 9   DOUGLAS CHAMBERS,    ) CV:2-06-CV-852-ID
10   Individually, and in his )
11   capacity as President of )
12   INGRAM STATE TECHNICAL  )
13   COLLEGE; JAMES WILSON,  )
14   Individually, and in his )
15   capacity as Dean of    )
16   Students of INGRAM STATE )
17   TECHNICAL COLLEGE,     )
18        Defendants.   )
19
20
21
22
23
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5   BARBARA HENDRIX,        )
 6        Plaintiff,   )
 7   vs            ) CASE NUMBER:
 8   DOUGLAS CHAMBERS,    ) 2:07-CV-21-MHT
 9   Individually, and in his )
10   capacity as President of )
11   Ingram State Technical )
12   College; JAMES WILSON, )
13   Individually, and in his )
14   capacity as Dean of    )
15   Student and Support   )
16   Services of Ingram State )
17   Technical College;    )
18   MALCOLM MONTGOMERY,    )
19   Individually, and in his )
20   capacity as Coordinator )
21   of Student Support    )
22   Services of Ingram State )
23   Technical College; and  )
```

Page 3

```
 1   JAMES T. MERK,        )
 2   Individually, and in his )
 3   capacity as Dean of    )
 4   Institution of Ingram   )
 5   State Technical College, )
 6        Defendants.   )
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5   BONITA J. OWENSBY,      )
 6        Plaintiff,   )
 7   vs            ) CASE NUMBER:
 8   J.F. INGRAM STATE    ) 2:06-CV-796-WKW
 9   TECHNICAL COLLEGE; J.  )
10   DOUGLAS CHAMBERS,      )
11   Individually, and in his )
12   official capacity as    )
13   President of J.F. Ingram )
14   State Technical College; )
15   and JAMES WILSON,      )
16   Individually, and in his )
17   official capacity as Dean)
18   of Student and Support  )
19   Services at J.F. Ingram  )
20   State Technical College, )
21        Defendants.   )
22
23   DEPOSITION OF JAMES EDWARD WILSON
```

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1   In accordance with Rule 5(d) of
2   The Alabama Rules of Civil Procedure, as
3   Amended, effective May 15, 1988, I, Cindy
4   Weldon, am hereby delivering to Jim
5   Debardelaben, the original transcript of the
6   oral testimony taken on the 25th day of
7   June, 2007, along with exhibits.
8        Please be advised that this is the
9   same and not retained by the Court Reporter,
10  nor filed with the Court.
11
12      S T I P U L A T I O N S
13      IT IS STIPULATED AND AGREED, by
14  and between the parties through their
15  respective counsel, that the deposition of
16  JAMES EDWARD WILSON, may be taken before
17  Cindy Weldon, Certified Shorthand Reporter,
18  Commissioner and Notary Public, at the
19  office of Jim Debardelaben, 1505 Madison
20  Avenue, Montgomery, Alabama, on June the
21  25th, 2007 at 9:30 a.m.
22      IT IS FURTHER STIPULATED AND
23  AGREED that it shall not be necessary for

Page 6

1   any objections to be made by counsel to any
2   questions, except as to form or leading
3   questions, and that counsel for the parties
4   may make objections and assign grounds at
5   the time of trial, or at the time said
6   deposition is offered in evidence, or prior
7   thereto.
8        IT IS FURTHER STIPULATED AND
9   AGREED that notice of filing of the
10  deposition by the Commissioner is waived.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1      A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4      MR. JIM DEBARDELABEN
5      1505 MADISON AVENUE
6      MONTGOMERY, ALABAMA  36107
7
8   FOR THE DEFENDANT:
9      MR. ANDREW W. CHRISTMAN
10     GIDIERE, HINTON, HERNDON & CHRISTMAN
11     60 COMMERCE STREET, SUITE 904
12     MONTGOMERY, ALABAMA  36104
13
14  ALSO PRESENT:
15     MS. JULIE GIVENS
16     MR. MONICA GREENE
17
18
19
20
21
22
23

Page 8

1      I N D E X
2
3   EXAMINATION BY:                PAGE
4   MR. DEBARDELABEN               10
5
6
7
8      E X H I B I T S
9                    PAGE
10  PLAINTIFF'S EXHIBIT NO. 1      40
11  PLAINTIFF'S EXHIBIT NO. 2      43
12  PLAINTIFF'S EXHIBIT NO. 3      56
13  PLAINTIFF'S EXHIBIT NO. 4      60
14  PLAINTIFF'S EXHIBIT NO. 5      66
15  PLAINTIFF'S EXHIBIT NO. 6      79
16  PLAINTIFF'S EXHIBIT NO. 7      82
17  PLAINTIFF'S EXHIBIT NO. 8      90
18  PLAINTIFF'S EXHIBIT NO. 9      103
19  PLAINTIFF'S EXHIBIT NO. 10     105
20  PLAINTIFF'S EXHIBIT NO. 11     118
21  PLAINTIFF'S EXHIBIT NO. 12     136
22  PLAINTIFF'S EXHIBIT NO. 13     136
23  PLAINTIFF'S EXHIBIT NO. 14     137

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

| | | |
|---|---|---|
| 1 | PLAINTIFF'S EXHIBIT NO. 15 | 138 |
| 2 | PLAINTIFF'S EXHIBIT NO. 16 | 139 |
| 3 | PLAINTIFF'S EXHIBIT NO. 17 | 144 |
| 4 | PLAINTIFF'S EXHIBIT NO. 18 | 147 |
| 5 | PLAINTIFF'S EXHIBIT NO. 19 | 151 |
| 6 | PLAINTIFF'S EXHIBIT NO. 20 | 154 |
| 7 | PLAINTIFF'S EXHIBIT NO. 21 | 167 |
| 8 | PLAINTIFF'S EXHIBIT NO. 22 | 174 |

Page 11

1  we could at times.
2      MR. CHRISTMAN: It's just whether
3  she accurately transcribed what you said.
4  But you have the right to read and sign it
5  before it's certified or you can waive that
6  right.
7      THE WITNESS: I would like to read
8  it.
9      MR. CHRISTMAN: He'll read it.
10     Q. Mr. Wilson, my name is Jim
11  Debardelaben and I represent in these cases
12  Ms. Givens, Ms. Greene, Ms. Owensby and Ms.
13  Hendrix.
14      Since there are three cases
15  involved, I'm going to be asking you
16  questions relating to all three cases.
17  Probably most of my questions will be
18  grouped together.
19      There's a lot of questions that
20  will be similar for all cases. So we're
21  just trying to save everybody time and money
22  by doing it this way.
23      But if I ask you a question and

Page 10

1      JAMES EDWARD WILSON,
2  after first being duly sworn, testified
3      as follows:
4  EXAMINATION BY MR. DEBARDELABEN:
5      THE COURT REPORTER: Usual
6  stipulations?
7      MR. CHRISTMAN: Yes, ma'am.
8      Q. Mr. Wilson, this is a Federal
9  deposition. And under the Rules of Federal
10  Procedure, for me to be able to use this
11  deposition, you have the right to read and
12  sign or waive the right to read and sign.
13      When you read and sign, you can't
14  change your answers. You can change
15  something she might have misunderstood. So
16  you might want to talk to your lawyer to see
17  if you want to read and sign or if you want
18  to waive reading and signing.
19      MR. CHRISTMAN: The question is
20  whether she took it down accurately or not
21  accurately.
22      MR. DEBARDELABEN: You can't go
23  back and change your answers. We all wish

Page 12

1  you don't understand it, please let me
2  know. If at any time you need a break,
3  please let me know.
4      But if I ask you the question and
5  you answer it, I'm going to assume that you
6  understood what I was asking. Would you
7  state your name, please, sir.
8      A. James Edward Wilson.
9      Q. And what is your date of birth?
10      A. 4-27-52.
11      Q. What is your present address, Mr.
12  Wilson?
13      A. 341 Pecan Tree Lane, Pike Road
14  36064.
15      Q. Are you presently married?
16      A. No.
17      Q. Do you have any children by a
18  former marriage?
19      A. I have -- no. Not by a former
20  marriage.
21      Q. Do you have any children that
22  reside in the Middle District of Alabama?
23  That's basically Montgomery, Elmore County

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  south.
2      A. No.
3      Q. Do you have any kin people that
4  reside from Elmore County and Autauga County
5  south?
6      A. Repeat your question.
7      Q. Do you have any kin folk that
8  reside from Autauga County south basically
9  on the --
10     A. I have a sister that lives in
11 Montgomery.
12     Q. What's her name?
13     A. Katherine Wright.
14     Q. Does she have any children that
15 are over nineteen years of age?
16     A. Yes.
17     Q. And what's their names?
18     A. Jeffrey and Jason.
19     Q. Do they reside in Montgomery?
20     A. One I know that lives here. And
21 I'm not certain whether Jason -- I mean
22 Jeffrey has moved or not.
23     Q. Is Ms. Katherine Wright married?

Page 14

1      A. Yes.
2      Q. What's her husband's name?
3      A. Dr. James Wright.
4      Q. Do you have any other kin people
5  residing in this area?
6      A. I have an aunt that lives in
7  Montgomery.
8      Q. What's her name, please?
9      A. Lila. Her old name was Pinkston.
10 I'm not certain what her last name is now.
11     Q. Is that all?
12     A. Yes.
13     Q. Where are you presently employed?
14     A. J.F. Ingram State Technical
15 College.
16     Q. Let's talk about your educational
17 background. Where did you graduate from
18 high school?
19     A. Maplesville.
20     Q. Maplesville. When was that?
21     A. In 1970.
22     Q. Where did you go after graduation?
23     A. To Alabama State.

Page 15

1      Q. And how long did you stay at
2  Alabama State?
3      A. I graduated undergrad in 1973.
4      Q. What was your degree in?
5      A. Business management.
6      Q. Do you have a further educational
7  degree?
8      A. A Master's of Science.
9      Q. And where is that from?
10     A. Alabama State.
11     Q. When was that?
12     A. 1976.
13     Q. Do you have any other degrees?
14     A. I have post-graduate work. Not a
15 degree.
16     Q. Where was your post-graduate work?
17     A. Alabama State and some at the
18 University of Alabama in Birmingham.
19     Q. None of these degrees were
20 education degrees, were they?
21     A. My bachelor is certified in
22 business ed.
23     Q. Business ed?

Page 16

1      A. Yes, sir.
2      Q. So your educational background is
3  in business?
4      A. My degree is in business
5  management. And I have a certification of a
6  bachelor's, therefore, in education, in
7  business education.
8      Q. And where did you get the
9  certification in business education?
10     A. Alabama State.
11     Q. And when was that?
12     A. Around or between 1976 and '78.
13 One of those years.
14     Q. Any further educational
15 achievement?
16     MR. CHRISTMAN: You mean honors or
17 degrees?
18     MR. DEBARDELABEN: Yes, degrees.
19     A. No.
20     Q. Honors?
21     A. No.
22     Q. Please go through your work
23 history starting when you graduated from

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

|  | Page 17 |
|---|---|
| 1 | **Alabama State in 1973.** |
| 2 | A. I began at -- I've worked at |
| 3 | K-Mart. I've worked at Gaylords. I've |
| 4 | worked at Union Camp. |
| 5 | **Q. When did you work at K-Mart?** |
| 6 | A. I don't recall exactly the year. |
| 7 | But it was between '70 -- I don't recall |
| 8 | exactly the date. But in the early '70's. |
| 9 | **Q. What about Gaylords?** |
| 10 | A. Same. |
| 11 | **Q. Union Camp?** |
| 12 | A. Around '74, I believe, to '75. |
| 13 | **Q. What did -- Where did you go after** |
| 14 | **Union Camp?** |
| 15 | A. Briefly back to school to finish |
| 16 | up my Master's. And from there, in -- to |
| 17 | Ingram. |
| 18 | **Q. So when did you start at Ingram?** |
| 19 | A. 1976, March. |
| 20 | **Q. What was your starting position at** |
| 21 | **Ingram?** |
| 22 | A. I was a related education |
| 23 | instructor. They called it related. |

|  | Page 18 |
|---|---|
| 1 | **Q. Now, what does that mean to us as** |
| 2 | **--** |
| 3 | A. You teach the related subjects for |
| 4 | the trade like the English, math. |
| 5 | **Q. Okay. Who was president at that** |
| 6 | **time?** |
| 7 | A. Dr. Murry C. Gregg. |
| 8 | **Q. Who was your -- Who did you work** |
| 9 | **under?** |
| 10 | A. Mr. Joseph Milton Mulder. |
| 11 | **Q. What was his position?** |
| 12 | A. He was eventually the Dean of |
| 13 | Instruction. |
| 14 | **Q. What was -- Do you know his** |
| 15 | **position now?** |
| 16 | A. No. I don't know what it was |
| 17 | called then. |
| 18 | **Q. But he was over you when you first** |
| 19 | **started working?** |
| 20 | A. Yes, sir. |
| 21 | **Q. What was the hiring process you** |
| 22 | **went through?** |
| 23 | A. I was interviewed, filled out an |

|  | Page 19 |
|---|---|
| 1 | application and came back for a second |
| 2 | interview and I was hired the second time. |
| 3 | **Q. Who interviewed you the first** |
| 4 | **time?** |
| 5 | A. I don't recall. |
| 6 | **Q. Who interviewed you and hired you** |
| 7 | **the second time?** |
| 8 | A. The last interview I had, I |
| 9 | believe that was Mulder and Dr. Gregg was |
| 10 | present. |
| 11 | **Q. Did you have any experience at any** |
| 12 | **place working in an environment where you** |
| 13 | **were instructing prisoners prior to going to** |
| 14 | **work at J.F. Ingram?** |
| 15 | A. I'm sorry? |
| 16 | **Q. Did you have any experience in any** |
| 17 | **place to work in an environment where you** |
| 18 | **instructed prisoners prior to going to work** |
| 19 | **at J.F. Ingram?** |
| 20 | A. Any experience -- repeat your |
| 21 | question. |
| 22 | **Q. Did you have any experience in** |
| 23 | **instructing inmates prior to going to work** |

|  | Page 20 |
|---|---|
| 1 | **at J.F. Ingram?** |
| 2 | A. No. |
| 3 | **Q. Did you have any previous teaching** |
| 4 | **experience before going to work at J.F.** |
| 5 | **Ingram?** |
| 6 | A. Yes, sir. |
| 7 | **Q. And where was that?** |
| 8 | A. At Trenholm State Tech College. |
| 9 | **Q. And what did you do at Trenholm?** |
| 10 | A. I taught business related courses, |
| 11 | accounting, adding machines or whatever the |
| 12 | course was called. |
| 13 | **Q. And when did you teach at** |
| 14 | **Trenholm?** |
| 15 | A. I believe in 1974. |
| 16 | **Q. Who was the president out there** |
| 17 | **then? Was it Mr. Dan McCloudy?** |
| 18 | A. No. It was Mr. Smiley. |
| 19 | **Q. Mr. Smiley.** |
| 20 | A. And at Faulkner, what is now |
| 21 | Faulkner University. But it was Alabama |
| 22 | Christian College at that time. |
| 23 | **Q. What did you teach at then Alabama** |

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1  **Christian?**
2     A.  I taught math.
3     **Q.  For what time period did you teach**
4  **math at Alabama Christian?**
5     A.  I believe it was two semesters.
6  One semester at Trenholm and two semesters
7  at Alabama Christian adjunct.  It was
8  part-time.
9     **Q.  Was that when you were going back**
10 **for your Master's?**
11    A.  I was at Faulkner prior to going
12 to Trenholm.  So it could have been.
13    **Q.  Now, when you went to work at J.F.**
14 **Ingram, did you go through any kind of**
15 **orientation process?**
16    A.  Yes, sir.
17    **Q.  Tell me about that orientation**
18 **process.**
19    A.  They explained that it was dealing
20 with inmates in that the difference between
21 things that you can or cannot bring in and
22 security issues and basically the time and
23 hours that you would report to work, what

Page 22

1  time you got off, what lunch hour, and how
2  to report incidents.
3     **Q.  Okay.  Was it -- When I say**
4  **orientation, did you go to any classes?**
5     A.  No.
6     **Q.  How long did the orientation last?**
7     A.  I don't recall.
8     **Q.  Was it over a day?**
9     A.  I had a person assigned to me for
10 a day or so.
11    **Q.  Do you remember that person?**
12    A.  Yes, sir.
13    **Q.  Who was it?**
14    A.  Mr. Smith.
15    **Q.  Mr. Smith.  What's his first name?**
16    A.  I don't recall his first name.
17    **Q.  And what was Mr. Smith's job at**
18 **J.F. Ingram, if you remember?**
19    A.  He was a related instructor.
20    **Q.  How long were you a related**
21 **instructor?**
22    A.  From 1976 until 1980, October.
23    **Q.  What happened in 1980?**

Page 23

1     A.  I was asked to direct the Student
2  Support Services Program.
3     **Q.  Who asked you to direct the**
4  **Student Support Services Program?**
5     A.  Dr. Murry Gregg.
6     **Q.  Now, what is the Student Support**
7  **Services Program?**
8     A.  I'm sorry?
9     **Q.  What is that?**
10    A.  It is a Federally funded program
11 to aid students to remain in college and to
12 graduate.
13    **Q.  How long were you the -- What**
14 **would you call yourself, the Director of the**
15 **Student Support Program?**
16    A.  Yes, sir.
17    **Q.  How long --**
18    A.  It was Director of Special
19 Services for Disadvantaged Students to begin
20 with.  And eventually the name changed to
21 student support services.
22    **Q.  Now, what were your duties?**
23    A.  To direct that program.

Page 24

1     **Q.  Now, what did that consist of?**
2     A.  It was to implement all the
3  components of the program which included at
4  that particular time counseling.
5     **Q.  What kind of counseling?**
6     A.  Based on needs of the student.
7     **Q.  Are we talking about educational**
8  **counseling or are we talking about personal**
9  **counseling, are we talking about, you know**
10 **-- What do you mean when you say**
11 **counseling?**
12    A.  Group counseling, individual
13 counseling, academic advisement.
14    **Q.  Do you have any background and**
15 **training in counseling?**
16    A.  Master's of Science.
17    **Q.  Master's of Science in what?**
18    A.  Counseling.
19    **Q.  So you got that Master's of**
20 **Science in counseling in 1976 from Alabama**
21 **State?**
22    A.  Yes, sir.
23    **Q.  How long did you remain the**

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  director of student needs?
2    A.  Student Support Services.
3    Q.  Student Support Services.
4    A.  Until 19 -- I'm sorry. 2006.
5    Q.  Okay. What happened in 2006?
6    A.  The college went under
7  restructuring and we named Malcolm
8  Montgomery director of Student Support
9  Services.
10   Q.  And what happened to you?
11   A.  I'm sorry?
12   Q.  What did you do?
13   A.  What did I do?
14   Q.  Yes, sir. I mean, Mr. Montgomery
15 became director of Student Support
16 Services. What job did you have?
17   A.  I had director of NED, which is
18 Neglecting Delinquent Student Program. I
19 was the Dean of Students and also in charge
20 of the counseling on the main campus. And I
21 became the vice-president or Dean of the
22 College.
23   Q.  When you became the Dean of

Page 26

1  Students, did you go through a competitive
2  process?
3    A.  The college went under
4  restructuring during that period of time and
5  I was named Dean of Students.
6    Q.  Yes, sir. Did you go through a
7  competitive process or were you just named?
8    A.  We went under restructuring.
9  There was no process other than
10 restructuring through the Chancellor's
11 office.
12   Q.  Did you have any competition for
13 your job that you know of?
14   A.  No, I don't know of.
15   Q.  Did you fill out an application?
16   A.  No. I don't recall filling one
17 out.
18   Q.  Was there an announcement that the
19 Dean of Student job was open?
20   A.  Not that I know of.
21   Q.  How did you learn that the Dean of
22 Student job was open?
23   A.  I was a part of the cabinet, the

Page 27

1  president's cabinet.
2    Q.  In what position?
3    A.  At that particular time, if I'm
4  not mistaken, that was the director of
5  Student Support Services.
6    Q.  Okay. Were you considered the
7  dean when you were with Student Support
8  Services?
9    A.  Which dean?
10   Q.  Were you a dean of any type when
11 you were with student support services?
12   A.  Prior to the Dean of Students, I
13 had been the acting assistant Dean of
14 Instruction and Assistant Dean to the
15 College.
16   Q.  And when did you become the acting
17 assistant dean?
18   A.  I don't recall exactly.
19   Q.  Was that -- Did you fill out an
20 application for that job?
21   A.  I don't recall.
22   Q.  So in 1980, you became director of
23 Special Services which went to Student

Page 28

1  Needs. What was your other position after
2  director of Special Services or Student
3  Needs?
4    A.  We had a competition where I did
5  fill out an application. And I believe it
6  was the assistant Dean of Instruction.
7    Q.  Okay.
8    A.  And I'm not certain of the date or
9  time period.
10   Q.  Okay. Now, let me go back and
11 clean up a couple of areas I left out. Mr.
12 Wilson, have you ever been arrested or
13 charged with a crime before?
14   A.  Yes.
15   Q.  What was that?
16   A.  It wasn't a crime. You may say a
17 violation.
18   Q.  What was that?
19   A.  One was in '74 or '75 -- I believe
20 '75 -- in Prattville from the Union Camp
21 job.
22   Q.  What was that charge?
23   A.  I never understood the charge,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 29 | Page 31 |
|---|---|
| 1  sir. But it had something to do with a loss | 1    A. No, sir. |
| 2  of checks and somebody had stole some checks | 2    Q. What was the outcome of the checks |
| 3  or something. | 3  at Union Camp that you were arrested for? |
| 4    Q. At Union Camp? | 4    A. Null pros. |
| 5    A. Yes, sir. | 5    Q. Null pros. How long did you work |
| 6    Q. Did the police arrest you? | 6  for Union Camp after that? |
| 7    A. Yes. As a matter of fact, I spent | 7    A. I'm not exactly certain. But it |
| 8  the night in jail. | 8  was a couple of months. |
| 9    Q. Any other instances besides that | 9    Q. Okay. Have you ever been involved |
| 10  one arrest? | 10  in a lawsuit? |
| 11    A. Yes, sir. In South Carolina. | 11    A. Yes, sir. |
| 12    Q. What happened in South Carolina? | 12    Q. What lawsuit have you been |
| 13    A. I was pulled over and the cop | 13  involved in? |
| 14  asked for my license. I asked him did I | 14    A. I sued J.F. Ingram State Technical |
| 15  need to get it out of the car. I brought | 15  College. |
| 16  back my license, handed it to him. He told | 16    Q. For what reason? |
| 17  me he would teach me for being a smart ass | 17    A. Discrimination. |
| 18  nigger and he arrested me. | 18    Q. How did they discriminate? |
| 19    Q. What did he arrest you for? | 19    A. They chose an inexperienced -- |
| 20    A. Being a smart ass nigger. | 20  well, a person I felt that I had more |
| 21    Q. What was his charge? | 21  experience and more tenure and more |
| 22    A. I don't recall. | 22  experience in the position. |
| 23    Q. What was the outcome of the arrest | 23    Q. Now, was this age, race or sex |

| Page 30 | Page 32 |
|---|---|
| 1  in South Carolina? | 1  discrimination? |
| 2    A. The next day about ten o'clock, | 2    A. It was race. |
| 3  they let me out to make a phone call. I | 3    Q. Race discrimination. Who did they |
| 4  made a phone call and told my brother-in-law | 4  choose? |
| 5  that my car had been impounded and I needed | 5    A. I'm sorry? |
| 6  money. And he sent me money. | 6    Q. Who did they chose? |
| 7      And if I'm not mistaken, he gave | 7    A. Bruce Thomas. |
| 8  me a ride to a little town. I went in, got | 8    Q. What did they choose Mr. Thomas |
| 9  the money order or union -- Western Union. | 9  for? |
| 10  Paid them their twenty-five or fifty | 10    A. I'm sorry? |
| 11  dollars, whatever it was, and that was the | 11    Q. What position did they choose Mr. |
| 12  end of it. | 12  Thomas for? |
| 13    Q. Did you get your car back? | 13    A. Assistant Dean of Instruction. |
| 14    A. Yes, sir. | 14    Q. Did you fill out an application |
| 15    Q. Did you have to go to court on | 15  for that position? |
| 16  this? | 16    A. Yes, sir. |
| 17    A. No, sir. | 17    Q. And who all did you sue at J.F. |
| 18    Q. You made no court appearance? | 18  Ingram? |
| 19    A. No, sir. | 19    A. Who all? |
| 20    Q. When did that happen? | 20    Q. Yes, sir. |
| 21    A. The early '80's. | 21    A. The president. |
| 22    Q. Early '80's. Have you ever been | 22    Q. Mr. Gregg? |
| 23  terminated from any job? | 23    A. Dr. Gregg. |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1    Q.  Anyone else?
2    A.  I don't recall exactly.
3    Q.  Did you sue anybody in
4  post-secondary?
5    A.  Generally it does go that way.
6    Q.  Did you sue Dr. Gainus?
7    A.  I don't recall.
8    Q.  Or was that prior to Dr. Gainus?
9    A.  I'm not certain who was chancellor
10  at that time.
11    Q.  When was this lawsuit?
12    A.  Probably in the mid '90's.
13    Q.  That probably would have been Dr.
14  Gainus.  What was the outcome?
15    A.  They settled out of court.
16    Q.  Did you get what you wanted?
17    A.  I don't understand your question.
18    Q.  Did you get the results you wanted
19  to get?
20    A.  They were fairly okay.
21    Q.  Did you get any monetary
22  settlement?
23    A.  Yes, sir.

Page 34

1    Q.  How much?
2    A.  I think it was forty-five
3  thousand.
4    Q.  So, Mr. Wilson, you agree that
5  sometimes it's necessary for an employee to
6  bring a lawsuit against their employers,
7  don't you?
8    A.  In some cases, yes, sir.
9    Q.  Yes, sir.  And that's our American
10  system; is that correct?
11       MR. CHRISTMAN:  I'm sorry?
12    Q.  I said that's our American system
13  and we're allowed to do that?
14    A.  That's our constitutional right.
15    Q.  Yes, sir.  And apparently there
16  has been no retaliation against you since
17  you brought the lawsuit; you have progressed
18  on up, haven't you?
19    A.  I have been promoted since.
20    Q.  Yes, sir.  Any other lawsuits?
21    A.  Job related?
22    Q.  Any related.
23    A.  I remember one.

Page 35

1    Q.  What was that?
2    A.  An accident.
3    Q.  An accident?  When was that?
4    A.  I don't recall.  It was between
5  1998 and 2000.
6    Q.  And where were you involved in an
7  accident?
8    A.  On McDonald Street.
9    Q.  Did you file the lawsuit or was it
10  filed against you?
11    A.  I filed.
12    Q.  Okay.  What was -- How were you
13  injured?
14    A.  You mean physically?
15    Q.  Yes, sir.
16    A.  You may want to say whiplash.
17    Q.  Who represented you?
18    A.  McPhillips.
19    Q.  McPhillips.  Who represented you
20  in your lawsuit against Dr. Gregg and J.F.
21  Ingram?
22    A.  Thomas, Means and Gillis.
23    Q.  Which lawyer?

Page 36

1    A.  Thomas and Anita Kelly.
2    Q.  Any other lawsuits?
3    A.  Not that I recall.
4    Q.  Can you identify this document for
5  me?
6    A.  Yes, sir.  It's our policies and
7  procedures manual.
8    Q.  And I noticed that -- I want you
9  to look at it because I want to be sure it's
10  up to date.  Is that -- I noticed it says
11  2002 on it.  Do you know if it's been
12  updated at any time since 2002?
13    A.  Yes, it has been.  Periodically,
14  it's updated.
15    Q.  When is the last policy manual
16  that was put out?
17    A.  Sir, I don't recall.  That's not
18  my responsibility.
19    Q.  Okay.  Have you seen one that
20  doesn't have 2002 on the front page?
21    A.  No.
22    Q.  Okay.  Who is responsible for
23  updating the policy manual?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A.  Dr. Merk.
2        Q.  Dr. Merk.  Now, you mentioned
3    you're part of -- Are you still part of the
4    president's cabinet?
5        A.  Yes, sir.
6        Q.  If a policy -- If the policy
7    manual is updated, is that discussed in the
8    president's cabinet?
9        A.  Yes, sir.
10       Q.  Do the cabinet members, the
11   majority of them have to agree for the
12   policy manual to be updated?
13       A.  Yes, sir.  It's basically
14   discussed and agreed upon before it comes
15   out.
16       Q.  Okay.  So any update we've had in
17   the policy manual went through the process
18   of being presented to the president's
19   cabinet?
20       A.  Yes, sir.
21       Q.  Okay.
22           MR. CHRISTMAN:  You gave him
23   this.  Did you want him to identify whether

Page 38

1    this is or is not the policy manual?
2        Q.  Well, if you can look at it
3    because I've got some questions about some
4    specific instances.  I'm not going to put
5    that whole policy manual in because a lot of
6    it just does not apply to what we're doing.
7        A.  Tell me again specifically what am
8    I looking for.
9        Q.  To see if you see anything in that
10   policy manual that you recognize as being
11   outdated or if you recognize that something
12   is left out, meaning that it's been updated
13   and is not in there.
14       A.  I'm not certain that this student
15   advisory committee is in the old -- in the
16   updated one.
17       Q.  Okay.  What section is that?
18       A.  It has a number 203 on it.
19       Q.  Mr. Wilson, if you see something
20   that you think is outdated or should be in
21   there, just tell me the number that appears
22   up on the right-hand top of it.
23       A.  Number 311.03.  I'm not certain

Page 39

1    that is not on the updated.  Number 400 may
2    be updated.  I think number 506 may have
3    been changed and may not have been changed.
4    I'm not certain whether there's an update on
5    that or not.  I think 702.01.
6        Q.  Now, when you say 700 -- let me
7    look at that because I'm confused.  702.01.
8    Okay.  So what you've told me with changing,
9    you had a question about section 203, 311.03
10   400, 506 and 702.01.  Other than those
11   sections, it appears to be up-to-date?
12       A.  In some cases.
13       Q.  Okay.  The only reason it wouldn't
14   be up-to-date would be anything that
15   happened from 2002 forward or should be?
16       A.  Well, in some cases, it mentioned
17   Dean of the College.  And at that time, the
18   Dean of the College was also the
19   instructional dean.  So I'm not certain it
20   was not written primarily because of that.
21       Q.  Okay.  But Dr. Merk is the person
22   who is responsible for the personnel manual?
23       A.  Yes.  Right.

Page 40

1        Q.  Okay.
2           (Whereupon, Plaintiff's Exhibit
3    No. 1 was marked for identification and
4    attached to the original transcript.)
5        Q.  Let me show you what I have marked
6    as Plaintiff's Exhibit 1 and ask you if
7    you're familiar with that memorandum?
8           MR. CHRISTMAN:  It's a multi-page
9    exhibit.  Five pages.
10          MR. DEBARDELABEN:  It's five
11   pages.  You're right.
12       Q.  I want to ask you a question.  Is
13   Plaintiff's Exhibit 1 the document that is
14   presently in place for student dismissal
15   procedures?
16       A.  Yes, sir.
17       Q.  Had no changes to that since 1998?
18       A.  No, sir.
19       Q.  Okay.  But that document on
20   student dismissal at J.F. Ingram State
21   Technical College, the procedure for having
22   problem students, it does not appear in the
23   policies and procedures manual, does it?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    A.  Not this one, no.
2    Q.  Yes, sir.  Now, since basically,
3  Mr. Wilson, you are now in charge of it, it
4  appears at least the first steps of
5  discipline with the student, when you have
6  new employees to come in, are they given a
7  copy of this procedure?
8    A.  Yes, sir.
9    Q.  And does that copy go into their
10 personnel file?
11   A.  It goes with them.
12   Q.  It goes with them?
13   A.  Yes.
14   Q.  Now, tell me how that is done.
15   A.  When new employees are hired at
16 the college, they go through an orientation
17 with each department.  In reference to this
18 procedure for handling problems with
19 students is done in student services.
20   Q.  And you're over student services?
21   A.  Yes, sir.
22   Q.  Okay.  And who does that?  Do you
23 do it personally or are you --

Page 42

1    A.  I'm a part of the process.
2    Q.  Okay.  Are the people when they
3  are hired, are they given a little notebook
4  or something and say these are your
5  documents and procedures and you need to
6  know them?
7    A.  Yes, sir.
8    Q.  So do you have -- Can you give
9  your attorney a copy of that orientation
10 notebook that you give to new hires?
11   A.  That comes from Dr. Merk's
12 office.  What they get from Student Services
13 is an overview of all the forms that are
14 necessary for admitting a student through
15 dropping, grading and discipline and any
16 other forms that we use throughout the
17 student's tenure at the institution.
18   Q.  Are the new hires given that
19 information or are they just given an
20 overview?
21   A.  No.  We have a form, each form
22 that explains -- as we're sitting at a table
23 as we are now -- and each form is gone over

Page 43

1  either by myself or Ms. Owensby.
2    Q.  Yes, sir.  Are the new hires given
3  copies of those forms?
4    A.  Yes, sir.
5    Q.  So are they in any type of bound
6  book?
7    A.  No, sir.
8    Q.  Is there any checklist to show
9  that the new hires have gotten that?
10   A.  Yes, sir.
11   Q.  When did you start this procedure?
12   A.  I didn't start it.  The
13 institution started it as a part of the
14 hiring process.
15   Q.  When was it started?
16   A.  I'm not certain.
17   Q.  When you were hired back in 1976,
18 I think, did you have that procedure?
19   A.  Not that I recall.
20   Q.  I want to show you what we're
21 going to mark as Plaintiff's Exhibit No. 2.
22       (Whereupon, Plaintiff's Exhibit
23 No. 2 was marked for identification and

Page 44

1  attached to the original transcript.)
2    Q.  Can you identify that document for
3  me, please, sir?
4    A.  Yes, sir.
5    Q.  What is that document?
6    A.  It's a copy of the student rules
7  and regulations.
8    Q.  Is that the student rules and
9  regulations as they presently exist at J.F.
10 Ingram?
11   A.  Mostly.  I would have to have the
12 student services handbook in order to say
13 that they are exactly.
14   Q.  Okay.
15   A.  It seems that they are in order.
16   Q.  I've noticed in looking through
17 various documents that sometimes the
18 institution is referred to as Ingram State
19 Technical College and other times it's
20 referred to as J.F. Ingram.  Which is the
21 correct name?
22   A.  J.F. Ingram State Technical
23 College.

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    Q.   Okay.  Has that name changed back
2    and forth over the years?
3    A.   Only once that I can recall.
4    Q.   And when was that?
5    A.   It was during the period of time
6    that we were seeking accreditation under
7    SAASC's, The Southern Association of
8    Accreditation of Schools and Colleges.
9    Q.   So the correct name is Ingram
10   State Technical College now?
11   A.   The correct name is J.F. Ingram
12   State Technical College.
13   Q.   When an instructor is having a
14   problem with a student, what are they
15   supposed to do?
16   A.   Go by this, which is Exhibit 1.
17   Q.   Okay.  Are they supposed to write
18   the student up?
19   A.   It says when a problem related to
20   a student behavior occurs in a shop or
21   classroom, the instructor's first response
22   should be an attempt to resolve the problem
23   through normal classroom management.

Page 46

1    Q.   And what training have you
2    provided to the instructors to know how to
3    resolve problems with inmate students?
4    A.   They go through inmate type of
5    training by DOC.
6    Q.   And how long is that?
7    A.   It's an eight hour.
8    Q.   One eight hour course?
9    A.   Yes.
10   Q.   And how often do they have that
11   eight hour course?
12   A.   When they are first hired.
13   Q.   And when did that start?
14   A.   I don't recall when.
15   Q.   Do you have -- Did you have that
16   course prior to 2000?
17   A.   Yes, sir.
18   Q.   Did you have it when Mr. Gregg was
19   the president?
20   A.   No, sir.
21   Q.   It came after?
22   A.   They -- It was not formalized as
23   it is now when Dr. Gregg was there.  DOC

Page 47

1    officials were invited in during
2    professional development.  And periodically
3    the institution would bring in certain
4    agencies to help with the orientation for
5    older employees, new employees, especially
6    for security reasons.
7    Q.   Your campus population of students
8    are all convicted felons, aren't they?
9    A.   Yes, sir.  I would think so.
10   Q.   They have to have at least a year
11   and date sentence to be in the prison
12   system, don't they?
13   A.   I don't know.
14   Q.   You don't know?
15   A.   No, sir.
16   Q.   Do you know the difference between
17   a felon and a misdemeanor?
18   A.   Yes, sir.
19   Q.   Can a person be sentenced to state
20   prison for a misdemeanor?
21   A.   I don't think so.  But I'm not
22   that up on the law.  Can they?
23        MR. CHRISTMAN:  He's going to ask

Page 48

1    you the questions today.
2    Q.   Your lawyer can explain it to
3    you.
4    A.   Okay.
5    Q.   On a scale of one to ten, if you
6    can do this, how trustworthy are your
7    students?
8        MR. CHRISTMAN:  Form.  You can
9    answer.
10   A.   How trustworthy on a scale of one
11   to ten?
12   Q.   Yes, sir.
13   A.   If you look at the overall in
14   making an average, I would say probably two
15   to three.
16   Q.   Yes, sir.  Now, you're going to
17   have some that are very trustworthy?
18   A.   Very seldom.
19   Q.   More often than not, you're going
20   to have some that you can't believe anything
21   they say?
22   A.   Right.
23   Q.   I want to talk to you about the

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1    horticulture department.
2        A.  Yes, sir.
3        Q.  J.F. Ingram is located on about a
4    twenty or thirty acre plot of ground?
5        A.  That's hard to say, sir, because
6    we are on three campus.
7        Q.  I'm talking about the main
8    campus.
9        A.  Main campus.
10       Q.  The one up on Shot Gun Hill.
11       A.  I'm not certain as to how much
12   that is.
13       Q.  But --
14       A.  It doesn't look like thirty acres.
15       Q.  When you first come in, you have
16   the part of the building that is the
17   administrative offices.  It houses most of
18   the administrative staff and administrative
19   offices; is that correct?
20       A.  Yes, sir.
21       Q.  And you go through a gate and kind
22   of around back.  You then have various shops
23   like the welding shop, the car shop, car

Page 50

1    repair shop, the paint shop.  And that's
2    right next to the -- right behind the
3    administrative building?
4        A.  Yes, sir.
5        Q.  And then you go on back behind
6    there a ways and you have your horticulture
7    shop in the back of the facility?
8        A.  Yes, sir.
9        Q.  And horticulture being what
10   horticulture is, it has more open and wide
11   spaces than the other shops, doesn't it?
12       A.  Outside, yes, sir.
13       Q.  Yes, sir.  And it covers larger
14   areas than the other shops?
15       A.  Well, not necessarily.  If you're
16   looking at space in terms of from point A to
17   point B, the furniture refinishing shop
18   would be the largest.
19       Q.  Now, I know from previous
20   depositions it appears that the horticulture
21   has at least one greenhouse that's three
22   thousand square feet?
23       A.  I don't know how many square feet,

Page 51

1    sir.
2        Q.  And then it has two more?
3        A.  I think we have three.
4        Q.  Yes, sir.  Are there any -- strike
5    that.  The furniture refinishing, the
6    automotive shop, be it the paint shop or
7    repair --
8        A.  I didn't understand your question.
9        Q.  The furniture refinishing shop and
10   the automotive shop, be it the paint shop or
11   mechanical repair, they are all up there
12   where the instructors are in fairly close
13   proximity to the administrative building,
14   aren't they?
15       A.  Well, the furniture refinishing
16   shop makes an L on to the administration
17   building.  And it's not necessarily close,
18   but it is hooked on to it.
19       Q.  Let me put it this way.  You can
20   look out the back side windows of the
21   administration building, what I'm calling
22   the administration building -- I think we
23   both agree -- and see the shops?

Page 52

1        A.  You can see the welding shop, the
2    auto upholstery and you can see the
3    upholstery shop looking out of the
4    administration building.  You can't
5    necessarily see the auto mechanic shop and
6    the furniture refinishing shop unless you
7    came outside the building.
8        Q.  And if you look out and look up to
9    the north and look out the window sideways,
10   you can see the paint shop?
11       A.  That's the furniture refinishing.
12       Q.  The automotive paint shop?
13       A.  We don't have an automotive paint
14   shop on that campus.
15       Q.  Y'all don't paint automotive cars
16   anymore?
17       A.  At the Draper Staton campus.
18       Q.  Okay.  You've moved it?
19       A.  Yes, sir.
20       Q.  Now, the horticulture area where
21   Ms. Hendrix works, it's located behind these
22   shops you were just talking about?
23       A.  Yes, sir.

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    Q.  So you have to come out of the
2  administrative building and go back behind
3  the other shops?
4    A.  Yes, sir.
5    Q.  Are there any classes taught in
6  the administrative building?
7    A.  Yes, sir.
8    Q.  Are those related course classes
9  as you were teaching it?
10    A.  And barbering.
11    Q.  You have a barber shop there?
12    A.  Yes, sir.
13    Q.  Would the horticulture area be the
14  most isolated area on the campus?
15    A.  From the administrative building?
16    Q.  Yes, sir.
17    A.  It's the one that is fartherest
18  away from the administration building.
19    Q.  Is it the one that -- Let me put
20  it this way.  To see the horticulture shop,
21  you have to be looking and go through a
22  building to go to it, don't you?
23    A.  No.

Page 54

1    Q.  Or go around from the
2  administration building?
3    A.  Yes, sir.
4    Q.  Now, the back side of some of --
5  the furniture refinishing and automotive
6  shop, welding shop, you can look out the
7  back side down and see the horticulture
8  shop?
9    A.  Not from furniture refinishing.
10    Q.  But from the others?
11    A.  From the others, yes.
12    Q.  Who made the decision to hire a
13  retired DOC captain to be Barbara Hendrix's
14  assistant, if you know?
15    A.  I don't know.  But I don't think
16  and I'm not certain that he was hired to be
17  her assistant.
18    Q.  I understand you claim that Ms.
19  Hendrix has written up more student reports
20  than any other instructor on campus; is that
21  correct?
22    MR. CHRISTMAN:  Object to the
23  form.  I don't think that's what the -- I

Page 55

1  don't think the witness has made that
2  assertion.
3    Q.  Let me show you something.
4    MR. CHRISTMAN:  If you know
5  anything about that, you can answer his
6  question.
7    Q.  Mr. Wilson --
8    A.  Yes, sir.
9    Q.  -- who would have more experience
10  in dealing with inmates, you or Mr. Joseph
11  Griswold?
12    A.  I don't know of his -- what his
13  experience is, sir.
14    Q.  So --
15    A.  I know he was a captain.
16    Q.  Who would have more experience in
17  dealing with discipline problems with
18  inmates, you or Mr. Griswold?
19    A.  I don't know.
20    Q.  You don't know what his experience
21  was?
22    A.  Right.
23    Q.  Do you think you would have more

Page 56

1  training than Captain Griswold in dealing
2  with problem inmates?
3    A.  It would depend on the problem.
4    Q.  Tell me about the training you've
5  had in dealing with problem inmates.
6    A.  It comes from experience.
7    Q.  Comes from experience.  Have you
8  had any special classes that deal with
9  problem inmates?
10    A.  No, sir.
11    Q.  In your facility now where you're
12  located, do you have daily interaction with
13  inmates?
14    A.  Yes, sir.
15    Q.  Are you in any type of classroom
16  setting with inmates daily?
17    A.  Occasionally.
18    Q.  This is a two-page exhibit.
19    (Whereupon, Plaintiff's Exhibit
20  No. 3 was marked for identification and
21  attached to the original transcript.)
22    Q.  Show you what we've marked as
23  Plaintiff's Exhibit No. 3.  It's a two-page

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  exhibit. I'll ask you if you have ever seen
2  this exhibit before, this paper?
3      MR. CHRISTMAN: For the purposes
4  of the record, the second page being a graft
5  was originally produced in a prior
6  deposition in one of these cases as a color
7  exhibit. It appears that Plaintiff's
8  Exhibit 1 has a black and white exhibit.
9      MR. DEBARELABEN: Correct.
10     MR. CHRISTMAN: Pardon me.
11 Plaintiff's Exhibit 3.
12     Q. Are you familiar with that
13 exhibit?
14     A. No, sir.
15     Q. Who keeps tabs --
16     A. I'm familiar with the information.
17     Q. Okay. Where is the information
18 kept on how many complaints a person makes?
19     A. In my office.
20     Q. In your office.
21     A. And when I say office, it's in the
22 office complex.
23     Q. Okay. Now, do you know who

Page 58

1  prepared what I'm referring to as
2  Plaintiff's Exhibit 3?
3      A. This information is prepared from
4  the write-ups that we get and is kept in the
5  day-to-day --
6      MR. CHRISTMAN: I think his
7  question is do you know who prepared the
8  exhibit.
9      A. Oh, no, sir.
10     Q. How often --
11     A. I remember working on it.
12     Q. How often is an exhibit like that
13 prepared?
14     A. You mean in -- repeat your
15 question.
16     Q. How often is an exhibit like
17 Plaintiff's Exhibit 3 prepared?
18     MR. CHRISTMAN: Object to the
19 form. You may answer.
20     Q. What's the purpose of it?
21     A. What's the purpose of it?
22     Q. Yes, sir.
23     A. It tells me how many types of

Page 59

1  write-ups we have in terms of conduct,
2  student conduct.
3      Q. Does it tell you there appear to
4  be more problems down in the horticulture
5  area than any other area?
6      A. Sir, to be honest with you, I have
7  not looked at this in that manner.
8      Q. What manner have you looked at
9  this form?
10     A. I haven't.
11     Q. You haven't. Who -- Did you
12 direct this exhibit to be prepared?
13     A. No, sir.
14     Q. Do you know who directed it to be
15 prepared?
16     A. Yes, sir.
17     Q. Who?
18     A. Dr. Merk.
19     Q. What was the reason for it?
20     A. I have no idea.
21     Q. So Dr. Merk -- When did Dr. Merk
22 direct this exhibit to be prepared?
23     A. He asked me approximately a month

Page 60

1  and a half ago for access to this data base.
2      Q. I noticed many of the complaints
3  we went over have J.L. Griswold and B.
4  Hendrix's name on them.
5      MR. CHRISTMAN: Object to the
6  form.
7      Q. Were -- let's put it this way.
8      MR. CHRISTMAN: Who went over?
9      MR. DEBARDELABEN: I'm fixing to
10 go back.
11     MR. CHRISTMAN: I'm sorry.
12     MR. DEBARDELABEN: Let's take a
13 short break.
14     MR. CHRISTMAN: Sure.
15     (Whereupon, a short recess was
16 taken.)
17     (Whereupon, Plaintiff's Exhibit
18 No. 4 was marked for identification and
19 attached to the original transcript.)
20     Q. I want to show you what I have
21 marked as Plaintiff's Exhibit 4. And I
22 noticed -- Do you know what that document
23 is?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1    A. Yes, sir.
2    **Q. What is that document?**
3    A. It's a student classroom report
4 and counseling record.
5    **Q. Now, is that what an instructor is**
6 **supposed to file if they have a problem with**
7 **a student?**
8    A. Yes, sir. This is not complete,
9 but it is a portion of it.
10    **Q. Okay. What is lacking on it?**
11    A. The back part.
12    **Q. Well, I'll represent to you that**
13 **this is -- What's on the back part of it?**
14    A. Information for recommendations,
15 information for approval and information for
16 who was interviewed and some more
17 documentation.
18    **Q. So if these documents don't have**
19 **the back side, it's an incomplete document?**
20    A. This one is not complete.
21    **Q. Right. If they don't have what's**
22 **ever on the back of it, then it would be an**
23 **incomplete document; correct?**

Page 62

1    A. Yes, sir.
2    **Q. Okay. And to be a complete**
3 **document, it's going to have to have a front**
4 **and back side; is that what you're telling**
5 **me?**
6    A. Yes, sir.
7    **Q. Okay. So what we have on this one**
8 **is the front page of a document?**
9    A. Yes, sir.
10    **Q. Okay. And is that your signature**
11 **down there?**
12    A. Yes, sir.
13    **Q. What I want to ask you about, what**
14 **we looked at a while ago, Exhibit 3, which**
15 **was Defendant's Exhibit 27 to Hendrix's**
16 **deposition, I don't see the name J.L.**
17 **Griswold on this list of Ms. Hendrix's of**
18 **these instructors or people who write up**
19 **students. Why is that?**
20    MR. CHRISTMAN: Form. If you
21 know.
22    **Q. If you know.**
23    A. I don't know.

Page 63

1    **Q. Would you keep this information in**
2 **your area?**
3    A. Yes, sir.
4    **Q. Who has access to it?**
5    A. Student service personnel and
6 those other persons that request.
7    **Q. Okay. Do you know specifically**
8 **who prepared Exhibit 3?**
9    A. Dr. Merk.
10    **Q. Dr. Merk himself?**
11    A. I guess he put it in the form that
12 he wanted it.
13    **Q. Okay. And you have no idea why**
14 **Mr. Griswold's does not show up on this**
15 **list?**
16    A. I see Griswold on that list.
17    **Q. Where is it? Maybe I'm reading it**
18 **wrong. We've got Griswold. We've got two.**
19    A. Right.
20    **Q. Now, is this J.L. Griswold or is**
21 **there another Griswold?**
22    A. There are two Griswolds.
23    **Q. There are two Griswolds?**

Page 64

1    A. Yes, sir.
2    **Q. So if J.L. Griswold had more -- Do**
3 **you know if that Griswold is J.L. or someone**
4 **else?**
5    A. I have no idea.
6    **Q. Okay. So if there is another --**
7 **If there's more than two with J.L. Griswold**
8 **on there, then we know that's a different**
9 **Griswold. What's the other Griswold's name?**
10    A. Bill.
11    **Q. Bill. And what does he do?**
12    A. He's the assistant to the Dean of
13 the College.
14    **Q. Assistant to the dean. And you're**
15 **the dean, aren't you?**
16    A. Yes, sir.
17    **Q. And what's Mr. Bill Griswold --**
18 **how does he assist you?**
19    A. By working with Dr. Merk.
20    **Q. And how does that assist you if he**
21 **works with Dr. Merk?**
22    A. He helps him with the instruction
23 program.

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1   Q.  Who does he take his instruction
2   from?
3       A.  Me and/or Dr. Merk and the
4   president.
5       Q.  So he's just a floater between you
6   and Dr. Merk and Mr. Chambers?
7       A.  He's an employee.
8       Q.  Right.  But any of the three of
9   you can tell him what to do?
10      A.  Yes, sir.
11      Q.  What's his official title,
12  assistant to the Dean of the College?
13      A.  Yes, sir.
14      Q.  Okay.  Mr. Wilson, when y'all are
15  doing a student discipline, are those
16  meetings recorded?
17      A.  Notes are taken, yes, sir.
18      Q.  And who is responsible for taking
19  the notes?
20      A.  Whoever I designate.
21      Q.  Huh?
22      A.  Whoever I designate.
23      Q.  So when you come in, it's who you

Page 66

1   designate?
2       A.  Generally, yes, sir.
3       Q.  Okay.  I want to show you a
4   document here that I believe was Defendant's
5   Exhibit 19 to Ms. Hendrix's deposition.
6   We're going to make it Plaintiff's Exhibit
7   No. 5.
8           (Whereupon, Plaintiff's Exhibit
9   No. 5 was marked for identification and
10  attached to the original transcript.)
11      Q.  Do you recall that?
12      A.  I've seen this, yes, sir.
13      Q.  Okay.  What was -- When did this
14  meeting take place?
15      A.  I don't recall the date, sir.
16      Q.  Okay.  Who called this meeting?
17      A.  Ms. Hendrix requested it.
18      Q.  Ms. Hendrix requested this
19  meeting?
20      A.  Yes, sir.
21      Q.  Who did she request it with?
22      A.  Both Malcolm and myself.
23      Q.  Okay.  And how did she go about

Page 67

1   requesting this meeting?
2       A.  As I was told, she came up to see
3   me and I was not there.  And instead, she
4   talked to Malcolm Montgomery.
5       Q.  What did she talk to Malcolm
6   about?
7       A.  Possibly a student possibly
8   masturbating in the horticulture area.
9       Q.  Now, if you are not there, who is
10  she to report that to?
11      A.  Generally Malcolm.  She has an
12  option to also talk with Dr. Merk.
13      Q.  Now, you weren't there.  I'm
14  asking you about this meeting.  So the
15  meeting we start off here that was
16  Defendant's Exhibit 19, it says J.W.  Who is
17  J.W.?
18      A.  You're talking about Exhibit 5?
19      Q.  Yes, sir.
20      A.  I guess that would be me.
21      Q.  Okay.  Who recorded this meeting?
22      A.  I think Dr. Merk may have.
23      Q.  Okay.  Dr. Merk recorded it?

Page 68

1       A.  Yes, sir.
2       Q.  Was there any announcement made
3   that this meeting was going to be recorded?
4       A.  I don't know, sir.
5       Q.  Is it the usual modus operandi at
6   J.F. Ingram to record meetings?
7       A.  In some cases.
8       Q.  Okay.  Was a tape recorder in the
9   middle of the table?
10      A.  I don't recall there being one.
11      Q.  Was there -- Was Ms. -- To your
12  knowledge, was Ms. Hendrix informed that
13  this meeting was being recorded?
14      A.  I don't know, sir.
15      Q.  Did you know it was being
16  recorded?
17      A.  Yes, sir.
18      Q.  Did Ms. Hendrix -- Did you tell
19  Ms. Hendrix it was being recorded?
20      A.  No, sir.
21      Q.  Did Mr. Montgomery know it was
22  being recorded?
23      A.  I don't know, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  Q. Do you know why this meeting was
2  recorded?
3     A. I would assume to get
4  information. To record the information.
5     Q. To record the information. Did
6  you designate anybody to keep notes in this
7  meeting?
8     A. Yes, sir.
9     Q. And who was that?
10    A. I believe it was Ms. Owensby. I'm
11 not certain.
12    Q. Can you read this over here and
13 tell me where you designated Ms. Owensby to
14 keep notes in this meeting?
15    A. I designated her when I went over
16 and got her to come and sit in the meeting.
17    Q. Okay. So you didn't designate her
18 in the meeting?
19    A. Sir?
20    Q. You didn't designate her in the
21 meeting?
22    A. I asked her if she would bring her
23 pad and sit in on that meeting.

Page 70

1     Q. Did she keep notes of the meeting?
2     A. I think so.
3     Q. Do you have those notes?
4     A. They are probably on file.
5     Q. Can you furnish them to your
6  attorney so he can furnish them to me?
7     A. Sure. Yes.
8     Q. How did you come to know that Ms.
9  Hendrix wanted this particular meeting?
10    A. I called her.
11    Q. You called her?
12    A. Yes, sir.
13    Q. Did you ask her to come to your
14 office?
15    A. No. I told her that I was back
16 and I knew that she had been up there to see
17 me and she said she would be back up there.
18    Q. Who is B.H.? That's Barbara
19 Hendrix, isn't it?
20    A. Probably.
21    Q. Who is P.E.?
22    A. Probably Paul Edwards.
23    Q. Isn't that an inmate?

Page 71

1     A. Yes, sir.
2     Q. Who is J.T.M?
3     A. Merk.
4     Q. That's Dr. Merk?
5     A. Yes, sir.
6     Q. Who asked Dr. Merk to be part of
7  this meeting?
8     A. Ms. Hendrix and I.
9     Q. Ms. Hendrix requested Dr. Merk?
10    A. Dr. Merk was in the office when
11 she came up.
12    Q. He was in whose office?
13    A. My office.
14    Q. What was he doing in your office
15 when she came up?
16    A. Talking to me.
17    Q. Talking to you. What was he
18 talking to you about?
19    A. I don't recall.
20    Q. After Ms. Hendrix came up, did you
21 ask Malcolm Montgomery to come in?
22    A. Yes, sir.
23    Q. Was he in the office prior to Ms.

Page 72

1  Hendrix getting there?
2     A. No.
3     Q. Okay. Now, did Ms. Hendrix ask
4  for a Ms. Roberts to come in?
5     A. No.
6     Q. Did she ask anybody to come in the
7  meeting?
8     A. No.
9     Q. So she asked for no one to come in
10 the meeting?
11    A. She asked Dr. Merk if he minded
12 staying.
13    Q. That's the only one she requested
14 to come to this meeting was --
15    A. Yes, sir.
16    Q. -- Dr. Merk?
17    A. Yes, sir.
18    Q. She didn't ask anybody else?
19    A. No.
20    Q. You didn't refuse to let her have
21 anybody in that meeting?
22    A. No. I just did not agree with who
23 she went out of the meeting and got and

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  brought back.
2      **Q.  Who did she go out of the meeting**
3  **and go get?**
4      A.  Ms. Roberts.
5      **Q.  Did you ask Ms. Roberts to leave?**
6      A.  Yes.
7      **Q.  Where is that in this transcript**
8  **of the meeting?**
9      A.  I don't know.
10     **Q.  Did you then go get Ms. Owensby?**
11     A.  No.
12     **Q.  Was Ms. Owensby already in the**
13 **meeting?**
14     A.  No.  I left out and asked Ms.
15 Roberts to go back and finish a task and I
16 asked her to tell Ms. Owensby to come to my
17 office.  And when she did, I asked Ms.
18 Owensby to go back and get a pad and keep up
19 with the notes.
20     **Q.  Why did you not want Ms. Roberts**
21 **in the meeting?**
22     A.  Because Ms. Roberts is not
23 accustomed to those types of hearings.  She

Page 74

1  does not deal with inmates at all.  And Ms.
2  Owensby is a part of that committee.
3      **Q.  Okay.  I want you to look at**
4  **Plaintiff's Exhibit 1.  Now, on Plaintiff's**
5  **Exhibit 1, was this meeting a non-emergency**
6  **procedure or an emergency procedure?**
7      A.  Non.
8      **Q.  Neither one of them?**
9      A.  Non-emergency.
10     **Q.  Non-emergency.  So what is an**
11 **emergency procedure?**
12     A.  When there's a fight or there is
13 danger to an employee or there's an
14 attempted escape.
15     **Q.  What's when a student's behavior**
16 **creates criminal activity?  What is that?**
17     A.  It could probably be an emergency.
18     **Q.  All right.  Now, give me an**
19 **example of that.**
20     A.  Of what?
21     **Q.  Criminal activity.**
22     A.  Fighting.
23     **Q.  Okay.  That's the only one you can**

Page 75

1      think about?
2      A.  No.  But that's -- beating on
3  another student.
4      **Q.  Now, would indecent exposure be**
5  **considered criminal activity?**
6      A.  From a perspective of the Court,
7  probably.
8      **Q.  What about with y'all?**
9      A.  I don't know if it would be called
10 criminal activity.
11     **Q.  But would you characterize if what**
12 **Ms. Hendrix was reporting was indecent**
13 **exposure?**
14     A.  She didn't report it as indecent
15 exposure.
16     **Q.  What did she report it as?**
17     A.  She reported it as seeing a
18 student that she thought was masturbating.
19     **Q.  Now, did she use those words?**
20     A.  That's what she used when she came
21 in the office.
22     **Q.  When she came in the office and**
23 **reported it to you this time, tell me**

Page 76

1  exactly what Ms. Hendrix told you.
2      A.  I don't recall exactly what she
3  said to me.  But I can tell you
4  approximately what she said to me.
5      **Q.  Okay.  Now, the meeting you had**
6  **with Ms. Hendrix was recorded by Dr. Merk;**
7  **correct?**
8      A.  Sir, this portion of what you have
9  seems as if it was recorded.  But now, I
10 cannot tell you that that was the beginning
11 or the middle or the end of that meeting.
12     **Q.  So you don't know if this portion**
13 **here is all of it or just part of it?**
14     A.  Right.
15     **Q.  But will you agree with me --**
16 **please read that -- that no place in this**
17 **transcript does it show Barbara Hendrix**
18 **using the word masturbation?  Read over it.**
19 **I just want to be sure.  I might have missed**
20 **something.**
21     MR. CHRISTMAN:  Well, I think the
22 document says what it says.  I'm not sure
23 his agreement regarding what's in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  document is material.
2      MR. DEBARDELABEN: Well, I'm
3  asking him because he was there.
4      A.  What's your question?
5      Q.  Is there any place in this
6  transcription of this meeting that occurred
7  that shows Ms. Hendrix using the word
8  masturbation?
9      A.  Not on that piece of paper.
10      Q.  All right.  Do you know who
11  transcribed this paper?
12      A.  No, sir.
13      Q.  Have you seen this transcript
14  before?
15      A.  Yes, sir.
16      Q.  Where did you see it?
17      A.  Dr. Merk showed it to me.
18      Q.  When did Dr. Merk show you this?
19      A.  Oh, between about three or four
20  months ago, if not shorter.
21      Q.  Was it while he was doing an
22  investigation into this incident?
23      A.  I think it was while the attorney

Page 78

1  asked for the information.
2      MR. CHRISTMAN: No.  We're not
3  going to talk about -- There's an
4  attorney/client privilege regarding anything
5  that y'all talked with me about.  To the
6  extent his question is asking you about
7  attorney/client information --
8      Q.  I don't want you to tell me what
9  your attorney told you or what you told the
10  attorney.  All I want to know is what was
11  said to Dr. Merk.  So this transcript wasn't
12  revealed to you until three or four months
13  ago?
14      A.  Right.
15      Q.  What happened to the student Ms.
16  Hendrix reported engaging in what she
17  believed to be improper conduct?
18      A.  I had a counseling session with
19  him.  And the end result was he withdrew
20  from school.
21      Q.  Did he withdraw or did you have
22  him withdrawn?
23      A.  It was a mutual agreement.

Page 79

1      Q.  Okay.  Did he enroll back into
2  school?
3      A.  I don't know.  I'd have to check
4  the records.
5      Q.  Are you familiar with a student by
6  the name of Raheen Fikes?
7      A.  Yes, sir.
8      Q.  Did I pronounce that correctly?
9      A.  Close.
10      Q.  And Ms. Hendrix has had some
11  problem with Mr. Fikes, hasn't she?
12      A.  Yes, sir.
13      Q.  And she reported in -- written up
14  and reported it to you and Mr. Montgomery on
15  a number of occasions of her problems with
16  Mr. Fikes, hasn't she?
17      A.  Yes, sir.
18      Q.  I want to ask you if you have ever
19  seen -- we'll do this as a composite Exhibit
20  No. 6.
21      (Whereupon, Plaintiff's Exhibit
22  No. 6 was marked for identification and
23  attached to the original transcript.)

Page 80

1      Q.  Are you familiar with those -- I
2  guess that would be half a page of
3  write-ups, the front page of them?
4      MR. CHRISTMAN: Go ahead and
5  review them before you answer.
6      A.  Now, what was your question, sir?
7      Q.  Are you familiar with those
8  write-ups?
9      A.  Yes, sir.
10      Q.  I call them write-up.  Is that the
11  proper term?
12      A.  That's what is commonly used.
13  They call them write-ups.
14      Q.  And how many write-ups there do we
15  have on Mr. Fikes?
16      A.  You have four separate ones and
17  one duplicate.
18      Q.  Okay.  Now, Mr. Fikes, apparently
19  from reading those memoranda, he just didn't
20  get along in Ms. Hendrix's class?
21      A.  He got along well with her.
22      Q.  He got along well with her?
23      A.  Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1    Q.  And what's the problem with those
2    write-ups?
3    A.  I don't see no problem with them.
4    Q.  You don't see a problem?
5    A.  No, sir.
6    Q.  So what we have -- But Ms.
7    Hendrix, she was upset with you for not
8    doing something with Mr. Raheem Fikes,
9    wasn't she?
10   A.  No, sir.
11   Q.  Didn't she write a memorandum to
12   Dr. Huffstutler?
13   A.  Yes, sir.
14   Q.  And did you see that memorandum?
15   A.  Yes, sir.
16   Q.  Did you discuss that with Dr.
17   Huffstutler?
18   A.  He had a meeting with both Ms.
19   Hendrix and myself.  There was a Donna
20   Wisman taking notes.
21   Q.  And what was the --
22   A.  It may have been Donna Wisman at
23   that particular time.

Page 82

1    Q.  What was the outcome of that
2    meeting?
3    A.  She told Dr. Huffstutler that she
4    understood the role that I played in dealing
5    with students and the counseling.
6    Q.  And she didn't have any further
7    problem with that?  What happened to Mr.
8    Fikes?
9    A.  He graduated.
10   Q.  Graduated?
11   A.  Yes, sir.
12       (Whereupon, Plaintiff's Exhibit
13   No. 7 was marked for identification and
14   attached to the original transcript.)
15   Q.  I want to show you what's marked
16   as Plaintiff's Exhibit No. 7.
17       MR. DEBARDELABEN:  You'll have to
18   look at that one.  I got kind of out of
19   whack here.
20   A.  And again, sir, these are
21   incomplete documents.
22   Q.  Yes, sir.  I just got them from a
23   previous deposition.  If they are incomplete

Page 83

1    --
2    A.  And action was taken on each one
3    of those.
4    Q.  Yes, sir.  I don't have the
5    complete document because it wasn't in the
6    other deposition.
7        MR. CHRISTMAN:  Well, for the
8    purposes of the record, I'm not sure any of
9    these were in the deposition.  Well, in any
10   depositions we've taken.  These were not a
11   part of any of my exhibits to a prior
12   deposition.
13   Q.  Are you familiar with this
14   document dated July 3rd, 2003?  Are you
15   familiar with that document dated July 3rd
16   of 2003?
17   A.  I don't remember seeing that, no,
18   sir.
19   Q.  Okay.  Have you ever used
20   profanity concerning Ms. Hendrix?
21   A.  No, sir.
22   Q.  If Mr. Griswold and Raheem Fikes
23   and Ms. Daily said you used profanity, would

Page 84

1    they not be telling the truth?
2    A.  I would be suggesting that they
3    would not be telling the truth.
4    Q.  Do you recall a meeting in the
5    Resource Center between Mr. Griswold, Raheem
6    and Ms. Daily and yourself around that time?
7    A.  We had a meeting with this young
8    man sometime back.  And if I'm not mistaken,
9    they were a part of it.
10   Q.  So was anybody taking notes in
11   that meeting?
12   A.  Sir, I'm certain there was.  This
13   student is a special ed student.  He comes
14   under different rules and regulations that
15   governs his behavior problems.
16   Q.  Now, would that meeting be
17   recorded by a tape recorder or hand --
18   A.  I have no idea.  Special education
19   people are responsible for that.
20   Q.  And who is the special education
21   person in this incident, Ms. Daily?
22   A.  Ms. Daily.
23   Q.  So Ms. Daily is the one that would

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  have knowledge as to that?
2      A.  Yes, sir.  And if there are notes,
3  it would be on file dated this date.
4      Q.  And Ms. Daily would keep that?
5      A.  If we took the notes, it would be
6  in the student services files.
7      Q.  But Ms. Daily is special
8  education?
9      A.  Yes, sir.
10     Q.  She's not under you?
11     A.  No, sir.
12     Q.  And Mr. Griswold, is he under you?
13     A.  No, sir.
14     Q.  And Raheem, he wouldn't take notes
15  because he's an inmate; correct?
16     A.  Correct.
17         MR. CHRISTMAN:  When you said
18  Griswold, you're talking about J.L.
19  Griswold?  You're not talking about Bill
20  Griswold right now; right?
21         MR. DEBARDELABEN:  No, no.  It
22  appears to be -- I don't know.  It just says
23  Mr. Griswold.

Page 86

1          MR. CHRISTMAN:  There is a
2  Griswold that works under him.
3      Q.  Which Mr. Griswold was in the
4  meeting?  Was it J.L. or Bill?
5      A.  It was J.L.
6      Q.  And J.L. is the person that
7  assisted at that time Ms. Hendrix?
8      A.  He was the person that was hired
9  there to look at that -- after that shop
10  before Ms. Hendrix got there.
11     Q.  Okay.  Is he the retired captain?
12     A.  Yes, sir.
13     Q.  So Mr. J.L. Griswold was employed
14  before Ms. Hendrix got there?
15     A.  Yes, sir.
16     Q.  When did he leave J.F. Ingram?
17     A.  I'm not certain.
18     Q.  Okay.  On all these special
19  services meetings you have -- and I say
20  all.  I've just heard the term -- is it a
21  requirement of J.F. Ingram to keep notes of
22  the minutes or is that some type of Federal
23  requirement?

Page 87

1      A.  You're saying special services
2  meeting?
3      Q.  Yes, sir.  For I understand Mr.
4  Raheem Fikes was under special services.
5      A.  I'm not certain of their rules and
6  regulations.
7      Q.  But if they are, it would be under
8  Ms. Daily's chain of command, not yours?
9          MR. CHRISTMAN:  You're talking
10  about special education.
11         MR. DEBARDELABEN:  Yes.
12     A.  Special education comes under Ms.
13  Rosy Edwards.
14     Q.  And Ms. Daily worked under her,
15  not you?
16     A.  At that particular time, it was
17  Ms. Kate Perryman.
18     Q.  So it would be under Ms. Perryman;
19  correct?
20     A.  Well, she's retired.
21     Q.  She's retired.  And when did Ms.
22  Perryman retire?
23     A.  I'm not certain.  Within the last

Page 88

1  two years.
2      Q.  Okay.
3          MR. DEBARDELABEN:  It's about
4  twelve o'clock.  Do you want to take a break
5  for lunch?
6          MR. CHRISTMAN:  Yes, sir.
7          (Whereupon, a lunch recess was
8  taken.)
9      Q.  Mr. Wilson, I remind you, that
10  even though we took a break, you're still
11  under oath.  I always make a habit of doing
12  that.
13         Do you recall back in October of
14  2006 that Ms. Hendrix asked you for a copy
15  of the book, Books and Bars?
16     A.  Books and bars?
17     Q.  Yes, sir.
18     A.  No, I don't.
19     Q.  You told her she could check it
20  out for two weeks.  You don't remember that?
21     A.  She asked me about some books that
22  we have had.  Particularly the Books and
23  Bars, I don't know about.  But I told her

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1 that she could check with Malcolm or Mr.
2 Trawick.
3     Q.  So if she thought -- If she said
4 you told her she would have to check out
5 Books and Bars for two weeks, you don't
6 dispute that?
7     A.  I would dispute the timetable,
8 yes, sir.
9     Q.  All right.  Did you ever give a
10 copy of that book to any other instructor?
11     A.  I don't know.  I don't recall
12 giving any books to anyone.
13     Q.  Okay.  And during the week of
14 October 9th, 2006, did you ever tell Student
15 A to warn the horticulture students that
16 someone in the automotive shop was out to
17 get the brothers in horticulture and to
18 watch out?
19     A.  No.
20     Q.  You didn't do that?
21     A.  No.
22     Q.  Do you know a student by the name
23 of Michael Evans?

Page 90

1     A.  That doesn't ring a bell, no.
2     Q.  You don't recall any confrontation
3 or situation with Ms. Hendrix over a student
4 named Michael Evans?
5     A.  The name doesn't ring a bell, no.
6     Q.  Okay.
7     A.  No, sir.
8     Q.  Let me show you these write-ups on
9 Mr. Evans and ask you if that helps you.
10 We'll mark these as Exhibit 8.
11         And it apparently is just the
12 front page.  But see if this refreshes your
13 recollection concerning a student named Mr.
14 Michael Evans.
15         (Whereupon, Plaintiff's Exhibit
16 No. 8 was marked for identification and
17 attached to the original transcript.)
18     A.  No, sir.
19     Q.  Okay.  Now, let me ask you -- Will
20 you please look at that.  Look at the second
21 one that has to do with Mr. Evans.  It says
22 student was not in assigned area, bus
23 loading area, when he was supposed to be

Page 91

1 there.  Instead he was found sleeping in
2 break area.
3         When you get these complaint
4 forms, they are in the form as we see the
5 front page of this one.  And the counselor's
6 signature is not there and the
7 recommendation or action taken is not on
8 there and it's not dated, is it?
9         MR. CHRISTMAN:  You mean at the
10 bottom?
11         MR. DEBARDELABEN:  Right.
12     Q.  When you get this, when it comes
13 to your office, you are -- I guess it's
14 either you or Mr. Montgomery receives it;
15 correct?
16     A.  Or someone else.
17     Q.  In your office.  It's not filled
18 out here where it says comments.  It's just
19 filled -- I'm looking at the second page
20 because it's filled in to where it says
21 counselor's signature down here.
22     A.  Right.
23     Q.  When you get them, they are like

Page 92

1 that, aren't they?
2     A.  Generally, yes, sir.
3     Q.  And whatever you do, you fill out
4 that bottom page and then whatever is
5 supposed to be on the back, you fill that
6 out, also?
7     A.  Right.
8     Q.  All right.
9     A.  If I get them.
10     Q.  Right.  Now, how do we know if you
11 get them?
12     A.  It would have my signature on it.
13     Q.  Right.  And when --
14     A.  Or someone's.
15     Q.  Someone's signature.  And when you
16 finish these, do you ever -- what you do, it
17 might be suspend him, it might be to counsel
18 him or it might be to bring him in and tell
19 him to do something else.  You fill out that
20 little area down there that's blank, don't
21 you?
22     A.  Something is initiated at some
23 time.  Sometimes we write it on a piece of

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  paper and it is stapled to that.
2      Q.  Okay.  Does that then go back to
3  the instructor or is it kept at your office?
4      A.  It's kept in my office.
5      Q.  Is there any communication going
6  back to the instructor on any type of
7  official form that tells the instructor the
8  outcome of the counseling slip?
9      A.  Not on an official form.  They
10  have a right to review what's on that,
11  recommendation of the files.
12      Q.  Okay.  Does -- If the instructor
13  -- that's a bad question.  To do that, the
14  instructor has to initiate to see what's on
15  the recommendation?
16      A.  You mean to see it?
17      Q.  Yes, sir.
18      A.  Generally they will ask.  But most
19  of the time, I inform them by telephone.
20      Q.  Okay.  Now, where are these
21  documents kept?  When I say these documents,
22  the complaint form.
23      A.  They are kept in the front office

Page 94

1  of student services.
2      Q.  So that's in the main
3  administration building?
4      A.  It's in that main building, yes,
5  sir.
6      Q.  Yes, sir.  So where is Ms.
7  Hendrix's office?
8      A.  In her area.
9      Q.  In horticulture?
10      A.  Horticulture.
11      Q.  On the back part of the campus?
12      A.  Yes, sir.
13      Q.  Okay.  How often -- that's a bad
14  question.  Does Ms. Hendrix have to come
15  into the main building everyday for
16  anything?
17      A.  I see her there at least twenty
18  times a day.
19      Q.  Okay.  So she does come back and
20  forth?
21      A.  Yes, sir.
22      Q.  How many other employees at J.F.I.
23  work in the horticulture area with Ms.

Page 95

1  Hendrix?
2      A.  Only she.
3      Q.  Only she.  If she has an
4  assistant, is that an inmate assistant?
5      A.  Generally, instructors have inmate
6  aids.
7      Q.  So any aid she had would be an
8  inmate aid?
9      A.  Yes, sir.
10      Q.  And approximately how many
11  students are in horticulture?
12      A.  I don't know exact.  But
13  approximately fifteen to seventeen.
14      Q.  All right.  Now, help me here, if
15  you will.  Let me write this down.  Is Ms.
16  Hendrix in charge of horticulture?
17      A.  She's over the program.  She's the
18  instructor for horticulture.
19      Q.  But she's over the horticulture
20  program?
21      A.  She's the instructor for
22  horticulture.
23      Q.  Who is her supervisor?

Page 96

1      A.  Dr. Merk.
2      Q.  Okay.  Who is over the welding
3  program?
4      A.  Dr. Merk is over all the
5  instructional programs.
6      Q.  Okay.  Who is the instructor for
7  the welding program?
8      A.  Which campus?
9      Q.  Both campuses.
10      A.  Mr. Arnett is on the main campus.
11  Mr. Wall is on the Draper, Staton campus and
12  Mr. Wade is on Tutwiler.
13      Q.  What about the automotive shop,
14  you have mechanics and what else in
15  automotive?
16      A.  Upholstery and auto body repair.
17      Q.  Where is the upholstery shop?
18      A.  On the main campus.
19      MR. CHRISTMAN:  Auto upholstery
20  shop is what you're asking.
21      MR. DEBARDELABEN:  Yes.  I'm
22  talking about auto upholstery.
23      Q.  And who's over that?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1      A.  Mr. Prossor.
2      Q.  Mr. Prossor.  Auto repair?
3      A.  Mr. Chisom and --
4      Q.  And when I say that, that's
5  mechanics like engine transmission.
6      A.  Mr. Benton.
7      Q.  Mr. Bentley?
8      A.  Benton.
9      Q.  What is the other one you have
10  that goes with paint shop?
11      A.  Auto body repair.
12      Q.  And who's over there?
13      A.  Mr. Chisom, Mr. Bail.
14      Q.  You have a furniture repair
15  upholstery shop, don't you?
16      A.  Furniture upholstery, yes, sir.
17      Q.  Okay.  Who's over there?
18      A.  Ms. Caylor.
19      Q.  Ms. Caylor?
20      A.  Yes, sir.
21      Q.  What other do you have with
22  furniture?  Is that it?
23      A.  Cabinet making.

Page 98

1      Q.  Okay.  Who's cabinet making?
2      A.  It's without an instructor.  We
3  have a substitute.
4      Q.  When it was -- How long has it
5  been vacant?
6      A.  Approximately six months.
7      Q.  Who was over it then?
8      A.  Mr. Haines.
9      Q.  Mr. Haines?
10      A.  Yes, sir.
11      Q.  Who's the substitute?
12      A.  Chris Thomas.
13      Q.  What happened to Mr. Haines?
14      A.  He's no longer at Ingram.
15      Q.  What else do you have?
16      A.  Furniture refinishing.
17      Q.  Who's over furniture refinishing?
18      A.  Mr. Keahey.
19      Q.  Anymore shops?
20      A.  Barbering.  The barber shop.
21      Q.  Is that Mr. Luster?
22      A.  He's over there now.  But the
23  position is Ms. Trimble's.

Page 99

1      Q.  Ms. Trimble.  What's Mr. Luster?
2      A.  Mr. Luster is barber instructor
3  for the Draper, Staton campus.
4      Q.  Where is Ms. Trimble?
5      A.  She's helping at Tutwiler with
6  cosmetology.
7      Q.  So at Tutwiler it's Ms. Trimble
8  and --
9      A.  At the present time, Ms. Trimble
10  is over at Tutwiler filling in for vacancy
11  for cosmetology.  Her position is the main
12  campus barber.
13      Q.  So you've got a cosmetology shop,
14  too?
15      A.  Yes, sir.
16      Q.  And that's Ms. Trimble?
17      A.  She's presently holding that
18  position now.
19      Q.  You got any more shops?
20      A.  Yes, sir.  Plenty.
21      Q.  What are they?
22      A.  At the Draper, Staton campus, we
23  have electrical, we have barbering, we have

Page 100

1  drafting.  We have carpentry, masonry,
2  plumbing, diesel, auto body repair, welding,
3  food service.
4      Q.  Who's in charge of them?
5      A.  Of food service?
6      Q.  Electrical.
7      A.  Mr. Carlyle.
8      Q.  Drafting?
9      A.  Mr. Harris.
10      Q.  Diesel?
11      A.  Mr. Spurling.
12      Q.  What else did you say was over
13  there?
14      A.  Masonry, carpentry.
15      Q.  Whose in charge of masonry?
16      A.  Masonry is Mr. Millidge.
17  Carpentry is Gol Smith.  Food services,
18  Blake.
19      Q.  Who?
20      A.  Blake.
21      Q.  Blake who?  Who is Mr. -- Is it
22  Mr. Blake?
23      A.  Mr. Blake.

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

| Page 101 | Page 103 |
|---|---|

Page 101

1    Q.  Any more shops?
2    A.  We have welding.  That's Mr.
3  Walls.  Plumbing.
4    Q.  You already gave me Mr. Walls.
5    A.  Mr. Till.
6    Q.  Plumbing is Mr. Till.  Okay.  Any
7  more?
8    A.  Tutwiler.
9    Q.  Who is at Tutwiler?
10    A.  You have Mr. Wade.
11    Q.  Mr. Wade.  You've already gave me
12  Mr. Wade.
13    A.  Mr. Thomas is over office
14  information system.  And we have Ms. Roberts
15  over commercial sewing.
16    Q.  Ms. Roberts?
17    A.  Ms. Roberts, right.
18    Q.  Okay.
19    A.  Mr. Blake is over food service on
20  the campus, also.  And we have auto
21  mechanics.  And I can't remember that guy's
22  name.  He's new.  And we have floor design,
23  which is interior design.  And I don't

Page 103

1    Q.  Okay.
2      (Whereupon, Plaintiff's Exhibit
3  No. 9 was marked for identification and
4  attached to the original transcript.)
5    Q.  Let me show you what I have marked
6  as Plaintiff's Exhibit 9.  Do you recognize
7  that memo?
8    A.  Yes, sir.
9    Q.  Now, what action did Ms. Hendrix
10  fail to take?
11    A.  She didn't tell me until some days
12  after, I believe, if I'm not mistaken.
13    Q.  Well, you wrote this memorandum on
14  September the 16th, didn't you?
15    A.  Yes, sir.
16    Q.  And you referred to something on
17  September the 15th.  I believe it was drug
18  use, wasn't it?
19    A.  I'm not certain what she had going
20  on then.
21    Q.  I was looking down here.  And it
22  said, and according to -- look at
23  Plaintiff's Exhibit 1.

Page 102

1  remember her name either.  She's new.  And I
2  believe that's about it on the shops.
3    Q.  Okay.  About six female
4  instructors?
5    A.  Probably.
6    Q.  But on -- How many do you have at
7  the main campus?
8    A.  Cosmetology.  I don't think I
9  mentioned that.
10    Q.  You did.  At the main campus,
11  presently you have two female instructors.
12  But Ms. Trimble is there, but she's over at
13  Tutwiler now?
14    A.  So that makes three.
15    Q.  Three.  But how often does Ms.
16  Trimble come to the main campus now?
17    A.  She was there until the beginning
18  of the summer semester.
19    Q.  At the present time her office is
20  --
21    A.  At Tutwiler.
22    Q.  -- over in Wetumpka?
23    A.  Right.

Page 104

1      MR. CHRISTMAN:  Exhibit 1?
2      MR. DEBARDELABEN:  Yes, sir.
3    Q.  Would you agree with me, according
4  to Plaintiff's Exhibit 1, that if it was
5  drug use, that's criminal activity?  Would
6  drug use be criminal activity?  Maybe I
7  should ask it that way.
8    A.  In my opinion, it would be.
9    Q.  Okay.  And that would have been an
10  emergency procedure, wouldn't it?
11    A.  To some people.
12    Q.  When student behavior constitutes
13  criminal activity.  Under y'all's rules for
14  number one, that's an emergency procedure,
15  isn't it?
16    A.  Uh-huh.
17    Q.  And --
18    A.  A non-emergency really.  It could
19  be.
20    Q.  Well --
21    A.  She said in the memorandum she was
22  suspicious.
23    Q.  Right.  And appropriate Department

26 (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  of Corrections personnel will be immediately
2  notified at any time the following
3  conditions exist. When a student's behavior
4  constitutes a criminal activity.
5      If she was under the impression it
6  was a criminal activity, she should have
7  reported it not to you, but to DOC,
8  shouldn't she, according to y'all's rules?
9      A. And to me.
10     Q. Well, sir, but that's not what
11 that says over there, is it?
12     A. What page are you on?
13     Q. I'm on page two of Exhibit 1 under
14 emergency procedure.
15     A. It doesn't say it there.
16     Q. Yes, sir.
17     A. But in order for us to take any
18 action, it would have to be reported to us,
19 too.
20     Q. I'm going to show you what I have
21 marked as Plaintiff's Exhibit 10.
22         (Whereupon, Plaintiff's Exhibit
23 No. 10 was marked for identification and

Page 106

1  attached to the original transcript.)
2      Q. Have you seen that memorandum?
3      A. No, sir.
4      Q. And Dr. Merk is Ms. Hendrix's
5  direct supervisor, isn't he?
6      A. Yes, sir.
7      Q. So if she has a problem with
8  something going on in her area, she should
9  really go bring it up with him, shouldn't
10 she?
11     A. Not in all cases.
12     Q. So what cases should she not bring
13 it up with Dr. Merk?
14     A. When it involves students and
15 according to the policies that are out there
16 that direct instructors and other personnel
17 what policies to act upon when it involves
18 students.
19     Q. Yes, sir. And an emergency
20 procedure is a criminal activity. It says
21 go to DOC, doesn't it?
22     A. Yes.
23     Q. And apparently she got the report

Page 107

1  to the Department of Corrections if her
2  September 16th, 2005 memo is to be believed?
3      A. After she had summoned Mr. Benton
4  and Mr. -- someone else she mentioned in
5  here -- and she went back down to Mr. Haines
6  -- that she went down to the greenhouse
7  while her inactions to come to me directly
8  was violating policy.
9      She should have either gone to DOC
10 and to me, not other personnel as it clearly
11 states in the memorandum.
12     Q. Now, it was -- I thought you told
13 me earlier that when you have a problem, an
14 instructor has what might be a problem with
15 a student, before they write it up or do
16 anything, they need to see if they can work
17 it out themselves?
18     A. That's the first part.
19     Q. Yes, sir. And she's put in a
20 situation of having it reported to her that
21 there are two students in the greenhouse
22 apparently with drugs of some type; is that
23 correct?

Page 108

1      A. That's what she said in the memo.
2      Q. Right. Now, should she walk in
3  that greenhouse by herself if you have two
4  fellows doing drugs?
5      A. No.
6      Q. Should she try to get somebody
7  down there ASAP to assist her no matter who
8  it is so she wouldn't be by herself?
9      A. She should have followed the
10 procedure and called DOC. And after she
11 called DOC, she should have called me or Dr.
12 Merk.
13     Q. Well, sir, that's what I'm having
14 a problem with. To make sure it's a
15 problem, you told me this morning you go in
16 and you check it out before they write
17 anything up or do something.
18     A. No, I didn't tell you that.
19     Q. Oh, okay. So the first part of
20 this about you telling me a student -- a
21 teacher is supposed to try to handle it
22 themselves before they -- step number one,
23 that's only on non-emergency procedures.

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1    But in this one where she believed
2 it was reported to her it might be drugs
3 going on, she's just supposed to report it
4 without seeing if that's worthy to be
5 believed?
6    A.  To DOC.
7    Q.  Now, she got the report to DOC,
8 didn't she?
9    A.  Sir?
10    Q.  She got it to DOC?
11    A.  It says here that she told Mr.
12 Caldwell.  And he's an officer of the DOC.
13    Q.  And Officer Mershire came down to
14 horticulture?
15    A.  Mershire.
16    Q.  Right.  And the first thing the
17 next morning, she spoke to Dr. Merk about
18 it, didn't she?
19    A.  I have no idea.
20    Q.  That's what she said.  This
21 morning, as you know, I spoke with you
22 regarding the incident first thing.  How did
23 you find out about the incident?

Page 110

1    A.  From the DOC officers.
2    Q.  Okay.  When did you find out about
3 the incident?
4    A.  Right after -- Sometime after they
5 had gone down.
6    Q.  So there is some type of unwritten
7 rule in the emergency procedures that she's
8 supposed to report it to you?
9    MR. CHRISTMAN:  Object to the
10 form.
11    Q.  I'm just looking in the emergency
12 procedures.  Where does it say she is
13 supposed to report it to you?
14    A.  It says the center director will
15 investigate any such occurrence and make a
16 report to the Dean of Student and Support
17 Services.
18    The dean, or designee, will
19 determine the status of the student and will
20 make appropriate contact with DOC as to the
21 student's future status at J.F. Ingram State
22 Technical College.
23    Q.  Yes, sir.  And where does it say

Page 111

1 the instructor is supposed to report this to
2 you?
3    A.  The center director will
4 investigate any --
5    Q.  Who is the center director?
6    A.  Dr. Merk.
7    Q.  And she reported it to Dr. Merk
8 the morning of the 16th?
9    A.  Apparently so.
10    Q.  And it -- But she immediately
11 reported it to DOC?
12    A.  That's not what she said in her
13 correspondence.  Her correspondence say that
14 she got Mr. Haines and Mr. Benton and they
15 went back down there.
16    Q.  Right.  And to see -- to check out
17 something that had been reported to her?
18    A.  They are neither dean nor DOC.
19    Q.  Right.  But they were trustworthy
20 people close to -- close by her?
21    A.  I don't know if they are
22 trustworthy or not.
23    Q.  So you don't think Mr. Haines and

Page 112

1 Mr. Benton are trustworthy?
2    A.  Sir, the policies and procedures
3 were not followed as far as I was concerned.
4    Q.  Okay.  And policies and procedures
5 are supposed to be followed, aren't they?
6    A.  As close as possible.
7    Q.  And anybody who don't follow
8 policies and procedures should be up for
9 reprimand?
10    A.  I'm sorry?
11    Q.  If you don't follow policies and
12 procedure, you should be up for reprimand?
13    MR. CHRISTMAN:  Form.
14    A.  That's not my decision.
15    Q.  Now, are you aware that Mr. J.L.
16 Griswold has made the statement that every
17 time Ms. Hendrix would take an inmate to Mr.
18 Wilson with a problem, it seemed that Ms.
19 Hendrix would be put on the spot for
20 bringing the inmate in for corrective
21 action?
22    A.  No, sir.
23    Q.  What reason would he have to make

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1   such a statement if it wasn't true, if you
2   know?
3       A.  I have no idea.
4       Q.  Were you aware that Mr. J.L.
5   Griswold, Captain Griswold, felt that Ms.
6   Hendrix was at risk being left in the
7   horticulture area by herself without an aide
8   for back up?
9       A.  No, sir.
10      Q.  Try to help me with this.  You
11  have an area in horticulture where you teach
12  classes about the plants; is that correct?
13      A.  Yes, sir.
14      Q.  And then you have three separate
15  greenhouses?
16      A.  Yes, sir.
17      Q.  Are the inmates in the greenhouses
18  doing things when others are in the
19  classroom being taught?
20      A.  I don't know how she structured
21  her lab classes and her theory classes.
22      Q.  So you don't know?
23      A.  Well, I'm down there sometimes.

Page 114

1   And most of the times when I'm there, she
2   has her classrooms filled with students when
3   she's teaching and there are sometimes when
4   I'm there she's out in various places with
5   students.
6       Q.  As Dean of the College, are you in
7   charge of security?
8       A.  We have a sergeant that is in
9   charge of security.
10      Q.  Now, the sergeant, he's the DOC?
11      A.  Right.
12      Q.  Talking about college security,
13  not --
14      A.  Yes, sir.  As Dean of Students, I
15  am.
16      Q.  As Dean of Students, you're in
17  charge of security?
18      A.  Yes, sir.
19      Q.  To make sure that the students
20  don't escape or don't do things to get in
21  trouble as best you can?
22      A.  The escape part is DOC.  I only
23  handle the policy as it relates to the two

Page 115

1   year college systems and those policies that
2   we have in effect at Ingram as it relates to
3   student securities.
4       Q.  Now, tell me what policies do you
5   have that you're in charge of security on.
6       A.  On what students?
7       Q.  All students.  When I use the
8   phrase security, what does that mean in your
9   vernacular toward the students?
10      A.  Behavior, whether or not they are
11  on the bus from -- when they come in, from
12  the time they're there until the time they
13  leave.
14      Q.  Okay.  Does it have anything to do
15  with them getting class work done on time?
16      A.  Not really.
17      Q.  Not being disruptive in class?
18      A.  That's classroom management.  If
19  it gets to where they cannot handle it, if
20  it's the same reoccurring problem, then
21  bring it to my attention.
22      Q.  Does security of the students mean
23  keeping up with the students while they are

Page 116

1   in your -- for each instructor, I mean?
2       A.  That's the responsibility of the
3   instructors.
4       Q.  Okay.  Do you know a person named
5   Leo Miller?
6       A.  Yes, sir.
7       Q.  How do you know Mr. Miller?
8       A.  He's used to work at Ingram.
9       Q.  What was his job at Ingram?
10      A.  He was an instructual aide.
11      Q.  Now, was Mr. Miller at one time a
12  student at Ingram?
13      A.  Yes, sir.
14      Q.  And how long after he was a
15  student at Ingram was he hired to be an
16  instructor at Ingram?
17      A.  I don't know.  I really don't
18  know.
19      Q.  Okay.  Now, do you have anything
20  to do as Dean of the College with live work?
21      A.  No, sir.
22      Q.  So the live work doesn't come
23  under you at all?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 117

1    A.  No, sir.
2    Q.  Who does that come under?
3    A.  Dr. Merk.
4    Q.  Dr. Merk.  Does Ingram to your
5    knowledge in any way do live work off the
6    college campus?
7    A.  Sometimes.
8    Q.  And can they do it for a private
9    individual?
10    A.  You would have to ask Ms. Greene.
11    She -- It was under her at one time.  But we
12    have a little card that tells exactly how
13    it's done.
14    Q.  Mr. Christman and I, we don't
15    qualify to get Ingram to do any work for us,
16    do we?
17    A.  It is for past students.  It is
18    for Federal and State employees and I think
19    City employees and relatives.
20    Q.  So unless you fall into that area,
21    it's --
22    A.  You don't qualify.
23    Q.  You don't qualify.  Okay.

Page 118

1    A.  And non-profit organizations.
2    Q.  Okay.
3        (Whereupon, Plaintiff's Exhibit
4    No. 11 was marked for identification and
5    attached to the original transcript.)
6    Q.  Do you know a Melissa P. Wallace?
7    A.  Yes, sir.
8    Q.  How do you know Ms. Wallace?
9    A.  She used to work at Ingram.
10    Q.  Was she employed by Ingram or
11    employed through another organization?
12    A.  She was with Ingram.
13    Q.  Ingram.  Have you ever been in a
14    meeting with President Chambers, Ms. Kaye
15    Perryman, Dr. Merk and Ms. Wallace and
16    yourself?
17    A.  I believe so.
18    Q.  Were you in that meeting on June
19    25th, 2005?
20    A.  I'm not certain of the date.
21    Q.  Okay.  Did you hear President
22    Chambers tell Ms. Wallace that if she ever
23    talked to Barry Blackwell again, he would

Page 119

1    not be giving her another Christmas present
2    like the one he gave her this time?
3    A.  I don't recall that, no, sir.
4    Q.  Are you saying it didn't happen or
5    you just don't recall one way or the other?
6    A.  I don't recall it happening.
7    Q.  Have you ever -- Did you hear --
8    let me ask it this way.  Did President
9    Chambers raise his voice in this meeting?
10    A.  I don't recall.
11    Q.  Has President Chambers ever raised
12    his voice at you?
13    A.  Yes, sir.
14    Q.  Is that quite often?
15    A.  Not quite often.  But often.
16    Q.  Would it be in the presence of
17    other people?
18    A.  Yes, sir.
19    Q.  Does he have a management style of
20    raising his voice and yelling?
21    A.  In a sense.
22    Q.  Do you yell back at him?
23    A.  Sometimes.  But hardly ever.

Page 120

1    Q.  Have you heard him yell at other
2    people?
3    A.  Yes, sir.
4    Q.  Have you ever heard him yell at
5    Ms. Greene?
6    A.  Yes, sir.
7    Q.  Does he yell in what you call
8    cabinet meetings?
9    A.  Yes, sir.
10    Q.  Have you ever heard him tell the
11    young lady that was recording the cabinet
12    meetings to cut off the recorder?
13    A.  Occasionally.
14    Q.  And when that recorder is cut off,
15    what happens?
16    A.  He has discussions.
17    Q.  Does he raise his voice?
18    A.  Sometimes.
19    Q.  Has President Chambers ever yelled
20    at you in front of your employees that you
21    supervise?
22    A.  Yes, sir.
23    Q.  Do you yell at your employees?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1    A.  I raise my voice sometimes.
2    Q.  Let's distinguish this, Mr.
3  Wilson.  I don't mean raising your voice.  I
4  mean yelling.  Do you know the difference
5  between yelling and raising your voice?
6        MR. CHRISTMAN:  Form.  I don't
7    A.  Give me an example.
8    Q.  This would be a loud invoice.
9  This would be yelling (demonstrating).
10    A.  It doesn't get that loud.
11    Q.  It doesn't get that loud.  Have
12  you ever asked him not to raise his voice at
13  you?
14    A.  No, sir.
15    Q.  I want to show you what has been
16  marked as Plaintiff's Exhibit No. 11.  Did
17  you have a conversation or were in a
18  conversation with President Chambers and Ms.
19  Sandy Caylor where you made the statement
20  that nobody in the business office -- that
21  the business office gets special treatment
22  at Ms. Caylor's plant?
23    A.  No.

Page 122

1    Q.  Have you ever seen this memorandum
2  before?
3    A.  Yes, sir.
4    Q.  Is there any truth to this
5  memorandum?
6    A.  A little very tiny bit.
7    Q.  Tell me what in this memorandum
8  that is not true.
9    A.  Okay.  Dean Wilson said that the
10  business office won't let me go.  Dean
11  Wilson also stated that if the business
12  office wanted something done for their
13  family or kids, they would send me.
14        As a matter of fact, I don't --
15  she's saying you stated that you knew it was
16  keeping an eye on it.  That sentence just
17  doesn't make sense.
18    Q.  You deny saying anything in this
19  memorandum that Ms. Caylor credits to you?
20    A.  I'm not finished reading it.  What
21  was your question now?
22    Q.  What in this memorandum attributed
23  to you is not true?

Page 123

1    A.  Mostly everything that's
2  attributed to me is not true.
3    Q.  So Ms. Caylor wrote President
4  Chambers lies about you?
5    A.  She misquoted what I said.
6    Q.  And how did she misquote it?
7    A.  What I said to her was if Ms.
8  Green had a project in there that needed
9  some of that fabric, I bet you it was
10  already gone.
11    Q.  Why did you say that to her?
12    A.  That's what I felt.
13    Q.  All right.  What else did she
14  misquote?
15    A.  Anything else in there about Dean
16  Wilson is misquoted.
17    Q.  So when --
18    A.  And may I add that it was done in
19  a joking manner.  We was laughing and
20  chatting about the fabric and about the sofa
21  she was doing.  And I asked her had she got
22  permission from Dr. Merk to go because two
23  or three days before that, she had stopped

Page 124

1  me and said she was trying to get Dr. Merk
2  to give her permission to go down there.
3        So I assumed the reason she had
4  not gone was because of Dr. Merk, not
5  because of Ms. Green.
6    Q.  Now, she said I just sold Dean
7  Wilson a class project sofa covered in some
8  of the practice fabric.  Was that true or
9  false?
10    A.  That's true.
11    Q.  He also had a work order for
12  this.  Is that true or false?
13    A.  That's true.
14    Q.  Okay.  So what you're saying, you
15  were -- all -- you were doing all this in a
16  joking manner?
17    A.  That was the whole tone of the
18  conversation.
19    Q.  But she felt compelled to write
20  Dr. -- excuse me -- President Chambers a
21  note on this?
22        MR. CHRISTMAN:  Object to the form
23  as to what she was compelled to do.

# FREEDOM COURT REPORTING

Page 125

1    Q.  For some reason, Ms. Caylor wrote
2  President Chambers a note on this
3  memorandum?
4    A.  According to it being Exhibit 11,
5  yes, sir.
6    Q.  Okay.  At the end of the year --
7  Y'all's year ends September the 30th?
8    A.  Yes, sir.
9    Q.  If you have money in your account,
10  do you try to get -- spend that money?
11    MR. CHRISTMAN:  Form.  What money,
12  what account?
13    Q.  As I understand the colleges, each
14  program has a certain amount of money
15  allocated to it; correct?
16    A.  I think so, yes, sir.
17    Q.  Your program has a certain amount
18  of money allocated to it?
19    A.  Yes, sir.
20    Q.  To spend during the year?
21    A.  Yes, sir.
22    Q.  And at the end of the year, if you
23  have say June, July or August really and

Page 126

1  September, if you see you're going to have
2  money left over and you need items, at that
3  time, do y'all try to get rid of that money,
4  spend it, buy the items you need?
5    A.  We try to all during the year.
6    Q.  Right.  But especially at the end
7  of the year, if you're going to have money
8  left, then you try to spend it to get what
9  you need for the following year?
10    A.  Generally it happens sometimes.
11    Q.  Okay.  Now, has Ms. Green to your
12  knowledge ever refused to get you items that
13  there was money in your account to buy and
14  the proper paperwork filled out?
15    A.  Repeat your question, sir.
16    Q.  Has Ms. Green in her position as
17  -- I call it fiscal affairs officer -- has
18  she ever refused to buy items for you when
19  the proper paperwork was filled out and
20  there was money in your budget?
21    A.  Yes, sir.  Well, let me phrase it
22  this way.  I can't say that Ms. Green
23  refused.  I can say that there are some

Page 127

1  times that I have ordered things that it was
2  not ordered.
3    Q.  All right.  And do you know the
4  reason for that?
5    A.  In some cases, she's explained
6  that it had to be bidded.  And in some
7  cases, there was no explanation.  And that
8  was very few times.
9    Q.  What, that she had no explanation?
10    A.  No.  That we did not get what we
11  ordered.
12    Q.  Okay.
13    A.  But there have been times.
14    Q.  Now, as Dean of the Fiscal Office,
15  it's her duty and responsibility to make
16  sure the bid law is complied with, isn't it?
17    A.  Yes, sir.
18    Q.  Do you know what the bid law is?
19    A.  I know approximately.
20    Q.  Do you know -- You've got a
21  general idea?
22    A.  Yes, sir.
23    Q.  But she has to know it

Page 128

1  specifically, doesn't she?
2    A.  Yes, sir.
3    Q.  And you depend on her not to let
4  you get in trouble?
5    A.  Yes, sir.
6    Q.  And if there is a question about
7  what you order, what Dr. Merk orders or Mr.
8  Huffstutler orders or even what Dr. Chambers
9  orders, she should question it, shouldn't
10  she?
11    A.  She has that right, yes.
12    Q.  I mean, she not only has that
13  right, that's her job, isn't it?
14    A.  Her job is to question those
15  things that need to be bid -- not question
16  it, but to bid them.  It is our decision by
17  our signature whether we have approved the
18  item or not.
19    Q.  Right.  But it has to be purchased
20  in a certain way according to the State law?
21    A.  Yes, sir.
22    Q.  And she cannot -- Even if you're
23  the Dean of the College or President

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  Chambers can't tell her to buy something or
2  do it in a way that does not comply with
3  State law, can she?
4      A.  Right.
5      Q.  And how long have you been in a
6  supervisory position at J.F. Ingram?
7      A.  Since 1980.
8      Q.  During that period of time, have
9  you known of J.F. Ingram to be called to
10 task by the examiner's for the mis-spending
11 of money?  Probably a better way to put it,
12 the wrongful spending of money?
13     A.  Yes, sir.
14     Q.  Now, where did they wrongfully
15 spend money?
16     A.  I'm sorry?
17     Q.  Where did they wrongfully spend
18 money that you recall?
19     A.  I don't know where they spent it
20 at.
21     Q.  Now, when was this?
22     A.  Oh, it's been some number of years
23 back.  I don't recall.

Page 130

1      Q.  Do you know who the Dean of the
2  Fiscal Office was at that time?
3      A.  I think Mr. Powell.
4      Q.  Mr. Powell.  During Ms. Greene's
5  term as the Dean of the Fiscal Office, do
6  you recall any exception from the examiner
7  where she wrongfully was spending funds?
8      A.  Not in meetings that I have been a
9  part of where there were such findings.  But
10 I don't think the findings said that she
11 mis-spent.  Not that I recall.
12     Q.  Would you say you're not worrying
13 about the mis-spending, it just might be
14 hard to get the money out of her sometimes?
15     A.  I'm sorry?
16     Q.  That you don't worry about the
17 mis-spending when she spends money, it just
18 might be hard to get money out of her on
19 some items?
20         MR. CHRISTMAN:  Form.
21     A.  Is that question a question?
22     Q.  Yes.  Is it she just doesn't want
23 to turn loose of the money sometimes if she

Page 131

1  has a question?  You have to convince her
2  that probably -- If she has a question, she
3  won't spend it, will she?
4      A.  I've not had a problem that much.
5  There have been some things that we've
6  ordered and even she and I have signed it,
7  signing the requisition approving it.  But
8  we don't have that item.
9          Now, I have asked her several
10 times when she's said that is it forth
11 coming.  Of course, that has been over a
12 year, though.
13     Q.  And that's sometimes out of all
14 y'all's control?
15     A.  Well, she's the business dean.
16     Q.  But you don't have a problem
17 working with Ms. Green?
18     A.  No, sir.
19     Q.  Ever had a problem working with
20 her?
21     A.  It depends on how you're defining
22 problems.  We have some disagreements.
23     Q.  Yes, sir.  You have

Page 132

1  disagreements.  But y'all can work out your
2  disagreements and go forward?
3      A.  Yes, sir.
4      Q.  And as in most jobs, you have
5  disagreements?
6      A.  Yes, sir.
7      Q.  Even President Chambers?
8      A.  Yes, sir.
9      Q.  Even Dean Merk?
10     A.  Yes, sir.
11     Q.  Even with Mr. Montgomery?
12     A.  Yes, sir.
13     Q.  But you work together?
14     A.  Yes, sir.
15     Q.  Okay.  Now, let's change horses.
16 Who is Ms. Bonita Owensby?
17     A.  She is the director of admissions
18 and registration.
19     Q.  Who does she work for?
20     A.  Me.
21     Q.  How long has she been working for
22 you?
23     A.  Since 1998.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1    Q.  What was her position in 1998?
2    A.  She was a secretary to the Dean of
3  Students.
4    Q.  Secretary to the Dean of
5  Students.  And you were the Dean of
6  Students; correct?
7    A.  Repeat your question.
8    Q.  She was secretary to the Dean of
9  Students in 1998?
10   A.  In 1998, she was the secretary to
11 the Dean of Students.
12   Q.  And you were the Dean of Students?
13   A.  I was the Dean of Students as of
14 September 1, 1998.
15   Q.  So who had that position before
16 you?
17   A.  Mr. Paul Reeder.
18   Q.  And she was his secretary?
19   A.  Yes, sir.
20   Q.  Okay.  Who was the registrar then?
21   A.  Mr. Tim Robinson.
22   Q.  And what did he do?
23   A.  He was the registrar.  He was a

Page 134

1  counselor and he was the task GED tester and
2  admission tester.
3    Q.  What was his official title?
4    A.  I think his official title was the
5  registrar.
6    Q.  Okay.  And when did Mr. Robinson
7  leave the job as registrar?
8    A.  Sir, I don't recall what his
9  departure date was.
10   Q.  Was he under you?
11   A.  At one time, yes, sir.
12   Q.  Was he under you when he left?
13   A.  Yes, sir.
14   Q.  Who took over his job?
15   A.  I did.
16   Q.  You did?
17   A.  I took over his duties.
18   Q.  Okay.  Were these Mr. Robinson's
19 duties when he left the employment of
20 Ingram?
21   A.  I don't know.
22   Q.  Was he under you at that point in
23 time?

Page 135

1    A.  Yes, sir.  Seems like it was his
2  -- it had been updated.
3    Q.  Is Ms. Owensby a good employee?
4    A.  Yes, sir.
5    Q.  When Mr. Robinson left, did Ms.
6  Owensby take on any of his duties?
7    A.  Not at first.
8    Q.  And that was -- She was just
9  assistant to the Dean of the College, wasn't
10 she?
11   A.  No, she wasn't.
12   Q.  She wasn't?  Were you?
13   A.  I'm sorry?
14   Q.  Who was the assistant to the Dean
15 of the College?
16   A.  I was at one time.
17   Q.  You were?
18   A.  I was assistant Dean of the
19 College.  Not assistant to.
20   Q.  Let me ask you this.  You might
21 can straighten me out on that.  And I'm sure
22 you can.
23       (Whereupon, Plaintiff's Exhibit

Page 136

1  No. 12 was marked for identification and
2  attached to the original transcript.)
3    Q.  Show you what we're going to mark
4  as 13.  It appears to be a two-page
5  document.  I'll ask if you can tell me what
6  this document is.  You might can not.
7       (Whereupon, Plaintiff's Exhibit
8  No. 13 was marked for identification and
9  attached to the original transcript.)
10   A.  Seems like a job description of
11 the assistant to the Dean of the College.
12   Q.  Okay.  Did you ever hold that
13 position?
14   A.  No, sir.
15   Q.  So that does not relate to you at
16 all?
17   A.  No, sir.
18   Q.  Okay.  Show you what we're going
19 to mark as 14 and ask if you can tell me
20 what this document is.
21       (Whereupon, Plaintiff's Exhibit
22 No. 14 was marked for identification and
23 attached to the original transcript.)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 137

1    A. This is a document that has
2  registrar assistant to the Dean of Students
3  and Support Services on whom they felt and
4  started a process to restructure the college
5  again.
6    Q. And whose job does that describe?
7    A. That would be -- described for a
8  person who was going to get -- hopefully be
9  put in that position at that time had the
10 Chancellor approved it.
11   Q. Did the chancellor not approve it?
12   A. No, sir. It did not go through.
13 The process stopped.
14   Q. Why did the process stop?
15   A. I don't know, sir.
16   Q. Did you have somebody in mind for
17 that job?
18   A. Sir?
19   Q. Did you have somebody in mind for
20 the job I just showed you Exhibit 14?
21   A. Yes, sir.
22   Q. Who was that?
23   A. Ms. Owensby.

Page 138

1    Q. Was Ms. Owensby capable of doing
2  that job in your opinion?
3    A. I think with me helping her and
4  aiding her, she could have.
5    Q. Show you what we're going to mark
6  as Plaintiff's Exhibit No. 15.
7      (Whereupon, Plaintiff's Exhibit
8  No. 15 was marked for identification and
9  attached to the original transcript.)
10   Q. I'll ask you if you can tell me
11 what that is a description of?
12   A. It's another job description for a
13 registrar.
14   Q. Did you have any input into that
15 job?
16   A. I think a combination of us worked
17 on this.
18   Q. Pardon me?
19   A. I think a combination of us --
20 student services personnel worked on that.
21   Q. Did you work on it?
22   A. I had some input.
23   Q. I'm going to show you what we're

Page 139

1  going to mark as Plaintiff's Exhibit 16.
2      (Whereupon, Plaintiff's Exhibit
3  No. 16 was marked for identification and
4  attached to the original transcript.)
5    Q. I'll ask you if you're familiar
6  with this document?
7    A. I'm familiar with it.
8    Q. Okay. Is anything in that
9  memorandum dated August 13th, 2004 from Ms.
10 Bonita Owensby to you incorrect?
11   A. I'm sorry?
12   Q. Is there anything that Ms. Owensby
13 has written in this document that is
14 incorrect?
15     MR. CHRISTMAN: This is a two-page
16 document.
17   A. I'm going to have to read it, sir.
18   Q. Yes, sir.
19     MR. CHRISTMAN: The second page is
20 a grievance statement; is that right?
21     MR. DEBARDELABEN: Apparently,
22 yes.
23     MR. CHRISTMAN: Is your question

Page 140

1  directed also to the grievance statement?
2      MR. DEBARDELABEN: You know what.
3  The grievance statement shouldn't be on
4  there. That was my mistake.
5      MR. CHRISTMAN: Okay. Let me
6  detach that from the exhibit. I'll let you
7  detach it from your exhibit.
8      MR. DEBARDELABEN: Because I could
9  not put an October 4th grievance on an
10 August the 11th. I could, but it wouldn't
11 be good.
12     MR. CHRISTMAN: The witness is now
13 only looking at a one page exhibit which is
14 a memo from Owensby to Wilson, Exhibit 16.
15   A. The second one, initiated a change
16 in testing procedures.
17   Q. She didn't do that?
18   A. No. That's not her job. That's
19 my job. The third dot, she was just doing
20 her job. Nothing increased in the
21 activity. She just started doing it.
22   Q. So prior to August 3rd, 2004, Ms.
23 Owensby wasn't doing her job?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1    A.  That's not what I said.  I said to
2  the number three dot, increased activity in
3  transcribing and evaluating transcripts and
4  conferring with other colleges and former
5  students regarding transcripts due -- and
6  then she has a parenthesis -- due to more
7  students enrolling with prior college credit
8  and DOC transitions.
9      **Q.  She did do that, didn't she?**
10     A.  She was doing it.
11     **Q.  And her job -- and it increased?**
12     A.  What increased?
13     **Q.  The transcribing she had to do and**
14  **evaluating the transcripts?**
15     A.  Perhaps it did with more students
16  going to college.  But that -- Those are
17  normal situations in a two-year college
18  system.
19     **Q.  All right.**
20     A.  The last dot, second to the last
21  at the bottom.
22     **Q.  Uh-huh.**
23     A.  She trained no student aides.

Page 142

1      **Q.  Sir?**
2      A.  She trained no student aides.
3      **Q.  What about assist with training**
4  **new staff?**
5      A.  Staff that worked under her.
6      **Q.  Okay.**
7      A.  And the last one, direct and
8  provide assistance with improving existing
9  admission forms, all student services
10  personnel worked with that.
11     **Q.  Okay.  Now, I noticed she signed**
12  **this under her job description registrar and**
13  **assistant to the Dean of Students.  Is that**
14  **what she was on August 13th, 2004?**
15     A.  No, sir.  That was a mistake that
16  came out of that office.  And she signed
17  that.  That was an error.  The president had
18  made no provision for job changes in that
19  either.
20        That was an error in personnel.
21  And Ms. Owensby brought it to my attention
22  and she went to that office to straighten
23  that up and I assumed that it was straight.

Page 143

1      **Q.  So that wasn't her job?**
2      A.  No, sir.
3        MR. CHRISTMAN:  We've been going
4  about an hour.  Can we take a break?  Do you
5  want to finish up something?
6        MR. DEBARDELABEN:  We can go ahead
7  and stop.
8        (Whereupon, a short recess was
9  taken.)
10     **Q.  Have you ever told anyone in your**
11  **office not to communicate with the business**
12  **office?**
13     A.  No.
14     **Q.  You've never told anybody that**
15  **worked for you not to communicate with the**
16  **business office?**
17     A.  No, sir.
18     **Q.  That would hinder everybody,**
19  **wouldn't it?**
20        MR. CHRISTMAN:  Form.
21     **Q.  That would hinder both you and**
22  **your people in the business office, wouldn't**
23  **it?**

Page 144

1      A.  It depends on what matter.
2      **Q.  Okay.  Show you what's marked as**
3  **17.**
4        **(Whereupon, Plaintiff's Exhibit**
5  **No. 17 was marked for identification and**
6  **attached to the original transcript.)**
7      **Q.  Do you recognize that document?**
8      A.  Yes, sir.
9      **Q.  What is that document?**
10     A.  It's an appointment letter.
11     **Q.  From who?**
12     A.  From J. Douglas Chambers.
13     **Q.  To who?**
14     A.  To Bonita J. Owensby.
15     **Q.  And what was she appointed to?**
16     A.  It says the purpose of this memo
17  is to confirm your appointment as registrar,
18  assistant to the Dean of Students and
19  Support Services, beginning effective 1 --
20  September 1, 2003 for the period ending
21  August 31, 2004.
22     **Q.  Now, when I asked you about that**
23  **prior to our little break, you told me that**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1   was a mistake. Was that a mistake?
2        A. In my opinion, yes, sir.
3        Q. But President Chambers has the
4   right to make that appointment, doesn't he?
5        A. Yes, sir.
6        Q. To your knowledge, was that
7   appointment ever changed?
8        A. According to the document, it did
9   not.
10       Q. Okay. So as of September 1st,
11  2003, was Ms. Bonita J. Owensby the
12  registrar or assistant to the Dean of
13  Students and Support Services?
14       A. According to that document.
15       Q. Well, what other document do you
16  have showing something different that you
17  know of?
18       A. I don't have one.
19       Q. Is there any document that shows
20  anything different?
21       A. No, sir.
22       Q. Okay. I'm a little confused on
23  this document. But this is the way I got

Page 146

1   it. Did you ever go to President Chambers
2   and say, hey, wait a minute, you've got a --
3   she doesn't have this appointment?
4        A. His signature was on it.
5        Q. Sir?
6        A. His signature was on it.
7        Q. Yes, sir.
8        A. He makes the appointments.
9        Q. And he had the right to make that
10  appointment, didn't he?
11       A. He's the president.
12       Q. Did you disagree with it?
13       A. I disagreed with the title and the
14  appointment letter when it was brought down
15  there as well as Ms. Owensby disagreed with
16  it.
17       Q. Now, what did she disagree with it
18  about?
19       A. Because it wasn't a title that she
20  was -- it wasn't her title. And she
21  questioned it and she brought it to my
22  attention.
23       Q. Let me show you what I have marked

Page 147

1   as Plaintiff's Exhibit No. 18.
2            (Whereupon, Plaintiff's Exhibit
3   No. 18 was marked for identification and
4   attached to the original transcript.)
5        Q. Do you recognize that document?
6        A. Yes, sir.
7        Q. What is that document?
8        A. It is an evaluation.
9        Q. And what's the title on that?
10       A. Position title, registrar,
11  assistant to the Dean of Students and
12  Support Services.
13       Q. And what date is that?
14       A. It has October 3, 2005.
15       Q. And you signed it. Is that your
16  signature on the back?
17       A. Yes, sir.
18       Q. October the 6th, '05?
19       A. Yes, sir.
20       Q. And this is of Ms. Bonita J.
21  Owensby?
22       A. Yes, sir.
23       Q. Okay. So Ms. Owensby was the

Page 148

1   registrar?
2        A. According to that document.
3        Q. And she had a different -- even
4   had more duties. She was the assistant to
5   the Dean of Students and Support Services?
6        A. She had that title.
7        Q. Yes, sir. Now, when Mr. Robinson
8   retired, he was the registrar, that was his
9   job title, wasn't it?
10       A. I believe so. I'm not certain.
11       Q. And Mr. Robinson resigned, what,
12  '99?
13       A. I'm not sure of the date. It was
14  sometime seemingly short after I resumed the
15  position of Dean of Students.
16       Q. And Mr. Robinson was a black male?
17       A. Correct.
18       Q. And he was replaced as registrar
19  by Ms. Bonita Owensby, a black female?
20           MR. CHRISTMAN: Form.
21       A. I assumed Mr. Robinson's duties
22  when he resigned.
23       Q. Okay. But by 2003, Ms. Owensby

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1  was named the registrar?
2      A.  According to that document.
3      Q.  Yes, sir. And her duties were
4  outlined in Exhibit 14, weren't they?
5      A.  No, sir.
6      Q.  As the registrar, assistant to the
7  Dean of Students?
8      A.  Those were -- Where did you get
9  these from?
10     Q.  I have them, sir.
11     A.  Well --
12     Q.  Her --
13     A.  I've not seen these other than --
14     Q.  You haven't seen these?
15     A.  If these were attached to -- in
16  her personnel file behind her job
17  description, then they could very well be.
18     Q.  But you wouldn't know, would you,
19  because personnel files are not what you're
20  supposed to do; correct?
21     A.  I don't go in them.
22     Q.  Okay. Who is responsible for
23  coming up with the job duties of an

Page 150

1  employee?
2      A.  I'm sorry?
3      Q.  Who is responsible for coming up
4  with the job duties of an employee? Would
5  that be the personnel department?
6      A.  Generally speaking, yes.
7      Q.  That wouldn't be you?
8      A.  Department heads help.
9      Q.  Right.
10     A.  Yes, sir.
11     Q.  But y'all don't have -- department
12  heads do not have the -- or so they say --
13  the expertise to come up with personnel job
14  descriptions?
15     A.  Sure, we have expertise.
16     Q.  Well, personnel doesn't always
17  agree with you on that, do they?
18     A.  Sometimes they do and sometimes
19  they don't.
20     Q.  Let's see. Are you familiar with
21  the grievance Ms. Owensby filed in 2004?
22     A.  Yes, sir.
23     Q.  Do you know why she filed that

Page 151

1  grievance?
2      A.  What does it say?
3      Q.  Well, I'm going to show it to
4  you. This will be No. 19.
5          (Whereupon, Plaintiff's Exhibit
6  No. 19 was marked for identification and
7  attached to the original transcript.)
8          MR. CHRISTMAN:  What was the
9  question?
10     Q.  Are you familiar with the
11  grievance Ms. Owensby filed?
12     A.  Yes, sir.
13     Q.  Did she discuss filing that
14  grievance with you before she filed it?
15     A.  No, sir.
16     Q.  Did she discuss filing that
17  grievance with you after she filed it?
18     A.  No, sir.
19     Q.  Did you play any part in any of
20  the grievance process?
21     A.  I think there was a couple of
22  meetings.
23     Q.  And who were you in those meetings

Page 152

1  with?
2      A.  Dr. Merk, at one time. I think
3  Ms. Owensby was in one. And the president.
4      Q.  Did you support Ms. Owensby in her
5  grievance?
6      A.  Not as written.
7      Q.  What about Exhibit 19 do you
8  disagree with?
9      A.  That her dual role was not dual.
10  She had a dual title.
11     Q.  Now, I notice in here that she
12  says something about my responsibility as
13  assistant to the Dean of Students is as
14  equivalent in value as other deans'
15  assistants because I carry out his
16  directives and assist him in meeting overall
17  goals and objectives of the student services
18  department. Is that a true statement?
19     A.  She's not the only one.
20     Q.  Yes, sir. But is that a true
21  statement, that she assists you in doing
22  that?
23     A.  She helps.

38  (Pages 149 to 152)

# FREEDOM COURT REPORTING

Page 153

1    Q.  Does she supervise direct work of
2  others and assists them in completing
3  scheduled tasks?
4    A.  At that particular time, I think
5  she had one person under her -- two people
6  under her supervision that she supervised.
7    Q.  Who supervised her in her job as
8  registrar?
9    A.  I did.
10    Q.  And what did your supervision
11  consist of?
12    A.  Be more specific.
13    Q.  What did you do to supervise her?
14    A.  Everyday functions of student
15  services.
16    Q.  Okay.  Had you ever been the
17  registrar before?
18    A.  I assumed the registrar's position
19  duties when Mr. Robinson left.
20    Q.  And how long did you hold that?
21    A.  I don't know, sir.  I would have
22  to look at records when we made some changes
23  from 1998 up until 2004.

Page 154

1    Q.  Okay.
2    A.  Or 2003 maybe -- whenever it is
3  when her title changed.  And then I
4  continued to do some.  I continue to do some
5  now.
6    Q.  I have another job description
7  apparently.  Let me do this as 20.
8      (Whereupon, Plaintiff's Exhibit
9  No. 20 was marked for identification and
10  attached to the original transcript.)
11    Q.  I'll ask you if you have ever seen
12  this job description as a registrar?  I
13  think that's registrar and assistant to the
14  Dean of Students and Support Services, isn't
15  it?
16      MR. CHRISTMAN:  That's what that
17  says.
18    A.  It seems that that document is
19  confusing.  It has registrar, assistant to
20  the Dean of Students and Support Services.
21  But it says under the supervision of the
22  Dean of Students, the registration and
23  admission coordinator will coordinate and

Page 155

1  direct all activities.
2      And that's why I pointed out to
3  you when this was invented, she was the
4  coordinator of registration and admission.
5  And that's how this confusion got going in.
6  That's why the president signed off on that
7  appointment letter because it wasn't pointed
8  out to him.
9      So whoever invented these job
10  descriptions confused the title.  This to me
11  should have been the coordinator of
12  registration and admissions.
13    Q.  Well, who prepares appointment
14  letters for the president?
15    A.  Dr. Merk and Ms. Turner.
16    Q.  So this would be something, if you
17  want to put it at somebody's feet, would be
18  Dr. Merk and Ms. Turner?
19    A.  Yes, sir.
20    Q.  And who is Ms. Turner?  What is
21  her position?
22    A.  She is the -- I think her title is
23  coordinator of personnel.

Page 156

1    Q.  And she works under Dr. Merk?
2    A.  Yes, sir.
3    Q.  And Dr. Merk, his title is dean of
4  what?
5    A.  Dean of Instruction.
6    Q.  Dean of Instruction?
7    A.  Yes, sir.
8    Q.  And as Dean of Instruction, he's
9  over personnel?
10    A.  Yes, sir.
11    Q.  Who was over it prior to Dr. Merk
12  being over personnel?
13    A.  Mr. Wright.
14    Q.  Mr. Wright.  How long had -- Now,
15  what was Mr. Wright's title?
16    A.  Director of personnel.
17    Q.  Director of personnel?
18    A.  Yes, sir.
19    Q.  And you no longer have a director
20  of personnel at J.F. Ingram?
21    A.  No, sir.  Unless Dr. Merk assumed
22  that responsibility when titled.
23    Q.  So what you have is a dean -- I

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1  mean a coordinator of personnel?
2      A.  Right.
3      Q.  Does the coordinator of personnel
4  basically run the day-to-day operation of
5  the personnel office?
6      A.  With the supervision of Dr. Merk,
7  yes, sir.
8      Q.  All right.  Is the registrar
9  considered an officer or a member of the
10  cabinet at --
11     A.  No, sir.
12     Q.  Okay.  When you go into levels, I
13  know you have the president who's at the top
14  and then you have the deans.  What's the
15  next level under that?
16     A.  Well, depending on who the person
17  is supervised by, that falls under either
18  the business dean, the Dean of Instruction
19  or the Dean of Students.
20     Q.  Yes, sir.
21     A.  Then you have director.
22     Q.  What's your next level down under
23  a dean?  Is it a director?

Page 158

1      A.  Well, it just depends.  Under the
2  Dean of the College, you have -- there's two
3  assistants.  Then you have -- I guess in the
4  organization scale, I would fall up under
5  myself because I am both the Dean of
6  Students and the Dean of the College.
7          And then you have your admissions
8  persons, your directors, your coordinators.
9  It just depends on the department.
10     Q.  Okay.  How many female
11  coordinators are there at J.F. Ingram?
12     A.  I don't know.  I've not counted
13  them.
14     Q.  Okay.  How many female
15  coordinators are there in your department?
16     A.  None.
17     Q.  None?
18     A.  I have no female coordinators.
19     Q.  Okay.  How many female directors
20  in your department?
21     A.  One.
22     Q.  Who is that?
23     A.  Ms. Owensby.

Page 159

1      Q.  How many male coordinators in your
2  department?
3      A.  Two.
4      Q.  How many male directors?
5      A.  No.  I have one coordinator and
6  one male director.
7      Q.  One coordinator and one male
8  director?
9      A.  Well, let's go back and again
10  define coordinator.
11     Q.  How do you define it?
12     A.  Well, there are some that are
13  coordinator of activities.  And they do not
14  supervise people.
15     Q.  Okay.
16     A.  Then there are some that are
17  coordinators of programs and they supervise
18  people.
19     Q.  Okay.  And what is Ms. Owensby?
20     A.  She's a director.
21     Q.  And what does she supervise?
22     A.  She supervises the activities of
23  admission and registration.

Page 160

1      Q.  Okay.  Now, how are students
2  admitted to J.F. Ingram?  I know one thing
3  -- or one of the requirements is they have
4  to be a felon and in prison?
5      A.  And they have to meet the minimum
6  requirements that are afforded by DOC as
7  being within a certain length of time and
8  having the ability to benefit.
9      Q.  Now, I always wanted to ask this
10  question.  If an inmate has six months to
11  serve, can he get into a program that has a
12  nine month requirement?
13     A.  Yes.
14     Q.  So they go into the program
15  knowing he can't finish it?
16     A.  Well, it depends on how you're
17  defining finishing.
18     Q.  Getting a degree from J.F.I.?
19     A.  You can't get a degree.  He gets a
20  certificate or he can get a certificate of
21  employability skills.
22     Q.  Okay.  So he can go into a program
23  that's a normal nine month program with only

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1 six months left on his sentence?
2     A.  We don't encourage that.  But we
3 don't deny them.
4     Q.  All right.
5     A.  We have programs that are one
6 semester, if the student completes nine
7 hours, which is called a short term training
8 program.
9     Q.  Do you know if Mr. Robinson -- Do
10 you know how much money he was making when
11 he left J.F.I. in 1999?
12     A.  No.  I know he was on a C-1 salary
13 schedule.
14     Q.  He was on which salary schedule?
15     A.  C-1.
16     Q.  And which salary schedule is Ms.
17 Owensby on?
18         MR. CHRISTMAN:  Now?
19     Q.  When she became the registrar and
20 dean -- assistant to Dean of Student
21 Services?
22     A.  I don't know.  I think it was E.
23     Q.  E.  What's the difference between

Page 162

1 a C and an E salary schedule?
2     A.  Money.
3     Q.  The E salary schedule would be
4 higher than the C salary schedule, wouldn't
5 it?
6     A.  No, sir.
7     Q.  Is it right backwards?
8     A.  Yes, sir.
9     Q.  So the C salary schedule is higher
10 than the E salary schedule?
11     A.  Yes, sir.
12     Q.  Have you ever known a registrar
13 other than Ms. Owensby that was not on the C
14 salary schedule?
15     A.  Not personally knowing them.  But
16 with the evaluation we did in the two-year
17 college system, yes.  There were plenty.
18     Q.  Have you ever known one at J.F.I.
19 that wasn't on the C salary schedule?
20     A.  We've only had these two.
21     Q.  Mr. Robinson and Ms. Owensby?
22     A.  Yes, sir.
23     Q.  Okay.  And Mr. Robinson is a male,

Page 163

1 a black male and Ms. Owensby is a black
2 female; correct?
3     A.  They appear to be, yes.
4     Q.  I haven't met Mr. Robinson.  I
5 wouldn't know.
6     A.  They both have features of one
7 being a black male and the other one has
8 features of being a black female.
9     Q.  Okay.  So in your opinion, they
10 are?
11     A.  Yes.
12     Q.  Okay.
13         MR. CHRISTMAN:  We'll stipulate to
14 that.
15     Q.  I haven't met Mr. Robinson.  I
16 don't know.  He might be a little green man
17 from Mars as far as I know.  Ms. Owensby, is
18 she still on the E salary schedule?
19     A.  No, sir.
20     Q.  She's on the C salary schedule?
21     A.  Yes, sir.
22     Q.  Has the job of registrar always
23 been supervised by you since you've been the

Page 164

1 director?
2     A.  I'm not the director, sir.
3     Q.  Since you became the director of
4 student services and then you became the
5 Dean of Student Services, didn't you?
6     A.  No.
7     Q.  What did you get in 1980?
8     A.  Director of student support
9 services.
10     Q.  Okay.  Was the registrar -- when
11 Mr. Robinson got it, did it come under your
12 supervision?
13     A.  No, sir.
14     Q.  Whose supervision was he under?
15     A.  Mr. Reeder.
16     Q.  Mr. Reeder.  Did Mr. Robinson ever
17 come under your supervision?
18     A.  In 1998.
19     Q.  1998?
20     A.  Yes, sir.  He was under my
21 supervision prior to.  At one point, he was
22 I believe the counselor for student support
23 services.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1    Q.  Will you look at Exhibit No. 15,
2    please, sir.  And is that a job description
3    for a registrar?  Do you know if that job
4    description was ever a working job
5    description for the registrar?
6        A.  I don't think so for either one.
7    These were generic materials pulled together
8    from books, from the internet and from a
9    host of other documents.
10       Q.  Well, I'm just looking down there
11   under supervision and other relationships.
12   It says the registrar works under the
13   direction of the Dean of Students.  That
14   would be you, wouldn't it?
15       A.  If this was a job description of a
16   registrar at J.F. Ingram State Technical
17   College, it would be so.  It would fall
18   under that position.
19       Q.  And who would be the best person
20   to tell us that?
21       A.  Tell us what?
22       Q.  If this is a job description of
23   the registrar at J.F. Ingram State Technical

Page 166

1    College?
2        A.  Ms. Turner.
3        Q.  Ms. Turner.  What is her first
4    name?
5        A.  Erica.
6        Q.  Erica Turner.  She's a coordinator
7    of --
8        A.  Of personnel.
9        Q.  -- personnel?  Change gears one
10   more time.  Did you have anything to do with
11   security cameras being placed in
12   horticulture?
13       A.  I think Mr. Griffin and Mr. Benold
14   put them there.
15       Q.  So what did you have to do with
16   that?
17       A.  Nothing.
18       Q.  Nothing.  So when I asked you the
19   question -- and I'm not trying to cut you
20   short -- if you had anything to do with it,
21   the answer would be no?
22       A.  I'm sorry?
23       Q.  You didn't make a decision whether

Page 167

1    to put them there or a recommendation to put
2    them there?
3        A.  No.  That's not my --
4        Q.  That's not your responsibility.
5    That would be Dr. Merk's responsibility,
6    wouldn't it?
7        A.  Yes.
8        Q.  Okay.
9            (Whereupon, Plaintiff's Exhibit
10   No. 21 was marked for identification and
11   attached to the original transcript.)
12       Q.  Show you what we've marked as
13   Plaintiff's Exhibit No. 21 and ask you if
14   you recall that letter or memorandum from
15   Ms. Greene?
16       A.  Yes, sir, I have.
17       Q.  Was that -- Do you disagree with
18   that letter?
19           MR. CHRISTMAN:  Form.
20       Q.  Did you respond to Ms. Greene's
21   memo?
22       A.  I don't remember whether I
23   responded or not.  Did I respond to it?

Page 168

1            MR. CHRISTMAN:  Just answer if you
2    can remember.
3        A.  I don't know if I responded or
4    not.
5        Q.  This was basically Ms. Greene
6    informing you that she would get to your
7    purchase order requests, but there was quite
8    a number of volumes from your area in a
9    short period of time, wasn't it?
10       A.  There were quite a bit, yes, sir.
11       Q.  Is that as a result of coming to
12   the end of the year trying to spend the
13   funds?
14       A.  Yes.
15       Q.  You have this kind of volume all
16   during the year?
17       A.  It depends on the assessment of
18   program needs and when they make their
19   requests to me.
20       Q.  Do you have your people assessing
21   needs all through the year?
22       A.  Yes, sir.
23       Q.  Do you try not to have them order

42  (Pages 165 to 168)

# FREEDOM COURT REPORTING

Page 169

1 all at one time?
2     A.  Yes, sir.  We try to do them as
3 they come in and we try to go through the
4 programs at the beginning, middle and the
5 end of the year, sit down and have
6 discussions with the instructors and try to
7 see what we can afford to supplement their
8 programs with what we can and cannot.
9         And then we have to meet with Dr.
10 Merk to make sure there are no duplications
11 in the requisitions.
12     Q.  As a matter of fact, Ms. Greene
13 told you perhaps if these funds were spent
14 all during the year rather than at the last
15 five months of the year, there would be less
16 of a chance for this type of volume to get
17 backlogged.  Do you agree with that
18 statement?
19     A.  If at all possible it can be done,
20 it would make it easier.  But in most cases,
21 it can't.
22     Q.  When somebody resigned in your
23 section -- I say section.  Under your area

Page 170

1 -- It's your responsibility to do an exit
2 interview, isn't it?
3     A.  I'm sorry?
4     Q.  When somebody leaves employment at
5 J.F.I. and they are working under you, isn't
6 it your responsibility to do an exit
7 interview?
8     A.  If it is, I didn't know it.  I
9 don't think it is, though.
10     Q.  You don't think it is?
11     A.  No, sir.  I think that's
12 personnel.
13     Q.  I'm sorry.  You're not the Dean of
14 the College.  Yes, you are, aren't you?
15     A.  Yes, I am.
16     Q.  Would you read -- I'm looking at
17 the policies and procedures manual, 617.01.
18 What does that say, please?
19     A.  It says the Dean of the College or
20 his/her designee with conduct -- with?  I'm
21 sure there's a typographical there --
22 conduct an exit interview with any employee
23 resigning, retiring, or otherwise leaving

Page 171

1 the employment of J.F. Ingram State
2 Technical College.
3         At the interview, the dean will
4 ensure that the employee has complied --
5 completed all necessary paperwork, turned in
6 keys, if applicable, and has accounted for
7 all inventoried items or equipment for which
8 he/she is responsible.  See attached form.
9         The interview will also provide an
10 opportunity for the exiting employee to
11 provide relevant information to the dean.
12 The employee will be afforded an opportunity
13 to attach a written comment or statement to
14 the exit form.
15         And as I've said to you, when we
16 began this, that that document was dated
17 2002 and it was written for Dr. Huffstutler
18 and that has since become Dr. Merk's duties.
19     Q.  Are you the Dean of the College?
20     A.  Yes, I am.
21     Q.  Do you know whether or not that
22 regulation has been changed?
23     A.  The person that is responsible for

Page 172

1 the exit interview is Dr. Merk.
2     Q.  So are you telling me -- this is
3 what I'm trying to get down -- the
4 regulations have changed, but the people who
5 are in charge of it is changed, but the
6 policies and procedures manual may not
7 reflect that change?
8     A.  It could possibly be that, sir.
9     Q.  Okay.
10     A.  But as it stands today, Dr. Merk
11 has been conducting all the exit interviews.
12     Q.  Dr. Merk has been conducting them?
13     A.  Yes, sir.
14     Q.  But to your knowledge, this form
15 hasn't been -- the procedures manual hasn't
16 been changed?
17     A.  I have not checked it to see.
18     Q.  Okay.
19     A.  But the procedure is still in
20 place.
21     Q.  There's one other document I want
22 to ask you about.  Dean Wilson, if you want
23 to know what a procedure in the policy of

43 (Pages 169 to 172)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1    J.F. Ingram is, what document do you go to
2    to find that out?
3        A.  The policies and procedures
4    manual.
5        Q.  But is there a copy of the
6    policies and procedures manual kept in one
7    place at J.F. Ingram that is an up-to-date
8    copy?
9        A.  Well, generally, when they do an
10   update, they pass out the updated sheets so
11   that every employee can put it in their
12   notebook.
13       Q.  Okay.  And when the update is
14   made, how is it updated?  By that, does the
15   cabinet update it or does the president put
16   out a memorandum?
17       A.  Generally, we would discuss it if
18   it's a change that is affecting the entire
19   college.  We discuss it in cabinet meetings
20   and sometimes Dr. Merk brings a change to
21   the cabinet for discussion.
22       Q.  Okay.  And then it's put out?
23       A.  Yes, sir.

Page 174

1        Q.  When I say put out --
2        A.  If it is approved.
3        Q.  That's a terrible word.  It's
4    circulated to the rest of the college; is
5    that correct?
6        A.  Yes, sir.
7        Q.  And who does the circulation?
8        A.  Generally, it would go out over
9    the president's signature.
10       Q.  And now since Dr. Merk is in his
11   position, he would be the one to write heard
12   on that to be sure it's done?
13       A.  To make sure what's done?
14       Q.  That the update goes out in a
15   timely manner?
16       A.  It could be a secretary.
17       Q.  But it falls under his area?
18       A.  Yes, sir.
19       (Whereupon, Plaintiff's Exhibit
20   No. 22 was marked for identification and
21   attached to the original transcript.)
22       Q.  Let me make a copy of this real
23   quick.  Let me show you what I have marked

Page 175

1    as Plaintiff's Exhibit No. 22.  Do you
2    recall Ms. Owensby's resignation?
3        A.  Yes, sir.
4        Q.  Did you attempt to talk her out of
5    resigning?
6        A.  No, sir.
7        Q.  Do you know why she did not
8    resign?
9        A.  Not exactly
10       Q.  Okay.  Did she talk to you about
11   withdrawing her resignation?
12       A.  Yes, sir.
13       Q.  Did you allow that?
14       A.  The president allowed it.
15       Q.  Were you in favor of it?
16       A.  Yes, sir.
17       Q.  Was she upset over her salary?
18       A.  Upset over her salary?
19       Q.  Yes, sir.
20       MR. CHRISTMAN:  Was she at the
21   time of the letter?
22       Q.  At the time of the letter, was Ms.
23   Owensby upset over her salary?

Page 176

1        A.  No, sir.
2        Q.  Do you know what she was upset
3    over?
4        A.  She wasn't upset at all.
5        Q.  Do you know why she -- Did she
6    give you her reason for resigning?
7        A.  Not in any great form.
8        Q.  Now, were you the Dean of the
9    College then?
10       A.  Yes, sir.
11       Q.  Okay.  But Dr. Merk was the one
12   that was conducting the exit interview?
13       A.  I'm sorry?
14       Q.  Dr. Merk would have been the one
15   conducting an exit interview?
16       A.  Conducting --
17       Q.  An exit interview?
18       A.  With whom?
19       Q.  With Ms. Owensby.
20       A.  Ms. Owensby didn't have an exit
21   interview.
22       Q.  Okay.  How do you know that?  You
23   didn't conduct it.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    A.  I was there at work.  She worked
2  for me.
3      Q.  She worked for you.  But you
4  wouldn't have been the one who conducted it
5  anyway, would you?
6      A.  I'm sorry?
7      Q.  You wouldn't have been the one to
8  conduct that interview, would you?
9      A.  You said would or would not?
10     Q.  Would not.
11     A.  No, I would not.
12     Q.  Mr. Wilson, are there some
13  memorandums or letters that you're familiar
14  with that has informed you and/or the rest
15  of the staff at Ingram State Technical
16  College that the Dean of the College is not
17  the one to conduct exit interviews?
18     A.  No.  Nor is there one that say
19  that he is.  Not memorandums.
20     Q.  Okay.  Is there any amendment to
21  the policies and procedures manual that
22  changes the process for the dean of a
23  college to conduct exit interviews that

Page 178

1  you're aware of?
2      A.  No.  None that I'm aware of.  But
3  there are some memorandums that have gone
4  out to ask the deans or the directors of the
5  programs to have an interview with their
6  people to collect keys and passwords to
7  computers and any material that is property
8  to be left there.
9      Q.  And who sent those out?
10     A.  The president.
11     Q.  The president.  And that would be,
12  in this case, President Chambers?
13     A.  In this case, it would be
14  President Chambers.
15        MR. CHRISTMAN:  In this time
16  period you mean.
17        MR. DEBARDELABEN:  Right.
18     Q.  Prior to President Chambers —
19  Well, from 2002.  I don't know what happened
20  after 2002.  From 2002 forward, the manual
21  has obviously been changed some?
22     A.  I would have to go and look.
23     Q.  Okay.

Page 179

1        MR. DEBARDELABEN:  Let's take
2  about a ten minute break.
3        MR. CHRISTMAN:  Sure.
4        (Whereupon, a short recess was
5  taken.)
6        MR. DEBARDELABEN:  No more
7  questions.  Thank you.
8        MR. CHRISTMAN:  I have no none.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 180

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6        I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14        I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in any wise
17  interested in the result of said cause.
18
19
20  ----------------
21        CINDY WELDON
22
23

45 (Pages 177 to 180)

# FREEDOM COURT REPORTING

| A | | | | |
|---|---|---|---|---|
| **ability** 160:8 | 50:3 51:13 53:2,6,15 | 17:1 20:21,23 21:4,7 24:20 | 39:11 41:4 50:20 57:7 | **ASAP** 108:7 **asked** 23:1,3 |

**ability** 160:8
**able** 10:10
**academic** 24:13
**access** 60:1 63:4
**accident** 35:2,3 35:7
**account** 125:9 125:12 126:13
**accounted** 171:6
**accounting** 20:11
**accreditation** 45:6,8
**accurately** 10:20 10:21 11:3
**accustomed** 73:23
**achievement** 16:15
**acre** 49:4
**acres** 49:14
**act** 106:17
**acting** 27:13,16
**action** 83:2 91:7 103:9 105:18 112:21 180:16
**activities** 155:1 159:13,22
**activity** 74:16,21 75:5,10 104:5 104:6,13 105:4 105:6 106:20 140:21 141:2
**add** 123:18
**adding** 20:11
**address** 12:11
**adjunct** 21:7
**administration** 51:16,21,22 52:4 53:18 54:2 94:3
**administrative** 49:17,18,18

50:3 51:13 53:2,6,15
**admission** 134:2 142:9 154:23 155:4 159:23
**admissions** 132:17 155:12 158:7
**admitted** 160:2
**admitting** 42:14
**advised** 5:8
**advisement** 24:13
**advisory** 38:15
**affairs** 126:17
**afford** 169:7
**afforded** 160:6 171:12
**age** 13:15 31:23
**agencies** 47:4
**ago** 60:1 62:14 77:20 78:13
**agree** 34:4 37:11 51:23 72:22 76:15 104:3 150:17 169:17
**agreed** 5:13,23 6:9 37:14
**agreement** 76:23 78:23
**ahead** 80:4 143:6
**aid** 23:11 95:7,8
**aide** 113:7 116:10
**aides** 141:23 142:2
**aiding** 138:4
**aids** 95:6
**Alabama** 1:2 2:2 4:2 5:2,20 7:6 7:12 12:22 14:23 15:2,10 15:17,18 16:10

17:1 20:21,23 21:4,7 24:20 180:3
**allocated** 125:15 125:18
**allow** 175:13
**allowed** 34:13 175:14
**Amended** 5:3
**amendment** 177:20
**American** 34:9 34:12
**amount** 125:14 125:17
**ANDREW** 7:9
**and/or** 65:3 177:14
**Anita** 36:1
**announcement** 26:18 68:2
**answer** 12:5 48:9 55:5 58:19 80:5 166:21 168:1
**answers** 10:14 10:23 180:9
**anybody** 33:3 69:6 72:6,18 72:21 84:10 112:7 143:14
**anymore** 52:16 98:19
**anyway** 177:5
**apparently** 34:15 80:18 90:11 106:23 107:22 111:9 139:21 154:7
**appear** 40:22 59:3 163:3
**appearance** 30:18
**appears** 38:21

39:11 41:4 50:20 57:7 85:22 136:4
**applicable** 171:6
**application** 19:1 26:15 27:20 28:5 32:14
**apply** 38:6
**appointed** 144:15
**appointment** 144:10,17 145:4,7 146:3 146:10,14 155:7,13
**appointments** 146:8
**appropriate** 104:23 110:20
**approval** 61:15
**approve** 137:11
**approved** 128:17 137:10 174:2
**approving** 131:7
**approximately** 59:23 76:4 95:10,13 98:6 127:19
**area** 14:5 52:20 53:13,14 59:5 59:5 63:2 67:8 90:22,23 91:2 92:20 94:8,23 106:8 113:7,11 117:20 168:8 169:23 174:17
**areas** 28:11 50:14
**Arnett** 96:10
**arrest** 29:6,10 29:19,23
**arrested** 28:12 29:18 31:3

**ASAP** 108:7
**asked** 23:1,3 29:14,14 59:23 69:22 71:6 72:9,11 73:14 73:16,17 78:1 88:14,21 121:12 123:21 131:9 144:22 166:18
**asking** 11:15 12:6 67:14 77:3 78:6 96:20
**ass** 29:17,20
**assertion** 55:2
**assessing** 168:20
**assessment** 168:17
**assign** 6:4
**assigned** 22:9 90:22
**assist** 64:18,20 108:7 142:3 152:16
**assistance** 142:8
**assistant** 27:13 27:14,17 28:6 32:13 54:14,17 64:12,14 65:12 95:4,4 135:9 135:14,18,19 136:11 137:2 142:13 144:18 145:12 147:11 148:4 149:6 152:13 154:13 154:19 161:20
**assistants** 152:15 158:3
**assisted** 86:7
**assists** 152:21 153:2
**Association** 45:7

| | | | | |
|---|---|---|---|---|
| assume 12:5 69:3 | Avenue 5:20 7:5 | Barry 118:23 | 85:19 86:4 | 142:21 146:14 146:21 |
| assumed 124:3 142:23 148:21 153:18 156:21 | average 48:14 aware 112:15 113:4 178:1,2 | bars 88:15,16,23 89:5 | Birmingham 15:18 | Bruce 32:7 |
| attach 171:13 | a.m 5:21 | base 60:1 | birth 12:9 | budget 126:20 |
| attached 40:4 | | Based 24:6 | bit 122:6 168:10 | building 49:16 |
| 44:1 56:21 | ——————— | basically 12:23 | black 57:8 | 50:3 51:13,17 |
| 60:19 66:10 | **B** | 13:8 21:22 | 148:16,19 | 51:21,22 52:4 |
| 79:23 82:14 | B 8:8 50:17 60:3 | 37:13 41:2 | 163:1,1,7,8 | 52:7 53:2,6,15 |
| 90:17 103:4 | bachelor 15:21 | 157:4 168:5 | Blackwell | 53:18,22 54:2 |
| 106:1 118:5 | bachelor's 16:6 | beating 75:2 | 118:23 | 94:3,4,15 |
| 136:2,9,23 | back 10:23 | began 17:2 | Blake 100:18,20 | bus 90:22 |
| 138:9 139:4 | 17:15 19:1 | 171:16 | 100:21,22,23 | 115:11 |
| 144:6 147:4 | 21:9 28:10 | beginning 76:10 | 101:19 | business 15:5,22 |
| 149:15 151:7 | 29:16 30:13 | 102:17 144:19 | blank 92:20 | 15:23 16:3,4,7 |
| 154:10 167:11 | 43:17 45:1 | 169:4 | body 96:16 | 16:9 20:10 |
| 171:8 174:21 | 49:22 50:5,7 | behavior 45:20 | 97:11 100:2 | 121:20,21 |
| attempt 45:22 | 51:20 53:2 | 74:15 84:15 | Bonita 4:5 | 122:10,11 |
| 175:4 | 54:4,7 60:10 | 104:12 105:3 | 132:16 139:10 | 131:15 143:11 |
| attempted 74:14 | 61:11,13,19,22 | 115:10 | 144:14 145:11 | 143:16,22 |
| attention 115:21 | 62:4 70:15,17 | believe 17:12 | 147:20 148:19 | 157:18 |
| 142:21 146:22 | 73:1,15,18 | 19:9 20:15 | book 43:6 88:15 | buy 126:4,13,18 |
| attorney 42:9 | 79:1 84:8 | 21:5 28:5,19 | 89:10 | 129:1 |
| 70:6 77:23 | 88:13 92:5 | 48:20 66:4 | books 88:15,16 | B.H 70:18 |
| 78:9,10 | 93:2,6 94:11 | 69:10 102:2 | 88:21,22 89:5 | ——————— |
| attorney/client | 94:19 107:5 | 103:12,17 | 89:12 165:8 | **C** |
| 78:4,7 | 111:15 113:8 | 118:17 148:10 | bottom 91:10 | C 7:1 18:7 162:1 |
| attributed | 119:22 129:23 | 164:22 | 92:4 141:21 | 162:4,9,13,19 |
| 122:22 123:2 | 147:16 159:9 | believed 78:17 | bound 43:5 | 163:20 180:1,1 |
| August 125:23 | background | 107:2 109:1,5 | break 12:2 | cabinet 26:23 |
| 139:9 140:10 | 14:17 16:2 | bell 90:1,5 | 60:13 88:4,10 | 27:1 37:4,8,10 |
| 140:22 142:14 | 24:14 | benefit 160:8 | 91:2 143:4 | 37:19 97:23 |
| 144:21 | backlogged | Benold 166:13 | 144:23 179:2 | 98:1 120:8,11 |
| aunt 14:6 | 169:17 | Bentley 97:7 | Briefly 17:15 | 157:10 173:15 |
| Autauga 13:4,8 | backwards | Benton 97:6,8 | bring 21:21 34:6 | 173:19,21 |
| auto 52:2,5 | 162:7 | 107:3 111:14 | 47:3 69:22 | Caldwell 109:12 |
| 96:16,19,22 | bad 93:13 94:13 | 112:1 | 92:18 106:9,12 | call 23:14 30:3,4 |
| 97:2,11 100:2 | Bail 97:13 | best 114:21 | 115:21 | 80:10,13 120:7 |
| 101:20 | Barbara 2:5 | 165:19 | bringing 112:20 | 126:17 |
| automotive 51:6 | 54:13 70:18 | bet 123:9 | brings 173:20 | called 17:23 |
| 51:10 52:12,13 | 76:17 | better 129:11 | brothers 89:17 | 18:17 20:12 |
| 52:15 54:5 | barber 53:11 | bid 127:16,18 | brother-in-law | 66:16 70:10,11 |
| 89:16 96:13,15 | 98:20 99:2,12 | 128:15,16 | 30:4 | 75:9 108:10,11 |
| | barbering 53:10 | bidded 127:6 | brought 29:15 | 108:11 129:9 |
| | 98:20 99:23 | Bill 64:10,11,17 | 34:17 73:1 | 161:7 |

# FREEDOM COURT REPORTING

calling 51:21
cameras 166:11
Camp 17:4,11
  17:14 28:20
  29:4 31:3,6
campus 25:20
  47:7 49:6,8,9
  52:14,17 53:14
  54:20 94:11
  96:8,10,11,18
  99:3,12,22
  101:20 102:7
  102:10,16
  117:6
campuses 96:9
capable 138:1
capacity 1:11,15
  2:10,14,20 3:3
  4:12,17
captain 54:13
  55:15 56:1
  86:11 113:5
car 29:15 30:5
  30:13 49:23,23
card 117:12
Carlyle 100:7
Carolina 29:11
  29:12 30:1
carpentry 100:1
  100:14,17
carry 152:15
cars 52:15
case 1:8 2:7 4:7
  178:12,13
cases 11:11,14
  11:16,20 34:8
  39:12,16 57:6
  68:7 106:11,12
  127:5,7 169:20
cause 180:17
Caylor 97:18,19
  121:19 122:19
  123:3 125:1
Caylor's 121:22

center 84:5
  110:14 111:3,5
certain 13:21
  14:10 28:8
  31:7 33:9
  38:14,23 39:4
  39:19 43:16
  47:3 49:11
  54:16 69:11
  84:12 86:17
  87:5,23 103:19
  118:20 125:14
  125:17 128:20
  148:10 160:7
certificate
  160:20,20
certification
  16:5,9
certified 5:17
  11:5 15:21
certify 180:6,14
chain 87:8
Chambers 1:9
  2:8 4:10 65:6
  118:14,22
  119:9,11
  120:19 121:18
  123:4 124:20
  125:2 128:8
  129:1 132:7
  144:12 145:3
  146:1 178:12
  178:14,18
chance 169:16
chancellor 33:9
  137:10,11
Chancellor's
  26:10
change 10:14,14
  10:23 132:15
  140:15 166:9
  172:7 173:18
  173:20
changed 23:20

39:3,3 45:1
  145:7 154:3
  171:22 172:4,5
  172:16 178:21
changes 40:17
  142:18 153:22
  177:22
changing 39:8
characterize
  75:11
charge 25:19
  28:22,23 29:21
  41:3 95:16
  100:4,15 114:7
  114:9,17 115:5
  172:5
charged 28:13
chatting 123:20
check 79:3
  88:19 89:1,4
  108:16 111:16
checked 172:17
checklist 43:8
checks 29:2,2
  31:2
children 12:17
  12:21 13:14
Chisom 97:3,13
choose 32:4,8,11
chose 31:19 32:6
Chris 98:12
Christian 20:22
  21:1,4,7
Christman 7:9
  7:10 10:7,19
  11:2,9 16:16
  34:11 37:22
  40:8 47:23
  48:8 54:22
  55:4 57:3,10
  58:6,18 60:5,8
  60:11,14 62:20
  76:21 78:2
  80:4 83:7

85:17 86:1
  87:9 88:6 91:9
  96:19 104:1
  110:9 112:13
  117:14 121:6
  124:22 125:11
  130:20 139:15
  139:19,23
  140:5,12 143:3
  143:20 148:20
  151:8 154:16
  161:18 163:13
  167:19 168:1
  175:20 178:15
  179:3,8
Christmas 119:1
Cindy 5:3,17
  180:21
circulated 174:4
circulation
  174:7
City 117:19
Civil 5:2
claim 54:18
class 80:20
  115:15,17
  124:7
classes 22:4 53:5
  53:8 56:8
  113:12,21,21
classroom 45:21
  45:23 56:15
  61:3 113:19
  115:18
classrooms
  114:2
clean 28:11
clearly 107:10
close 51:12,17
  79:9 111:20,20
  112:6
collect 178:6
college 1:13,17
  2:12,17,23 3:5

4:9,14,20
  14:15 20:8,22
  23:11 25:6,22
  26:3 27:15
  31:15 39:17,18
  40:21 41:16
  44:19,23 45:10
  45:12 64:13
  65:12 110:22
  114:6,12 115:1
  116:20 117:6
  128:23 135:9
  135:15,19
  136:11 137:4
  141:7,16,17
  158:2,6 162:17
  165:17 166:1
  170:14,19
  171:2,19
  173:19 174:4
  176:9 177:16
  177:16,23
colleges 45:8
  125:13 141:4
color 57:6
combination
  138:16,19
come 41:6 49:15
  53:1 65:23
  69:16 70:8,13
  71:21 72:4,6,9
  72:14 73:16
  94:14,19
  102:16 107:7
  115:11 116:22
  117:2 150:13
  164:11,17
  169:3
comes 37:14
  42:11 56:6,7
  84:13 87:12
  91:12
coming 131:11
  149:23 150:3

# FREEDOM COURT REPORTING

168:11
**command** 87:8
**comment** 171:13
**comments** 91:18
**COMMERCE**
7:11
**commercial**
101:15
**Commissioner**
5:18 6:10
**committee** 38:15
74:2
**commonly** 80:12
**communicate**
143:11,15
**communication**
93:5
**compelled**
124:19,23
**competition**
26:12 28:4
**competitive** 26:1
26:7
**complaint** 91:3
93:22
**complaints**
57:18 60:2
**complete** 61:8
61:20 62:2
83:5
**completed** 171:5
**completes** 161:6
**completing**
153:2
**complex** 57:22
**complied** 127:16
171:4
**comply** 129:2
**components**
24:3
**composite** 79:19
**computers**
178:7
**computer-aided**

180:10
**concerned** 112:3
**concerning**
83:20 90:13
**conditions** 105:3
**conduct** 59:1,2
78:17 170:20
170:22 176:23
177:8,17,23
**conducted** 177:4
**conducting**
172:11,12
176:12,15,16
**conferring**
141:4
**confirm** 144:17
**confrontation**
90:2
**confused** 39:7
145:22 155:10
**confusing**
154:19
**confusion** 155:5
**considered** 27:6
75:5 157:9
**consist** 24:1
153:11
**constitutes**
104:12 105:4
**constitutional**
34:14
**contact** 110:20
**continue** 154:4
**continued** 154:4
**control** 131:14
**conversation**
121:17,18
124:18
**convicted** 47:8
**convince** 131:1
**coordinate**
154:23
**coordinator**
2:20 154:23

155:4,11,23
157:1,3 159:5
159:7,10,13
166:6
**coordinators**
158:8,11,15,18
159:1,17
**cop** 29:13
**copies** 43:3
**copy** 41:7,9 42:9
44:6 88:14
89:10 173:5,8
174:22
**correct** 34:10
44:21 45:9,11
49:19 54:21
57:9 61:23
76:7 85:15,16
87:19 91:15
107:23 113:12
125:15 133:6
148:17 149:20
163:2 174:5
180:11
**Corrections**
105:1 107:1
**corrective**
112:20
**correctly** 79:8
**correspondence**
111:13,13
**cosmetology**
99:6,11,13
102:8
**counsel** 5:15 6:1
6:3 92:17
180:15
**counseling** 24:4
24:5,8,9,11,12
24:13,15,18,20
25:20 61:4
78:18 82:5
93:8
**counselor** 134:1

164:22
**counselor's** 91:5
91:21
**counted** 158:12
**County** 12:23
13:4,4,8 180:4
**couple** 28:11
31:8 151:21
**course** 20:12
46:8,11,16
53:8 131:11
**courses** 20:10
**court** 1:1 2:1 4:1
5:9,10 10:5
30:15,18 33:15
75:6
**covered** 124:7
**covers** 50:13
**creates** 74:16
**credit** 141:7
**credits** 122:19
**crime** 28:13,16
**criminal** 74:16
74:21 75:5,10
104:5,6,13
105:4,6 106:20
**cut** 120:12,14
166:19
**CV:2:06-CV-...**
1:9
**C-1** 161:12,15

_____

**D**

**D** 8:1
**daily** 56:12,16
83:23 84:6,21
84:22,23 85:4
85:7 87:14
**Daily's** 87:8
**Dan** 20:17
**danger** 74:13
**data** 60:1
**date** 12:9 17:8
28:8 36:10

47:11 66:15
85:3 118:20
134:9 147:13
148:13
**dated** 83:14,15
85:3 91:8
139:9 171:16
**day** 5:6 22:8,10
30:2 94:18
**days** 103:11
123:23
**day-to-day** 58:5
157:4
**deal** 56:8 74:1
**dealing** 21:19
55:10,17 56:1
56:5 82:4
**dean** 1:15 2:14
3:3 4:17 18:12
25:19,21,23
26:5,19,21
27:7,9,10,12
27:13,14,17
28:6 32:13
39:17,18,19
64:12,14,15
65:12 110:16
110:18 111:18
114:6,14,16
116:20 122:9
122:10 123:15
124:6 127:14
128:23 130:1,5
131:15 132:9
133:2,4,5,8,11
133:12,13
135:9,14,18
136:11 137:2
142:13 144:18
145:12 147:11
148:5,15 149:7
152:13 154:14
154:20,22
156:3,5,6,8,23

157:18,18,19
157:23 158:2,5
158:6 161:20
161:20 164:5
165:13 170:13
170:19 171:3
171:11,19
172:22 176:8
177:16,22
**deans** 152:14
157:14 178:4
**Debardelaben**
5:5,19 7:4 8:4
10:4,22 11:11
16:18 40:10
60:9,12 77:2
82:17 85:21
87:11 88:3
91:11 96:21
104:2 139:21
140:2,8 143:6
178:17 179:1,6
**DEBARELA...**
57:9
**decision** 54:12
112:14 128:16
166:23
**DEFENDANT**
7:8
**Defendants** 1:18
3:6 4:21
**Defendant's**
62:15 66:4
67:16
**define** 159:10,11
**defining** 131:21
160:17
**degree** 15:4,7,15
16:4 160:18,19
**degrees** 15:13
15:19,20 16:17
16:18
**Delinquent**
25:18

**delivering** 5:4
**demonstrating**
121:9
**deny** 122:18
161:3
**department**
41:17 49:1
104:23 107:1
150:5,8,11
152:18 158:9
158:15,20
159:2
**departure** 134:9
**depend** 56:3
128:3
**depending**
157:16
**depends** 131:21
144:1 158:1,9
160:16 168:17
**deposition** 4:23
5:15 6:6,10
10:9,11 57:6
62:16 66:5
82:23 83:6,9
83:12 180:7
**depositions**
50:20 83:10
**describe** 137:6
**described** 137:7
**description**
136:10 138:11
138:12 142:12
149:17 154:6
154:12 165:2,4
165:5,15,22
**descriptions**
150:14 155:10
**design** 101:22
101:23
**designate** 65:20
65:22 66:1
69:6,17,20
**designated**

69:13,15
**designee** 110:18
170:20
**detach** 140:6,7
**determine**
110:19
**development**
47:2
**diesel** 100:2,10
**difference** 21:20
47:16 121:4
161:23
**different** 64:8
84:14 145:16
145:20 148:3
**direct** 23:1,3,23
59:12,22 106:5
106:16 142:7
153:1 155:1
**directed** 59:14
140:1
**direction** 165:13
**directives**
152:16
**directly** 107:7
**director** 23:14
23:18 25:1,8
25:15,17 27:4
27:22 28:2
110:14 111:3,5
132:17 156:16
156:17,19
157:21,23
159:6,8,20
164:1,2,3,8
**directors** 158:8
158:19 159:4
178:4
**Disadvantaged**
23:19
**disagree** 146:12
146:17 152:8
167:17
**disagreed**

146:13,15
**disagreements**
131:22 132:1,2
132:5
**discipline** 41:5
42:15 55:17
65:15
**discriminate**
31:18
**discrimination**
31:17 32:1,3
**discuss** 81:16
151:13,16
173:17,19
**discussed** 37:7
37:14
**discussion**
173:21
**discussions**
120:16 169:6
**dismissal** 40:14
40:20
**dispute** 89:6,7
**disruptive**
115:17
**distinguish**
121:2
**District** 1:1,2
2:1,2 4:1,2
12:22
**DIVISION** 1:3
2:3 4:3
**DOC** 46:5,23
54:13 105:7
106:21 107:9
108:10,11
109:6,7,10,12
110:1,20
111:11,18
114:10,22
141:8 160:6
**document** 36:4
40:13,19 44:2
44:5 60:22

61:2,19,23
62:3,8 66:4
76:22 77:1
83:5,14,15
136:5,6,20
137:1 139:6,13
139:16 144:7,9
145:8,14,15,19
145:23 147:5,7
148:2 149:2
154:18 171:16
172:21 173:1
**documentation**
61:17
**documents** 42:5
44:17 61:18
82:21 93:21,21
165:9
**doing** 11:22 38:6
65:15 71:14
77:21 81:8
88:11 108:4
113:18 123:21
124:15 138:1
140:19,21,23
141:10 152:21
**dollars** 30:11
**Donna** 81:19,22
**dot** 140:19 141:2
141:20
**Douglas** 1:9 2:8
4:10 144:12
**Dr** 14:3 18:7
19:9 23:5
32:23 33:6,8
33:13 35:20
37:1,2 39:21
42:11 46:23
59:18,21,21
63:9,10 64:19
64:21 65:3,6
67:12,22,23
71:4,6,9,10
72:11,16 76:6

# FREEDOM COURT REPORTING

77:17,18 78:11
81:12,16 82:13
96:1,4 106:4
106:13 108:11
109:17 111:6,7
117:3,4 118:15
123:22 124:1,4
124:20 128:7,8
152:2 155:15
155:18 156:1,3
156:11,21
157:6 167:5
169:9 171:17
171:18 172:1
172:10,12
173:20 174:10
176:11,14
**drafting** 100:1,8
**Draper** 52:17
  96:11 99:3,22
**dropping** 42:15
**drug** 103:17
  104:5,6
**drugs** 107:22
  108:4 109:2
**dual** 152:9,9,10
**due** 141:5,6
**duly** 10:2
**duplicate** 80:17
**duplications**
  169:10
**duties** 23:22
  134:17,19
  135:6 148:4,21
  149:3,23 150:4
  153:19 171:18
**duty** 127:15

**_____ E _____**

**E** 7:1,1 8:1,8
  161:22,23
  162:1,3,10
  163:18 180:1,1
**earlier** 107:13

**early** 17:8 30:21
  30:22
**easier** 169:20
**ed** 15:22,23
  84:13
**education** 15:20
  16:6,7,9 17:22
  84:18,20 85:8
  87:10,12
**educational**
  14:16 15:6
  16:2,14 24:7
**Edward** 4:23
  5:16 10:1 12:8
**Edwards** 70:22
  87:13
**effect** 115:2
**effective** 5:3
  144:19
**eight** 46:7,8,11
**either** 43:1
  91:14 102:1
  107:9 142:19
  157:17 165:6
**electrical** 99:23
  100:6
**Elmore** 12:23
  13:4
**emergency** 74:6
  74:11,17
  104:10,14
  105:14 106:19
  110:7,11
**employability**
  160:21
**employed** 14:13
  86:13 118:10
  118:11
**employee** 34:5
  65:7 74:13
  135:3 150:1,4
  170:22 171:4
  171:10,12
  173:11

**employees** 41:6
  41:15 47:5,5
  94:22 117:18
  117:19 120:20
  120:23
**employers** 34:6
**employment**
  134:19 170:4
  171:1
**encourage** 161:2
**ends** 125:7
**engaging** 78:16
**engine** 97:5
**English** 18:4
**enroll** 79:1
**enrolling** 141:7
**ensure** 171:4
**entire** 173:18
**environment**
  19:12,17
**equipment**
  171:7
**equivalent**
  152:14
**Erica** 166:5,6
**error** 142:17,20
**escape** 74:14
  114:20,22
**especially** 47:5
  126:6
**evaluating** 141:3
  141:14
**evaluation** 147:8
  162:16
**Evans** 89:23
  90:4,9,14,21
**eventually** 18:12
  23:20
**everybody** 11:21
  143:18
**everyday** 94:15
  153:14
**evidence** 6:6
**exact** 95:12

**exactly** 17:6,8
  27:18 31:7
  33:2 44:13
  76:1,2 117:12
  175:9
**EXAMINATI...**
  8:3 10:4
**examiner** 130:6
**examiner's**
  129:10
**example** 74:19
  121:7
**exception** 130:6
**excuse** 124:20
**exhibit** 8:10,11
  8:12,13,14,15
  8:16,17,18,19
  8:20,21,22,23
  9:1,2,3,4,5,6,7
  9:8 40:2,6,9,13
  43:21,22 45:16
  56:18,19,23
  57:1,2,7,8,8,11
  57:13 58:2,8
  58:12,16,17
  59:12,22 60:17
  60:21 62:14,15
  63:8 66:5,6,8
  67:16,18 74:4
  74:5 79:19,21
  82:12,16 90:10
  90:15 103:2,6
  103:23 104:1,4
  105:13,21,22
  118:3 121:16
  125:4 135:23
  136:7,21
  137:20 138:6,7
  139:1,2 140:6
  140:7,13,14
  144:4 147:1,2
  149:4 151:5
  152:7 154:8
  165:1 167:9,13

  174:19 175:1
**exhibits** 5:7
  83:11
**exist** 44:9 105:3
**existing** 142:8
**exit** 170:1,6,22
  171:14 172:1
  172:11 176:12
  176:15,17,20
  177:17,23
**exiting** 171:10
**experience**
  19:11,16,20,22
  20:4 31:21,22
  55:9,13,16,20
  56:6,7
**expertise** 150:13
  150:15
**explain** 48:2
**explained** 21:19
  127:5
**explains** 42:22
**explanation**
  127:7,9
**exposure** 75:4
  75:13,15
**extent** 78:6
**eye** 122:16

**_____ F _____**

**F** 180:1
**fabric** 123:9,20
  124:8
**facility** 50:7
  56:11
**fact** 29:7 122:14
  169:12
**fail** 103:10
**fairly** 33:20
  51:12
**fall** 117:20 158:4
  165:17
**falls** 157:17
  174:17

## 367 VALLEY AVENUE

false 124:9,12
familiar 40:7
 57:12,16 79:5
 80:1,7 83:13
 83:15 139:5,7
 150:20 151:10
 177:13
family 122:13
far 112:3 163:17
fartherest 53:17
Faulkner 20:20
 20:21 21:11
favor 175:15
features 163:6,8
Federal 10:8,9
 86:22 117:18
Federally 23:10
feet 50:22,23
 155:17
fellows 108:4
felon 47:17
 160:4
felons 47:8
felt 31:20 113:5
 123:12 124:19
 137:3
female 102:3,11
 148:19 158:10
 158:14,18,19
 163:2,8
fifteen 95:13
fifty 30:10
fight 74:12
Fighting 74:22
Fikes 79:6,11,16
 80:15,18 81:8
 82:8 83:22
 87:4
file 35:9 41:10
 61:6 70:4 85:3
 149:16
filed 5:10 35:10
 35:11 150:21
 150:23 151:11

151:14,17
files 85:6 93:11
 149:19
filing 6:9 151:13
 151:16
fill 26:15 27:19
 28:5 32:14
 92:3,5,19
filled 18:23
 91:17,19,20
 114:2 126:14
 126:19
filling 26:16
 99:10
find 109:23
 110:2 173:2
findings 130:9
 130:10
finish 17:15
 73:15 92:16
 143:5 160:15
finished 122:20
finishing 160:17
first 10:2 18:18
 19:3 22:15,16
 41:4 45:21
 46:12 49:15
 107:18 108:19
 109:16,22
 135:7 166:3
fiscal 126:17
 127:14 130:2,5
five 40:9,10
 169:15
fixing 60:9
floater 65:5
floor 101:22
folk 13:7
follow 112:7,11
followed 108:9
 112:3,5
following 105:2
 126:9
follows 10:3

food 100:3,5,17
 101:19
foregoing 180:7
 180:11
form 6:2 42:21
 42:21,23 48:8
 54:23 58:19
 59:9 60:6
 62:20 63:11
 91:4 93:7,9,22
 110:10 112:13
 121:6 124:22
 125:11 130:20
 143:20 148:20
 167:19 171:8
 171:14 172:14
 176:7
formalized
 46:22
former 12:18,19
 141:4
forms 42:13,16
 43:3 91:4
 142:9
forth 45:2 94:20
 131:10
forty-five 34:2
forward 39:15
 132:2 178:20
found 91:1
four 77:19 78:12
 80:16
front 36:20 62:3
 62:8 80:3
 90:12 91:5
 93:23 120:20
functions
 153:14
funded 23:10
funds 130:7
 168:13 169:13
furnish 70:5,6
furniture 50:17
 51:5,9,15 52:6

52:11 54:5,9
 97:14,16,22
 98:16,17
further 5:22 6:8
 15:6 16:14
 82:6 180:14
future 110:21

_____

**G**

Gainus 33:6,8
 33:14
gate 49:21
Gaylords 17:3,9
gears 166:9
GED 134:1
general 127:21
generally 33:5
 66:2 67:11
 92:2 93:18
 95:5 126:10
 150:6 173:9,17
 174:8
generic 165:7
getting 72:1
 115:15 160:18
GIDIERE 7:10
Gillis 35:22
give 42:8,10
 74:18 89:9
 121:7 124:2
 176:6
given 41:6 42:3
 42:18,19 43:2
 180:12
Givens 1:5 7:15
 11:12
giving 89:12
 119:1
go 10:22 14:22
 16:22 17:13
 21:14 22:4
 26:1,6 28:10
 30:15 33:5
 41:9,16 45:16

46:4 49:21
 50:5 53:2,21
 53:22 54:1
 60:10 66:23
 73:2,3,10,15
 73:18 80:4
 93:2 106:9,21
 108:15 122:10
 123:22 124:2
 132:2 137:12
 143:6 146:1
 149:21 157:12
 159:9 160:14
 160:22 169:3
 173:1 174:8
 178:22
goals 152:17
goes 41:11,12
 97:10 174:14
going 11:15 12:5
 19:13,18,23
 20:4 21:9,11
 38:4 43:21
 47:23 48:16,19
 62:3 66:6 68:3
 78:3 93:5
 103:19 105:20
 106:8 109:3
 126:1,7 136:3
 136:18 137:8
 138:5,23 139:1
 139:17 141:16
 143:3 151:3
 155:5
Gol 100:17
good 135:3
 140:11
gotten 43:9
governs 84:15
grading 42:15
graduate 14:17
 23:12
graduated 15:3
 16:23 82:9,10

# FREEDOM COURT REPORTING

graduation
14:22
graft 57:4
great 176:7
green 123:8
124:5 126:11
126:16,22
131:17 163:16
Greene 1:6 7:16
11:12 117:10
120:5 167:15
168:5 169:12
Greene's 130:4
167:20
greenhouse
50:21 107:6,21
108:3
greenhouses
113:15,17
Gregg 18:7 19:9
23:5 32:22,23
35:20 46:18,23
grievance
139:20 140:1,3
140:9 150:21
151:1,11,14,17
151:20 152:5
Griffin 166:13
Griswold 55:11
55:18 56:1
60:3 62:17
63:16,18,20,21
64:2,3,7,9,17
83:22 84:5
85:12,18,19,20
85:23 86:2,3
86:13 112:16
113:5,5
Griswolds 63:22
63:23
Griswold's
63:14 64:9
ground 49:4
grounds 6:4

Group 24:12
grouped 11:18
guess 63:11
67:20 80:2
91:13 158:3
Gun 49:10
guy's 101:21

_____

**H**

H 8:8
habit 88:11
Haines 98:8,9,13
107:5 111:14
111:23
half 60:1 80:2
hand 84:17
handbook 44:12
handed 29:16
handle 108:21
114:23 115:19
handling 41:18
happen 30:20
119:4
happened 22:23
25:5,10 29:12
39:15 78:15
82:7 98:13
178:19
happening
119:6
happens 120:15
126:10
hard 49:5
130:14,18
Harris 100:9
heads 150:8,12
hear 118:21
119:7
heard 86:20
120:1,4,10
174:11
hearing 180:13
hearings 73:23
help 47:4 95:14

113:10 150:8
helping 99:5
138:3
helps 64:22 90:9
152:23
Hendrix 2:5
11:13 52:21
54:19 66:17,18
68:12,18,19
70:9,19 71:8,9
71:20 72:1,3
75:12 76:1,6
76:17 77:7
78:16 79:10
81:7,19 83:20
86:7,10,14
88:14 90:3
94:14 95:1,16
103:9 112:17
112:19 113:6
Hendrix's 54:13
60:4 62:15,17
66:5 80:20
94:7 106:4
**HERNDON**
7:10
hey 146:2
He'll 11:9
he/she 171:8
high 14:18
higher 162:4,9
Hill 49:10
hinder 143:18
143:21
**HINTON** 7:10
hire 54:12
hired 19:2,6
41:15 42:3
43:17 46:12
54:16 86:8
116:15
hires 42:10,18
43:2,9
hiring 18:21

43:14
history 16:23
his/her 170:20
hold 136:12
153:20
holding 99:17
honest 59:6
honors 16:16,20
hooked 51:18
hopefully 137:8
horses 132:15
horticulture
49:1 50:6,9,10
50:20 52:20
53:13,20 54:7
59:4 67:8
89:15,17 94:9
94:10,23 95:11
95:16,18,19,22
109:14 113:7
113:11 166:12
host 165:9
hour 22:1 46:7,8
46:11 143:4
hours 21:23
161:7
houses 49:17
Huffstutler
81:12,17 82:3
128:8 171:17
Huh 65:21
husband's 14:2

_____

**I**

idea 59:20 63:13
64:5 84:18
109:19 113:3
127:21
identification
40:3 43:23
56:20 60:18
66:9 79:22
82:13 90:16
103:3 105:23

118:4 136:1,8
136:22 138:8
139:3 144:5
147:3 151:6
154:9 167:10
174:20
identify 36:4
37:23 44:2
immediately
105:1 111:10
implement 24:2
impounded 30:5
impression
105:5
improper 78:17
improving 142:8
inactions 107:7
incident 77:22
84:21 109:22
109:23 110:3
incidents 22:2
included 24:3
incomplete
61:19,23 82:21
82:23
incorrect 139:10
139:14
increased
140:20 141:2
141:11,12
indecent 75:4,12
75:14
individual 24:12
117:9
Individually
1:10,14 2:9,13
2:19 3:2 4:11
4:16
inexperienced
31:19
inform 93:19
information
42:19 57:16,17
58:3 61:14,15

# FREEDOM COURT REPORTING

61:15 63:1
69:4,4,5 78:1,7
101:14 171:11
**informed** 68:12
177:14
**informing** 168:6
**Ingram** 1:12,16
2:11,16,22 3:4
4:8,13,19
14:14 17:17,18
17:21 19:14,19
20:1,5 21:14
22:18 31:14
32:18 35:21
40:20 44:10,18
44:20,22 45:9
45:11 49:3
68:6 86:16,21
98:14 110:21
115:2 116:8,9
116:12,15,16
117:4,15 118:9
118:10,12,13
129:6,9 134:20
156:20 158:11
160:2 165:16
165:23 171:1
173:1,7 177:15
**initiate** 93:14
**initiated** 92:22
140:15
**injured** 35:13
**inmate** 46:3,4
70:23 85:15
95:4,5,8
112:17,20
160:10
**inmates** 19:23
21:20 55:10,18
56:2,5,9,13,16
74:1 113:17
**input** 138:14,22
**instances** 29:9
38:4

**institution** 3:4
42:17 43:13
44:18 47:3
**instructed** 19:18
**instructing**
19:13,23
**instruction**
18:13 27:14
28:6 32:13
64:22 65:1
156:5,6,8
157:18
**instructional**
39:11 96:5
**instructor** 17:23
22:19,21 45:13
54:20 61:5
89:10 93:3,6,7
93:12,14 95:18
95:21 96:6
98:2 99:2
107:14 111:1
116:1,16
**instructors** 46:2
51:12 62:18
95:5 102:4,11
106:16 116:3
169:6
**instructor's**
45:21
**instructural**
116:10
**interaction**
56:12
**interested**
180:17
**interior** 101:23
**internet** 165:8
**interview** 19:2,8
170:2,7,22
171:3,9 172:1
176:12,15,17
176:21 177:8
178:5

**interviewed**
18:23 19:3,6
61:16
**interviews**
172:11 177:17
177:23
**invented** 155:3,9
**inventoried**
171:7
**investigate**
110:15 111:4
**investigation**
77:22
**invited** 47:1
**invoice** 121:8
**involved** 11:15
31:9,13 35:6
**involves** 106:14
106:17
**isolated** 53:14
**issues** 21:22
**item** 128:18
131:8
**items** 126:2,4,12
126:18 130:19
171:7

___

**J**

J 4:5,9 144:12
144:14 145:11
147:20
**jail** 29:8
**James** 1:13 2:12
3:1 4:15,23
5:16 10:1 12:8
14:3
**Jason** 13:18,21
**Jeffrey** 13:18,22
**Jim** 5:4,19 7:4
11:10
**job** 22:17 25:16
26:13,19,22
27:20 28:21
30:23 34:21

116:9 128:13
128:14 134:7
134:14 136:10
137:6,17,20
138:2,12,15
140:18,19,20
140:23 141:11
142:12,18
143:1 148:9
149:16,23
150:4,13 153:7
154:6,12 155:9
163:22 165:2,3
165:4,15,22
**jobs** 132:4
**joking** 123:19
124:16
**Joseph** 18:10
55:10
**JULIE** 1:5 7:15
**July** 83:14,15
125:23
**June** 5:7,20
118:18 125:23
**J.F** 4:8,13,19
14:14 19:14,19
20:1,4 21:13
22:18 31:14
32:17 35:20
40:20 44:9,20
44:22 45:11
49:3 68:6
86:16,21
110:21 129:6,9
156:20 158:11
160:2 165:16
165:23 171:1
173:1,7
**J.F.I** 94:22
160:18 161:11
162:18 170:5
**J.L** 60:3 62:16
63:20 64:2,3,7
85:18 86:4,5,6

86:13 112:15
113:4
**J.T.M** 71:2
**J.W** 67:16,17

___

**K**

**Kate** 87:17
**Katherine** 13:13
13:23
**Kaye** 118:14
**Keahey** 98:18
**keep** 63:1 69:6
69:14 70:1
73:18 85:4
86:21
**keeping** 115:23
122:16
**keeps** 57:15
**Kelly** 36:1
**kept** 57:18 58:4
93:3,4,21,23
173:6
**keys** 171:6 178:6
**kids** 122:13
**kin** 13:3,7 14:4
180:15
**kind** 21:14 24:5
49:21 82:18
168:15
**knew** 70:16
122:15
**know** 12:2,3
13:20 18:14,16
24:9 26:13,14
26:20 36:11
42:6 46:2
47:13,14,16
50:19,23 54:14
54:15 55:4,12
55:15,19,20
57:23 58:7
59:14 60:22
62:21,22,23
63:7 64:3,8

68:4,14,15,21
68:23 69:1
70:8 73:9 75:9
76:12 77:10
78:10 79:3
85:22 88:23
89:11,22 92:10
95:12 109:21
111:21 113:2
113:20,22
116:4,7,17,18
118:6,8 121:4
127:3,18,19,20
127:23 129:19
130:1 134:21
137:15 140:2
145:17 149:18
150:23 153:21
157:13 158:12
160:2 161:9,10
161:12,22
163:5,16,17
165:3 168:3
170:9 171:21
172:23 175:7
176:2,5,22
178:19
**knowing** 160:15
162:15
**knowledge**
68:12 85:1
117:5 126:12
145:6 172:14
**known** 129:9
162:12,18
**K-Mart** 17:3,5

---
**L**
---
**L** 5:12 51:16
**lab** 113:21
**lacking** 61:10
**lady** 120:11
**Lane** 12:13
**larger** 50:13

**largest** 50:18
**laughing** 123:19
**law** 47:22
127:16,18
128:20 129:3
**lawsuit** 31:10,12
33:11 34:6,17
35:9,20
**lawsuits** 34:20
36:2
**lawyer** 10:16
35:23 48:2
**leading** 6:2
**learn** 26:21
**leave** 73:5 86:16
115:13 134:7
**leaves** 170:4
**leaving** 170:23
**left** 28:11 38:12
73:14 113:6
126:2,8 134:12
134:19 135:5
153:19 161:1
161:11 178:8
**length** 160:7
**Leo** 116:5
**letter** 144:10
146:14 155:7
167:14,18
175:21,22
**letters** 155:14
177:13
**let's** 14:16 60:7
60:12 121:2
132:15 150:20
159:9 179:1
**level** 157:15,22
**levels** 157:12
**license** 29:14,16
**lies** 123:4
**Lila** 14:9
**list** 62:17 63:15
63:16
**little** 30:8 42:3

92:20 117:12
122:6 144:23
145:22 163:16
**live** 116:20,22
117:5
**lives** 13:10,20
14:6
**loading** 90:23
**located** 49:3
52:21 56:12
**long** 15:1 22:6
22:20 23:13,17
24:23 31:5
46:6 98:4
116:14 129:5
132:21 153:20
156:14
**longer** 98:14
156:19
**look** 36:9 38:2
39:7 48:13
49:14 51:20
52:8,8,9 54:6
74:3 82:18
86:9 90:20,20
103:22 153:22
165:1 178:22
**looked** 59:7,8
62:14
**looking** 38:8
44:16 50:16
52:3 53:21
91:19 103:21
110:11 140:13
165:10 170:16
**loose** 130:23
**loss** 29:1
**lot** 11:19 38:5
**loud** 121:8,10,11
**lunch** 22:1 88:5
88:7
**Luster** 98:21
99:1,2

---
**M**
---
**machines** 20:11
**Madison** 5:19
7:5
**main** 25:20 49:7
49:9 94:2,4,15
96:10,18 99:11
102:7,10,16
**majority** 37:11
**making** 48:14
97:23 98:1
161:10
**Malcolm** 2:18
25:7 66:22
67:4,5,11
71:21 89:1
**male** 148:16
159:1,4,6,7
162:23 163:1,7
**man** 84:8 163:16
**management**
15:5 16:5
45:23 115:18
119:19
**manner** 59:7,8
123:19 124:16
174:15
**manual** 36:7,15
36:23 37:7,12
37:17 38:1,5
38:10 39:22
40:23 170:17
172:6,15 173:4
173:6 177:21
178:20
**Maplesville**
14:19,20
**March** 17:19
**mark** 43:21
90:10 136:3,19
138:5 139:1
**marked** 40:3,5
43:23 56:20,22
60:18,21 66:9

79:22 82:13,15
90:16 103:3,5
105:21,23
118:4 121:16
136:1,8,22
138:8 139:3
144:2,5 146:23
147:3 151:6
154:9 167:10
167:12 174:20
174:23
**marriage** 12:18
12:20
**married** 12:15
13:23
**Mars** 163:17
**masonry** 100:1
100:14,15,16
**Master's** 15:8
17:16 21:10
24:16,17,19
**masturbating**
67:8 75:18
**masturbation**
76:18 77:8
**material** 77:1
178:7
**materials** 165:7
**math** 18:4 21:2
21:4
**matter** 29:7
108:7 122:14
144:1 169:12
**ma'am** 10:7
**McCloudy**
20:17
**McDonald** 35:8
**McPhillips**
35:18,19
**mean** 13:21
16:16 18:1
24:10 25:14
35:14 58:14
91:9 93:16

115:8,22 116:1
121:3,4 128:12
157:1 178:16
**meaning** 38:12
**means** 35:22
180:9
**mechanic** 52:5
**mechanical**
51:11
**mechanics** 96:14
97:5 101:21
**meet** 160:5
169:9
**meeting** 66:14
66:16,19 67:1
67:14,15,21
68:3,13 69:1,7
69:14,16,18,21
69:23 70:1,9
71:7 72:7,10
72:14,21,23
73:2,8,13,21
74:5 76:5,11
77:6 81:18
82:2 84:4,7,11
84:16 86:4
87:2 118:14,18
119:9 152:16
**meetings** 65:16
68:6 86:19
120:8,12 130:8
151:22,23
173:19
**Melissa** 118:6
**member** 157:9
**members** 37:10
**memo** 103:7
107:2 108:1
140:14 144:16
167:21
**memoranda**
80:19
**memorandum**
40:7 81:11,14

103:13 104:21
106:2 107:11
122:1,5,7,19
122:22 125:3
139:9 167:14
173:16
**memorandums**
177:13,19
178:3
**mentioned** 37:2
39:16 102:9
107:4
**Merk** 3:1 37:1,2
39:21 59:18,21
59:21 63:9,10
64:19,21 65:3
65:6 67:12,22
67:23 71:3,4,6
71:9,10 72:11
72:16 76:6
77:17,18 78:11
96:1,4 106:4
106:13 108:12
109:17 111:6,7
117:3,4 118:15
123:22 124:1,4
128:7 132:9
152:2 155:15
155:18 156:1,3
156:11,21
157:6 169:10
172:1,10,12
173:20 174:10
176:11,14
**Merk's** 42:11
167:5 171:18
**Mershire** 109:13
109:15
**met** 163:4,15
**Michael** 89:23
90:4,14
**mid** 33:12
**middle** 1:2 2:2
4:2 12:22 68:9

76:11 169:4
**Miller** 116:5,7
116:11
**Millidge** 100:16
**Milton** 18:10
**mind** 137:16,19
**minded** 72:11
**minimum** 160:5
**minute** 146:2
179:2
**minutes** 86:22
**misdemeanor**
47:17,20
**misquote** 123:6
123:14
**misquoted** 123:5
123:16
**missed** 76:19
**mistake** 140:4
142:15 145:1,1
**mistaken** 27:4
30:7 84:8
103:12
**misunderstood**
10:15
**mis-spending**
129:10 130:13
130:17
**mis-spent**
130:11
**modus** 68:5
**monetary** 33:21
**money** 11:21
30:6,6,9 125:9
125:10,11,14
125:18 126:2,3
126:7,13,20
129:11,12,15
129:18 130:14
130:17,18,23
161:10 162:2
**MONICA** 1:5
7:16
**Montgomery**

2:18 5:20 7:6
7:12 12:23
13:11,19 14:7
25:8,14 67:4
68:21 71:21
79:14 91:14
132:11 180:4
**month** 59:23
160:12,23
**months** 31:8
77:20 78:12
98:6 160:10
161:1 169:15
**morning** 108:15
109:17,21
111:8
**moved** 13:22
52:18
**Mulder** 18:10
19:9
**multi-page** 40:8
**Murry** 18:7 23:5
**mutual** 78:23

**N**
**N** 5:12 7:1 8:1
**name** 11:10 12:7
13:12 14:2,8,9
14:10 22:15,16
23:20 44:21
45:1,9,11 60:4
62:16 64:9
79:6 89:22
90:5 101:22
102:1 166:4
**named** 25:7 26:5
26:7 90:4,13
116:4 149:1
**names** 13:17
**necessarily**
50:15 51:17
52:5
**necessary** 5:23
34:5 42:14

171:5
**NED** 25:17
**need** 12:2 29:15
42:5 107:16
126:2,4,9
128:15
**needed** 30:5
123:8
**needs** 24:6 25:1
28:1,3 168:18
168:21
**Neglecting**
25:18
**neither** 74:8
111:18 180:15
**never** 28:23
143:14
**new** 41:6,15
42:10,18 43:2
43:9 47:5
101:22 102:1
142:4
**nigger** 29:18,20
**night** 29:8
**nine** 160:12,23
161:6
**nineteen** 13:15
**Non** 74:7
**non-emergency**
74:5,9,10
104:18 108:23
**non-profit** 118:1
**normal** 45:23
141:17 160:23
**north** 52:9
**NORTHERN**
1:3 2:3 4:3
**Notary** 5:18
**note** 124:21
125:2
**notebook** 42:3
42:10 173:12
**notes** 65:17,19
69:6,14 70:1,3

73:19 81:20
84:10 85:2,5
85:14 86:21
**notice** 6:9
152:11
**noticed** 36:8,10
44:16 60:2,22
142:11
**notified** 105:2
**Null** 31:4,5
**number** 1:8 2:7
4:7 38:18,21
38:23 39:1,2
79:15 104:14
108:22 129:22
141:2 168:8

_____
**O**
_____
**O** 5:12
**oath** 88:11
**Object** 54:22
58:18 60:5
110:9 124:22
**objections** 6:1,4
**objectives**
152:17
**obviously**
178:21
**Occasionally**
56:17 120:13
**occasions** 79:15
**occurred** 77:6
**occurrence**
110:15
**occurs** 45:20
**October** 22:22
88:13 89:14
140:9 147:14
147:18
**offered** 6:6
**office** 5:19 26:11
42:12 57:19,20
57:21,22 70:14
71:10,12,13,14

71:23 73:17
75:21,22 91:13
91:17 93:3,4
93:23 94:7
101:13 102:19
121:20,21
122:10,12
127:14 130:2,5
142:16,22
143:11,12,16
143:22 157:5
**officer** 109:12
109:13 126:17
157:9
**officers** 110:1
**offices** 49:17,19
**official** 4:12,17
65:11 93:7,9
134:3,4
**officials** 47:1
**Oh** 58:9 77:19
108:19 129:22
**okay** 18:5 22:3
25:5 27:6 28:7
28:10 31:9
33:20 35:12
36:19,22 37:16
37:21 38:17
39:8,13,21
40:1,19 41:22
42:2 44:14
45:1,17 48:4
52:18 57:17,23
61:10 62:2,7
62:10 63:7,13
64:6 65:14
66:3,13,16,23
67:21,23 68:8
69:17 72:3
74:3,23 76:5
79:1 80:18
83:19 86:11,18
88:2 89:13
90:6,19 93:2

93:12,20 94:13
94:19 96:2,6
97:17 98:1
101:6,18 102:3
103:1 104:9
108:19 110:2
112:4 115:14
116:4,19
117:23 118:2
118:21 122:9
124:14 125:6
126:11 127:12
132:15 133:20
134:6,18
136:12,18
139:8 140:5
142:6,11 144:2
145:10,22
147:23 148:23
149:22 153:16
154:1 157:12
158:10,14,19
159:15,19
160:1,22
162:23 163:9
163:12 164:10
167:8 172:9,18
173:13,22
175:10 176:11
176:22 177:20
178:23
**old** 14:9 38:15
**older** 47:5
**once** 45:3
**ones** 80:16
**open** 26:19,22
50:10
**operandi** 68:5
**operation** 157:4
**opinion** 104:8
138:2 145:2
163:9
**opportunity**
171:10,12

**option** 67:12
**oral** 5:6
**order** 30:9 44:12
44:15 105:17
124:11 128:7
168:7,23
**ordered** 127:1,2
127:11 131:6
**orders** 128:7,8,9
**organization**
118:11 158:4
**organizations**
118:1
**orientation**
21:15,17 22:4
22:6 41:16
42:9 47:4
**original** 5:5 40:4
44:1 56:21
60:19 66:10
79:23 82:14
90:17 103:4
106:1 118:5
136:2,9,23
138:9 139:4
144:6 147:4
151:7 154:10
167:11 174:21
**originally** 57:5
**outcome** 29:23
31:2 33:14
82:1 93:8
**outdated** 38:11
38:20
**outlined** 149:4
**outside** 50:12
52:7
**overall** 48:13
152:16
**overview** 42:13
42:20
**Owensby** 4:5
11:12 43:1
69:10,13 73:10

73:12,16,18
74:2 132:16
135:3,6 137:23
138:1 139:10
139:12 140:14
140:23 142:21
144:14 145:11
146:15 147:21
147:23 148:19
148:23 150:21
151:11 152:3,4
158:23 159:19
161:17 162:13
162:21 163:1
163:17 175:23
176:19,20
**Owensby's**
175:2
**o'clock** 30:2
88:4

_____
**P**
_____
**P** 5:12 7:1,1
118:6
**pad** 69:23 73:18
**page** 8:3,9 36:20
57:4 62:8 80:2
80:3 90:12
91:5,19 92:4
105:12,13
139:19 140:13
**pages** 40:9,11
**Paid** 30:10
**paint** 50:1 51:6
51:10 52:10,12
52:13,15 97:10
**paper** 57:2 77:9
77:11 93:1
**paperwork**
126:14,19
171:5
**Pardon** 57:10
138:18
**parenthesis**

141:6
part 26:23 37:3
  37:3 42:1
  43:13 49:16
  61:11,13 71:6
  74:2 76:13
  83:11 84:9
  94:11 107:18
  108:19 114:22
  130:9 151:19
particular 24:4
  27:3 70:9
  81:23 87:16
  153:4
Particularly
  88:22
parties 5:14 6:3
  180:16
part-time 21:8
pass 173:10
passwords
  178:6
Paul 70:22
  133:17
Pecan 12:13
people 13:3 14:4
  42:2 62:18
  84:19 104:11
  111:20 119:17
  120:2 143:22
  153:5 159:14
  159:18 168:20
  172:4 178:6
period 21:3 26:4
  28:9 45:5
  129:8 144:20
  168:9 178:16
periodically
  36:13 47:2
permission
  123:22 124:2
Perryman 87:17
  87:18,22
  118:15

person 22:9,11
  31:20 39:21
  47:19 57:18
  84:21 86:6,8
  116:4 137:8
  153:5 157:16
  165:19 171:23
personal 24:8
personally 41:23
  162:15
personnel 39:22
  41:10 63:5
  105:1 106:16
  107:10 138:20
  142:10,20
  149:16,19
  150:5,13,16
  155:23 156:9
  156:12,16,17
  156:20 157:1,3
  157:5 166:8,9
  170:12
persons 63:6
  158:8
perspective 75:6
phone 30:3,4
phrase 115:8
  126:21
physically 35:14
piece 77:9 92:23
Pike 12:13
Pinkston 14:9
place 19:12,17
  40:14 66:14
  76:16 77:5
  172:20 173:7
placed 166:11
places 114:4
Plaintiff 2:6 4:6
  7:3
Plaintiffs 1:7
Plaintiff's 8:10
  8:11,12,13,14
  8:15,16,17,18

8:19,20,21,22
  8:23 9:1,2,3,4
  9:5,6,7,8 40:2
  40:6,13 43:21
  43:22 56:19,23
  57:7,11 58:2
  58:17 60:17,21
  66:6,8 74:4,4
  79:21 82:12,16
  90:15 103:2,6
  103:23 104:4
  105:21,22
  118:3 121:16
  135:23 136:7
  136:21 138:6,7
  139:1,2 144:4
  147:1,2 151:5
  154:8 167:9,13
  174:19 175:1
plant 121:22
plants 113:12
play 151:19
played 82:4
please 5:8 12:1,3
  12:7 14:8
  16:22 44:3
  76:16 90:20
  165:2 170:18
plenty 99:20
  162:17
plot 49:4
plumbing 100:2
  101:3,6
point 50:16,17
  134:22 164:21
pointed 155:2,7
police 29:6
policies 36:6
  40:23 106:15
  106:17 112:2,4
  112:8,11 115:1
  115:4 170:17
  172:6 173:3,6
  177:21

policy 36:15,23
  37:6,6,12,17
  38:1,5,10
  107:8 114:23
  172:23
population 47:7
portion 61:9
  76:8,12
position 17:20
  18:11,15 27:2
  28:1 31:22
  32:11,15 98:23
  99:11,18
  126:16 129:6
  133:1,15
  136:13 137:9
  147:10 148:15
  153:18 155:21
  165:18 174:11
possible 112:6
  169:19
possibly 67:7,7
  172:8
post-graduate
  15:14,16
post-secondary
  33:4
Powell 130:3,4
practice 124:8
Prattville 28:20
prepared 58:1,3
  58:7,13,17
  59:12,15,22
  63:8
prepares 155:13
presence 119:16
present 7:14
  12:11 19:10
  99:9 102:19
  119:1
presented 37:18
presently 12:15
  14:13 40:14
  44:9 99:17

102:11
president 1:11
  2:10 4:13 18:5
  20:16 32:21
  46:19 65:4
  118:14,21
  119:8,11
  120:19 121:18
  123:3 124:20
  125:2 128:23
  132:7 142:17
  145:3 146:1,11
  152:3 155:6,14
  157:13 173:15
  175:14 178:10
  178:11,12,14
  178:18
president's 27:1
  37:4,8,18
  174:9
previous 20:3
  50:19 82:23
primarily 39:20
prior 6:6 19:13
  19:18,23 21:11
  27:12 33:8
  46:16 57:5
  71:23 83:11
  140:22 141:7
  144:23 156:11
  164:21 178:18
prison 47:11,20
  160:4
prisoners 19:13
  19:18
private 117:8
privilege 78:4
probably 11:17
  33:12,13 48:14
  70:4,20,22
  74:17 75:7
  102:5 129:11
  131:2
problem 40:22

45:14,19,22
56:2,3,5,9 61:6
79:11 81:1,3,4
82:7 106:7
107:13,14
108:14,15
112:18 115:20
131:4,16,19
**problems** 41:18
46:3 55:17
59:4 79:15
84:15 131:22
**procedure** 5:2
10:10 40:21
41:7,18 43:11
43:18 74:6,6
74:11 104:10
104:14 105:14
106:20 108:10
112:12 172:19
172:23
**procedures** 36:7
40:15,23 42:5
108:23 110:7
110:12 112:2,4
112:8 140:16
170:17 172:6
172:15 173:3,6
177:21
**process** 18:21
21:15,18 26:2
26:7,9 37:17
42:1 43:14
137:4,13,14
151:20 177:22
**produced** 57:5
**profanity** 83:20
83:23
**professional**
47:2
**program** 23:2,4
23:7,10,15,23
24:3 25:18
64:23 95:17,20

96:3,7 125:14
125:17 160:11
160:14,22,23
161:8 168:18
**programs** 96:5
159:17 161:5
169:4,8 178:5
**progressed**
34:17
**project** 123:8
124:7
**promoted** 34:19
**pronounce** 79:8
**proper** 80:11
126:14,19
**property** 178:7
**pros** 31:4,5
**Prossor** 97:1,2
**provide** 142:8
171:9,11
**provided** 46:2
**provision**
142:18
**proximity** 51:13
**Public** 5:18
**pulled** 29:13
165:7
**purchase** 168:7
**purchased**
128:19
**purpose** 58:20
58:21 144:16
**purposes** 57:3
83:8
**put** 36:16 38:4
51:19 53:19
60:7 63:11
107:19 112:19
129:11 137:9
140:9 155:17
166:14 167:1,1
173:11,15,22
174:1
**P.E** 70:21

_____

**Q**

**qualify** 117:15
117:22,23
**question** 10:19
11:23 12:4
13:6 19:21
33:17 39:9
40:12 51:8
55:6 58:7,15
77:4 78:6 80:6
93:13 94:14
122:21 126:15
128:6,9,14,15
130:21,21
131:1,2 133:7
139:23 151:9
160:10 166:19
**questioned**
146:21
**questions** 6:2,3
11:16,17,19
38:3 48:1
179:7 180:8
**quick** 174:23
**quite** 119:14,15
168:7,10

_____

**R**

**R** 7:1 180:1
**race** 31:23 32:2
32:3
**Raheem** 81:8
83:22 84:5
85:14 87:4
**Raheen** 79:6
**raise** 119:9
120:17 121:1
121:12
**raised** 119:11
**raising** 119:20
121:3,5
**read** 10:11,12,13
10:17 11:4,7,9
69:12 76:16,18

139:17 170:16
**reading** 10:18
63:17 80:19
122:20
**real** 174:22
**really** 104:18
106:9 115:16
116:17 125:23
**reason** 31:16
39:13 59:19
112:23 124:3
125:1 127:4
176:6
**reasons** 47:6
**recall** 17:6,7
19:5 22:7,16
26:16 27:18,21
29:22 33:2,7
35:4 36:3,17
43:19 45:3
46:14 66:11,15
68:10 71:19
76:2 84:4
88:13 89:11
90:2 119:3,5,6
119:10 129:18
129:23 130:6
130:11 134:8
167:14 175:2
**receives** 91:14
**recess** 60:15
88:7 143:8
179:4
**recognize** 38:10
38:11 103:6
144:7 147:5
**recollection**
90:13
**recommendati...**
91:7 93:11,15
167:1
**recommendati...**
61:14
**record** 57:4 61:4

68:6 69:4,5
83:8
**recorded** 65:16
67:21,23 68:3
68:13,16,19,22
69:2 76:6,9
84:17
**recorder** 68:8
84:17 120:12
120:14
**recording**
120:11
**records** 79:4
153:22
**Reeder** 133:17
164:15,16
**reference** 41:17
**referred** 44:18
44:20 103:16
**referring** 58:1
**refinishing**
50:17 51:5,9
51:15 52:6,11
54:5,9 98:16
98:17
**reflect** 172:7
**refreshes** 90:12
**refuse** 72:20
**refused** 126:12
126:18,23
**regarding** 76:23
78:4 109:22
141:5
**registrar** 133:20
133:23 134:5,7
137:2 138:13
142:12 144:17
145:12 147:10
148:1,8,18
149:1,6 153:8
153:17 154:12
154:13,19
157:8 161:19
162:12 163:22

# FREEDOM COURT REPORTING

164:10 165:3,5
165:12,16,23
**registrar's**
153:18
**registration**
132:18 154:22
155:4,12
159:23
**regulation**
171:22
**regulations** 44:7
44:9 84:14
87:6 172:4
**relate** 136:15
**related** 17:22,23
18:3 20:10
22:19,20 34:21
34:22 45:19
53:8
**relates** 114:23
115:2
**relating** 11:16
**relationships**
165:11
**relatives** 117:19
**relevant** 171:11
**remain** 23:11
24:23
**remember** 22:11
22:18 34:23
58:11 83:17
88:20 101:21
102:1 167:22
168:2
**remind** 88:9
**reoccurring**
115:20
**repair** 50:1 51:7
51:11 96:16
97:2,11,14
100:2
**repeat** 13:6
19:20 58:14
126:15 133:7

**replaced** 148:18
**report** 21:23
22:2 61:3
67:10 75:14,16
106:23 109:3,7
110:8,13,16
111:1
**reported** 75:17
75:23 78:16
79:13,14 105:7
105:18 107:20
109:2 111:7,11
111:17
**Reporter** 5:9,17
10:5
**reporting** 75:12
**reports** 54:19
**represent** 11:11
61:12
**represented**
35:17,19
**represents**
180:11
**reprimand**
112:9,12
**request** 63:6
66:21
**requested** 66:17
66:18 71:9
72:13
**requesting** 67:1
**requests** 168:7
168:19
**requirement**
86:21,23
160:12
**requirements**
160:3,6
**requisition**
131:7
**requisitions**
169:11
**reside** 12:22
13:4,8,19

**residing** 14:5
**resign** 175:8
**resignation**
175:2,11
**resigned** 148:11
148:22 169:22
**resigning** 170:23
175:5 176:6
**resolve** 45:22
46:3
**Resource** 84:5
**respective** 5:15
**respond** 167:20
167:23
**responded**
167:23 168:3
**response** 45:21
**responsibility**
36:18 116:2
127:15 152:12
156:22 167:4,5
170:1,6
**responsible**
36:22 39:22
65:18 84:19
149:22 150:3
171:8,23
**rest** 174:4
177:14
**restructure**
137:4
**restructuring**
25:7 26:4,8,10
**result** 78:19
168:11 180:17
**results** 33:18
**resumed** 148:14
**retained** 5:9
**retaliation** 34:16
**retire** 87:22
**retired** 54:13
86:11 87:20,21
148:8
**retiring** 170:23

**revealed** 78:12
**review** 80:5
93:10
**rid** 126:3
**ride** 30:8
**right** 10:11,12
11:4,6 34:14
39:23 40:11
48:22 50:2,2
55:22 61:21
63:19 65:8
74:18 76:14
77:10 78:14
85:20,20 89:9
91:11,22 92:7
92:8,10,13
93:10 95:14
101:17 102:23
104:23 108:2
109:16 110:4
111:16,19
114:11 123:13
126:6 127:3
128:11,13,19
129:4 139:20
141:19 145:4
146:9 150:9
157:2,8 161:4
162:7 178:17
**right-hand**
38:22
**ring** 90:1,5
**risk** 113:6
**Road** 12:13
**Roberts** 72:4
73:4,5,15,20
73:22 101:14
101:16,17
**Robinson**
133:21 134:6
135:5 148:7,11
148:16 153:19
161:9 162:21
162:23 163:4

163:15 164:11
164:16
**Robinson's**
134:18 148:21
**role** 82:4 152:9
**Rosy** 87:13
**rule** 5:1 110:7
**rules** 5:2 10:9
44:6,8 84:14
87:5 104:13
105:8
**run** 157:4

————————
**S**
**S** 5:12,12 7:1 8:8
**SAASC's** 45:7
**salary** 161:12,14
161:16 162:1,3
162:4,9,10,14
162:19 163:18
163:20 175:17
175:18,23
**Sandy** 121:19
**save** 11:21
**saying** 87:1
119:4 122:15
122:18 124:14
**says** 36:10 45:19
67:16 76:22,22
85:22 90:21
91:18,20
105:11 106:20
109:11 110:14
144:16 152:12
154:17,21
165:12 170:19
**scale** 48:5,10
158:4
**schedule** 161:13
161:14,16
162:1,3,4,9,10
162:14,19
163:18,20
**scheduled** 153:3

# FREEDOM COURT REPORTING

school 14:18
17:15 78:20
79:2
Schools 45:8
Science 15:8
24:16,17,20
second 19:1,2,7
57:4 90:20
91:19 139:19
140:15 141:20
secretary 133:2
133:4,8,10,18
174:16
section 38:17
39:9 169:23,23
sections 39:11
securities 115:3
security 21:22
47:6 114:7,9
114:12,17
115:5,8,22
166:11
see 10:16 38:9,9
38:19 51:23
52:1,2,5,10
53:20 54:7
62:16 63:16
67:2 70:16
77:16 81:3,4
81:14 90:12
91:4 93:14,16
94:17 107:16
111:16 126:1
150:20 169:7
171:8 172:17
seeing 75:17
83:17 109:4
seeking 45:6
seemingly
148:14
seen 36:19 57:1
66:12 77:13
79:19 106:2
122:1 149:13

149:14 154:11
seldom 48:18
semester 21:6
102:18 161:6
semesters 21:5,6
send 122:13
sense 119:21
122:17
sent 30:6 178:9
sentence 47:11
122:16 161:1
sentenced 47:19
separate 80:16
113:14
September
103:14,17
107:2 125:7
126:1 133:14
144:20 145:10
sergeant 114:8
114:10
serve 160:11
service 63:5
100:3,5 101:19
services 2:16,22
4:19 23:2,4,7
23:19,21 25:2
25:3,9,16 27:5
27:8,11,23
28:2 41:19,20
42:12 44:12
85:6 86:19
87:1,4 94:1
100:17 110:17
137:3 138:20
142:9 144:19
145:13 147:12
148:5 152:17
153:15 154:14
154:20 161:21
164:4,5,9,23
session 78:18
setting 56:16
settled 33:15

settlement 33:22
seventeen 95:13
sewing 101:15
sex 31:23
sheets 173:10
shop 45:20
49:23,23 50:1
50:1,7,17 51:6
51:6,9,10,10
51:16 52:1,3,5
52:6,10,12,14
53:11,20 54:6
54:6,8 86:9
89:16 96:13,17
96:20 97:10,15
98:20 99:13
shops 49:22
50:11,14 51:23
52:22 53:3
98:19 99:19
101:1 102:2
short 60:13,15
143:8 148:14
161:7 166:20
168:9 179:4
shorter 77:20
Shorthand 5:17
Shot 49:10
show 40:5 43:8
43:20 55:3
56:22 60:20
63:14 66:3
76:17 77:18
82:15 90:8
103:5 105:20
121:15 136:3
136:18 138:5
138:23 144:2
146:23 151:3
167:12 174:23
showed 77:17
137:20
showing 145:16
shows 77:7

145:19
side 51:20 54:4,7
61:19 62:4
sideways 52:9
sign 10:12,12,13
10:17 11:4
signature 62:10
91:6,21 92:12
92:15 128:17
146:4,6 147:16
174:9
signed 131:6
142:11,16
147:15 155:6
signing 10:18
131:7
similar 11:20
sir 12:7 16:1
18:20 20:6
21:16 22:12
23:16 24:22
25:14 26:6
29:1,5,11
30:14,17,19
31:1,11 32:16
32:20 33:23
34:8,9,15,20
35:15 36:6,17
37:5,9,13,20
40:16,18 41:2
41:8,21 42:7
43:2,4,7,10
44:3,4 46:17
46:20 47:9,15
47:18 48:12,16
49:2,5,20 50:4
50:8,12,13
51:1,4 52:19
52:23 53:4,7
53:12,16 54:3
55:8,13 56:10
56:14 57:14
58:9,22 59:6
59:13,16 61:1

61:8 62:1,6,9
62:12 63:3
64:1,16 65:10
65:13,17 66:2
66:12,15,20
67:19 68:1,4
68:14,17,20,23
69:8,19 70:12
71:1,5,22
72:15,17 76:8
77:12,15 79:7
79:12,17 80:6
80:9,23 81:5
81:10,13,15
82:11,20,22
83:4,18,21
84:12 85:2,9
85:11,13 86:12
86:15 87:3
88:6,17 89:8
90:7,18 92:2
93:17 94:5,6
94:12,21 95:9
97:16,20 98:10
99:15,20 103:8
103:15 104:2
105:10,16
106:3,6,19
107:19 108:13
109:9 110:23
112:2,22 113:9
113:13,16
114:14,18
116:6,13,21
117:1 118:7
119:3,13,18
120:3,6,9,22
121:14 122:3
125:5,8,16,19
125:21 126:15
126:21 127:17
127:22 128:2,5
128:21 129:13
131:18,23

# FREEDOM COURT REPORTING

132:3,6,8,10
132:12,14
133:19 134:8
134:11,13
135:1,4 136:14
136:17 137:12
137:15,18,21
139:17,18
142:1,15 143:2
143:17 144:8
145:2,5,21
146:5,7 147:6
147:17,19,22
148:7 149:3,5
149:10 150:10
150:22 151:12
151:15,18
152:20 153:21
155:19 156:2,7
156:10,18,21
157:7,11,20
162:6,8,11,22
163:19,21
164:2,13,20
165:2 167:16
168:10,22
169:2 170:11
172:8,13
173:23 174:6
174:18 175:3,6
175:12,16,19
176:1,10
**sister** 13:10
**sit** 69:16,23
169:5
**sitting** 42:22
**situation** 90:3
107:20
**situations**
141:17
**six** 98:6 102:3
160:10 161:1
**skills** 160:21
**sleeping** 91:1

**slip** 93:8
**smart** 29:17,20
**Smiley** 20:18,19
**Smith** 22:14,15
100:17
**Smith's** 22:17
**sofa** 123:20
124:7
**sold** 124:6
**somebody** 29:2
108:6 137:16
137:19 169:22
170:4
**somebody's**
155:17
**someone's** 92:14
92:15
**sorry** 19:15 23:8
25:4,11 32:5
32:10 34:11
60:11 112:10
129:16 130:15
135:13 139:11
150:2 166:22
170:3,13
176:13 177:6
**south** 13:1,5,8
29:11,12 30:1
**Southern** 45:7
**space** 50:16
**spaces** 50:11
**speaking** 150:6
**special** 23:18
27:23 28:2
56:8 84:13,18
84:20 85:7
86:18 87:1,4
87:10,12
121:21
**specific** 38:4
153:12
**specifically** 38:7
63:7 128:1
**spend** 125:10,20

126:4,8 129:15
129:17 131:3
168:12
**spending** 129:12
130:7
**spends** 130:17
**spent** 29:7
129:19 169:13
**spoke** 109:17,21
**spot** 112:19
**Spurling** 100:11
**square** 50:22,23
**staff** 49:18 142:4
142:5 177:15
**stands** 172:10
**stapled** 93:1
**start** 17:18
43:11,12 46:13
67:15
**started** 18:19
43:13,15 137:4
140:21
**starting** 16:23
17:20
**state** 1:12,16
2:11,16,22 3:5
4:8,14,20 12:7
14:14,23 15:2
15:10,17 16:10
17:1 20:8
24:21 31:14
40:20 44:18,22
45:10,12 47:19
110:21 117:18
128:20 129:3
165:16,23
171:1 177:15
180:3
**stated** 122:11,15
**statement**
112:16 113:1
121:19 139:20
140:1,3 152:18
152:21 169:18

171:13
**states** 1:1 2:1 4:1
107:11
**Staton** 52:17
96:11 99:3,22
**status** 110:19,21
**stay** 15:1
**staying** 72:12
**stenotype** 180:8
**step** 108:22
**steps** 41:4
**stipulate** 163:13
**STIPULATED**
5:13,22 6:8
**stipulations**
10:6
**stole** 29:2
**stop** 137:14
143:7
**stopped** 123:23
137:13
**straight** 142:23
**straighten**
135:21 142:22
**Street** 7:11 35:8
**strike** 51:4
**structured**
113:20
**student** 2:15,21
4:18 23:1,4,6
23:15,21 24:6
25:1,2,3,8,15
25:18 26:19,22
27:5,7,11,23
28:2 38:14
40:14,20 41:5
41:19,20 42:12
42:14 44:6,8
44:12 45:14,18
45:20 54:19
59:2 61:3,7
63:5 65:15
67:7 75:3,18
78:15 79:5

84:13,13 85:6
89:14,22 90:3
90:13,22 94:1
104:12 107:15
108:20 110:16
110:19 115:3
116:12,15
138:20 141:23
142:2,9 152:17
153:14 161:6
161:20 164:4,5
164:8,22
**students** 1:16
23:11,19 25:19
26:1,5 27:12
40:22 41:19
46:3 47:7 48:7
62:19 82:5
89:15 95:11
106:14,18
107:21 114:2,5
114:14,16,19
115:6,7,9,22
115:23 117:17
133:3,5,6,9,11
133:12,13
137:2 141:5,7
141:15 142:13
144:18 145:13
147:11 148:5
148:15 149:7
152:13 154:14
154:20,22
157:19 158:6
160:1 165:13
**student's** 42:17
74:15 105:3
110:21
**style** 119:19
**subjects** 18:3
**substitute** 98:3
98:11
**sue** 32:17 33:3,6
**sued** 31:14

# FREEDOM COURT REPORTING

suggesting 84:2
**SUITE** 7:11
**summer** 102:18
**summoned**
107:3
**supervise**
120:21 153:1
153:13 159:14
159:17,21
**supervised**
153:6,7 157:17
163:23
**supervises**
159:22
**supervision**
153:6,10
154:21 157:6
164:12,14,17
164:21 165:11
**supervisor**
95:23 106:5
**supervisory**
129:6
**supplement**
169:7
**support** 2:15,21
4:18 23:2,4,6
23:15,21 25:2
25:3,8,15 27:5
27:7,11 110:16
137:3 144:19
145:13 147:12
148:5 152:4
154:14,20
164:8,22
**supposed** 45:15
45:17 61:6
90:23 92:5
108:21 109:3
110:8,13 111:1
112:5 149:20
**sure** 36:9 60:14
70:7 76:19,22
83:8 108:14

114:19 127:16
135:21 148:13
150:15 169:10
170:21 174:12
174:13 179:3
**suspend** 92:17
**suspicious**
104:22
**sworn** 10:2
**system** 34:10,12
47:12 101:14
141:18 162:17
**systems** 115:1

___

## T

**T** 3:1 5:12,12
8:8 180:1,1
**table** 42:22 68:9
**tabs** 57:15
**take** 60:12 65:1
66:14 85:14
88:4 103:10
105:17 112:17
135:6 143:4
179:1
**taken** 5:6,16
60:16 65:17
83:2,10 88:8
91:7 143:9
179:5 180:7
**talk** 10:16 14:16
48:23 67:5,12
78:3 175:4,10
**talked** 67:4 78:5
118:23
**talking** 24:7,8,9
49:7 52:22
67:18 71:16,17
71:18 85:18,19
87:9 96:22
114:12
**tape** 68:8 84:17
**task** 73:15
129:10 134:1

**tasks** 153:3
**taught** 20:10
21:2 53:5
113:19
**teach** 18:3 20:13
20:23 21:3
29:17 113:11
**teacher** 108:21
**teaching** 20:3
53:9 114:3
**Tech** 20:8
**Technical** 1:12
1:17 2:11,17
2:23 3:15 4:9,14
4:20 14:14
31:14 40:21
44:19,22 45:10
45:12 110:22
165:16,23
171:2 177:15
**telephone** 93:19
**tell** 21:17 38:7
38:21 41:14
56:4 59:3 65:9
68:18 69:13
73:16 75:23
76:3,10 78:8
89:14 92:18
103:11 108:18
115:4 118:22
120:10 122:7
129:1 136:5,19
138:10 165:20
165:21
**telling** 62:4 84:1
84:3 108:20
172:2
**tells** 58:23 93:7
117:12
**ten** 30:2 48:5,11
179:2
**tenure** 31:21
42:17
**term** 80:11

86:20 130:5
161:7
**terminated**
30:23
**terms** 50:16 59:1
**terrible** 174:3
**tester** 134:1,2
**testified** 10:2
**testimony** 5:6
180:12
**testing** 140:16
**Thank** 179:7
**theory** 113:21
**thereto** 6:7
180:9
**thing** 109:16,22
160:2
**things** 21:21
113:18 114:20
127:1 128:15
131:5
**think** 34:2 38:20
39:2,5 43:18
47:9,21 51:3
51:22 54:15,23
55:1,23 58:6
67:22 70:2
75:1 76:21
77:23 102:8
111:23 117:18
125:16 130:3
130:10 134:4
138:3,16,19
151:21 152:2
153:4 154:13
155:22 161:22
165:6 166:13
170:9,10,11
**third** 140:19
**thirty** 49:4,14
**Thomas** 32:7,8
32:12 35:22
36:1 98:12
101:13

**thought** 75:18
89:3 107:12
**thousand** 34:3
50:22
**three** 11:14,16
48:15 49:6
50:21 51:3
65:8 77:19
78:12 102:14
102:15 113:14
123:23 141:2
**Till** 101:5,6
**Tim** 133:21
**time** 6:5,5 11:21
12:2 18:6 19:2
19:4,7 20:22
21:3,22 22:1
24:4 26:4 27:3
28:9 33:10
36:12 39:17
45:5 75:23
81:23 84:6
86:7 87:16
92:23 93:18
99:9 102:19
105:2 112:17
115:12,12,15
116:11 117:11
119:2 126:3
129:8 130:2
134:11,23
135:16 137:9
152:2 153:4
160:7 166:10
168:9 169:1
175:21,22
178:15
**timely** 174:15
**times** 11:1 44:19
94:18 114:1
127:1,8,13
131:10
**timetable** 89:7
**tiny** 122:6

title 65:11 134:3
  134:4 146:13
  146:19,20
  147:9,10 148:6
  148:9 152:10
  154:3 155:10
  155:22 156:3
  156:15
titled 156:22
today 48:1
  172:10
told 29:16 30:4
  39:8 67:2
  70:15 76:1
  78:9,9 82:3
  88:19,23 89:4
  107:12 108:15
  109:11 143:10
  143:14 144:23
  169:13
tone 124:17
top 38:22 157:13
town 30:8
trade 18:4
trained 141:23
  142:2
training 24:15
  46:1,5 56:1,4
  142:3 161:7
transcribed 11:3
  77:11 180:9
transcribing
  141:3,13
transcript 5:5
  40:4 44:1
  56:21 60:19
  66:10 73:7
  76:17 77:13
  78:11 79:23
  82:14 90:17
  103:4 106:1
  118:5 136:2,9
  136:23 138:9
  139:4 144:6

147:4 151:7
  154:10 167:11
  174:21 180:12
transcription
  77:6 180:10
transcripts
  141:3,5,14
transitions
  141:8
transmission
  97:5
Trawick 89:2
treatment
  121:21
Tree 12:13
Trenholm 20:8
  20:9,14 21:6
  21:12
trial 6:5
Trimble 99:1,4
  99:7,9,16
  102:12,16
Trimble's 98:23
trouble 114:21
  128:4
true 113:1 122:8
  122:23 123:2
  124:8,10,12,13
  152:18,20
  180:11
trustworthy
  48:6,10,17
  111:19,22
  112:1
truth 84:1,3
  122:4
try 108:6,21
  113:10 125:10
  126:3,5,8
  168:23 169:2,3
  169:6
trying 11:21
  124:1 166:19
  168:12 172:3

turn 130:23
turned 171:5
Turner 155:15
  155:18,20
  166:2,3,6
Tutwiler 96:12
  99:5,7,10
  101:8,9 102:13
  102:21
twelve 88:4
twenty 49:4
  94:17
twenty-five
  30:10
two 21:5,6 48:14
  51:2 63:18,22
  63:23 64:7
  88:1,20 89:5
  102:11 105:13
  107:21 108:3
  114:23 123:22
  153:5 158:2
  159:3 162:20
two-page 56:18
  56:23 136:4
  139:15
two-year 141:17
  162:16
type 27:10 43:5
  46:4 56:15
  86:22 93:6
  107:22 110:6
  169:16
types 58:23
  73:23
typographical
  170:21

_____
U
_____

U 5:12
Uh-huh 104:16
  141:22
undergrad 15:3
understand 12:1

33:17 51:8
  54:18 87:3
  125:13
understood 12:6
  28:23 82:4
union 17:4,11
  17:14 28:20
  29:4 30:9,9
  31:3,6
UNITED 1:1 2:1
  4:1
University 15:18
  20:21
unwritten 110:6
update 37:16
  39:4 173:10,13
  173:15 174:14
updated 36:12
  36:14 37:7,12
  38:12,16 39:1
  39:2 135:2
  173:10,14
updating 36:23
upholstery 52:2
  52:3 96:16,17
  96:19,22 97:15
  97:16
upset 81:7
  175:17,18,23
  176:2,4
up-to-date 39:11
  39:14 173:7
use 10:10 42:16
  75:19 103:18
  104:5,6 115:7
usual 10:5 68:5

_____
V
_____

vacancy 99:10
vacant 98:5
value 152:14
various 44:17
  49:22 114:4
vernacular

115:9
vice-president
  25:21
violating 107:8
violation 28:17
voice 119:9,12
  119:20 120:17
  121:1,3,5,12
volume 168:15
  169:16
volumes 168:8
vs 1:8 2:7 4:7

_____
W
_____

W 7:9
Wade 96:12
  101:10,11,12
wait 146:2
waive 10:12,18
  11:5
waived 6:10
walk 108:2
Wall 96:11
Wallace 118:6,8
  118:15,22
Walls 101:3,4
want 10:16,17
  10:17 35:16
  36:8,9 37:23
  40:12 43:20
  48:23 60:20
  62:13 66:3
  73:20 74:3
  76:19 78:8,10
  79:18 82:15
  88:4 121:15
  130:22 143:5
  155:17 172:21
  172:22
wanted 33:16,18
  63:12 70:9
  122:12 160:9
warn 89:15
wasn't 28:16

78:11 81:9
83:5 103:18
113:1 135:9,11
135:12 140:23
143:1 146:19
146:20 148:9
155:7 162:19
168:9 176:4
**watch** 89:18
**way** 11:22 33:5
51:19 53:20
60:7 104:7
117:5 119:5,8
126:22 128:20
129:2,11
145:23
**ways** 50:6
**week** 89:13
**weeks** 88:20
89:5
**welding** 49:23
52:1 54:6 96:2
96:7 100:2
101:2
**Weldon** 5:4,17
180:21
**went** 18:22
21:13 25:6
26:3,8 27:23
30:8 37:17
60:3,8 69:15
72:23 107:5,6
111:15 142:22
**weren't** 67:13
149:4
**Western** 30:9
**Wetumpka**
102:22
**we'll** 79:19
90:10 163:13
**we're** 11:20
34:13 38:6
42:22 43:20
66:6 78:2

136:3,18 138:5
138:23
**we've** 37:16
56:22 63:18,18
83:10 131:5
143:3 162:20
167:12
**whack** 82:19
**whiplash** 35:16
**white** 57:8
**wide** 50:10
**Wilson** 1:13
2:12 4:15,23
5:16 10:1,8
11:10 12:8,12
28:12 34:4
38:19 41:3
55:7 65:14
88:9 112:18
121:3 122:9,11
123:16 124:7
140:14 172:22
177:12
**window** 52:9
**windows** 51:20
**wise** 180:16
**wish** 10:23
**Wisman** 81:20
81:22
**withdraw** 78:21
**withdrawing**
175:11
**withdrawn**
78:22
**withdrew** 78:19
**witness** 11:7
55:1 140:12
180:13
**word** 76:18 77:7
174:3
**words** 75:19
**work** 15:14,16
16:22 17:5
18:8 19:14,17

19:18,23 20:4
21:13,23 31:5
94:23 107:16
115:15 116:8
116:20,22
117:5,15 118:9
124:11 132:1
132:13,19
138:21 153:1
177:1
**worked** 17:2,3,4
87:14 138:16
138:20 142:5
142:10 143:15
177:1,3
**working** 18:19
19:12 58:11
64:19 131:17
131:19 132:21
165:4 170:5
**works** 52:21
64:21 86:2
156:1 165:12
**worry** 130:16
**worrying** 130:12
**worthy** 109:4
**wouldn't** 39:13
85:14 104:10
108:8 140:10
143:19,22
149:18 150:7
162:4 163:5
165:14 167:6
177:4,7
**Wright** 13:13,23
14:3 156:13,14
**Wright's** 156:15
**write** 45:17
62:18 81:11
92:23 95:15
107:15 108:16
124:19 174:11
**write-up** 80:10
**write-ups** 58:4

59:1 80:3,8,13
80:14 81:2
90:8
**written** 39:20
54:19 79:13
139:13 152:6
171:13,17
**wrong** 63:18
**wrongful** 129:12
**wrongfully**
129:14,17
130:7
**wrote** 103:13
123:3 125:1

_____ **X** _____
**X** 8:1,8
_____

_____ **Y** _____
**year** 17:6 47:10
115:1 125:6,7
125:20,22
126:5,7,9
131:12 168:12
168:16,21
169:5,14,15
**years** 13:15
16:13 45:2
88:1 129:22
**yell** 119:22
120:1,4,7,23
**yelled** 120:19
**yelling** 119:20
121:4,5,9
**young** 84:7
120:11
**y'all** 52:15 65:14
75:8 78:5
126:3 132:1
150:11
**y'all's** 104:13
105:8 125:7
131:14

_____ **0** _____

**05** 147:18

_____ **1** _____
**1** 8:10 40:3,6,13
45:16 57:8
74:4,5 103:23
104:1,4 105:13
133:14 144:19
144:20
**1st** 145:10
**10** 8:4,19 105:21
105:23
**103** 8:18
**105** 8:19
**11** 8:20 118:4
121:16 125:4
**11th** 140:10
**118** 8:20
**12** 8:21 136:1
**13** 8:22 136:4,8
**13th** 139:9
142:14
**136** 8:21,22
**137** 8:23
**138** 9:1
**139** 9:2
**14** 8:23 136:19
136:22 137:20
149:4
**144** 9:3
**147** 9:4
**15** 5:3 9:1 138:6
138:8 165:1
**15th** 103:17
**1505** 5:19 7:5
**151** 9:5
**154** 9:6
**16** 9:2 139:1,3
140:14
**16th** 103:14
107:2 111:8
**167** 9:7
**17** 9:3 144:3,5
**174** 9:8

# FREEDOM COURT REPORTING

**18** 9:4 147:1,3
**19** 9:5 25:4 66:5
  67:16 151:4,6
  152:7
**1970** 14:21
**1973** 15:3 17:1
**1974** 20:15
**1976** 15:12
  16:12 17:19
  22:22 24:20
  43:17
**1980** 22:22,23
  27:22 129:7
  164:7
**1988** 5:3
**1998** 35:5 40:17
  132:23 133:1,9
  133:10,14
  153:23 164:18
  164:19
**1999** 161:11

_____
**2**
_____

**2** 8:11 43:21,23
**2:06-CV-796-...**
  4:8
**2:07-CV-21-...**
  2:8
**20** 9:6 154:7,9
**2000** 35:5 46:16
**2002** 36:11,12
  36:20 39:15
  171:17 178:19
  178:20,20
**2003** 83:14,16
  144:20 145:11
  148:23 154:2
**2004** 139:9
  140:22 142:14
  144:21 150:21
  153:23
**2005** 107:2
  118:19 147:14
**2006** 25:4,5

**88** 14 89:14
**2007** 5:7,21
**203** 38:18 39:9
**21** 9:7 167:10,13
**22** 9:8 174:20
  175:1
**25th** 5:6,21
  118:19
**27** 62:15

_____
**3**
_____

**3** 8:12 56:20,23
  57:11 58:2,17
  62:14 63:8
  147:14
**3rd** 83:14,15
  140:22
**30th** 125:7
**31** 144:21
**311.03** 38:23
  39:9
**341** 12:13
**36064** 12:14
**36104** 7:12
**36107** 7:6

_____
**4**
_____

**4** 8:13 60:18,21
**4th** 140:9
**4-27-52** 12:10
**40** 8:10
**400** 39:1,10
**43** 8:11

_____
**5**
_____

**5** 8:14 66:7,9
  67:18
**5(d)** 5:1
**506** 39:2,10
**56** 8:12

_____
**6**
_____

**6** 8:15 79:20,22
**6th** 147:18
**60** 7:11 8:13

**617.01** 170:17
**66** 8:14

_____
**7**
_____

**7** 8:16 82:13,16
**70** 17:7
**70's** 17:8
**700** 39:6
**702.01** 39:5,7,10
**74** 17:12 28:19
**75** 17:12 28:19
  28:20
**78** 16:12
**79** 8:15

_____
**8**
_____

**8** 8:17 90:10,16
**80's** 30:21,22
**82** 8:16

_____
**9**
_____

**9** 8:18 103:3,6
**9th** 89:14
**9:30** 5:21
**90** 8:17
**90's** 33:12
**904** 7:11
**99** 148:12

# FREEDOM COURT REPORTING

|  | Page 1 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 |  |
| 5 | JULIE GIVENS and MONICA ) |
| 6 | GREENE,                ) |
| 7 |      Plaintiffs,   ) |
| 8 | vs.                ) CASE NUMBER: |
| 9 | DOUGLAS CHAMBERS,      ) CV:2:06-CV-852-ID |
| 10 | Individually, and in his ) |
| 11 | capacity as President of ) |
| 12 | INGRAM STATE TECHNICAL   ) |
| 13 | COLLEGE; JAMES WILSON,  ) |
| 14 | Individually, and in his ) |
| 15 | capacity as Dean of    ) |
| 16 | Students of INGRAM STATE ) |
| 17 | TECHNICAL COLLEGE,     ) |
| 18 |      Defendants.   ) |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |

|  | Page 3 |
|---|---|
| 1 | JAMES T. MERK,        ) |
| 2 | Individually, and in his ) |
| 3 | capacity as Dean of     ) |
| 4 | Institution of Ingram    ) |
| 5 | State Technical College, ) |
| 6 |      Defendants.    ) |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |

|  | Page 2 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 |  |
| 5 | BARBARA HENDRIX,        ) |
| 6 |      Plaintiff,   ) |
| 7 | vs                ) CASE NUMBER: |
| 8 | DOUGLAS CHAMBERS,        ) 2:07-CV-21-MHT |
| 9 | Individually, and in his ) |
| 10 | capacity as President of ) |
| 11 | Ingram State Technical   ) |
| 12 | College; JAMES WILSON,  ) |
| 13 | Individually, and in his ) |
| 14 | capacity as Dean of     ) |
| 15 | Student and Support     ) |
| 16 | Services of Ingram State ) |
| 17 | Technical College;     ) |
| 18 | MALCOLM MONTGOMERY,      ) |
| 19 | Individually, and in his ) |
| 20 | capacity as Coordinator ) |
| 21 | of Student Support      ) |
| 22 | Services of Ingram State ) |
| 23 | Technical College; and   ) |

|  | Page 4 |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 |  |
| 5 | BONITA J. OWENSBY,      ) |
| 6 |      Plaintiff,   ) |
| 7 | vs                ) CASE NUMBER: |
| 8 | J.F. INGRAM STATE      ) 2:06-CV-796-WKW |
| 9 | TECHNICAL COLLEGE; J.   ) |
| 10 | DOUGLAS CHAMBERS,       ) |
| 11 | Individually, and in his ) |
| 12 | official capacity as    ) |
| 13 | President of J.F. Ingram ) |
| 14 | State Technical College; ) |
| 15 | and JAMES WILSON,       ) |
| 16 | Individually, and in his ) |
| 17 | official capacity as Dean) |
| 18 | of Student and Support   ) |
| 19 | Services at J.F. Ingram  ) |
| 20 | State Technical College, ) |
| 21 |      Defendants.   ) |
| 22 |  |
| 23 |      DEPOSITION OF JAMES THOMAS MERK |

1  (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1    In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as
3  Amended, effective May 15, 1988, I, Cindy
4  Weldon, am hereby delivering to Jim
5  Debardelaben, the original transcript of the
6  oral testimony taken on the 26th day of
7  June, 2007, along with exhibits.
8        Please be advised that this is the
9  same and not retained by the Court Reporter,
10 nor filed with the Court.
11
12    S T I P U L A T I O N S
13    IT IS STIPULATED AND AGREED, by
14 and between the parties through their
15 respective counsel, that the deposition of
16 JAMES THOMAS MERK, may be taken before Cindy
17 Weldon, Certified Shorthand Reporter,
18 Commissioner and Notary Public, at the
19 office of Jim Debardelaben, 1505 Madison
20 Avenue, Montgomery, Alabama, on June the
21 26th, 2007 at 11:15 a.m.
22    IT IS FURTHER STIPULATED AND
23 AGREED that it shall not be necessary for

Page 6

1  any objections to be made by counsel to any
2  questions, except as to form or leading
3  questions, and that counsel for the parties
4  may make objections and assign grounds at
5  the time of trial, or at the time said
6  deposition is offered in evidence, or prior
7  thereto.
8        IT IS FURTHER STIPULATED AND
9  AGREED that notice of filing of the
10 deposition by the Commissioner is waived.
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    MR. JIM DEBARDELABEN
5    1505 MADISON AVENUE
6    MONTGOMERY, ALABAMA  36107
7
8  FOR THE DEFENDANT:
9    MR. ANDREW W. CHRISTMAN
10   GIDIERE, HINTON, HERNDON & CHRISTMAN
11   60 COMMERCE STREET, SUITE 904
12   MONTGOMERY, ALABAMA  36104
13
14 ALSO PRESENT:
15   MS. BARBARA HENDRIX
16   MR. MALCOLM MONTGOMERY
17
18
19
20
21
22
23

Page 8

1    I N D E X
2
3  EXAMINATION BY:          PAGE
4  MR. DEBARDELABEN         10, 215
5  MR. CHRISTMAN            203
6
7
8
9    E X H I B I T S
10        PAGE
11 PLAINTIFF'S EXHIBIT NO. 1     45
12 PLAINTIFF'S EXHIBIT NO. 2     51
13 PLAINTIFF'S EXHIBIT NO. 3     64
14 PLAINTIFF'S EXHIBIT NO. 4     71
15 PLAINTIFF'S EXHIBIT NO. 5     74
16 PLAINTIFF'S EXHIBIT NO. 6     78
17 PLAINTIFF'S EXHIBIT NO. 7     80
18 PLAINTIFF'S EXHIBIT NO. 8     85
19 PLAINTIFF'S EXHIBIT NO. 9     92
20 PLAINTIFF'S EXHIBIT NO. 10    99
21 PLAINTIFF'S EXHIBIT NO. 11   100
22 PLAINTIFF'S EXHIBIT NO. 12   102
23 PLAINTIFF'S EXHIBIT NO. 13   110

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

| 1  | PLAINTIFF'S EXHIBIT NO. 14 | 110 |
| 2  | PLAINTIFF'S EXHIBIT NO. 15 | 117 |
| 3  | PLAINTIFF'S EXHIBIT NO. 16 | 122 |
| 4  | PLAINTIFF'S EXHIBIT NO. 17 | 123 |
| 5  | PLAINTIFF'S EXHIBIT NO. 18 | 133 |
| 6  | PLAINTIFF'S EXHIBIT NO. 19 | 134 |
| 7  | PLAINTIFF'S EXHIBIT NO. 20 | 138 |
| 8  | PLAINTIFF'S EXHIBIT NO. 21 | 146 |
| 9  | PLAINTIFF'S EXHIBIT NO. 22 | 151 |
| 10 | PLAINTIFF'S EXHIBIT NO. 23 | 153 |
| 11 | PLAINTIFF'S EXHIBIT NO. 24 | 156 |
| 12 | PLAINTIFF'S EXHIBIT NO. 25 | 159 |
| 13 | PLAINTIFF'S EXHIBIT NO. 26 | 169 |
| 14 | PLAINTIFF'S EXHIBIT NO. 27 | 170 |
| 15 | PLAINTIFF'S EXHIBIT NO. 28 | 172 |
| 16 | PLAINTIFF'S EXHIBIT NO. 29 | 174 |
| 17 | PLAINTIFF'S EXHIBIT NO. 30 | 175 |
| 18 | PLAINTIFF'S EXHIBIT NO. 31 | 180 |

Page 10

1        JAMES THOMAS MERK,
2  after first being duly sworn, testified
3        as follows:
4  EXAMINATION BY MR. DEBARDELABEN:
5      THE COURT REPORTER:  Usual
6  stipulations?
7        MR. DEBARDELABEN:  Yes, ma'am.
8        MR. CHRISTMAN:  Yes.
9      Q.  Dr. Merk, this is a Federal
10 deposition.  With a Federal deposition, you
11 have the right to read and sign or you can
12 waive reading and signing.
13     You can't change your answer.  But
14 if the court reporter takes down something
15 wrong, you can bring it to her attention.
16 She can basically listen to the tape again
17 and make that correction.
18     You can make the choice whether
19 you want to read and sign it or waive
20 reading and signing.  You might want to
21 discuss that with your lawyer.
22       MR. CHRISTMAN:  It's just up to
23 you.  The question is did she accurately

Page 11

1  transcribe what was said.  It's called
2  reading and signing it.
3      A.  I'll read and sign.
4      Q.  Okay.  Would you state your name,
5  please, sir.
6      A.  James Thomas Merk.
7      Q.  And what's your address?
8      A.  2549 Highway 31 North, Deatsville
9  Alabama 36022.
10     Q.  Is that Elmore County or Autauga
11 County?
12     A.  Autauga County.
13     Q.  That's what I thought.  Where did
14 you graduate from high school?
15     A.  I did not graduate from high
16 school.
17     Q.  Where did you go to high school?
18     A.  I went to Exeter High School,
19 Exeter, New Hampshire.
20     Q.  When did you get your -- Do you
21 have a GED?
22     A.  I do.
23     Q.  And when did you get your GED?

Page 12

1      A.  It was awarded in 1967.
2      Q.  And where was that?
3      A.  The state of New Hampshire,
4  Concord.
5      Q.  When you stopped going to school,
6  what was your first job?
7      A.  Basic recruit, United States Air
8  Force.
9      Q.  When did you join the Air Force?
10     A.  9, May, 1966.
11     Q.  And where did you go in the Air
12 Force or where was -- Lackland?
13     A.  I went to Lackland, yes, sir.
14     Q.  What was your first assignment
15 after basic at Lackland?
16     A.  Technical training at Amarillo Air
17 Force Base, Texas.
18     Q.  And what was your specialty?
19     A.  My specialty was liquid fuels
20 maintenance, AFSC 54630.
21     Q.  And how long did you stay in the
22 Air Force?
23     A.  Twenty-six years and seven months

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    or so. Some of that time was reserve time.
2    **Q.  How long did you stay on active**
3    **duty?**
4    A.  Twenty-five years and nine months.
5    **Q.  What was your last active duty**
6    **station?**
7    A.  Gunter Air Force Base, Montgomery,
8    Alabama.
9    **Q.  What was the highest rank you**
10   **achieved?**
11   A.  Chief master sergeant.
12   **Q.  What duties did you perform?**
13   A.  What duties do I perform?
14   **Q.  Did you perform. Let's start --**
15       MR. CHRISTMAN:  As chief?
16   **Q.  -- as chief.**
17   A.  As chief master sergeant, I was
18   chief of the leadership and management
19   division, United States Air Force Senior NCO
20   Academy.  I was chief of the distance
21   learning program, United States Air Force
22   Senior NCO Academy.  And I was director of
23   curriculum, United States Air Force Senior

Page 14

1    NCO Academy.
2    **Q.  And that's over at Maxwell?**
3    A.  Gunter.
4    **Q.  Gunter.  Prior to being chief,**
5    **what was your position?  I guess it should**
6    **be rank.**
7    A.  I was a senior master sergeant.
8    **Q.  And what did you do as a senior**
9    **master sergeant?**
10   A.  As a senior master sergeant, I was
11   a mechanical superintendent at Spain Dallum
12   Air Force Base in Germany.  I was later an
13   academic instructor at the United States Air
14   Force Senior NCO Academy.
15   **Q.  And where is the U.S. Air Force**
16   **Senior NCO Academy?**
17   A.  The same place.  Gunter.
18   **Q.  Why don't you start after basic**
19   **training and tell me when you got your ranks**
20   **and what you basically did in those**
21   **assignments.**
22   A.  At the end of basic training, I
23   was promoted to E-2.  That's airmen third

Page 15

1    class.  I went to technical training at
2    Amarillo Air Force Base where I learned
3    liquid fuels maintenance as an apprentice.
4        I was transferred to Dover Air
5    Force Base Delaware where I earned my second
6    stripe, airmen second class.  And I left
7    there sometime in July of 1967.
8        You want me to recite the -- In
9    August of 1967, I reported to Hahn Air Force
10   Base in Germany where I worked as a liquid
11   fuels maintenance apprentice until I was
12   promoted to airmen first class and upgraded
13   to the five level, at which time I was a
14   liquid fuels maintenance specialist before I
15   was an apprentice.
16       I was promoted to staff sergeant
17   in 1970.  And in September of 1970, I left
18   the Air Force.  The dates may be a little
19   off.
20   **Q.  Okay.**
21   A.  I returned to New Hampshire.  Got
22   employment as a Volkswagon mechanic.  Worked
23   at that for about nine months.  Was

Page 16

1    recruited back into the Air Force as a staff
2    sergeant.  And I served at Pease Air Force
3    Base as the liquid fuels maintenance
4    specialist.
5        I performed those duties for about
6    four years.  And then I was placed on the
7    service call desk, emergency service call
8    desk where I took calls from the public on
9    the base and dispatched civil engineering
10   personnel to take care of emergencies at
11   night.
12       In May of 1976, I was stationed at
13   Galena Airport Alaska for a year where I was
14   a noncommissioned officer in charge of the
15   mechanical section the in civil engineering
16   squadron.  I was promoted to technical
17   sergeant.
18       And in 1977, in July or August or
19   so, I was transferred to Sembach Air Force
20   Base Germany.  I served as the
21   noncommissioned officer in charge of the
22   liquid fuels maintenance shop at Sembach Air
23   Force Base.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**Page 17**

1  I supervised two German civilians
2  and four U.S. Air Force personnel. I was
3  promoted to master sergeant and worked for a
4  short time as the wing complaints NCO,
5  non-commission officer. I led fly away
6  teams to Southern Germany to reopen radar
7  stations.
8  I served as mechanical
9  superintendent on another fly away team that
10  went to Eschashere, Turkey (spelled
11  phonetically) to support a NATO exercise
12  that was actually the attempt to rescue the
13  hostages in Iran.
14  Q. Okay.
15  A. I was transferred to Spain Dallum
16  Air Force Base I want to say in December of
17  1981. There, I served as the mechanical
18  superintendent. And I supervised about a
19  hundred German civilians and a small number
20  of U.S. Air Force personnel.
21  And we provided heating,
22  refrigeration, air conditioning and liquid
23  fuels maintenance for a small air base.

**Page 18**

1  Again, I was the -- assigned as an exercise
2  evaluation team member.
3  I created exercises that were
4  tests. My squadron was readiness to perform
5  at war time missions. And I was promoted
6  again to senior master sergeant.
7  Q. What year were you a senior master
8  sergeant?
9  A. I want to say late 1983. Along
10  with that came an assignment as a student to
11  the Air Force Senior NCO Academy at Gunter
12  Air Force Base Alabama where I attended a
13  nine week long training session for senior
14  noncommissioned officers.
15  I was asked to consider returning
16  there as an instructor. I thought it over
17  for about nine months or so. And in July of
18  1985, I was assigned to the Senior NCO
19  Academy as an instructor. I went through
20  the academic instructor school.
21  I graduated from it and
22  immediately began work as an academic
23  instructor.

**Page 19**

1  Q. How long did you instruct?
2  A. For about a good year and a half
3  full-time. And until I left, I continued
4  instructing a concentrated study area. It's
5  an elective.
6  Q. Okay. What was your next
7  assignment after instructor?
8  A. My next assignment was as a
9  division chief for the Leadership and
10  Management Division.
11  Q. Where was that?
12  A. That was at Gunter Air Force
13  Base.
14  Q. I assumed it was. But I don't
15  want to assume.
16  A. Yes.
17  Q. And how long were you the division
18  chief?
19  A. For about a year.
20  Q. What was your next assignment?
21  A. My next assignment was to the
22  Correspondence Program, a distance learning
23  program where we provided instruction for

**Page 20**

1  about sixty thousand NCO's in the Air Force
2  realm.
3  Q. And where were you stationed?
4  A. At Gunter Air Force Base Senior
5  NCO Academy.
6  Q. Okay. How long did you stay at
7  Gunter?
8  A. From July 25th, 1985 to 1,
9  January, 1993.
10  Q. Did you retire 1, January, 1993?
11  A. Yes.
12  Q. And there's some -- Was that a
13  retirement from active duty?
14  A. That was retired from active duty.
15  Q. After active duty, you had some
16  reserve type --
17  A. No.
18  Q. You had reserve time between your
19  break in the service?
20  A. Yes, sir.
21  Q. So when you were in New Hampshire
22  in the '70's, you were also in the reserve?
23  A. Inactive reserves, yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    Q.  Okay.  So when you gave me the
2    twenty-six years, seven months as for
3    retirement, you only had twenty-five years
4    and nine months in active service and
5    approximately -- what's that -- eight months
6    of sort of inactive service?  Is that it?
7        MR. CHRISTMAN:  Object to only.
8        A.  I object to only, too.  That was a
9    long time.
10    Q.  I'm trying to get -- I'm confused
11    here.  Twenty-six years seven months --
12        A.  I was out of the Air Force on
13    inactive reserve sometime in the 1970's for
14    about nine months.
15    Q.  Right.  And then you went back and
16    served.  You got a total active duty time of
17    twenty-five years and nine months?
18        A.  Yes.
19    Q.  Okay.
20        A.  I'd have to check my 214's to get
21    a --
22    Q.  That's close enough.  The
23    twenty-six years, seven months -- that nine

Page 22

1    months doesn't count for retirement
2    purposes, does it?
3        A.  No.  But it counted for pay.
4    Q.  That's good.  Now, what's your
5    educational background?
6        A.  I received a certificate of high
7    school equivalency from the State Department
8    of Education of New Hampshire in June or so
9    of 1967.  It may have been July.  I, for a
10    short time, attended Delaware State
11    University.
12        I attended the University of
13    Maryland.  I graduated from the University
14    of New Hampshire.
15    Q.  When did you attend Delaware
16    State?
17        A.  Oh, during my time at Dover,
18    Delaware.  And that was from 1966 to 1967.
19    I don't remember the semesters.  It was
20    cold.
21    Q.  And the next college you attended?
22        A.  Was the University of Maryland.
23    Q.  When did you attend the University

Page 23

1    of Maryland?
2        A.  That was from 1967 to 1970.
3    Q.  And then you graduated from what?
4        A.  I graduated from the University of
5    New Hampshire.
6    Q.  When did you attend there?
7        A.  I'm a little hazy on this.  It was
8    1972 or so to 1974.  I'd have to check the
9    diploma to see when I actually got it.
10    Q.  So what kind of degree did you get
11    from the University of New Hampshire?
12        A.  I got a bachelor's of Arts degree
13    with a major in Political Science.
14    Q.  After your bachelor's degree, what
15    was your next educational institution?
16        A.  It was Golden Gate University
17    where I was enrolled in a master's of Public
18    Administration Program.
19    Q.  And Golden Gate is in San
20    Francisco?
21        A.  Yes.
22    Q.  Was that on campus?
23        A.  It was an on base course offered

Page 24

1    to U.S. Air Force personnel at Pease Air
2    Force Base New Hampshire.
3    Q.  And how long did you take a course
4    from Golden Gate?
5        A.  I was with them for three
6    semesters.
7    Q.  Three semesters.  What educational
8    institution did you go to next?
9        A.  Bald State University.
10    Q.  Michigan?
11        A.  It was in Bald -- in Muncie,
12    Indiana, the home campus was.  But this was
13    a night program at Sembach Air Force Base in
14    Germany.
15    Q.  And what courses of study did you
16    take there?
17        A.  I took a master's of Arts degree
18    in counseling.
19    Q.  Did you finish the course of study
20    at Bald State?
21        A.  Yes.
22    Q.  And you got a master's of Arts.
23    Did some of your courses from the Golden

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  Gate University transfer?
2      A.  No.
3      Q.  After you got your Master's of Art
4  -- When did you get that approximately?
5      A.  Probably 1982.
6      Q.  Okay.  What was your next
7  institution you attended?
8      A.  The next institution I attended
9  was actually the Air Force Senior NCO
10  Academy.
11      Q.  You didn't get any -- What kind of
12  degree did you get from that?
13      A.  I got a diploma.
14      Q.  Yes.  What did you -- What do they
15  issue?
16      A.  They issue a diploma.
17      Q.  Diploma?
18      A.  There are credits that are
19  transferred to associate degrees through the
20  Community College at the Air Force.
21      Q.  Okay.
22      A.  I didn't use them.
23      Q.  After you went through the Senior

Page 26

1  NCO from the Air Force, what institution did
2  you go to next?
3      A.  Auburn University.
4      Q.  When did you go to Auburn?
5      A.  From 1985 to 1995.
6      Q.  What was your course of study?
7      A.  It was a Doctorate of Education
8  degree in Adult and Vocational Education.
9      Q.  Did you go to the main campus at
10  Auburn?
11      A.  I did.
12      Q.  Now, is this a continuous time you
13  were taking classes?
14      A.  Yes.
15      Q.  Or were you intermittently taking
16  classes?
17      A.  Continuous.
18      Q.  Did you take -- I don't know how
19  they do doctorate programs.  Did you have a
20  certain amount of course work you had to
21  take per semester or a certain time you had
22  to get your doctorate in?
23      A.  Both.  I had to be registered for

Page 27

1  one credit per -- a minimum of one credit
2  per semester.  And towards the end, there
3  was a limitation placed on the amount of
4  time you could spend working on your
5  dissertation.  And I don't remember what
6  that is.  But we could dig the catalog out
7  and find it.
8      Q.  Were you taking classes from 1985
9  to 1995 or did you finish your course work
10  up and then spend some time working on your
11  dissertation?
12      A.  The latter.
13      Q.  Okay.  When did you stop taking
14  classes approximately?
15      A.  Probably late 1987.
16      Q.  What did you write your
17  dissertation on?
18      A.  That's going to take some
19  thinking.
20      Q.  I would imagine the blood you
21  sweated over that dissertation you could pop
22  it right out.
23      A.  Well, I wrote the dissertation on

Page 28

1  the difference of two feedback modalities
2  and summative testing on adults' cognitive
3  education.
4      Q.  Now, for us lay people in the room
5  that don't know education, why don't you
6  just put it in simple terms.
7      A.  In very simple terms, computers
8  were just coming onto the scene in
9  education.  And I tried to prove or disprove
10  the hypothesis that feedback that was
11  personalized to individuals based on the
12  test scores that they received which guided
13  them in particular learning objectives would
14  be more productive in raising their scores
15  on summative exams than a mere correct or
16  incorrect marked on their test.
17          It was my strong feeling that
18  computer generated feedback would be a very,
19  very effective alternative to no feedback
20  and it would improve the scores that the
21  students made.
22      Q.  Did it?
23      A.  Yes, it did.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 29 | Page 31 |
|---|---|
| 1  **Q. Okay.** | 1  **1993?** |
| 2  A. But it was at an insignificant | 2  A. J.F. Ingram State Technical |
| 3  level. | 3  College. |
| 4  **Q. A lot of work to find that out,** | 4  **Q. Okay. Was it ever -- Has it ever** |
| 5  **wasn't it?** | 5  **been a community college?** |
| 6  A. But it got me the card. | 6  A. Yes, it has been. |
| 7  **Q. I'm glad lawyers don't have to do** | 7  **Q. After you've been there?** |
| 8  **dissertations. But then again, y'all don't** | 8  A. Yes. |
| 9  **have three days of tests at the end to see** | 9  **Q. When did it change to a community** |
| 10  **if you can do it.** | 10  **college approximately? I won't hold you to** |
| 11  A. Mine took a week. | 11  **the dates.** |
| 12  **Q. What's your work history after the** | 12  A. It was late 1993 that the State |
| 13  **Air Force?** | 13  Board of Education changed the name. |
| 14  A. During my last three months in the | 14  **Q. And then at some time, they** |
| 15  Air Force, I worked for forty-five days | 15  **changed it back to a technical college?** |
| 16  performing some contract work for J.F. | 16  A. Yes. |
| 17  Ingram State Technical College. After my | 17  **Q. When was that approximately?** |
| 18  retirement, I was hired as an institutional | 18  A. Sometime in 1995 I'd say. |
| 19  effectiveness coordinator. | 19  **Q. What's the difference between a** |
| 20  **Q. Who hired you?** | 20  **technical college and a community college?** |
| 21  A. Dr. Murry Gregg. | 21  A. A community college offers |
| 22     MR. CHRISTMAN: G-R-E-G-G. | 22  transferred degrees. A technical college |
| 23  **Q. Did you have to make an** | 23  generally doesn't offer transfer degrees. |

| Page 30 | Page 32 |
|---|---|
| 1  **application?** | 1  **Q. What's a transfer degree?** |
| 2  A. Yes, sir, I did. | 2  A. An Associate of Arts or an |
| 3  **Q. You were hired as a what? I** | 3  Associate of Science with course work that |
| 4  **didn't hear it.** | 4  would be transferable to a four-year |
| 5  A. Institutional effectiveness | 5  university. |
| 6  coordinator. | 6  **Q. Okay. So when your students get a** |
| 7  **Q. What were your job duties?** | 7  **degree from J.F. Ingram, that can't be** |
| 8  A. My job duties were to prepare J.F. | 8  **transferred for course work to a four-year** |
| 9  Ingram State Technical College for | 9  **school?** |
| 10  accreditation with the Southern Association | 10  A. That's correct. |
| 11  of Colleges and Schools Commission on | 11  **Q. So terminal degree?** |
| 12  Colleges in terms of institutional | 12  A. It's an Associate of Applied |
| 13  effectiveness and institutional research. | 13  Technology. Yes. |
| 14  **Q. Had it been accredited before?** | 14  **Q. It would be terminal? I mean, you** |
| 15  A. No. | 15  **can't go any higher?** |
| 16  **Q. So this was the initial** | 16  A. No. |
| 17  **accreditation?** | 17  **Q. No, it is or no, you can't go any** |
| 18  A. Yes. | 18  **higher?** |
| 19  **Q. I know through the years, J.F.** | 19  A. No, you can't go any higher. |
| 20  **Ingram has gone from a trade school to a** | 20  **Q. And after you were hired, what was** |
| 21  **junior college to a technical college?** | 21  **your next employment with J.F. Ingram?** |
| 22  A. Yes. | 22  A. Assistant to the president. |
| 23  **Q. What was it when you went there in** | 23  **Q. Assistant to the president. Who** |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  was the president?
2      A.  Murry Gregg.
3      Q.  Did you apply for that job?
4      A.  No.
5      Q.  It was appointed?
6      A.  Yes.
7      Q.  When were you appointed as
8  assistant to the president approximately?
9      A.  It had to have been sometime in
10  late 1994 or early 1995.
11      Q.  What was your next position?
12      A.  Personnel director.  And I
13  maintained my duties as assistant to the
14  president.
15      Q.  When did you become personnel
16  director?
17      A.  I don't remember.  It would be
18  after 1995.
19      Q.  How long were you personnel
20  director?
21      A.  I really don't remember.  I still
22  have duties.
23      Q.  Okay.  Sometime in that period, I

Page 34

1  know there was a gentleman named Mr. Greg
2  Wright who was personnel director?
3      A.  Yes.  I assumed his duties.
4      Q.  You assumed Mr. Wright's duties
5  when he retired?
6      A.  Yes, sir.
7      Q.  Did you apply for that job or was
8  that duty just assigned to you?
9      A.  The duties were assigned to me.
10      Q.  So when Mr. Wright retired, you
11  became the personnel director?
12      A.  Well, there was a reorganization
13  that took place and it had to be approved by
14  the Chancellor.
15      Q.  Right.  But you were assigned the
16  duties of the personnel director?
17      A.  Yes.
18      Q.  Okay.  What was your position
19  after personnel director?  Were you still
20  the assistant to the president and the
21  personnel director?
22      A.  Yes, I was.  And the institutional
23  effectiveness coordinator.

Page 35

1      Q.  How did you get the job of
2  institutional effectiveness coordinator?
3      A.  I applied for it.
4      MR. CHRISTMAN:  That was the first
5  position he already testified about.
6      MR. DEBARDELABEN:  I thought he
7  was adding another one.
8      MR. CHRISTMAN:  No.  It was just
9  the original.
10      Q.  When did you get additional duties
11  after personnel director or what was your
12  next position?
13      A.  The next position was that of
14  Center Director for the main campus.
15      Q.  What's a Center Director?
16      A.  Center Director is like a building
17  principal.
18      Q.  What are your duties as the Center
19  Director?
20      A.  Assign and evaluate faculty,
21  ensure that the facilities are maintained
22  safely and securely.  Make sure that there
23  are instructors available for students.  And

Page 36

1  if not, find some.
2      Q.  Okay.  So --
3      A.  Oh, I forgot to mention this.  In
4  addition to being the personnel director, I
5  was also made responsible for all of the
6  computing systems.
7      Q.  You call that IT?
8      A.  Yes.
9      Q.  You were the IT officer?  Was that
10  before Center Director?
11      A.  Yes, sir.
12      Q.  When did you become the IT
13  officer?  I'm going to call -- Do you
14  understand what I say when I say IT?
15      A.  Yes, I do.  I can't really tell
16  you that because I haven't committed that to
17  memory.  If you took a look at my records --
18  and you may have them -- that would surely
19  reveal that.
20      Q.  Now, after Center Director, what
21  was your next -- excuse me.  Strike that.
22  Did I understand you to say you were
23  responsible for basically hiring faculty or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  getting faculty there?
2      A.  Getting faculty there.
3      Q.  And ensuring the facilities are
4  safe and secure?
5      A.  Yes.
6      Q.  Now, what do you --
7      MR. CHRISTMAN:  Did you withdraw
8  the hiring faculty part of your question or
9  was that part of your --
10      MR. DEBARDELABEN:  No, no.  He
11  said getting faculty there.
12      Q.  So hiring faculty I understand can
13  only be done by the president?
14      A.  Right.
15      MR. DEBARDELABEN:  But what I
16  understood and I didn't follow up on, is
17  that if they have a need for faculty, he's
18  supposed to inform the president to get them
19  there.
20      MR. CHRISTMAN:  That was still
21  part of your question.
22      Q.  Now, what does -- What do you do
23  to ensure that the facilities are safe and

Page 38

1  secure?  How does that --
2      A.  Well, I lock them up every night.
3      Q.  Is that it?  Just lock them up?
4      A.  No.  You really want me to tell
5  you all the things?
6      Q.  Yes, sir.  Because I don't -- I've
7  heard different people are responsible for
8  different things.  And the only way I can
9  find out who is responsible for what is to
10  ask these questions that seem to be --
11      A.  If a window was broken, I had to
12  get it fixed.  If a door lock didn't work, I
13  had to get it fixed.  If the plumbing didn't
14  work, I had to get that fixed.  If there
15  were security breaches in the fence from
16  somebody escaping, I had to get it fixed.
17      Q.  So on --
18      A.  If other problems occurred,
19  problems with students, I had a role in
20  that.  If problems with instructors
21  occurred, I had a role in that.
22      Q.  So on security there, anything to
23  do with protecting the people's safety there

Page 39

1  and protecting the property?
2      A.  Yes, sir.
3      Q.  Okay.  So ensuring the locks on
4  the doors are locked and there's not too
5  many keys out and stuff like that, do you
6  ensure that?
7      A.  Yes.
8      Q.  So if a key is missing down here
9  from a room, that's your problem, to get the
10  facility back secured?
11      A.  I'll get the facility secured.
12  But it's not my problem.  It's somebody
13  elses problem.
14      Q.  Well, whose problem would that be?
15      A.  Whoever is the custodian of the
16  key.
17      Q.  So you're not in charge -- See,
18  that's where I'm confused.  How can you be
19  in charge of security of the facilities when
20  you don't have control of the keys?
21      A.  I have a master key.
22      Q.  So you have a master key.  But
23  someone else has custody of the other keys?

Page 40

1      A.  Yes.
2      Q.  Okay.  After Center Director, have
3  you gotten another position added to your
4  many positions?
5      A.  Yes.  I'm also and now the Dean of
6  Instruction.
7      Q.  Did you keep institutional
8  effectiveness coordinator and assistant to
9  the president?
10      A.  I did not.
11      Q.  What duties do you have now?
12      A.  Through reorganization, I was
13  divested of my duties as institutional
14  effectiveness coordinator.
15      Q.  Okay.  Are you still assistant to
16  the president?
17      A.  Not by title.
18      Q.  Would that be -- What do you mean
19  not by title?
20      A.  My title is Dean of Instruction.
21      Q.  Okay.  Are you still personnel
22  director?
23      A.  No.  My title is actually Dean of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  Instruction.
2      Q.  Who is the personnel director now?
3      A.  I do that.
4      Q.  Okay.  So you're still the
5  personnel director, also?
6          MR. CHRISTMAN:  Object to the
7  form.
8      A.  Well, if you're asking me if I'm
9  titled --
10     Q.  No, no.
11     A.  I'm responsible for those
12  functions.
13     Q.  Okay.  Who is the personnel
14  director then if you are not?
15     A.  I said I -- We don't have a
16  personnel director.
17     Q.  Okay.  That's what I was trying to
18  find out.  Are you still the Center Director
19  for the main campus?
20     A.  Not by title.
21     Q.  Is there a Center Director for the
22  main campus?
23     A.  No.

Page 42

1      Q.  That has been rolled into the Dean
2  of Instruction's duties?
3      A.  Yes, sir.
4      Q.  Are you still the IT officer?
5      A.  Yes.
6      Q.  Okay.  Or was it rolled into the
7  Dean of Instruction duties?
8      A.  Yes.
9      Q.  So the Dean of Instruction now
10  includes the IT officer, the Center -- the
11  duties of the IT officer I should say -- the
12  duties of the Center Director for the main
13  campus and over -- and the duties of the
14  personnel director, I assume?
15     A.  Yes.
16     Q.  They are all rolled into yours?
17     A.  Yes.
18     Q.  When did that reorganization take
19  place?  Let's put it this way.
20     A.  I want to say it was the fall of
21  2005.
22     Q.  2005.  Is that when you were
23  appointed the Dean of Instruction?

Page 43

1      A.  Yes.
2      Q.  Okay.  And did you apply for that
3  job or was it a reorganization?
4      A.  It was a reorganization.
5      Q.  Okay.  Am I incorrect in assuming
6  that the only time you applied for a job at
7  J.F. Ingram is your initial employment?
8      A.  No, you're not.
9      Q.  So let me put it a different way.
10  The only application you made was for
11  initial appointment.  The rest of them have
12  been reorganization or appointments?
13     A.  Yes.
14          MR. DEBARDELABEN:  This is a good
15  time to take a lunch break.
16          (Whereupon, a lunch recess was
17  taken.)
18     Q.  Dr. Merk, you're still under oath
19  as you know.  Mr. Merk, I want to show you
20  what has been presented to me as the
21  policies and procedures manual for J.F.
22  Ingram State Technical College.  Do you
23  recognize that document?

Page 44

1          Thumb through it and check and see
2  if there's anything that needs to be updated
3  or is that the updated version?
4          MR. CHRISTMAN:  The first question
5  is do you recognize the document.
6      A.  Oh, I do recognize it.
7      Q.  I thought you might have to look
8  at the whole thing to see if you recognized
9  it.
10          MR. CHRISTMAN:  The second
11  question is going to be whether anything has
12  been updated or revised.
13     Q.  Or needs to be updated or
14  revised.  If you see any errors in that
15  document as it exists, please let us know.
16     A.  This looks like the current one.
17  And it needs to be updated.
18     Q.  Who's responsible for getting the
19  information out to update them?
20     A.  That's the cabinet.
21     Q.  The cabinet?
22     A.  And the president.
23     Q.  Okay.  Let's mark that as

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  Plaintiff's Exhibit 1. What needs to be
2  updated in it, Dr. Merk?
3      A.  There's a lot of reference to the
4  Dean of the College.
5      Q.  Reference to the Dean of the
6  College?
7      A.  Yes.
8      Q.  It's not supposed to be the Dean
9  of the College anymore?
10     A.  Well, no. I said there are
11  references to the Dean of the College which
12  are incorrect.
13     Q.  Okay. Has the updates been put
14  out?
15     A.  No.
16     Q.  Is the manual before you, the
17  policies and procedures manual of 2002, the
18  most updated version that's available at the
19  college?
20     A.  It is.
21     Q.  Okay. We're going to mark this as
22  1 to Dr. Merk's deposition.
23         (Whereupon, Plaintiff's Exhibit

Page 46

1  No. 1 was marked for identification and
2  attached to the original transcript.)
3      Q.  Dr. Merk, when you say it needs to
4  be updated, who is the specific person
5  responsible for making sure that the
6  policies and procedures manual is updated?
7      A.  Which ones?
8      Q.  The policies and procedures manual
9  before you.
10     A.  Well, there are things in there
11  relating to students and they would
12  naturally be done by the Dean of Students.
13     Q.  Okay.
14     A.  There are things in there relating
15  to personnel and they would be updated by
16  me.
17     Q.  Okay. So do the --
18     A.  If there are things in there
19  relating to business office functions, then
20  they would be updated by the business
21  office.
22     Q.  So do the updates have to be
23  approved by the president's cabinet?

Page 47

1      A.  Yes, sir.
2      Q.  So any updates that were supposed
3  to have in the policies and procedures
4  manual of 2002, can you go back -- that's a
5  bad question.
6          Is it possible to go back and look
7  at the minutes of the president's cabinet
8  meetings and determine what updates there
9  are?
10         MR. CHRISTMAN:  Form.
11     Q.  Do you understand the question?
12     A.  No.
13     Q.  Okay. This policy manual has a
14  date of 2002 on the front; correct?
15     A.  Yes.
16     Q.  Do you know what month that was
17  printed in 2002?
18     A.  No.
19     Q.  If we assume for the purposes of
20  this question that it's January of 2002, if
21  we -- if you want to find any updates that
22  have been made to it, if we look at the
23  minutes of the president's cabinet from

Page 48

1  January of 2002 to present, would that
2  reflect the updates, the changes?
3          MR. CHRISTMAN:  Form.
4      A.  Well, that I would certainly think
5  so.
6      Q.  If the changes are not in the
7  president's cabinet meetings, have they been
8  properly approved? If the changes are not
9  reflected in the minutes of the president's
10  cabinet meetings or the cabinet meeting,
11  have these changes been properly approved?
12     A.  Well, they could be. The
13  president is the one that approves the
14  policies for J.F. Ingram State Technical
15  College.
16     Q.  Okay. So if there's approval in
17  the change of a policy, is there some type
18  of written instruction from the president?
19     A.  Yes.
20     Q.  Who would that go to?
21     A.  The office of record for that
22  policy.
23     Q.  Okay. So in your situation with

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1  any changes that's been made in your area in
2  this, you would have a letter from the
3  president or a memorandum?  Dean Wilson --
4      A.  Some kind of correspondence, yes.
5      Q.  And Dean Wilson in his area and
6  Dean Greene in her area?
7      A.  Uh-huh.
8      Q.  I think that's all the deans y'all
9  have at the present time, isn't it?
10     A.  Right.
11     Q.  And then when Dean Huffstutler was
12 over there, it would be his.  I think you
13 had another dean.  It would be reflected.
14 Okay.
15         So if I wanted to get the updated
16 policy manual, I can request all the changes
17 from the various deans that have been made
18 in that area and they should have a copy of
19 it; correct?
20     A.  Well, I would think so.  I don't
21 keep their files.
22     Q.  Do you know if the president keeps
23 copies of all letters he sends out?

Page 50

1      A.  I do not know that.
2      Q.  Okay.  Who's the president's
3  secretary?
4      A.  Ms. Julie Wood.
5      Q.  Then if copies of letters were
6  kept, Ms. Wood would know where they are
7  quicker than the president, wouldn't she,
8  probably?
9         MR. CHRISTMAN:  Form.  If you
10 know.
11     A.  In as much as there have been
12 several secretaries there since the
13 president was appointed and different filing
14 systems have been in place, I can't say
15 positively that Ms. Julie Wood would know
16 where all correspondence is.
17     Q.  How long has she been the
18 president's secretary?
19     A.  Two, three years.
20     Q.  Okay.
21     A.  Three years maybe.
22     Q.  Who was it before Ms. Wood?
23     A.  Donna Wisman.

Page 51

1      Q.  Who was it before Ms. Wisman?
2      A.  Sylvia Murphy.
3      Q.  Okay.  And Ms. Murphy was Dr.
4  Gregg's secretary, wasn't she?
5      A.  Yes.
6      Q.  Okay.  Let me ask you to look at
7  what I'm going to mark Plaintiff's Exhibit
8  No. 2.
9         (Whereupon, Plaintiff's Exhibit
10 No. 2 was marked for identification and
11 attached to the original transcript.)
12     Q.  I'll ask you if you recognize that
13 as the employee grievance procedure?
14     A.  Yes.
15     Q.  Now, when was that employee
16 grievance procedure issued?
17     A.  September 1st, 2000 I'd say.
18     Q.  That's when it was revised, wasn't
19 it?  And it was actually issued on September
20 the 1st, '84, wasn't it?
21     A.  A policy was issued in September
22 of '84.  This one was issued September of
23 2000.

Page 52

1      Q.  Okay.  Has there been any updates
2  since September of 2000?
3      A.  Not that I know of.
4      Q.  So this is the present policy in
5  force; is that correct?
6      A.  Yes.
7      Q.  Are you familiar with this policy?
8      A.  Somewhat.  But I can tell you that
9  I haven't committed it to memory.
10     Q.  You were present during Mr.
11 Montgomery's deposition this morning,
12 weren't you?
13     A.  Yes, I was.
14     Q.  And you were present during the
15 entire deposition, weren't you?
16     A.  Yes, I was.
17     Q.  I want to ask you about
18 Plaintiff's Exhibit 3 to Mr. Montgomery's
19 deposition.  Are you familiar with that
20 exhibit?
21     MR. CHRISTMAN:  By the way -- and
22 I'll say this on the record -- that I have
23 located the audio recording of this

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  meeting. And we'll have that reproduced for
2  you. It is a digital recording and I will
3  have it produced to you in digital format.
4      A.  Yes, I'm familiar with this.
5      **Q.  Is this a transcription of a**
6  **meeting --- Do you know when this meeting**
7  **took place?**
8      A.  It was either the 14th or 15th of
9  February.
10     **Q.  Of 2006?**
11     A.  Yes.
12     **Q.  Do you know who recorded this**
13 **meeting?**
14     A.  Yes.
15     **Q.  Who?**
16     A.  Me.
17     **Q.  Did you put -- How did you record**
18 **it?**
19     A.  I used a digital recorder.
20     **Q.  Were all participants of the**
21 **meeting aware that it was being recorded?**
22     A.  No.
23     **Q.  Who was aware that this meeting**

Page 54

1  **was being recorded?**
2      A.  I was.
3      **Q.  Were you the only person?**
4      A.  I would say so.
5      **Q.  Dr. Merk, do you make a habit of**
6  **recording meetings with other people without**
7  **informing them?**
8      A.  No.
9      **Q.  Why did you record this meeting?**
10     A.  I wanted to remember it.
11     **Q.  Who called this meeting, Dr. Merk?**
12     A.  I'm not actually sure. I was with
13 Mr. Wilson and people started arriving. I'm
14 not sure if he did it or not. You'll have
15 to ask him.
16     **Q.  What was the purpose of this**
17 **meeting?**
18     A.  As it developed, it was to gain
19 facts about an incident that happened with
20 one of Ms. Hendrix's students and Ms.
21 Hendrix.
22     **Q.  So the sole purpose of this**
23 **meeting was to gain facts about an incident**

Page 55

1  **that happened between one of Ms. Hendrix's**
2  **students and Ms. Hendrix?**
3      A.  That's what I got out of it.
4      **Q.  Who transcribed this meeting?**
5      A.  Let's see. Probably Julie Wood.
6      **Q.  Julie Wood. Who was provided**
7  **copies of this transcript?**
8      A.  I gave one to Ed George and I gave
9  one to these guys.
10     **Q.  Okay. When was this meeting**
11 **transcribed?**
12     A.  I don't remember.
13     **Q.  Did you ever tell anyone else in**
14 **this meeting that this meeting had been**
15 **recorded?**
16     A.  Yes.
17     **Q.  Who did you tell it had been**
18 **recorded?**
19     A.  I told the president.
20     **Q.  Okay. Well, he wasn't in the**
21 **meeting.**
22     A.  No.
23     **Q.  When did you tell the president**

Page 56

1  **that this meeting had been recorded?**
2      A.  I don't remember exactly. It
3  would have been sometime between the meeting
4  and sometime between the final -- my
5  submission of my findings.
6      **Q.  Was this transcript transcribed**
7  **before you submitted your findings?**
8      A.  I really don't remember.
9      **Q.  And tell me if I'm correct on**
10 **this. It might speed things up. Dean**
11 **Wilson was present, Malcolm Montgomery was**
12 **present, Barbara Hendrix was present and you**
13 **were present and you participated in this**
14 **meeting, didn't you?**
15     A.  Yes, I did.
16     **Q.  And it appears Ms. Bonita Owensby**
17 **was present; is that correct?**
18     A.  Yes.
19     **Q.  Was there anyone else present?**
20     A.  There was a student that was
21 around.
22     **Q.  Was that Paul Edwards?**
23     A.  I think that was his name.

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1    Q.  Okay.  Who is the grievance
2  coordinator?
3    A.  Me.
4    Q.  And when did you become the
5  grievance coordinator?
6    A.  When I took on duties as the
7  personnel director.
8    Q.  So the personnel director is
9  always the grievance coordinator?
10    A.  I don't know that.  It's been the
11  case since I was personnel director.
12    Q.  This Plaintiff's Exhibit 3 before
13  you, which is Plaintiff's Exhibit 3 to Mr.
14  Montgomery's deposition, did you have any
15  other interviews with Ms. Hendrix prior to
16  taping this meeting?
17    A.  Yes.
18    Q.  When did you have an interview
19  with Ms. Hendrix prior to taping this
20  meeting?
21    A.  It was early in the morning.  And
22  she told me that she had been asked by Mr.
23  Montgomery to do something and that her

Page 58

1  husband was not happy about it and she was
2  not happy and her husband would be calling
3  me.
4    Q.  And that was the morning -- That
5  was prior to this transcribed meeting we
6  have as Plaintiff's Exhibit 3 in Mr. Malcolm
7  Montgomery --
8    A.  I think so.  It may have been
9  afterward.
10    Q.  Now, did you record that meeting?
11    A.  No.
12    Q.  Did you make any record of that
13  meeting?
14    A.  I think I have a memo to record
15  somewhere on that.  But I'm not sure.
16    Q.  When you do a memo to record, does
17  that go in the person's personnel file?
18    A.  No.
19    Q.  What's -- What is the record
20  you're making a memo for?
21      MR. CHRISTMAN:  Object to the
22  form.
23    Q.  What is the record -- What are you

Page 59

1  talking about the record?  You said memo to
2  record?
3    A.  Well, as I said with the grievance
4  policy itself, I don't remember things --
5  all of the things that I do.  So I like to
6  take notes or make audio recordings.
7    Q.  Okay.  So what record -- When you
8  say memo to record, what record are we
9  talking about?
10    A.  My files.
11    Q.  Your files.  So you keep separate
12  files on everything you do at J.F. Ingram?
13      MR. CHRISTMAN:  Object to the
14  form.  That's not what he's saying.
15    Q.  Is that correct?  Do you keep
16  separate files on everything you do?
17      MR. CHRISTMAN:  That may be true.
18  But he's suggesting --
19    Q.  Do you keep separate files on
20  separate individuals when you have
21  conversations with them?
22    A.  Not ordinarily.
23    Q.  What determines whether or not you

Page 60

1  keep a record of a conversation you had on
2  that individual?
3      MR. CHRISTMAN:  Object to the
4  form.
5    Q.  You can answer.
6      MR. CHRISTMAN:  You're just
7  talking about any kind of record?
8      MR. DEBARDELABEN:  Yes.
9    Q.  What determines whether or not you
10  keep a record of a conversation?
11    A.  The content of the conversation
12  and whether or not in my opinion it is a
13  severe problem or a problem that's about to
14  occur.  If it's something that has to be
15  dealt with and I have to deal with it and it
16  has to be done properly, I make a record of
17  it.
18    Q.  Okay.  So you either make an audio
19  record by recording it or do you make a
20  written record or both?
21    A.  Both.
22    Q.  Or one of the other?
23    A.  Or one of the other.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  Q.  Okay.  Now, what about the
2  situation with Ms. Hendrix caused you to
3  record what we've got as Exhibit No. 3 to
4  Mr. Montgomery's deposition?
5      A.  I thought that there was a
6  possibility of a case of sexual harassment
7  by a student and I wanted to make sure that
8  nothing that we did at Ingram would show or
9  demonstrate any degree of tolerance for
10  sexual harassment, any degree of tolerance.
11      Q.  Explain to me how this could be a
12  sexual harassment case by a student.
13      A.  If I as Ms. Hendrix's supervisor
14  am aware of a hostile environment or overt
15  sexual activity aimed at her and I make it
16  appear as though it's a condition of her
17  employment by doing nothing, then I'm
18  guilty.  I did not do that.  I will not do
19  that.  And I will not tolerate it by anyone.
20      Q.  Okay.  Now, what made you think
21  this particular incident would be something
22  aimed at Ms. Hendrix for sexual harassment?
23      A.  Are you asking me --

Page 62

1      Q.  Yes, sir.
2      A.  -- what made me think of a student
3  -- the allegation of a student masturbating
4  and she seeing it was sexual harassment?
5      Q.  Yes, sir.  That would be brought
6  against Ms. Hendrix.
7      A.  Now I understand  No, I didn't
8  say it would be brought against Ms. Hendrix.
9      Q.  Who would it be brought against?
10      A.  Who would the sexual harassment be
11  brought against?
12      Q.  Yes, sir.
13      A.  Me, the institution, anybody in
14  the administration if firm action was not
15  taken to make it stop
16      Q.  To make it stop.  Okay.  What
17  conversation had you had with anyone prior
18  to making a tape of the meeting you were
19  having with Ms. Hendrix and Mr. Montgomery
20  and Dean Wilson and Ms. Owensby concerning
21  the incident involving Ms. Hendrix seeing a
22  student allegedly masturbating?
23      A.  I don't recall any conversations

Page 63

1  unless the timing was off wherein Ms.
2  Hendrix and I spoke about it.  And that's
3  entirely possible.
4      Q.  Well, see, Dr. Merk, that's what
5  I'm trying to find out, where you had the
6  information in your mind to make a
7  determination to record this conversation,
8  why do you think it would be important.
9  Because if I understood what you just told
10  me, you didn't know anything about it until
11  this meeting?
12      A.  Right.
13      Q.  So why did you record this meeting
14  if you had no information what the meeting
15  was going to be about and you hadn't talked
16  to anybody about it.
17      A.  I'm certain you heard me when I
18  said that I was with Mr. Wilson.
19      Q.  And I've asked you what
20  conversation you've had and you've told me
21  none.
22      A.  No, I didn't have any conversation
23  with Mr. Wilson.  The conversation came to

Page 64

1  me.
2      Q.  Which conversation?
3      A.  Ms. Hendrix came.  Paul Edwards
4  came to me.
5      Q.  When?
6      A.  Prior to this meeting.
7  Immediately prior to it.
8      Q.  Immediately prior to this?
9      A.  Yes.
10      Q.  Who called the meeting?
11      A.  It must have been Mr. Wilson.
12      Q.  How did Mr. Wilson know to call a
13  meeting?
14      A.  I don't know.  You'll have to ask
15  him that.
16      Q.  I think we're about to beat that
17  dead horse on that one.  Let's get back on
18  another file.
19          (Whereupon, Plaintiff's Exhibit
20  No. 3 was marked for identification and
21  attached to the original transcript.)
22      Q.  Now I'm going to show you what I
23  have marked as Plaintiff's Exhibit 3 to your

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  deposition and ask you if you have seen this
2  before? And I'll represent to y'all that
3  all I have is a copy.
4        MR. CHRISTMAN: I'm sorry. You'll
5  represent what?
6        MR. DEBARDELABEN: All I have is a
7  copy.
8        MR. CHRISTMAN: This is a
9  multi-page exhibit.
10      Q.  Handwritten exhibit. Five pages.
11      A.  What was your question?
12      Q.  Do you know -- Have you seen this
13  memorandum before?
14      A.  I think I dictated it.
15      Q.  Do you know who wrote it?
16      A.  Excuse me?
17      Q.  Did you write this?
18      A.  No.
19      Q.  Who wrote it?
20      A.  Probably Ms. Cherry.
21      Q.  Ms. Cherry. And it says up at the
22  top 8:45 on Wednesday, February the 2nd,
23  2006; is that correct?

Page 66

1        A.  February the 15th.
2        Q.  February the 15th, 2006?
3        A.  Yes.
4        Q.  Could you read that memo since you
5  wrote it?
6        A.  I don't know if I can or not.
7  I'll do my best.
8        Q.  I'm just afraid there's some words
9  that I can't make out as well. I don't want
10  to put something here that's not in here.
11      A.  Memo, 8:45 on Wednesday, February
12  15th, 2006.
13      MR. CHRISTMAN: Well, before --
14  You're going to ask him to read the whole
15  thing? I'm not going to let him do that.
16  It speaks for itself. I don't want him to
17  try and interpret what you've already said
18  you don't think you can interpret.
19      If you have a specific question
20  about the memo, we're delighted to answer
21  those questions. But I'm not going to let
22  him try to interpret what's written here any
23  better than you were able to do that, Mr.

Page 67

1  Debardelaben.
2        Q.  Did you dictate this memorandum?
3        A.  Yes.
4        Q.  And these are your words on the
5  memorandum?
6        A.  Not completely.
7        Q.  What is this a memorandum
8  concerning?
9        A.  Concerning Ms. Hendrix.
10      Q.  Okay. What about Ms. Hendrix?
11      A.  Well, there's a lot about it.
12      Q.  What is this incident -- this
13  memorandum concerning? Is it a specific
14  incident or just --
15      MR. CHRISTMAN: I object to the
16  form. Are you asking him in general?
17  There's a lot in here. I don't how he can
18  answer what's in it because there are
19  matters regarding dress, matters regarding
20  her husband. There's a lot of stuff in
21  here.
22      Q.  Why did you make this statement to
23  her? I'm reading on the next to the last

Page 68

1  page. And I'll ask if you this is a correct
2  statement.
3        I told her that she will never
4  know what it like to view female from male
5  perspective. Did you make that statement to
6  Ms. Hendrix?
7        A.  I sure did. We were discussing a
8  conversation that she had had with a student
9  -- I don't remember whom it was -- and that
10  she felt certain that the student had no
11  interest in her in any manner concerning
12  sex.
13      Q.  Okay. Now -- But you didn't
14  mention that student in this memorandum, did
15  you?
16      A.  I don't think I did, no.
17      Q.  Okay. Go back to the next page.
18  And I can't read this well. Starting down
19  one, two -- the third line. And I also
20  pointed out that your clothes are what?
21      A.  I don't know.
22      Q.  You can't make that out?
23      A.  No. But unlike other women who

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 69 |
|---|---|
| 1 | work at Ingram, Ms. Hendrix wears loose |
| 2 | clothes and they're not -- in my opinion, |
| 3 | they are not aimed at arousing any kind of |
| 4 | sexual interest in her students in her. |
| 5 | **Q. Now, Ms. Ingram works --** |
| 6 | MR. CHRISTMAN: Hendrix. |
| 7 | **Q. Hendrix. Ms. Hendrix works in** |
| 8 | **horticulture. So she's out working with** |
| 9 | **plants all day, isn't she?** |
| 10 | A. Yes. |
| 11 | **Q. And part of her duties are to keep** |
| 12 | **the grounds up at J.F. Ingram. When I say** |
| 13 | **grounds, I'm talking about the plants.** |
| 14 | A. They are not her duties. They're |
| 15 | duties of the grounds keepers or the |
| 16 | custodian staff and people assigned to them. |
| 17 | **Q. Okay.** |
| 18 | A. She has volunteered. And it has |
| 19 | brought great credit to her program to take |
| 20 | care of flower beds. |
| 21 | **Q. And --** |
| 22 | A. We receive compliments from every |
| 23 | visitor. She does a great job. |

|  | Page 70 |
|---|---|
| 1 | **Q. Y'all do that and it's a very good** |
| 2 | **advertisement when visitors come to see our** |
| 3 | **own horticulture program can do this?** |
| 4 | A. Not only is it a great |
| 5 | advertisement, but it's great for the |
| 6 | students. |
| 7 | **Q. For they see what it does. Did** |
| 8 | **you provide a copy of this memorandum to Ms.** |
| 9 | **Hendrix when you wrote it?** |
| 10 | A. No. |
| 11 | MR. CHRISTMAN: Form. What he |
| 12 | wrote, this exhibit? |
| 13 | **Q. When you dictated it?** |
| 14 | A. No. |
| 15 | **Q. This was only for your records?** |
| 16 | A. Yes. |
| 17 | **Q. Okay. And this memorandum was** |
| 18 | **written at -- well, dictated at** |
| 19 | **approximately 8:45 a.m. on Wednesday,** |
| 20 | **February the 15th, 2006?** |
| 21 | A. That's what it says. I'm having a |
| 22 | little trouble with the timing of all these |
| 23 | events here after a year. |

|  | Page 71 |
|---|---|
| 1 | **Q. Okay. When did you become aware** |
| 2 | **that Ms. Hendrix was very upset about the** |
| 3 | **situation that happened with Student Pruitt?** |
| 4 | MR. CHRISTMAN: Form. |
| 5 | **Q. Let me rephrase that. When did** |
| 6 | **you become aware that Ms. Hendrix was upset** |
| 7 | **with Mr. Malcolm Montgomery's handling of** |
| 8 | **the situation with Student Pruitt?** |
| 9 | A. I don't know the date. But I can |
| 10 | say that after she told me that her husband |
| 11 | was going to call me, I understood that |
| 12 | there was a degree of concern. |
| 13 | **Q. And she told you, according to the** |
| 14 | **Exhibit 3 we just read, she told you that** |
| 15 | **the early morning of -- I think that was** |
| 16 | **February the 15th, wasn't it?** |
| 17 | A. Well, that is what it says on |
| 18 | there. But I won't guarantee it. |
| 19 | **Q. Okay.** |
| 20 | **(Whereupon, Plaintiff's Exhibit** |
| 21 | **No. 4 was marked for identification and** |
| 22 | **attached to the original transcript.)** |
| 23 | **Q. I'm going to show you what I have** |

|  | Page 72 |
|---|---|
| 1 | marked as Plaintiff's Exhibit 4 and |
| 2 | represent to you that was Defendant's |
| 3 | Exhibit 10 to Ms. Hendrix's deposition. |
| 4 | Have you ever seen that memorandum addressed |
| 5 | to you from Ms. Hendrix? |
| 6 | A. I have seen it. |
| 7 | **Q. Okay. What did you do in response** |
| 8 | **-- excuse me. This is dated February the** |
| 9 | **15th, 2006; correct?** |
| 10 | A. Yes. |
| 11 | **Q. Do you know when you received** |
| 12 | **Plaintiff's Exhibit No. 4?** |
| 13 | A. No. |
| 14 | **Q. Now, at some point in time, Ms.** |
| 15 | **Hendrix filed a grievance; is that correct?** |
| 16 | A. Yes. |
| 17 | **Q. And who did she file the grievance** |
| 18 | **against?** |
| 19 | A. Mr. Montgomery and Mr. Wilson. |
| 20 | **Q. Okay. And is there a certain** |
| 21 | **policy you're to follow filing a grievance?** |
| 22 | A. Yes. |
| 23 | **Q. Now, was the grievance filed after** |

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  you had been in a meeting with Ms. Hendrix,
2  received a memo from Ms. Hendrix and been in
3  a meeting with Mr. Malcolm Montgomery, Ms.
4  Hendrix, Mr. Wilson, Ms. Owensby and Paul
5  Edwards?
6      MR. CHRISTMAN: When you refer to
7  all those people separately, are you
8  referring to one meeting?
9      MR. DEBARDELABEN: No. They were
10  separate meetings.
11     Q. You had one meeting with Ms.
12  Hendrix apparently on -- at 8:45 on February
13  the 15th. And then apparently after that,
14  you had another meeting or maybe before that
15  that involved Ms. Hendrix, Mr. Montgomery,
16  Dean Wilson, Ms. Owensby and Paul Edwards;
17  is that correct?
18     A. I did have a meeting with Ms.
19  Hendrix and I did have a meeting with Ms.
20  Hendrix, Dean Wilson, Malcolm Montgomery,
21  Bonita Owensby and Paul Edwards. And for a
22  short time, Deanne Roberts was in the room.
23     Q. Okay. Now --

Page 74

1      A. But I don't remember which
2  occurred first.
3      Q. I'll show you a two-page document
4  that I'm going to mark as Plaintiff's
5  Exhibit No. 5.
6      (Whereupon, Plaintiff's Exhibit
7  No. 5 was marked for identification and
8  attached to the original transcript.)
9      Q. Which was No. 11 to Ms. Hendrix's
10  deposition. And I'll ask you if you have
11  seen that document before?
12     A. Yes.
13     Q. And is this what is considered a
14  complaint?
15     A. This is a grievance form.
16     Q. Grievance form. Okay. And it
17  says on here the original complaint was
18  reported to Dr. Merk on 2-15-06; correct?
19     A. That's what it says.
20     Q. Okay. And it's signed by Ms.
21  Hendrix on 2-23-06.
22     A. Yes. That is her assertion.
23     Q. Okay. Where would be the proper

Page 75

1  place for Ms. Hendrix to file this
2  grievance?
3      A. Any employee who wishes to make a
4  complaint shall report that complaint in
5  writing to his/her immediate supervisor.
6      Q. Now, you're reading on Exhibit 2
7  at what page?
8      A. It's item one letter A.
9      Q. Okay. And are you Ms. Hendrix's
10  immediate supervisor?
11     A. Yes.
12     Q. Now, we've used two different
13  words here. And I just want to be sure that
14  we're on the same page. It says the initial
15  steps to resolve a complaint. It says, any
16  employee who wishes to make a complaint. Is
17  a complaint the same thing as a grievance in
18  this instance?
19     A. I would say no.
20     Q. What's the difference? Because
21  this is employee grievance procedure and
22  this says any -- I'm reading on the policy
23  -- employee grievance procedure. That's

Page 76

1  what you're reading from.
2      And in A, initial steps -- I mean
3  one it says initial steps to resolve a
4  complaint and A is employees. It says, any
5  employee who wishes to make a complaint. Is
6  this a complaint or a grievance we're
7  making?
8      A. Which one are you talking about?
9  I know where you're reading from.
10     Q. Yes, I'm reading right there. And
11  I'm looking at the form we use and it says a
12  grievance report.
13     A. Yes.
14     Q. And I'm -- It appears that
15  grievance and complaint might be used
16  interchangeably?
17     A. No.
18     Q. Okay. What's the difference
19  between the two?
20     A. A complaint is the initial step.
21  A grievance reads, grievance procedure, item
22  two under Plaintiff's Exhibit 2, if any
23  student or employee complaint is not, or

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  cannot be, resolved at the first level of
2  supervision, as described above, such an
3  unresolved complaint shall be termed a
4  grievance.
5      Q. So did Ms. Hendrix commit to
6  writing a complaint to you on February the
7  15th?
8      A. Are you talking about Plaintiff's
9  Exhibit No. 4?
10     Q. Yes, sir.
11     A. I did not view it as a complaint.
12     Q. But she did?
13     A. Well, she told me she did later.
14     Q. Okay. Now --
15         MR. CHRISTMAN: Jim, is there some
16 reason that I have an unsigned copy of this
17 one?
18         MR. DEBARDELABEN: I don't think
19 we have a signed copy.
20         MR. CHRISTMAN: Yes, you do.
21         MR. DEBARDELABEN: Well, I have
22 unsigned copies, too. I don't know.
23         MR. CHRISTMAN: It appears to be

Page 78

1  just this -- the exhibit itself is signed.
2  That's the one I --
3         MR. DEBARDELABEN: You know, I
4  probably used -- got it copied out of a
5  different form. But no, there's no
6  particular reason.
7         MR. DEBARDELABEN: Okay.
8         MR. DEBARDELABEN: Didn't know it
9  wasn't.
10        MR. CHRISTMAN: Okay.
11     Q. Now, after the grievance procedure
12 is initiated -- which it was initiated by
13 Plaintiff's Exhibit 5, wasn't it?
14     A. If you say so. I say the
15 complaint was initiated by her submission of
16 a grievance report, Form A, Plaintiff's
17 Exhibit 5.
18     Q. Okay. Ms. Hendrix signed the
19 grievance report apparently on the 23rd of
20 February of 2006, didn't she?
21     A. That's what it says.
22     Q. Okay. Let me show you what we're
23 going to mark as Plaintiff's Exhibit No. 6.

Page 79

1         (Whereupon, Plaintiff's Exhibit
2  No. 6 was marked for identification and
3  attached to the original transcript.)
4      Q. Do you recognize Plaintiff's
5  Exhibit No. 6?
6      A. Yes.
7      Q. Now, is that your signature on
8  Plaintiff's Exhibit No. 6.
9      Q. Yes.
10     Q. Did you dictate that?
11     A. No.
12     Q. Who dictated this?
13     A. It wasn't dictated.
14     Q. Did you write it or type it?
15     A. I typed it.
16     Q. You typed it. So you are the one
17 who did do Plaintiff's Exhibit No. 6?
18     A. No.
19     Q. Who wrote it then? Who signed it?
20     A. I signed it. I typed it. It was
21 prepared on this college letterhead paper by
22 Erica Turner.
23     Q. Now, how was it prepared on

Page 80

1  letterhead paper by Ms. Turner if you signed
2  it and you typed it?
3      A. I signed it after she had put it
4  on letterhead paper after I had typed the
5  text of it.
6      Q. Did you e-mail this to her or did
7  you sit down at her computer?
8      A. I don't remember. I probably
9  e-mailed it to her.
10     Q. Okay. I want to show you what I
11 have marked as Plaintiff's Exhibit No. 7.
12        (Whereupon, Plaintiff's Exhibit
13 No. 7 was marked for identification and
14 attached to the original transcript.)
15     Q. This was Defendant's Exhibit No.
16 -- I believe that was 14 to Ms. Hendrix's
17 deposition. Which came first, your meeting
18 -- your acknowledging the two grievance
19 proceedings or -- I'm sorry. You wrote No.
20 7, too, or that's your signature, isn't it?
21     A. Yes
22     Q. Which letter came first, No. 6 or
23 No. 7?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1    A. No. 6.
2    Q. Okay. And after you got No. 6,
3  you gave her -- you had a meeting with her
4  at ten o'clock with Dean -- in front of Dean
5  Greene?
6    A. Yes.
7    Q. And you met with her -- You
8  scheduled a meeting with her on March 1st,
9  2006 at 1:00 p.m. in the president's
10 conference room?
11   A. Yes.
12   Q. Did you record that meeting?
13   A. Yes.
14   Q. Has that been transcribed?
15   A. Yes.
16   Q. Was it only you and Ms. Hendrix
17 present?
18   A. At some time during the meeting, a
19 security officer, Sergeant Smoke, came in
20 the room. We stopped discussing what we
21 were discussing and listened to what he had
22 to say. I can't remember what it was.
23   Q. Did you tell Ms. Greene -- excuse

Page 82

1  me. Did you tell Ms. Hendrix the meeting
2  was being recorded?
3    A. No.
4    Q. Please look at Exhibit 2 on the
5  grievance procedure and tell me where in
6  Exhibit 2 that it says you're to have a
7  meeting with Ms. Hendrix?
8    A. Well, it doesn't say there. It
9  says here in initial steps to resolve a
10 complaint. Up under A, employees, the first
11 thing that you do if, after discussion with
12 the employee and the supervisor, it is
13 determined that the complaint can be
14 resolved immediately, the supervisor will
15 take action to resolve, or initiate action
16 which will result in the resolution of the
17 complaint, and will submit a report within
18 ten days.
19   Q. But Ms. Hendrix had already filed
20 a grievance form?
21   A. She filed a grievance form. But
22 she didn't file a complaint.
23   Q. And she stated in her letter

Page 83

1  attached to it, the original complaint with
2  regards to the incident of 2-14-06.
3         And you called -- You had a
4  meeting. You wrote her a letter which is
5  Plaintiff's Exhibit No. 6 acknowledging her
6  two grievances?
7    A. No. I acknowledged receipt of two
8  grievance report forms.
9    Q. And then you treated her grievance
10 report forms as complaints?
11   A. Yes, sir.
12   Q. Okay. When an employee who makes
13 a complaint, doesn't it say in step one that
14 the employee has to give a resolution, a
15 suggested resolution to the complaint?
16   A. No.
17   Q. Okay. Now, why did you tell her
18 in your February 27th letter --
19        MR. CHRISTMAN: Which one are you
20 --
21        MR. DEBARDELABEN: I'm fixing to
22 tell you which one.
23   Q. I'm looking at No. 6. The one,

Page 84

1  two -- fourth line down. Your February
2  15th, 2006 memo requests no remedy or
3  resolution. Where --
4    A. Where are you looking?
5    Q. I'm looking at the fourth line
6  down on No. 6. Fourth line, first
7  paragraph.
8    A. Yes.
9    Q. Where in the complaint form does
10 it say in the complaint part of it that the
11 employee is to suggest a remedy or
12 resolution?
13   A. It does not.
14   Q. So she wasn't required to suggest
15 a remedy or resolution by the grievance --
16 employee grievance procedure adopted by J.F.
17 Ingram?
18   A. Correct.
19   Q. Okay.
20   A. Another thing that wasn't
21 available on her letter was a suggestion
22 that that was a written complaint against
23 Malcolm Montgomery and James Wilson.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    MR. DEBARDELABEN: Let's take a
2   break.
3        (Whereupon, a short recess was
4   taken.)
5    Q.  The last exhibit we talked about
6   was Exhibit No. 7, wasn't it?
7    A.  I don't know if it was the last
8   one, but it was one we talked about.
9    Q.  I want to show you -- And on
10  Exhibit No. 7, you mentioned to Ms. Hendrix
11  that she did not have a suggested remedy or
12  resolution, didn't you, or is that 6?  Was
13  that 6 or 7?
14   A.  That's 6.
15       MR. CHRISTMAN: That's 6.
16   Q.  6. And on February 28 -- Do you
17  recognize this letter?
18       MR. CHRISTMAN: Have you -- Is the
19  other question still on the table or are we
20  now talking about Exhibit 8?
21       MR. DEBARDELABEN: We're talking
22  about Exhibit 8.
23       (Whereupon, Plaintiff's Exhibit

Page 86

1   No. 8 was marked for identification and
2   attached to the original transcript.)
3    Q.  Exhibit 6, you asked Ms. -- you
4   mentioned to Ms. Hendrix that she did not
5   suggest a remedy or resolution, didn't you?
6    A.  Yes, I did.
7    Q.  And pursuant to Exhibit 2, which
8   is the regulation, she is not required to
9   suggest a remedy or resolution, is she?
10   A.  No, she's not.
11   Q.  Why did you put that in your
12  letter?
13   A.  Because I wasn't convinced that
14  she was filing a complaint. And I can tell
15  you that if I had been convinced, I would
16  have approached her complaint with the same
17  energy and hard work as I did her filing a
18  complaint using a grievance form.
19   Q.  Now, Dr. Merk, does J.F. Ingram
20  have a specific form to file a complaint on?
21   A.  No.
22   Q.  Does it have any specific wording
23  on how to file a complaint?

Page 87

1    A.  No.
2    Q.  Does it state that it has to be
3   worded a complaint?
4    A.  No.
5    Q.  Well, you agree with me then,
6   don't you, that the way the regulation is
7   written is a little bit confusing on what
8   you have to do to file a complaint?
9    A.  I can agree that the regulation is
10  confusing.
11   Q.  Now --
12   A.  But I cannot agree that I
13  recognized her letter -- I don't seem to see
14  it here -- her letter, Plaintiff's Exhibit
15  4, as a complaint.
16   Q.  Okay.
17   A.  And I will tell you once again
18  that had I recognized that as a complaint, I
19  would have done everything in my power to
20  have initiated a procedure that would have
21  followed our policy.
22   Q.  Okay. Now, Ms. Hendrix expressed
23  to you on the morning of February the -- I

Page 88

1   believe that's the 15th of your memo here --
2   that she was upset. You knew she was upset,
3   didn't you?
4    A.  Yes.
5    Q.  And you asked her what made her
6   upset, didn't you? I'm looking at
7   Plaintiff's Exhibit No. 3. Right here I
8   think it says I asked her what made her
9   upset.
10   A.  Uh-huh.
11   Q.  What did she tell you; do you
12  remember?
13   A.  No. Does it say in the memo?
14   Q.  You know, it appears, Dr. Merk,
15  that this memo states what you mentioned to
16  her and what you asked. I do not see in the
17  memo any response that you put that Ms.
18  Hendrix made. Why did you leave her
19  responses out?
20       MR. CHRISTMAN: Object to the
21  form.
22   Q.  You can answer.
23       MR. CHRISTMAN: Leave her

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  responses out of Exhibit 3?
2      MR. DEBARDELABEN: Out of Exhibit
3  3.
4      A. She said that she was upset for
5  what took place yesterday and her husband.
6      Q. And then you said, I asked her
7  what made her upset?
8      A. Yes. I would say that I didn't
9  leave her responses out. I may have left
10  some of them out.
11      Q. Is the only response you have in
12  there about what she said, she said that she
13  was upset for what took place yesterday and
14  her husband?
15      A. She talked to --
16      MR. CHRISTMAN: Before you answer
17  the question -- forgive me. Jim, your
18  question is assuming -- you're saying what
19  you said as if he wrote this. And I do not
20  concede his testimony reflects that.
21      MR. DEBARDELABEN: He said he
22  dictated this.
23      MR. CHRISTMAN: Yes.

Page 90

1      MR. DEBARDELABEN: And I'm reading
2  what was dictated.
3      MR. CHRISTMAN: Well, he also said
4  that -- earlier to you he said this was not
5  what he dictated. It wasn't complete.
6      MR. DEBARDELABEN: So we have --
7      Q. Is there anything else that you
8  have to show a more complete document than
9  this?
10      A. No.
11      Q. And I forget the lady's name you
12  said took it down.
13      A. Ms. Cherry.
14      Q. So Ms. Cherry would be the one to
15  ask about it if she took everything down,
16  wouldn't she?
17      A. She would be the one, yes.
18      Q. Okay. Now, let me get back to
19  Plaintiff's Exhibit 8 which was Defendant's
20  Exhibit 8 to the Hendrix deposition.
21      Was there any procedure for Ms.
22  Hendrix to propose a resolution or remedy in
23  the complaint stage?

Page 91

1      A. Yes.
2      Q. Where is that procedure?
3      A. If, after discussion between the
4  employee and the supervisor, it is
5  determined that the complaint can be
6  resolved immediately, the supervisor will
7  take action to resolve, or initiate action
8  which will result in the resolution of, the
9  complaint, and will submit a written report
10  within ten working days, implied, not
11  written, of the filing of the complaint to
12  the president, the college's grievance
13  coordinator, and other supervisory officials
14  the president may designate, detailing both
15  the complaint and the resolution of the
16  complaint. This was absolutely the first
17  step, to try to get a resolution quickly
18  within ten days.
19      Q. But there's no place in there that
20  says the employee is -- must provide
21  suggestion of a resolution, does it?
22      A. No.
23      Q. I want to show you what we're

Page 92

1  going to mark as Plaintiff's Exhibit No. 9.
2      (Whereupon, Plaintiff's Exhibit
3  No. 9 was marked for identification and
4  attached to the original transcript.)
5      Q. I'll ask you if you recognize this
6  document?
7      A. Yes, I recognize this.
8      Q. Who wrote this document?
9      A. I did.
10      Q. The second paragraph states Ms.
11  Hendrix complained that Mr. Malcolm
12  Montgomery asked her to show him what she
13  saw a student doing. That's what she
14  stated, wasn't it?
15      A. Well, let's read it. That's what
16  she said in her complaint written on a
17  grievance form.
18      Q. Now, I want to show you what's
19  been marked as Plaintiff's Exhibit No. 2 on
20  Mr. Malcolm Montgomery's deposition and ask
21  you if you recognize that interview?
22      A. Yes, I recognize that.
23      Q. Did you conduct that interview

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  with Mr. Montgomery?
2      A.  I did.
3      Q.  And you conducted the interview on
4  March 16th, 2006?
5      A.  Yes.
6      Q.  Any place in that interview did
7  you specifically ask Montgomery did Ms.
8  Hendrix -- excuse me.  Strike that.  Did you
9  ask Mr. Malcolm Montgomery did he ask Ms.
10  Hendrix to show him what she saw a student
11  doing?
12      MR. CHRISTMAN:  Object to the form
13  of the question.  Excuse me.  I'm just
14  objecting for the record.  You can answer if
15  you understand his question.
16      A.  Would you repeat that question.
17      Q.  Yes, sir.  You write to Dr. J.
18  Douglas Chambers on March 1st, 2006 -- and
19  I'm reading from Exhibit No. 9 -- Ms.
20  Hendrix complained that Mr. Malcolm
21  Montgomery asked her to show him what she
22  saw a student doing.
23      Did you specifically ask Mr.

Page 94

1  Malcolm Montgomery in your interview on
2  March 16 if he asked Ms. Hendrix to show
3  him what she saw a student doing?
4      MR. CHRISTMAN:  Ms. Hendrix.
5      Q.  Ms. Hendrix.  I'm sorry.
6      A.  No, I did not.  I did however --
7      Q.  Excuse me.  And that was her
8  complaint, wasn't it, that Mr. Montgomery
9  asked her to show him what she saw a student
10  doing?
11      MR. CHRISTMAN:  Go ahead and
12  finish your response before he cut you off.
13      A.  I didn't ask him specifically if
14  he asked her to show him what she saw a
15  student doing.  She had already asserted
16  that she had been asked to show him what the
17  student had been doing.
18      And allegedly what the student had
19  been doing was masturbating.  I asked him
20  did you ask Ms. Hendrix to demonstrate the
21  act of masturbation and he said no.
22      Q.  That's not what she complained
23  about, though, was it?

Page 95

1      MR. CHRISTMAN:  Object to the
2  form.
3      Q.  Didn't she complain, according to
4  your letter, your written word, Ms.
5  Hendrix complained that Mr. Malcolm
6  Montgomery asked her to show him what she
7  saw a student doing?  You wrote that, didn't
8  you?
9      A.  Yes.
10      Q.  And that's what she complained
11  about?
12      A.  I'm missing something here.
13      Q.  Yes, sir, you are.
14      MR. CHRISTMAN:  So am I.
15      A.  The whole thing is about Ms.
16  Hendrix having to demonstrate what she saw a
17  student doing which she alleges was
18  masturbation.
19      Q.  Right.
20      A.  And if I can't say did you ask Ms.
21  Hendrix to demonstrate the act of
22  masturbation, which is what this is all
23  about, then you'll have to forgive me.  And

Page 96

1  it's entirely possible.  But I missed the
2  boat.
3      Q.  What's your --
4      A.  But I really don't think so.
5      Q.  What's your training in
6  investigation?
7      A.  None.
8      Q.  You have no training in
9  investigation?
10      A.  No.
11      Q.  What's your training in
12  interrogation?
13      A.  None.
14      Q.  What's your training in resolving
15  complaints?
16      A.  I resolve complaints every day.
17      Q.  Have you had any formal training?
18      A.  Only a master's degree in
19  counseling.
20      Q.  In counseling.  Have you been
21  trained how to conduct an investigation?
22      A.  No.
23      Q.  Have you been trained how to

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  conduct an interview for an investigation?
2      A.  No.
3      Q.  And with counseling, you try to
4  resolve a problem, don't you?
5      A.  Yes indeed.
6      Q.  And in an investigation, you try
7  to establish the facts surrounding an event,
8  don't you?
9      A.  That is exactly what I was trying
10  to do.
11      Q.  Right.  And to establish the facts
12  surrounding the event, you need to ask if
13  what she said is what he asked.  You didn't
14  do that, did you?
15      A.  It doesn't say that in this thing.
16      MR. CHRISTMAN:  Object to the
17  form.
18      Q.  Why did you word it Ms. Hendrix
19  complained that Mr. Malcolm Montgomery asked
20  her to show him what she saw a student
21  doing?
22      A.  Because that's what she wrote --
23      Q.  That's what --

Page 98

1      A.  -- on the grievance form.
2      Q.  Right.  And we're talking about
3  Plaintiff's Exhibit No. 5, the grievance
4  form, isn't it?
5      A.  Yes.
6      Q.  You were present during Mr.
7  Montgomery's deposition this morning,
8  weren't you?
9      A.  Yes.
10      Q.  Had you heard before this morning
11  that he was sitting and eating his lunch
12  when Ms. Hendrix came up to see him?
13      A.  I knew Ms. Hendrix came up to see
14  him.  I didn't know he was eating his lunch.
15      Q.  Were you aware that Ms. Owensby
16  and Ms. Harrell was in the room?
17      A.  No.  You mean the lunch room?
18      Q.  I don't know which room that is.
19  It's where he was eating his lunch.
20      A.  Yes.
21      Q.  I used the word break room.  He
22  said it wasn't a break room.  I don't know
23  what y'all call it.  Now, on your resolution

Page 99

1  of March the 1st, did you give a copy of
2  that to the employee before -- which is Ms.
3  Hendrix -- before you sent it up to
4  President Chambers?
5      A.  No.  Not to President Chambers.
6      MR. CHRISTMAN:  Can you tell me
7  what exhibit you're referring to, please,
8  Jim?
9      MR. DEBARDELABEN:  No. 9.
10      Q.  When did you provide -- that's a
11  terrible question.
12      (Whereupon, Plaintiff's Exhibit
13  No. 10 was marked for identification and
14  attached to the original transcript.)
15      Q.  Did you provide Ms. Hendrix with a
16  copy of that proposed resolution?
17      A.  I did.
18      Q.  How did you provide her a copy of
19  the proposed resolution?
20      A.  I handed it to her.
21      Q.  You handed it to her.  Did you
22  give her a cover letter?
23      A.  I don't think so.

Page 100

1      Q.  You just gave her a copy of the
2  proposed resolution.  Did you discuss it
3  with her at all before you gave her the copy
4  of the proposed resolution?
5      A.  We had a discussion wherein I
6  asked her to look at the plan of resolution
7  as quickly as possible and get back with me
8  to see whether or not it was acceptable to
9  her.
10      Q.  Okay.  When did -- Do you remember
11  when you gave it to her?
12      A.  No, I don't.
13      Q.  This is -- Is this the response
14  she gave you?  That's No. 10.  Is that her
15  response to your resolution of the
16  grievance?
17      A.  Yes, it is.
18      Q.  What did you do when you received
19  that response?
20      A.  I don't remember.
21      (Whereupon, Plaintiff's Exhibit
22  No. 11 was marked for identification and
23  attached to the original transcript.)

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    Q.  Show you what I have marked as No.
2   11, Plaintiff's Exhibit No. 11.  I'll ask
3   you if you wrote that letter to Ms. Hendrix
4   in response to her March 10th memo?
5    A.  Yes, I did.
6    Q.  Okay.  At any time did you ever
7   inform President Chambers that you had
8   participated in meetings that you were going
9   to be investigating?
10   A.  Meetings that I was going to be
11  investigating?
12   Q.  Yes, sir.  Concerning this
13  incident?
14       MR. CHRISTMAN:  Form.
15   A.  I don't know if I actually said
16  it.
17   Q.  Yes, sir.  When he appointed you
18  to investigate this, did you say look,
19  President Chambers, I was in a meeting where
20  this issue was discussed and Mr. Wilson was
21  there, Mr. Montgomery was there, Ms. Hendrix
22  was there, Ms. Owensby was there and I
23  actually participated in the meeting?  Did

Page 102

1   you inform him of that?
2    A.  I don't think so.
3    Q.  Did you inform him that Ms.
4   Hendrix had come to you and complained about
5   this at apparently 8:45 on February the
6   15th?
7    A.  No.
8    Q.  So prior to you being appointed to
9   investigate this issue by President
10  Chambers, you had knowledge of the incident
11  of your own free will?
12       MR. CHRISTMAN:  Form.
13   Q.  Excuse me.  You had personal
14  knowledge of the incident and of the facts
15  surrounding it?
16   A.  Yes.  I'm her supervisor.
17       (Whereupon, Plaintiff's Exhibit
18  No. 12 was marked for identification and
19  attached to the original transcript.)
20   Q.  Let me show you what I have marked
21  as Plaintiff's Exhibit No. 12.  Did you
22  conduct an interview with Mr. James Wilson
23  on March 16th, 2006?

Page 103

1    A.  Yes.
2    Q.  And one of Ms. Hendrix's complaint
3   was that she had asked Ms. Roberts to be in
4   the meeting and Mr. Hendrix asked Ms.
5   Roberts to leave the meeting?
6        MR. CHRISTMAN:  Mr. Wilson.
7    Q.  Mr. Wilson.  Let me start that
8   over.  One of Ms. Hendrix's complaints was
9   she had asked a Ms. Roberts to be present in
10  the meeting on February the 14th, 2006 -- it
11  might have been the 15th -- and Mr. Wilson
12  asked Ms. Roberts to leave and asked Ms.
13  Bonita Owensby to come in the meeting?  That
14  was one of her complaints, wasn't it?
15   A.  Yes.
16   Q.  And you were present at that
17  meeting and participated in that meeting,
18  didn't you?
19   A.  I did.
20   Q.  And you actually recorded that
21  meeting without anybody knowing it, didn't
22  you?
23   A.  That's right.

Page 104

1    Q.  Did you inform President Chambers
2   of that when he appointed you to conduct
3   this investigation of Ms. Hendrix's
4   complaint?
5    A.  I don't recall.
6    Q.  Who was present with you when you
7   conducted this interview with Mr. Wilson?
8    A.  William Griswold.
9    Q.  Prior to conducting this
10  tape-recorded interview with Mr. Wilson on
11  March 16th, 2006, how many conversations had
12  you had with Mr. Wilson concerning Ms.
13  Hendrix's complaint?
14   A.  We had several conversations.
15   Q.  Were any of those conversations
16  recorded?
17   A.  No.
18   Q.  Did you write any written
19  memorandum of those conversations?
20   A.  No.
21   Q.  Now, at the time of the meeting
22  that you recorded between Ms. Hendrix, Mr.
23  Malcolm Montgomery, Mr. Edwards, yourself,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  Mr. Wilson and Ms. Owensby, the student had
2  been removed, hadn't he?
3      A.  Yes.
4          MR. CHRISTMAN:  Talking about
5  Pruitt now?
6          MR. DEBARDELABEN:  Pruitt.
7      Q.  Pruitt had been removed from the
8  school?
9      A.  Correct.
10      Q.  So that meeting had nothing to do
11  with whether or not Pruitt was going to be
12  removed, did it?
13          MR. CHRISTMAN:  Which meeting?
14      Q.  The February 15th meeting or the
15  recorded meeting that you recorded without
16  anybody knowing it.  That meeting had --
17  That had nothing to do with Pruitt being
18  removed from school, did it?
19      A.  I'll say it had everything to do
20  with the meeting.
21      Q.  He was already removed.
22      A.  You don't understand the
23  procedure.

Page 106

1      Q.  What is the procedure?
2      A.  The procedure is to eliminate the
3  threat.
4      Q.  Of what?
5      A.  Some sort of sexual misconduct.
6      Q.  On whose part?
7      A.  On Mr. Pruitt's part.
8      Q.  Mr. Pruitt's part.  He had been
9  removed from school at the point -- at the
10  time you had the meeting on February the
11  15th, hadn't he?  The action had been taken?
12      A.  Yes.  That's right.
13      Q.  There was no other action to take
14  concerning Mr. Pruitt?
15      A.  Well, I disagree with you.
16      Q.  What other action did you take
17  concerning Mr. Pruitt?
18      A.  Let's see.
19      Q.  What are you looking at, sir?
20      A.  I'm looking at a notebook with the
21  same exhibits you have with the exception of
22  this one.
23          THE WITNESS:  Do they have this,

Page 107

1  student dismissal procedures?
2          MR. CHRISTMAN:  It was an exhibit
3  to prior depositions.
4      A.  We have procedures for handling
5  problems with students.
6      Q.  Yes, sir.  And the student
7  dismissal procedure, the student is supposed
8  to be there, isn't he?
9      A.  Not necessarily.
10      Q.  Doesn't it say in that procedure
11  that the student is supposed to be there?
12  What exhibit number is that so I can follow
13  you?  That's in your policies and procedures
14  manual, isn't it?  What section is that,
15  sir?
16          MR. CHRISTMAN:  If it is.
17      A.  This is a student services
18  procedure for handling problems with
19  students.
20      Q.  Is that the 1998?
21      A.  Yes.
22      Q.  Is that in the 2002 policies and
23  procedure manual?

Page 108

1      A.  I wouldn't think so.
2      Q.  Now, in the policies and
3  procedures manual, it talks about student
4  conduct, grading system, student grade
5  conferences.  It has a section on students,
6  doesn't it?
7      A.  It does.
8      Q.  What procedure are you talking
9  about, sir?
10      A.  J.F. Ingram State Technical
11  College procedures for handling problems
12  with students.
13      Q.  Okay.  So that's not in your
14  policies and procedures manual.  What date
15  is that?
16      A.  October 1, 1998.
17      Q.  And it's not in your updated 2002
18  procedures manual?
19      A.  No.  There are other guidelines
20  that may not appear as a policy, too.
21      Q.  And where is that guideline kept,
22  sir?
23      A.  Kept on every instructor's desk.

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  It's kept in every center director's file.
2  It is kept in the student services
3  department.
4  **Q. Now, when people come to work at**
5  **J.F. Ingram, do they get a copy of the**
6  **procedures manual?**
7      MR. CHRISTMAN: You talking about
8  the one you have in your hand?
9      MR. DEBARDELABEN: Yes, sir.
10  A. Yes, they do.
11  **Q. Do they sign for it?**
12  A. Yes.
13  **Q. Okay. Do they get a separate copy**
14  **of -- what's that document you're talking**
15  **about?**
16  A. J.F. Ingram State Technical
17  College procedures for handling problems
18  with students.
19  **Q. Yes, sir. Do they sign for that?**
20  A. Probably not.
21  **Q. What procedures did J.F. Ingram**
22  **have to ensure that students get that**
23  **document?**

Page 110

1  A. Students?
2  **Q. Instructors get that document?**
3  **Could we mark that since he's talking about**
4  **it?**
5      MR. CHRISTMAN: Sure. If we can
6  make a copy of it.
7      MR. DEBARDELABEN: Sure.
8      MR. CHRISTMAN: I don't want to
9  mark his copy.
10      MR. DEBARDELABEN: Let me see
11  that. I'll make a quick copy.
12      (Whereupon, a short recess was
13  taken.)
14  **Q. We're going to mark this document**
15  **as No. 13. I noticed there's two letters.**
16  **You gave me two letters.**
17  A. Uh-huh.
18  **Q. I'm marking the first one as 13.**
19  **The October 1st, 1998 as 13.**
20      MR. CHRISTMAN: It's multi page.
21      MR. DEBARDELABEN: Yes, it's multi
22  page.
23  **Q. I'm going to mark the one dated**

Page 111

1  August 3rd, 2000 as 14.
2      (Whereupon, Plaintiff's Exhibit
3  No. 13 and 14 were marked for identification
4  and attached to the original transcript.)
5      MR. CHRISTMAN: Was there a
6  question on the floor? I just don't
7  remember.
8      MR. DEBARDELABEN: If it is, I
9  withdraw it.
10      MR. CHRISTMAN: Okay.
11  **Q. Look at this document marked**
12  **October the 1st, 1998. Why isn't that in**
13  **the policies and procedure manual; do you**
14  **know?**
15  A. I don't know. But I can tell you
16  that much of the correspondence that takes
17  place internally doesn't get placed in the
18  policies and procedures manual.
19  **Q. And I'm looking -- And the reason**
20  **I ask that question, sir, is the very last**
21  **-- next to the last line. I have attached**
22  **a copy of the amended policies and**
23  **procedures to be used.**

Page 112

1  A. You'd have to ask somebody in the
2  student services department.
3  **Q. Actually we'd have to ask Dr.**
4  **Huffstutler?**
5  A. Yes. That would be going right to
6  the horse's mouth.
7  **Q. Right. Was Mr. Wilson the Dean of**
8  **Students on October 1st, 1998 or do you**
9  **remember?**
10  A. I think he was.
11  **Q. Okay.**
12  A. We brought our AS-400 system
13  online in September and he was the Dean of
14  Students at that time.
15  **Q. If the behavior of Mr. Pruitt was**
16  **actually masturbation, would that be**
17  **criminal activity?**
18  A. It would be a violation of Rule 38
19  of the DOC rules for inmates.
20  **Q. Well, you don't know whether it**
21  **would be criminal activity or not, do you?**
22  A. Well, Rule 38 is indecent
23  exposure. I guess you could probably

28  (Pages 109 to 112)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1  identify that better than me. Is it
2  actually -- Is indecent exposure criminal
3  activity?
4        MR. CHRISTMAN: Well, that's just
5  --
6     A. I don't know.
7        MR. CHRISTMAN: It either is or
8  isn't part of Title 13 of the Alabama Code.
9  You know it's a violation of Rule 38 of
10 DOC's regs.
11    A. Yes.
12       MR. CHRISTMAN: That's what you
13 know.
14    Q. So if it was criminal activity, it
15 would be an emergency procedure, wouldn't
16 it?
17    A. Yes.
18    Q. Did you consider that an emergency
19 procedure, a situation of alleged
20 masturbation by a student?
21    A. Yes. And I still do.
22    Q. And at that point in time, the
23 Department of Corrections are notified;

Page 114

1  right?
2     A. Yes.
3     Q. And they take the action, J.F.I.
4  does not take any action?
5     A. We have no custody. But what we
6  do is conduct a due process hearing directly
7  after an incident of that sort or as soon as
8  possible.
9     Q. Okay. Now, that's what I'm
10 looking for, Dr. Merk. Where under
11 emergency procedures -- where does it say
12 there will be any hearing conducted?
13    A. The center director will
14 investigate any such occurrence and make a
15 report to the Dean of Students and Support
16 Services. The dean, or designee, will
17 determine the status of the student and will
18 make appropriate contacts with DOC as to the
19 student's future status at J.F. Ingram State
20 Technical College.
21    Q. And if I remember correctly from
22 all your jobs, you are the center director?
23    A. Yes.

Page 115

1     Q. So you were already having to
2  investigate this about the student and you
3  had an ongoing investigation going on when
4  you were asked to conduct an investigation
5  on Ms. Hendrix's grievance?
6     A. Yes.
7     Q. So if there had been a public
8  hearing, you could have certainly been a
9  witness to it, couldn't you, because you
10 conducted the investigation? That's part of
11 your job?
12       MR. CHRISTMAN: Object to the
13 form. Hearing on what? There's two
14 different procedures in place.
15    Q. If Ms. Hendrix had had a hearing
16 --
17       MR. CHRISTMAN: On the student's
18 misconduct --
19    Q. -- on her grievance --
20       MR. CHRISTMAN: Well --
21    Q. -- you could have been a potential
22 witness?
23    A. I would have been happy to have

Page 116

1  been a potential witness. The fact is, she
2  did not request a hearing.
3     Q. Let's look at that procedure.
4  Let's look at 14 before we get off on that
5  page. Whose writing is this on document 14?
6     A. It says it's from James Wilson. I
7  don't know who is writing that.
8     Q. You don't --
9        MR. CHRISTMAN: You're talking
10 about the handwriting?
11       MR. DEBARDELABEN: The
12 handwriting.
13    Q. Because I got the document from
14 you and I just wondered if you knew whose
15 handwriting that is.
16    A. No, I do not know.
17    Q. Okay. And what you say is and
18 what this memorandum says, there is zero
19 tolerance for a violation of Rule 38?
20    A. That's right.
21    Q. Okay. And is this a further
22 definition or -- definition is the wrong
23 word -- clarification of the October 1st,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  1998 amended policies and procedure that we
2  introduced as No. 13?
3       A.  I don't know what Mr. Wilson's
4  intent was when he wrote it.  But it would
5  appear to be so.
6       Q.  That's fair enough.  Now, I think
7  I asked you about our Exhibit 11.  11 was
8  your response to Ms. Hendrix's March 10th,
9  2006 memo, wasn't it?
10      A.  Yes.
11      Q.  And that's where you had begun
12 your -- the investigation of the grievance?
13      A.  That's right.
14      Q.  Okay.  And as part of that
15 investigation of the grievance, you
16 interviewed Mr. Wilson, which we've already
17 talked about, on March 16th, 2006.  You
18 interviewed Mr. Malcolm Montgomery on March
19 15th, 2006.
20          (Whereupon, Plaintiff's Exhibit
21 No. 15 was marked for identification and
22 attached to the transcript.)
23      Q.  Show you what I'm going to mark as

Page 118

1  Plaintiff's Exhibit 15.  It's Ms. Hendrix's
2  interview.  Did you conduct that interview
3  of Ms. Hendrix on March 16th, 2006?
4       A.  Yes.
5       Q.  And who was present with you when
6  you conducted this?
7       A.  As I recall -- Well, we're here
8  with Barbara Hendrix, James Merk and Bill
9  Griswold.
10      Q.  Do you see down on page two, nine
11 paragraphs down -- the eighth paragraph, is
12 the M you, when you said, okay, what kind of
13 information were you asked to provide during
14 the course of settling the incident?  Is H
15 Ms. Hendrix?
16      A.  Yes.
17      Q.  I was asked what did I see.  And I
18 was asked to show him what I saw him doing,
19 the student doing.  That's what Ms. Hendrix
20 said.
21          It says, was the process of
22 providing information unduly demeaning,
23 embarrassing or discomforting?  Ms. Hendrix

Page 119

1  said, the second part was.  You put
2  showing.  She said the showing.
3          Now, did you interview -- You
4  interviewed Ms. Hendrix at approximately
5  twelve o'clock?
6       A.  Yes.
7       Q.  Is that correct?
8       A.  That's what it says here.
9       Q.  Yes, sir.  And you interviewed Mr.
10 Montgomery, according to his interview, at
11 approximately 2:30, didn't you, on the same
12 day?
13      A.  Uh-huh.
14      Q.  And Ms. Hendrix in her interview
15 said Mr. Montgomery asked her to show him
16 what she saw the student doing; is that
17 correct?
18      A.  Yes.
19      Q.  But when you got to Mr.
20 Montgomery, you didn't ask him what he said
21 to Ms. Hendrix.  You asked him specific
22 questions.
23          Did you discuss an incident of a

Page 120

1  student masturbating with Ms. Hendrix.
2  That's either -- yes, he -- She came into my
3  office to discuss the incident that she was
4  having with student and it did pertain to
5  him masturbating.
6          You never asked him any place in
7  his interview what Ms. Hendrix complained
8  of, did you?
9          MR. CHRISTMAN:  Object to the form
10 of the question.
11      Q.  You can answer.
12      A.  Excuse me?
13      Q.  Ms. Hendrix said Mr. Montgomery
14 asked her to show him what the student was
15 doing?
16      A.  Yes.
17      Q.  And what you asked Mr. Montgomery
18 was did you ask Ms. Hendrix to demonstrate
19 the student masturbating?
20      A.  Yes.
21      Q.  Okay.  You don't see the
22 difference in those two questions?
23      A.  Not with my knowledge of what it

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1   was that she complained about. There's no
2   -- Is there a difference?
3        Q.  Yes, sir.
4        MR. CHRISTMAN:  Well, don't ask
5   him questions because his testimony is not
6   relevant.  I don't think there's a
7   difference.  He thinks there is a
8   difference.  We'll see if there is or isn't.
9        Q.  Now, do you see a difference if a
10  man would kill with a .38 and was asked -- a
11  person -- did you shoot Mr. Jones with a .22
12  --
13       MR. CHRISTMAN:  Object to the
14  form.
15       Q.  -- and Mr. Jones said no, because
16  he actually shot him with a .38?  Do you see
17  the difference between those two questions?
18       A.  I have no idea what you're talking
19  about.
20       Q.  I didn't figure you would.  Now, I
21  want to show you what we're going to mark as
22  Plaintiff's Exhibit No. 16.
23       (Whereupon, Plaintiff's Exhibit

Page 122

1   No. 16 was marked for identification and
2   attached to the original transcript.)
3        Q.  I'll ask you if you have seen that
4   document before?
5        A.  Yes, I have.
6        Q.  What is that document?
7        A.  It's a request for time extension
8   concerning the Hendrix grievance.
9        Q.  Okay.  Where in the employee
10  grievance procedure does it give you the
11  right to ask for a time extension?
12       A.  It does not.
13       Q.  It's not in the procedure, is it?
14       A.  No.
15       Q.  Okay.  Where in the grievance
16  procedure does it give the president the
17  right to grant a time extension?
18       A.  I don't know.  Do you want me to
19  read through it?
20       Q.  Yes, sir.  Because I'm just
21  reading it.  And if it's in there, I've
22  missed it.
23       A.  It doesn't show one.

Page 123

1        Q.  Okay.  But on the bottom of
2   Exhibit 16, does it show that Dr. Chambers
3   approved this extension?
4        A.  Yes.
5        Q.  Okay.
6        (Whereupon, Plaintiff's Exhibit
7   No. 17 was marked for identification and
8   attached to the original transcript.)
9        Q.  I want to show you what I have
10  marked as Exhibit 17 and ask if you can
11  identify that document for me?
12       A.  Yes.
13       Q.  What is that document?
14       A.  It is a report of findings from my
15  investigation of the two grievances filed by
16  Ms. Hendrix.
17       Q.  When the grievance was filed on
18  Malcolm Montgomery by Ms. Hendrix, she said,
19  in essence, that he asked her to show what
20  the inmate was doing.
21       Did you interpret that, that she
22  asked him -- that Ms. Hendrix was asked by
23  Mr. Montgomery to demonstrate masturbation?

Page 124

1        A.  Yes.
2        Q.  That was your interpretation?
3        A.  It was.
4        Q.  And she said he asked her to -- in
5   your interpretation of it -- to demonstrate
6   masturbation; correct?
7        A.  Yes.
8        Q.  And Mr. Montgomery said no, he
9   didn't ask her that; is that correct?
10       A.  Yes.
11       Q.  And you made the determination
12  that Mr. Montgomery didn't ask her that?
13       A.  Say that last part again.
14       Q.  You made the determination that
15  Mr. Montgomery did not ask Ms. Hendrix to
16  demonstrate masturbation, didn't you?
17       A.  No, I did not.
18       Q.  So they both contend something
19  different; correct?
20       A.  Polar opposites.
21       Q.  Polar opposites.  And you, in your
22  investigation, were not able to make a
23  determination of what happened, were you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 125

1    A.  That's right.
2    Q.  So they disputed what actually
3  happened, the truth, you know?  Ms. Hendrix
4  said the polar opposite from Mr. Montgomery
5  and Mr. Montgomery said the polar opposite
6  from Ms. Hendrix; is that correct?
7    A.  They did.
8    Q.  Okay.
9    A.  There was no testimony on either
10  of their parts.  There's no evidence to
11  suggest that one was true and one was false
12  or the other was false and the other was
13  true.
14    Q.  So in your recommendation, you
15  found there was no dispute of material facts
16  between Ms. Hendrix and Mr. Wilson?
17    A.  That was my interpretation.
18    Q.  But you just told me they are
19  saying the direct polar opposites.  I think
20  you said polar opposites.  I used the word
21  direct.  But they were saying the polar
22  opposites from each other?
23    A.  That's what I said.

Page 126

1    Q.  Okay.  Now --
2    A.  I have however learned since I
3  wrote this that it is a fact that she stated
4  what she stated and it is a fact that
5  Montgomery stated what he stated.  And were
6  I an attorney and were I doing it again, I
7  wouldn't have suggested that there may have
8  been material -- what it is, facts?
9    Q.  I think the word this used is a --
10  I don't want to use opposite words --
11  dispute of a material fact.
12    A.  And I went on to say that there
13  was no evidence to show that anyone was
14  rewarded or punished or discriminated for or
15  against on the basis of gender or race.
16    Q.  Now, let's get on further.  If
17  there is any dispute between the -- I'm
18  reading down here at number three.  Would
19  you please look at section number three of
20  Plaintiff's Exhibit No. -- I believe that's
21  No. 2, isn't it, the employees grievance
22  procedure?
23    A.  I don't know what page you're on.

Page 127

1    Q.  I'm looking at section number
2  three where it says investigation, hearing,
3  and findings.
4    A.  Okay.
5    Q.  Second paragraph.  If there is any
6  dispute between the parties as to the
7  factual allegations, the coordinator shall
8  schedule a hearing which shall be scheduled
9  so as to be completed in time for there to
10  be a report made to the president within --
11  it says thirty and then it's got three in
12  parenthesis.  I assume that's thirty days --
13  after the official receipt of grievance.
14      Now, let me go behind that or
15  above that.  Where does it say you will file
16  your report to the president?  I think
17  that's up in the first paragraph of
18  investigation procedures, doesn't it?
19      The grievance coordinator,
20  personally and/or with the assistance of
21  such other person as the president may
22  designate.  And he designated Mr. Bill
23  Griswold?

Page 128

1    A.  Yes.
2    Q.  Within fifteen days following the
3  receipt of the grievance properly submitted
4  on the college's grievance form, conduct a
5  factual investigation.  And you did that.
6  You conducted a factual investigation?
7    A.  Yes.
8    Q.  It says if there is no dispute
9  between the grievant and the person or
10  persons against who the allegations were
11  made as to the factual circumstances, the
12  grievance coordinator shall submit a written
13  report of factual findings and conclusions
14  to the president within thirty days of the
15  grievance.
16      Well, you submitted a report.  But
17  now you're telling me today that looking
18  back at it, you think there were some
19  differences in factual circumstances.  Is
20  that what I'm hearing?
21    A.  What you're hearing is that I have
22  learned that lawyers use words differently
23  than I use them.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 129

1  Q. Okay.
2  A. And they interpret words
3  differently.
4  Q. Now, after this is -- What I want
5  to get down to, after your report is
6  submitted to the president, what happens to
7  it? I'm looking for that.
8  A. The president or his designee
9  shall submit a completed report, using the
10 college's grievance form, to the grievant
11 and the respondent, and shall include a copy
12 of the report to the hearing officer slash
13 committee.
14    If the grievance involves a claim
15 of illegal discrimination, the grievant
16 shall have the right to appeal the decision
17 of the hearing officer or committee to the
18 Chancellor of the Alabama Department of
19 Postsecondary Education provided that a
20 notice of appeal is filed, using the
21 college's grievance appeal form, with the
22 grievance coordinator, and the Chancellor
23 within fifteen days following the grievant's

Page 130

1  receipt of the committee report.
2  Q. What is the college's grievance
3  form?
4  A. This thing.
5  Q. And that's exhibit what, sir?
6  A. 5.
7  Q. Exhibit 5 is a college grievance
8  form?
9  A. Yes.
10 Q. Have you ever seen -- excuse me.
11 Let me rephrase it this way. Are you the
12 president's designee?
13 A. Yes.
14 Q. Okay. Have you submitted a
15 completed report using the college's
16 grievance form to the grievant?
17 A. Yes.
18 Q. Where is the grievance form?
19 A. It's not here.
20 Q. Yes, sir. Or did you just stick
21 the copy of the report in her box?
22 A. No. I remember filling one of
23 these things out.

Page 131

1  Q. Okay. You remember filling it
2  out. Did you -- Are you sure you gave it to
3  the grievant?
4  A. Yes. Along with the copy of the
5  report that was attached.
6  Q. And if she didn't get that -- Did
7  you personally hand it to her?
8  A. No.
9  Q. How did Ms. Hendrix get it?
10 A. That one is incomplete.
11 Q. Let me ask you this way, sir, and
12 may be I can understand it. We've only got
13 one of these forms.
14    As you're looking at the form,
15 down at the bottom of this form -- and
16 that's Exhibit No. 5; correct? It has some
17 spaces to be -- blank spaces to be filled
18 out by the dean, department or division
19 chair; is that correct?
20 A. Yes.
21 Q. Did you keep a copy of everything
22 you did on Ms. Hendrix's grievance?
23 A. I think I did. Here's a copy of

Page 132

1  what was sent to her. Apparently you guys
2  didn't get the completed package. Is that
3  possible?
4  MR. CHRISTMAN: Are those your
5  copies, Jim?
6  A. Yes.
7  MR. DEBARDELABEN: Can I have a
8  copy of this?
9  MR. CHRISTMAN: We need to make
10 copies of that. Sure.
11 MR. DEBARDELABEN: Let me make a
12 copy of both of them.
13 Q. This is your original on Mr.
14 Wilson.
15 A. Actually it's a copy.
16 Q. Well, it's your original. That's
17 all I'm saying. It's not the original.
18 It's your original. That's all I was trying
19 to get to. I made us all a copy.
20    Let me mark these. Give you your
21 original back. I know it's not, but I'll
22 give you your original back on Mr.
23 Montgomery. I want to show you what we're

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  going to mark as Plaintiff's Exhibit 18.
2      (Whereupon, Plaintiff's Exhibit
3  No. 18 was marked for identification and
4  attached to the original transcript.)
5      Q. I'll ask you if you can tell me
6  what that document is?
7      A. That is a grievance report form A
8  part two, part one and part two.
9      Q. Okay. Now, who signed this?
10     A. I did.
11     Q. And you signed it as the dean,
12 department, division chair's signature?
13     A. Yes, sir.
14     MR. CHRISTMAN: You're talking
15 about signed at the bottom.
16     MR. DEBARDELABEN: Yes.
17     MR. CHRISTMAN: It's signed in
18 more than one location.
19     MR. DEBARDELABEN: Signed at the
20 bottom.
21     Q. And you sent yourself a copy,
22 James T. Merk?
23     A. Yes.

Page 134

1      Q. Now, when did you sign this?
2      A. April 21st.
3      Q. Okay. What did you do with it
4  after it was signed?
5      A. I don't remember.
6      Q. You don't remember. Where would
7  the original be?
8      A. She would have the original.
9      Q. How was it delivered to Ms.
10 Hendrix, if you know?
11     A. I don't know.
12     Q. What is the usual protocol for
13 delivering to Ms. Hendrix or anybody?
14     A. In an envelope and put in the box.
15     Q. Okay. Did you stuff it in an
16 envelope?
17     A. No, I did not.
18     Q. Who would have stuck it in an
19 envelope?
20     A. That would have been Erica Turner.
21     (Whereupon, Plaintiff's Exhibit
22 No. 19 was marked for identification and
23 attached to the original transcript.)

Page 135

1      Q. Ms. Turner. I want to show you
2  what's been marked as Plaintiff's Exhibit
3  No. 19. And can you tell me what that is?
4      A. It's a grievance report Form A,
5  part one and part two.
6      Q. And this is dated April the 21st,
7  2006?
8      A. Yes.
9      MR. CHRISTMAN: On the bottom you
10 mean.
11     MR. DEBARDELABEN: On the bottom.
12     Q. This is a grievance report
13 complaint on who?
14     A. James Wilson.
15     Q. Okay. And your date that you gave
16 the report to Mr. Chambers is the 19th of
17 April?
18     A. Yes.
19     Q. Do you know what day of the week
20 that was?
21     A. No idea.
22     Q. And he gave you this back the 21st
23 of April, 2006?

Page 136

1      A. And I sent it to her.
2      Q. And you put it in the mail
3  process?
4      A. Yes.
5      Q. What else was in the document
6  besides this grievance report Form A?
7      A. It would have been report of
8  findings.
9      Q. Would you have sent two different
10 documents or just all of this in one letter?
11     A. It would have been in one letter.
12     Q. Okay. Do you know if -- You don't
13 know when she received this, do you?
14     A. No.
15     Q. If she wanted to appeal that -- It
16 says if appeal is not filed by the close of
17 business on the fifteenth day following the
18 grievant receiving the report, the
19 grievant's right to appeal shall be
20 forfeited. When does the time start running
21 on her fifteen days?
22     MR. CHRISTMAN: You're asking for
23 his interpretation of this rule?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 137

1    MR. DEBARDELABEN: Yes, sir.
2  Because this is a college rule.
3      **Q.  Is it the date that you signed it,**
4  **the April 21st; if she's not there, is it**
5  **the date she received it?  How do we know**
6  **when Ms. Hendrix received this or any**
7  **grievant?**
8      A.  What I have here in front of me, I
9  can't tell you that.  But I will find out
10  how it was sent.
11      Q.  Yes, sir.
12      A.  And when it was received.
13      **Q.  We have no way of knowing when it**
14  **was received by any records that you know**
15  **of; correct?**
16      A.  Yes, that's correct.  I never even
17  saw the -- her appeal.  It was out of my
18  hands.
19      **Q.  Well, you wouldn't get the appeal,**
20  **would you?**
21      A.  No.
22      **Q.  It would go directly to the**
23  **Chancellor?**

Page 138

1      A.  Yes.
2      **Q.  Let me show you what I'm going to**
3  **mark as Plaintiff's Exhibit No. 20 to your**
4  **deposition.  I'll represent to you it was**
5  **No. 3 to Dr. Dean Wilson's deposition.**
6        (Whereupon, Plaintiff's Exhibit
7  No. 20 was marked for identification and
8  attached to the original transcript.)
9      **Q.  Let me ask you if you know what**
10  **this document is?**
11      A.  This is a compilation of student
12  discipline reports by instructors slash
13  staff member.
14      **Q.  Now, is this only the instructors**
15  **at J.F. Ingram main campus?**
16      A.  No.
17      **Q.  It's all instructors?**
18      A.  Yes.
19      **Q.  Now, have all these instructors**
20  **except Ms. Hendrix been employed from 1997**
21  **forward?**
22      A.  Probably not.  Let me look.
23      **Q.  So what I've got in the legend up**

Page 139

1  **there, it says from 9-2-1997 through**
2  **5-15-2007, it says all.  And then you've got**
3  **Hendrix from 2-25-2002 to 5-15-2007.  Why**
4  **did you break out Hendrix like that?**
5      A.  I had been asked to examine and
6  determine whether there was an inordinately
7  large number of discipline reports.  And if
8  there were on Ms. Hendrix, that I should
9  counsel her concerning those reports and
10  classroom management.
11      **Q.  And you did -- Who asked you to do**
12  **this in -- was it May of 2007?**
13      A.  Yes.
14      **Q.  Who asked you to do that?**
15      A.  Mr. Wilson.
16      **Q.  Mr. Wilson.  Who is -- I believe**
17  **his name is J.L. Griswold, Captain J.L.**
18  **Griswold.  Who is that?**
19      A.  Where do you see that?
20        MR. CHRISTMAN:  He just asked you
21  who he is.
22      **Q.  Do you know who he is?**
23      A.  Yes.

Page 140

1      **Q.  Who is he?**
2      A.  He's a former DOC employee and a
3  former employee of Ingram State Technical
4  College.
5      **Q.  Was he a captain at DOC?**
6      A.  Yes.
7      **Q.  Did he have extensive experience**
8  **in dealing with inmates?**
9      A.  I think that would be an
10  assumption on my part.
11      **Q.  Was he Ms. Hendrix's assistant?**
12      A.  Yes.
13      **Q.  Okay.  And if Mr. Griswold wrote**
14  **up a complaint, was that credited to Ms.**
15  **Hendrix?**
16      A.  I don't think so.
17      **Q.  Who actually did the compilation?**
18      A.  Who compiled all these things?
19      **Q.  Yes.**
20      A.  I compiled it based on records.
21      **Q.  We've got Griswold over here,**
22  **too.  Is that J.L. Griswold or is that Bill**
23  **Griswold?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1    A.  I don't know.  I'd have to look.
2    Q.  Don't know.  Now, if Mr. J.L.
3  Griswold wrote up students, would they
4  appear on here under his name?
5    A.  I don't think they appear on this
6  one under his name.
7    Q.  Would they appear under Ms.
8  Hendrix's name?
9    A.  I don't know.  Like I said, I'd
10  have to check the data base to actually
11  determine.
12    Q.  Did you say Mr. Wilson asked you
13  to compile this?
14    A.  No.  He asked me to counsel Ms.
15  Hendrix regarding classroom management.
16    Q.  Okay.  Is she writing too many
17  disciplinaries?  Do you believe Ms. Hendrix
18  is writing too many disciplinaries on
19  students?
20    A.  I believe that she is writing more
21  than most.
22    Q.  Okay.  And we've got a five year
23  period here; right?

Page 142

1    A.  Yes.
2    MR. CHRISTMAN:  For Hendrix.
3    MR. DEBARDELABEN:  For Ms.
4  Hendrix.
5    Q.  And in a five year period, she's
6  written ten a year.  Less than one a month;
7  is that correct?
8    A.  That would be an average, yes,
9  sir.
10    Q.  Now, let me look at something.  I
11  want to show you what we've marked
12  previously in Mr. Montgomery's deposition.
13  Do you recognize that as a photograph of
14  J.F. Ingram?
15    A.  Yes.
16    Q.  And are the first little row of
17  buildings up there where the administrative
18  offices are?
19    A.  Yes.
20    MR. CHRISTMAN:  You're talking
21  about the ones on the east.
22    MR. DEBARDELABEN:  East, yes.
23    A.  By the parking lot.

Page 143

1    Q.  And is the next little row of
2  buildings where the shops are except for
3  horticulture?
4    MR. CHRISTMAN:  I'm sorry.  Next
5  in terms of what, west?
6    Q.  Well, you've got one running to
7  the west out of -- off the administrative
8  building.  Then you've got a couple running
9  from north to south that touch the one
10  running to the west.  Is that where the
11  shops are?
12    A.  Yes.
13    Q.  Is that area behind the second
14  group of buildings all the horticulture
15  shops?
16    A.  No.
17    Q.  What is it?
18    A.  It's a parking lot for buses.
19  It's a place for storage.  It's several
20  greenhouses and a classroom facility.
21    Q.  How many greenhouses?  Is it three
22  greenhouses there?
23    A.  Yes, there are.

Page 144

1    Q.  Okay.  And how many square feet
2  are in the greenhouses?  Do you have any
3  idea?
4    A.  No, I don't.  But I will say that
5  by the looks of it, the refinishing shop and
6  the cabinet making shop are equal to the --
7  including the areas adjacent to them are
8  equal in size to the -- but that would just
9  be my fifty-nine year old eyes looking at
10  this very small picture.
11    Q.  Have you ever measured the area
12  she's responsible for?
13    A.  No, I have not.
14    MR. CHRISTMAN:  I assume you're
15  talking about tape measured the physical
16  dimensions of the property.
17    MR. DEBARDELABEN:  Correct.
18    A.  I have not done that.
19    Q.  Now, do any other instructors have
20  three buildings they have students working
21  in?
22    A.  Yes.  I would say Mr. Keahey has
23  got, one, two, three, four buildings.

36 (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1    **Q. Four buildings?**
2    A. Yes. They are joined by the same
3    roof, but there are four separate buildings
4    there.
5    **Q. Is there anybody else working with**
6    **Mr. Keahey?**
7    A. Yes. He has an assistant.
8    **Q. And is there a fence between Mr.**
9    **Keahey's building and the rest of the**
10   **campus?**
11   A. Yes, there is.
12   **Q. And you can't walk out of Mr.**
13   **Keahey's building and walk to the**
14   **administrative buildings without going**
15   **through a fence?**
16   A. Yes, sir, you can do that.
17   **Q. Can you walk from Ms. Hendrix's**
18   **horticulture area to the administrative**
19   **building without going through a fence?**
20   A. No. You have to go through a
21   fence.
22   **Q. Okay. How many openings are there**
23   **in the fence?**

Page 146

1    A. There's a small doorway on the
2    south side and there's a large gap in the
3    fence where the gates have been moved, posts
4    pulled out where our school buses pass
5    through.
6    **Q. Has Ms. Hendrix requested a gate**
7    **to be put up in one of the openings?**
8    A. Yes, she has.
9    **Q. Let me show you this, sir.**
10   **(Whereupon, Plaintiff's Exhibit**
11   **No. 21 was marked for identification and**
12   **attached to the original transcript.)**
13   **Q. You may or may not have seen**
14   **this. Have you ever seen this, what I have**
15   **marked as Plaintiff's Exhibit 21, this**
16   **letter from Ms. Hendrix? I think it's**
17   **actually a memo to Dr. Huffstutler.**
18   A. I don't recall seeing that.
19   **Q. Okay. Did you realize that the**
20   **area she is responsible for having students**
21   **in is fifty-three thousand and ten square**
22   **feet and an acre containing forty-three**
23   **thousand five hundred and sixty square feet?**

Page 147

1    A. No. And I can't verify that
2    that's a fact.
3    **Q. Okay. Did you realize she has two**
4    **greenhouses of over three thousand square**
5    **feet each?**
6    A. I know she has two big ones. I
7    don't know what the size is.
8    **Q. And the small one has nine hundred**
9    **and sixty square feet in it?**
10   A. No, I did not realized that.
11   **Q. Would you say Ms. Hendrix has --**
12   **let me see if I'm right on this. She grows**
13   **a lot of bushes and trees and stuff in**
14   **there. That's what she's supposed to do;**
15   **right?**
16       MR. CHRISTMAN: Form.
17   **Q. At the horticulture, they grow**
18   **bushes and trees and plants and shrubs?**
19   A. Yes, they do.
20   **Q. And they get rather large; is that**
21   **correct?**
22   A. How big is rather?
23   **Q. Big as this tree behind me, two or**

Page 148

1    **three feet?**
2    A. Some do.
3    **Q. And there's many areas where**
4    **students can get around and get behind**
5    **bushes and get out of the eyesight of the**
6    **instructor, isn't there?**
7    A. Yes, they could.
8    **Q. And more so in Ms. Hendrix's area**
9    **than any other areas of the shop -- of the**
10   **school because of what they grow down there?**
11   A. Well, I wouldn't say that exactly.
12   **Q. Okay.**
13   A. The welding area is immense. It's
14   filled with booths. It's filled with
15   machinery. There are fences inside it and
16   it's dark.
17   **Q. And --**
18   A. The cabinet --
19   **Q. But she doesn't have fences inside**
20   **her area, does she?**
21   A. Well, she has barriers. The
22   cabinet making shop consists of what used to
23   be two shops with two offices, a passage way

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1  connecting two large rooms, a built on,
2  added on room that locks up a carport
3  affair.
4      And it's loaded with machinery and
5  partitions and stacks of wood that would be
6  equally able to hide somebody. And in the
7  same way, the refinishing shop has got tools
8  and stacks of wood, tool rooms, classrooms,
9  refinishing rooms, spray rooms. It has lots
10 of places for students to hide, too.
11     In the automotive shop, there is
12 equipment. There's classrooms or a
13 classroom. There's office space with closet
14 space in it. There is machinery. There's
15 closed in machine shop areas.
16     There are closed in areas outside
17 of the actual shop area. There are boats,
18 there are cars. There are equipment and
19 customers' property that could hide people.
20     Q. When did y'all get security
21 cameras on those shops that you were just
22 telling me about?
23     A. We put security cameras in the

Page 150

1  library and in the barber shop about a year
2  ago.
3      Q. Okay. What about in the
4  automotive upholstery?
5      A. They haven't been installed yet.
6      Q. Okay. You've got security cameras
7  in horticulture?
8      A. Yes.
9      Q. When did you put them down there?
10     A. About the same time we did the
11 library and the barber shop.
12     Q. About a year ago?
13     A. I would say so.
14     Q. Now, why weren't they installed
15 prior to that time?
16     A. There were two reasons for that.
17 One was acquiring the manpower necessary to
18 do it and the other was finishing the
19 equipment package and buying the material.
20     We're still in the process of
21 installing the cameras. And it's a pretty
22 significant amount of work involved in
23 burying cables, pouring footings for masts,

Page 151

1  directing masts, running the wires and
2  programming the computers and so forth.
3  It's not a small job.
4      Q. I'm going to show you what we're
5  going to mark as Plaintiff's Exhibit 22.
6          (Whereupon, Plaintiff's Exhibit
7  No. 22 was marked for identification and
8  attached to the original transcript.)
9      Q. Ms. Hendrix -- What's the date of
10 that letter, please?
11     A. June 21st, 2006.
12     Q. She requested then that that gate
13 -- that one of those gates be locked,
14 didn't she?
15     A. Not in this letter.
16     Q. Okay. Let me see that letter.
17 Maybe I misread it. She would like to
18 direct all students to use the small gate
19 along the FLY fence?
20     A. Yes, sir.
21     Q. And she requested that they not be
22 allowed to go through the big gate, didn't
23 she, in essence? It didn't say that, but

Page 152

1  she requested I would like to direct all
2  students to use the small gate. Did you
3  allow her to do that?
4      MR. CHRISTMAN: I object to the
5  form of the question. I'm not for sure what
6  all --
7      Q. Did you allow -- Did you change
8  where the students had to go through the
9  small gate when you got this letter in June
10 21st of 2006?
11     A. No, I did not.
12     Q. Why not?
13     A. I knew that we had the cameras
14 going in and I didn't think it was an
15 appropriate expense or expenditure of money
16 to reinstall gates and fence posts in a
17 fence that doesn't need to be there.
18     Q. Okay. Now, Dr. Merk, have you
19 ever seen this memo from Ms. Hendrix dated
20 9-9-2004?
21     A. What was your question again?
22     Q. Have you ever seen that
23 memorandum?

38 (Pages 149 to 152)

## FREEDOM COURT REPORTING

Page 153

1  A.  Yes.
2  Q.  In fact, it has what we've got as
3  Plaintiff's Exhibit No. 21 attached to it,
4  didn't it?
5  A.  I can't verify that.
6  Q.  Okay.  But it refers in the
7  September letter to the May memorandum,
8  doesn't it?  It says something about a May
9  memorandum?
10  A.  It does.
11  Q.  And No. 21 is in May, isn't it?
12  A.  It is.
13  Q.  Okay.  And if Ms. Hendrix had
14  stated that she attached that to it, you
15  wouldn't dispute that, would you?
16  A.  No.  But I couldn't verify it.
17  Q.  Okay.
18  (Whereupon, Plaintiff's Exhibit
19  No. 23 was marked for identification and
20  attached to the original transcript.)
21  Q.  Now, in May of 2007, you prepared
22  Plaintiff's Exhibit No. 20, didn't you?
23  A.  Yes.

Page 154

1  Q.  And you did that because Dean
2  Wilson asked you to see if Ms. Hendrix was
3  writing up too many students?
4  A.  No.  That is not why I did it.
5  Q.  Well, why did you do it?
6  A.  I did it because I believe in
7  data.
8  Q.  You believe in data.  Now, I --
9  A.  I use data for most everything I
10  try to do there at the college.  I use data
11  to establish program viability.  I look at
12  how many people are leaving the programs and
13  for what reasons.  I look at some graduation
14  rates.
15  I try to use data to establish
16  costs for the programs.  And to best of my
17  ability, I try to make decisions based on
18  data.
19  Q.  Okay.
20  A.  I was directed to counsel her
21  regarding what Mr. Wilson thought was a
22  large number of complaints.
23  Q.  Well, if students are not acting

Page 155

1  right, shouldn't she write it up?  She's
2  directed to do that, isn't it?
3  A.  Well, one of the duties of an
4  instructor is classroom management.  And, in
5  fact -- wherever it is -- the process -- the
6  policy for handling student complaints, the
7  first thing -- do we have a copy of that?
8  MR. CHRISTMAN:  Right here.
9  Exhibit 13.
10  A.  When a problem related to a
11  student behavior occurs in a shop or
12  classroom, the instructor's first response
13  should be an attempt to resolve the problem
14  through normal classroom management.
15  If the instructor talking to the
16  student cannot resolve the problem, the
17  instructor will proceed with the following
18  steps.
19  Q.  Did you determine she wasn't doing
20  that?
21  A.  I haven't made a determination of
22  that yet.  The only thing I've got is data.
23  Q.  Let me show you something.

Page 156

1  Plaintiff's Exhibit No. 24, did you write
2  Ms. Hendrix that letter?  I don't know if
3  you'd call that a letter or a memorandum.
4  A.  This would be a memorandum.
5  (Whereupon, Plaintiff's Exhibit
6  No. 24 was marked for identification and
7  attached to the original transcript.)
8  Q.  Did you send that to Ms. Hendrix?
9  A.  Yes, I did.
10  Q.  Would you read the last paragraph
11  out?
12  A.  Regarding student flow, at this
13  time, there is no plan to install a gate on
14  the far north fence.  Please review JFI
15  policy number 627 student supervision.
16  If you find an unsupervised
17  student, please identify them and report the
18  infraction to the appropriate personnel as
19  outlined in JF Ingram State Technical
20  College Procedures for Handling Problems
21  with Students.
22  Q.  So, in essence, you're telling her
23  there that if she sees a problem, someone

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1  out of place, to write them up, didn't you?
2      A.  Say that again.
3      Q.  You told her to write a
4  complaint.  That's what that procedure says?
5      MR. CHRISTMAN:  Form.
6      A.  If you find an unsupervised
7  student, please identify them and report the
8  infraction to the appropriate personnel as
9  outlined in JFI Procedures for Handling
10  Problems with Students.
11      Q.  And who would be the appropriate
12  personnel she should report it to?
13      A.  Well, if it were a student in a
14  shop, she should report it to the shop
15  instructor and the shop instructor should
16  handle the problem with the student.
17      Q.  What if it's in her horticulture
18  area?
19      A.  She should take the student to --
20  if she can identify the student, then she
21  should take the student to the student
22  services area.  If she can identify the
23  student and send him back, she should take

Page 158

1  appropriate action by writing them up.
2      Q.  Right.  What training is provided
3  to the instructors to know when to write up
4  a student and when not to write up a
5  student?  Let me put it a different way and
6  maybe --
7      A.  I want to say the last time
8  training was provided was in a faculty
9  development meeting where I passed out this
10  thing just as a reminder, this thing being
11  --
12      Q.  The policy?
13      A.  Right.  Exhibit 13.
14      Q.  Exhibit 13.  When was that?
15      A.  It was either in our -- no.  It
16  would have been in August '06.
17      Q.  August '06.  Prior to August of
18  '06, what training have been given to
19  instructors of when to write up a student
20  for inappropriate behavior let's say?
21      A.  I can't answer that question.  But
22  I believe the investigation of the -- rather
23  a review of the minutes of faculty

Page 159

1  development meetings would show that Mr.
2  Wilson does it on a regular basis.  Likewise
3  --
4      Q.  How does he do that?
5      A.  He stands up and explains if
6  students are doing thus and so, this is what
7  your responsibility is.
8      Q.  Are the only standards that the
9  teachers have for writing up students the
10  standards that's been put forth in Exhibit
11  13?
12      A.  Those are the only ones I know of.
13      Q.  Okay.
14          (Whereupon, Plaintiff's Exhibit
15  No. 25 was marked for identification and
16  attached to the original transcript.)
17      Q.  Can you identify what I have
18  marked as Plaintiff's Exhibit No. 25?
19      A.  Uh-huh.
20      Q.  What is that?
21      A.  These are student rules and
22  regulations.
23      Q.  And if a student is violating

Page 160

1  those rules and regulations, what is an
2  instructor to do pursuant to the first
3  paragraph?
4      A.  Are you talking about students
5  enrolled at J.F. Ingram State Technical
6  College are expected to demonstrate good
7  behavior?
8      Q.  Yes, sir.
9      A.  Well, assume responsibility for
10  their actions.  The student shall be subject
11  to appropriate disciplinary and/or
12  administrative action, up to permanent
13  dismissal from class and/or enrollment by
14  ISTC for misconduct of any property
15  controlled, owned or used by ISTC, or off
16  campus activity or function which is
17  authorized, sponsored, or conducted by
18  ISTC.
19          Such prohibited conduct includes
20  the commission of, or the attempt to commit,
21  or aiding another person who commits or
22  attempts to commit any of the following
23  offenses.  That's what it says.  What was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1  your question again?
2  **Q.  What is an instructor to do if**
3  **they see a student committing any of these**
4  **offenses?**
5  A.  Are you asking me to go down the
6  list one by one?
7  **Q.  No, sir.  Just looking at any of**
8  **these offenses that an instructor sees a**
9  **student doing, what is the proper conduct of**
10  **that instructor?**
11  A.  It would depend upon the offense.
12  An offense like number four, refusing to go
13  work when instructed to do so by a proper
14  authority, would call for some sort of
15  counseling.  However --
16  **Q.  Are --**
17  A.  Violation of any Department of
18  Corrections' rules or regulations such as,
19  but not limited to, rules prohibiting
20  escape, making or possessing weapons,
21  sniffing paint thinner or any other
22  inhalant, possession of drugs or alcohol,
23  fighting, et cetera, that would fall under

Page 162

1  the safety and security of things and that
2  would be reported directly to DOC to
3  eliminate the threat.
4  **Q.  Perhaps a better way to ask it is,**
5  **if an instructor sees a student committing**
6  **any of these violations, is the instructor**
7  **just supposed to ignore it?**
8  A.  Absolutely not.
9  **Q.  Right.  Now, at the beginning of**
10  **the deposition, you impressed upon me the**
11  **importance of record keeping when you're**
12  **dealing with inmates.**
13  **It is very important that records**
14  **are kept on inmates, isn't it, while they**
15  **are incarcerated?**
16  MR. CHRISTMAN:  Form.
17  **Q.  And on your students who are**
18  **inmates, it's very important that records**
19  **are kept on them by how they are conducting**
20  **themselves within the environment and**
21  **setting of J.F. Ingram State Technical**
22  **College?**
23  MR. CHRISTMAN:  Form.  I'm

Page 163

1  objecting to the form.  Answer if you can.
2  A.  I don't recall impressing on you
3  the importance of student record keeping.
4  **Q.  It's not important to keep records**
5  **on how students act within the confines of**
6  **J.F. Ingram State Technical College?**
7  A.  Yes, it is important to do that.
8  **Q.  Right.  All right.  And if there's**
9  **a violation, you keep a record of that,**
10  **don't you, if an instructor is having a**
11  **problem?**
12  A.  Well, it would depend on the
13  problem.
14  **Q.  So there shouldn't be any -- There**
15  **is just some of these violations that should**
16  **be no record kept of and the instructor**
17  **should ignore?**
18  MR. CHRISTMAN:  Object to the
19  form.  That's not what he said.
20  A.  When a problem related to student
21  behavior occurs in a shop or a classroom, an
22  instructor's first response should be an
23  attempt to resolve the problem through

Page 164

1  normal classroom management.
2  If a student who refuses to work
3  can be shown the light of day and be
4  convinced through speaking, discourse
5  between two adults, then he should actually
6  do it.  And he does it.  It's not necessary
7  to follow the rest of that paragraph.
8  If the instructor talking to the
9  student cannot resolve the problem, the
10  instructor will proceed with the following
11  steps in the outline, writing the student
12  up, taking them to a counselor and doing all
13  the rest of the things we talked about in
14  this Exhibit No. 13.
15  **Q.  Have you discovered in any of your**
16  **data you collected, in the way you do it,**
17  **that Ms. Hendrix is not trying to counsel a**
18  **student before she writes them up?**
19  A.  Say that again.
20  **Q.  Have you discovered through any of**
21  **the data you have collected that Ms. Hendrix**
22  **is not counseling with students before she's**
23  **writing them up?**

41 (Pages 161 to 164)

# FREEDOM COURT REPORTING

Page 165

1    A.  No.
2    Q.  Now, she is, by the very nature of
3  her location, more isolated than any of the
4  other instructors at J.F. Ingram, isn't she?
5       MR. CHRISTMAN:  Form.
6    A.  I would not say she is more
7  isolated.  I would say that she is
8  isolated.  And I would also say that our
9  special education instructors working in
10  trailers surrounded by a fence are also
11  isolated.
12    Q.  Your special education
13  instructors, they are working within a --
14  how big are the trailers?
15    A.  Double wide.
16    Q.  Double wide.  Mostly two thousand
17  square feet?
18    A.  I don't know how big they are.
19  They are double wide.
20    Q.  How many special education
21  instructors do y'all have working in double
22  wides?
23    A.  That's hard to say because they

Page 166

1  are not always occupied.
2    Q.  Where are those double wides
3  located, please, sir?
4    A.  About five miles.
5    Q.  Pardon me?
6    A.  On the Draper campus.
7    Q.  On the Draper campus.  Is there
8  anybody on the main campus more isolated
9  than -- excuse me.  Strike that.  Is Ms.
10  Hendrix more isolated than anybody else on
11  the main campus?
12       MR. CHRISTMAN:  Object to the
13  form.  Vague.  Isolated from what?
14       MR. DEBARDELABEN:  From the rest
15  of the campus.
16    A.  Well, in proximity-wise to other
17  buildings.  But proximity-wise to the
18  nearest DOC officer, she's certainly the
19  closest.
20    Q.  Well, a DOC officer is in what I
21  call stands.
22    A.  Correct.  There's one right here
23  and there's one right there (indicating).

Page 167

1    Q.  And as long as she's on the
2  outside, she's in the eyesight of the DOC
3  officers.  But on the inside of her
4  classroom, she is not, is she?
5    A.  No, that's not true.  In the
6  classroom, we have cameras.  In her office
7  area, we have cameras.
8    Q.  What about in the greenhouses?
9    A.  In the greenhouses, there are
10  cameras and they are being hooked up.
11    Q.  They aren't hooked up now, are
12  they?
13    A.  I can't tell you that because the
14  crew is working on them today.
15    Q.  Do you have anybody monitoring the
16  cameras?
17    A.  Do I have anybody monitoring?
18    Q.  That's a bad question.  Does JFI
19  have any person monitoring cameras?
20    A.  The DOC monitors the cameras.
21    Q.  Are there films kept on the
22  cameras?  Do they keep the film over a
23  period of time?

Page 168

1    A.  Not those cameras.
2    Q.  Okay.  So if something happens,
3  they can see it happening, but there's no
4  record of it?
5    A.  Yes.
6       MR. CHRISTMAN:  No film record you
7  mean.
8       MR. DEBARDELABEN:  No film
9  record.  That's exactly what I mean.  Give
10  me about five minutes.  I've got to hit
11  Bonita's stuff next.
12       MR. CHRISTMAN:  Okay.
13       (Whereupon, a short recess was
14  taken.)
15    Q.  Do you know who Ms. Bonita Owensby
16  is?
17    A.  Yes, I do.
18    Q.  Who is Ms. Owensby?
19    A.  She's a woman who works in student
20  services.
21    Q.  And what is her position?
22    A.  Registration coordinator, I
23  think.  I'd have to see a contract to know

42  (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  for sure.
2      Q.  Okay.
3          (Whereupon, Plaintiff's Exhibit
4  No. 26 was marked for identification and
5  attached to the original transcript.)
6      Q.  Show you what I have marked as
7  Plaintiff's Exhibit No. 26.  And I'll ask
8  you if you're familiar with that
9  memorandum?  Can you tell me what that
10 document is, please, sir?
11     A.  It's a memo of record concerning a
12 meeting that I had with Ms. Owensby
13 regarding documentation for the rank and
14 grade sheet.
15     Q.  What's the date of that, please,
16 sir?
17     A.  July 26th, 2002.
18     Q.  2002.  And you told me you did not
19 know from memory what her exact position is?
20     A.  That's right.
21     Q.  You'd need to see the appointment
22 letter?
23     A.  Yes.

Page 170

1      Q.  Let me show you what I'm going to
2  mark as Plaintiff's Exhibit No. 27.  It was
3  Exhibit 17 to Mr. Dean Wilson's deposition.
4          (Whereupon, Plaintiff's Exhibit
5  No. 27 marked for identification and
6  attached to the original transcript.)
7      Q.  Can you tell me that document is?
8      A.  It's an appointment letter.
9      Q.  And what did it appoint Ms.
10 Owensby to?
11     A.  Registrar slash assistant to the
12 Dean of Students and Support Services.
13     Q.  Okay.  What is the registrar slash
14 Dean of Students?
15         MR. CHRISTMAN:  I'm sorry?
16     Q.  What is the registrar slash Dean
17 of Students?
18     A.  It says registrar slash assistant
19 to the Dean of Students.
20     Q.  Assistant to Dean of Students.
21     A.  And Support Services.
22     Q.  I apologize.
23         MR. CHRISTMAN:  The question is

Page 171

1  what is that position?
2      Q.  Yes.  What is that position?
3      A.  It's a clerical position that
4  provides administrative assistance to the
5  Dean of Students and performs registrar
6  functions.
7      Q.  Is she the only registrar on J.F.
8  Ingram State Technical College campus?
9      A.  This is, I think, dated August
10 25th, 2003.
11     Q.  Yes, sir.
12     A.  Do you mean was she the only one
13 at that time?
14     Q.  Now.
15     A.  No.
16     Q.  Yes.
17     A.  She handles the student
18 registration.
19     Q.  And is her designation registrar
20 slash assistant to the Dean of Students?
21     A.  I really don't know.  I'd have to
22 check out her current appointment letter.
23     Q.  Okay.  Let me show you what we'll

Page 172

1  mark as -- I'm trying to speed this up.
2  Show you what we'll mark as Plaintiff's
3  Exhibit No. 28.
4          (Whereupon, Plaintiff's Exhibit
5  No. 28 was marked for identification and
6  attached to the original transcript.)
7      Q.  I'll ask you if you can tell me
8  what that document is?
9      A.  It's a grievance report Form A.
10     Q.  Now, who made that grievance?
11     A.  Ms. Owensby.
12     Q.  What was her grievance?  And let
13 me ask you -- and I don't know.
14     A.  Based on the initial complaint
15 dated September 3rd, 2004, concerning
16 salary.  See attached page for grievance
17 statement.
18     Q.  Is this the attached page?  Does
19 it appear to be?
20         MR. CHRISTMAN:  If you know.  Are
21 you making this a part of this exhibit yet
22 or are you --
23         MR. DEBARDELABEN:  I'm waiting

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1   until he gives testimony about it first. I
2   think it should be attached.
3          MR. CHRISTMAN: It's dated October
4   11. She references September 3rd.
5          MR. DEBARDELABEN: Initial
6   complaint.
7          MR. CHRISTMAN: His question is to
8   you is that the attachment.
9      A.  It sure looks like it.
10     Q.  Would you attach that, please,
11  sir, because I had it separated. I thought
12  it was. But I didn't want to make that a
13  part of it until you saw it. Prior to --
14  What is the date on that, please, sir?
15         MR. CHRISTMAN: On what?
16         MR. DEBARDELABEN: Exhibit 28.
17         MR. CHRISTMAN: Page one or page
18  two?
19         MR. DEBARDELABEN: Page one and
20  then page two.
21     A.  There is no date.
22     Q.  It references September 3rd,
23  doesn't it?

Page 174

1      A.  Oh, yes. It references September
2   3rd.
3      Q.  That's the initial complaint
4   concerning salary?
5      A.  Yes.
6      Q.  What's the date on the previous
7   page?
8      A.  October 11.
9      Q.  Okay. Prior to Ms. Owensby filing
10  the complaint -- excuse me -- the grievance,
11  did she file a complaint?
12     A.  I don't remember.
13     Q.  Okay. I want to show you
14  something we'll mark as Plaintiff's Exhibit
15  No. 29.
16         (Whereupon, Plaintiff's Exhibit
17  No. 29 was marked for identification and
18  attached to the original transcript.)
19     Q.  This might refresh your memory.
20  Do you recognize Plaintiff's Exhibit No. 29?
21     A.  Yes.
22     Q.  Did you write that to Ms. Owensby?
23     A.  Yes.

Page 175

1      Q.  And basically sent her a grievance
2   report Form A?
3      A.  Yes.
4      Q.  Does that help you refresh your
5   memory, sir?
6      A.  Not by much.
7      Q.  Did you investigate that grievance
8   through the same procedure we went over
9   previously?
10     A.  I can't say that they were the
11  same. But they would have been similar.
12     Q.  You followed the grievance
13  procedure outline, didn't you?
14     A.  Yes.
15     Q.  Okay. Is this the resolution
16  findings and conclusions -- and we'll mark
17  this as Exhibit No. 30 to Ms. Owensby's
18  complaint.
19         (Whereupon, Plaintiff's Exhibit
20  No. 30 was marked for identification and
21  attached to the original transcript.)
22         MR. CHRISTMAN: This is the same
23  thing, Jim.

Page 176

1          MR. DEBARDELABEN: Oh, I'm sorry.
2      Q.  And I want you to look at -- Is
3   this attachment supposed to be with that?
4      A.  It may or may not have been.
5      Q.  I've seen it both ways. So I
6   didn't want to put something on there that
7   was not of your doing. But does that kind
8   of look like grafts you would do?
9      A.  Yes, it does.
10     Q.  Have you determined if the chart
11  should be attached to Plaintiff's Exhibit
12  No. 30?
13     A.  No, I haven't.
14     Q.  Okay.
15     A.  That may be for my own records.
16     Q.  Is Ms. Owensby a black female?
17     A.  She is.
18     Q.  Is she over forty years of age?
19     A.  I don't know.
20     Q.  Who occupied the position of
21  registrar before Ms. Owensby?
22     A.  Tim Robinson.
23     Q.  Is he a black male?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1    A.  He was a black male.  He's
2  deceased.
3    Q.  He's deceased.  And wasn't a part
4  of Ms. Owensby's complaint that she was not
5  being paid the same as Mr. Robinson?
6    A.  No.
7    Q.  Do you know what Mr. Robinson's
8  salary was when he left the job of
9  registrar?
10    A.  I don't know.  But I could find
11  out.
12    Q.  Does approximately sixty-seven
13  thousand dollars sound correct?
14    A.  I really don't know.  Those are
15  old, old pay tables.
16    Q.  Okay.  Now, Ms. Robinson -- excuse
17  me.  Ms. Owensby, at the time you did this
18  grievance, what was her salary?
19    A.  I can't tell from these records.
20    Q.  Okay.  It says since October of
21  '99, your compensation has increased by
22  eleven thousand five hundred and fifty-seven
23  dollars.  So you don't know what her salary

Page 178

1  was?
2    A.  No.  There's a -- I don't know
3  what her salary was on October 11, 2004.
4    Q.  Okay.
5    A.  But if I had an appointment
6  letter, I could tell you quickly.
7    Q.  Okay.  The appointment letter --
8  Whatever the appointment letter says her
9  salary was, that's what her salary is?
10    A.  Unless I made a mistake or my
11  assistant has made a mistake -- and that's
12  not unheard of.  But ninety-nine out of a
13  hundred times, that is the case.
14    Q.  Tell me how an appointment letter
15  is signed.  Who prepares it for the
16  president?
17    A.  At the present time?
18    Q.  Yes, sir.
19    A.  My personnel coordinator prepares
20  it for the president.
21    Q.  Okay.  Under your direction?
22    A.  Yes.
23    Q.  So if something -- Does it go

Page 179

1  directly from the personnel coordinator to
2  the president?
3    A.  No.
4    Q.  Where does it go?
5    A.  It goes through me and it goes
6  through the fiscal dean.
7    Q.  Dean Greene?
8    A.  Yes.
9    Q.  When it goes through Dean Greene,
10  what does Dean Greene's section do with it?
11    A.  They check the pay scale to ensure
12  that if it says E-1, 01, ten years, that the
13  appropriate amount is placed, whatever that
14  is.  And I surely don't memorize pay scales.
15  They verify that the amount is correct.
16    Q.  Do they sign off on it or
17  anything?
18    A.  They generally initial it.
19    Q.  Initial it.  Okay.  Did your
20  investigation determine whether or not Mr.
21  Robinson was paid more than Ms. Owensby for
22  the same position of registrar?
23    A.  First, I didn't look at Robinson's

Page 180

1  salary.
2    Q.  Okay.
3    A.  I know that he made more than Ms.
4  Owensby.  Second, it is not the same
5  position.  The position changed radically
6  after Mr. Robinson left.
7    He had far greater
8  responsibilities than Ms. Owensby and he had
9  a much more developed education background.
10  He had a master's degree where Ms. Owensby
11  doesn't even have a bachelor's degree.
12    Q.  Let me show you Plaintiff's
13  Exhibit 31 and ask you if you recognize what
14  Plaintiff's Exhibit 31 is?
15    (Whereupon, Plaintiff's Exhibit
16  No. 31 was marked for identification and
17  attached to the original transcript.)
18    A.  This is a -- looks like a job
19  description, a job title for a registrar,
20  assistant to Dean of Students and Support
21  Services.
22    But as best I can recall, this was
23  a document that was generated in order to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  prepare a request for a reorganization for
2  Ms. Owensby's position. But the
3  reorganization never took place.
4      Q. When was that done, to do a
5  reorganization for Ms. Owensby's position?
6      A. I can't remember.
7      Q. I see.
8      A. If I had -- If I had all of her
9  personnel file here, I could probably zero
10  into one year or more. I can't tell you
11  from looking at this.
12      Q. Let me see. You got your position
13  as Dean of Instructor through a
14  reorganization?
15      A. Yes, sir.
16      Q. Mr. Wilson got his position as
17  Dean of the College and Dean of Students
18  through reorganization?
19      A. Yes.
20      Q. Did Ms. Greene get her position as
21  -- I want to say fiscal dean -- through
22  reorganization or did she apply for it and
23  was appointed?

Page 182

1      A. I think that she applied.
2      Q. Okay. How many other deans do
3  y'all have up there now? When I say y'all,
4  I mean J.F. Ingram.
5      A. At the present time, we have one
6  other person on the dean salary schedule.
7  That's Rosy Edwards. She's the director of
8  student -- the special ed.
9      Q. Special ed?
10      A. Yes. Until January of last year,
11  we had another female dean. She was the
12  Dean of Strategic Planning and Institutional
13  Research.
14      Q. Who was that?
15      A. It was Kaye Perryman.
16      Q. Did she apply for that job or was
17  it through reorganization?
18      A. It was directed by the Chancellor.
19      Q. Directed by the Chancellor. Who
20  is the other dean you said -- Now, I asked
21  for deans. Not on dean salary. Is there a
22  dean there now?
23      A. No, there's no dean.

Page 183

1      Q. Okay.
2      A. But there is a black female who
3  was appointed through reorganization.
4      Q. Yes. Was Ms. Perryman's job Dean
5  of Strategic Planning?
6      A. Yes.
7      Q. Has that job been filled or is it
8  open?
9      A. Has it been filled?
10      Q. Yes, sir. Is it open, is it being
11  advertised?
12      A. It's open.
13      Q. Is there any plans to your
14  knowledge to fill it since you are the
15  person -- director of personnel? That's one
16  of your hats.
17      A. I've got plans. But I'm probably
18  a lone soldier.
19      Q. Would it be a correct statement to
20  say the only dean that applied for her job
21  -- applied for the job and went through
22  interviews to get selected is Dean Greene?
23      A. Yes.

Page 184

1      Q. I'm looking at your findings and
2  conclusions. And at the bottom of the first
3  paragraph it says, in October of 2003, your
4  title was changed to registrar slash
5  assistant to the Dean of Students.
6          Your compensation remained the
7  same and no additional duties or
8  responsibilities were added.
9      A. No additional duties or
10  responsibilities were added.
11      Q. Was Mr. Robinson paid on the C
12  salary schedule or the E salary schedule?
13      A. Robinson as registrar was paid on
14  the C-1 salary schedule.
15      Q. Okay. Which salary schedule is
16  Ms. Owensby paid on?
17      A. She's paid on the C-3 salary
18  schedule.
19      Q. Now?
20      A. Yes.
21      Q. But when was that changed?
22      A. I believe it was effective
23  September 3rd, '06.

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1    Q.  '06.
2        MR. CHRISTMAN: You mean effective
3    or when was it approved?  Does that make any
4    difference to you?
5        MR. DEBARDELABEN: Huh-uh.
6    Q.  When you obtained information
7    concerning other registrar positions in the
8    Alabama College System --
9    A.  Yes.
10   Q.  -- did you try to obtain
11   information of other registrars who are
12   assistant to the Dean of Students or
13   assistant -- and also had the duties of the
14   assistant to the dean or did you just look
15   at the registrars salary?
16   A.  I asked that a query be written
17   that had as a key word registrar.  Anything
18   with the word registrar in it was sent back
19   to me.
20   Q.  Okay.  Did you try to find out if
21   there were other people, you know, in like
22   positions of hers as being an assistant to
23   the Dean of Students or the Dean of the

Page 186

1    College and also the registrar?
2    A.  Later I did.  After she filed an
3    EEOC complaint.
4    Q.  What did you find?
5    A.  I found that there were other
6    people doing registration functions.  But
7    they held other positions than assistant to
8    the dean.  They may have been the Dean of
9    Instruction or Dean of Students.
10       I can't remember all of the things
11   that were reported back to me.  Those that
12   had significant duties of high
13   responsibility, there were about two-thirds
14   more people than Bonita.
15   Q.  About two-thirds of the people had
16   duties with higher responsibilities?
17   A.  Yes.
18   Q.  And a third had duties of lower
19   responsibility?
20   A.  Or equal.
21   Q.  Or equal.  Did you find out a
22   salary range?
23   A.  Yes, it was there.  But I don't

Page 187

1    recall what it is.  If you really need it, I
2    can get it for you.
3    Q.  Would you give that to Mr.
4    Christman?
5    A.  Sure.
6    Q.  And let me -- How would we
7    specify?  Did you research on salary
8    concerning registrars slash other positions?
9    A.  No.  It was still anything
10   concerning registrars.
11   Q.  Okay.
12   A.  I did a survey of all the college
13   H and R personnel.
14   Q.  Is that online any place?
15   A.  I think so.
16   Q.  How would I phrase that so you'd
17   know what I'm looking for?
18   A.  You don't have to.  I'll know what
19   you're looking for.
20       MR. CHRISTMAN: Well, he's got to
21   put it in writing to me.  If you'd just send
22   me a request for any comparison.
23   Q.  Salary information you gathered

Page 188

1    concerning Bonita Owensby?
2    A.  Yes.
3    Q.  Okay.
4        MR. CHRISTMAN: Comparison data
5    would be fine.
6        MR. DEBARDELABEN: Okay.
7    Q.  Do you know who Leo Miller is?
8    A.  Yes.
9    Q.  Who is Leo Miller?
10   A.  Leo Miller is a person who was
11   employed by Ingram both as a student and
12   later on as an instructor assistant.
13   Q.  He couldn't have been employed if
14   he went there as a student, could he?
15   A.  Well, we call it employment.  He
16   went there as a student.  But he was a
17   student aide.
18   Q.  Okay.  Now, do you know a Mr. Tim
19   Leonard?
20   A.  I know the name.  But I don't know
21   the man.
22   Q.  Okay.  Tell me, are you in charge
23   of live work at Ingram?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 189 | Page 191 |
|---|---|
| 1   A. I am now.<br>2   **Q. Okay. What are the qualifications**<br>3 **to get live work done? Qualification is**<br>4 **probably a bad word.**<br>5   A. No, that's the right word. There<br>6 are four of them. Let's see if I can recite<br>7 them. You must be a public employee or<br>8 retired public employee. You must be a<br>9 state agency.<br>10   You must be a non-profit<br>11 organization supported strictly through<br>12 charity or contributions, or you must be a<br>13 student of a two-year college system.<br>14   **Q. Okay. No exception?**<br>15   A. There are exceptions that can be<br>16 made by the president.<br>17   **Q. Where does the president have**<br>18 **authority to make those exceptions?**<br>19   A. It's given to him by the<br>20 Chancellor.<br>21   **Q. Given to him by the Chancellor.**<br>22 **Is that given in writing?**<br>23   A. Yes. | 1 between an individual and an Ingram employee<br>2 acting as a private person is their<br>3 business.<br>4   **Q. I'm talking about --**<br>5   A. I don't authorize any Ingram<br>6 employee to go off campus to do work.<br>7 However, before my time, we were known to<br>8 build airports and football stadiums and<br>9 even work on school buildings and parking<br>10 lots.<br>11   **Q. Were you aware that Mr. Miller**<br>12 **claimed that he did work for Mr. Leonard and**<br>13 **was compensated for that work by turning in**<br>14 **his hours for working at J.F. Ingram?**<br>15   A. No.<br>16   **Q. Do you know where Mr. Leo Miller**<br>17 **is now?**<br>18   A. I think he's in the Montgomery<br>19 jail.<br>20   **Q. Do you have any problem getting**<br>21 **anything out of the business office?**<br>22   A. Yes.<br>23   **Q. What kind of problems do you have** |

| Page 190 | Page 192 |
|---|---|
| 1   **Q. Does each exception -- that's a**<br>2 **bad question. Is there a rule or does each**<br>3 **exception have to be granted separately?**<br>4   A. I wouldn't know because I took<br>5 over the responsibility for bringing live<br>6 work in in January of this year. I require<br>7 that a photo ID card stating what the<br>8 person's employment is or a copy of a 501-C3<br>9 form or something of that sort to just<br>10 actually show -- or a student ID card be<br>11 attached to live work orders.<br>12   **Q. Now --**<br>13   A. And to this date, I haven't had<br>14 any exceptions.<br>15   **Q. Do you know if Mr. Tim Leonard was**<br>16 **a state employee, a public official or a**<br>17 **retired state employee?**<br>18   A. I don't know. I couldn't identify<br>19 him in a line up.<br>20   **Q. What about off campus work? When**<br>21 **I say off campus, going to somebody's house**<br>22 **and putting cabinets in. Is that allowed?**<br>23   A. Any kind of contractal agreement | 1 with the business office?<br>2   A. I have problems getting budgetary<br>3 data out of the business office. I have<br>4 problems getting updates on accounts. I<br>5 have problems getting requisitions filled.<br>6   **Q. Do you keep memorandums on that?**<br>7   A. Yes.<br>8   **Q. And if I ask you for all your**<br>9 **memorandums detailing problems you have with**<br>10 **the business office, you can provide them**<br>11 **through your attorney?**<br>12   A. I can do that.<br>13   **Q. Okay.**<br>14   MR. CHRISTMAN: Be glad to.<br>15   **Q. Now, you don't keep up with your**<br>16 **own expenditures?**<br>17   A. I attempt to. But I never know<br>18 whether or not a thing has been ordered,<br>19 even though I'm supposed to know. I know<br>20 when we get it in. But I don't know whether<br>21 or not it's been paid for.<br>22   I've had problems with some<br>23 suppliers who won't provide us with |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 193

1 materials because we haven't paid the bills
2 on time.
3    Q.  And who are those suppliers?
4    A.  Sunday Dinner, B & S Supply.
5 Those are just a couple.
6    Q.  Okay.  Do you know if the bills
7 are properly submitted?
8    A.  I'm not part of that.  I have no
9 idea.
10    Q.  Would you agree that the fiscal
11 office should not pay bills that aren't
12 properly submitted?
13    A.  Sure.
14    Q.  And if they are late because they
15 are not properly submitted, that's not the
16 business office's fault, is it?
17    A.  No.
18    Q.  And when you say you've had
19 problems with bills being paid, you don't
20 know if there was a problem with the way
21 they are billed or not, do you?
22    A.  No.  All I know is that I can't
23 get materials for the shops.  The

Page 194

1 instructors don't have materials to use for
2 the students and the students don't get the
3 education.
4    Q.  Okay.  And the business office,
5 they just can't go out and order something;
6 they have to go through the procedures the
7 State sets, don't they?
8    A.  I don't know how they do it.
9    Q.  You have no background in knowing
10 how the business office does things, do you?
11    A.  No.
12    Q.  Were you aware there was an
13 examiner's of public account recommendation
14 at one time that there should be a live work
15 coordinator in the business office?
16    A.  Yes.  I wrote the job description
17 form and duties and responsibilities.
18    Q.  Since you're the personnel
19 director, do you know why that wasn't
20 filled?
21    A.  A request never came through.
22    Q.  Who requested it?
23    A.  A request never came through.

Page 195

1    Q.  Where would the request have come
2 from?
3    A.  Business office.
4    Q.  Who has to approve a request
5 before it comes through?
6    A.  The president.
7    Q.  Okay.  So it goes from the
8 business office to the president, and if the
9 president doesn't approve it, it just
10 doesn't come through, does it?
11    A.  No.  But I think we had a person
12 on board who had been looked at to take that
13 position.
14    Q.  And who had been looked at?
15    A.  Mr. Griswold.
16    Q.  Mr. Griswold.  Is that J.L. or
17 Bill?
18    A.  Bill.
19    Q.  Now, Dr. Chambers runs the school?
20    A.  Yes, he does.
21    Q.  He can create any position he
22 wants, can't he?
23    A.  Essentially.  If there's funding

Page 196

1 for it.
2    Q.  Right.  And if he's wanting to
3 hire a live work coordinator and you wrote
4 up the description --
5    A.  And I gave it to Monica.
6    Q.  -- Dr. Chambers could hire one,
7 couldn't he, regardless of what --
8    A.  She'd have to ask for it.
9    Q.  Deane Greene?
10    A.  She'd have to ask for it.
11    Q.  And you don't know if she's asked
12 for it or not, do you?
13    A.  No, I don't.
14    Q.  Now, I'm a little perplexed by
15 your answer in that we had somebody on board
16 looked at for the job.  I thought all State
17 jobs should be filled from like a
18 competitive register and advertisement?
19    A.  That's not true.  Reorganizations
20 can take place.
21    Q.  Oh, so you can reorganize and put
22 somebody in the job without notifying the
23 public that it's open?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 197

1  A.  Yes.
2  Q.  And that's perfectly legitimate?
3  A.  We used to.  Now we have to submit
4  a request for reorganization to the
5  Chancellor who sends it out to some kind of
6  attorney.  I don't know who it is.  And they
7  request any reorganization.  We haven't
8  requested any reorganizations lately.
9  Q.  When did that come about?
10  MR. CHRISTMAN:  Object to the
11  form.  When did what come about?
12  MR. DEBARDELABEN:  Come about
13  having to submit it to the Chancellor.
14  A.  Well, it's recently.
15  Q.  Let me put it this way.
16  A.  Let me finish.  When the first
17  interim chancellor got put in there or about
18  that time, I received a copy of a letter
19  saying that there would be no more
20  reorganizations, that the appointments would
21  all be made based on competitive searches.
22  Since that time -- I don't know
23  when that was.  It was like last year or

Page 198

1  so.  Since that time, I've seen
2  documentation saying that reorganizations
3  can take place.  However, they are not
4  approved by the Chancellor without an
5  external review.
6  Q.  So --
7  A.  So it can still be done.
8  Q.  It all started that the Chancellor
9  -- it had to go through the Chancellor when
10  whatever was going in the two-year college
11  system was all in the paper, when that
12  investigation came up about the Chancellor
13  and whoever --
14  A.  When the interim chancellor came
15  in, it was stopped.
16  Q.  After Mr. Johnson left, things
17  changed?
18  A.  Yes.
19  Q.  Okay.  And you're not privy to why
20  they changed?
21  A.  No.
22  Q.  Dr. Merk, do you know the ratio --
23  excuse me.  Bad word.  Do you know the

Page 199

1  percentage of the number of blacks as
2  opposed to the number of whites that have
3  been hired by J.F. Ingram within the last
4  five years?
5  MR. CHRISTMAN:  You talking about
6  off the top of his head?
7  MR. DEBARDELABEN:  He collects
8  data.
9  Q.  Do you have that data any place in
10  your personnel records?
11  A.  Yes.
12  Q.  How would we get that data?  Would
13  we just request the percentage of blacks and
14  whites that have been hired within the last
15  five years?
16  A.  Sure.
17  Q.  You have that data?
18  A.  I think I could go back ten years.
19  Q.  Okay.  Do you have the data in
20  your personnel records that shows the
21  starting salary for the positions of the
22  person?
23  A.  No.

Page 200

1  Q.  Okay.  Is that salary available at
2  J.F. Ingram?  That's a bad question.  Is
3  that information on the salaries available
4  at J.F. Ingram?
5  A.  Yes, it would be.
6  Q.  Would that be through Ms. Greene's
7  area?
8  A.  She would probably be the best
9  person to ask for that.  If I were to do it,
10  it would mean opening up archives records
11  and looking through the appointment letters.
12  Q.  Okay.
13  A.  But she keeps that on file.
14  Q.  Okay.  Were you a proponent of an
15  Access system?
16  A.  I didn't know anything about the
17  Access system when it was bought.  I knew
18  that we needed to have some kind of a
19  standardized system.
20  Q.  You're the IT person, aren't you?
21  A.  I am now.
22  Q.  When did you become the IT person?
23  A.  1999, 2000 or so.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1   Q.  Okay.  Who was the IT person
2   before you?
3       A.  The last one that we had on board
4   was a fellow named Roger Robinson.  He went
5   off to another job and we didn't have one
6   for a long time.
7       Q.  Okay.  So there was no IT person
8   when the Access system was purchased?
9       A.  No.  We had a contractor.
10      Q.  Do any of your relatives work for
11  Access?
12      A.  Yes.
13      Q.  Who?
14      A.  My daughter.
15      Q.  Your daughter.  Any other
16  relatives who work for Access?
17      A.  My son-in-law used to.
18      Q.  Who made the decision to purchase
19  Access?
20      A.  I really don't know.  You'd have
21  to ask Dr. Huffstutler or Dr. Chambers.
22      Q.  Okay.  While Ms. Greene has been
23  the Dean of the Fiscal Department or

Page 202

1   whatever y'all call it, do you ever remember
2   an examiners of public accounts for audit
3   finding that J.F. Ingram has wrongfully
4   spent funds or illegally spent funds?
5       A.  No.  I can think of all other
6   kinds of findings.
7       Q.  Would you say the biggest problem
8   colleges -- two-year colleges get into is
9   the misspending of funds or the illegal
10  spending?
11      A.  My opinion on that is it's the one
12  that gets the most notoriety.  But I don't
13  know what all the problems are that the
14  other colleges have.  Personally, the
15  biggest problem I have is getting service
16  out of the business office.
17      Q.  But you have never been questioned
18  by the examiner that any of the funds you
19  wanted to spend was spent improperly, have
20  you?
21      A.  No.
22      MR. DEBARDELABEN:  That's all.
23      MR. CHRISTMAN:  I'm not quite

Page 203

1   finished.
2   EXAMINATION BY MR. CHRISTMAN:
3       Q.  Earlier Mr. Debardelaben
4   questioned you about whether Ms. Hendrix
5   received your report of findings.  Do you
6   recall that examination testimony?
7       A.  Yes.
8       Q.  And I believe you said that you
9   know you put it in an envelope or something
10  for her to get?
11      A.  Yes.  I'm certain of that.  But I
12  don't recall.
13      Q.  You don't know if she got it?
14      A.  No.
15      Q.  You don't know when she got it?
16      A.  I don't know when she got it.
17      Q.  Well --
18      A.  I can assume she got it because
19  I've heard there was a request for an
20  extension for the appeal time.
21      Q.  Did you hear that she had written
22  a letter to the Chancellor at some point?
23      A.  It was something like that, yes.

Page 204

1       Q.  And did you hear that she had
2   written -- in that letter, she indicated how
3   late she was in filing her appeal?
4       A.  Yes.  It was a matter of days or
5   so.
6       Q.  Well, you'd agree with me that her
7   testimony about whether she was late or not
8   late would demonstrate when she got her
9   grievance findings?
10      A.  Yes.
11      MR. DEBARDELABEN:  I'm going to
12  object to leading your own client.
13      A.  Well, I can say that after I
14  received -- After I got started on the whole
15  grievance procedure, I put everything I
16  could possibly put into it in terms of
17  calendars, in terms of investigating, using
18  the best questioning that I could use in
19  terms of deadlines.
20      I put my department on hold for
21  about a month and lived with that
22  grievance.  I did absolutely the best job
23  that I could.  And I did it in the most fair

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1  way that I could. Now, I don't have with me
2  a signed return receipt request.
3       But there may be one in my file.
4  I don't know. I do know that after all that
5  work and after working with an instructor
6  who done such a good job, I was personally
7  hurt to be made part of this.
8       But I still say that she's a good
9  instructor. She provides quality
10 instruction. She provides good results.
11 But -- and nothing can take that away from
12 her. And I wouldn't try to.
13      That's basically what I have to
14 say about that. I did the best I could. I
15 followed the time lines to the degree that I
16 was able to. We did have a spring break in
17 the middle of that period.
18      Now, we got off to a little
19 troubled start about whether or not there
20 was a complaint. But once it got rolling,
21 it got rolling.
22  Q. Did you give Ms. Hendrix less
23 process than you believe she was entitled

Page 206

1  to?
2   A. Oh, heavens no.
3   Q. Do you believe she was entitled to
4  anymore process than she got?
5   A. No.
6   Q. Is there anything in the grievance
7  procedure associated with what happens if
8  you don't file your report of findings on
9  time?
10  A. I haven't been able to find
11 anything on that. But I can tell you that I
12 didn't want to be late in filing anything.
13 I didn't want to do anything to jeopardize
14 the process.
15  Q. Well, did you file your report of
16 findings on time?
17  A. Yes, I did.
18  Q. Had your deadline lapsed before
19 you requested a little more time to turn in
20 your findings?
21  A. No, it had not.
22  Q. And do you know -- You don't know
23 of any -- Do you know of any procedures that

Page 207

1  dictate what happens in the process if the
2  report of findings is not filed with the
3  president on time?
4   A. There's nothing in that procedure
5  that tells what's supposed to happen.
6   Q. There's not a provision in here,
7  for example, that says the one who filed the
8  grievance automatically wins?
9   A. No, there's not.
10  Q. Is there a provision -- I believe
11 it was discussed when Mr. Debardelaben was
12 questioning you, but is there a provision
13 about what happens if the grievant does not
14 file a timely appeal?
15  A. May I see that document.
16  Q. And you're looking at -- I think
17 it's Exhibit 2. It's the grievance
18 procedure guideline.
19  A. Yes. Over here in section four
20 under available appeals, the last sentence
21 says, if the appeal is not filed by the
22 close of business on the fifteenth day
23 following the grievant's receipt of the

Page 208

1  report, the grievant's right to appeal shall
2  be forfeited.
3   Q. So is it your understanding that
4  -- So what is your understanding about what
5  happens to a grievance when the complainant
6  does not file a timely appeal?
7   A. It's over. It finished.
8   Q. And that is expressly provided for
9  in these proceedings, isn't it?
10  A. Yes, it is.
11  Q. Do you know if Ms. Hendrix filed a
12 timely appeal?
13  A. I do not know.
14  Q. Did she ever request your help in
15 filing the appeal?
16  A. No.
17  Q. Are you aware of any impediments
18 to her filing a timely appeal?
19  A. No. I can't think of anything.
20 She felt strongly enough about it. She
21 might have filed one. I don't know why she
22 didn't.
23  Q. I want to direct your attention to

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 209 |
|---|
| 1    -- |
| 2         MR. CHRISTMAN:  Do you know what |
| 3    exhibit this is, Jim? |
| 4         MR. DEBARDELABEN:  20. |
| 5         Q.  Plaintiff's 20.  Does this exhibit |
| 6    suggest anything at all about whether Ms. |
| 7    Hendrix is or is not attempting to handle |
| 8    student problems at the classroom management |
| 9    stage?  When I say -- Well, does it suggest |
| 10   anything to you about that? |
| 11        A.  Yes, it does.  Because these are |
| 12   actual counts in frequency distributions of |
| 13   the written complaints, the steps two, three |
| 14   that take place in the discipline process. |
| 15        Q.  What does it suggest to you about |
| 16   whether she actually engages in the first |
| 17   step, which is classroom -- regular |
| 18   classroom management techniques prior to |
| 19   instituting formal written complaints? |
| 20        A.  Two things.  Either she's getting |
| 21   a lot of written -- a lot of complaints and |
| 22   she's handling them or she's immediately |
| 23   sending the problem to Student Services and |

| Page 210 |
|---|
| 1    the counselors.  I think that the latter is |
| 2    the case. |
| 3         Q.  Meaning she's -- is or is not -- |
| 4    meaning she is or is not counseling with the |
| 5    students prior to filing -- |
| 6         A.  She's not counseling them. |
| 7         Q.  At least in comparison to |
| 8    everybody else? |
| 9         A.  Yes. |
| 10        Q.  But you haven't instituted a |
| 11   formal -- or have you instituted any formal |
| 12   reprimand or procedure against Ms. Hendrix |
| 13   for failing to counsel students? |
| 14        A.  No.  Absolutely not.  And this |
| 15   wouldn't -- I use data to improve |
| 16   processes.  I really do.  I don't use it to |
| 17   do gotcha's.  I really think that Ms. |
| 18   Hendrix is one of our better instructors. |
| 19   She produces results that are known up and |
| 20   down the state. |
| 21        She's active in the craft |
| 22   committee.  She gets her students employed. |
| 23   What it does show me is that there are some |

| Page 211 |
|---|
| 1    kind of problems with management of students |
| 2    that are more acute with her than with any |
| 3    other instructor. |
| 4         Q.  But have you got to the bottom of |
| 5    that yet? |
| 6         A.  No, I have not.  But I must also |
| 7    tell you that I'm aware of a letter that Mr. |
| 8    Debardelaben sent to President Chambers |
| 9    warning him not to retaliate in any way. |
| 10        Q.  How is that -- |
| 11        MR. DEBARDELABEN:  I want to see |
| 12   that letter.  I didn't write such a letter. |
| 13   I want that on the record. |
| 14        MR. CHRISTMAN:  Well, I'll give it |
| 15   to you, Jim. |
| 16        MR. DEBARDELABEN:  I sent one to |
| 17   the Chancellor. |
| 18        MR. CHRISTMAN:  I'll give it to |
| 19   you.  I have it. |
| 20        MR. DEBARDELABEN:  I don't |
| 21   remember that. |
| 22        MR. CHRISTMAN:  They gave it to |
| 23   me.  And I wrote you a letter in response. |

| Page 212 |
|---|
| 1         MR. DEBARDELABEN:  You wrote it. |
| 2    I haven't seen that letter. |
| 3         MR. CHRISTMAN:  I'll be glad to |
| 4    give it you. |
| 5         MR. DEBARDELABEN:  I would love to |
| 6    have it.  And when you get it, I'd like to |
| 7    attach it to this deposition. |
| 8         A.  If it went to the Chancellor, |
| 9    that's my mistake.  I was aware that Ingram |
| 10   was not to retaliate or appear to retaliate |
| 11   based upon these proceedings. |
| 12        MR. DEBARDELABEN:  I want it |
| 13   corrected.  I wanted it corrected that -- |
| 14        MR. CHRISTMAN:  Wait.  Let me -- |
| 15        MR. DEBARDELABEN:  No.  Let me say |
| 16   this because I've been accused of contacting |
| 17   people who are defendants, which is an |
| 18   ethical violation.  If I sent it to the |
| 19   Chancellor, I want it corrected. |
| 20        And I think Drew will correct it, |
| 21   that it went to the Chancellor which was the |
| 22   proper -- whether you agree it was proper or |
| 23   not.  It did not go to any defendants. |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1    And I think what you'll find is I
2  sent a letter to the Chancellor saying I'm
3  filing this and I do not expect any
4  retaliation against these people.
5      And I do believe it's to the
6  Chancellor. There's a letter going to the
7  Chancellor. Nothing going to President
8  Chambers.
9    A.  If that's the case, then I have no
10 reason to doubt that it is. I still say
11 that I have not retaliated and I will not
12 retaliate. You asked me if there was some
13 kind of reprimand that I was working on and
14 I say absolutely not.
15     I will use the information that I
16 can get from the data that are being
17 produced to change practices to improve the
18 system that we've got and I'll always do
19 that.
20    Q.  **Before I ask you the next**
21 **question, let me just make sure I understand**
22 **Mr. Debardelaben's statement on the record.**
23     MR. CHRISTMAN: You don't -- Are

Page 214

1  you suggesting that I have made statements
2  about whether you have contacted my
3  clients?
4      MR. DEBARDELABEN: You wrote me a
5  letter. I have not contacted anybody at
6  J.F. Ingram concerning this lawsuit with a
7  letter don't retaliate. I did send a copy
8  of the suit or the complaint to the
9  Chancellor and said I do not expect
10 retaliation.
11     MR. CHRISTMAN: All right.
12     MR. DEBARDELABEN: But it did not
13 go, to my knowledge, to J.F. Ingram. And I
14 don't think you'll find a letter addressed
15 to J.F. Ingram.
16     MR. CHRISTMAN: You didn't send it
17 to J.F. Ingram?
18     MR. DEBARDELABEN: No. And I
19 don't think you'll see where I addressed a
20 letter to J.F. Ingram.
21     MR. CHRISTMAN: I'll pull the
22 letter I have and I'll give it to you.
23     MR. DEBARDELABEN: Because if you

Page 215

1  did, it went --
2      MR. CHRISTMAN: If you want to see
3  --
4      MR. DEBARDELABEN: -- and I didn't
5  know about it.
6      MR. CHRISTMAN: If you want to
7  attach it to this deposition --
8      MR. DEBARDELABEN: I do.
9      MR. CHRISTMAN: -- I'll leave that
10 to you. I will give you a copy of the
11 letter you gave to me or you gave to someone
12 that was sent to me.
13    Q.  At some point, did J.F. Ingram
14 receive a copy of a letter from Mr.
15 Debardelaben associated with retaliation?
16    A.  Yes.
17    Q.  And you're not sure how that got
18 to the folks at Ingram?
19    A.  I'm not sure.
20    Q.  Okay.
21     MR. CHRISTMAN: That's all I
22 have.
23 EXAMINATION BY MR. DEBARDELABEN:

Page 216

1    Q.  **Dr. Merk, have you seen a copy of**
2  **a letter that I have sent to anybody at J.F.**
3  **Ingram, that I have sent addressed to**
4  **anybody at J.F. Ingram?**
5    A.  Yes.
6    Q.  **That I have sent to somebody**
7  **addressed at J.F. Ingram?**
8    A.  You sent a letter to Barbara
9  Hendrix that she attached to a leave form
10 for a court appearance.
11    Q.  **Did I send -- let me rephrase**
12 **that. Concerning retaliation?**
13    A.  I don't know who it was addressed
14 to. But I know I was made aware that I must
15 not retaliate.
16    Q.  **Did you see the letter?**
17    A.  No. I had it read to me.
18    Q.  **Who read it to you?**
19    A.  President Chambers.
20    Q.  **President Chambers. So you're**
21 **going on something President Chambers told**
22 **you? You have never seen a letter?**
23    A.  I saw something in his hand.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 217

```
1      Q.  Okay.  Did he say I wrote it to
2  him?
3      A.  No.  He said it was from you.
4      Q.  Okay.  But you didn't see the
5  letter?
6      A.  No.
7      Q.  Okay.  That's fair enough.  Now,
8  whatever Ms. Hendrix is doing with the
9  students, she sure is getting results, isn't
10 she?
11     A.  She's getting results.
12     Q.  She's getting very good results?
13     A.  Yes.
14     Q.  Do other -- your other instructors
15 get the results she gets out of the
16 students?
17     A.  Yes.
18     Q.  So if she's getting good results,
19 you don't think you should change what she's
20 doing, should you?
21     A.  I'll have to do more research on
22 that.
23     Q.  Okay.  I want to go back to this
```

Page 218

```
1  Plaintiff's Exhibit 2.  You said if you were
2  doing it now -- Was there a dispute between
3  Mr. Montgomery and Ms. Hendrix as to the
4  factual allegation?
5          MR. CHRISTMAN:  I'm going to let
6  him answer that question.  We've been over
7  this.  This is not within the scope of my
8  redirect.  But I'll let him answer that one
9  more time.  Then I'm not going to let him
10 answer it again.
11     A.  I did not view her claim and his
12 claim as a dispute.  Both addressed the same
13 point from opposite ends of the compass.
14     Q.  Did either --
15     A.  Neither of them could be proven or
16 disproven.
17     Q.  Did Ms. Hendrix agree to waive the
18 hearing?
19     A.  No.
20     Q.  Okay.  What I'm confused about, on
21 a report of findings and conclusions, the
22 first sentence says, following the hearing,
23 there shall be a written report to the
```

Page 219

```
1  president.
2          Where does it provide if there is
3  no hearing there will be a written report to
4  the president?
5      A.  If there's no dispute between the
6  grievant and the person or persons against
7  whom the allegations were made as to the
8  factual circumstances, factual
9  circumstances, the grievance coordinator
10 shall submit a written report of factual
11 findings and conclusions to the president
12 within thirty days.
13     Q.  Where are you reading, sir?
14     A.  Item three, investigation,
15 hearing, and findings.  The report shall
16 also include any recommendations that the
17 grievance coordinator shall have as to the
18 resolution of the grievance.
19     Q.  Okay.  And then what is done with
20 the report?
21     A.  Excuse me?
22     Q.  Then what does the president do
23 with the report?
```

Page 220

```
1      A.  I don't know what he did with it
2  other than direct me to send it to Hendrix.
3      Q.  Okay.  But you don't know when Ms.
4  Hendrix received it?
5      A.  No, I don't.
6      Q.  And you don't know if she received
7  the grievance form?
8          MR. CHRISTMAN:  Did you respond to
9  that?
10         THE WITNESS:  No.
11         MR. CHRISTMAN:  You did not
12 respond to his last question?
13         THE WITNESS:  No, I didn't.
14     Q.  What's your response to my last
15 question?
16     A.  I don't know if she got it or not.
17     Q.  Okay.  And there is no -- To your
18 knowledge, there is no procedure to
19 determine if a person gets the grievance
20 form or not?
21     A.  No.
22         MR. DEBARDELABEN:  That's it.
23         MR. CHRISTMAN:  I'm done.
```

55 (Pages 217 to 220)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 221

```
 1        C E R T I F I C A T E
 2
 3   STATE OF ALABAMA )
 4   MONTGOMERY COUNTY)
 5
 6        I hereby certify that the above
 7   and foregoing deposition was taken down by
 8   me in stenotype, and the questions and
 9   answers thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14        I further certify that I am
15   neither of counsel, nor of kin to the
16   parties to the action, nor am I in any wise
17   interested in the result of said cause.
18
19
20        ----------------
21          CINDY WELDON
22
23
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 222

| A | | | | |
|---|---|---|---|---|
| **ability** 154:17 | 221:16 | **agency** 189:9 | **allegedly** 62:22 | 207:14,21 |
| **able** 66:23 | **actions** 160:10 | **ago** 150:2,12 | 94:18 | 208:1,6,12,15 |
| 124:22 149:6 | **active** 13:2,5 | **agree** 87:5,9,12 | **alleges** 95:17 | 208:18 |
| 205:16 206:10 | 20:13,14,15 | 193:10 204:6 | **allow** 152:3,7 | **appeals** 207:20 |
| **absolutely** 91:16 | 21:4,16 210:21 | 212:22 218:17 | **allowed** 151:22 | **appear** 61:16 |
| 162:8 204:22 | **activity** 61:15 | **AGREED** 5:13 | 190:22 | 108:20 117:5 |
| 210:14 213:14 | 112:17,21 | 5:23 6:9 | **alternative** | 141:4,5,7 |
| **academic** 14:13 | 113:3,14 | **agreement** | 28:19 | 172:19 212:10 |
| 18:20,22 | 160:16 | 190:23 | **Amarillo** 12:16 | **appearance** |
| **Academy** 13:20 | **actual** 149:17 | **ahead** 94:11 | 15:2 | 216:10 |
| 13:22 14:1,14 | 209:12 | **aide** 188:17 | **amended** 5:3 | **appears** 56:16 |
| 14:16 18:11,19 | **acute** 211:2 | **aiding** 160:21 | 111:22 117:1 | 76:14 77:23 |
| 20:5 25:10 | **added** 40:3 | **aimed** 61:15,22 | **amount** 26:20 | 88:14 |
| **acceptable** | 149:2 184:8,10 | 69:3 | 27:3 150:22 | **application** 30:1 |
| 100:8 | **adding** 35:7 | **air** 12:7,9,11,16 | 179:13,15 | 43:10 |
| **Access** 200:15 | **addition** 36:4 | 12:22 13:7,19 | **ANDREW** 7:9 | **applied** 32:12 |
| 200:17 201:8 | **additional** 35:10 | 13:21,23 14:12 | **and/or** 127:20 | 35:3 43:6 |
| 201:11,16,19 | 184:7,9 | 14:13,15 15:2 | 160:11,13 | 182:1 183:20 |
| **account** 194:13 | **address** 11:7 | 15:4,9,18 16:1 | **answer** 10:13 | 183:21 |
| **accounts** 192:4 | **addressed** 72:4 | 16:2,19,22 | 60:5 66:20 | **apply** 33:3 34:7 |
| 202:2 | 214:14,19 | 17:2,16,20,22 | 67:18 88:22 | 43:2 181:22 |
| **accreditation** | 216:3,7,13 | 17:23 18:11,12 | 89:16 93:14 | 182:16 |
| 30:10,17 | 218:12 | 19:12 20:1,4 | 120:11 158:21 | **appoint** 170:9 |
| **accredited** 30:14 | **adjacent** 144:7 | 21:12 24:1,1 | 163:1 196:15 | **appointed** 33:5 |
| **accurately** 10:23 | **administration** | 24:13 25:9,20 | 218:6,8,10 | 33:7 42:23 |
| **accused** 212:16 | 23:18 62:14 | 26:1 29:13,15 | **answers** 221:9 | 50:13 101:17 |
| **achieved** 13:10 | **administrative** | **airmen** 14:23 | **anybody** 62:13 | 102:8 104:2 |
| **acknowledged** | 142:17 143:7 | 15:6,12 | 63:16 103:21 | 181:23 183:3 |
| 83:7 | 145:14,18 | **Airport** 16:13 | 105:16 134:13 | **appointment** |
| **acknowledging** | 160:12 171:4 | **airports** 191:8 | 145:5 166:8,10 | 43:11 169:21 |
| 80:18 83:5 | **adopted** 84:16 | **Alabama** 1:2 2:2 | 167:15,17 | 170:8 171:22 |
| **acquiring** | **Adult** 26:8 | 4:2 5:2,20 7:6 | 214:5 216:2,4 | 178:5,7,8,14 |
| 150:17 | **adults** 28:2 | 7:12 11:9 13:8 | **anymore** 45:9 | 200:11 |
| **acre** 146:22 | 164:5 | 18:12 113:8 | 206:4 | **appointments** |
| **act** 94:21 95:21 | **advertised** | 129:18 185:8 | **apologize** | 43:12 197:20 |
| 163:5 | 183:11 | 221:3 | 170:22 | **apprentice** 15:3 |
| **acting** 154:23 | **advertisement** | **Alaska** 16:13 | **apparently** | 15:11,15 |
| 191:2 | 70:2,5 196:18 | **alcohol** 161:22 | 73:12,13 78:19 | **approached** |
| **action** 62:14 | **advised** 5:8 | **allegation** 62:3 | 102:5 132:1 | 86:16 |
| 82:15,15 91:7 | **affair** 149:3 | 218:4 | **appeal** 129:16 | **appropriate** |
| 91:7 106:11,13 | **afraid** 66:8 | **allegations** | 129:20,21 | 114:18 152:15 |
| 106:16 114:3,4 | **AFSC** 12:20 | 127:7 128:10 | 136:15,16,19 | 156:18 157:8 |
| 158:1 160:12 | **afterward** 58:9 | 219:7 | 137:17,19 | 157:11 158:1 |
| | **age** 176:18 | **alleged** 113:19 | 203:20 204:3 | 160:11 179:13 |

# FREEDOM COURT REPORTING

approval 48:16
approve 195:4,9
approved 34:13
46:23 48:8,11
123:3 185:3
198:4
approves 48:13
approximately
21:5 25:4
27:14 31:10,17
33:8 70:19
119:4,11
177:12
April 134:2
135:6,17,23
137:4
archives 200:10
area 19:4 49:1,5
49:6,18 143:13
144:11 145:18
146:20 148:8
148:13,20
149:17 157:18
157:22 167:7
200:7
areas 144:7
148:3,9 149:15
149:16
arousing 69:3
arriving 54:13
Art 25:3
Arts 23:12 24:17
24:22 32:2
asked 18:15
57:22 63:19
86:3 88:5,8,16
89:6 92:12
93:21 94:2,9
94:14,16,19
95:6 97:13,19
100:6 103:3,4
103:9,12,12
115:4 117:7
118:13,17,18

119:15,21
120:6,14,17
121:10 123:19
123:22,22
124:4 139:5,11
139:14,20
141:12,14
154:2 182:20
185:16 196:11
213:12
asking 41:8
61:23 67:16
136:22 161:5
asserted 94:15
assertion 74:22
assign 6:4 35:20
assigned 18:1,18
34:8,9,15
69:16
assignment
12:14 18:10
19:7,8,20,21
assignments
14:21
assistance
127:20 171:4
assistant 32:22
32:23 33:8,13
34:20 40:8,15
140:11 145:7
170:11,18,20
171:20 178:11
180:20 184:5
185:12,13,14
185:22 186:7
188:12
associate 25:19
32:2,3,12
associated 206:7
215:15
Association
30:10
assume 19:15
42:14 47:19

127:12 144:14
160:9 203:18
assumed 19:14
34:3,4
assuming 43:5
89:18
assumption
140:10
AS-400 112:12
attach 173:10
212:7 215:7
attached 46:2
51:11 64:21
71:22 74:8
79:3 80:14
83:1 86:2 92:4
99:14 100:23
102:19 111:4
111:21 117:22
122:2 123:8
131:5 133:4
134:23 138:8
146:12 151:8
153:3,14,20
156:7 159:16
169:5 170:6
172:6,16,18
173:2 174:18
175:21 176:11
180:17 190:11
216:9
attachment
173:8 176:3
attempt 17:12
155:13 160:20
163:23 192:17
attempting
209:7
attempts 160:22
attend 22:15,23
23:6
attended 18:12
22:10,12,21
25:7,8

attention 10:15
208:23
attorney 126:6
192:11 197:6
Auburn 26:3,4
26:10
audio 52:23 59:6
60:18
audit 202:2
August 15:9
16:18 111:1
158:16,17,17
171:9
Autauga 11:10
11:12
authority
161:14 189:18
authorize 191:5
authorized
160:17
automatically
207:8
automotive
149:11 150:4
available 35:23
45:18 84:21
200:1,3 207:20
Avenue 5:20 7:5
average 142:8
awarded 12:1
aware 53:21,23
61:14 71:1,6
98:15 191:11
194:12 208:17
211:7 212:9
216:14
a.m 5:21 70:19

———————
B
———————
B 8:9 193:4
bachelor's 23:12
23:14 180:11
back 16:1 21:15
31:15 39:10

47:4,6 64:17
68:17 90:18
100:7 128:18
132:21,22
135:22 157:23
185:18 186:11
199:18 217:23
background
22:5 180:9
194:9
bad 47:5 167:18
189:4 190:2
198:23 200:2
Bald 24:9,11,20
Barbara 2:5
7:15 56:12
118:8 216:8
barber 150:1,11
barriers 148:21
base 12:17 13:7
14:12 15:2,5
15:10 16:3,9
16:20,23 17:16
17:23 18:12
19:13 20:4
23:23 24:2,13
141:10
based 28:11
140:20 154:17
172:14 197:21
212:11
basic 12:7,15
14:18,22
basically 10:16
14:20 36:23
175:1 205:13
basis 126:15
159:2
beat 64:16
beds 69:20
began 18:22
beginning 162:9
begun 117:11
behavior 112:15

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

155:11 158:20 160:7 163:21
**believe** 80:16 88:1 126:20 139:16 141:17 141:20 154:6,8 158:22 184:22 203:8 205:23 206:3 207:10 213:5
**best** 66:7 154:16 180:22 200:8 204:18,22 205:14
**better** 66:23 113:1 162:4 210:18
**big** 147:6,22,23 151:22 165:14 165:18
**biggest** 202:7,15
**Bill** 118:8 127:22 140:22 195:17,18
**billed** 193:21
**bills** 193:1,6,11 193:19
**bit** 87:7
**black** 176:16,23 177:1 183:2
**blacks** 199:1,13
**blank** 131:17
**blood** 27:20
**board** 31:13 195:12 196:15 201:3
**boat** 96:2
**boats** 149:17
**Bonita** 4:5 56:16 73:21 103:13 168:15 186:14 188:1
**Bonita's** 168:11
**booths** 148:14

**bottom** 123:1 131:15 133:15 133:20 135:9 135:11 184:2 211:4
**bought** 200:17
**box** 130:21 134:14
**breaches** 38:15
**break** 20:19 43:15 85:2 98:21,22 139:4 205:16
**bring** 10:15
**bringing** 190:5
**broken** 38:11
**brought** 62:5,8,9 62:11 69:19 112:12
**budgetary** 192:2
**build** 191:8
**building** 35:16 143:8 145:9,13 145:19
**buildings** 142:17 143:2 143:14 144:20 144:23 145:1,3 145:14 166:17 191:9
**built** 149:1
**burying** 150:23
**buses** 143:18 146:4
**bushes** 147:13 147:18 148:5
**business** 46:19 46:20 136:17 191:3,21 192:1 192:3,10 193:16 194:4 194:10,15 195:3,8 202:16 207:22

**buying** 150:19

## C

**C** 7:1 184:11 221:1,1
**cabinet** 44:20,21 46:23 47:7,23 48:7,10,10 144:6 148:18 148:22
**cabinets** 190:22
**cables** 150:23
**calendars** 204:17
**call** 16:7,7 36:7 36:13 64:12 71:11 98:23 156:3 161:14 166:21 188:15 202:1
**called** 11:1 54:11 64:10 83:3
**calling** 58:2
**calls** 16:8
**cameras** 149:21 149:23 150:6 150:21 152:13 167:6,7,10,16 167:19,20,22 168:1
**campus** 23:22 24:12 26:9 35:14 41:19,22 42:13 138:15 145:10 160:16 166:6,7,8,11 166:15 171:8 190:20,21 191:6
**capacity** 1:11,15 2:10,14,20 3:3 4:12,17
**captain** 139:17

140:5
**card** 29:6 190:7 190:10
**care** 16:10 69:20
**carport** 149:2
**cars** 149:18
**case** 1:8 2:7 4:7 57:11 61:6,12 178:13 210:2 213:9
**catalog** 27:6
**cause** 221:17
**caused** 61:2
**center** 35:14,15 35:16,18 36:10 36:20 40:2 41:18,21 42:10 42:12 109:1 114:13,22
**certain** 26:20,21 63:17 68:10 72:20 203:11
**certainly** 48:4 115:8 166:18
**certificate** 22:6
**Certified** 5:17
**certify** 221:6,14
**cetera** 161:23
**chair** 131:19
**chair's** 133:12
**Chambers** 1:9 2:8 4:10 93:18 94:2 99:4,5 101:7,19 102:10 104:1 123:2 135:16 195:19 196:6 201:21 211:8 213:8 216:19 216:20,21
**chancellor** 34:14 129:18,22 137:23 182:18 182:19 189:20

189:21 197:5 197:13,17 198:4,8,9,12 198:14 203:22 211:17 212:8 212:19,21 213:2,6,7 214:9
**change** 10:13 31:9 48:17 152:7 213:17 217:19
**changed** 31:13 31:15 180:5 184:4,21 198:17,20
**changes** 48:2,6,8 48:11 49:1,16
**charge** 16:14,21 39:17,19 188:22
**charity** 189:12
**chart** 176:10
**check** 21:20 23:8 44:1 141:10 171:22 179:11
**Cherry** 65:20,21 90:13,14
**chief** 13:11,15 13:16,17,18,20 14:4 19:9,18
**choice** 10:18
**Christman** 7:9 7:10 8:5 10:8 10:22 13:15 21:7 29:22 35:4,8 37:7,20 41:6 44:4,10 47:10 48:3 50:9 52:21 58:21 59:13,17 60:3,6 65:4,8 66:13 67:15

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 69:6 70:11 | **Cindy** 5:3,16 | 22:21 25:20 | 161:3 162:5 | 174:11 175:18 |
| 71:4 73:6 | 221:21 | 29:17 30:9,21 | **community** | 177:4 186:3 |
| 77:15,20,23 | **circumstances** | 30:21 31:3,5 | 25:20 31:5,9 | 205:20 214:8 |
| 78:10 83:19 | 128:11,19 | 31:10,15,20,20 | 31:20,21 | **complaintant** |
| 85:15,18 88:20 | 219:8,9 | 31:21,22 43:22 | **comparison** | 208:5 |
| 88:23 89:16,23 | **civil** 5:2 16:9,15 | 45:4,6,9,11,19 | 187:22 188:4 | **complaints** 17:4 |
| 90:3 93:12 | **civilians** 17:1,19 | 48:15 79:21 | 210:7 | 83:10 96:15,16 |
| 94:4,11 95:1 | **claim** 129:14 | 108:11 109:17 | **compass** 218:13 | 103:8,14 |
| 95:14 97:16 | 218:11,12 | 114:20 130:7 | **compensated** | 154:22 155:6 |
| 99:6 101:14 | **claimed** 191:12 | 137:2 140:4 | 191:13 | 209:13,19,21 |
| 102:12 103:6 | **clarification** | 154:10 156:20 | **compensation** | **complete** 90:5,8 |
| 105:4,13 107:2 | 116:23 | 160:6 162:22 | 177:21 184:6 | **completed** 127:9 |
| 107:16 109:7 | **class** 15:1,6,12 | 163:6 171:8 | **competitive** | 129:9 130:15 |
| 110:5,8,20 | 160:13 | 181:17 185:8 | 196:18 197:21 | 132:2 |
| 111:5,10 113:4 | **classes** 26:13,16 | 186:1 187:12 | **compilation** | **completely** 67:6 |
| 113:7,12 | 27:8,14 | 189:13 198:10 | 138:11 140:17 | **compliments** |
| 115:12,17,20 | **classroom** | **colleges** 30:11 | **compile** 141:13 | 69:22 |
| 116:9 120:9 | 139:10 141:15 | 30:12 202:8,8 | **compiled** 140:18 | **computer** 28:18 |
| 121:4,13 132:4 | 143:20 149:13 | 202:14 | 140:20 | 80:7 |
| 132:9 133:14 | 155:4,12,14 | **college's** 91:12 | **complain** 95:3 | **computers** 28:7 |
| 133:17 135:9 | 163:21 164:1 | 128:4 129:10 | **complained** | 151:2 |
| 136:22 139:20 | 167:4,6 209:8 | 129:21 130:2 | 92:11 93:20 | **computer-aided** |
| 142:2,20 143:4 | 209:17,18 | 130:15 | 94:22 95:5,10 | 221:10 |
| 144:14 147:16 | **classrooms** | **come** 70:2 102:4 | 97:19 102:4 | **computing** 36:6 |
| 152:4 155:8 | 149:8,12 | 103:13 109:4 | 120:7 121:1 | **concede** 89:20 |
| 157:5 162:16 | **clerical** 171:3 | 195:1,10 197:9 | **complaint** 74:14 | **concentrated** |
| 162:23 163:18 | **client** 204:12 | 197:11,12 | 74:17 75:4,4 | 19:4 |
| 165:5 166:12 | **clients** 214:3 | **comes** 195:5 | 75:15,16,17 | **concern** 71:12 |
| 168:6,12 | **close** 21:22 | **coming** 28:8 | 76:4,5,6,15,20 | **concerning** |
| 170:15,23 | 136:16 207:22 | **COMMERCE** | 76:23 77:3,6 | 62:20 67:8,9 |
| 172:20 173:3,7 | **closed** 149:15,16 | 7:11 | 77:11 78:15 | 67:13 68:11 |
| 173:15,17 | **closest** 166:19 | **commission** | 82:10,13,17,22 | 101:12 104:12 |
| 175:22 185:2 | **closet** 149:13 | 30:11 160:20 | 83:1,13,15 | 106:14,17 |
| 187:4,20 188:4 | **clothes** 68:20 | **Commissioner** | 84:9,10,22 | 122:8 139:9 |
| 192:14 197:10 | 69:2 | 5:18 6:10 | 86:14,16,18,20 | 169:11 172:15 |
| 199:5 202:23 | **Code** 113:8 | **commit** 77:5 | 86:23 87:3,8 | 174:4 185:7 |
| 203:2 209:2 | **cognitive** 28:2 | 160:20,22 | 87:15,18 90:23 | 187:8,10 188:1 |
| 211:14,18,22 | **cold** 22:20 | **commits** 160:21 | 91:5,9,11,15 | 214:6 216:12 |
| 212:3,14 | **collected** 164:16 | **committed** | 91:16 92:16 | **conclusions** |
| 213:23 214:11 | 164:21 | 36:16 52:9 | 94:8 103:2 | 128:13 175:16 |
| 214:16,21 | **collects** 199:7 | **committee** | 104:4,13 | 184:2 218:21 |
| 215:2,6,9,21 | **college** 1:13,17 | 129:13,17 | 135:13 140:14 | 219:11 |
| 218:5 220:8,11 | 2:12,17,23 3:5 | 130:1 210:22 | 157:4 172:14 | **Concord** 12:4 |
| 220:23 | 4:9,14,20 | **committing** | 173:6 174:3,10 | **condition** 61:16 |

| | | | | |
|---|---|---|---|---|
| conditioning 17:22 | 168:23 | 132:8,12,15,19 | count 22:1 | D 8:1 |
| conduct 92:23 | contractor 201:9 | 133:21 155:7 | counted 22:3 | Dallum 14:11 |
| 96:21 97:1 | contractual | 190:8 197:18 | counts 209:12 | 17:15 |
| 102:22 104:2 | 190:23 | 214:7 215:10 | County 11:10,11 | dark 148:16 |
| 108:4 114:6 | contributions | 215:14 216:1 | 11:12 221:4 | data 141:10 |
| 115:4 118:2 | 189:12 | correct 28:15 | couple 143:8 | 154:7,8,9,10 |
| 128:4 160:19 | control 39:20 | 32:10 47:14 | 193:5 | 154:15,18 |
| 161:9 | controlled | 49:19 52:5 | course 23:23 | 155:22 164:16 |
| conducted 93:3 | 160:15 | 56:9,17 59:15 | 24:3,19 26:6 | 164:21 188:4 |
| 104:7 114:12 | conversation | 65:23 68:1 | 26:20 27:9 | 192:3 199:8,9 |
| 115:10 118:6 | 60:1,10,11 | 72:9,15 73:17 | 32:3,8 118:14 | 199:12,17,19 |
| 128:6 160:17 | 62:17 63:7,20 | 74:18 84:18 | courses 24:15,23 | 210:15 213:16 |
| conducting | 63:22,23 64:2 | 105:9 119:7,17 | court 1:1 2:1 4:1 | date 47:14 71:9 |
| 104:9 162:19 | 68:8 | 124:6,9,19 | 5:9,10 10:5,14 | 108:14 135:15 |
| conference | conversations | 125:6 131:16 | 216:10 | 137:3,5 151:9 |
| 81:10 | 59:21 62:23 | 131:19 137:15 | cover 99:22 | 169:15 173:14 |
| conferences | 104:11,14,15 | 137:16 142:7 | craft 210:21 | 173:21 174:6 |
| 108:5 | 104:19 | 144:17 147:21 | create 195:21 | 190:13 |
| confines 163:5 | convinced 86:13 | 166:22 177:13 | created 18:3 | dated 72:8 |
| confused 21:10 | 86:15 164:4 | 179:15 183:19 | credit 27:1,1 | 110:23 135:6 |
| 39:18 218:20 | coordinator | 212:20 221:11 | 69:19 | 152:19 171:9 |
| confusing 87:7 | 2:20 29:17 | corrected | credited 140:14 | 172:15 173:3 |
| 87:10 | 30:6 34:23 | 212:13,13,19 | credits 25:18 | dates 15:18 |
| connecting | 35:2 40:8,14 | correction 10:17 | crew 167:14 | 31:11 |
| 149:1 | 57:2,5,9 91:13 | Corrections | criminal 112:17 | daughter 201:14 |
| consider 18:15 | 127:7,19 | 113:23 161:18 | 112:21 113:2 | 201:15 |
| 113:18 | 128:12 129:22 | correctly 114:21 | 113:14 | day 5:6 69:9 |
| considered | 168:22 178:19 | correspondence | current 44:16 | 96:16 119:12 |
| 74:13 | 179:1 194:15 | 19:22 49:4 | 171:22 | 135:19 136:17 |
| consists 148:22 | 196:3 219:9,17 | 50:16 111:16 | curriculum | 164:3 207:22 |
| contacted 214:2 | copied 78:4 | costs 154:16 | 13:23 | days 29:9,15 |
| 214:5 | copies 49:23 | counsel 5:15 6:1 | custodian 39:15 | 82:18 91:10,18 |
| contacting | 50:5 55:7 | 6:3 139:9 | 69:16 | 127:12 128:2 |
| 212:16 | 77:22 132:5,10 | 141:14 154:20 | custody 39:23 | 128:14 129:23 |
| contacts 114:18 | copy 49:18 65:3 | 164:17 210:13 | 114:5 | 136:21 204:4 |
| containing | 65:7 70:8 | 221:15 | customers | 219:12 |
| 146:22 | 77:16,19 99:1 | counseling | 149:19 | dead 64:17 |
| contend 124:18 | 99:16,18 100:1 | 24:18 96:19,20 | cut 94:12 | deadline 206:18 |
| content 60:11 | 100:3 109:5,13 | 97:3 161:15 | CV:2:06-CV-... | deadlines |
| continued 19:3 | 110:6,9,11 | 164:22 210:4,6 | 1:9 | 204:19 |
| continuous | 111:22 129:11 | counselor | C-1 184:14 | deal 60:15 |
| 26:12,17 | 130:21 131:4 | 164:12 | C-3 184:17 | dealing 140:8 |
| contract 29:16 | 131:21,23 | counselors 210:1 | —————— | 162:12 |
| | | | D | dealt 60:15 |

# FREEDOM COURT REPORTING

Page 227

**dean** 1:15 2:14
3:3 4:17 40:5
40:20,23 42:1
42:7,9,23 45:4
45:5,8,11
46:12 49:3,5,6
49:11,13 56:10
62:20 73:16,20
81:4,4 112:7
112:13 114:15
114:16 131:18
133:11 138:5
154:1 170:3,12
170:14,16,19
170:20 171:5
171:20 179:6,7
179:9,10
180:20 181:13
181:17,17,21
182:6,11,12,20
182:21,22,23
183:4,20,22
184:5 185:12
185:14,23,23
186:8,8,9
201:23
**Deane** 196:9
**Deanne** 73:22
**deans** 49:8,17
182:2,21
**Deatsville** 11:8
**Debardelaben**
5:5,19 7:4 8:4
10:4,7 35:6
37:10,15 43:14
60:8 65:6 67:1
73:9 77:18,21
78:3,7,8 83:21
85:1,21 89:2
89:21 90:1,6
99:9 105:6
109:9 110:7,10
110:21 111:8
116:11 132:7

132:11 133:16
133:19 135:11
137:1 142:3,22
144:17 166:14
168:8 172:23
173:5,16,19
176:1 185:5
188:6 197:12
199:7 202:22
203:3 204:11
207:11 209:4
211:8,11,16,20
212:1,5,12,15
214:4,12,18,23
215:4,8,15,23
220:22
**Debardelaben's**
213:22
**deceased** 177:2
177:3
**December** 17:16
**decision** 129:16
201:18
**decisions** 154:17
**DEFENDANT**
7:8
**defendants** 1:18
3:6 4:21
212:17,23
**Defendant's**
72:2 80:15
90:19
**definition**
116:22,22
**degree** 23:10,12
23:14 24:17
25:12 26:8
32:1,7,11 61:9
61:10 71:12
96:18 180:10
180:11 205:15
**degrees** 25:19
31:22,23
**Delaware** 15:5

22:10,15,18
**delighted** 66:20
**delivered** 134:9
**delivering** 5:4
134:13
**demeaning**
118:22
**demonstrate**
61:9 94:20
95:16,21
120:18 123:23
124:5,16 160:6
204:8
**department**
22:7 109:3
112:2 113:23
129:18 131:18
133:12 161:17
201:23 204:20
**depend** 161:11
163:12
**deposition** 4:23
5:15 6:6,10
10:10,10 45:22
52:11,15,19
57:14 61:4
65:1 72:3
74:10 80:17
90:20 92:20
98:7 138:4,5
142:12 162:10
170:3 212:7
215:7 221:7
**depositions**
107:3
**described** 77:2
**description**
180:19 194:16
196:4
**designate** 91:14
127:22
**designated**
127:22
**designation**

171:19
**designee** 114:16
129:8 130:12
**desk** 16:7,8
108:23
**detailing** 91:14
192:9
**determination**
63:7 124:11,14
124:23 155:21
**determine** 47:8
114:17 139:6
141:11 155:19
179:20 220:19
**determined**
82:13 91:5
176:10
**determines**
59:23 60:9
**developed** 54:18
180:9
**development**
158:9 159:1
**dictate** 67:2
79:10 207:1
**dictated** 65:14
70:13,18 79:12
79:13 89:22
90:2,5
**difference** 28:1
31:19 75:20
76:18 120:22
121:2,7,8,9,17
185:4
**differences**
128:19
**different** 38:7,8
43:9 50:13
75:12 78:5
115:14 124:19
136:9 158:5
**differently**
128:22 129:3
**dig** 27:6

**digital** 53:2,3,19
**dimensions**
144:16
**Dinner** 193:4
**diploma** 23:9
25:13,16,17
**direct** 125:19,21
151:18 152:1
208:23 220:2
**directed** 154:20
155:2 182:18
182:19
**directing** 151:1
**direction** 178:21
**directly** 114:6
137:22 162:2
179:1
**director** 13:22
33:12,16,20
34:2,11,16,19
34:21 35:11,14
35:15,16,19
36:4,10,20
40:2,22 41:2,5
41:14,16,18,21
42:12,14 57:7
57:8,11 114:13
114:22 182:7
183:15 194:19
**director's** 109:1
**disagree** 106:15
**disciplinaries**
141:17,18
**disciplinary**
160:11
**discipline**
138:12 139:7
209:14
**discomforting**
118:23
**discourse** 164:4
**discovered**
164:15,20
**discriminated**

## FREEDOM COURT REPORTING

126:14
discrimination 129:15
discuss 10:21 100:2 119:23 120:3
discussed 101:20 207:11
discussing 68:7 81:20,21
discussion 82:11 91:3 100:5
dismissal 107:1 107:7 160:13
dispatched 16:9
disprove 28:9
disproven 218:16
dispute 125:15 126:11,17 127:6 128:8 153:15 218:2 218:12 219:5
disputed 125:2
dissertation 27:5,11,17,21 27:23
dissertations 29:8
distance 13:20 19:22
distributions 209:12
DISTRICT 1:1 1:2 2:1,2 4:1,2
divested 40:13
division 1:3 2:3 4:3 13:19 19:9 19:10,17 131:18 133:12
DOC 112:19 114:18 140:2,5 162:2 166:18 166:20 167:2

167:20
doctorate 26:7 26:19,22
document 43:23 44:5,15 74:3 74:11 90:8 92:6,8 109:14 109:23 110:2 110:14 111:11 116:5,13 122:4 122:6 123:11 123:13 133:6 136:5 138:10 169:10 170:7 172:8 180:23 207:15
documentation 169:13 198:2
documents 136:10
DOC's 113:10
doing 61:17 92:13 93:11,22 94:3,10,15,17 94:19 95:7,17 97:21 118:18 118:19 119:16 120:15 123:20 126:6 155:19 159:6 161:9 164:12 176:7 186:6 217:8,20 218:2
dollars 177:13 177:23
Donna 50:23
door 38:12
doors 39:4
doorway 146:1
double 165:15 165:16,19,21 166:2
doubt 213:10
Douglas 1:9 2:8

4:10 93:18
Dover 15:4 22:17
Dr 10:9 29:21 43:18 45:2,22 46:3 51:3 54:5 54:11 63:4 74:18 86:19 88:14 93:17 112:3 114:10 123:2 138:5 146:17 152:18 195:19 196:6 198:22 201:21 201:21 216:1
Draper 166:6,7
dress 67:19
Drew 212:20
drugs 161:22
due 114:6
duly 10:2
duties 13:12,13 16:5 30:7,8 33:13,22 34:3 34:4,9,16 35:10,18 40:11 40:13 42:2,7 42:11,12,13 57:6 69:11,14 69:15 155:3 184:7,9 185:13 186:12,16,18 194:17
duty 13:3,5 20:13,14,15 21:16 34:8

_____

## E

E 7:1,1 8:1,9 184:12 221:1,1
earlier 90:4 203:3
early 33:10 57:21 71:15

earned 15:5
east 142:21,22
eating 98:11,14 98:19
ed 55:8 182:8,9
education 22:8 26:7,8 28:3,5,9 31:13 129:19 165:9,12,20 180:9 194:3
educational 22:5 23:15 24:7
Edwards 56:22 64:3 73:5,16 73:21 104:23 182:7
EEOC 186:3
effective 5:3 28:19 184:22 185:2
effectiveness 29:19 30:5,13 34:23 35:2 40:8,14
eight 21:5
eighth 118:11
either 53:8 60:18 113:7 120:2 125:9 158:15 209:20 218:14
elective 19:5
eleven 177:22
eliminate 106:2 162:3
Elmore 11:10
elses 39:13
embarrassing 118:23
emergencies 16:10
emergency 16:7 113:15,18 114:11

employed 138:20 188:11 188:13 210:22
employee 51:13 51:15 75:3,16 75:21,23 76:5 76:23 82:12 83:12,14 84:11 84:16 91:4,20 99:2 122:9 140:2,3 189:7 189:8 190:16 190:17 191:1,6
employees 76:4 82:10 126:21
employment 15:22 32:21 43:7 61:17 188:15 190:8
ends 218:13
energy 86:17
engages 209:16
engineering 16:9,15
enrolled 23:17 160:5
enrollment 160:13
ensure 35:21 37:23 39:6 109:22 179:11
ensuring 37:3 39:3
entire 52:15
entirely 63:3 96:1
entitled 205:23 206:3
envelope 134:14 134:16,19 203:9
environment 61:14 162:20
equal 144:6,8

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

equally 149:6
equipment
149:12,18
150:19
equivalency
22:7
Erica 79:22
134:20
errors 44:14
escape 161:20
escaping 38:16
Eschashere
17:10
essence 123:19
151:23 156:22
Essentially
195:23
establish 97:7
97:11 154:11
154:15
et 161:23
ethical 212:18
evaluate 35:20
evaluation 18:2
event 97:7,12
events 70:23
everybody 210:8
evidence 6:6
125:10 126:13
exact 169:19
exactly 56:2
97:9 148:11
168:9
examination 8:3
10:4 203:2,6
215:23
examine 139:5
examiner
202:18
examiners 202:2
examiner's
194:13
example 207:7
exams 28:15

exception
106:21 189:14
190:1,3
exceptions
189:15,18
190:14
excuse 36:21
65:16 72:8
81:23 93:8,13
94:7 102:13
120:12 130:10
166:9 174:10
177:16 198:23
219:21
exercise 17:11
18:1
exercises 18:3
Exeter 11:18,19
exhibit 8:11,12
8:13,14,15,16
8:17,18,19,20
8:21,22,23 9:1
9:2,3,4,5,6,7,8
9:9,10,11,12
9:13,14,15,16
9:17,18 45:1
45:23 51:7,9
52:18,20 57:12
57:13 58:6
61:3 64:19,23
65:9,10 70:12
71:14,20 72:1
72:3,12 74:5,6
75:6 76:22
77:9 78:1,13
78:17,23 79:1
79:5,8,17
80:11,12,15
82:4,6 83:5
85:5,6,10,20
85:22,23 86:3
86:7 87:14
88:7 89:1,2
90:19,20 92:1

92:2,19 93:19
98:3 99:7,12
100:21 101:2
102:17,21
107:2,12 111:2
117:7,20 118:1
121:22,23
123:2,6,10
126:20 130:5,7
131:16 133:1,2
134:21 135:2
138:3,6 146:10
146:15 151:5,6
153:3,18,22
155:9 156:1,5
158:13,14
159:10,14,18
164:14 169:3,7
170:2,3,4
172:3,4,21
173:16 174:14
174:16,20
175:17,19
176:11 180:13
180:14,15
207:17 209:3,5
218:1
exhibits 5:7
106:21
exists 44:15
expect 213:3
214:9
expected 160:6
expenditure
152:15
expenditures
192:16
expense 152:15
experience
140:7
Explain 61:11
explains 159:5
exposure 112:23
113:2

expressed 87:22
expressly 208:8
extension 122:7
122:11,17
123:3 203:20
extensive 140:7
external 198:5
eyes 144:9
eyesight 148:5
167:2
e-mail 80:6
e-mailed 80:9
E-1 179:12
E-2 14:23

—————
**F**
F 221:1
facilities 35:21
37:3,23 39:19
facility 39:10,11
143:20
fact 116:1 126:3
126:4,11 147:2
153:2 155:5
facts 54:19,23
97:7,11 102:14
125:15 126:8
factual 127:7
128:5,6,11,13
128:19 218:4
219:8,8,10
faculty 35:20
36:23 37:1,2,8
37:11,12,17
158:8,23
failing 210:13
fair 117:6
204:23 217:7
fall 42:20 161:23
false 125:11,12
familiar 52:7,19
53:4 169:8
far 156:14 180:7
fault 193:16

February 53:9
65:22 66:1,2
66:11 70:20
71:16 72:8
73:12 77:6
78:20 83:18
84:1 85:16
87:23 102:5
103:10 105:14
106:10
Federal 10:9,10
feedback 28:1
28:10,18,19
feeling 28:17
feet 144:1
146:22,23
147:5,9 148:1
165:17
fellow 201:4
felt 68:10 208:20
female 68:4
176:16 182:11
183:2
fence 38:15
145:8,15,19,21
145:23 146:3
151:19 152:16
152:17 156:14
165:10
fences 148:15,19
fifteen 128:2
129:23 136:21
fifteenth 136:17
207:22
fifty-nine 144:9
fifty-seven
177:22
fifty-three
146:21
fighting 161:23
figure 121:20
file 58:17 64:18
72:17 75:1
82:22 86:20,23

# FREEDOM COURT REPORTING

Page 230

87:8 109:1
127:15 174:11
181:9 200:13
205:3 206:8,15
207:14 208:6
**filed** 5:10 72:15
72:23 82:19,21
123:15,17
129:20 136:16
186:2 207:2,7
207:21 208:11
208:21
**files** 49:21 59:10
59:11,12,16,19
**filing** 6:9 50:13
72:21 86:14,17
91:11 174:9
204:3 206:12
208:15,18
210:5 213:3
**fill** 183:14
**filled** 131:17
148:14,14
183:7,9 192:5
194:20 196:17
**filling** 130:22
131:1
**film** 167:22
168:6,8
**films** 167:21
**final** 56:4
**find** 27:7 29:4
36:1 38:9
41:18 47:21
63:5 137:9
156:16 157:6
177:10 185:20
186:4,21
206:10 213:1
214:14
**finding** 202:3
**findings** 56:5,7
123:14 127:3
128:13 136:8

175:16 184:1
202:6 203:5
204:9 206:8,16
206:20 207:2
218:21 219:11
219:15
**fine** 188:5
**finish** 24:19 27:9
94:12 197:16
**finished** 203:1
208:7
**finishing** 150:18
**firm** 62:14
**first** 10:2 12:6
12:14 15:12
35:4 44:4 74:2
77:1 80:17,22
82:10 84:6
91:16 110:18
127:17 142:16
155:7,12 160:2
163:22 173:1
179:23 184:2
197:16 209:16
218:22
**fiscal** 179:6
181:21 193:10
201:23
**five** 15:13 65:10
141:22 142:5
146:23 166:4
168:10 177:22
199:4,15
**fixed** 38:12,13
38:14,16
**fixing** 83:21
**floor** 111:6
**flow** 156:12
**flower** 69:20
**fly** 17:5,9 151:19
**folks** 215:18
**follow** 37:16
72:21 107:12
164:7

**followed** 87:21
175:12 205:15
**following** 128:2
129:23 136:17
155:17 160:22
164:10 207:23
218:22
**follows** 10:3
**football** 191:8
**footings** 150:23
**force** 12:8,9,12
12:17,22 13:7
13:19,21,23
14:12,14,15
15:2,5,9,18
16:1,2,19,23
17:2,16,20
18:11,12 19:12
20:1,4 21:12
24:1,2,13 25:9
25:20 26:1
29:13,15 52:5
**foregoing** 221:7
221:11
**forfeited** 136:20
208:2
**forget** 90:11
**forgive** 89:17
95:23
**forgot** 36:3
**form** 6:2 41:7
47:10 48:3
50:9 58:22
59:14 60:4
67:16 70:11
71:4 74:15,16
76:11 78:5,16
82:20,21 84:9
86:18,20 88:21
92:17 93:12
95:2 97:17
98:1,4 101:14
102:12 115:13
120:9 121:14

128:4 129:10
129:21 130:3,8
130:16,18
131:14,15
133:7 135:4
136:6 147:16
152:5 157:5
162:16,23
163:1,19 165:5
166:13 172:19
175:2 190:9
194:17 197:11
216:9 220:7,20
**formal** 96:17
209:19 210:11
210:11
**format** 53:3
**former** 140:2,3
**forms** 83:8,10
131:13
**forth** 151:2
159:10
**forty** 176:18
**forty-five** 29:15
**forty-three**
146:22
**forward** 138:21
**found** 125:15
186:5
**four** 16:6 17:2
144:23 145:1,3
161:12 189:6
207:19
**fourth** 84:1,5,6
**four-year** 32:4,8
**Francisco** 23:20
**free** 102:11
**frequency**
209:12
**front** 47:14 81:4
137:8
**fuels** 12:19 15:3
15:11,14 16:3
16:22 17:23

**full-time** 19:3
**function** 160:16
**functions** 41:12
46:19 171:6
186:6
**funding** 195:23
**funds** 202:4,4,9
202:18
**further** 5:22 6:8
116:21 126:16
221:14
**future** 114:19

_____
G
_____

**gain** 54:18,23
**Galena** 16:13
**gap** 146:2
**gate** 23:16,19
24:4 25:1
146:6 151:12
151:18,22
152:2,9 156:13
**gates** 146:3
151:13 152:16
**gathered** 187:23
**GED** 11:21,23
**gender** 126:15
**general** 67:16
**generally** 31:23
179:18
**generated** 28:18
180:23
**gentleman** 34:1
**George** 55:8
**German** 17:1,19
**Germany** 14:12
15:10 16:20
17:6 24:14
**getting** 37:1,2,11
44:18 191:20
192:2,4,5
202:15 209:20
217:9,11,12,18
**GIDIERE** 7:10

# FREEDOM COURT REPORTING

give 83:14 99:1 99:22 122:10 122:16 132:20 132:22 168:9 187:3 205:22 211:14,18 212:4 214:22 215:10
given 158:18 189:19,21,22 221:12
GIVENS 1:5
gives 173:1
glad 29:7 192:14 212:3
go 11:17 12:11 24:8 26:2,4,9 32:15,17,19 47:4,6 48:20 58:17 68:17 94:11 127:14 137:22 145:20 151:22 152:8 161:5,12 178:23 179:4 191:6 194:5,6 198:9 199:18 212:23 214:13 217:23
goes 179:5,5,9 195:7
going 12:5 27:18 36:13 44:11 45:21 51:7 63:15 64:22 66:14,15,21 71:11,23 74:4 78:23 92:1 101:8,10 105:11 110:14 110:23 112:5 115:3 117:23 121:21 133:1 138:2 145:14

145:19 151:4,5 152:14 170:1 190:21 198:10 204:11 213:6,7 216:21 218:5,9
Golden 23:16,19 24:4,23
good 19:2 22:4 43:14 70:1 160:6 205:6,8 205:10 217:12 217:18
gotcha's 210:17
gotten 40:3
grade 108:4 169:14
grading 108:4
graduate 11:14 11:15
graduated 18:21 22:13 23:3,4
graduation 154:13
grafts 176:8
grant 122:17
granted 190:3
great 69:19,23 70:4,5
greater 180:7
Greene 1:6 49:6 81:5,23 179:7 179:9 181:20 183:22 196:9 201:22
Greene's 179:10 200:6
greenhouses 143:20,21,22 144:2 147:4 167:8,9
Greg 34:1
Gregg 29:21 33:2
Gregg's 51:4

grievance 51:13 51:16 57:1,5,9 59:3 72:15,17 72:21,23 74:15 74:16 75:2,17 75:21,23 76:6 76:12,15,21,21 77:4 78:11,16 78:19 80:18 82:5,20,21 83:8,9 84:15 84:16 86:18 91:12 92:17 98:1,3 100:16 115:5,19 117:12,15 122:8,10,15 123:17 126:21 127:13,19 128:3,4,12,15 129:10,14,21 129:22 130:2,7 130:16,18 131:22 133:7 135:4,12 136:6 172:9,10,12,16 174:10 175:1,7 175:12 177:18 204:9,15,22 206:6 207:8,17 208:5 219:9,17 219:18 220:7 220:19
grievances 83:6 123:15
grievant 128:9 129:10,15 130:16 131:3 136:18 137:7 207:13 219:6
grievant's 129:23 136:19 207:23 208:1
Griswold 104:8

118:9 127:23 139:17,18 140:13,21,22 140:23 141:3 195:15,16
grounds 6:4 69:12,13,15
group 143:14
grow 147:17 148:10
grows 147:12
guarantee 71:18
guess 14:5 112:23
guided 28:12
guideline 108:21 207:18
guidelines 108:19
guilty 61:18
Gunter 13:7 14:3,4,17 18:11 19:12 20:4,7
guys 55:9 132:1
G-R-E-G-G 29:22

## H

H 8:9 118:14 187:13
habit 54:5
Hahn 15:9
half 19:2
Hampshire 11:19 12:3 15:21 20:21 22:8,14 23:5 23:11 24:2
hand 109:8 131:7 216:23
handed 99:20,21
handle 157:16 209:7

handles 171:17
handling 71:7 107:4,18 108:11 109:17 155:6 156:20 157:9 209:22
hands 137:18
handwriting 116:10,12,15
Handwritten 65:10
happen 207:5
happened 54:19 55:1 71:3 124:23 125:3
happening 168:3
happens 129:6 168:2 206:7 207:1,13 208:5
happy 58:1,2 115:23
harassment 61:6 61:10,12,22 62:4,10
hard 86:17 165:23
Harrell 98:16
hats 183:16
hazy 23:7
head 199:6
hear 30:4 203:21 204:1
heard 38:7 63:17 98:10 203:19
hearing 114:6 114:12 115:8 115:13,15 116:2 127:2,8 128:20,21 129:12,17 218:18,22 219:3,15

221:13
**heating** 17:21
**heavens** 206:2
**held** 186:7
**help** 175:4
208:14
**Hendrix** 2:5
7:15 54:21
55:2 56:12
57:15,19 61:2
61:22 62:6,8
62:19,21 63:2
64:3 67:9,10
68:6 69:1,6,7,7
70:9 71:2,6
72:5,15 73:1,2
73:4,12,15,19
73:20 74:21
75:1 77:5
78:18 81:16
82:1,7,19
85:10 86:4
87:22 88:18
90:20,22 92:11
93:8,10,20
94:4,5,20 95:5
95:16,21 97:18
98:12,13 99:3
99:15 101:3,21
102:4 103:4
104:22 115:15
118:3,8,15,19
118:23 119:4
119:14,21
120:1,7,13,18
122:8 123:16
123:18,22
124:15 125:3,6
125:16 131:9
134:10,13
137:6 138:20
139:3,4,8
140:15 141:15
141:17 142:2,4

146:6,16
147:11 151:9
152:19 153:13
154:2 156:2,8
164:17,21
166:10 203:4
205:22 208:11
209:7 210:12
210:18 216:9
217:8 218:3,17
220:2,4
**Hendrix's** 54:20
55:1 61:13
72:3 74:9 75:9
80:16 103:2,8
104:3,13 115:5
117:8 118:1
131:22 140:11
141:8 145:17
148:8
**HERNDON**
7:10
**hide** 149:6,10,19
**high** 11:14,15,17
11:18 22:6
186:12
**higher** 32:15,18
32:19 186:16
**highest** 13:9
**Highway** 11:8
**HINTON** 7:10
**hire** 196:3,6
**hired** 29:18,20
30:3 32:20
199:3,14
**hiring** 36:23
37:8,12
**history** 29:12
**his/her** 75:5
**hit** 168:10
**hold** 31:10
204:20
**home** 24:12
**hooked** 167:10

167:11
**horse** 64:17
**horse's** 112:6
**horticulture**
69:8 70:3
143:3,14
145:18 147:17
150:7 157:17
**hostages** 17:13
**hostile** 61:14
**hours** 191:14
**house** 190:21
**Huffstutler**
49:11 112:4
146:17 201:21
**Huh-uh** 185:5
**hundred** 17:19
146:23 147:8
177:22 178:13
**hurt** 205:7
**husband** 58:1,2
67:20 71:10
89:5,14
**hypothesis**
28:10

_____
**I**
**ID** 190:7,10
**idea** 121:18
135:21 144:3
193:9
**identification**
46:1 51:10
64:20 71:21
74:7 79:2
80:13 86:1
92:3 99:13
100:22 102:18
111:3 117:21
122:1 123:7
133:3 134:22
138:7 146:11
151:7 153:19
156:6 159:15

169:4 170:5
172:5 174:17
175:20 180:16
**identify** 113:1
123:11 156:17
157:7,20,22
159:17 190:18
**ignore** 162:7
163:17
**illegal** 129:15
202:9
**illegally** 202:4
**imagine** 27:20
**immediate** 75:5
75:10
**immediately**
18:22 64:7,8
82:14 91:6
209:22
**immense** 148:13
**impediments**
208:17
**implied** 91:10
**importance**
162:11 163:3
**important** 63:8
162:13,18
163:4,7
**impressed**
162:10
**impressing**
163:2
**improperly**
202:19
**improve** 28:20
210:15 213:17
**inactive** 20:23
21:6,13
**inappropriate**
158:20
**incarcerated**
162:15
**incident** 54:19
54:23 61:21

62:21 67:12,14
83:2 101:13
102:10,14
114:7 118:14
119:23 120:3
**include** 129:11
219:16
**includes** 42:10
160:19
**including** 144:7
**incomplete**
131:10
**incorrect** 28:16
43:5 45:12
**increased**
177:21
**indecent** 112:22
113:2
**Indiana** 24:12
**indicated** 204:2
**indicating**
166:23
**individual** 60:2
191:1
**Individually**
1:10,14 2:9,13
2:19 3:2 4:11
4:16
**individuals**
28:11 59:20
**inform** 37:18
101:7 102:1,3
104:1
**information**
44:19 63:6,14
118:13,22
185:6,11
187:23 200:3
213:15
**informing** 54:7
**infraction**
156:18 157:8
**Ingram** 1:12,16
2:11,16,22 3:4

# FREEDOM COURT REPORTING

4:8,13,19
29:17 30:9,20
31:2 32:7,21
43:7,22 48:14
59:12 61:8
69:1,5,12
84:17 86:19
108:10 109:5
109:16,21
114:19 138:15
140:3 142:14
156:19 160:5
162:21 163:6
165:4 171:8
182:4 188:11
188:23 191:1,5
191:14 199:3
200:2,4 202:3
212:9 214:6,13
214:15,17,20
215:13,18
216:3,4,7
**inhalant** 161:22
**initial** 30:16
43:7,11 75:14
76:2,3,20 82:9
172:14 173:5
174:3 179:18
179:19
**initiate** 82:15
91:7
**initiated** 78:12
78:12,15 87:20
**inmate** 123:20
**inmates** 112:19
140:8 162:12
162:14,18
**inordinately**
139:6
**inside** 148:15,19
167:3
**insignificant**
29:2
**install** 156:13

**installed** 150:5
150:14
**installing**
150:21
**instance** 75:18
**instituted**
210:10,11
**instituting**
209:19
**institution** 3:4
23:15 24:8
25:7,8 26:1
62:13
**institutional**
29:18 30:5,12
30:13 34:22
35:2 40:7,13
182:12
**instruct** 19:1
**instructed**
161:13
**instructing** 19:4
**instruction**
19:23 40:6,20
41:1 42:7,9,23
48:18 186:9
205:10
**Instruction's**
42:2
**instructor** 14:13
18:16,19,20,23
19:7 148:6
155:4,15,17
157:15,15
160:2 161:2,8
161:10 162:5,6
163:10,16
164:8,10
181:13 188:12
205:5,9 211:3
**instructors**
35:23 38:20
110:2 138:12
138:14,17,19

144:19 158:3
158:19 165:4,9
165:13,21
194:1 210:18
217:14
**instructor's**
108:23 155:12
163:22
**intent** 117:4
**interchangeably**
76:16
**interest** 68:11
69:4
**interested**
221:17
**interim** 197:17
198:14
**intermittently**
26:15
**internally**
111:17
**interpret** 66:17
66:18,22
123:21 129:2
**interpretation**
124:2,5 125:17
136:23
**interrogation**
96:12
**interview** 57:18
92:21,23 93:3
93:6 94:1 97:1
102:22 104:7
104:10 118:2,2
119:3,10,14
120:7
**interviewed**
117:16,18
119:4,9
**interviews** 57:15
183:22
**introduced**
117:2
**investigate**

101:18 102:9
114:14 115:2
175:7
**investigating**
101:9,11
204:17
**investigation**
96:6,9,21 97:1
97:6 104:3
115:3,4,10
117:12,15
123:15 124:22
127:2,18 128:5
128:6 158:22
179:20 198:12
219:14
**involved** 73:15
150:22
**involves** 129:14
**involving** 62:21
**Iran** 17:13
**isolated** 165:3,7
165:8,11 166:8
166:10,13
**issue** 25:15,16
101:20 102:9
**issued** 51:16,19
51:21,22
**ISTC** 160:14,15
160:18
**item** 75:8 76:21
219:14

---
**J**

**J** 4:5,9 93:17
**jail** 191:19
**James** 1:13 2:12
3:1 4:15,23
5:16 10:1 11:6
84:23 102:22
116:6 118:8
133:22 135:14
**January** 20:9,10
47:20 48:1

182:10 190:6
**jeopardize**
206:13
**JF** 156:19
**JFI** 156:14
157:9 167:18
**Jim** 5:4,19 7:4
77:15 89:17
99:8 132:5
175:23 209:3
211:15
**job** 12:6 30:7,8
33:3 34:7 35:1
43:3,6 69:23
115:11 151:3
177:8 180:18
180:19 182:16
183:4,7,20,21
194:16 196:16
196:22 201:5
204:22 205:6
**jobs** 114:22
196:17
**Johnson** 198:16
**join** 12:9
**joined** 145:2
**Jones** 121:11,15
**Julie** 1:5 50:4,15
55:5,6
**July** 15:7 16:18
18:17 20:8
22:9 169:17
**June** 5:7,20 22:8
151:11 152:9
**junior** 30:21
**J.F** 4:8,13,19
29:16 30:8,19
31:2 32:7,21
43:7,21 48:14
59:12 69:12
84:16 86:19
108:10 109:5
109:16,21
114:19 138:15

# FREEDOM COURT REPORTING

142:14 160:5
162:21 163:6
165:4 171:7
182:4 191:14
199:3 200:2,4
202:3 214:6,13
214:15,17,20
215:13 216:2,4
216:7
**J.F.I** 114:3
**J.L** 139:17,17
140:22 141:2
195:16

_____
## K
**Kaye** 182:15
**Keahey** 144:22
145:6
**Keahey's** 145:9
145:13
**keep** 40:7 49:21
59:11,15,19
60:1,10 69:11
131:21 163:4,9
167:22 192:6
192:15
**keepers** 69:15
**keeping** 162:11
163:3
**keeps** 49:22
200:13
**kept** 50:6 108:21
108:23 109:1,2
162:14,19
163:16 167:21
**key** 39:8,16,21
39:22 185:17
**keys** 39:5,20,23
**kill** 121:10
**kin** 221:15
**kind** 23:10
25:11 49:4
60:7 69:3
118:12 176:7

190:23 191:23
197:5 200:18
211:1 213:13
**kinds** 202:6
**knew** 88:2 98:13
116:14 152:13
200:17
**know** 26:18 28:5
30:19 34:1
43:19 44:15
47:16 49:22
50:1,6,10,15
52:3 53:6,12
57:10 63:10
64:12,14 65:12
65:15 66:6
68:4,21 71:9
72:11 76:9
77:22 78:3,8
85:7 88:14
98:14,18,22
101:15 111:14
111:15 112:20
113:6,9,13
116:7,16 117:3
122:18 125:3
126:23 132:21
134:10,11
135:19 136:12
136:13 137:5
137:14 138:9
139:22 141:1,2
141:9 147:6,7
156:2 158:3
159:12 165:18
168:15,23
169:19 171:21
172:13,20
176:19 177:7
177:10,14,23
178:2 180:3
185:21 187:17
187:18 188:7
188:18,20,20

190:4,15,18
191:16 192:17
192:19,19,20
193:6,20,22
194:8,19
196:11 197:6
197:22 198:22
198:23 200:16
201:20 202:13
203:9,13,15,16
205:4,4 206:22
206:22,23
208:11,13,21
209:2 215:5
216:13,14
220:1,3,6,16
**knowing** 103:21
105:16 137:13
194:9
**knowledge**
102:10,14
120:23 183:14
214:13 220:18
**known** 191:7
210:19

_____
## L
**L** 5:12
**Lackland** 12:12
12:13,15
**lady's** 90:11
**lapsed** 206:18
**large** 139:7
146:2 147:20
149:1 154:22
**late** 18:9 27:15
31:12 33:10
193:14 204:3,7
204:8 206:12
**lately** 197:8
**lawsuit** 214:6
**lawyer** 10:21
**lawyers** 29:7
128:22

**lay** 28:4
**leadership** 13:18
19:9
**leading** 6:2
204:12
**learned** 15:2
126:2 128:22
**learning** 13:21
19:22 28:13
**leave** 88:18,23
89:9 103:5,12
215:9 216:9
**leaving** 154:12
**led** 17:5
**left** 15:6,17 19:3
89:9 177:8
180:6 198:16
**legend** 138:23
**legitimate** 197:2
**Leo** 188:7,9,10
191:16
**Leonard** 188:19
190:15 191:12
**letter** 49:2 75:8
80:22 82:23
83:4,18 84:21
85:17 86:12
87:13,14 95:4
99:22 101:3
136:10,11
146:16 151:10
151:15,16
152:9 153:7
156:2,3 169:22
170:8 171:22
178:6,7,8,14
197:18 203:22
204:2 211:7,12
211:12,23
212:2 213:2,6
214:5,7,14,20
214:22 215:11
215:14 216:2,8
216:16,22

217:5
**letterhead** 79:21
80:1,4
**letters** 49:23
50:5 110:15,16
200:11
**let's** 13:14 42:19
44:23 55:5
64:17 85:1
92:15 106:18
116:3,4 126:16
158:20 189:6
**level** 15:13 29:3
77:1
**library** 150:1,11
**light** 164:3
**Likewise** 159:2
**limitation** 27:3
**limited** 161:19
**line** 68:19 84:1,5
84:6 111:21
190:19
**lines** 205:15
**liquid** 12:19
15:3,10,14
16:3,22 17:22
**list** 161:6
**listen** 10:16
**listened** 81:21
**little** 15:18 23:7
70:22 87:7
142:16 143:1
196:14 205:18
206:19
**live** 188:23
189:3 190:5,11
194:14 196:3
**lived** 204:21
**loaded** 149:4
**located** 52:23
166:3
**location** 133:18
165:3
**lock** 38:2,3,12

# FREEDOM COURT REPORTING

locked 39:4
151:13
locks 39:3 149:2
lone 183:18
long 12:21 13:2
18:13 19:1,17
20:6 21:9 24:3
33:19 50:17
167:1 201:6
look 36:17 44:7
47:6,22 51:6
82:4 100:6
101:18 111:11
116:3,4 126:19
138:22 141:1
142:10 154:11
154:13 176:2,8
179:23 185:14
looked 195:12
195:14 196:16
looking 76:11
83:23 84:4,5
88:6 106:19,20
111:19 114:10
127:1 128:17
129:7 131:14
144:9 161:7
181:11 184:1
187:17,19
200:11 207:16
looks 44:16
144:5 173:9
180:18
loose 69:1
lot 29:4 45:3
67:11,17,20
142:23 143:18
147:13 209:21
209:21
lots 149:9
191:10
love 212:5
lower 186:18
lunch 43:15,16

98:11,14,17,19
——————
**M**
M 118:12
machine 149:15
machinery
148:15 149:4
149:14
Madison 5:19
7:5
mail 136:2
main 26:9 35:14
41:19,22 42:12
138:15 166:8
166:11
maintained
33:13 35:21
maintenance
12:20 15:3,11
15:14 16:3,22
17:23
major 23:13
making 46:5
58:20 62:18
76:7 144:6
148:22 161:20
172:21
Malcolm 2:18
7:16 56:11
58:6 71:7 73:3
73:20 84:23
92:11,20 93:9
93:20 94:1
95:5 97:19
104:23 117:18
123:18
male 68:4
176:23 177:1
man 121:10
188:21
management
13:18 19:10
139:10 141:15
155:4,14 164:1

209:8,18 211:1
manner 68:11
manpower
150:17
manual 43:21
45:16,17 46:6
46:8 47:4,13
49:16 107:14
107:23 108:3
108:14,18
109:6 111:13
111:18
March 81:8 93:4
93:18 94:2
99:1 101:4
102:23 104:11
117:8,17,18
118:3
mark 44:23
45:21 51:7
74:4 78:23
92:1 110:3,9
110:14,23
117:23 121:21
132:20 133:1
138:3 151:5
170:2 172:1,2
174:14 175:16
marked 28:16
46:1 51:10
64:20,23 71:21
72:1 74:7 79:2
80:11,13 86:1
92:3,19 99:13
100:22 101:1
102:18,20
111:3,11
117:21 122:1
123:7,10 133:3
134:22 135:2
138:7 142:11
146:11,15
151:7 153:19
156:6 159:15

159:18 169:4,6
170:5 172:5
174:17 175:20
180:16
marking 110:18
Maryland 22:13
22:22 23:1
master 13:11,17
14:7,9,10 17:3
18:6,7 39:21
39:22
master's 23:17
24:17,22 25:3
96:18 180:10
masts 150:23
151:1
masturbating
62:3,22 94:19
120:1,5,19
masturbation
94:21 95:18,22
112:16 113:20
123:23 124:6
124:16
material 125:15
126:8,11
150:19
materials 193:1
193:23 194:1
matter 204:4
matters 67:19
67:19
Maxwell 14:2
ma'am 10:7
mean 32:14
40:18 76:2
98:17 135:10
168:7,9 171:12
182:4 185:2
200:10
meaning 210:3,4
means 221:9
measured
144:11,15

mechanic 15:22
mechanical
14:11 16:15
17:8,17
meeting 48:10
53:1,6,6,13,21
53:23 54:9,11
54:17,23 55:4
55:10,14,14,21
56:1,3,14
57:16,20 58:5
58:10,13 62:18
63:11,13,14
64:6,10,13
73:1,3,8,11,14
73:18,19 80:17
81:3,8,12,18
82:1,7 83:4
101:19,23
103:4,5,10,13
103:17,17,21
104:21 105:10
105:13,14,15
105:16,20
106:10 158:9
169:12
meetings 47:8
48:7,10 54:6
73:10 101:8,10
159:1
member 18:2
138:13
memo 58:14,16
58:20 59:1,8
66:4,11,20
73:2 84:2 88:1
88:13,15,17
101:4 117:9
146:17 152:19
169:11
memorandum
49:3 65:13
67:2,5,7,13
68:14 70:8,17

72:4 104:19
116:18 152:23
153:7,9 156:3
156:4 169:9
**memorandums**
192:6,9
**memorize**
179:14
**memory** 36:17
52:9 169:19
174:19 175:5
**mention** 36:3
68:14
**mentioned**
85:10 86:4
88:15
**mere** 28:15
**Merk** 3:1 4:23
5:16 10:1,9
11:6 43:18,19
45:2 46:3 54:5
54:11 63:4
74:18 86:19
88:14 114:10
118:8 133:22
152:18 198:22
216:1
**Merk's** 45:22
**met** 81:7
**Michigan** 24:10
**middle** 1:2 2:2
4:2 205:17
**miles** 166:4
**Miller** 188:7,9
188:10 191:11
191:16
**mind** 63:6
**Mine** 29:11
**minimum** 27:1
**minutes** 47:7,23
48:9 158:23
168:10
**misconduct**
106:5 115:18

160:14
**misread** 151:17
**missed** 96:1
122:22
**missing** 39:8
95:12
**missions** 18:5
**misspending**
202:9
**mistake** 178:10
178:11 212:9
**modalities** 28:1
**money** 152:15
**Monica** 1:5
196:5
**monitoring**
167:15,17,19
**monitors** 167:20
**Montgomery**
2:18 5:20 7:6
7:12,16 13:7
56:11 57:23
58:7 62:19
72:19 73:3,15
73:20 84:23
92:12 93:1,7,9
93:21 94:1,8
95:6 97:19
101:21 104:23
117:18 119:10
119:15,20
120:13,17
123:18,23
124:8,12,15
125:4,5 126:5
132:23 191:18
218:3 221:4
**Montgomery's**
52:11,18 57:14
61:4 71:7
92:20 98:7
142:12
**month** 47:16
142:6 204:21

**months** 12:23
13:4 15:23
18:17 21:2,4,5
21:11,14,17,23
22:1 29:14
**morning** 52:11
57:21 58:4
71:15 87:23
98:7,10
**mouth** 112:6
**moved** 146:3
**multi** 110:20,21
**multi-page** 65:9
**Muncie** 24:11
**Murphy** 51:2,3
**Murry** 29:21
33:2

_____

**N**

**N** 5:12 7:1 8:1
**name** 11:4 31:13
56:23 90:11
139:17 141:4,6
141:8 188:20
**named** 34:1
201:4
**NATO** 17:11
**naturally** 46:12
**nature** 165:2
**NCO** 13:19,22
14:1,14,16
17:4 18:11,18
20:5 25:9 26:1
**NCO's** 20:1
**nearest** 166:18
**necessarily**
107:9
**necessary** 5:23
150:17 164:6
**need** 37:17
97:12 132:9
152:17 169:21
187:1
**needed** 200:18

**needs** 44:2,13,17
45:1 46:3
**neither** 218:15
221:15
**never** 68:3 120:6
137:16 181:3
192:17 194:21
194:23 202:17
216:22
**New** 11:19 12:3
15:21 20:21
22:8,14 23:5
23:11 24:2
**night** 16:11
24:13 38:2
**nine** 13:4 15:23
18:13,17 21:4
21:14,17,23
118:10 147:8
**ninety-nine**
178:12
**noncommissio...**
16:14,21 18:14
**non-commissi...**
17:5
**non-profit**
189:10
**normal** 155:14
164:1
**north** 11:8 143:9
156:14
**NORTHERN**
1:3 2:3 4:3
**Notary** 5:18
**notebook** 106:20
**notes** 59:6
**notice** 6:9
129:20
**noticed** 110:15
**notified** 113:23
**notifying** 196:22
**notoriety** 202:12
**number** 1:8 2:7
4:7 17:19

107:12 126:18
126:19 127:1
139:7 154:22
156:15 161:12
199:1,2

_____

**O**

**O** 5:12
**oath** 43:18
**object** 21:7,8
41:6 58:21
59:13 60:3
67:15 88:20
93:12 95:1
97:16 115:12
120:9 121:13
152:4 163:18
166:12 197:10
204:12
**objecting** 93:14
163:1
**objections** 6:1,4
**objectives** 28:13
**obtain** 185:10
**obtained** 185:6
**occupied** 166:1
176:20
**occur** 60:14
**occurred** 38:18
38:21 74:2
**occurrence**
114:14
**occurs** 155:11
163:21
**October** 108:16
110:19 111:12
112:8 116:23
173:3 174:8
177:20 178:3
184:3
**offense** 161:11
161:12
**offenses** 160:23
161:4,8

# FREEDOM COURT REPORTING

Page 237

| | | | | |
|---|---|---|---|---|
| **offer** 31:23 | 52:1 55:10,20 | 188:18,22 | 74:8,17 79:3 | **P** 5:12 7:1,1 |
| **offered** 6:6 | 57:1 59:7 | 189:2,14 | 80:14 83:1 | **package** 132:2 |
| 23:23 | 60:18 61:1,20 | 192:13 193:6 | 86:2 92:4 | 150:19 |
| **offers** 31:21 | 62:16 67:10 | 194:4 195:7 | 99:14 100:23 | **page** 8:3,10 68:1 |
| **office** 5:19 46:19 | 68:13,17 69:17 | 198:19 199:19 | 102:19 111:4 | 68:17 75:7,14 |
| 46:21 48:21 | 70:17 71:1,19 | 200:1,12,14 | 122:2 123:8 | 110:20,22 |
| 120:3 149:13 | 72:7,20 73:23 | 201:1,7,22 | 132:13,16,17 | 116:5 118:10 |
| 167:6 191:21 | 74:16,20,23 | 215:20 217:1,4 | 132:18,21,22 | 126:23 172:16 |
| 192:1,3,10 | 75:9 76:18 | 217:7,23 | 133:4 134:7,8 | 172:18 173:17 |
| 193:11 194:4 | 77:14 78:7,10 | 218:20 219:19 | 134:23 138:8 | 173:17,19,20 |
| 194:10,15 | 78:18,22 80:10 | 220:3,17 | 146:12 151:8 | 174:7 |
| 195:3,8 202:16 | 81:2 83:12,17 | **old** 144:9 177:15 | 153:20 156:7 | **pages** 65:10 |
| **officer** 16:14,21 | 84:19 87:16,22 | 177:15 | 159:16 169:5 | **paid** 177:5 |
| 17:5 36:9,13 | 90:18 100:10 | **once** 87:17 | 170:6 172:6 | 179:21 184:11 |
| 42:4,10,11 | 101:6 108:13 | 205:20 | 174:18 175:21 | 184:13,16,17 |
| 81:19 129:12 | 109:13 111:10 | **ones** 46:7 142:21 | 180:17 | 192:21 193:1 |
| 129:17 166:18 | 112:11 114:9 | 147:6 159:12 | **outline** 164:11 | 193:19 |
| 166:20 | 116:17,21 | **ongoing** 115:3 | 175:13 | **paint** 161:21 |
| **officers** 18:14 | 117:14 118:12 | **online** 112:13 | **outlined** 156:19 | **paper** 79:21 |
| 167:3 | 120:21 122:9 | 187:14 | 157:9 | 80:1,4 198:11 |
| **offices** 142:18 | 122:15 123:1,5 | **open** 183:8,10 | **outside** 149:16 | **paragraph** 84:7 |
| 148:23 | 125:8 126:1 | 183:12 196:23 | 167:2 | 92:10 118:11 |
| **office's** 193:16 | 127:4 129:1 | **opening** 200:10 | **overt** 61:14 | 127:5,17 |
| **official** 4:12,17 | 130:14 131:1 | **openings** 145:22 | **Owensby** 4:5 | 156:10 160:3 |
| 127:13 190:16 | 133:9 134:3,15 | 146:7 | 56:16 62:20 | 164:7 184:3 |
| **officials** 91:13 | 135:15 136:12 | **opinion** 60:12 | 73:4,16,21 | **paragraphs** |
| **Oh** 22:17 36:3 | 140:13 141:16 | 69:2 202:11 | 98:15 101:22 | 118:11 |
| 44:6 174:1 | 141:22 144:1 | **opposed** 199:2 | 103:13 105:1 | **Pardon** 166:5 |
| 176:1 196:21 | 145:22 146:19 | **opposite** 125:4,5 | 168:15,18 | **parenthesis** |
| 206:2 | 147:3 148:12 | 126:10 218:13 | 169:12 170:10 | 127:12 |
| **okay** 11:4 15:20 | 150:3,6 151:16 | **opposites** 124:20 | 172:11 174:9 | **parking** 142:23 |
| 17:14 19:6 | 152:18 153:6 | 124:21 125:19 | 174:22 176:16 | 143:18 191:9 |
| 20:6 21:1,19 | 153:13,17 | 125:20,22 | 176:21 177:17 | **part** 37:8,9,21 |
| 25:6,21 27:13 | 154:19 159:13 | **oral** 5:6 | 179:21 180:4,8 | 69:11 84:10 |
| 29:1 31:4 32:6 | 168:2,12 169:2 | **order** 180:23 | 180:10 184:16 | 106:6,7,8 |
| 33:23 34:18 | 170:13 171:23 | 194:5 | 188:1 | 113:8 115:10 |
| 36:2 39:3 40:2 | 174:9,13 | **ordered** 192:18 | **Owensby's** | 117:14 119:1 |
| 40:15,21 41:4 | 175:15 176:14 | **orders** 190:11 | 175:17 177:4 | 124:13 133:8,8 |
| 41:13,17 42:6 | 177:16,20 | **ordinarily** 59:22 | 181:2,5 | 133:8 135:5,5 |
| 43:2,5 44:23 | 178:4,7,21 | **organization** | **owned** 160:15 | 140:10 172:21 |
| 45:13,21 46:13 | 179:19 180:2 | 189:11 | **o'clock** 81:4 | 173:13 177:3 |
| 46:17 47:13 | 182:2 183:1 | **original** 5:5 35:9 | 119:5 | 193:8 205:7 |
| 48:16,23 49:14 | 184:15 185:20 | 46:2 51:11 | —————— | **participants** |
| 50:2,20 51:3,6 | 187:11 188:3,6 | 64:21 71:22 | **P** | 53:20 |

# FREEDOM COURT REPORTING

participated
  56:13 101:8,23
  103:17
particular 28:13
  61:21 78:6
parties 5:14 6:3
  127:6 221:16
partitions 149:5
parts 125:10
pass 146:4
passage 148:23
passed 158:9
Paul 56:22 64:3
  73:4,16,21
pay 22:3 177:15
  179:11,14
  193:11
Pease 16:2 24:1
people 28:4 38:7
  54:6,13 69:16
  73:7 109:4
  149:19 154:12
  185:21 186:6
  186:14,15
  212:17 213:4
people's 38:23
percentage
  199:1,13
perfectly 197:2
perform 13:12
  13:13,14 18:4
performed 16:5
performing
  29:16
performs 171:5
period 33:23
  141:23 142:5
  167:23 205:17
permanent
  160:12
perplexed
  196:14
Perryman
  182:15

Perryman's
  183:4
person 46:4 54:3
  121:11 127:21
  128:9 160:21
  167:19 182:6
  183:15 188:10
  191:2 195:11
  199:22 200:9
  200:20,22
  201:1,7 219:6
  220:19
personal 102:13
personalized
  28:11
personally
  127:20 131:7
  202:14 205:6
personnel 16:10
  17:2,20 24:1
  33:12,15,19
  34:2,11,16,19
  34:21 35:11
  36:4 40:21
  41:2,5,13,16
  42:14 46:15
  57:7,8,11
  58:17 156:18
  157:8,12
  178:19 179:1
  181:9 183:15
  187:13 194:18
  199:10,20
persons 128:10
  219:6
person's 58:17
  190:8
perspective 68:5
pertain 120:4
phonetically
  17:11
photo 190:7
photograph
  142:13

phrase 187:16
physical 144:15
picture 144:10
place 14:17
  34:13 42:19
  50:14 53:7
  75:1 89:5,13
  91:19 93:6
  111:17 115:14
  120:6 143:19
  157:1 181:3
  187:14 196:20
  198:3 199:9
  209:14
placed 16:6 27:3
  111:17 179:13
places 149:10
Plaintiff 2:6 4:6
  7:3
Plaintiffs 1:7
Plaintiff's 8:11
  8:12,13,14,15
  8:16,17,18,19
  8:20,21,22,23
  9:1,2,3,4,5,6,7
  9:8,9,10,11,12
  9:13,14,15,19
  9:17,18 45:1
  45:23 51:7,9
  52:18 57:12,13
  58:6 64:19,23
  71:20 72:1,12
  74:4,6 76:22
  77:8 78:13,16
  78:23 79:1,4,8
  79:17 80:11,12
  83:5 85:23
  87:14 88:7
  90:19 92:1,2
  92:19 98:3
  99:12 100:21
  101:2 102:17
  102:21 111:2
  117:20 118:1

121:22,23
123:6 126:20
133:1,2 134:21
135:2 138:3,6
146:10,15
151:5,6 153:3
153:18,22
156:1,5 159:14
159:18 169:3,7
170:2,4 172:2
172:4 174:14
174:16,20
175:19 176:11
180:12,14,15
209:5 218:1
plan 100:6
  156:13
Planning 182:12
  183:5
plans 183:13,17
plants 69:9,13
  147:18
please 5:8 11:5
  44:15 82:4
  99:7 126:19
  151:10 156:14
  156:17 157:7
  166:3 169:10
  169:15 173:10
  173:14
plumbing 38:13
point 72:14
  106:9 113:22
  203:22 215:13
  218:13
pointed 68:20
polar 124:20,21
  125:4,5,19,20
  125:21
policies 43:21
  45:17 46:6,8
  47:3 48:14
  107:13,22
  108:2,14

111:13,18,22
117:1
policy 47:13
  48:17,22 49:16
  51:21 52:4,7
  59:4 72:21
  75:22 87:21
  108:20 155:6
  156:15 158:12
Political 23:13
pop 27:21
position 14:5
  33:11 34:18
  35:5,12,13
  40:3 168:21
  169:19 171:1,2
  171:3 176:20
  179:22 180:5,5
  181:2,5,12,16
  181:20 195:13
  195:21
positions 40:4
  185:7,22 186:7
  187:8 199:21
positively 50:15
possessing
  161:20
possession
  161:22
possibility 61:6
possible 47:6
  63:3 96:1
  100:7 114:8
  132:3
possibly 204:16
posts 146:3
  152:16
Postsecondary
  129:19
potential 115:21
  116:1
pouring 150:23
power 87:19
practices 213:17

FREEDOM COURT REPORTING

prepare 30:8
181:1
prepared 79:21
79:23 153:21
prepares 178:15
178:19
present 7:14
48:1 49:9 52:4
52:10,14 56:11
56:12,12,13,17
56:19 81:17
98:6 103:9,16
104:6 118:5
178:17 182:5
presented 43:20
president 1:11
2:10 4:13
32:22,23 33:1
33:8,14 34:20
37:13,18 40:9
40:16 44:22
48:13,18 49:3
49:22 50:7,13
55:19,23 91:12
91:14 99:4,5
101:7,19 102:9
104:1 122:16
127:10,16,21
128:14 129:6,8
178:16,20
179:2 189:16
189:17 195:6,8
195:9 207:3
211:8 213:7
216:19,20,21
219:1,4,11,22
president's
46:23 47:7,23
48:7,9 50:2,18
81:9 130:12
pretty 150:21
previous 174:6
previously
142:12 175:9

principal 35:17
printed 47:17
prior 6:6 14:4
57:15,19 58:5
62:17 64:6,7,8
102:8 104:9
107:3 150:15
158:17 173:13
174:9 209:18
210:5
private 191:2
privy 198:19
probably 25:5
27:15 50:8
55:5 65:20
78:4 80:8
109:20 112:23
138:22 181:9
183:17 189:4
200:8
problem 39:9,12
39:13,14 60:13
60:13 97:4
155:10,13,16
156:23 157:16
163:11,13,20
163:23 164:9
191:20 193:20
202:7,15
209:23
problems 38:18
38:19,20 107:5
107:18 108:11
109:17 156:20
157:10 191:23
192:2,4,5,9,22
193:19 202:13
209:8 211:1
procedure 5:2
51:13,16 75:21
75:23 76:21
78:11 82:5
84:16 87:20
90:21 91:2

105:23 106:1,2
107:7,10,18,23
108:8 111:13
113:15,19
116:3 117:1
122:10,13,16
126:22 157:4
175:8,13
204:15 206:7
207:4,18
210:12 220:18
procedures
43:21 45:17
46:6,8 47:3
107:1,4,13
108:3,11,14,18
109:6,17,21
111:18,23
114:11 115:14
127:18 156:20
157:9 194:6
206:23
proceed 155:17
164:10
proceedings
80:19 208:9
212:11
process 114:6
118:21 136:3
150:20 155:5
205:23 206:4
206:14 207:1
209:14
processes
210:16
produced 53:3
213:17
produces 210:19
productive
28:14
program 13:21
19:22,23 23:18
24:13 69:19
70:3 154:11

programming
151:2
programs 26:19
154:12,16
prohibited
160:19
prohibiting
161:19
promoted 14:23
15:12,16 16:16
17:3 18:5
proper 74:23
161:9,13
212:22,22
properly 48:8
48:11 60:16
128:3 193:7,12
193:15
property 39:1
144:16 149:19
160:14
proponent
200:14
propose 90:22
proposed 99:16
99:19 100:2,4
protecting 38:23
39:1
protocol 134:12
prove 28:9
proven 218:15
provide 70:8
91:20 99:10,15
99:18 118:13
192:10,23
219:2
provided 17:21
19:23 55:6
129:19 158:2,8
208:8
provides 171:4
205:9,10
providing
118:22

provision 207:6
207:10,12
proximity-wise
166:16,17
Pruitt 71:3,8
105:5,6,7,11
105:17 106:14
106:17 112:15
Pruitt's 106:7,8
public 5:18 16:8
23:17 115:7
189:7,8 190:16
194:13 196:23
202:2
pull 214:21
pulled 146:4
punished 126:14
purchase 201:18
purchased 201:8
purpose 54:16
54:22
purposes 22:2
47:19
pursuant 86:7
160:2
put 28:6 42:19
43:9 45:13
53:17 66:10
80:3 86:11
88:17 119:1
134:14 136:2
146:7 149:23
150:9 158:5
159:10 176:6
187:21 196:21
197:15,17
203:9 204:15
204:16,20
putting 190:22
p.m 81:9

———————
Q
———————
Qualification
189:3

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 240

qualifications 189:2
quality 205:9
query 185:16
question 10:23
37:8,21 44:4
44:11 47:5,11
47:20 65:11
66:19 85:19
89:17,18 93:13
93:15,16 99:11
111:6,20
120:10 152:5
152:21 158:21
161:1 167:18
170:23 173:7
190:2 200:2
213:21 218:6
220:12,15
questioned
202:17 203:4
questioning
204:18 207:12
questions 6:2,3
38:10 66:21
119:22 120:22
121:5,17 221:8
quick 110:11
quicker 50:7
quickly 91:17
100:7 178:6
quite 202:23

——————
R
R 7:1 187:13
221:1
race 126:15
radar 17:6
radically 180:5
raising 28:14
range 186:22
rank 13:9 14:6
169:13
ranks 14:19

rates 154:14
ratio 198:22
read 10:11,19
11:3 66:4,14
68:18 71:14
92:15 122:19
156:10 216:17
216:18
readiness 18:4
reading 10:12
10:20 11:2
67:23 75:6,22
76:1,9,10 90:1
93:19 122:21
126:18 219:13
reads 76:21
realize 146:19
147:3
realized 147:10
really 33:21
36:15 38:4
56:8 96:4
171:21 177:14
187:1 201:20
210:16,17
realm 20:2
reason 77:16
78:6 111:19
213:10
reasons 150:16
154:13
recall 62:23
104:5 118:7
146:18 163:2
180:22 187:1
203:6,12
receipt 83:7
127:13 128:3
130:1 205:2
207:23
receive 69:22
215:14
received 22:6
28:12 72:11

73:2 100:18
136:13 137:5,6
137:12,14
197:18 203:5
204:14 220:4,6
receiving 136:18
recess 43:16
85:3 110:12
168:13
recite 15:8 189:6
recognize 43:23
44:5,6 51:12
79:4 85:17
92:5,7,21,22
142:13 174:20
180:13
recognized 44:8
87:13,18
recommendati...
125:14 194:13
recommendati...
219:16
record 48:21
52:22 53:17
54:9 58:10,12
58:14,16,19,23
59:1,2,7,8,8
60:1,7,10,16
60:19,20 61:3
63:7,13 81:12
93:14 162:11
163:3,9,16
168:4,6,9
169:11 211:13
213:22
recorded 53:12
53:21 54:1
55:15,18 56:1
82:2 103:20
104:16,22
105:15,15
recorder 53:19
recording 52:23
53:2 54:6

60:19
recordings 59:6
records 36:17
70:15 137:14
140:20 162:13
162:18 163:4
176:15 177:19
199:10,20
200:10
recruit 12:7
recruited 16:1
redirect 218:8
refer 73:6
reference 45:3,5
references 45:11
173:4,22 174:1
referring 73:8
99:7
refers 153:6
refinishing
144:5 149:7,9
reflect 48:2
reflected 48:9
49:13
reflects 89:20
refresh 174:19
175:4
refrigeration
17:22
refuses 164:2
refusing 161:12
regarding 67:19
67:19 141:15
154:21 156:12
169:13
regardless 196:7
regards 83:2
register 196:18
registered 26:23
registrar 170:11
170:13,16,18
171:5,7,19
176:21 177:9
179:22 180:19

184:4,13 185:7
185:17,18
186:1
registrars
185:11,15
187:8,10
registration
168:22 171:18
186:6
regs 113:10
regular 159:2
209:17
regulation 86:8
87:6,9
regulations
159:22 160:1
161:18
reinstall 152:16
related 155:10
163:20
relating 46:11
46:14,19
relatives 201:10
201:16
relevant 121:6
remained 184:6
remedy 84:2,11
84:15 85:11
86:5,9 90:22
remember 22:19
27:5 33:17,21
54:10 55:12
56:2,8 59:4
68:9 74:1 80:8
81:22 88:12
100:10,20
111:7 112:9
114:21 130:22
131:1 134:5,6
174:12 181:6
186:10 202:1
211:21
reminder
158:10

# FREEDOM COURT REPORTING

removed 105:2,7 105:12,18,21 106:9
reopen 17:6
reorganization 34:12 40:12 42:18 43:3,4 43:12 181:1,3 181:5,14,18,22 182:17 183:3 197:4,7
reorganizations 196:19 197:8 197:20 198:2
reorganize 196:21
repeat 93:16
rephrase 71:5 130:11 216:11
report 75:4 76:12 78:16,19 82:17 83:8,10 91:9 114:15 123:14 127:10 127:16 128:13 128:16 129:5,9 129:12 130:1 130:15,21 131:5 133:7 135:4,12,16 136:6,7,18 156:17 157:7 157:12,14 172:9 175:2 203:5 206:8,15 207:2 208:1 218:21,23 219:3,10,15,20 219:23
reported 15:9 74:18 162:2 186:11
reporter 5:9,17 10:5,14

reports 138:12 139:7,9
represent 65:2,5 72:2 138:4
represents 221:11
reprimand 210:12 213:13
reproduced 53:1
request 49:16 116:2 122:7 181:1 187:22 194:21,23 195:1,4 197:4 197:7 199:13 203:19 205:2 208:14
requested 146:6 151:12,21 152:1 194:22 197:8 206:19
requests 84:2
require 190:6
required 84:14 86:8
requisitions 192:5
rescue 17:12
research 30:13 182:13 187:7 217:21
reserve 13:1 20:16,18,22 21:13
reserves 20:23
resolution 82:16 83:14,15 84:3 84:12,15 85:12 86:5,9 90:22 91:8,15,17,21 98:23 99:16,19 100:2,4,6,15 175:15 219:18
resolve 75:15

76:3 82:9,15 91:7 96:16 97:4 155:13,16 163:23 164:9
resolved 77:1 82:14 91:6
resolving 96:14
respective 5:15
respond 220:8 220:12
respondent 129:11
response 72:7 88:17 89:11 94:12 100:13 100:15,19 101:4 117:8 155:12 163:22 211:23 220:14
responses 88:19 89:1,9
responsibilities 180:8 184:8,10 186:16 194:17
responsibility 159:7 160:9 186:13,19 190:5
responsible 36:5 36:23 38:7,9 41:11 44:18 46:5 144:12 146:20
rest 43:11 145:9 164:7,13 166:14
result 82:16 91:8 221:17
results 205:10 210:19 217:9 217:11,12,15 217:18
retained 5:9
retaliate 211:9

212:10,10 213:12 214:7 216:15
retaliated 213:11
retaliation 213:4 214:10 215:15 216:12
retire 20:10
retired 20:14 34:5,10 189:8 190:17
retirement 20:13 21:3 22:1 29:18
return 205:2
returned 15:21
returning 18:15
reveal 36:19
review 156:14 158:23 198:5
revised 44:12,14 51:18
rewarded 126:14
right 10:11 21:15 27:22 34:15 37:14 49:10 63:12 76:10 88:7 95:19 97:11 98:2 103:23 106:12 112:5,7 114:1 116:20 117:13 122:11 122:17 125:1 129:16 136:19 141:23 147:12 147:15 155:1,8 158:2,13 162:9 163:8,8 166:22 166:23 169:20 189:5 196:2 208:1 214:11

Roberts 73:22 103:3,5,9,12
Robinson 176:22 177:5 177:16 179:21 180:6 184:11 184:13 201:4
Robinson's 177:7 179:23
Roger 201:4
role 38:19,21
rolled 42:1,6,16
rolling 205:20 205:21
roof 145:3
room 28:4 39:9 73:22 81:10,20 98:16,17,18,21 98:22 149:2
rooms 149:1,8,9 149:9
Rosy 182:7
row 142:16 143:1
rule 5:1 112:18 112:22 113:9 116:19 136:23 137:2 190:2
rules 5:2 112:19 159:21 160:1 161:18,19
running 136:20 143:6,8,10 151:1
runs 195:19

_____
S
S 5:12,12 7:1 8:9 193:4
safe 37:4,23
safely 35:22
safety 38:23 162:1
salaries 200:3

# FREEDOM COURT REPORTING

salary 172:16
174:4 177:8,18
177:23 178:3,9
178:9 180:1
182:6,21
184:12,12,14
184:15,17
185:15 186:22
187:7,23
199:21 200:1
San 23:19
saw 92:13 93:10
93:22 94:3,9
94:14 95:7,16
97:20 118:18
119:16 137:17
173:13 216:23
saying 59:14
89:18 125:19
125:21 132:17
197:19 198:2
213:2
says 65:21 70:21
71:17 74:17,19
75:14,15,22
76:3,4,11
78:21 82:6,9
88:8 91:20
116:6,18
118:21 119:8
127:2,11 128:8
136:16 139:1,2
153:8 157:4
160:23 170:18
177:20 178:8
179:12 184:3
207:7,21
218:22
scale 179:11
scales 179:14
scene 28:8
schedule 127:8
182:6 184:12
184:12,14,15

184:18
scheduled 81:8
127:8
school 11:14,16
11:17,18 12:5
18:20 22:7
30:20 32:9
105:8,18 106:9
146:4 148:10
191:9 195:19
Schools 30:11
Science 23:13
32:3
scope 218:7
scores 28:12,14
28:20
searches 197:21
second 15:5,6
44:10 92:10
119:1 127:5
143:13 180:4
secretaries
50:12
secretary 50:3
50:18 51:4
section 16:15
107:14 108:5
126:19 127:1
179:10 207:19
secure 37:4 38:1
secured 39:10
39:11
securely 35:22
security 38:15
38:22 39:19
81:19 149:20
149:23 150:6
162:1
see 23:9 29:9
39:17 44:1,8
44:14 55:5
63:4 70:2,7
87:13 88:16
98:12,13 100:8

106:18 110:10
118:10,17
120:21 121:8,9
121:16 139:19
147:12 151:16
154:2 161:3
168:3,23
169:21 172:16
181:7,12 189:6
207:15 211:11
214:19 215:2
216:16 217:4
seeing 62:4,21
146:18
seen 65:1,12
72:4,6 74:11
122:3 130:10
146:13,14
152:19,22
176:5 198:1
212:2 216:1,22
sees 156:23
161:8 162:5
selected 183:22
Sembach 16:19
16:22 24:13
semester 26:21
27:2
semesters 22:19
24:6,7
send 156:8
157:23 187:21
214:7,16
216:11 220:2
sending 209:23
sends 49:23
197:5
senior 13:19,22
13:23 14:7,8
14:10,14,16
18:6,7,11,13
18:18 20:4
25:9,23
sent 99:3 132:1

133:21 136:1,9
137:10 175:1
185:18 211:8
211:16 212:18
213:2 215:12
216:2,3,6,8
sentence 207:20
218:22
separate 59:11
59:16,19,20
73:10 109:13
145:3
separated
173:11
separately 73:7
190:3
September
15:17 51:17,19
51:21,22 52:2
112:13 153:7
172:15 173:4
173:22 174:1
184:23
sergeant 13:11
13:17 14:7,9
14:10 15:16
16:2,17 17:3
18:6,8 81:19
served 16:2,20
17:8,17 21:16
service 16:7,7
20:19 21:4,6
202:15
services 2:16,22
4:19 107:17
109:2 112:2
114:16 157:22
168:20 170:12
170:21 180:21
209:23
session 18:13
sets 194:7
setting 162:21
settling 118:14

seven 12:23 21:2
21:11,23
severe 60:13
sex 68:12
sexual 61:6,10
61:12,15,22
62:4,10 69:4
106:5
sheet 169:14
She'd 196:8,10
shoot 121:11
shop 16:22
144:5,6 148:9
148:22 149:7
149:11,15,17
150:1,11
155:11 157:14
157:14,15
163:21
shops 143:2,11
143:15 148:23
149:21 193:23
short 17:4 22:10
73:22 85:3
110:12 168:13
Shorthand 5:17
shot 121:16
show 43:19 61:8
64:22 71:23
74:3 78:22
80:10 85:9
90:8 91:23
92:12,18 93:10
93:21 94:2,9
94:14,16 95:6
97:20 101:1
102:20 117:23
118:18 119:15
120:14 121:21
122:23 123:2,9
123:19 126:13
132:23 135:1
138:2 142:11
146:9 151:4

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

155:23 159:1
169:6 170:1
171:23 172:2
174:13 180:12
190:10 210:23
showing 119:2,2
shown 164:3
shows 199:20
shrubs 147:18
side 146:2
sign 10:11,19
11:3 109:11,19
134:1 179:16
signature 79:7
80:20 133:12
signed 74:20
77:19 78:1,18
79:19,20 80:1
80:3 133:9,11
133:15,17,19
134:4 137:3
178:15 205:2
significant
150:22 186:12
signing 10:12,20
11:2
similar 175:11
simple 28:6,7
sir 11:5 12:13
20:20 30:2
34:6 36:11
38:6 39:2 42:3
47:1 62:1,5,12
77:10 83:11
93:17 95:13
101:12,17
106:19 107:6
107:15 108:9
108:22 109:9
109:19 111:20
119:9 121:3
122:20 130:5
130:20 131:11
133:13 137:1

137:11 142:9
145:16 146:9
151:20 160:8
161:7 166:3
169:10,16
171:11 173:11
173:14 175:5
178:18 181:15
183:10 219:13
sit 80:7
sitting 98:11
situation 48:23
61:2 71:3,8
113:19
sixty 20:1
146:23 147:9
sixty-seven
177:12
size 144:8 147:7
slash 129:12
138:12 170:11
170:13,16,18
171:20 184:4
187:8
small 17:19,23
144:10 146:1
147:8 151:3,18
152:2,9
Smoke 81:19
sniffing 161:21
soldier 183:18
sole 54:22
somebody 38:16
39:12 112:1
149:6 196:15
196:22 216:6
somebody's
190:21
Somewhat 52:8
son-in-law
201:17
soon 114:7
sorry 65:4 80:19
94:5 143:4

170:15 176:1
sort 21:6 106:5
114:7 161:14
190:9
sound 177:13
south 143:9
146:2
Southern 17:6
30:10
space 149:13,14
spaces 131:17
131:17
Spain 14:11
17:15
speaking 164:4
speaks 66:16
special 165:9,12
165:20 182:8,9
specialist 15:14
16:4
specialty 12:18
12:19
specific 46:4
66:19 67:13
86:20,22
119:21
specifically 93:7
93:23 94:13
specify 187:7
speed 56:10
172:1
spelled 17:10
spend 27:4,10
202:19
spending 202:10
spent 202:4,4,19
spoke 63:2
sponsored
160:17
spray 149:9
spring 205:16
squadron 16:16
18:4
square 144:1

146:21,23
147:4,9 165:17
stacks 149:5,8
stadiums 191:8
staff 15:16 16:1
69:16 138:13
stage 90:23
209:9
standardized
200:19
standards 159:8
159:10
stands 159:5
166:21
start 13:14
14:18 103:7
136:20 205:19
started 54:13
198:8 204:14
starting 68:18
199:21
state 1:12,16
2:11,16,22 3:5
4:8,14,20 11:4
12:3 22:7,10
22:16 24:9,20
29:17 30:9
31:2,12 43:22
48:14 87:2
108:10 109:16
114:19 140:3
156:19 160:5
162:21 163:6
171:8 189:9
190:16,17
194:7 196:16
210:20 221:3
stated 82:23
92:14 126:3,4
126:5,5 153:14
statement 67:22
68:2,5 172:17
183:19 213:22
statements

214:1
states 1:1 2:1 4:1
12:7 13:19,21
13:23 14:13
88:15 92:10
stating 190:7
station 13:6
stationed 16:12
20:3
stations 17:7
status 114:17,19
stay 12:21 13:2
20:6
stenotype 221:8
step 76:20 83:13
91:17 209:17
steps 75:15 76:2
76:3 82:9
155:18 164:11
209:13
stick 130:20
STIPULATED
5:13,22 6:8
stipulations
10:6
stop 27:13 62:15
62:16
stopped 12:5
81:20 198:15
storage 143:19
Strategic 182:12
183:5
STREET 7:11
strictly 189:11
Strike 36:21
93:8 166:9
stripe 15:6
strong 28:17
strongly 208:20
stuck 134:18
student 2:15,21
4:18 18:10
56:20 61:7,12
62:2,3,22 68:8

68:10,14 71:3
71:8 76:23
92:13 93:10,22
94:3,9,15,17
94:18 95:7,17
97:20 105:1
107:1,6,7,11
107:17 108:3,4
109:2 112:2
113:20 114:17
115:2 118:19
119:16 120:1,4
120:14,19
138:11 155:6
155:11,16
156:12,15,17
157:7,13,16,19
157:20,21,21
157:23 158:4,5
158:19 159:21
159:23 160:10
161:3,9 162:5
163:3,20 164:2
164:9,11,18
168:19 171:17
182:8 188:11
188:14,16,17
189:13 190:10
209:8,23
**students** 1:16
28:21 32:6
35:23 38:19
46:11,12 54:20
55:2 69:4 70:6
107:5,19 108:5
108:12 109:18
109:22 110:1
112:8,14
114:15 141:3
141:19 144:20
146:20 148:4
149:10 151:18
152:2,8 154:3
154:23 156:21

157:10 159:6,9
160:4 162:17
163:5 164:22
170:12,14,17
170:19,20
171:5,20
180:20 181:17
184:5 185:12
185:23 186:9
194:2,2 210:5
210:13,22
211:1 217:9,16
**student's** 114:19
115:17
**study** 19:4 24:15
24:19 26:6
**stuff** 39:5 67:20
134:15 147:13
168:11
**subject** 160:10
**submission** 56:5
78:15
**submit** 82:17
91:9 128:12
129:9 197:3,13
219:10
**submitted** 56:7
128:3,16 129:6
130:14 193:7
193:12,15
**suggest** 84:11,14
86:5,9 125:11
209:6,9,15
**suggested** 83:15
85:11 126:7
**suggesting** 59:18
214:1
**suggestion** 84:21
91:21
**suit** 214:8
**SUITE** 7:11
**summative** 28:2
28:15
**Sunday** 193:4

**superintendent**
14:11 17:9,18
**supervised** 17:1
17:18
**supervision** 77:2
156:15
**supervisor**
61:13 75:5,10
82:12,14 91:4
91:6 102:16
**supervisory**
91:13
**suppliers** 192:23
193:3
**Supply** 193:4
**support** 2:15,21
4:18 17:11
114:15 170:12
170:21 180:20
**supported**
189:11
**supposed** 37:18
45:8 47:2
107:7,11
147:14 162:7
176:3 192:19
207:5
**sure** 35:22 46:5
54:12,14 58:15
61:7 68:7
75:13 110:5,7
131:2 132:10
152:5 169:1
173:9 187:5
193:13 199:16
213:21 215:17
215:19 217:9
**surely** 36:18
179:14
**surrounded**
165:10
**surrounding**
97:7,12 102:15
**survey** 187:12

**sweated** 27:21
**sworn** 10:2
**Sylvia** 51:2
**system** 108:4
112:12 185:8
189:13 198:11
200:15,17,19
201:8 213:18
**systems** 36:6
50:14

---

**T**

**T** 3:1 5:12,12
8:9 133:22
221:1,1
**table** 85:19
**tables** 177:15
**take** 16:10 24:3
24:16 26:18,21
27:18 42:18
43:15 59:6
69:19 82:15
85:1 91:7
106:13,16
114:3,4 157:19
157:21,23
195:12 196:20
198:3 205:11
209:14
**taken** 5:6,16
43:17 62:15
85:4 106:11
110:13 168:14
221:7
**takes** 10:14
111:16
**talked** 63:15
85:5,8 89:15
117:17 164:13
**talking** 59:1,9
60:7 69:13
76:8 77:8
85:20,21 98:2
105:4 108:8

109:7,14 110:3
116:9 121:18
133:14 142:20
144:15 155:15
160:4 164:8
191:4 199:5
**talks** 108:3
**tape** 10:16 62:18
144:15
**tape-recorded**
104:10
**taping** 57:16,19
**teachers** 159:9
**team** 17:9 18:2
**teams** 17:6
**technical** 1:12
1:17 2:11,17
2:23 3:5 4:9,14
4:20 12:16
15:1 16:16
29:17 30:9,21
31:2,15,20,22
43:22 48:14
108:10 109:16
114:20 140:3
156:19 160:5
162:21 163:6
171:8
**techniques**
209:18
**Technology**
32:13
**tell** 14:19 36:15
38:4 52:8
55:13,17,23
56:9 81:23
82:1,5 83:17
83:22 86:14
87:17 88:11
99:6 111:15
133:5 135:3
137:9 167:13
169:9 170:7
172:7 177:19

# FREEDOM COURT REPORTING

Page 245

178:6,14
181:10 188:22
206:11 211:7
**telling** 128:17
149:22 156:22
**tells** 207:5
**ten** 81:4 82:18
91:10,18 142:6
146:21 179:12
199:18
**termed** 77:3
**terminal** 32:11
32:14
**terms** 28:6,7
30:12 143:5
204:16,17,19
**terrible** 99:11
**test** 28:12,16
**testified** 10:2
35:5
**testimony** 5:6
89:20 121:5
125:9 173:1
203:6 204:7
221:12
**testing** 28:2
**tests** 18:4 29:9
**Texas** 12:17
**text** 80:5
**thereto** 6:7
221:9
**thing** 44:8 66:15
75:17 82:11
84:20 95:15
97:15 130:4
155:7,22
158:10,10
175:23 192:18
**things** 38:5,8
46:10,14,18
56:10 59:4,5
130:23 140:18
162:1 164:13
186:10 194:10

**think** 48:4 49:8
49:12,20 56:23
58:8,14 61:20
62:2 63:8
64:16 65:14
66:18 68:16
71:15 77:18
88:8 96:4
99:23 102:2
108:1 112:10
117:6 121:6
125:19 126:9
127:16 128:18
131:23 140:9
140:16 141:5
146:16 152:14
168:23 171:9
173:2 182:1
187:15 191:18
195:11 199:18
202:5 207:16
208:19 210:1
210:17 212:20
213:1 214:14
214:19 217:19
**thinking** 27:19
**thinks** 121:7
**thinner** 161:21
**third** 14:23
68:19 186:18
**thirty** 127:11,12
128:14 219:12
**Thomas** 4:23
5:16 10:1 11:6
**thought** 11:13
18:16 35:6
44:7 61:5
154:21 173:11
196:16
**thousand** 20:1
146:21,23
147:4 165:16
177:13,22

**threat** 106:3
162:3
**three** 24:5,7
29:9,14 50:19
50:21 126:18
126:19 127:2
127:11 143:21
144:20,23
147:4 148:1
209:13 219:14
**Thumb** 44:1
**Tim** 176:22
188:18 190:15
**time** 6:5,5 13:1,1
15:13 17:4
18:5 20:18
21:9,16 22:10
22:17 26:12,21
27:4,10 31:14
43:6,15 49:9
72:14 73:22
81:18 101:6
104:21 106:10
112:14 113:22
122:7,11,17
127:9 136:20
150:10,15
156:13 158:7
167:23 171:13
177:17 178:17
182:5 191:7
193:2 194:14
197:18,22
198:1 201:6
203:20 205:15
206:9,16,19
207:3 218:9
**timely** 207:14
208:6,12,18
**times** 178:13
**timing** 63:1
70:22
**title** 40:17,19,20
40:23 41:20

113:8 180:19
184:4
**titled** 41:9
**today** 128:17
167:14
**told** 55:19 57:22
63:9,20 68:3
71:10,13,14
77:13 125:18
157:3 169:18
216:21
**tolerance** 61:9
61:10 116:19
**tolerate** 61:19
**tool** 149:8
**tools** 149:7
**top** 65:22 199:6
**total** 21:16
**touch** 143:9
**trade** 30:20
**trailers** 165:10
165:14
**trained** 96:21,23
**training** 12:16
14:19,22 15:1
18:13 96:5,8
96:11,14,17
158:2,8,18
**transcribe** 11:1
**transcribed** 55:4
55:11 56:6
58:5 81:14
221:9
**transcript** 5:5
46:2 51:11
55:7 56:6
64:21 71:22
74:8 79:3
80:14 86:2
92:4 99:14
100:23 102:19
111:4 117:22
122:2 123:8
133:4 134:23

138:8 146:12
151:8 153:20
156:7 159:16
169:5 170:6
172:6 174:18
175:21 180:17
221:12
**transcription**
53:5 221:10
**transfer** 25:1
31:23 32:1
**transferable**
32:4
**transferred** 15:4
16:19 17:15
25:19 31:22
32:8
**treated** 83:9
**tree** 147:23
**trees** 147:13,18
**trial** 6:5
**tried** 28:9
**trouble** 70:22
**troubled** 205:19
**true** 59:17
125:11,13
167:5 196:19
221:11
**truth** 125:3
**try** 66:17,22
91:17 97:3,6
154:10,15,17
185:10,20
205:12
**trying** 21:10
41:17 63:5
97:9 132:18
164:17 172:1
**Turkey** 17:10
**turn** 206:19
**Turner** 79:22
80:1 134:20
135:1
**turning** 191:13

twelve 119:5
twenty-five 13:4
  21:3,17
twenty-six 12:23
  21:2,11,23
two 17:1 28:1
  50:19 68:19
  75:12 76:19,22
  80:18 83:6,7
  84:1 110:15,16
  115:13 118:10
  120:22 121:17
  123:15 133:8,8
  135:5 136:9
  144:23 147:3,6
  147:23 148:23
  148:23 149:1
  150:16 164:5
  165:16 173:18
  173:20 209:13
  209:20
two-page 74:3
two-thirds
  186:13,15
two-year 189:13
  198:10 202:8
type 20:16 48:17
  79:14
typed 79:15,16
  79:20 80:2,4

**U**

U 5:12
Uh-huh 49:7
  88:10 110:17
  119:13 159:19
understand
  36:14,22 37:12
  47:11 62:7
  93:15 105:22
  131:12 213:21
understanding
  208:3,4
understood

37:16 63:9
  71:11
unduly 118:22
unheard 178:12
United 1:1 2:1
  4:1 12:7 13:19
  13:21,23 14:13
university 22:11
  22:12,13,22,23
  23:4,11,16
  24:9 25:1 26:3
  32:5
unresolved 77:3
unsigned 77:16
  77:22
unsupervised
  156:16 157:6
update 44:19
updated 44:2,3
  44:12,13,17
  45:2,18 46:4,6
  46:15,20 49:15
  108:17
updates 45:13
  46:22 47:2,8
  47:21 48:2
  52:1 192:4
upgraded 15:12
upholstery
  150:4
upset 71:2,6
  88:2,2,6,9 89:4
  89:7,13
use 25:22 76:11
  126:10 128:22
  128:23 151:18
  152:2 154:9,10
  154:15 194:1
  204:18 210:15
  210:16 213:15
usual 10:5
  134:12
U.S 14:15 17:2
  17:20 24:1

**V**

Vague 166:13
various 49:17
verify 147:1
  153:5,16
  179:15
version 44:3
  45:18
viability 154:11
view 68:4 77:11
  218:11
violating 159:23
violation 112:18
  113:9 116:19
  161:17 163:9
  212:18
violations 162:6
  163:15
visitor 69:23
visitors 70:2
Vocational 26:8
Volkswagon
  15:22
volunteered
  69:18
vs 1:8 2:7 4:7

**W**

W 7:9
Wait 212:14
waiting 172:23
waive 10:12,19
  218:17
waived 6:10
walk 145:12,13
  145:17
want 10:19,20
  15:8 17:16
  18:9 19:15
  38:4 42:20
  43:19 47:21
  52:17 66:9,16
  75:13 80:10
  85:9 91:23

92:18 110:8
  121:21 122:18
  123:9 126:10
  129:4 132:23
  135:1 142:11
  158:7 173:12
  174:13 176:2,6
  181:21 206:12
  206:13 208:23
  211:11,13
  212:12,19
  215:2,6 217:23
wanted 49:15
  54:10 61:7
  136:15 202:19
  212:13
wanting 196:2
wants 195:22
war 18:5
warning 211:9
wasn't 29:5 51:4
  51:18,20 55:20
  71:16 78:9,13
  79:13 84:14,20
  85:6 86:13
  90:5 92:14
  94:8 98:22
  103:14 117:9
  155:19 177:3
  194:19
way 38:8 42:19
  43:9 52:21
  87:6 130:11
  131:11 137:13
  148:23 149:7
  158:5 162:4
  164:16 193:20
  197:15 205:1
  211:9
ways 176:5
weapons 161:20
wears 69:1
Wednesday
  65:22 66:11

70:19
week 18:13
  29:11 135:19
welding 148:13
Weldon 5:4,17
  221:21
went 11:18
  12:13 15:1
  17:10 18:19
  21:15 25:23
  30:23 126:12
  175:8 183:21
  188:14,16
  201:4 212:8,21
  215:1
weren't 52:12
  52:15 98:8
  150:14
west 143:5,7,10
we'll 53:1 121:8
  171:23 172:2
  174:14 175:16
we're 45:21
  64:16 66:20
  75:14 76:6
  78:22 85:21
  91:23 98:2
  110:14 118:7
  121:21 132:23
  150:20 151:4
we've 61:3 75:12
  117:16 131:12
  140:21 141:22
  142:11 153:2
  213:18 218:6
whites 199:2,14
wide 165:15,16
  165:19
wides 165:22
  166:2
William 104:8
Wilson 1:13
  2:12 4:15 49:3
  49:5 54:13

# FREEDOM COURT REPORTING

Page 247

56:11 62:20
63:18,23 64:11
64:12 72:19
73:4,16,20
84:23 101:20
102:22 103:6,7
103:11 104:7
104:10,12
105:1 112:7
116:6 117:16
125:16 132:14
135:14 139:15
139:16 141:12
154:2,21 159:2
181:16
**Wilson's** 117:3
138:5 170:3
**window** 38:11
**wing** 17:4
**wins** 207:8
**wires** 151:1
**wise** 221:16
**wishes** 75:3,16
76:5
**Wisman** 50:23
51:1
**withdraw** 37:7
111:9
**witness** 106:23
115:9,22 116:1
220:10,13
221:13
**woman** 168:19
**women** 68:23
**wondered**
116:14
**wood** 50:4,6,15
50:22 55:5,6
149:5,8
**word** 95:4 97:18
98:21 116:23
125:20 126:9
185:17,18
189:4,5 198:23

**worded** 87:3
**wording** 86:22
**words** 66:8 67:4
75:13 126:10
128:22 129:2
**work** 18:22
26:20 27:9
29:4,12,16
32:3,8 38:12
38:14 69:1
86:17 109:4
150:22 161:13
164:2 188:23
189:3 190:6,11
190:20 191:6,9
191:12,13
194:14 196:3
201:10,16
205:5
**worked** 15:10
15:22 17:3
29:15
**working** 27:4,10
69:8 91:10
144:20 145:5
165:9,13,21
167:14 191:14
205:5 213:13
**works** 69:5,7
168:19
**wouldn't** 50:7
90:16 108:1
113:15 126:7
137:19 148:11
153:15 190:4
205:12 210:15
**Wright** 34:2,10
**Wright's** 34:4
**write** 27:16
65:17 79:14
93:17 104:18
155:1 156:1
157:1,3 158:3
158:4,19

174:22 211:12
**writes** 164:18
**writing** 75:5
77:6 116:5,7
141:16,18,20
154:3 158:1
159:9 164:11
164:23 187:21
189:22
**written** 48:18
60:20 66:22
70:18 84:22
87:7 91:9,11
92:16 95:4
104:18 128:12
142:6 185:16
203:21 204:2
209:13,19,21
218:23 219:3
219:10
**wrong** 10:15
116:22
**wrongfully**
202:3
**wrote** 27:23
65:15,19 66:5
70:9,12 79:19
80:19 83:4
89:19 92:8
95:7 97:22
101:3 117:4
126:3 140:13
141:3 194:16
196:3 211:23
212:1 214:4
217:1

―――――――
**X**
―――――――
X 8:1,9

―――――――
**Y**
―――――――
**year** 16:13 18:7
19:2,19 70:23
141:22 142:5,6
144:9 150:1,12

181:10 182:10
190:6 197:23
**years** 12:23 13:4
16:6 21:2,3,11
21:17,23 30:19
50:19,21
176:18 179:12
199:4,15,18
**yesterday** 89:5
89:13
**y'all** 29:8 49:8
65:2 70:1
98:23 149:20
165:21 182:3,3
202:1

―――――――
**Z**
―――――――
**zero** 116:18
181:9

―――――――
**0**
―――――――
**01** 179:12
**06** 158:16,17,18
184:23 185:1

―――――――
**1**
―――――――
**1** 8:11 20:8,10
45:1,22 46:1
108:16
**1st** 51:17,20
81:8 93:18
99:1 110:19
111:12 112:8
116:23
**1:00** 81:9
**10** 8:4,20 72:3
99:13 100:14
**10th** 101:4 117:8
**100** 8:21
**102** 8:22
**11** 8:21 74:9
100:22 101:2,2
117:7,7 173:4
174:8 178:3
**11:15** 5:21

**110** 8:23 9:1
**117** 9:2
**12** 8:22 102:18
102:21
**122** 9:3
**123** 9:4
**13** 8:23 110:15
110:18,19
111:3 113:8
117:2 155:9
158:13,14
159:11 164:14
**133** 9:5
**134** 9:6
**138** 9:7
**14** 9:1 80:16
111:1,3 116:4
116:5
**14th** 53:8 103:10
**146** 9:8
**15** 5:3 9:2
117:21 118:1
**15th** 53:8 66:1,2
66:12 70:20
71:16 72:9
73:13 77:7
84:2 88:1
102:6 103:11
105:14 106:11
117:19
**1505** 5:19 7:5
**151** 9:9
**153** 9:10
**156** 9:11
**159** 9:12
**16** 9:3 94:2
121:22 122:1
123:2
**16th** 93:4 102:23
104:11 117:17
118:3
**169** 9:13
**17** 9:4 123:7,10
170:3

## 367 VALLEY AVENUE

# FREEDOM COURT REPORTING

**170** 9:14
**172** 9:15
**174** 9:16
**175** 9:17
**18** 9:5 133:1,3
**180** 9:18
**19** 9:6 134:22
  135:3
**19th** 135:16
**1966** 12:10
  22:18
**1967** 12:1 15:7,9
  22:9,18 23:2
**1970** 15:17,17
  23:2
**1970's** 21:13
**1972** 23:8
**1974** 23:8
**1976** 16:12
**1977** 16:18
**1981** 17:17
**1982** 25:5
**1983** 18:9
**1985** 18:18 20:8
  26:5 27:8
**1987** 27:15
**1988** 5:3
**1993** 20:9,10
  31:1,12
**1994** 33:10
**1995** 26:5 27:9
  31:18 33:10,18
**1997** 138:20
**1998** 107:20
  108:16 110:19
  111:12 112:8
  117:1
**1999** 200:23

––––––––––
**2**
––––––––––
**2** 8:12 51:8,10
  75:6 76:22
  82:4,6 86:7
  92:19 126:21

**207:17** 218:1
**2nd** 65:22
**2-14-06** 83:2
**2-15-06** 74:18
**2-23-06** 74:21
**2-25-2002** 139:3
**2:06-CV-796-...**
  4:8
**2:07-CV-21-...**
  2:8
**2:30** 119:11
**20** 9:7 138:3,7
  153:22 209:4,5
**2000** 51:17,23
  52:2 111:1
  200:23
**2002** 45:17 47:4
  47:14,17,20
  48:1 107:22
  108:17 169:17
  169:18
**2003** 171:10
  184:3
**2004** 172:15
  178:3
**2005** 42:21,22
**2006** 53:10
  65:23 66:2,12
  70:20 72:9
  78:20 81:9
  84:2 93:4,18
  102:23 103:10
  104:11 117:9
  117:17,19
  118:3 135:7,23
  151:11 152:10
**2007** 5:7,21
  139:12 153:21
**203** 8:5
**21** 9:8 146:11,15
  153:3,11
**21st** 134:2 135:6
  135:22 137:4
  151:11 152:10

**214's** 21:20
**215** 8:4
**22** 9:9 121:11
  151:5,7
**23** 9:10 153:19
**23rd** 78:19
**24** 9:11 156:1,6
**25** 9:12 159:15
  159:18
**25th** 20:8 171:10
**2549** 11:8
**26** 9:13 169:4,7
**26th** 5:6,21
  169:17
**27** 9:14 170:2,5
**27th** 83:18
**28** 9:15 85:16
  172:3,5 173:16
**29** 9:16 174:15
  174:17,20

––––––––––
**3**
––––––––––
**3** 8:13 52:18
  57:12,13 58:6
  61:3 64:20,23
  71:14 88:7
  89:1,3 138:5
**3rd** 111:1
  172:15 173:4
  173:22 174:2
  184:23
**30** 9:17 175:17
  175:20 176:12
**31** 9:18 11:8
  180:13,14,16
**36022** 11:9
**36104** 7:12
**36107** 7:6
**38** 112:18,22
  113:9 116:19
  121:10,16

––––––––––
**4**
––––––––––
**4** 8:14 71:21
  72:1,12 77:9

**87:15**
**45** 8:11

––––––––––
**5**
––––––––––
**5** 8:15 74:5,7
  78:13,17 98:3
  130:6,7 131:16
**5(d)** 5:1
**5-15-2007** 139:2
  139:3
**501-C3** 190:8
**51** 8:12
**54630** 12:20

––––––––––
**6**
––––––––––
**6** 8:16 78:23
  79:2,5,8,17
  80:22 81:1,2
  83:5,23 84:6
  85:12,13,14,15
  85:16 86:3
**60** 7:11
**627** 156:15
**64** 8:13

––––––––––
**7**
––––––––––
**7** 8:17 80:11,13
  80:20,23 85:6
  85:10,13
**70's** 20:22
**71** 8:14
**74** 8:15
**78** 8:16

––––––––––
**8**
––––––––––
**8** 8:18 85:20,22
  86:1 90:19,20
**8:45** 65:22 66:11
  70:19 73:12
  102:5
**80** 8:17
**84** 51:20,22
**85** 8:18

––––––––––
**9**
––––––––––

**9** 8:19 12:10
  92:1,3 93:19
  99:9
**9-2-1997** 139:1
**9-9-2004** 152:20
**904** 7:11
**92** 8:19
**99** 8:20 177:21