# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **BONITA J. OWENSBY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. CV 2:06 CV796-WKW** |
| | ) |
| **J.F. INGRAM STATE TECHNICAL** | ) |
| **COLLEGE; J. DOUGLAS** | ) |
| **CHAMBERS INDIVIDUALLY** | ) |
| **AND IN HIS OFFICIAL CAPACTIY** | ) |
| **AS PRESIDENT OF J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE;** | ) |
| **AND JAMES WILSON,** | ) |
| **INDIVIDUALLY AND IN HIS** | ) |
| **OFFICIAL CAPACITY AS DEAN** | ) |
| **OF STUDENTS AND SUPPORT** | ) |
| **SERVICES AT J.F. INGRAM** | ) |
| **STATE TECHNICAL COLLEGE,** | ) |
| | ) |
| **Defendants.** | ) |

## MOTION FOR SUMMARY JUDGMENT
### DISCOVERY ATTACHMENTS

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  CV-2:06-cv-796MKW

6

7    BONITA J. OWENSBY,

8        Plaintiff,

9    vs.

10   J.F. INGRAM STATE TECHNICAL

11   COLLEGE; J. DOUGLAS CHAMBERS,

12   Individually and in his official

13   capacity as President of J.F.

14   INGRAM STATE TECHNICAL COLLEGE;

15   and JAMES WILSON, Individually and

16   in his official capacity as Dean

17   of Students and Support Services

18   at J.F. INGRAM STATE TECHNICAL

19   COLLEGE,

20        Defendants.

21

22           DEPOSITION TESTIMONY OF

23              BONITA J. OWENSBY

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1                   S T I P U L A T I O N

2

3              IT IS STIPULATED AND AGREED by and

4       between the parties through their respective

5       counsel, that the deposition of BONITA J. OWENSBY

6       may be taken before Cynthia M. Noakes, Court

7       Reporter, at the Law Offices of GIDIERE, HINTON,

8       HERNDON & CHRISTMAN, 60 Commerce Street, 904

9       Regions Tower, Montgomery, Alabama 36104, on the

10      26th day of July, 2007.

11              IT IS FURTHER STIPULATED AND AGREED

12      that the signature to and the reading of the

13      deposition by the witness is waived, the

14      deposition to have the same force and effect as

15      if full compliance had been had with all laws and

16      rules of Court relating to the taking of

17      depositions.

18              IT IS FURTHER STIPULATED AND AGREED

19      that it shall not be necessary for any objections

20      to be made by counsel to any questions except as

21      to the form or leading questions, and that

22      counsel for the parties may make objections and

23      assign grounds at the time of the trial, or at

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3             IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 4

1                           INDEX

2     EXAMINATION BY:                      PAGE NUMBER:

3     MR. BEAM                              10-295

4

5     EXHIBITS:

6     Defendants' Exhibit No. 1                    30

7     Defendants' Exhibit No. 2                    33

8     Defendants' Exhibit No. 3                    37

9     Defendants' Exhibit No. 4                    39

10    Defendants' Exhibit No. 5                    41

11    Defendants' Exhibit No. 6                    43

12    Defendants' Exhibit No. 7                    44

13    Defendants' Exhibit No. 8                    45

14    Defendants' Exhibit No. 9                    50

15    Defendants' Exhibit No. 10                   51

16    Defendants' Exhibit No. 11                   55

17    Defendants' Exhibit No. 12                   56

18    Defendants' Exhibit No. 13                   59

19    Defendants' Exhibit No. 14                   60

20    Defendants' Exhibit No. 15                   62

21    Defendants' Exhibit No. 16                   65

22    Defendants' Exhibit No. 17                   67

23    Defendants' Exhibit No. 18                   92

Page 5

1                    INDEX (continued)

2

3    Defendants' Exhibit No. 19              93

4    Defendants' Exhibit No. 20             105

5    Defendants' Exhibit No. 21             112

6    Defendants' Exhibit No. 22             126

7    Defendants' Exhibit No. 23             132

8    Defendants' Exhibit No. 24             140

9    Defendants' Exhibit No. 25             142

10   Defendants' Exhibit No. 26             146

11   Defendants' Exhibit No. 27             150

12   Defendants' Exhibit No. 28             151

13   Defendants' Exhibit No. 29             153

14   Defendants' Exhibit No. 30             158

15   Defendants' Exhibit No. 31             160

16   Defendants' Exhibit No. 32             209

17   Defendants' Exhibit No. 33             210

18   Defendants' Exhibit No. 34             210

19   Defendants' Exhibit No. 35             211

20   Defendants' Exhibit No. 36             215

21   Defendants' Exhibit No. 37             215

22   Defendants' Exhibit No. 38             221

23   Defendants' Exhibit No. 39             236

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services.

Page 6

1                     INDEX (continued)

2

3    Defendants' Exhibit No. 40                    238

4    Defendants' Exhibit No. 41                    238

5    Defendants' Exhibit No. 42                    239

6    Defendants' Exhibit No. 43                    241

7    Defendants' Exhibit No. 44                    241

8    Defendants' Exhibit No. 45                    243

9    Defendants' Exhibit No. 46                    250

10   Defendants' Exhibit No. 47                    250

11   Defendants' Exhibit No. 48                    251

12   Defendants' Exhibit No. 49                    262

13   Defendants' Exhibit No. 50                    288

14   Reporter's Certificate                        296

15

16

17

18    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 7

```
1                    A P P E A R A N C E S

2

3    ON  BEHALF  OF  THE  PLAINTIFF:

4              MR.  JIM  L.  DEBARDELABEN

5              ATTORNEY  AT  LAW

6              1505  Madison  Avenue

7              Montgomery,  Alabama  36107

8              (334)  265-9206

9

10   ON  BEHALF  OF  THE  DEFENDANTS:

11             MR.  MATTHEW  Y.  BEAM

12             GIDIERE,  HINTON,

13             HERNDON  &  CHRISTMAN

14             ATTORNEYS  AT  LAW

15             60  Commerce  Street

16             904  Regions  Tower

17             Montgomery,  Alabama   36104

18             (334)  834-9950

19

20   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

21

22             I,  CYNTHIA  M.  NOAKES,  a  Court  Reporter

23   of  Eufaula,  Alabama,  acting  as  Commissioner,
```

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 8

1    certify that on this date, as provided by the

2    Alabama Rules of Civil Procedure and the

3    foregoing stipulation of counsel, there came

4    before me at the Law Offices of GIDIERE, HINTON,

5    HERNDON & CHRISTMAN, 60 Commerce Street, 904

6    Regions Tower, Montgomery, Alabama 36104,

7    beginning at 9 a.m., BONITA J. OWENSBY, witness

8    in the above cause, for oral examination,

9    whereupon the following proceedings were had:

10

11              BONITA J. OWENSBY,

12    being first duly sworn, was examined and

13              testified as follows:

14

15              THE COURT REPORTER:  Usual

16    stipulations?

17              MR. BEAM:  Yes, ma'am.

18              MR. DEBARDELABEN:  Yeah.  And Mr. Merk

19    is here on Ms. Owensby's suit in what capacity?

20              MR. BEAM:  He's just here to observe.

21              MR. DEBARDELABEN:  Well, he's not a

22    named party in Ms. Owensby's suit.

23              MR. BEAM:  That's right.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 9

1          MR. DEBARDELABEN:  I'm trying to get

2    what capacity because he is not a named party.

3          MR. BEAM:  Right.

4          MR. DEBARDELABEN:  He's not allowed to

5    just come in and observe, unless he's designated

6    in some capacity.  Now, once he is designated in

7    that capacity, I probably will want to take his

8    deposition in that capacity.  But he hasn't been

9    designated in any capacity.

10         MR. BEAM:  Okay.

11         MR. DEBARDELABEN:  I mean, you know, I

12   just want to see what he's here for.  I'm just

13   trying to get that up front before we start.

14         MR. BEAM:  I understand.  Okay.  I'm

15   going to use the restroom.

16         MR. DEBARDELABEN:  Okay.  That's fine.

17         (A brief recess was taken.)

18         MR. BEAM:  Dr. Jim Merk is here with us

19   today, and the capacity that he is here in is as

20   representative of J.F. Ingram State Technical

21   College.

22         MR. DEBARDELABEN:  In his capacity as

23   personnel director?  I think that's one of his

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1    titles.

2                MR. BEAM:   That's right.   Dr. Merk,

3    what is your official title now?

4                DR. MERK:   Dean of Instruction.

5                MR. BEAM:   Okay.   In his capacity as

6    Dean of Instruction.

7                MR. DEBARDELABEN:   And under that,

8    you're personnel director, I think, or something.

9    You're over personnel?

10               DR. MERK:   Yes.

11               MR. DEBARDELABEN:   Okay.

12               MR. BEAM:   Okay?

13               MR. DEBARDELABEN:   Yeah, that's fine.

14               MR. BEAM:   Okay.

15

16                     EXAMINATION

17   BY MR. BEAM:

18   Q.    Ms. Owensby, my name is Matt Beam, and I'm

19   here to take your deposition.   This is a federal

20   lawsuit and you are the named plaintiff.   And so

21   what I'm going to ask you to do today is to answer

22   my questions.   And, as you know, you've just been

23   sworn in and you're under oath.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 11

1        Do you know what that means, to be under

2   oath?

3   A.    Yes.

4   Q.    And do you plan to tell the truth today?

5   A.    Yes.

6   Q.    Okay.  Let me ask you to speak up so that

7   the court reporter can always take down what

8   you're saying.  She can't take down if you nod or

9   if you say uh-huh.

10        If you need to take a break, just let me

11   know.  I'm sure we'll take some breaks during the

12   course of the deposition, but if you want to take

13   a break, just let me know.

14   A.    Okay.

15   Q.    If you don't understand my question, just

16   let me know.

17   A.    Okay.

18   Q.    If you're confused by it, just let me know

19   and I'll do my best to make it more clear.

20   A.    Okay.

21   Q.    Ms. Owensby, could you state your full name?

22   A.    Bonita Jackson Owensby.

23   Q.    Ms. Owensby, has your name changed in the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 12

1    last 20 years?

2    A.    Yes.

3    Q.    Okay.  Can you tell me when it was changed?

4    A.    In 1997, I believe, after my divorce, it

5    changed from Bonita J. Lewis to Bonita J. Owensby.

6    In 1983, it changed from Bonita Marcella Jackson

7    to Bonita J. Lewis.

8    Q.    Good enough.  Can you tell me what your

9    present address is?

10   A.    397 McKeithen Place.  That's in Millbrook,

11   Alabama.

12   Q.    And, Ms. Owensby, are you married now?

13   A.    Yes.

14   Q.    And what is your husband's name?

15   A.    Carlton Owensby.

16   Q.    And do you have any children?

17   A.    One child.

18   Q.    And what is your child's name?

19   A.    Carla Katelyn Lewis.

20   Q.    And how old is she?

21   A.    She's 12.

22   Q.    Okay.  I noticed in your interrogatory

23   responses that you had a long list of relatives

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 13

1    that live in the middle district of Alabama.

2         Is that a complete list of relatives that

3    live in the middle district?

4    A.    I'm trying to determine the middle district.

5    Q.    Okay.  Autauga County, Elmore County,

6    Montgomery County --

7              MR. BEAM:  Jim, feel free to

8    supplement --

9              MR. DEBARDELABEN:  I would say from

10   Montgomery south, on the east side of the

11   interstate, down to the Florida line and over to

12   Georgia.

13             MR. BEAM:  That's correct.

14   A.    Okay.  I have relatives in Montgomery, the

15   Harvests.  And I have to name all of them, right?

16   Q.    If you can.

17             MR. DEBARDELABEN:  Well, did you name

18   them all in your --

19             THE WITNESS:  I don't think I named the

20   Harvests.

21   Q.    Okay.  Well, my question is:  Is there

22   anyone else, beyond the Harvests, that you need to

23   name as relatives, beyond what you have in your

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 14

1    interrogatory response?

2    A.    I have extended relatives; basically, the

3    ones who have married off, you know, to other

4    areas that live in Montgomery.  And I don't think

5    all of them are listed in there.

6    Q.    Okay.  Can you just tell me what their names

7    are?  Just their last names.

8    A.    Okay.  We have the Harvests, the Perkins,

9    another set of Lewises, Jacksons; and I believe

10   that's all of them.  Now, when you say Georgia --

11              MR. DEBARDELABEN:  No, no, no, you

12   don't have to get into Georgia.

13              THE WITNESS:  Okay.

14   A.    So that's -- I named the Tymeses, the

15   Jameses.  That's it.

16   Q.    Okay.  Ms. Owensby, have you ever been

17   involved in any other lawsuits?

18   A.    I had a lawsuit concerning an automobile

19   accident in -- I think that was in the '80s, I

20   believe, around '87, '88.

21   Q.    Were you the plaintiff or the defendant in

22   that case?

23   A.    Plaintiff.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 15

1   Q.     And what was the ultimate resolution of that

2   case?

3   A.     It was settled out of court.

4   Q.     Okay.  Any other lawsuits you've been

5   involved in, besides that one car accident?

6   A.     I was named as a witness in a lawsuit

7   involving J.F. Ingram, Loretta Washington, and

8   William Griswold.

9   Q.     And you were a witness for the plaintiff or

10  the defense?

11  A.     The plaintiff.

12  Q.     And the plaintiff was Loretta Washington?

13  A.     Loretta Washington.

14  Q.     Okay.  Did you ever give a deposition in

15  that case?

16  A.     No.

17  Q.     Did you ever testify in that case?

18  A.     No.

19  Q.     You were just a named witness?

20  A.     I was a named witness.

21  Q.     Okay.  And you have never been involved in

22  any other lawsuits, besides those two?

23  A.     No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 16

1    Q.    Okay.  Ms. Owensby, tell me where you work

2    now.

3    A.    J.F. Ingram State Technical College.

4    Q.    And what year did you start working there?

5    A.    1985.

6    Q.    Prior to 1985, could you tell me what's the

7    first job that you had?

8    A.    The first job I had was in 1981.  I went to

9    work for the state Department of Education

10   temporarily, on a temporary basis.

11   Q.    Tell me what you did there.  What did you do

12   for them?

13   A.    There, I started off working in the teacher

14   certification area.  From there, I went to the

15   professional development department; and I worked

16   there five and a half months.

17   Q.    So when you left there, where was your next

18   job?

19   A.    My next job was St. Margaret's Hospital.

20   Q.    What did you do at St. Margaret's?

21   A.    I was a radiology clerk.

22   Q.    And how long did you work at St. Margaret's?

23   A.    I worked there until 1985.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 17

1   Q.    Okay.  So those were the only jobs that you

2   had prior to working at Ingram?

3   A.    Now, I had summer jobs as a teenager.  Do I

4   need to name those?

5   Q.    Just tell me briefly what you did.

6   A.    At 16, I worked for the City of Millbrook.

7   It was like a summer CETA government program.  And

8   I worked there two summers straight.  And I worked

9   part time at Millbrook Super Foods.  And I think I

10  was about 16 then.  And that was it.

11  Q.    Okay.  Have you named for me all your

12  employment from high school until you went to work

13  at Ingram in '85?  Can you think of any other jobs

14  you've had.

15  A.    I worked part time at the Baptist Hospital.

16  Q.    When was that?

17  A.    I think it was '97, right after my divorce.

18  Q.    Okay.  In 1997?

19  A.    I think it was 1997.

20  Q.    Okay.  What did you do there?

21  A.    I was working in the surgery department.  I

22  was what you call a surgical clerk.

23  Q.    How many hours a week did you do that?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

```
1   A.      About 20.

2   Q.      Did you work there and also work at Ingram?

3   A.      Yes.

4   Q.      How long did you work there?

5   A.      Not long.  I don't think I did a year.  It

6   wasn't working out.  Too much time away from my

7   daughter.  And at that time, I was a single

8   parent, and I thought it would be better for me to

9   just do my day job and try to maintain with what I

10  had.

11  Q.      Did I ask you when you got married, your

12  marriage now?

13  A.      No.

14  Q.      How long have you been married?

15  A.      Almost seven years.

16  Q.      And you are married now?

17  A.      Yes.

18  Q.      How old is your daughter?

19  A.      She's 12.

20  Q.      Okay.  Ms. Owensby, where did you go to high

21  school?

22  A.      Stanhope Elmore High.

23  Q.      What county is that in?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 19

1    A.    Elmore.

2    Q.    What year did you graduate?

3    A.    1980.

4    Q.    Did you receive any honors?

5    A.    Just regular diploma.

6    Q.    And what did you do after you graduated from

7    Stanhope Elmore?

8    A.    I went to AUM for one semester -- one

9    quarter.  It was quarters then.

10   Q.    What did you study at AUM?

11   A.    I took the basic courses.  I took a

12   sociology course, a psychology course, and -- two

13   sociology courses.

14   Q.    And how long did you go to AUM?

15   A.    One quarter.

16   Q.    Okay.  And that was directly after you

17   finished high school?

18   A.    Yes.  Because I started that fall.

19   Q.    And why did you leave AUM?

20   A.    Starting out as a college freshman -- and

21   during that time, I guess I either registered too

22   late or -- I couldn't get the courses, the basic

23   starting courses that I desired, and I ended up

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 20

1    having to take those three courses, and they were

2    a bit overwhelming.

3        And I decided that I really wanted to get in

4    the job market as soon as possible.  And I chose

5    to go to Trenholm to get a trade, so I could get

6    out and get a job, and then later go back to where

7    I could pay for my own education.

8    Q.    So after you left AUM, you enrolled in

9    classes at Trenholm?

10   A.    Yes.

11   Q.    Was that right after you left AUM?

12   A.    Yes.  That December.

13   Q.    And what did you study at Trenholm?

14   A.    Legal stenography.

15   Q.    And how long did you go to Trenholm?

16   A.    Eleven months.

17   Q.    Did you graduate from Trenholm?

18   A.    Yes.

19   Q.    What was your degree in from Trenholm?

20   A.    It was in legal stenography.

21   Q.    What year did you get that degree?

22   A.    In 1981.

23   Q.    Can you tell me what other education beyond

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1    high school you have pursued?  After you finished

2    at Trenholm, did you take any more classes

3    anywhere else?

4    A.    After I finished Trenholm, I went to Central

5    Alabama Community College, obtained my Associate

6    in Arts degree there.  And from there, I went to

7    Troy State, and I earned about 30 semester hours

8    there.

9    Q.    And at the community college, when did you

10   attend that?  What was the college you said?  I'm

11   sorry.

12   A.    Central Alabama Community College.

13   Q.    Okay.  When did you go there?

14   A.    I started Central Alabama, I believe it was

15   in 1991.  I believe; I'm not sure.

16   Q.    You started in '91?

17   A.    Yes.

18   Q.    And when did you finish there?

19   A.    I think it was '93; I'm not sure.  It took

20   about two years.

21   Q.    And what was your degree in from Central

22   Alabama Community College?

23   A.    Associate in Arts.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1    Q.    Did you receive any awards or honors?

2    A.    No.

3    Q.    Did you receive any awards or honors from

4    Trenholm?

5    A.    No.

6    Q.    After you left Central Alabama Community

7    College, you said you went to school back here in

8    Montgomery again?

9    A.    Went back to Troy State in Montgomery.

10   Q.    What did you study there?

11   A.    I -- what was my major?  Did I choose a

12   major?  I'm not sure what my major -- what major I

13   chose.  I'm trying to think.  I'm not sure.  I can

14   probably think about it later on.

15   Q.    Just generally, do you remember what you

16   studied?

17   A.    I had about three -- well, two psychology

18   classes, World Religion, World Literature,

19   sociology, Marriage in the Family, a bunch of

20   psychology courses.

21   Q.    Okay.  What year did you graduate from

22   Trenholm?

23   A.    1981.

Page 23

1    Q.    Okay.  Did you graduate from Troy?

2    A.    No.

3    Q.    How many classes would you say you took at

4    Troy?

5    A.    I would say I took about five or six.

6    Q.    And what year did you finish taking classes

7    at Troy?

8    A.    My last classes were 2002.

9    Q.    Why did you stop taking classes at Troy?

10   A.    Well, it again got kind of difficult for me

11   to maintain family life and school and work all at

12   the same time.  It was getting difficult for me to

13   have someone to watch my child in the eveningtime

14   while I went to school at night, and I gave it up.

15   Q.    But you're not sure what degree you were

16   pursuing at Troy?

17   A.    Probably general education.

18   Q.    Are there any other classes that you've

19   taken beyond high school that you can remember

20   that you can tell me about?

21   A.    I took a course at Athens College.  It was a

22   Special Ed course:  Introductory to the

23   Exceptional Child in the Classroom.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 24

1   Q.    When did you take that?

2   A.    That would have been, I believe, in 1992.

3   Because we were going to Athens and Central

4   Alabama at the same time.

5   Q.    You just took one class at Athens?

6   A.    One class.

7   Q.    Why did you take that class?

8   A.    Because I was pursuing a degree in

9   education, or at least that was my goal.

10  Q.    Any other coursework beyond high school that

11  you can think of?

12  A.    No, not that I can think of.

13  Q.    Any other academic awards or honors you can

14  think of?

15  A.    No.

16  Q.    Ms. Owensby, are you a licensee of any state

17  agency in Alabama?

18  A.    What do you mean by that?

19  Q.    Do you hold any professional licenses?

20  A.    No.

21  Q.    Have you ever applied for any licensure in

22  Alabama?

23  A.    No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 25

1    Q.    As a result of the education that you have

2    told me about, can you tell me what skills that

3    you obtained as a result of that education?

4    A.    Well, I've obtained intellectual skills;

5    I've obtained being able to understand processes

6    and concepts of, really, any given situation:  how

7    to analyze it, how to start goals, how to reach

8    goals.  Basically, how to implement any type

9    process that's before me.  How to do it

10   successfully, efficiently.  That's it.

11   Q.    As a result of your education, did you

12   receive training in computers?

13   A.    Yes, I received training in computers.  I

14   did have a computer class.  It was where we did

15   most of the computer work -- it wasn't like an

16   everyday computer class, because they would come

17   to the campus to teach it.

18        I had computer experience in Lotus.  This

19   class was taught from the Nunnelly campus --

20   Central Alabama's Nunnelly campus.  They came here

21   to Ingram and taught the Lotus class.

22        I've had extensive training with the AS/400,

23   which is the system that we use at the college

Page 26

1    now.   Basic computer, before we got onto the

2    AS/400 system, was the IBM 36.  It was the

3    mainframe for the institution.  And we basically

4    had to learn ourselves on that.

5         So we went basically from an Apple computer

6    to the IBM 36; from there to the AS/400.  And we

7    had training from ACCESS software on AS/400.  But

8    all the other computers, other than the Lotus, I

9    basically learned myself.

10   Q.    So the computer class that you were telling

11   me about was at Alabama Central Community College?

12   A.    Yes.   That Lotus class.

13   Q.    And in the course of the education that

14   you've told me about, can you tell me about any

15   other special skills that you obtained as a result

16   of your education?

17   A.    As a result of my education, I have learned

18   very well how to interact with people.  My

19   supervisory skills, I think my education played a

20   lot in that.

21   Q.    Can I ask you how?

22   A.    Well, you can -- in my opinion, you don't

23   have to have a Ph.D. or a master's degree to know

Page 27

1    how to deal with people in general.  Basically,

2    treating people fairly, treating people --

3    everybody across the board.  No favoritism.

4    Basically, if you have people working under you,

5    make sure you have prepared them for their job to

6    the point to where they can do it.

7        However, if there's a problem, there's a way

8    to approach that also.  I don't believe in what

9    they call the dogmatic system.  You do or don't.

10   I try other approaches in order to get through to

11   the people that are under me.  And I try not to

12   allow personal feelings to get in the way of the

13   job, or prevent me from doing whatever it is I

14   have to do when it comes to the people that work

15   under me.

16   Q.    Can you tell me any other special skills you

17   feel that you got from your education?

18   A.    Being able to look at something or read

19   something and catch on pretty fast.  I'm a very

20   quick learner.  If I do something once or maybe

21   twice, I can do it, more or less.

22   Q.    Let me mention this to you really quick:  I

23   have horrible allergies, and I'm due for my

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 28

1    allergy shot.  So if you hear me wheezing and

2    coughing over here, I'm not reacting to you; I'm

3    just due for my allergy medication, okay?

4    A.    Okay.

5    Q.    Any other skills that you feel that are a

6    direct result of your education?

7    A.    No.

8    Q.    Ms. Owensby, do you have a professional

9    degree?

10   A.    What is your definition of a professional

11   degree?

12   Q.    Well, today I'm afraid I'm asking the

13   questions, so if you don't understand my

14   question --

15   A.    Okay, yeah.

16   Q.    You don't understand what I'm saying when I

17   say "professional degree"?

18   A.    Right.

19   Q.    My question is:  Do you have a four-year

20   college degree?

21   A.    No.

22   Q.    Okay.  Do you have a degree that would train

23   you for a traditional profession, like business or

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 29

1    law or medicine?

2              MR. DEBARDELABEN:  Object to the form.

3    You can answer it.

4    A.      No.

5    Q.      Do you consider yourself to have a

6    professional degree?

7    A.      I consider myself having a degree and have

8    learned enough in, I would say almost three years,

9    to be able to go out in the workforce and work a

10   job successfully, and particularly the job that

11   I'm doing now.

12           With the former education I've had and with

13   basic knowledge and experience, I think my degree

14   is applicable to the job that I'm doing, or

15   sufficient.

16   Q.      And in what you have just described to me,

17   you have described a lot of people skills.

18           Would you say that your education helped

19   develop your people skills?

20   A.      No.  I had people skills basically through

21   growing up and life experiences.  It enhanced it,

22   but a lot of that you learn through the growing

23   process, and basically going through regular

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 30

1    school from primary to high school and even higher

2    up.

3    Q.    Okay.  I'm going to turn your attention to

4    the mid '80s, when you went to work for J.F.

5    Ingram.

6    A.    Okay.

7    Q.    Ms. Owensby, I'm going to ask you to take a

8    look at this document.

9                (The witness examines the

10               document.)

11   Q.    Can you tell me what that is?

12   A.    This is an appointment letter for my

13   position as office clerk in 1985.

14   Q.    Okay.

15               MR. BEAM:  I would like to mark that as

16   Defendants' Exhibit 1.

17               (Defendants' Exhibit No. 1 was

18               marked for identification and a

19               copy of the same is attached

20               hereto.)

21   Q.    Ms. Owensby, what was your position when you

22   started at Ingram?

23   A.    When I started at Ingram, I started as an

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 31

1    office clerk.  I basically answered to the

2    president's secretary.

3        I filed office documents for her; I typed --

4    I did typing for her; I was responsible for the

5    mail; and I would also assist, with her

6    permission, instructors if they needed something

7    typed or any type of documents done or copying or

8    whatever.  Just basic general office work.

9    Q.    And what salary schedule were you on when

10   you started?

11   A.    E.

12   Q.    And what was your annual salary?

13   A.    10,272.

14   Q.    Okay.  And your title was what?

15   A.    Office clerk.

16   Q.    Okay.  Ms. Owensby, I'm going to ask you to

17   take a look at this document.  I'm sorry.

18        Before I ask you that, do you think that you

19   were awarded that appointment based on your race?

20   A.    No.

21   Q.    Do you think you were awarded that

22   appointment based on your gender?

23   A.    No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 32

1    Q.    Okay.  I'm going to ask you to look at this

2    second document and please tell me if you

3    recognize it.

4    A.    Yes.

5    Q.    And tell me what that is.

6    A.    That's an appointment letter for the year

7    ending August 31, 1986, for office clerk.

8    Q.    And what is the date on that letter?

9    A.    September 1, 1985.

10   Q.    Okay.  And what is the date on Defendants'

11   Exhibit 1?

12   A.    February 11, 1985.

13   Q.    Okay.  And what does that letter say is your

14   new title?

15   A.    This one?

16   Q.    Uh-huh.

17   A.    Office clerk.

18   Q.    And what is your salary?

19   A.    11,256.

20   Q.    Do you know why you got a raise in less than

21   a year?

22   A.    Because that was the state allocation.  They

23   usually would do a 4 or 5 percent.  I don't know

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1    what percentage from 10,272 to 11,256 is.  That

2    would have been the allocation from the state.

3    Q.    Okay.

4          MR. BEAM:  I'm going to mark that

5    Defendants' Exhibit 2.

6                (Defendants' Exhibit No. 2 was

7                marked for identification and a

8                copy of the same is attached

9                hereto.)

10   Q.    Ms. Owensby, did you get this appointment as

11   a result of your race?

12   A.    No.

13   Q.    Did you get this appointment as a result of

14   your gender?

15   A.    No.

16   Q.    I'm just going to move these aside so we can

17   keep them in order.

18         Ms. Owensby, can you identify that document

19   for me?

20   A.    This is dated September 1, 1986, and this is

21   an appointment letter for the year ending

22   August 31, 1987, for the position office clerk.

23   Q.    And what was your salary there?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1    A.      11,718.

2    Q.      Does that appointment letter reflect a

3    raise?

4    A.      Yes.   State raise.   Percentage.

5    Q.      What do you mean by "state raise,

6    percentage"?

7    A.      According to the salary schedules that are

8    issued from the Department of Postsecondary, there

9    are steps and there are grades.   And you start on

10   a certain grade.   I think the schedule -- okay.

11   The E-7 would have been the grade, and then

12   whatever step.

13          From that salary schedule, you start at a

14   certain salary; and each year the salary would

15   change, according to whatever percentages the

16   state has allocated for that particular year.

17          And you go up to, I think, ten years.

18   You'll get increments in salaries for up to ten

19   years.   After the tenth year, I think you have to

20   wait two years, or two to five years.   I think

21   it's five years, because I don't think you start

22   back to getting them until you get to your 15th

23   step.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 35

1          So basically they are increments that go

2     across instead of up.

3     Q.    Who was the president at J.F. Ingram at the

4     time?

5     A.    Dr. Murry C. Gregg.

6     Q.    Did you interview with Dr. Gregg when you

7     were initially hired?

8     A.    Yes.

9     Q.    Did you interview with anybody else?

10    A.    Mr. Freddie Powell, Ms. Sylvia Murphree and

11    Mr. Milt Mulder, and Mr. Paul Reeder.

12    Q.    Do you remember what you talked about when

13    you were interviewed?

14    A.    I had applied for a position at the college

15    before I actually got this position.  And actually

16    they called me when this position became available

17    to see if I was interested.  They, I guess, went

18    back and pulled some applications, and they saw my

19    application; and they called to see if I was

20    interested in this particular position, because I

21    had applied for one other position before this one

22    became available.

23          And I said I was interested and I came in

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 36

1    and we interviewed.  And we talked basically my

2    education from Trenholm.  They knew that I had

3    gotten a diploma in legal stenography, and my

4    experience from St. Margaret's Hospital working as

5    a clerk.  So it was basically pertaining to my

6    work experience as a clerk.

7    Q.    Did you compete against other applicants for

8    that initial appointment?

9    A.    I'm not sure about that.  Because, like I

10   said, they called me.  I don't know whether they

11   pulled other applications or who else they called.

12   I didn't see anybody when I came for the

13   interview, so I can't say.

14   Q.    I know you testified just a few minutes ago

15   a little bit about what your responsibilities were

16   when you started.

17        Is there anything you would like to add to

18   that testimony, what your responsibilities were in

19   the first two years that you worked as an office

20   clerk?

21   A.    The basic primary responsibilities I talked

22   about.  And there were other -- well, I wouldn't

23   call them responsibilities; they were more or less

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1    helping out or volunteering.

2          During that time, I think the college was --

3    we had consultants there that were trying to get

4    grants, or writing for federal grants, and a lot

5    of typing had to be done.

6          And there was a consultant who was working,

7    had a lot of typing to be done.  And he asked if I

8    could help him.  And I said yes.  But I always had

9    to get permission from Ms. Murphree.  And she

10   granted that permission, and I started typing for

11   that consultant in his grant writing.

12         And there was several times when we had,

13   like, emergency-type situations, and lot of typing

14   again had to be done.  And I was there to do it.

15   Q.    Okay.

16               MR. BEAM:  I'm going to mark this as

17   Defendants' Exhibit 3.

18               (Defendants' Exhibit No. 3 was

19               marked for identification and a

20               copy of the same is attached

21               hereto.)

22   Q.    Okay.  Ms. Owensby, would you tell me if you

23   recognize that document?

Page 38

1   A.     Yes, I recognize it.

2   Q.     Can you tell me what it is?

3   A.     It looks as though they are notes from an

4   interview, I would say, when I assumed the

5   position as Secretary to the Dean of Students.

6   Seems that they are notes that Ms. Murphree took.

7   Q.     Okay.  And did you tell Ms. Lewis (sic) that

8   you thought you could handle more responsibility?

9   A.     Yes.  Well, they asked me if I could, and I

10  told them yes because I could.

11  Q.     And were you requesting to be considered for

12  a salary increase at that time?

13  A.     No, I didn't request this.  There was a

14  change in position, so it was an automatic salary

15  increase.

16  Q.     But you were asking to be considered for

17  this position; is that what you're saying?

18  A.     No.  I was chosen or elected.  In other

19  words, they asked me if I would assume that new

20  position, asked me if I was interested, and I said

21  yes.

22  Q.     So after they came to you and asked if you

23  would consider this, what did you tell them?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 39

1   A.    I told them yes.  They asked me if I thought

2   I could handled the responsibility, and I said

3   yes.

4   Q.    Okay.

5         MR. BEAM:  I'm going to mark that as

6   Defendants' Exhibit 4.

7         (Defendants' Exhibit No. 4 was

8         marked for identification and a

9         copy of the same is attached

10        hereto.)

11  Q.    And did you receive that appointment?

12  A.    Yes.

13  Q.    Do you recognize this document?

14  A.    This would be the appointment letter for

15  that position.

16  Q.    And what position were you appointed to?

17  A.    Secretary to the Dean of Students.

18  Q.    And what was your annual salary at that

19  point?

20  A.    13,104.

21  Q.    And what is that appointment letter dated?

22  A.    July 20, 1987.

23  Q.    So if I understand your testimony correctly,

Page 40

1    they came to you and asked you if you would like

2    to be considered for this position?

3    A.    Yes.

4    Q.    And you said yes, and you got it?

5    A.    Well, they interviewed me.

6    Q.    They did interview you?

7    A.    Yes.

8    Q.    Did they consider other people for that

9    position?  Do you know?

10   A.    I don't know.

11   Q.    Who did you interview with?

12   A.    Dr. Gregg, Ms. Murphree, Dean Reeder, Dean

13   Mulder and Dean Powell.

14   Q.    Do you remember what they asked you in those

15   interviews?

16   A.    Basically, it was more or less a statement

17   that Dr. Gregg said, that he had observed my work

18   for the past two years as an office clerk; and he

19   had talked with his secretary, and she had noted

20   to him that she thought that I would be able to

21   handle that type of responsibility.

22         And he talked it over with Dean Reeder, who

23   was the dean that I would be secretary to, and he

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1    stated that it was okay with him.  His secretary

2    had resigned.

3         And from their observation, they thought

4    that I would be a good candidate for the job, so

5    they offered it to me.

6              MR. BEAM:  I'm going to mark that as

7    Defendants' Exhibit 5.

8              (Defendants' Exhibit No. 5 was

9              marked for identification and a

10             copy of the same is attached

11             hereto.)

12   Q.    Ms. Owensby, let me ask you this:  Up until

13   this point, had any of these appointments that you

14   had received, were they a result of your race?

15   A.    No.

16   Q.    Or of your gender?

17   A.    I don't think so, no.

18   Q.    Do you recognize this document?

19   A.    This would be an appointment letter for

20   secretary to Dean of Students ending August 31,

21   1988.

22   Q.    And what is that letter dated?

23   A.    September 1, 1997 (sic).

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 42

1    Q.    I think it's 1987.

2    A.    Oh, yeah, you're right.  I'm sorry.  1987.

3    Q.    And what is your title there?

4    A.    Secretary to the Dean of Students.

5    Q.    And what's your annual salary?

6    A.    13,566.

7    Q.    Does that reflect a pay increase?

8    A.    Yes.

9    Q.    Okay.  Did you get that appointment because

10   of your race?

11          MR. DEBARDELABEN:  I'm going to object.

12   You're asking why she got the appointment.  She

13   doesn't know why somebody else gave her the

14   appointment.  She can only testify as to her

15   knowledge.  So whether she got it for her race or

16   gender, she has no idea.  But she can answer what

17   she knows.  But you're asking for somebody else's

18   reasoning.

19          MR. BEAM:  I'll rephrase.

20   Q.    Do you believe that you got this appointment

21   because of your race?

22   A.    I don't -- I don't know.

23   Q.    Do you believe you got this appointment as a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 43

1    result of your gender?

2    A.    No, I don't.  No.

3    Q.    Okay.

4          MR. BEAM:  We'll mark that as

5    Defendants' Exhibit 6.

6          (Defendants' Exhibit No. 6 was

7          marked for identification and a

8          copy of the same is attached

9          hereto.)

10   Q.    Ms. Owensby, do you recognize this document?

11   A.    It's another appointment letter for the

12   period ending August 31, 1989.

13   Q.    And what is that letter dated?

14   A.    September 1, 1988.

15   Q.    And what is your title?

16   A.    Secretary to the Dean of Students.

17   Q.    And what is your pay rate?

18   A.    This one -- I don't see it on here.  This

19   one does not have it on here.

20   Q.    Okay.  Do you believe you got that

21   appointment as a result of your race?

22   A.    No.

23   Q.    Do you believe you got that appointment as a

Page 44

1    result of your gender?

2    A.      No.

3    Q.      All right.

4              MR. BEAM:   We'll mark that Defendants'

5    Exhibit 7.

6              (Defendants' Exhibit No. 7 was

7              marked for identification and a

8              copy of the same is attached

9              hereto.)

10   Q.     Ms. Owensby, do you recognize this document?

11   A.     Thereto again, it's an appointment letter

12   for Secretary to the Dean of Students for the year

13   ending August 31, 1990.

14   Q.     What is that letter dated?

15   A.     September 1, 1989.

16   Q.     And what's the title in that appointment

17   letter?

18   A.     Secretary to the Dean of Students.

19   Q.     Is there a pay rate on there?

20   A.     No, there's not a pay rate on this one.

21   Q.     Did you get that appointment -- I'm sorry.

22   Do you believe that you got that appointment as a

23   result of your race?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1    A.    No.

2    Q.    Do you believe you got that appointment as a

3    result of your gender?

4    A.    No.

5         MR. BEAM:  We'll make that Defendants'

6    Exhibit 8.

7              (Defendants' Exhibit No. 8 was

8              marked for identification and a

9              copy of the same is attached

10             hereto.)

11   Q.    Ms. Owensby, do you recognize that document?

12   A.    This is another appointment letter.

13   Q.    What is it dated?

14   A.    September 1, 1990.

15   Q.    And what is the title?

16   A.    Secretary to the Dean of Students.

17   Q.    And do you have a pay rate in there?

18   A.    No.

19             MR. DEBARDELABEN:  Matt, let me clear

20   something up.  Are you asking a pay rate?

21             MR. BEAM:  Uh-huh.  What her annual

22   salary is.

23             MR. DEBARDELABEN:  Annual salary.

Page 46

1    Because they put a salary schedule at a function,

2    but I didn't understand what -- I thought you were

3    saying annual meaning by annual salary.  Okay.

4         MR. BEAM:  And I'm sorry.  I don't mean

5    to be confusing.

6         MR. DEBARDELABEN:  And I think she

7    thought annual salary.  But there is a rate of

8    pay; it just doesn't show.

9         MR. BEAM:  You're right.

10   Q.   Does it reflect your annual salary?

11   A.   Yes.  At an E-5, Step 6, whatever that

12   salary schedule was for that year.

13   Q.   Do you know what that would mean?  What that

14   step would mean?

15   A.   That, at the time, I was on the E step --

16   no.  I was on the E grade or E level at Step 6.

17   Q.   And when you were hired at Ingram, did you

18   start on the E salary schedule?

19   A.   Yes.

20   Q.   And this document reflects that you are

21   still on the E schedule in 1990; is that right?

22   A.   Yes.

23   Q.   And did you get that appointment as a result

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 47

1    of your race?  I'm sorry.  Do you believe you got

2    that appointment as a result of your race?

3    A.    No.  Like this and all the other ones, I got

4    it because I apparently was a productive employee

5    and I was doing my job and they saw fit to

6    reappoint me year after year.  Apparently they

7    were satisfied with my work.

8    Q.    And does this document from 1990 reflect a

9    one-step increase on the E salary schedule from

10   the previous year?

11   A.    This is an E-5.  I started at E-7.  And I

12   think the last one -- do you have an E-6?

13   Q.    On Defendants' Exhibit 8, in '89, you are on

14   E-5.

15   A.    Okay.  And in '90 I'm on E-5, according to

16   this one.

17   Q.    And what is your step?

18   A.    Step 6.

19   Q.    So does that reflect a step up?  From Step 5

20   to Step 6 is that an increase?

21   A.    Well, this one is '90.  I think the other

22   one was dated '91.  So I think it's backwards.

23   Q.    This is '89.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 48

1    A.     Okay.   '89, E-5, Step 5; and 1990, E-5, Step

2    6.  So it's one step over.

3    Q.     One step up?

4    A.     Over.

5    Q.     One step over?

6    A.     Yes.  You have to look at the salary

7    schedule to see how it goes.  It goes over and up.

8    Q.     Okay.  So tell me what you mean when you say

9    you went from Step 5 to Step 6.  What does one

10   step over mean?

11   A.     Step 6 was the year.  Six years experience.

12   Q.     Did you get a raise in 1990, from this

13   appointment letter in '89 to 1990?

14   A.     I'm not sure.  Because neither one of them

15   shows what the actual salary was.

16   Q.     So you don't know if you go from Step 5 to

17   Step 6 on the E salary schedule, whether that's a

18   raise?

19   A.     If I went from E-5, Step 5 to E-5, Step 6,

20   according to the way the salary schedule is

21   positioned, E-5 to E-6 probably would have

22   changed, due to, thereto again, the allocation

23   from the state.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1           I mean, according to the salary schedule,

2    each step over, you get increments, I think, until

3    you get to year ten.  Then you stop for a while;

4    and you have to go until year 15, and you're

5    granted other increments.

6    Q.    So from 1989, when you got that appointment

7    letter, until this appointment letter from 1990,

8    did you get a raise?

9    A.    Yeah, I got a raise.  But it wasn't a merit

10   raise; it was a raise that every person that was

11   on that particular level, or any other level,

12   according to the years.

13          I mean, if I was E-5, Step 5, and that next

14   year I went to my sixth year of employment, then,

15   of course, I got the increment that is allowed on

16   the salary schedule not only for me but everybody

17   that works there.

18   Q.    So you did get a merit raise?

19   A.    No.

20   Q.    You did not get a merit raise?

21   A.    I didn't get a merit raise.  A merit raise,

22   you go up.

23   Q.    Okay.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 50

1          MR. BEAM:  I'm going to mark that as

2    Defendants' Exhibit 9.

3              (Defendants' Exhibit No. 9 was

4              marked for identification and a

5              copy of the same is attached

6              hereto.)

7    Q.    Ms. Owensby, can you tell me what that

8    document is?

9    A.    This is an appointment letter for the

10   position of Secretary to the Dean of Students

11   ending August 31, 1992.

12   Q.    Okay.  And what is that letter dated?

13   A.    September 1, 1991.

14   Q.    And what is your title?

15   A.    Secretary to the Dean of Students.

16   Q.    And what is your pay rate?

17   A.    E-5, Step 6.

18   Q.    Okay.  And does that letter reflect an

19   increase over what you had before, the previous

20   year?

21   A.    No.  It looks like it was the same.

22   Q.    Do you have any knowledge as to whether or

23   not you got a raise from 1990 to 1991?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 51

1   A.      No.

2   Q.      You don't know?

3   A.      No.

4   Q.      Okay.

5           MR. BEAM:  We'll make that Defendants'

6   Exhibit 10.

7           (Defendants' Exhibit No. 10 was

8           marked for identification and a

9           copy of the same is attached

10          hereto.)

11  Q.      Ms. Owensby, do you believe that you got

12  that appointment as a result of your race?

13  A.      No.

14  Q.      Do you believe you got that appointment as a

15  result of your gender?

16  A.      No.

17  Q.      Okay.  Can you tell me what that document

18  is?

19  A.      An appointment letter Secretary to the Dean

20  of Students for year ending August 31, 1993.

21  Q.      And what is that letter dated?

22  A.      September 1, 1992.

23  Q.      And what is your title?

Page 52

1  A.    Secretary to the Dean of Students.

2  Q.    And does that document reflect a pay rate?

3  A.    Yes.  Change in pay because it goes from

4  Step 6 to Step 8.

5  Q.    And do you know why you got to go from Step

6  6 to Step 8?

7  A.    Because that's the way the salary schedule

8  is.  That's the way it is on the salary schedule.

9  Q.    Was that a pay increase?  Was that a pay

10  increase?

11  A.    A percentage allocated from the state.  The

12  way the salary schedule is, the regular increments

13  that are allowed on the salary schedule for the

14  years.

15  Q.    But your answer is that yes, you got a

16  salary increase?

17  A.    Yes.

18  Q.    And was that salary increase based on merit?

19  A.    No.

20  Q.    What was it based on?

21  A.    It was based on the year -- years of

22  employment.

23  Q.    So if you've worked for the two-year college

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1    system for a certain number of years, you just get

2    an automatic raise; merit does not matter?

3    A.    According to the way the salary schedule,

4    again, is set up.  You get increments all the way

5    up to -- and I'm thinking this one here, from E6,

6    maybe you had to wait two years and go to Step 8

7    in order to get an increase.

8         But if you'll look at the salary schedule

9    for that particular year, you would see what I'm

10   talking about.  It's the same thing that all other

11   employees got.

12   Q.    Okay.  But as the pay increases are

13   evaluated, part of that evaluation is not your

14   performance?

15   A.    Based on the way the salary schedule is, I

16   mean, if you have completed another year at the

17   institution, you go to that particular step.

18   Q.    So regardless of your performance -- your

19   testimony is that regardless of your performance,

20   you get these pay increases, based on the salary

21   schedule?

22   A.    So does everybody else, based on the salary

23   schedule that they're on.  Whether you're on E,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1    C/D, A/B.

2    Q.    So your performance doesn't matter?

3    A.    Well, the performance does matter.  You get

4    those in your yearly evaluations.

5          And I assume the college has another way of

6    remedying situations if the "employer" is not

7    performing.

8    Q.    Can you tell me what your understanding is

9    of the connection between performance and pay

10   raises in your work history at Ingram from 1985

11   through 1992?

12   A.    In performances and pay raises?

13   Q.    What's the connection between performance

14   and pay raises?

15   A.    Actually, according to this, there are no

16   general connection, because you are automatically

17   going over each year.

18   Q.    Ms. Owensby, did you get that appointment in

19   1992 as a result of -- do you believe it was a

20   result of your race?

21   A.    No.

22   Q.    Do you believe it was a result of your

23   gender?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 55

```
1    A.      No.

2    Q.      Okay.

3              MR. BEAM:  I'm going to mark that as

4    Defendants' Exhibit 11.

5              (Defendants' Exhibit No. 11 was

6              marked for identification and a

7              copy of the same is attached

8              hereto.)

9    Q.      Ms. Owensby, do you recognize this document?

10   A.      This is an appointment letter for the year

11   ending August 31, 1994.

12   Q.      And what is the date of that letter?

13   A.      September 1, 1993.

14   Q.      And what is your title?

15   A.      Secretary to the Dean of Students.

16   Q.      And what is your pay rate?

17   A.      E-5, Step 8.

18   Q.      Does that rate reflect an increase from the

19   previous year?

20   A.      Same.

21   Q.      Do you know why it's the same?

22   A.      Because it's at year eight.  And I think,

23   according to that salary schedule, you're on year
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 56

```
 1   eight until you've reached ten years.  So probably

 2   if you see the next one, I'll probably be there

 3   again until I've reached the tenth year.

 4   Q.    From 1992 to 1993, do you know if you got a

 5   pay raise?

 6   A.    No, I'm not sure.

 7   Q.    Ms. Owensby, did you get this appointment as

 8   a result of your race?

 9   A.    No.

10   Q.    Did you get that appointment as a result of

11   your gender?  I'm sorry.  Do you believe this was

12   a result of your race?

13   A.    No.

14   Q.    Or your gender?

15   A.    No.

16              (Defendants' Exhibit No. 12 was

17              marked for identification and a

18              copy of the same is attached

19              hereto.)

20   Q.    Can you tell me quickly, how does the

21   appointment letter system work?  Does every

22   employee get an appointment letter?

23   A.    Yes.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 57

1    Q.    And does that appointment letter reflect the

2    same information for each employee?

3    A.    Basically.  If they are moving from one step

4    to the other, basically the same information.

5    Now, if you don't get an appointment letter, then

6    that shows dissatisfaction in your work.  So I've

7    been getting an appointment letter from 1985 until

8    August of 2006, so apparently my performance was

9    up to par.

10   Q.    So if you get an appointment letter, that is

11   documentation --

12   A.    That they are satisfied with your work.

13   Q.    And it's also documentation of what your

14   title is?

15   A.    Yes.

16   Q.    And it's documentation of what your pay rate

17   is?

18   A.    Yes.

19   Q.    Ms. Owensby, do you recognize this document?

20   A.    Appointment letter, Secretary to the Dean of

21   Students, period ending August 31, 1995.

22   Q.    And what is the date on that letter?

23   A.    September 1, 1994.

Page 58

1    Q.    And what is your title?

2    A.    Secretary to the Dean of Students.

3    Q.    And what is your pay rate?

4    A.    E-3, Step 10.

5    Q.    And does that pay rate reflect an increase

6    from the previous appointment letter?

7    A.    Yes.

8    Q.    What's the difference?

9    A.    Like I explained before, from Step 8 you

10   have to wait two years and you go to Step 10.  So

11   I've reached that tenth increment on the salary

12   schedule.

13   Q.    Did this new appointment letter and a new

14   step reflect a pay increase?

15   A.    Yes.

16   Q.    Do you know how much it was?

17   A.    No.

18   Q.    Can you guess?

19   A.    Probably about anywhere between 4 and maybe

20   7 percent.

21   Q.    Do you believe you got that appointment as a

22   result of your race?

23   A.    No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 59

1   Q.    Do you believe you got that appointment as a

2   result of your gender?

3   A.    No.

4            MR. BEAM:  I'm going to mark that as

5   Defendants' Exhibit 13.

6            (Defendants' Exhibit No. 13 was

7            marked for identification and a

8            copy of the same is attached

9            hereto.)

10  Q.    Ms. Owensby, do you recognize this document?

11  A.    This is an appointment letter for the period

12  ending August 31, 1996.

13  Q.    And what is that letter dated?

14  A.    August -- I'm sorry.  September 1, 1995.

15  Q.    And what is your title?

16  A.    Secretary to the Dean of Students.

17  Q.    And what is your pay rate?

18  A.    E-3, Step 10.

19  Q.    Does that reflect an increase from the

20  previous year?

21  A.    No.  It's the same.

22  Q.    Do you know why it remained the same?

23  A.    Because I'm thinking that salary schedule is

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 60

1    at 10 now, and a person would have to wait until

2    the 15th year.  So it will probably stay at 10

3    until the next five years.

4    Q.    Do you actually get a raise through this

5    appointment letter?  Did you actually receive a

6    raise from this appointment letter forward?

7    A.    No.  From this one, I'm assuming I went to

8    Step 15.  I don't know; I would have to see the

9    next appointment letter.  I mean -- no.  I'm

10   assuming I stayed at 10 until my 15th year.

11   Q.    Okay.  Did you get that appointment as a

12   result of your -- I'm sorry.  Do you believe you

13   got that appointment as a result of your race?

14   A.    No.

15   Q.    Do you believe you got that appointment as a

16   result of your gender?

17   A.    No.

18   Q.    Okay.

19            MR. BEAM:  I'll mark that Defendants'

20   Exhibit 14.

21            (Defendants' Exhibit No. 14 was

22            marked for identification and a

23            copy of the same is attached

Page 61

1              hereto.)

2    Q.    Ms. Owensby, do you recognize this document?

3    A.    This is an appointment letter for the period

4    ending August 31, 1997.

5    Q.    And what is that letter dated?

6    A.    September 1, 1996.

7    Q.    And who is that letter from?

8    A.    Mr. J. Douglas Chambers.

9    Q.    And what is your title there?

10   A.    Secretary to the Dean of Students.

11   Q.    And what is the pay rate?

12   A.    E-3, Step 10.

13   Q.    Is that the first appointment letter you

14   received from Doug Chambers?

15   A.    I believe so; I'm not sure.

16   Q.    I think the last one is Gregg.

17   A.    Yeah.

18   Q.    So that's your first appointment letter from

19   Dr. Chambers?

20   A.    Yes.

21   Q.    Okay.  And does that appointment letter

22   reflect a pay increase?

23   A.    No.  It's the same as the previous one:

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1    E-3, Step 10.

2    Q.    Do you know why you remained on the same pay

3    rate or the same point on the scale?

4    A.    Like I explained before, because I hadn't

5    reached that 15th year to be at Step 15.

6    Q.    Does this appointment letter reflect an

7    increase in your pay?

8    A.    No.

9            MR. BEAM:  I'll mark this Defendants'

10   Exhibit 15.

11           (Defendants' Exhibit No. 15 was

12           marked for identification and a

13           copy of the same is attached

14           hereto.)

15   Q.    Ms. Owensby, did you receive this

16   appointment from Dr. Chambers because of your --

17   do you believe it was because of your race?

18   A.    No.

19   Q.    Do you believe it was because of your

20   gender?

21   A.    No.

22   Q.    Let me ask you a couple of summarizing

23   questions.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 63

1           We've gone through your work history from

2    '85 until the appointment letter dated 1996, which

3    would be for the period ending August 31, 1997.

4    So that's basically the first ten years of your

5    employment at Ingram.

6           To your knowledge, did you receive a pay

7    raise every year during your first ten years of

8    employment at Ingram?

9    A.     The general pay raise that's governed by the

10   increments on the salary schedule.

11   Q.     But you did receive a raise every year?

12   A.     Yes.  Well, from whatever step I started, up

13   to -- I think it was E-6; it went from E-6 then to

14   E-8, which would have been an increase; and then

15   from E-8 to that E-10.  So they were basic.

16   Q.     But you did get a raise every year for the

17   first ten years of your employment?

18   A.     I believe so.

19   Q.     Okay.  And did any of the appointments that

20   you received, do you believe they reflected a

21   consideration of your race?

22   A.     My race, no.

23   Q.     Do you believe that you got any of these

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 64

1    appointments as a result of your gender?

2    A.    No.

3    Q.    Okay.  Good enough.  We'll take a break.

4              (A brief recess was taken.)

5    (BY MR. BEAM)

6    Q.    Ms. Owensby, do you recognize this document?

7    A.    Appointment letter for the period ending

8    August 31, 1998.

9    Q.    And what is your title in that document?

10   A.    Secretary to the Dean of Students.

11   Q.    And what is that letter dated?

12   A.    September 1, 1997.

13   Q.    And what's the pay rate?

14   A.    E-3, Step 10.

15   Q.    Okay.  Does that pay rate designation

16   reflect a pay increase?

17   A.    No.

18   Q.    And who is the president of the school

19   there?

20   A.    Mr. J. Douglas Chambers.

21   Q.    Okay.  Let me ask you a question.  Since you

22   have been designated as Secretary to the Dean of

23   Students, up until this point, have your duties

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 65

1    changed?

2    A.     No.

3    Q.     Any of your responsibilities evolved?

4    A.     Nope.

5    Q.     Did you receive -- do you believe you

6    received this appointment as a result of your

7    race?

8    A.     No.

9    Q.     Do you believe you received this appointment

10   as a result of your gender?

11   A.     No.

12          MR. BEAM:  I'm going to mark that as

13   Defendants' Exhibit 16.

14          (Defendants' Exhibit No. 16 was

15          marked for identification and a

16          copy of the same is attached

17          hereto.)

18   Q.     Ms. Owensby, do you recognize this document?

19   A.     This is an appointment letter for the period

20   ending August 31, 1999.

21   Q.     And what is your title there?

22   A.     Secretary, here.

23   Q.     It says just "secretary"?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1    A.    That's what it says on this letter.

2    Q.    Okay.  And what is the pay rate there?

3    A.    35,970.

4    Q.    And what is it dated?

5    A.    Well, it doesn't have a -- well, this is the

6    date that I signed it:  9/30/1998.

7    Q.    Okay.  Do you believe that that appointment

8    letter reflects a pay increase?

9    A.    I believe so.

10   Q.    So this is dated in 1998, which would be

11   about 12 years since you started at Ingram; is

12   that correct?

13   A.    I guess, yes.

14   Q.    And how many thousands of dollars has your

15   salary increased?

16   A.    I'm not sure.  I'd have to go back and see.

17   Q.    From 1985 until 1998?

18         MR. DEBARDELABEN:  Object to the form.

19   Are you talking about each year, or are you

20   talking about what her beginning salary was and

21   then the difference between --

22   Q.    The difference between your starting salary

23   and your salary in that appointment letter is how

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 67

1    much?

2    A.    My starting salary is 10,000, and this is

3    35-, so you're looking at about 25-.

4    Q.    And, Ms. Owensby, did you receive this

5    appointment as a result of your -- do you believe

6    you received it as a result of your race?

7    A.    No.

8    Q.    Do you believe you got this appointment as a

9    result of your gender?

10    A.    No.

11    Q.    Who appointed you to that position?

12    A.    Mr. J Douglas Chambers.

13           MR. BEAM:  I'll mark this as

14    Defendants' Exhibit 17.

15           (Defendants' Exhibit No. 17 was

16           marked for identification and a

17           copy of the same is attached

18           hereto.)

19    Q.    Do you recognize this document?

20    A.    Appointment letter for the period ending

21    August 31, 2000.

22    Q.    Okay.  And who is that appointment letter

23    from?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 68

1    A.    J. Douglas Chambers.

2    Q.    And what is your title?

3    A.    Secretary.

4    Q.    Ms. Owensby, did your responsibilities

5    change from when you were designated as Secretary

6    to the Dean of Students to just secretary?

7    A.    No.

8    Q.    Did who you report to change?

9    A.    No.

10   Q.    Do you know who, at this point in your

11   tenure at J.F. Ingram, who did you report to?

12   A.    At this point I reported to James Wilson.

13   Q.    And who did you provide secretarial services

14   to?

15   A.    James Wilson.

16   Q.    Is that also true for the previous year,

17   when you were simply secretary?

18   A.    That would be James Wilson.

19   Q.    Who did you report to when you were

20   Secretary to the Dean of Students?

21   A.    This one here, 1997, that would have been

22   Paul Reeder.

23   Q.    So in 19- -- this appointment letter that is

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 69

```
1    Defendants' Exhibit 17, that's when you began to

2    work for Mr. Wilson? 1997?

3    A.     Yes.

4    Q.     Did your responsibilities change from when

5    you left working for Mr. Reeder to when you began

6    working for Mr. Wilson?

7    A.     Somewhat.  Because Mr. Wilson was also the

8    director of another program.

9    Q.     What was he director of?

10   A.     Student Support Services.

11   Q.     And how did your responsibilities change

12   from when you worked for Mr. Reeder until this

13   time period when you began to work for Mr. Wilson?

14   A.     There were some differences in the student

15   support services program.

16   Q.     What were those differences?

17   A.     The project itself.  They were two separate

18   entities.

19   Q.     What were two separate entities?

20   A.     The student support services and student

21   services.

22   Q.     And how did your responsibilities change?

23   A.     There were tasks pertaining to student
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1    support services.

2    Q.    And what were those tasks?

3    A.    I'm not sure.  I can't remember them.

4    Q.    Do you recall anything else about how your

5    responsibilities changed from when you went to

6    work for Mr. Wilson and left working for Mr.

7    Reeder?

8    A.    No.

9    Q.    What is your pay rate there on this

10    appointment letter we're looking at right now?

11    A.    35,970.

12    Q.    And does that reflect a pay increase from

13    the previous appointment letter?

14    A.    No.  It's the same.

15    Q.    And who provided you with this appointment

16    letter?

17    A.    J. Douglas Chambers.

18    Q.    And when is it dated?

19    A.    This one doesn't have a date on it.

20    Q.    What is the time period that it pertains to?

21    A.    Beginning effective September 1, 1999,

22    ending August 31, 2000.

23    Q.    Can you tell me what your responsibilities

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 71

1   were during the time that this appointment letter

2   was in effect?

3   A.    During this time -- actually, prior to --

4   wait; let's see.  They did change.

5        The registrar had resigned at this time, and

6   responsibilities were distributed, and I took on

7   some of those responsibilities.

8   Q.    So how did your responsibilities change?

9   A.    Well, the duties and responsibilities that

10  he "were" doing had to be distributed.  He had

11  resigned.

12  Q.    And when you say "he," who are you talking

13  about?

14  A.    The previous registrar.

15  Q.    And what was his name?

16  A.    Tim Robinson.

17  Q.    Do you know when he resigned?

18  A.    I think it was April of 1999, I believe.

19  Q.    And his resignation, if I understand your

20  testimony, prompted changes in your

21  responsibilities?

22  A.    Yes.

23  Q.    And what were the changes in those

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 72

1    responsibilities?

2    A.      Whereas he supervised the admissions --

3    registration and admissions process, I did; I took

4    on those responsibilities.   There were several

5    things that his job description entailed, and they

6    were given to me, and I did them.

7    Q.      Did you take on all of his job

8    responsibilities?

9    A.      Not all of them at that time.

10   Q.      Can you tell me which job responsibilities

11   of Tim Robinson -- his name is Robinson?

12   A.      Uh-huh.

13   Q.      Which of Tim Robinson's responsibilities did

14   you take on during the time that this appointment

15   letter was in effect?

16   A.      There again, I was responsible for all of

17   the admissions and registration for the college.

18   I would take admission applications, schedule

19   students for testing, process the registrations

20   for that semester, compare the roster for the new

21   incoming students; I evaluated the transcripts; I

22   would advise students when they had questions; I

23   did like an orientation, before admissions, with

Page 73

1    the students.

2    Q.    Were these all new responsibilities?

3    A.    Yes.

4    Q.    Did you -- let me rephrase that.  What

5    responsibilities did you continue to provide as

6    secretary?

7    A.    All of them.  The ones I had from the

8    beginning.

9    Q.    During the time period that this letter was

10   in effect, what were the responsibilities that you

11   had as secretary?

12   A.    Basically, doing the correspondence for the

13   Dean of Students, taking care of his travel; I did

14   requisitions, basic general office information; I

15   processed the DED documents; I prepared the

16   awards; and I kept a ledger of the process of what

17   we did.

18   Q.    With regard specifically to your secretarial

19   responsibilities, had those changed from when you

20   began work as a secretary at Ingram until this

21   time period?

22            MR. DEBARDELABEN:  I'd like a little

23   clarification.  I think you need it, because we

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

```
1    have the secretary and then we've got her

2    secretary to the dean, and then she went in, I

3    think, '97 to secretary.  Which one are you

4    talking about?

5              MR. BEAM:  Just as secretary.

6    Q.    As you are designated here as secretary --

7    and I think for a few years you've been designated

8    just secretary; not Secretary to the Dean of

9    Students, just secretary.

10             Had your responsibilities changed from the

11   time you were appointed secretary until this time

12   period?

13   A.    You're saying from the time I was appointed

14   secretary.  You're referring to the previous

15   wording of the title, right?

16   Q.    Yes.  I'm talking about just the time period

17   in which you are designated only as secretary, not

18   Secretary to the Dean of Students.

19             It looks to me as though your appointment

20   letters reflect a change in your title from

21   secretary to Dean of Students to secretary.  And

22   I'm asking you:  From the time period that you

23   were appointed secretary, which, I believe, is a
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 75

1    few years prior to this letter, until the time

2    when this letter is in effect, did your

3    responsibilities as a secretary evolve?

4    A.    Yes.

5    Q.    How did they change?

6    A.    Well, at that time, I had assumed the extra

7    duties, due to the resignation of the registrar.

8    And thereto I also served as the secretary to

9    student support services, which was because the

10   Dean of Students was serving as director of

11   student support services.  So I provided

12   secretarial duties in both entities as well as

13   assumed those extra responsibilities that the

14   previous registrar had.

15   Q.    So separate and apart from the extra duties

16   that you took on when Tim Robinson resigned, what

17   were the changes in your responsibilities as

18   secretary?

19   A.    The responsibilities to the support services

20   division.

21   Q.    And what changed with regard to those

22   responsibilities?

23   A.    I typed up, thereto again, grants; I kept up

Page 76

1    with requisitions for support services; I would do

2    travel for the dean when he "were" on business for

3    support services.

4    Q.    These responsibilities that you just

5    described, when did you begin to start providing

6    those services?

7    A.    When I became Secretary to the Dean of

8    Students and Support Services.

9    Q.    When was that?

10   A.    When James Wilson became the Dean of

11   Students and Support Services.

12   Q.    So if I understand your testimony, when you

13   stopped working for Mr. Reeder and you began

14   working for Mr. Wilson, your responsibilities as

15   his secretary increased?

16   A.    Yes.

17   Q.    And those responsibilities that increased

18   are what you have just described?

19   A.    Yes.

20   Q.    And as this letter is in effect in 1999, for

21   the period effective 1999 through 2000, you were

22   providing the services that you just described; is

23   that correct?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 77

1    A.    Yes.

2    Q.    As well as the responsibilities that you

3    have described that you took over from Tim

4    Robinson?

5    A.    Yes.

6    Q.    Can you tell me when exactly you took over

7    the responsibilities that previously were Tim

8    Robinson's?

9    A.    Shortly after he resigned.

10   Q.    Would you say it was a few months after he

11   resigned or immediately after he resigned?

12   A.    I would say immediately.

13   Q.    Okay.

14   A.    I mean, yeah.

15   Q.    And let me ask you a little bit about those

16   initial responsibilities that you took on that

17   were Mr. Robinson's.

18         You said they were associated with

19   admissions and registration?

20   A.    Yes.

21   Q.    Can you tell me what services you provided

22   that were associated with admission and

23   registration?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 78

1    A.    I was responsible for the admission process

2    of all the new students; I was responsible for the

3    preregistration process of the returning students,

4    and the registration process for both new and

5    returning students; I was responsible for

6    evaluating transcripts; I was responsible for

7    advising students when they had questions in

8    relation to admissions and registration; I

9    supervised two clerks; there were two clerks under

10   me.

11   Q.    Who gave you these responsibilities?

12   A.    Dean Wilson.

13   Q.    What did he tell you when he gave them to

14   you?  Do you remember?

15   A.    Not sure.

16   Q.    Do you remember anything that he told you

17   about exactly what responsibilities you would take

18   over after Mr. Robinson retired?

19   A.    He said that -- he gave them to me.  I mean,

20   "These are your responsibilities.  This is what

21   you will do.  You will oversee the process."

22   Q.    When you say that you evaluated transcripts,

23   what did you -- how did you evaluate them?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 79

1   A.     We received transcripts from another

2   college; we would check to see if that college was

3   accredited along the same lines as the

4   accreditation for Ingram, to see if those courses

5   were comparable or courses that could be accepted

6   for Ingram courses; accepted them, and posted it

7   to the transcript.

8   Q.     Would you describe this process as a

9   verification of the transcripts?

10  A.     Yes, I would.  Yes.  Verification and

11  evaluating.  You had to check them and see if the

12  transcript is correct, if it's stamped, if it's

13  official.

14  Q.     And you said you also advised students?

15  A.     Yes.

16  Q.     Did you advise students in conjunction with

17  that evaluation of their transcript?

18  A.     If the need arrived, I did.

19  Q.     When would the need arrive?

20  A.     When a student came to my office and asked

21  if his transcript came in and if any credits had

22  been accepted.

23  Q.     Would you give a student advice with regard

Page 80

1   to their transcript or admissions process?

2   A.    Yes, if needed.

3   Q.    And did you consider these as part of the

4   responsibilities that Mr. Wilson had delegated to

5   you?

6   A.    Yes.

7   Q.    Ms. Owensby, you said just a moment ago that

8   you were providing services with regard to

9   correspondence for Mr. Wilson?

10  A.    Yes.

11  Q.    What would that entail?

12  A.    Typing up all of his memos, taking minutes,

13  notes, and even preparing memos just from him

14  saying, Prepare a memo for such and such.  I

15  prepared them for his signature.

16  Q.    What about travel and requisitions?  Those

17  were some other topics that you mentioned.  What

18  kind of services would you perform with regard to

19  travel?

20  A.    Doing the instate or out-of-state travel

21  form.  Once he had taken the trip and had

22  returned, there's a form you have to complete to

23  prepare for the business office in order for the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1    traveler to be reimbursed.

2    Q.    You also said you advised students.  What

3    kind of other advice would you have to give

4    students, as part of your responsibilities?

5    A.    Advice pertaining to their transcript,

6    advise pertaining to how many credits they needed

7    in order to complete a certain program, how many

8    credits they needed in order to obtain a certain

9    type of certificate or a certain type of degree,

10   whether or not the credits from that institution

11   were comparable to the course or acceptable for

12   Ingram courses.

13   Q.    Can you give me any other examples of the

14   kind of services that you provided that you took

15   over after Mr. Robinson resigned?

16   A.    I was more available, as far as for a

17   student to come in to even ask questions.

18   Q.    You were more available to the students at

19   Ingram as a result of these new responsibilities?

20   A.    I was because I was there all the time.

21   Q.    Were there other people providing the same

22   services that you were providing to the students

23   at this time?

Page 82

1  A.    I'm not sure.  If a student went to see Dean

2  Reeder, I'm not sure what they went to see him

3  for.

4  Q.    But it's possible that other people were

5  giving advice or evaluations with regard to

6  transcripts during that time?

7  A.    The only person that I would say would have

8  been, if it was, would be Dean Wilson, if a

9  student elected to see him.

10  Q.    Are there any other responsibilities that

11  you took over from Mr. Robinson at this time that

12  you haven't already described to me?

13  A.    The overall management and operation of the

14  AS/400.  That was the new computer system that the

15  college was using.

16  Q.    And what did you do with regard to the new

17  computer system?

18  A.    I was trained with the student services

19  modules.  I implemented the tasks pertaining to

20  the student services modules, not only implemented

21  or managed it, I also performed whatever task that

22  needed, you know, to be done.  I managed and

23  operated from the system.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 83

1   Q.     You said you got some training on this

2   computer system?

3   A.     Yes.

4   Q.     Who gave you that training?

5   A.     ACCESS Software Corporation.  The ACCESS

6   group.

7   Q.     So part of your responsibilities were

8   learning this new computer system?

9   A.     Yes.

10  Q.     As well as using this new computer system?

11  A.     Yes.

12  Q.     Any other responsibilities associated with

13  the computer system that you had?

14  A.     I was responsible for troubleshooting errors

15  that occurred.

16  Q.     How did you do that?

17  A.     Basically, knowing what was put in the

18  system, and my knowledge of the different modules

19  and going from there.  Basically, from my

20  knowledge and my training from ACCESS software.

21  Q.     Did you teach other people how to use the

22  ACCESS software?

23  A.     Yes.

Page 84

1    Q.    Any other responsibilities you had

2    associated with the computer work?

3    A.    I generated reports from the computer.

4    Q.    What kind of reports?

5    A.    Admission rosters, registration rosters,

6    class rolls, withdrawal reports,

7    end-of-the-semester reports; all the reports that

8    were required from the student services module

9    from the system.

10   Q.    What percentage of your time would you say

11   was devoted to your secretarial responsibilities

12   versus your responsibilities that you took over

13   from Mr. Robinson?

14   A.    I would say about 70/30.

15   Q.    Which way?

16   A.    Secretarial 30, 70 percent registration

17   admissions.

18   Q.    So 70 percent of your time was what Mr.

19   Robinson had been doing and 30 percent was

20   secretarial; is that what you're saying?

21   A.    I would say.

22   Q.    Okay.  Ms. Owensby, who taught you how to

23   perform all these jobs that Mr. Robinson had?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 85

1    A.    I basically taught myself, and from my years

2    of being at the institution.

3    Q.    Had you had a lot of interaction with Mr.

4    Robinson prior to his retirement?

5    A.    Yes.

6    Q.    Did you learn a lot from him as to how to do

7    his -- the responsibilities that he had, did you

8    learn a lot from him how those processes worked?

9    A.    I basically had an idea from watching him,

10   you know.  But thereto again, a person who can

11   read and understand what they read and implement

12   and follow procedures, I was able to do it.

13   Q.    But you didn't take over all his

14   responsibilities, did you?

15   A.    Not at that time.

16   Q.    Who else took over Mr. Robinson's

17   responsibilities, besides you?

18   A.    Ms. Toxey helped.

19            THE COURT REPORTER:  I'm sorry?

20   Q.    Who was that?

21   A.    Ms. Elaine Toxey.

22   Q.    Okay.  And what did she do?

23   A.    Elaine basically -- at the time, Elaine

Page 86

1    worked up under Mr. Robinson.  She was his clerk;

2    so she did all of the clerk work.  And basically

3    Elaine continued to do her clerk work.

4         And I more or less supervised the overall

5    process.  If there was a problem with what Elaine

6    was doing, she would bring it to me and we would

7    work it out.

8    Q.    Did you supervise Elaine?

9    A.    Yes.

10   Q.    Were you directed by anyone to supervise

11   her?

12   A.    Well, Mr. Wilson, when he put me over the

13   process, that was "automatically," because he gave

14   me the responsibility to be over the admission and

15   registration process, or to coordinate it.

16   Q.    Did you report to anyone who had taken over

17   any of Mr. Robinson's responsibilities?

18   A.    The only person I reported to was Dean

19   Wilson.

20   Q.    Did Dean Wilson take over any of Mr.

21   Robinson's responsibilities when he retired?

22   A.    Dean Wilson signed off on transcripts.

23   Q.    Was that one of Mr. Robinson's

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 87

1    responsibilities?

2    A.    Yes.

3    Q.    Were there any other responsibilities that

4    Dean Wilson took over upon Mr. Robinson's

5    retirement?

6    A.    I'm thinking, I'm not sure, that he would,

7    you know, talk with the students, I guess, if they

8    had a problem or something.

9    Q.    Did he supervise your completion day to day

10   of these responsibilities?

11   A.    Yes.

12   Q.    Did he supervise Elaine and her completion

13   of those responsibilities?

14   A.    I supervised Elaine and her completion of

15   the responsibilities.

16   Q.    Did Dean Wilson supervise Elaine?

17   A.    Dean Wilson was the head of the division.

18   Q.    Did Dean Wilson supervise Elaine?

19   A.    He supervised all of us.

20   Q.    So Dean Wilson supervised Elaine as well?

21   A.    Yes.

22   Q.    But you also supervised Elaine?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 88

1   Q.      And Dean Wilson supervised you?

2   A.      Yes.

3   Q.      Did Elaine ever advise students?

4   A.      I don't know.

5   Q.      Did Elaine evaluate transcripts?

6   A.      No.

7   Q.      To your knowledge, did Dean Wilson ever

8   counsel students?

9   A.      I'm not sure, but -- I don't know.  He's the

10  Dean of Students so he probably did.

11  Q.      Did Dean Wilson evaluate transcripts?

12  A.      No.

13  Q.      Did Dean Wilson ever advise students with

14  regard to the admissions process?

15  A.      I'm not sure.

16  Q.      Do you know anything else about the services

17  that Dean Wilson provided initially upon Mr.

18  Robinson's retirement?

19  A.      No.

20  Q.      Can you describe for me any other

21  responsibilities that we haven't talked about that

22  you had upon Mr. Robinson's retirement?

23  A.      No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 89

1  Q.    Did you supervise any testing during this

2  time?

3  A.    I coordinated testing and scheduled testing.

4  Q.    How did that work?

5  A.    I would contact the institutions and they

6  would send me a list of students that qualified to

7  come to school.  And from there, I would

8  coordinate with the testers times and dates for

9  these people to be tested, and would contact the

10  institution with the times and dates.  And we'd

11  get the students over for testing.

12  Q.    So you supervised that process?

13  A.    Yes.

14  Q.    Is it accurate to say that Mr. Robinson's

15  responsibilities were spread among you and Elaine

16  Toxey and Dean Wilson?

17  A.    From the beginning.

18  Q.    During the time period that this letter was

19  in effect?

20  A.    Yes.

21  Q.    And so this is approximately the year, give

22  or take a few months, after Mr. Robinson retired?

23  A.    Uh-huh.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 90

1    Q.    His responsibilities were spread among the

2    three of you?

3    A.    Yes.

4    Q.    Could you tell me by percentage how much of

5    his responsibilities you took over?

6    A.    I would say about 80 percent.

7    Q.    And how much of Mr. Robinson's

8    responsibilities did Dean Wilson take over?

9    A.    I'm -- I couldn't -- I don't -- I'm -- I'm

10   -- I'm not sure.

11   Q.    What about Elaine Toxey?  What percentage of

12   Mr. Robinson's responsibilities did she take over?

13   A.    I'm not sure about that either, because it's

14   -- she was his clerk.

15   Q.    Do you know if the distribution of these

16   responsibilities was at the direction of Dr.

17   Chambers?

18   A.    I'm not sure of that either.

19   Q.    At that time, who was president of the

20   college?

21   A.    Mr. Chambers.

22   Q.    And at the time, what was Dean Wilson's

23   title?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 91

1  A.    Dean of Students and Support Services.

2  Q.    Okay.  Are there any other responsibilities

3  that you had during the time period that this

4  appointment letter was in effect that you haven't

5  already described for me?

6  A.    No.

7  Q.    Do you believe that you received this

8  appointment as a result of your race?

9  A.    No.

10 Q.    Do you believe you received this appointment

11 as a result of your gender?

12 A.    No.  There were no male secretaries at

13 Ingram.

14 Q.    Do you believe that the fact that there were

15 no male secretaries at the time at Ingram impacted

16 your appointment?

17 A.    No.  I'm -- no.

18 Q.    So is it that your testimony is that your

19 appointment was, in part, to your knowledge or

20 your belief, based on your gender?

21 A.    No.

22 Q.    Okay.

23           MR. BEAM:  I'm going to mark that as

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 92

```
 1   Defendants' Exhibit 18.

 2              (Defendants' Exhibit No. 18 was

 3              marked for identification and a

 4              copy of the same is attached

 5              hereto.)

 6   Q.    Ms. Owensby, do you recognize this document?

 7   A.    Yes.

 8   Q.    And when is it dated?

 9   A.    July 28, 2000.

10   Q.    And what is the title that you are appointed

11   to in that letter?

12   A.    Secretary.

13   Q.    And what is your pay rate?

14   A.    37,409.

15   Q.    And what is the step and grade that you have

16   there?

17   A.    E-3, Grade 3.

18   Q.    Does that reflect an increase of your

19   previous appointment letter?

20   A.    Yes.

21   Q.    Did your salary go up?

22   A.    Yes.

23   Q.    And your title here is what?
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 93

1    A.     Secretary.

2    Q.     Okay.  From this appointment letter that we

3    previously talked about until the appointment

4    letter that we are looking at here today, this is

5    basically the next year; is that right?

6    A.     Yes.

7    Q.     And when did you sign that letter?

8    A.     August 16, 2000.

9    Q.     Okay.  And can you tell me if your

10   responsibilities changed from the previous year

11   until the time frame for this letter?

12   A.     No.

13   Q.     And did you receive this appointment, to

14   your belief, as a result of your race?

15   A.     No.

16   Q.     Did you receive this appointment, to your

17   belief, because of your gender?

18   A.     No.

19   Q.     Okay.

20          MR. BEAM:  We will mark that

21   Defendants' Exhibit 19.

22          (Defendants' Exhibit No. 19 was

23          marked for identification and a

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trial Services

Page 94

1               copy of the same is attached

2               hereto.)

3    Q.    But you did get a raise?  You agree that you

4    got a raise from the previous year to this

5    appointment letter?

6    A.    Yes.

7    Q.    Was that raise based on merit?

8               MR. DEBARDELABEN:  Object to the form.

9    Q.    Do you believe that you were given a raise

10   because of your performance?

11   A.    That step increase and -- that was a result,

12   another situation with the state.

13   Q.    Okay.  I'm sorry.  I'm not following you.

14   A.    State and years of experience.

15   Q.    Okay.  Why did you get that raise?

16              MR. DEBARDELABEN:  Object to the form.

17   Q.    To your knowledge, why did you get that

18   raise?

19   A.    Because of my years of experience.

20   Q.    Do you remember if anyone told you anything

21   about why you got that raise?

22   A.    It was a situation with the state.  The

23   salary schedule changed in 2000, I believe -- '99

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 95

1    and 2000.

2    Q.    I just want to make sure I understand you.

3    The change in the state salary schedule policy

4    affected --

5    A.    Uh-huh.  That and everybody else's.

6    Q.    Okay.  Did your performance have anything to

7    do, to your knowledge, with this raise?

8    A.    That, again, was a situation that occurred

9    with the whole E salary schedule for the state.

10   It not only affected me but others.

11   Q.    And I understand, Ms. Owensby, what you are

12   saying.

13        My question is:  Did your performance, to

14   your knowledge, affect your pay increase as

15   reflected in this document?  Did your performance

16   as an employee at Ingram?

17   A.    My performance for the 18 years I had

18   experience at Ingram put me at that rate of pay at

19   that time.

20   Q.    So is your testimony today that yes, my

21   performance was -- has a direct connection with

22   this pay raise?

23             MR. DEBARDELABEN:  Object to the form.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 96

1    And I'm going to state it.  She said it's because

2    of the years she had there.  And she said

3    previously that if you don't get an appointment,

4    you're not performing.  So it's kind of hard to

5    answer any more than that.  She's not a personnel

6    person.

7    Q.    This is a very simple question.  To your

8    knowledge, Ms. Owensby, was your performance a

9    component of the decision to give you a pay raise?

10            MR. DEBARDELABEN:   Object.

11   A.    For that year, I was evaluated.  Apparently

12   my work was satisfactory that I received an

13   appointment for that year at that rate of pay,

14   according to the years experience I had and the

15   adjustment that was made to the E salary schedule.

16   Q.    Do you believe if your performance had been

17   very poor, you would have received this

18   appointment letter?

19   A.    No.

20   Q.    Do you believe -- who gave you this

21   appointment?

22   A.    J. Douglas Chambers.

23   Q.    And did you ever speak with Dr. Chambers

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 97

1    about this particular appointment?

2    A.    Not that one.

3    Q.    Do you believe you received this

4    appointment, to your knowledge, as a result of

5    your race?

6    A.    I'm not sure what were the ramifications in

7    the revision of the E salary schedule during that

8    time.  I don't know.  Because the salary schedule

9    changed because of something that had occurred,

10   and I'm not sure what it was.

11   Q.    You're talking about the salary schedule

12   that applied to everybody?

13   A.    That applied to everybody with the state.

14   Q.    With regard though to this specific

15   appointment, do you believe that your race played

16   a part in the decision to give you this

17   appointment?

18   A.    No.

19   Q.    Do you believe that your gender played a

20   role in the decision to give you this appointment?

21   A.    No.

22   Q.    Ms. Owensby, this is another document.  What

23   is that document?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 98

1  A.    A temporary appointment letter.

2  Q.    When is it dated?

3  A.    August 13, 2000.

4  Q.    And who is that from?

5  A.    J. Douglas Chambers.

6  Q.    And who is it to?

7  A.    It's to me.

8  Q.    Okay.  And what does it appoint you to?

9  A.    Coordinator of Registration and Admission.

10 Q.    And what is your salary schedule there?

11 A.    41,047.

12 Q.    And what is your annual salary?

13 A.    $41,047.

14 Q.    Does that appointment reflect an increase

15 over the previous appointment letter?

16 A.    Yes.

17 Q.    And Dr. Chambers gave you this appointment

18 letter, the October 13, 2000?

19 A.    Yes.

20 Q.    And did your responsibilities change?  We

21 have a new title change.  Did your

22 responsibilities change?

23 A.    Those are the responsibilities that I -- the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 99

1    extra duties that I had incurred from the previous

2    registrar's position.

3    Q.    Did your -- does this title change reflect a

4    change in your responsibilities?

5    A.    The title change, yes, would reflect a

6    change in my responsibilities October of 2000.

7    Q.    What change does it reflect?

8    A.    The ones that I explained to you previous.

9    Q.    So it's your testimony that this appointment

10   letter and the change in your title reflects your

11   added responsibilities that were Mr. Robinson's?

12   A.    Yes.

13   Q.    And did those responsibilities change at all

14   as a result of this appointment letter?

15   A.    No.  They were the same responsibilities.

16   Q.    So the responsibilities that you took over

17   from Mr. Robinson when he retired until the time

18   frame of this letter are the same?

19   A.    Yes.

20   Q.    Okay.  And did you get a raise as a result

21   of this appointment letter?

22   A.    Yes.

23   Q.    Do you know how much that raise was?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 100

1   A.      About $4,000 difference.

2   Q.      Did you talk to Dr. Chambers about this

3   appointment?

4   A.      I don't remember whether we talked about it

5   or it was done through Mr. Wilson.

6   Q.      Okay.  And what time period is this letter

7   for?

8   A.      The time period beginning November 1, 2000,

9   for the period ending August 31, 2001.

10  Q.      Okay.  Did you continue to have your

11  secretarial responsibilities?

12  A.      Yes.

13  Q.      Okay.  So there's no change in your

14  responsibilities from the point immediately after

15  which Mr. Robinson retired until now?

16  A.      Right.

17  Q.      Okay.  And is that true for the time period

18  in question with this letter?

19  A.      Yes.

20  Q.      Through August 31, 2001?

21  A.      Yes.

22  Q.      Okay.  Did you receive this appointment, to

23  your knowledge, as a result of your race?

Page 101

1   A.      This one, I -- I believe so.

2   Q.      Okay.  To your knowledge, did you receive

3   this appointment as a result of your gender?

4   A.      Yes.

5   Q.      Okay.  To your knowledge, what role did your

6   race play in this appointment?

7   A.      To my knowledge, my race played -- the role

8   my race played in this appointment is the fact

9   that after the resignation of the registrar, which

10  was in 1999, April -- spring of '99 -- I had

11  performed the duties that were assigned.  I wasn't

12  immediately paid for those duties.  It was only

13  until now, October of 2000, that they decided to

14  compensate for the extra duties that I had

15  incurred through, I guess, a change in title, I

16  guess to -- I don't know -- to justify or

17  whatever.

18      But it took from that time, and not even

19  within the contract year; it was after the

20  contract year had started, for me to be

21  compensated for the extra duties I had incurred a

22  whole year before.

23  Q.      And you say it was after the contract year.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 102

1    What do you mean?

2    A.    That beginning effective November 1, 2000.

3    Q.    Effective November 1, 2000?

4    A.    Yes.  November.  The contract year starts in

5    September.

6    Q.    Okay.  So it's your testimony that your race

7    played a part, to your knowledge, played a role in

8    this appointment?

9    A.    Yes.

10   Q.    And did your gender play a role in this

11   appointment, to your knowledge?

12   A.    At this time, I don't think gender was.

13   Q.    Okay.

14   A.    But I believe race was.

15   Q.    And you believe -- and I don't want to put

16   words in your mouth.  But as I understand your

17   testimony --

18   A.    No, gender.

19   Q.    I'm sorry?

20   A.    Gender.

21   Q.    You're saying you do believe gender played a

22   role, to your knowledge, in this appointment?

23   A.    Yes.  I believe race and gender.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 103

1   Q.     And as I understand your testimony, you are

2   saying that your pay and your title did not

3   reflect the new responsibilities that you took on

4   upon Mr. Robinson's retirement?

5   A.     Yes.

6   Q.     And you believe that the decision not to

7   have your pay and title reflect these added

8   responsibilities was based on your race and your

9   gender?

10  A.     Yes.

11  Q.     And you believe that, despite the fact that

12  you did get a raise in this appointment letter?

13  A.     Yes.

14  Q.     Ms. Owensby, can you tell me what you

15  believe your title and your pay should have been

16  at the time that -- at the time of this

17  appointment letter?

18  A.     It should have either been registrar or been

19  paid at this C salary schedule the same as the

20  previous registrar.  Or even if it remained

21  coordinator, which is what it is now, being paid

22  at, at least the C-3 salary schedule where other

23  coordinators were being paid.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 104

1    Q.    So this appointment reflects you still being

2    on the E salary schedule?

3    A.    Yes.

4    Q.    And you had started on the E salary schedule

5    even going back to 1985?

6    A.    Yes.

7    Q.    Okay.  Ms. Owensby, can you tell me

8    precisely when you believe you should have been

9    put on the C salary schedule?

10   A.    When my title was changed to Coordinator of

11   Registration and Admission, and when I had assumed

12   the added responsibilities of the previous

13   registrar.

14   Q.    Do you believe you should have been named

15   Coordinator of Registration and Admission

16   immediately upon Mr. Robinson's retirement?

17   A.    Yes.

18   Q.    Do you believe you should have been

19   immediately placed on the C salary schedule upon

20   his retirement?

21   A.    Yes.

22   Q.    And given this title that we're talking

23   about here?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 105

1    A.    That title or title as registrar.

2    Q.    Okay.  And it's your testimony today that

3    you believe that your race and your gender both

4    played a role in the decision, from the time of

5    Mr. Robinson's retirement until the time of this

6    appointment letter?

7    A.    Yes.

8    Q.    Okay.

9              MR. BEAM:  I'm going to mark that as

10   Defendants' Exhibit No. 20.

11             (Defendants' Exhibit No. 20 was

12             marked for identification and a

13             copy of the same is attached

14             hereto.)

15   Q.    And I may have already asked you this, and

16   I'm sorry if I did:  Who gave you this

17   appointment?

18   A.    J. Douglas Chambers.

19   Q.    And it does reflect or it does not reflect a

20   pay increase from the previous year?

21   A.    Yes, it reflects.

22   Q.    It reflects a pay increase?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

1  Q.    Ms. Owensby, what is this document?

2  A.    Appointment letter for the period ending

3  August 31, 2002.

4  Q.    Okay.  And when is that letter dated?

5  A.    August 17, 2001.

6  Q.    Okay.  And what is the time frame that it

7  pertains to?

8  A.    Beginning effective September 1, for the

9  period ending August 31, 2002.

10  Q.    Okay.  And what is your title there?

11  A.    Coordinator of Registration and Admission.

12  Q.    And what is your pay scale?  What is your

13  position on the salary schedule?

14  A.    E2, Grade 2, Step 15 with 19 years

15  experience.

16  Q.    Does that reflect an increase in the step

17  system from the previous year?

18  A.    It's the same.

19  Q.    Did you get a raise in that appointment

20  letter?

21  A.    No.

22  Q.    Okay.  Do you know why you didn't get a

23  raise?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 107

1   A.      Nope.

2   Q.      Did you talk to anybody about why you didn't

3   get a raise?

4   A.      No.

5   Q.      Who gave you that appointment?

6   A.      J. Douglas Chambers.

7   Q.      And did your responsibilities change at all

8   after that appointment?

9   A.      Increased performance.

10  Q.      What do you mean by "increased performance"?

11  What do you mean?

12  A.      Due to the increase of student population,

13  increase in programs.

14  Q.      Are you saying the volume of your work

15  increased?

16  A.      Volume.

17  Q.      Okay.  Did the scope of your

18  responsibilities change?

19  A.      I was responsible -- it changed.

20  Q.      How did it change?

21  A.      Because we started taking the special

22  education program.  We started actually keeping

23  records on the computer for the Special Ed

Page 108

1    students as well.

2        That increased the student population, and

3    it increased my contact with the instructors

4    because there were added instructors for the

5    program.

6    Q.    So is it your testimony that both the volume

7    of the work increased and the scope of

8    responsibilities increased?

9    A.    Yes.

10   Q.    And your testimony is that there were

11   changes in the programs offered by Ingram that

12   increased your responsibilities?

13   A.    Yes.

14   Q.    Anything else that you would add to how your

15   responsibilities increased?

16   A.    At this time, that was it.

17   Q.    Okay.  What percentage of your time was now

18   devoted to these responsibilities versus your

19   secretarial responsibilities?

20   A.    I would say the increase of the Special Ed

21   students, about 80 percent now, in dealing with

22   the admission and registration process.

23   Q.    Were your secretarial duties diminishing

Page 109

1    during this time?

2    A.    No.  I just maintained.  I was able to

3    handle them both.  They were still there.

4    Q.    Were you -- as a result of this increase in

5    the volume of your work and your responsibilities,

6    did you have to work longer hours?

7    A.    No.

8    Q.    How did you handle the increase?

9    A.    I guess basically just better planning,

10    starting early with the process.  And I think

11    during that time one more clerk came on.

12    Q.    Prior to this increase in your work volume

13    and your responsibilities, were you busy?

14    A.    I stayed busy.

15    Q.    Have you been busy since the day you started

16    at Ingram?

17    A.    Yes.

18    Q.    Okay.  I just want to make sure I

19    understand.  You say you had an increase during

20    this period in the volume and an increase in the

21    responsibilities?

22    A.    Yes.

23    Q.    Any other strategies that you employed to

Page 110

1    handle this increased volume of work or increased

2    responsibilities?

3    A.    Just like I said, I started the process

4    earlier.

5    Q.    When you say "the process," what do you

6    mean?

7    A.    That's the admission for the new students,

8    the preregistration process; bumping up the time

9    for grades to be in; anywhere where I could maybe

10   start early and get a head start to where I

11   wouldn't be so bogged down trying to close a

12   semester and begin a semester.

13   Q.    Who were you reporting to at this time?

14   A.    Dean Wilson.

15   Q.    Did Dean Wilson assist you in the management

16   of your workload?

17   A.    Not really.

18   Q.    Did he provide you any guidance as to how to

19   handle these new responsibilities?

20   A.    Not really.

21   Q.    Did he provide you any guidance as to how to

22   handle this new volume of work?

23   A.    Not really.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 111

1  Q.    Did anyone provide you guidance as to how to

2  handle these new responsibilities?

3  A.    No.

4  Q.    Did anyone provide you guidance as to how to

5  handle this new -- how to handle this increased

6  work volume?

7  A.    No.

8  Q.    You figured it out by yourself how to do it?

9  A.    Yes.

10  Q.    Okay.  Dr. Chambers gave you this

11  appointment?

12  A.    Yes.

13  Q.    And it does not reflect a change in title;

14  is that right?

15  A.    This one is the same as that one, same

16  title.

17  Q.    That's the same title for this appointment

18  letter.  It reflects the same title, the same

19  position on the pay scale, and the same annual

20  salary?

21  A.    Same annual salary, different position on

22  the pay scale from 18 years to 19 years.

23  Q.    Why did your position on the pay scale

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 112

1    change?

2    A.    Because I was within my 19th year of

3    experience.

4    Q.    To your knowledge, do you know why you did

5    not receive a raise in your annual pay?

6    A.    No.

7    Q.    Okay.  Did your -- to your knowledge, did

8    your race play a part in that appointment?

9    A.    It would have been the same because it's the

10   same title.

11   Q.    So your testimony is that your race played a

12   role?

13   A.    Yes.

14   Q.    And, to your knowledge, did your gender play

15   a role in that appointment?

16   A.    Yes.

17   Q.    Okay.  Thank you.

18          MR. BEAM:  We'll mark this Defendants'

19   Exhibit 21.

20          (Defendants' Exhibit No. 21 was

21          marked for identification and a

22          copy of the same is attached

23          hereto.)

Page 113

1    Q.    Did you talk to anyone about this

2    appointment? any of your supervisors?

3    A.    I believe I talked with Mr. Wilson in

4    reference to that.  And there "were" controversy

5    after speaking with him about it.

6    Q.    What do you mean by "controversy"?

7    A.    He referred me to, I think, Dr. Merk; I'm

8    not sure.  And Dr. Merk responded.  And I think it

9    went from Dr. Merk to -- well, it went from Dr.

10   Merk -- I think I approached President Chambers in

11   reference to that.  So it kind of went back and

12   forth.

13   Q.    What did you initially tell Dean Wilson?

14   A.    I had been appointed Coordinator of

15   Registration and Admissions and been compensated

16   at an E-2 salary schedule, whereas there were

17   administrative assistants already at E-1.

18   Q.    And what did he say?

19   A.    I don't remember.

20   Q.    But your testimony is that he referred you

21   to Dr. Merk?

22   A.    Yes.

23   Q.    And you had a conversation with Dr. Merk

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 114

1    about your position on the pay scale?

2    A.    Yes.  I wrote a letter to Dr. Merk.

3    Q.    And did Dr. Merk respond to you verbally or

4    in writing?

5    A.    In writing.

6    Q.    And were you satisfied with his response?

7    A.    Not really.

8    Q.    So what did you do then?

9    A.    I think I went to Mr. Chambers.

10   Q.    And what did you tell Dr. Chambers?

11   A.    That here I am coordinator for registration

12   and admissions, also carrying the duties of

13   secretary, performing the duties of secretary, and

14   I'm being paid at E-2, whereas there were

15   administrative assistants, whose duties were

16   secretary-like duties, being paid E-1 at the time.

17   Q.    Do you remember anything else you told him?

18   A.    I'm not sure.

19   Q.    What did he tell you?

20   A.    We'll look into it; we'll get back with you.

21   Something to that effect.

22   Q.    Were you satisfied with his response?

23   A.    No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 115

1    Q.    Did you tell him you weren't satisfied with

2    his response?

3    A.    I think I did in a memo; I'm not sure.  I

4    think I did.

5    Q.    Do you remember what you told him?

6    A.    That I didn't understand why it was, you

7    know, such a problem, with the type level of

8    responsibility and the work that I was doing, that

9    it only merited an E-2.

10   Q.    So your testimony is, at this time, during

11   this appointment, your position on the pay scale

12   was incorrect?

13   A.    Yes.

14   Q.    And you voiced this concern to Dean Wilson,

15   Dr. Merk, and Dr. Chambers?

16   A.    Yes.

17   Q.    Did you voice it to anyone else?

18   A.    No.

19   Q.    And I know you touched on this already;

20   forgive me if I've already asked you this:  The

21   basis for your belief that you were on the wrong

22   position on the salary scale was what?

23   A.    I was on the wrong position on the salary

Page 116

1    scale because I believe I should have been at C,

2    where other coordinators were, or at C where the

3    previous registrar "were," since my duties were

4    incorporated with the previous duties of the

5    registrar.

6    Q.    So your belief at this particular time on

7    this appointment was that you should have been on

8    the C schedule?

9    A.    I should have been.

10    Q.    And is it your testimony that you should

11    have been placed on the C schedule immediately

12    upon Mr. Robinson's retirement, when you took over

13    those responsibilities?

14    A.    And my title became Coordinator of

15    Registration and Admissions, yes.

16    Q.    So, Ms. Owensby, when should you have been

17    placed on the C schedule?

18    A.    When I took on the responsibilities and when

19    my title changed.  However, when I took on the

20    responsibilities, my title didn't change right

21    off.  It took over a year before they changed my

22    title.

23    Q.    Do you remember when you talked initially

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 117

1    with Dean Wilson about this?

2    A.    I believe it would have been close to

3    contract time for the year 2000.

4    Q.    Okay.

5    A.    Because it had started a new fiscal year.

6    Q.    So the conversations that you referred to a

7    few minutes ago when you said that you brought up

8    your concern with Dean Wilson and he referred you

9    to Dr. Merk and you ultimately talked to Dr.

10   Chambers, when did that sequence of events occur?

11   A.    I believe it was the contract year of '99,

12   because I had already assumed the duties in April

13   of '99.  So the contract year would have started

14   September of '99, and I had not received any

15   compensation.

16        I don't think I said anything then.  But

17   that next year.  Because here it is they had

18   skipped the contract year and it's going over into

19   another year and nothing had changed.  But I had

20   the duties and the responsibilities.

21   Q.    So what is the month and year that you

22   initially brought this up with Dean Wilson and the

23   sequence that you previously described?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 118

1    A.    I believe it was in 2000.  And it would have

2    been before contract time.  I'm not sure about the

3    month, but it would have been leading up to the

4    contract year 2000.

5    Q.    Do you know approximately what time of the

6    year it would have been that you brought this up

7    with him initially?

8    A.    It may have been July or August, maybe.

9    Q.    So at the time of this appointment that we

10   have in front of us here, which is dated

11   August 17, 2001, you have already spoken with Dean

12   Wilson and Dr. Merk and Dr. Chambers about your

13   concerns about where you are on the salary

14   schedule; is that right?

15   A.    I had already spoken to Dean Wilson and Mr.

16   Chambers.  And I'm not sure what date that letter

17   was dated to Dr. Merk.  But I know for sure I had

18   spoken to Dean Wilson and Mr. Chambers in

19   reference to that.

20   Q.    And this would have been, you think, in July

21   of 2000?

22   A.    I'm not sure.  It was leading up to contract

23   time.

Page 119

1   Q.    Leading up to contract time in 2000.  Okay.

2   So at the time of this appointment, you had

3   already spoken with Dean Wilson and Dr. Chambers,

4   when you got this appointment letter?

5   A.    Yes.

6   Q.    But you're not sure if you had spoken with

7   Dr. Merk?

8   A.    I'm not sure about Dr. Merk.  But I know I

9   had spoken with Wilson and Chambers.

10  Q.    When you got this appointment letter, did

11  you voice any further concerns about your

12  placement on the salary schedule?

13  A.    I'm not sure.

14  Q.    Okay.  Do you have any idea when you spoke

15  with Dr. Merk about it?

16  A.    It probably would have been that next

17  contract year.

18  Q.    Okay.

19  A.    Which would have been 2002.

20  Q.    So is it your testimony today that the first

21  time that you brought up your placement on the

22  salary schedule -- your concerns about that --

23  would be right before contract time in 2000?

Page 120

1   A.    Yes.

2   Q.    And you voiced those concerns to Dean

3   Wilson?

4   A.    Yes.

5   Q.    And you think you voiced them after that to

6   Dr. Chambers?

7   A.    Yes.

8   Q.    And sometime after that, did you voice

9   concerns to them again?

10  A.    Yes.

11  Q.    And when was that?

12  A.    I believe it would have been sometime in

13  2002.

14  Q.    And do you remember who you talked to?

15  A.    Wilson.  And I don't know whether I sent a

16  letter to Dr. Chambers or not.  I think I dealt

17  with Wilson on that situation, but I'm not sure.

18  Q.    Do you remember what you told Dean Wilson at

19  that time?

20  A.    Thereto again, I showed him where I had this

21  level of responsibility with this title and was

22  really being paid less than what they would

23  consider secretaries for the institution.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 121

1    Q.    And what was Dean Wilson's response to your

2    complaints the second time?

3    A.    I believe he said that he was talking to the

4    president about it; I'm not sure.

5    Q.    Did you talk to the president about it?

6    A.    I'm not sure whether I talked to him about

7    it at this point or not.

8    Q.    Did you talk to Dr. Merk about it?

9    A.    Like I said, I remember writing Dr. Merk a

10   letter in reference to, but I don't remember what

11   date.

12   Q.    Okay.  Do you remember anything else with

13   regard to voicing any concerns as a result of this

14   particular appointment dated August 17, 2001?

15   A.    No.

16   Q.    Okay.  And I may have already asked you

17   this; I'm sorry if I did:  Did you receive this

18   appointment, to your knowledge, as a result of

19   your race?

20   A.    Yes.

21   Q.    Did you receive this appointment, to your

22   knowledge, as a result of your gender?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 122

1   Q.    Okay.  Ms. Owensby, what is this document?

2   A.    Appointment letter for the position as

3   Coordinator of Registration and Admissions,

4   effective September 1, 2002, for the period ending

5   August 31, 2003.

6   Q.    What is that letter dated?

7   A.    August 28, 2002.

8   Q.    And does this letter reflect a change in

9   your title?

10   A.    No.

11   Q.    Does it reflect a change in your position on

12   the pay scale?

13   A.    Yes.

14   Q.    And what is that difference?

15   A.    The difference is E-1 at Grade 1, Step 20.

16   From E-2 to E-1.

17   Q.    Okay.  And does that appointment letter

18   reflect an increase in your salary?

19   A.    Yes.

20   Q.    Okay.  And who gave you that appointment?

21   A.    J. Douglas Chambers.

22   Q.    So during the time that you believe that you

23   were -- that race and gender were being considered

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 123

1   in your appointment letters, you were receiving

2   raises?

3   A.    At this point I did.

4   Q.    And during the time period that we've talked

5   about thus far in which you say that race and

6   gender were a factor, to your knowledge, in the

7   decision of your appointment letter, you did

8   receive more than one raise during that time

9   period that we've talked about?

10  A.    Yes.

11  Q.    Okay. Did your duties or responsibilities

12  change upon this appointment letter?

13  A.    Volume of work, again. We had taken on

14  added programs. We went from four ADL programs --

15  well, four ADL sites to eight. So we were serving

16  more sites, which increased student population,

17  increased instructors, and increased

18  responsibilities.

19  Q.    Is it your testimony that your work volume

20  increased during this time period?

21  A.    Yes.

22  Q.    Did the scope of your responsibilities

23  increase?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 124

1    A.    Yes.

2    Q.    Anything else that you can remember about

3    how your responsibilities increased during this

4    time period?

5    A.    We started -- and I'm not sure exactly was

6    this the year or not -- but we started doing

7    graduation ceremonies for our students, something

8    we had not been doing before.  And I helped in

9    that as well.

10   Q.    Do you remember when you started helping

11   with that?

12   A.    I'm not sure when we started, when we had

13   the first one.  It could have been that year.

14   Q.    Okay.  You think it was about this time

15   frame?

16   A.    Yes.

17   Q.    Okay.  Who gave you that appointment?

18   A.    J. Douglas Chambers.

19   Q.    Did you voice any concerns to Dr. Chambers

20   about this appointment?

21   A.    No.

22   Q.    Did you voice any concerns to anybody about

23   this appointment?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 125

1   A.     No.

2   Q.     Okay.  Do you continue to have your

3   secretarial duties during this time period?

4   A.     Yes.

5   Q.     Are those secretarial duties any different

6   than what they had been previously?

7   A.     I'm not sure.  I believe they were about the

8   same.

9   Q.     The volume of the secretarial work was the

10  same?

11  A.     Yes.

12  Q.     Was the scope of responsibilities with

13  regard to your secretarial duties the same?

14  A.     Yes.

15  Q.     This appointment letter, I think we decided,

16  reflects a raise from one year to the next.  Can

17  you tell me how much that raise was?

18  A.     About 6,000.

19  Q.     Did you receive that raise, in part, because

20  of your performance as an employee at Ingram?

21          MR. DEBARDELABEN:  Object to form.

22  A.     Because, I believe, I "were" being already

23  underpaid, still being paid at the E salary

Page 126

1    schedule, with the type of responsibility I had.

2    And to me it was an appeasement to put me at E-1,

3    just to say, We did compensate you.

4    Q.    Do you believe that this document reflects a

5    belief on the part of your supervisors that you

6    were doing a good job?

7    A.    Yes.

8    Q.    Do you think if you had been doing a very

9    poor job you would have received this raise?

10   A.    No.   I don't think I would have been

11   employed.

12   Q.    Ms. Owensby, do you believe you received

13   this appointment because of your race?

14   A.    Yes.

15   Q.    Do you believe that you received this

16   appointment because of your gender?

17   A.    Yes.

18            MR. BEAM:   We'll mark this as Exhibit

19   22.

20            (Defendants' Exhibit No. 22 was

21            marked for identification and a

22            copy of the same is attached

23            hereto.)

Page 127

1    Q.    And that goes through August 31, 2003.

2    Okay.

3         Ms. Owensby, do you recognize this document?

4    A.    This is an appointment letter for the

5    position Registrar/Assistant to the Dean of

6    Students and Support Services, effective

7    September 1, 2003, for the period ending August

8    31, 2004.

9              MR. BEAM:  Do y'all want to break for

10   lunch?  It's after noon.

11             MR. DEBARDELABEN:  Are you in a good

12   place to break?  Do you want to finish with that

13   exhibit?

14             MR. BEAM:  Let me see this one real

15   quick.  This exhibit reflects another change in

16   title.  Let's just break here.

17             MR. DEBARDELABEN:  Okay.

18             (A lunch recess was taken.)

19   (BY MR. BEAM)

20   Q.    Ms. Owensby, I know that you recently had a

21   surgical procedure, so let me know if you want to

22   take a break or if you're not feeling good.

23   A.    Okay.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 128

1    Q.    Do you feel okay right now?

2    A.    Uh-huh.

3    Q.    Okay.  Let me ask you to take a look at

4    this.  Well, I'll just save that.

5          I think we were talking about this document

6    when we broke.  It's dated August 25, 2003.  Can

7    you tell me what that is?

8    A.    It's an appointment letter for the period

9    beginning September 1, 2003, ending August 31,

10   2004, for the position Registrar/Assistant to the

11   Dean of Students and Support Services.

12   Q.    Okay.  And, Ms. Owensby, what position on

13   the salary schedule does that document reflect?

14   A.    E-1, Grade 1, Step 20 with 21 years.

15   Q.    Is that an increase over what you got the

16   year before?

17   A.    It's the same.

18   Q.    Okay.  Is the annual salary the same?

19   A.    Yes.

20   Q.    Okay.  Do you know why your annual pay

21   stayed the same?

22   A.    I think that was the -- Step 20, I think,

23   either was the end of the pay schedule, I believe.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 129

```
1   I think it went up to 20 steps, I think; I'm not

2   sure.

3   Q.    Okay.  Who gave you that appointment?

4   A.    J. Douglas Chambers.

5   Q.    Okay.  And did that appointment reflect a

6   new title?

7   A.    Yes.

8   Q.    What was the title that you got with that

9   appointment?

10  A.    Registrar/Assistant to the Dean of Students

11  and Support Services.

12  Q.    Okay.  So you had never had that title

13  before?

14  A.    No.

15  Q.    Why did you get the new title?

16  A.    That's the title that was assigned.

17  Q.    Do you know why you got it?

18  A.    I was performing the duties of the

19  registrar, and maybe they decided they would

20  finally give me my just title.

21  Q.    So it's your testimony that this title was

22  changed to accurately reflect what your

23  responsibilities were?
```

Page 130

1    A.    I would say.

2    Q.    Okay.  Were you pleased or displeased with

3    this change in title?

4    A.    I was pleased.

5    Q.    And did you voice being pleased to anyone at

6    Ingram?

7    A.    No.

8    Q.    You didn't voice being pleased about that

9    title change to any of your superiors?

10   A.    No.

11   Q.    Okay.  Do you believe that this appointment

12   was a result of your race?

13   A.    I would say yes, due to the situation I'm

14   still being paid at E-1.  The title, but not the

15   money.

16   Q.    Okay.  So you believe that there was a nexus

17   between your race and your salary at that time?

18   A.    Yes.

19   Q.    Can you tell me what that nexus was?

20   A.    I believe, being that the former position as

21   registrar was a C salary position when a black

22   male had it, for some reason, and I don't know

23   what their reason was, they wouldn't place me

Page 131

1    there.

2    Q.    Do you believe that this appointment

3    reflects a decision based on your gender?

4    A.    I would say, because there were other

5    females on the C salary schedule in coordinator

6    positions.

7    Q.    Okay.  I just want to make sure I understand

8    your testimony.

9         You were pleased with the title change?

10   A.    Yes.

11   Q.    But you were not pleased with your annual

12   salary?

13   A.    Correct.

14   Q.    And you were not pleased with your position

15   on the salary scale?

16   A.    Correct.

17   Q.    And you believe that there was a nexus

18   between your position on the salary scale, your

19   annual salary, your race and your gender?

20   A.    I believe that was the reason why I wasn't

21   on that C salary schedule, with that title and the

22   level of responsibility.

23   Q.    Did you voice your concerns about your

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 132

1    placement on the salary schedule to anyone at this

2    time, at the time of this appointment?

3    A.    Not right at this time.  Not at this time.

4    Q.    When you say, "not at this time," you mean

5    not at the --

6    A.    Not at the time of the appointment.

7    Q.    Okay.

8              MR. BEAM:  We're going to mark this

9    Exhibit 23.

10             (Defendants' Exhibit No. 23 was

11             marked for identification and a

12             copy of the same is attached

13             hereto.)

14   Q.    Ms. Owensby, can you tell me what this

15   document is?

16   A.    That's an appointment letter for the

17   position of Registrar/Assistant to the Dean of

18   Students and Support Services beginning September

19   1, 2004, for the period ending August 31, 2005.

20   Q.    Does this document reflect a change in your

21   position on the salary scale?

22   A.    No.

23   Q.    Does it reflect a change in --

Page 133

1   A.      Well, it does.  It goes to 22 years, I

2   think.  This one was 21 years.

3   Q.      So there is a change?

4   A.      Yes.

5   Q.      Did you get -- does that document reflect an

6   increase in your annual pay?

7   A.      No.

8   Q.      Do you know why that is?

9   A.      Thereto, I was at Step 20, and either there

10  were just 20 steps or maybe there were 25.  But

11  I'm not sure how many steps was left on there.

12  Q.      What is the title of that appointment?

13  A.      Registrar/Assistant to the Dean of Students

14  and Support Services.

15  Q.      And I know that in the previous appointment

16  letter we just looked at, that was also your

17  title, right?

18  A.      Yes.

19  Q.      With that change in title, was there an

20  increase in the scope of your responsibilities?

21  A.      During that time we started doing the

22  workforce development program where some of our

23  students were able to participate in a short-term

Page 134

1    certification program in the eveningtime.

2    Q.    And what was your role in that program?

3    A.    I had to admit and register them, and also

4    keep up with their records.

5    Q.    And it's your testimony that that

6    constituted an expansion of your responsibilities?

7    A.    Yes.

8    Q.    Did it constitute an increase in your work

9    volume?

10   A.    Yes.

11   Q.    Did you continue to provide secretarial

12   services?

13   A.    I continued to type memos.

14   Q.    Is it your testimony today that your

15   secretarial duties began to diminish with this

16   appointment?

17   A.    Somewhat.

18   Q.    How did they diminish?

19   A.    I didn't do requisitions anymore and I

20   didn't do his travel anymore.

21   Q.    When you say "his," who do you mean?

22   A.    Dean Wilson.

23   Q.    With this title change, did you report to a

Page 135

1    new supervisor?

2    A.     No.

3    Q.     Who did you report to?

4    A.     Dean Wilson.

5    Q.     Any other changes in your secretarial

6    responsibilities?

7    A.     No.

8    Q.     Any other changes in your other

9    responsibilities?

10   A.     Yes.

11   Q.     What were those?

12   A.     There was an additional clerk that came

13   along, and we started being more accountable in

14   the areas of job placement and transition.

15   Q.     When you say, "we started being more

16   accountable," who are you talking about?

17   A.     The department.

18   Q.     Which department?

19   A.     Student services.

20   Q.     Okay.

21   A.     And with the transition situation, there

22   were transition clerks that actually came on

23   board.  And some reason, I had to train them.

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 136

1    Q.    You don't know why you had to train them?

2    A.    Well, at the time, their, I guess, jobs

3    wasn't quite defined or whatever, and they were

4    there.

5    Q.    Who told you to train them?

6    A.    Dean Wilson.

7    Q.    Did that make you mad?

8    A.    No.  I was being cooperative.

9    Q.    Any other responsibilities that increased

10   after you got a new title, or changed? increased

11   or changed?

12   A.    Well, in the Student Services Department,

13   period, there are constant changes.

14   Q.    Why are there constant changes?

15   A.    Because it seems as if most things kind of

16   triggers to that area.  We had the transition

17   coming in, placement and follow up.  Placement and

18   follow up always has been in that area, but it

19   wasn't as active earlier as it is during this time

20   or coming, you know, up to this time.

21   Q.    Who's been in charge in the changes in this

22   department?

23   A.    Dean Wilson.

Page 137

1    Q.    Dean Wilson is overseeing all the changes;

2    is that your testimony?  Dean Wilson has been the

3    authority or the supervisor that has made these

4    changes?

5    A.    I'm not sure whether he made all of those

6    changes or whether they came from higher up or

7    what the decision was, but they ended there in

8    student services.

9    Q.    When did the Student Services Department

10   start changing?

11   A.    It gradually started changing right after

12   the resignation of the registrar on up to now.

13   Constant.

14   Q.    It continues to change today; is that what

15   you're saying?

16   A.    Yes.

17   Q.    Okay.  And these changes have occurred after

18   the retirement of Mr. Robinson --

19   A.    Resignation.

20   Q.    I'm sorry.  -- resignation of Mr. Robinson,

21   at the direction of Dean Wilson, I believe you

22   said, and who else?

23   A.    At the direction of Dean Wilson and, I

Page 138

1    guess, the president. I'm, you know -- the

2    administration.

3        Whatever decisions that were best for the

4    college was handed down from the head to whatever

5    department head the situation involved.

6    Q.    So Dr. Chambers has also had a role in the

7    changes in this department?

8    A.    I would say he has a role in changes in

9    everything when it comes to the school.

10   Q.    Anybody else, to your knowledge, play a part

11   in the decisions to change the structure of the

12   Student Services Department?

13   A.    I'm not sure. Nobody that, you know...

14   Q.    Okay. Is it your belief, to your knowledge,

15   that this appointment was made as a result of your

16   race?

17   A.    Yes.

18   Q.    And is it also your belief that it was made,

19   in part, based on your gender?

20   A.    Yes.

21   Q.    Okay. And did you voice those concerns at

22   the time of this appointment?

23   A.    I did after this appointment.

Page 139

1    Q.    Who did you talk to?

2    A.    Dean Wilson.

3    Q.    What did you tell him?

4    A.    I wrote him a memo.  I'm not sure of the

5    total contents of the memo, but I explained to him

6    that I was performing in a dual role position, and

7    the job was being done.

8    Q.    When you say, "the job was being done," what

9    do you mean?

10   A.    In other words, he had no complaints.  I

11   have gotten good evaluations during the whole time

12   I've worked at Ingram.

13   Q.    By "the job," it's your testimony that you

14   mean your responsibilities were getting done?

15   A.    Yes.

16   Q.    Okay.  And you voiced some concern to Dean

17   Wilson.  Did you voice concern to anyone else?

18   A.    Not at that time.

19   Q.    Okay.  Were you pleased or displeased with

20   Dean Wilson's response to your concerns?

21   A.    I was displeased.

22   Q.    Did you tell him you were displeased?

23   A.    I don't remember.

Page 140

1   Q.    Okay.

2              MR. BEAM:  Let's make that Exhibit 24.

3              (Defendants' Exhibit No. 24 was

4              marked for identification and a

5              copy of the same is attached

6              hereto.)

7   Q.    And that goes through '05.  Okay.

8   Q.    Ms. Owensby, do you recognize this document?

9   And there's two pages.

10  A.    Yes.

11  Q.    Okay.  What is that document?

12  A.    It's an appointment letter for the position

13  as Registrar, effective September 1, 2005, and

14  ending August 31, 2006.

15  Q.    What is the title that you are appointed to

16  there?

17  A.    Registrar.

18  Q.    Okay.  And what is your position on the

19  schedule -- I'm sorry.  Does your position on the

20  pay scale reflect an increase from the previous

21  year?

22  A.    Yes.

23  Q.    What step are you on now?  What grade and

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 141

1    step?

2    A.    E-1, Grade 1, Step 20 with 23 years.

3    Q.    And does this appointment letter reflect an

4    increase in your annual salary?

5    A.    Yes.

6    Q.    How much more did you make that year?

7    A.    A little over 3,000, almost 4-.

8    Q.    From the previous year; is that right?

9    A.    From the previous year, yeah.

10   Q.    Okay.  And who gave you that appointment?

11   A.    J. Douglas Chambers.

12   Q.    Did that appointment make you happy or

13   unhappy?

14   A.    Unhappy.

15   Q.    And why did it make you unhappy?

16   A.    Because I still deserved -- I felt that I

17   should have been on the C salary schedule.

18   Q.    Okay.  Were you happy with your annual

19   salary?

20   A.    No.

21   Q.    And you're just saying that you were not

22   happy with your pay scale -- I mean, your position

23   on the scale?

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 142

1    A.    Right.

2    Q.    And can you tell me why you were unhappy?

3    A.    Because here at 2005 is when this letter was

4    done, here I am appointed as Registrar at $50,379

5    annual salary; whereas the previous registrar

6    resigned at 67-something.  And this is 2005 and

7    that was back in 1999.  And I'm still nowhere in

8    the ballpark.

9    Q.    Do you believe that this appointment was, in

10   part, based on your race?

11   A.    Yes.

12   Q.    Do you believe it was based on your gender?

13   A.    Yes.

14   Q.    Okay.

15            MR. BEAM:  We'll make that Exhibit 25.

16            (Defendants' Exhibit No. 25 was

17            marked for identification and a

18            copy of the same is attached

19            hereto.)

20   Q.    And, Ms. Owensby, what is this document

21   attached to Defendants' Exhibit 25?

22   A.    The job description for Registrar/Assistant

23   to the Dean of Students and Support Services.

Page 143

1    Q.    Is that the official job title that you had

2    as a result of this appointment?

3    A.    According to this job title and this

4    appointment letter, the Assistant to the Dean of

5    Students and Support Services is no long there.

6    It's just plain Registrar now.

7    Q.    But does this document accurately reflect

8    what your responsibilities were in this time

9    period?

10   A.    That and the ones I submitted as added

11   responsibilities.

12   Q.    So your testimony is this is not a complete

13   recitation of your responsibilities at this time?

14   A.    Right.

15   Q.    Can you tell me what additional

16   responsibilities you had beyond these?

17   A.    The ones that I mentioned throughout this

18   deposition.

19   Q.    Okay.  Is it your testimony that this is not

20   the job description that was in place at the time?

21   A.    It was the one that was in place because

22   this is the one that they attached to my

23   appointment letter.

Page 144

1   Q.    Did you tell anyone at the time that your

2   responsibilities, as you understood them, were

3   different than what was documented with your

4   appointment letter?

5   A.    I did to Mr. Wilson, on a letter I submitted

6   to him with my additional duties.

7   Q.    Okay.  So you submitted a letter to Dean

8   Wilson stating what?

9   A.    My additional duties, as well as my existing

10  duties.

11  Q.    But you said this document is not accurate?

12  A.    I didn't say the document wasn't accurate in

13  my letter; I just stated my exiting duties plus my

14  added duties.

15  Q.    All right.  Ms. Owensby, tell me what this

16  is.

17  A.    That's an appointment letter for the

18  position as Director of Registration and

19  Admissions, effective September 1, 2006, for the

20  period ending August 31, 2007.

21  Q.    And what title are you given there?

22  A.    Director of Registration and Admissions.

23  Q.    And what is your salary?

Page 145

1    A.    60,000.

2    Q.    And what is your position on the pay scale?

3    A.    C-3.

4    Q.    And who gave you that appointment?

5    A.    J. Douglas Chambers.

6    Q.    Is this the first time that you are on the C

7    salary schedule?

8    A.    Yes.

9    Q.    Are you presently on the C salary schedule?

10   A.    Yes.

11   Q.    Once you got on the C salary schedule, were

12   you happy?

13   A.    Somewhat.

14   Q.    What were you not happy about?

15   A.    Thereto, the actual rate of pay.

16   Q.    What do you believe the rate of pay should

17   have been?

18   A.    It should have been at least the same as the

19   former registrar which, at the time when he

20   resigned, he was at C-1.

21   Q.    Do you know how much Tim Robinson made when

22   he resigned?

23   A.    It was 67-something; I'm not sure.

Page 146

1    Q.    How long had Mr. Robinson been there?

2    A.    He had been there -- I think he got there

3    two years before I got there.

4    Q.    Okay.  So how many years is that?

5    A.    I've been here 22, so he -- up to now it

6    would have been 24 years.

7    Q.    Okay.  So Mr. Robinson had been there 24

8    years?

9    A.    No, no.  In 1999 -- I don't know exactly

10   when Mr. Robinson's hire date was; I'm not sure.

11   Q.    You don't know?

12   A.    No.

13   Q.    Do you know how long Mr. Robinson was a

14   registrar?

15   A.    I believe from '89 to '99.  I'm not sure of

16   that either.

17   Q.    Ms. Owensby, do you think that this

18   appointment letter considered your race?

19   A.    Yes.

20   Q.    Do you think it considered your gender?

21   A.    Yes.

22   Q.    Okay.

23             MR. BEAM:  We'll make that Exhibit 26.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 147

1               (Defendants' Exhibit No. 26 was

2               marked for identification and a

3               copy of the same is attached

4               hereto.)

5     Q.    Ms. Owensby, I'm going to ask you to take a

6     look at this document and tell me if you recognize

7     it.

8     A.    Yes.

9     Q.    What is that?

10    A.    It looks like a job description for Timothy

11    Robinson.

12    Q.    Does that job description accurately reflect

13    Mr. Robinson's duties?

14    A.    I assume it does.

15    Q.    Do you have any reason to believe that it

16    doesn't?

17    A.    No.

18    Q.    When Mr. Robinson resigned, did you take

19    over all of the responsibilities in that job

20    description?

21    A.    All except for G.

22    Q.    And what's in G?

23    A.    Monitor Educational Planning Committees to

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 148

1    ensure that the committees are functioning in a

2    proper and timely manner.

3        The Educational Planning Committees kind of

4    -- well, they "wasn't" functioning too well during

5    his time.

6        And then it kind of dissolved itself and was

7    renamed to what we call an Admissions Committee.

8    And I did serve on the Admissions Committee

9    because I was the Coordinator of Admissions and

10   Registration.

11   Q.    So who took over the responsibilities listed

12   in G?

13   A.    I would say that being that it was

14   dissolved, some of the activities were up under

15   the Admissions Committee; and I did serve on the

16   Admissions Committee in that capacity.

17       And as far as monitoring, I don't know who

18   would have took this over, because it was really

19   dissolved.  I mean, you couldn't take it over if

20   it was dissolved or inactive.

21   Q.    So all of the work that's associated in

22   section G was dissolved?

23   A.    Yes.  It wasn't functioning.

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 149

1   Q.    Okay.  And your testimony is that you took

2   over every other responsibility in this job

3   description?

4   A.    Yes.

5   Q.    Of these tasks that are in this job

6   description, what responsibilities did Dean Wilson

7   take over?

8   A.    He verified graduation requirements.  In

9   other words, he signed off on them after I had

10  prepared them for him.

11  Q.    Anything else that Dean Wilson did on that

12  list?

13  A.    No.

14  Q.    What did Ms. Toxey do from that list?

15  A.    None of these.  Sometimes she would

16  communicate with DOC.  And that was generally at

17  my request or when I would tell her to call DOC.

18  Q.    So your testimony is that you took over all

19  these responsibilities on this list?

20  A.    Yes.

21  Q.    And some of those responsibilities you

22  shared with Dean Wilson and Ms. Toxey?

23  A.    Yes.

Page 150

1    Q.    But you weren't solely responsible for the

2    completion of all the job duties on that list?

3    A.    No.

4    Q.    Okay.

5          MR. BEAM:  We'll mark that Defendants'

6    Exhibit 27.

7          (Defendants' Exhibit No. 27 was

8          marked for identification and a

9          copy of the same is attached

10         hereto.)

11   Q.    Ms. Owensby, can you tell me what that

12   document is?

13   A.    This looks like a job description for

14   Registration and Admissions Coordinator.

15   Q.    Was that -- does that document accurately

16   reflect your job description when you were the

17   Registration and Admissions Coordinator?

18   A.    Yes.

19   Q.    Are there differences in that list of

20   responsibilities and in the list of

21   responsibilities that you just told me you took

22   over from Mr. Robinson?

23   A.    Seems like there are differences.  There are

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 151

1    some differences.

2    Q.     Why are there differences?

3    A.     Because some of these duties were added,

4    some of them were modified, and --

5    Q.     What responsibilities were added or

6    modified?

7    A.     "Assumes other duties as assigned by the

8    Dean of Students and Support Services...."

9    Q.     Anything else?

10   A.     "Maintains accurate records and reports...."

11   These were the end-of-semester reports that we had

12   to do -- produce hard copies and electronic files

13   Postsecondary -- and this is something that the

14   former registrar didn't do.

15   Q.     So it's your testimony that this document

16   reflects new responsibilities that were added to

17   your job description after you absorbed Mr.

18   Robinson's job?

19   A.     Yes.  Or modified.

20   Q.     Okay.

21              MR. BEAM:  We'll mark that Defendants'

22   Exhibit 28.

23              (Defendants' Exhibit No. 28 was

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 152

1           marked for identification and a

2           copy of the same is attached

3           hereto.)

4    Q.    Ms. Owensby, what is this document?

5    A.    This is a job description for

6    Registrar/Assistant to the Dean of Students and

7    Support Services.

8    Q.    Does that document accurately reflect your

9    responsibilities when you held that position?

10   A.    Somewhat.   Thereto again, there were

11   additions.

12   Q.    What were the additions?

13   A.    At Assistant to the Dean of Students and

14   Support Services, I would assist him in doing the

15   IPEDS; I would assist in the graduation

16   ceremonies, help to plan and coordinate those

17   events; we started a job fair.  I believe it was

18   during that time.  I assisted in that.

19        Anything that Dean Wilson took on as Dean of

20   Students, if he chaired any type event or

21   whatever, the majority of the time I was involved

22   in helping him to get it coordinated and getting

23   it together.

Page 153

1    Q.    Okay.  Does that constitute a change or

2    increase in the scope of your responsibilities?

3    A.    Yes.

4    Q.    Is this document accurate?

5    A.    Not completely.

6    Q.    What's wrong with it?

7    A.    The added additions as Assistant to the Dean

8    of Students is not there.

9    Q.    Do you know why it's not there?

10   A.    I guess because they never updated.

11   Q.    Who is "they"?

12   A.    Personnel.

13   Q.    The personnel department at Ingram?

14   A.    Yes.

15   Q.    Okay.

16              MR. BEAM:  I'll make this Exhibit 29.

17              (Defendants' Exhibit No. 29 was

18              marked for identification and a

19              copy of the same is attached

20              hereto.)

21   Q.    Ms. Owensby, I want to turn your attention

22   to this document that we've already looked at.

23   This is Defendants' Exhibit 26.

Page 154

1          There's a job description attached to that

2    document.  And this is the most recent appointment

3    letter that would reflect your job right now.

4          Is that document attached, is that an

5    accurate description of your responsibilities now?

6    Yes or no?

7    A.    Yes.

8    Q.    Okay.  Is that a final document or is that a

9    working document?

10   A.    I don't know, because it has changed so many

11   times.  This is the last one I've received.

12   Q.    You don't know if that's your job

13   description right now?

14   A.    I know it's my job description right now,

15   the one I was issued with this appointment letter;

16   but I don't know whether it's the final one.

17   Q.    Is that it?

18   A.    Thus far yes, it's the final one.

19   Q.    Okay.  That is the job description in place

20   right now for you?

21   A.    Yes.

22   Q.    That's a document that's been approved by

23   President Chambers?

Page 155

1   A.    I don't know whether it's been approved or

2   not, but this is a document that was in my

3   personnel file.

4   Q.    Okay.  Have you seen that document before?

5   A.    Yes.

6   Q.    When did you see it?

7   A.    I don't remember what date.  It came

8   separate from the appointment letter.

9   Q.    From who?

10  A.    It was on my desk.

11  Q.    You don't know how it got there?

12  A.    No.

13  Q.    Do you know who put that document together?

14  A.    No.

15  Q.    Have you ever asked anybody about it?

16  A.    No.

17  Q.    Did you have any input in the development of

18  that document?

19  A.    I met with Mr. Traywick at one time.

20  Q.    Who is he?

21  A.    He's the transition coordinator.

22  Q.    What does that mean?

23  A.    He is coordinator over the transition

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 156

1    program.

2    Q.    What's the transition program?

3    A.    This is where we provide services for our

4    students who are near parole time.  We try to get

5    them a home plan, job plan, provide them with life

6    skills in order to make it out in the free world.

7    Q.    Why did you meet with Mr. Traywick?

8    A.    Because I think Mr. Wilson had him

9    restructuring the positions and all.  And he

10   talked with me about my position and all.  So I

11   assume that Mr. Traywick revised it.  I don't know

12   who did, but a copy was on my desk and a copy was

13   in my personnel file.

14   Q.    When did you talk with Mr. Traywick?

15   A.    I'm not sure.

16   Q.    But you're pretty sure you talked to him

17   about the development of your job description?

18   A.    Yes.

19   Q.    Okay.  Ms. Owensby, what is this document?

20   A.    This is a job description for Assistant to

21   the Dean of the College.

22   Q.    And was that ever your job description right

23   there?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 157

1   A.    That's not my job description.

2   Q.    Has it ever been your job description?

3   A.    No.

4   Q.    Okay.  Have you ever performed any of the

5   duties that are described in that document?

6   A.    I coordinate with special education services

7   personnel every day; "liaison" directly with the

8   program directors, facility directors, college

9   deans, administrators, support staff, faculty;

10  coordinate with the Department of Corrections'

11  officials, No. 3 and No 4.

12  Q.    Who is that a job description for?

13  A.    That job description was that of Conrad

14  Lassiter and William Griswold.

15  Q.    Okay.  When?

16  A.    I'm not sure of the date.

17  Q.    Okay.  But you've performed some of those

18  duties?

19  A.    I've performed 1 through 5.  I've been

20  involved in each aspect of that position, I mean,

21  of these first five on this list, and did them

22  with the special services division.

23  Q.    Okay.

Page 158

1          MR. BEAM:  Let's make that Exhibit 30.

2          (Defendants' Exhibit No. 30 was

3          marked for identification and a

4          copy of the same is attached

5          hereto.)

6    Q.    Ms. Owensby, let me ask you this:  You

7    stated earlier you got a degree from Central

8    Alabama Community College?

9    A.    Yes.

10   Q.    Can you tell me what that document is?

11   A.    This looks like a letter from Mr. Freddie

12   Powell.  "Due to the addition of a Registrar and

13   Placement Officer, who jointly use Ms. Bonita

14   Lewis along with the Dean of Students, I recommend

15   she be placed at E-5, Step 5, effective

16   September 1, 1989."

17   Q.    And what is the document attached to it?

18   A.    My degree.

19   Q.    Is that the only degree that you have ever

20   received?

21   A.    Yes.

22   Q.    And what is that degree in?

23   A.    Associate in Arts.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 159

1   Q.    And is that the degree that you -- no.  You

2   said you got a degree in legal stenography?

3   A.    Yeah.  A diploma.

4   Q.    But that was from --

5   A.    Trenholm.

6   Q.    Okay.  And you have that degree from Alabama

7   Community College?

8   A.    Central Alabama Community College.

9   Q.    What is legal stenography?

10  A.    It's basically what a lawyer's secretary or

11  paralegal would do.  Basically, kept up with the

12  legal briefs, filing briefs, filing -- taking

13  court papers and stuff to be filed in court.

14  Basically, what maybe your assistant would do, or

15  Jim's.

16  Q.    And in this degree, you got an Associate in

17  Arts.  What was your focus in that program?

18  A.    At the time, I wanted to veer off into

19  General Ed.

20  Q.    What was the --

21  A.    And this was just my basics.

22  Q.    Okay.  Did you have any focus in the

23  coursework that you did here?

Page 160

1   A.    Basically the English, literature, and the

2   psychology courses.

3   Q.    Okay.  Any of that coursework relate to your

4   job responsibilities now?

5   A.    Yeah, in a sense.

6   Q.    How?

7   A.    The ability to comprehend; the ability to

8   perform tasks with little to no supervision; the

9   ability to make decisions without -- on my own,

10  good decisions; the ability to write, communicate.

11  Q.    Okay.  Anything else?

12  A.    And deal with people.

13  Q.    So your coursework in general studies at

14  Central Alabama Community College taught you how

15  to deal with people?

16  A.    Yes.

17  Q.    How did it do that?

18  A.    The psychology class.

19  Q.    Okay.

20        MR. BEAM:  I'm going to mark this as

21  Defendants' Exhibit 31.

22        (Defendants' Exhibit No. 31 was

23        marked for identification and a

Page 161

1           copy of the same is attached

2           hereto.)

3   Q.    Ms. Owensby, when you were hired in 1985, I

4   think you said you weren't sure if you competed

5   against anyone for the position that you got; is

6   that right?

7   A.    Right.

8   Q.    Have you ever competed against anyone else

9   for a promotion that you've received at Ingram?

10  A.    No.

11  Q.    So it's your testimony that no one else has

12  ever been considered for any of the promotions

13  that you have received?

14  A.    Not that I know of.

15  Q.    Ms. Owensby, how much money do you make

16  today?

17  A.    60,000.

18  Q.    How much did you make when you started at

19  Ingram?

20  A.    10,000.

21  Q.    Do you know what percentage of increase that

22  is?

23  A.    No.  What's the percentage?

Page 162

1    Q.    I'm asking you if you know.

2    A.    From 10 to 60?  That would be, what, 60

3    percent?

4    Q.    Okay.  And during the time period that you

5    have been employed at Ingram, from 1985 until the

6    present, the only degree that you've received

7    during that time period is from Central Alabama

8    Community College; is that right?

9    A.    Yes.

10   Q.    Have you ever described yourself as a

11   paraprofessional?

12   A.    I did in one of those memos I wrote.

13   Q.    Is that still accurate today?

14   A.    No.  Because the paraprofessionals, as

15   classified by Ingram, were -- actually, it was

16   used as a comparison.

17         At that time, Ingram "were" paying what they

18   were calling paraprofessionals.  And these were

19   people that were sitting in classrooms being paid

20   at E-1 at the time I was being paid at E-3 and

21   E-2.

22   Q.    So you don't consider yourself a

23   paraprofessional now?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 163

1    A.     No.

2    Q.     When did you stop considering yourself as a

3    paraprofessional?

4    A.     When I was assigned the duties of the

5    registrar and the duties of assistant to the Dean

6    of Students, performed those duties, got good

7    evaluations for each year I performed those

8    duties.

9    Q.     Let me make sure I understand your

10   testimony.

11          You were a paraprofessional prior to being

12   assigned the duties of Mr. Robinson?

13   A.     Basically.  Because the paraprofessionals

14   and the secretaries and clerks kind of all were

15   considered in the same, I guess -- well, they were

16   being paid at the E salary schedule.  So I assumed

17   that this is where, I guess, Ingram justified

18   paraprofessionals at the E salary schedule with

19   the clerks and the secretaries.

20   Q.     But prior to absorbing those

21   responsibilities, did you consider yourself a

22   paraprofessional?

23   A.     No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 164

1    Q.    What did you consider yourself?

2    A.    I considered myself a professional.

3    Q.    Okay.  When did you stop considering

4    yourself as a paraprofessional and start

5    considering yourself as a professional?

6    A.    When I took on those duties.

7    Q.    Okay.  Ms. Owensby, do you know what

8    education Mr. Robinson had?

9    A.    I think he started off with a B.S. degree

10   and ended with a master's.

11   Q.    Do you know what his B.S. degree was in?

12   A.    I'm not sure.

13   Q.    Do you know what his master's degree was in?

14   A.    Counseling.

15   Q.    Do you know what the requirements are to be

16   on the C salary schedule in the Alabama Department

17   of Postsecondary Education?

18   A.    The only requirements I know of is the fact

19   that a person who holds a doctorate degree will be

20   paid a set amount over what's on the scale.

21   Q.    To your knowledge --

22   A.    Any other requirements, I'm not familiar

23   with.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 165

1    Q.    To your knowledge, is it a requirement that

2    you have a four-year college degree to be on the C

3    salary schedule?

4    A.    No, not to my knowledge.

5    Q.    Okay.  Do you think that your educational

6    background was similar to Mr. Robinson's?

7    A.    No.

8    Q.    Do you feel that you have performed the

9    responsibilities that Mr. Robinson had in an

10   effective way?

11   A.    Yes.

12   Q.    Do you think that you have been rewarded for

13   that performance?

14   A.    No.

15   Q.    Do you think you've been rewarded at all for

16   your performance since you took over those duties?

17   A.    Somewhat.

18   Q.    What do you mean by "somewhat"?

19   A.    Not to my satisfaction.

20   Q.    But you have been rewarded in some way; is

21   that right?

22   A.    Yeah.

23   Q.    Just not enough to make you happy; is that

**MERRILL LEGAL SOULTIONS**
**Court Reporting\*Legal Videography\*Trial Services**

Page 166

1    right?

2    A.    Not enough for the level of responsibility

3    and for the type salary that job responsibility

4    carried when this black male had the job.

5    Q.    Ms. Owensby, at Ingram College, who has the

6    authority to redistribute responsibilities?

7    A.    The president and, I guess, your department

8    head.

9    Q.    And during the time period from 1999, after

10   Mr. Robinson resigned, until now, have

11   responsibilities among the employees in the

12   Student Services Department changed?

13   A.    Yes, somewhat.

14   Q.    And do you know who has been in charge of

15   the redistribution of these responsibilities

16   during this time period?

17   A.    Dean Wilson.

18   Q.    Anybody else?

19   A.    I'm not sure.

20   Q.    You don't know?

21   A.    I don't know whether -- I know Mr. Chambers

22   is the head decisionmaker, but Dean Wilson --

23   Q.    Do you know if President Chambers has the

Page 167

1    authority to redistribute responsibilities in the

2    Department of Student Services?

3    A.    I'm not sure he does; but I would assume he

4    has the authority, being that he is the head of

5    the institution.

6    Q.    So he does have the authority to do that, to

7    redistribute responsibilities?

8    A.    Yes.

9    Q.    And he has done that in this particular

10   instance, over the course of the last six or seven

11   years, right?

12   A.    Yes.

13   Q.    And do you agree or disagree with his

14   distribution of those responsibilities?

15            MR. DEBARDELABEN:    Object to the form.

16   Which responsibilities?

17   A.    When you say "responsibilities," which

18   responsibilities.

19   Q.    The sum total of the responsibilities of the

20   Student Services Department.

21            MR. DEBARDELABEN:    She doesn't have the

22   qualification to answer that question.    She can

23   answer it the best she can.

Page 168

1          MR. BEAM:  Can you read back the

2     question?

3               (The last question was read.)

4          MR. DEBARDELABEN:  Objection.

5     A.    I can't say.  If he distributed the

6     responsibilities, with him being the department

7     head and him being the ultimate decisionmaker, it

8     was his decision.

9          "A lots" of times your supervisor or your

10    department head hand down decisions that you don't

11    agree with or agree with, but you have to do them

12    if you want to work.

13    Q.    And I understand that.  I guess my question

14    is:  Do you have a problem with the distribution

15    of responsibilities within the Department of

16    Student Services?

17             MR. DEBARDELABEN:  Object to the form.

18    A.    I have a problem with it when they're not

19    distributed fairly or not properly compensated.

20    Q.    Have they been distributed fairly in your

21    case?

22    A.    I would say fairly, but not compensated.

23    Q.    Okay.  What is the basis of your belief that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 169

1    this has been unfair?

2    A.    Because if I have -- the situation where the

3    former registrar resigned, I was assigned these

4    duties by my immediate supervisor.  I took the

5    duties; I performed them; I did a good job.  He

6    evaluated me as doing a good job.  Apparently he

7    was satisfied with it.

8         I not only did it; I took on even added

9    responsibilities, did that.  All the time getting

10   good evaluations from him.  Have gone above and

11   beyond.  Whatever call of duty he has asked of me

12   to do, I've done them and I've done them well.

13        And to me, it was not -- it was devalued.

14   And I feel it was devalued because of me being a

15   black female.

16   Q.    And what is your basis for that belief?

17   A.    Because all other coordinators with that

18   level of responsibility were on the C salary

19   schedule, ranging from C-3 up to C-2 in the

20   coordinators area.  And here I was at E-2 as a

21   coordinator, nowhere near that.

22        And all of these people were either black

23   males, white males, white females.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 170

1   Q.    Do you have any other evidence?

2   A.    No.

3   Q.    Have you ever heard Dr. Chambers say

4   anything to you that you thought blatantly

5   revealed his bias toward you because you were

6   black and female?

7   A.    Well, I don't know what to really call that

8   incident.

9   Q.    What incident?

10  A.    Where I went into his office to inquire

11  about a pay increase -- and this was during the

12  time that I had assumed those responsibilities and

13  still had not been compensated for -- and I was

14  given the runaround between he and Wilson.

15        And I went to him and talked to him about

16  it, and he told me that Wilson told him that I

17  didn't do anything.

18        And I couldn't -- to me, it seems as though

19  he was playing games or -- I don't know what it

20  was.  But I just felt very humiliated in the

21  office.  And it just seemed like he didn't -- I

22  guess he was trying to make me feel worthless for

23  even asking him for a pay raise.

Page 171

1    Q.    What did he say to you to make you feel

2    worthless?

3    A.    What he said my boss said.

4    Q.    And what was that?

5    A.    "Wilson said you don't do anything."  I

6    mean, he just...

7    Q.    And you believe he said that because you're

8    black and a female?

9    A.    Yeah.  I don't believe he would have said it

10   to anybody else.

11   Q.    Okay.  Anything else that Dr. Chambers has

12   ever said that makes you believe that he has

13   considered your race and your gender when you have

14   been considered for a promotion?

15   A.    No.

16   Q.    So your belief that Dr. Chambers has

17   discriminated against you because of your race and

18   your gender is based on one conversation that you

19   had with him?

20        MR. DEBARDELABEN:  Object to the form.

21   That's not -- you asked her one conversation.  You

22   didn't ask her what she believed he was -- no, no,

23   she didn't say that.  Mischaracterization of her

Page 172

1    testimony.

2    Q.     I'll ask you the question again.  You just

3    testified to a conversation that you had with Dr.

4    Chambers.

5    A.     Yes.

6    Q.     That you said made you feel worthless.  And

7    you cited that as evidence that he had made

8    decisions based on your gender and race.

9          I asked you if there were any other

10   conversations that you've had with Dr. Chambers

11   that would lead you to believe that he has made

12   decisions as to your pay and your position on the

13   pay scale based on your race or gender.

14   A.     The fact that I had written several memos to

15   him in reference to the pay increase.  And I'm

16   thinking it was after that visit; I'm not sure.

17   Q.     I'm just asking you about conversations.

18   A.     Not conversations, verbally, to where --

19   Q.     Ms. Owensby, let me just ask you to listen

20   carefully to my questions.

21   A.     No conversations.

22   Q.     Any other conversations that you've had with

23   Dr. Chambers, beyond the one you've just described

Page 173

1    to me, that led you to believe, formed the basis

2    of your belief that you have been discriminated

3    against based on your gender and your race, with

4    Dr. Chambers?

5    A.    There was one time when he presented that

6    temporary appointment letter to me.  And he looked

7    at me and he said --

8    Q.    Which appointment letter?

9    A.    It's when they temporarily appointed me as

10   Coordinator of Admissions and Registration on a

11   temporary basis.

12   Q.    Okay.  What did he say?

13   A.    He had me to sign a Letter of Understanding

14   to where I'm going to put you in this position,

15   but you know that if you can't handle it, then

16   you're going back to being secretary, and you will

17   get a decrease -- I mean, your pay will resort

18   back to secretary's pay.

19        And I don't think he did anybody else like

20   that.  Appointed them in a temporary position, as

21   if he didn't think that I was going to be able to

22   perform the job successfully.

23        In other words, to me, it made me feel like

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 174

1   he thought that I was going to fail and he was

2   just waiting for me to do so.

3   Q.    Any other conversations you've had with Dr.

4   Chambers that led you to believe you were being

5   discriminated against based on your race or your

6   gender?

7   A.    No.

8   Q.    Okay.  I just want to make sure I understand

9   your testimony.

10      You've had two conversations with Dr.

11  Chambers?

12  A.    Yes.

13  Q.    That led you to form the belief that Dr.

14  Chambers has discriminated against you based on

15  your race and your gender?

16  A.    Yes.

17  Q.    What conversations have you had with Dean

18  Wilson that lead you to believe that he has

19  discriminated against you based on your race and

20  gender? race or gender, either one.

21  A.    Dean Wilson, I wrote letters to him.  In my

22  grievance letter, I indicated the way I felt about

23  the position and the pay that I was receiving.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 175

1          As far as conversations, Dean Wilson would

2      not -- he wouldn't let himself get into a

3      conversation to where you could actually tell.

4      Q.     Tell what?

5      A.     Exactly what he meant or was indicating.  He

6      wouldn't get into a conversation.  If you verbally

7      went in and asked him for a raise, he'll tell you,

8      "I don't want to hear it."

9          Therefore, I always had to put whatever I

10     had to say to him in writing, so I'd know that I

11     conveyed it over to him, whether he responded or

12     not.

13     Q.     Okay.  And just for purposes of clarity, you

14     have never had a conversation -- and correct me if

15     I'm wrong; I don't want to put words in your

16     mouth.

17         But you're saying that you've never had a

18     conversation with Dean Wilson that would help you

19     or assisted you in forming the belief that you

20     have been discriminated against based on your

21     gender or your race?

22     A.     Not that I can remember.

23     Q.     How long have you worked for Dean Wilson?

Page 176

1   A.    Since 1998.

2   Q.    And how long have you worked for Dr.

3   Chambers?

4   A.    Since 1997, I believe.  Whenever he became

5   the president.  I'm not sure whether it was '96 or

6   '97.

7   Q.    Ms. Owensby, I don't want to take anything

8   for granted.  What race do you consider yourself?

9   A.    I'm black.

10   Q.    And what is your belief as to the race of

11   Dr. Chambers?

12   A.    He's -- well, I assume he's black.  I

13   believe he's black.

14   Q.    What about Dean Wilson?

15   A.    Black.

16   Q.    So your belief is that you have been

17   discriminated against, with regard to your

18   promotions and pay, by two black men?

19   A.    Yes.

20   Q.    That they have discriminated against you for

21   being their race?

22   A.    If you want to put it that way.  I think

23   they discriminated against me for being -- because

Page 177

1    I was black and female.

2    Q.    So it's your testimony today that two black

3    men have discriminated against you for being

4    black?

5    A.    When it comes to actually compensating me

6    for that position.

7    Q.    You believe that they made decisions as to

8    your compensation based on the fact that you are

9    black?

10   A.    As the reason why that position was not

11   deemed a C salary schedule position until this

12   past August was because I was black -- because I

13   am black and female.

14   Q.    Okay.  And we've talked about conversations

15   that you've had with Dr. Chambers and with Dean

16   Wilson that led you to form the basis of that

17   belief.

18         Now, I want to ask you quickly again -- we

19   talked about the first conversation you had with

20   Dr. Chambers, and you went in to talk with him.

21   But you're not sure when this was; is that right?

22   A.    No.

23   Q.    Was it before or after you filed your

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 178

1    grievance?

2    A.    Oh, this was before.

3    Q.    Okay.  Did you go in to specifically talk to

4    him about your pay?

5    A.    Talking about when I filed my grievance?

6    Q.    I'm talking about the conversation that you

7    told me helped you form the basis of your belief

8    that you've been discriminated against based on

9    your race and gender.  That conversation that you

10   had with Dr. Chambers.

11        Did you go in to specifically talk to him in

12   his office about your pay?

13   A.    Yes.

14   Q.    And when you walked in, he knew that you

15   were there to talk about your pay?

16   A.    Yes.

17   Q.    And tell me what you told him.

18   A.    I was wondering what was the status.

19   Because I had written him a letter and he said

20   that he would be working on it, but this was a

21   whole year after.

22        And I told him that I was there to check the

23   status on being compensated for the extra duties I

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 179

1   had incurred due to the resignation of the

2   registrar.

3        And he told me that he had been talking with

4   Dean Wilson and that they were working on it, and

5   that Dean Wilson is the one who makes the

6   recommendations.

7        And I told him I said, Well, I believe Dean

8   Wilson has already made the recommendation to you,

9   at least that's what he told me that he had

10  recommended.  And...

11  Q.    Okay.  Is this the conversation that you

12  described in your interrogatory response?  That

13  you went in and Dr. Chambers allegedly said, "You

14  can hide behind the bathroom door if your want me

15  to get him in here and get him to say it again"?

16  A.    Yes.

17  Q.    So Dr. Chambers told you that you had not

18  been recommended for a promotion; is that right?

19  A.    Right.  He says that he approves them after

20  your department head recommends.

21  Q.    Did he tell you you were not getting a

22  promotion because --

23  A.    No, he didn't tell me.  He was more or less

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 180

1  saying that he hadn't received the recommendation

2  from Wilson.

3  Q.    Did you talk to Wilson about this?

4  A.    I did.

5  Q.    What did he say?

6  A.    He said that Mr. Chambers was lying, that he

7  had recommended.  So it was a back-and-forth

8  situation.

9  Q.    What is your ultimate belief now, today?  Do

10  you think that Dean Wilson recommended or do you

11  not?

12  A.    I don't know, because Dean Wilson never

13  showed me anything in writing.

14  Q.    But it's your belief that the way that Dr.

15  Chambers reacted to you, when you approached him

16  about your request for a raise, revealed, in a

17  blatant way, that he was discriminating against

18  you because you were a black female?

19  A.    Yes.

20  Q.    Did you ever tell Dr. Chambers that you

21  thought you were being discriminated against

22  because you were black and female?

23  A.    No.

Page 181

1    Q.    Why not?

2    A.    I just didn't.

3    Q.    Did you ever tell Dean Wilson that?

4    A.    I did in the grievance statement.

5    Q.    But, I mean, did you ever go talk to them

6    and tell them, "I think I'm being discriminated

7    against because I'm black and I'm female"?

8    A.    No.  Not like that, no.

9    Q.    Do you know how many promotions you have

10   received since you've worked under Dr. Chambers'

11   supervision?

12   A.    I think the only promotion was the one from

13   coordinator to -- well, actually, when I finally

14   left the secretarial part to Coordinator of

15   Admissions.

16   Q.    Do you know how many times Dean Wilson has

17   recommended you for promotions or pay increases?

18   A.    No.

19   Q.    But you believe they've discriminated

20   against you, based on their decisions since Tim

21   Robinson resigned?

22   A.    Yes.

23   Q.    Since Tim Robinson resigned, you believe

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 182

1    they've discriminated against you because you're

2    black and a female?

3    A.    Yes.

4    Q.    Despite any promotions or raises that you

5    did receive?

6    A.    Yes.

7    Q.    So is it your testimony that the result of

8    this discrimination has been that you were not

9    given enough of a raise?

10   A.    I was not given comparable compensation for

11   what the previous registrar received, and --

12   Q.    Well, Ms. Owensby, the gist of your

13   complaint is that you did not receive enough of a

14   raise.  Is that right or is that not right?

15   A.    That's right.

16   Q.    That's right.  The gist of your complaint is

17   that you got a raise but it wasn't enough?

18   A.    To justify the level of responsibility and

19   the type job --

20   Q.    Okay.

21   A.    -- I was responsible for.

22   Q.    So your claim is based on the disparity

23   between the raise that you got and the raise that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 183

1    you think you should have gotten?

2              MR. DEBARDELABEN:   Object to the form.

3    Q.    You can answer.

4    A.    Yeah.

5    Q.    Ms. Owensby, does Dr. Chambers have a

6    responsibility to run the college in an efficient

7    way?

8    A.    Yes.

9    Q.    Does he have a responsibility to spend tax

10   dollars in an efficient way?

11   A.    Yes.

12   Q.    Have you ever been a college president?

13   A.    No.

14   Q.    Do you believe that Dr. Chambers has made

15   mistakes in his administration of the school?

16   A.    Yes.

17   Q.    What mistakes has he made?

18   A.    As far as his approval of certain people in

19   certain positions.

20   Q.    Any other mistakes he's made?

21   A.    Overall, in my opinion, not allowing

22   department heads to actually make conscious

23   decisions when it comes to their people or their

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

Page 184

1    subordinates.  Micromanaging.

2    Q.    Okay.  So is your case based, in part, on

3    your belief that Dr. Chambers hasn't done a good

4    job running the college?

5    A.    Will you state that again?

6    Q.    Is it your --

7            MR. BEAM:  Will you read it back?

8            (The last question was read.)

9            MR. DEBARDELABEN:  Object to the form.

10   A.    No my case is not on that.

11   Q.    It's not?

12   A.    No.

13   Q.    Okay.  Have you ever visited another school

14   in the two-year college system in Alabama?

15   A.    Yes.

16   Q.    Which ones have you visited?

17   A.    Trenholm; Chattahoochee Valley; Jefferson

18   Davis; and Patterson, when it was Patterson, but

19   now it's merged into Trenholm.

20   Q.    Do you know what the registrars at those

21   other schools do?

22   A.    Not exactly.

23   Q.    Are they different than what you do?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 185

1   A.    I'm not sure.  I haven't seen their job

2   descriptions.

3   Q.    Would you agree that J.F. Ingram is a unique

4   school in the context of all the other schools in

5   Alabama?

6   A.    Yes.

7   Q.    Why is it unique?

8   A.    Because of our student population.

9   Q.    And who is your student population?

10  A.    Incarcerated men and women in the Alabama

11  Penal System.

12  Q.    Would you agree that the unique role and

13  mission of J.F. Ingram means that the employees

14  there have different duties and responsibilities

15  than other schools?

16          MR. DEBARDELABEN:  Object to the form.

17  A.    Yes.

18  Q.    You do?  You would agree with that?

19  A.    Yes.

20  Q.    Okay.  Ms. Owensby, do you know where you

21  would fall in a survey of other registrars across

22  the two-year college system, in terms of pay?

23  A.    No.

Page 186

1    Q.    You have no idea if you would be at the

2    bottom or the top?

3    A.    No.

4    Q.    Okay.  Let's talk about the grievance that

5    you filed.

6          Do you recognize this document?

7    A.    Yes.

8    Q.    And what is that?

9    A.    It's a grievance report.

10   Q.    And is that the grievance you filed?

11   A.    Yes.

12   Q.    And would you like to -- can you tell me

13   what the gist of that document is, of the

14   grievance?

15   A.    The gist is just as it reads:  My job title

16   changed from Admissions Coordinator to Registrar

17   and Assistant to the Dean of Students.  At the

18   time I was Admissions Coordinator, I assumed some

19   of the duties of the registrar; but at the time I

20   became Registrar and Assistant to the Dean of

21   Students, there were no more -- I was over the

22   overall process of the whole Admissions and

23   Registration Department.  It was my

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 187

1   responsibility.

2   Q.    Okay.  When did you file your grievance?

3   A.    October 12, 2004.

4   Q.    Okay.  Ms. Owensby, would you look at these

5   other documents?  And with Jim's permission, I'd

6   like to make this group of documents an exhibit

7   which would constitute the relevant documents to

8   her grievance and the response to the filing of

9   her grievance.  And this document, as well, which

10  I believe is Dr. Merk's response.

11              (The witness examines the

12              document.)

13  Q.    Ms. Owensby, are those the documents that

14  constitute the grievance that you filed?

15  A.    It appears to be.

16  Q.    Okay.  To your knowledge, are there any

17  documents missing?  And I'll be happy -- if your

18  lawyer wants to take a look, that's fine.  If I

19  don't have something in there, I'll be happy to

20  include it.

21  A.    I think this had a chart or something to it

22  that Dr. Merk had attached to it.

23  Q.    Okay.  Is it this chart?

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

Page 188

1   A.     Yes.   I think that was on there.

2   Q.     Okay.   Let's put that in there.   Is that

3   right?

4   A.     It appears to be.

5   Q.     Okay.

6              MR. DEBARDELABEN:   I don't think the

7   first letter is in there.

8              THE WITNESS:   The first letter to

9   Wilson?

10             MR. DEBARDELABEN:   Yeah.

11             THE WITNESS:   This is it.

12             MR. DEBARDELABEN:   Okay.   It actually

13  began with a letter to Dr. Merk, Director of

14  Personnel, dated June 2, 2004.   A memorandum.

15             MR. BEAM:   Okay.   Do you have that?

16  Can I see that?

17             MR. DEBARDELABEN:   Sure.

18             MR. BEAM:   So you believe that this was

19  part of the grievance file?

20             MR. DEBARDELABEN:   Well, that led up to

21  the grievance.   And that should probably be part

22  of the grievance file.

23         Then you've got a September 3rd letter, a

Page 189

1    September 28th letter, October the 5th; you've got

2    the grievance report form, the October 12th

3    statement.

4              MR. BEAM:  And I know there's some

5    memos that --

6              MR. DEBARDELABEN:  It looks like

7    there's an August 13, 2004, letter requesting a

8    salary increase.

9              MR. BEAM:  Yeah.

10   Q.   Well, let me ask you if we can do this:  I

11   know that there are some memos that you sent about

12   your concerns about your pay.  And I'd like to get

13   those on the record and ask you about them.

14        What I'd like to do is just make an exhibit

15   the official grievance that you filed and the

16   official response by Ingram to that grievance.

17   And we'll make that an exhibit.  And then we'll

18   make some of these other documents separate

19   exhibits.

20        But we'll make the grievance that you filed

21   and the college's official, in-writing response

22   one exhibit, if that's okay with y'all.

23              MR. BEAM:  Is that okay with you, Jim?

Page 190

1              MR. DEBARDELABEN:  It's your

2    deposition.  You can do it any way you want to.

3              MR. BEAM:  Well, that's what we'll do.

4    We'll just put these together.

5    Q.    And let me ask you this, Ms. Owensby:  Do

6    you have any disagreement with the way that the

7    grievance procedure itself was carried out?  And

8    I'm asking you a very precise question.

9         All I want to know is:  Do you have any

10   disagreement with how the procedure itself was

11   handled once you filed a grievance?

12        I'm not asking whether or not you're okay

13   with the results or the response; I'm just asking

14   about the procedure.

15        Did they follow procedure when you filed a

16   grievance?

17   A.    I'm not sure.  It appears that I started the

18   grievance with my immediate supervisor, which was

19   to inform him; and then his response.  And from

20   there...

21   Q.    Ms. Owensby, I'm not trying to push you or

22   change your answer, but it's a pretty simple

23   question.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 191

1          Were you okay with the procedure that was

2     followed or not?

3     A.    The only thing I wasn't okay with is the

4     fact that, in Wilson's response, he didn't offer

5     to talk about it or anything; he just responded

6     saying that there would be no changes or whatever.

7          And then from there, my next step was to

8     file the initial grievance with the grievance

9     coordinator, which was Dr. Merk at the time, which

10    I did.

11         And the only thing with Dr. Merk's response

12    was that --

13    Q.    Ms. Owensby, I'm going to have to stop you.

14    I'm trying not to make this difficult.

15         The only question I'm asking right now is:

16    Do you have any disagreement with the procedure

17    that was followed by the supervisors at Ingram

18    once you filed a grievance?

19    A.    Yes.

20    Q.    And what is the problem that you have with

21    the procedure that was followed?

22    A.    That there was no discussion.  There was no:

23    Let's talk about it.

Page 192

1    Q.    Okay.

2    A.    From the initial letter to Dean Wilson, it

3    was no offering to let's discuss it before it goes

4    any further or before it actually becomes an

5    initial grievance complaint.

6    Q.    At what point were you, your belief,

7    entitled to a conversation with someone that you

8    didn't get to have a conversation?

9    A.    After I filed the initial letter of

10   grievance to my immediate supervisor.

11   Q.    Did you ask for a conversation about it?

12   A.    No.

13   Q.    Is it your belief that they were required to

14   come to you and talk to you about it?

15   A.    If they were interested in how I felt and

16   wanted to address the situation.

17   Q.    Is it your belief that they were required,

18   based on the policies and procedures at Ingram, to

19   come and talk to you about it?

20   A.    Yes.

21   Q.    Okay.  What is the basis of your belief that

22   the policies and procedures, with regard to having

23   a conversation with you, were not followed?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 193

1    A.    Because they "wasn't" followed.  I mean,

2    there was no conversation.  It was like, go ahead.

3    Q.    I guess I would ask you to point me to the

4    policy or procedure that requires the conversation

5    that you just stated that you wanted to have.

6    A.    I don't have a policy or procedure.

7    Q.    Okay.

8    A.    With me.

9    Q.    Okay.  But beyond the desire to have this

10   conversation, did the people that handled your

11   grievance follow the appropriate procedure?

12   A.    Yes.

13   Q.    Okay.  Did -- but you never went to anyone

14   and asked to talk about it?

15   A.    No.

16   Q.    Why not?

17   A.    Because I expressed my feelings on this

18   letter of grievance to my immediate supervisor.

19   And, in my opinion, if he was interested or if he

20   even cared about it in any way, he would have

21   discussed it right then, and maybe it could have

22   been worked out then.

23   Q.    So it's your testimony that your grievance

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 194

1    was complete and accurate in writing; that's why

2    you didn't ask for a conversation?

3    A.    Yes.

4    Q.    But you believe that it was in violation of

5    the policies and procedures at Ingram for no one

6    to come and talk to you about it?

7    A.    I'm not sure.  Because right now, I'm not

8    totally familiar with whether or not there is a

9    violation in the grievance policy.

10    Q.    So you're not sure if the policy and

11    procedures for handling a grievance were followed

12    or not?

13    A.    No.

14    Q.    Okay.  Fair enough.  Ms. Owensby, did you

15    have disagreement with the response that you got

16    after you filed your grievance?

17    A.    I had a disagreement with the response in

18    Dr. Merk's findings and conclusions.

19    Q.    And what was your disagreement with Dr.

20    Merk's findings and conclusions?

21    A.    He didn't even address my -- he didn't even

22    address my title as Assistant to the Dean of

23    Students in his findings.  He totally ignored it

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 195

1   as if it didn't exist.  And he provided this chart

2   of my salary history, in which probably the

3   majority of people within their X numbers of

4   years, their chart probably looks about the same

5   as mine.  He actually didn't provide any

6   comparable salaries.

7   Q.    Anything else that you disagreed with in Dr.

8   Merk's findings and results?

9   A.    That's it.

10  Q.    Okay.  Ms. Owensby, has anyone else at

11  Ingram ever held your three most recent positions?

12  A.    I hear what you're saying.  As to the

13  Student Services Department or as providing

14  services to the Student Services Department,

15  you're saying the three positions.

16       Are you clarifying Secretary to the Dean of

17  Students as...

18  Q.    What I'm asking is:  Has anyone else at J.F.

19  Ingram ever held your three most recent positions,

20  according to your appointment letters?

21  A.    Marie Stanfield was the former Secretary to

22  the Dean of Students, and Tim Robinson was the

23  registrar.  And that's it.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 196

1    Q.    Okay.  So your testimony is yes or no?

2    A.    Yes to two of the positions.

3    Q.    Which two?

4    A.    The registrar and Secretary to the Dean of

5    Students.

6    Q.    Okay.  And I want you to try as hard as you

7    can to really focus on the exact question I'm

8    asking.

9          Has anyone else at Ingram ever held the

10   exact job titles and associated responsibilities

11   as you have since 1999, let's say?

12             MR. DEBARDELABEN:  Asked and answered.

13   Q.    You can answer.

14   A.    The exact same -- repeat that, please.

15   Q.    Okay.  Has anyone else that has been

16   employed at J.F. Ingram, to your knowledge, ever

17   held the exact same titles that you have and

18   associated responsibilities?

19   A.    Since 1999?

20   Q.    Since 1999.

21   A.    No.

22   Q.    Okay.  So your job description -- the

23   evolution of your job description, I should say,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 197

1    is unique; is that true?

2    A.    I wouldn't say unique.  There are --

3    Q.    Well, my definition of unique is that it's

4    special or you're the only one.  And you just told

5    me you're the only one.

6         So I'm just asking:  Would you agree that

7    your job evolution at Ingram, your job

8    descriptions and your responsibilities, especially

9    since 1999, is unique?

10   A.    I don't -- I know what you're saying.

11        They are not verbatim as to other positions,

12   but there are some duties in my job description

13   that are similar to other job descriptions of

14   other personnel.

15   Q.    And I understand that you have some similar

16   job functions that other people have performed.

17   But the exact scope of your responsibilities,

18   since 1999, has been unprecedented at Ingram;

19   isn't that true?

20   A.    Yes.

21   Q.    Okay.  Do you believe that the uniqueness of

22   your responsibilities reflects the uniqueness of

23   the school in which you work?

Page 198

1    A.    Yes.

2    Q.    And why is that?

3    A.    Because there are certain things that we do

4    at Ingram that other schools don't have to do,

5    because of the type student population we have.

6    But there are things that -- and it works vice

7    versa.

8         Because of the uniqueness of our student

9    population, to me, the work and the duties or what

10   it takes to meet the needs of our student

11   population far exceeds that of a regular college

12   setting.

13   Q.    And, Ms. Owensby, you named two comparators

14   in your interrogatory response:  Gene Bridgman and

15   Julie Givens.

16        Can you tell me why you named Julie Givens

17   as someone who had been treated more favorably

18   than you?

19   A.    Yes.  Because, at the time, I was secretary

20   at E-3 and Julie was secretary at E-2 at the time.

21   Q.    And when you say "at the time," what time

22   are you talking about?

23   A.    Between '97 and '99.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 199

1    Q.    Okay.

2    A.    And Julie was promoted from secretary to

3    administrative assistance, which put her up from

4    E-2 to E-1; and I was still at E-3.

5         And in order for me to get to E-2, I had to

6    become Coordinator of Admissions and Registration,

7    taking on duties of the prior registrar in

8    cooperation with my secretarial duties, just to

9    get to an E-2 status.

10        Whereas, she was secretary and recommended

11   by her boss to become administrative assistant at

12   E-1.  No problem.  Simple recommendation.

13   Q.    What department was Julie Givens working in?

14   A.    The Department of Fiscal Affairs.

15   Q.    Is the responsibilities of the Department of

16   Fiscal Affairs the same as the Department of

17   Student Services?

18   A.    No.

19   Q.    They are different departments?

20   A.    Yes.

21   Q.    You also named Gene Bridgman as a

22   comparator, somebody that has been treated more

23   favorably than you.  Who is he?

Page 200

1    A.    Gene was the Accountant and Assistant to the

2    Dean of Fiscal Affairs.

3    Q.    When did he leave Ingram?

4    A.    I'm not sure.

5    Q.    What did he do?

6    A.    He did accounting and, I assume, assisted

7    the Dean of Fiscal Affairs in whatever duties she

8    assigned him.

9    Q.    What evidence do you have that Gene Bridgman

10   was treated more favorably than you?

11   A.    Because, at the time, as Accountant and

12   Assistant to the Dean of Fiscal Affairs, Gene was

13   being paid at the C-2 salary schedule.  And he had

14   an associate's degree, just as I did, from the

15   same college.

16   Q.    Ms. Owensby, do you feel like you have a

17   good understanding of the responsibilities that

18   Ms. Givens and Mr. Bridgman were charged with?

19   A.    Pretty much.

20   Q.    Earlier you testified that you were always

21   busy at Ingram; is that right?

22   A.    Yes.

23   Q.    How did you have time to know what Gene

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 201

1    Bridgman and Julie Givens do?

2    A.    If a person knows basically what a job

3    entails, and anybody -- most people who have

4    worked in the business world, worked in any type

5    of institution that deal with finances or

6    whatever, know the role of an accountant or

7    generally the role of an accountant.

8    Q.    So you knew generally what they did?

9    A.    Generally.  Not exact, but generally.

10   Q.    And how did you find that out?

11   A.    From observing.

12   Q.    From observing them perform their job; is

13   that what you're saying?

14   A.    Yes.

15   Q.    Okay.  So in the midst of all the

16   responsibilities that you have described to us

17   today, you had time to observe other people and

18   their job responsibilities?

19   A.    Yes.

20   Q.    And evaluate them?

21   A.    I had breaks.

22   Q.    And you used some of your break time to

23   evaluate what other people did?

Page 202

1    A.    No.

2    Q.    I thought that's what you just said.

3    A.    I know what I said.  But no, not just taking

4    a break to go and see what other people were

5    doing.  I had a general idea.

6    Q.    Okay.

7    A.    Because at one time, our departments were

8    right next door to each other.

9    Q.    So you had a general idea of what they did?

10   A.    Yes.

11   Q.    But you didn't know specifically what they

12   did?

13   A.    No.

14   Q.    And this was a general knowledge that you

15   got working in the same college that they did?

16   A.    Exactly.

17                MR. BEAM:  Do y'all want to take a

18   break?

19                THE WITNESS:  Yes.

20                MR. BEAM:  Okay.

21                (A brief recess was taken.)

22   (BY MR. BEAM)

23   Q.    Okay.  Ms. Owensby, let me ask you this:

Page 203

1    Have you ever asked for a raise and been denied?

2    A.    Yes.

3    Q.    And when was that?

4    A.    I think it was 2004.  It was in the

5    grievance.

6    Q.    Okay.  I'm sorry.  Let me refine that

7    question.

8          Beyond the grievance that you filed, have

9    you ever gone to Dean Wilson or Doug Chambers and

10   said, "I've requested a raise and been denied"?

11   A.    Yes.  When I asked for the raise for my

12   additional duties, I say I was denied because I

13   didn't receive it the following contract year.  I

14   had to wait a whole year later.

15   Q.    When was that?

16   A.    1999.

17   Q.    Okay.  In 1999, who did you talk to?

18   A.    Dean Wilson.  And I wrote a letter to Mr.

19   Chambers.

20   Q.    Okay.  And you asked them what?

21   A.    For compensation for the extra duties I had

22   incurred.

23   Q.    Okay.  Any other time, beside your

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 204

```
 1   grievance, that you asked them for a raise and

 2   they denied it?

 3   A.     That's it.

 4   Q.     Okay.  Ms. Owensby, you testified just a few

 5   minutes ago about the grievance and its response;

 6   And you said that you disagreed with the findings

 7   in the response.

 8          Do you know what role Dean Wilson and

 9   President Chambers played in that ultimate

10   decision?

11   A.     You mean the findings?

12   Q.     Yeah.

13   A.     No, I don't.

14   Q.     Okay.  Well, let me ask you this:  Do you

15   believe that the response to the grievance that

16   you filed reflects discrimination, on the part of

17   President Chambers and Dean Wilson, against you

18   for your race and gender?

19   A.     In the findings, the only thing is is that

20   my position as Assistant to the Dean of Students

21   wasn't addressed.  But other than that, no.

22   Q.     Okay.  But you're not sure what role they

23   played in the grievance response?
```

Page 205

1    A.    No.

2    Q.    Okay.  And your testimony is that you do

3    believe that that response reflected

4    discrimination, on their part, against you for

5    your race and gender?

6    A.    I wouldn't say the response itself.  I mean,

7    this was the findings, what they say they -- what

8    Dr. Merk said he found.

9    Q.    Well, that was the official response from

10   the college?

11   A.    Right.

12   Q.    And President Chambers runs the college.

13   So, I mean, that constituted the official response

14   from the college as to the grievance that you

15   filed.

16         And my question is:  Did that response

17   impact your belief that you have been

18   discriminated against by President Chambers and

19   Dean Wilson because of your race and gender?

20   A.    Yes.

21   Q.    Okay.  How do you know that?

22   A.    It's my belief.  I mean, I believe it was.

23   Q.    Okay.  And can you tell me what the basis of

Page 206

1    that belief is?

2    A.    That they did not care to further discuss

3    the situation.  Again, my position as Assistant to

4    the Dean of Students wasn't addressed at all.

5    Q.    But you're not sure what role they played in

6    the development of that response?

7    A.    No.

8    Q.    But you do believe that it is evidence of

9    their discrimination against you for your race and

10   gender?

11   A.    Yes.

12   Q.    Okay.  And the basis of that belief is what?

13   A.    Well, it was cc'd to Mr. Chambers, Dr.

14   Merk's findings.  Apparently he agreed with the

15   findings.

16   Q.    How do you know he agreed with the findings?

17   A.    Well, I don't know whether he agreed.  But

18   it was cc'd to him, and I didn't get any other

19   response from him.

20   Q.    Okay.  So part of your belief is that

21   because you got no response from President

22   Chambers or Dean Wilson, beyond the official

23   response from the college, that you were being

Page 207

1    discriminated against based on your race and

2    gender?

3    A.    Yes.

4    Q.    Okay.  And can you tell me anything else

5    that forms the basis of that belief or helped you

6    form the basis of that belief?

7    A.    No.

8    Q.    Okay.  Ms. Owensby, can you tell me what

9    your understanding is of the role that Dean Wilson

10   has played in the restructuring of the Student

11   Services Department since the retirement of the

12   registrar, who was Tim Robinson?

13              MR. DEBARDELABEN:  Object to the form.

14   A.    I'm not sure.

15   Q.    Okay.  I guess all my question is is:  Do

16   you know if Dean Wilson assisted President

17   Chambers in the restructuring of the Student

18   Services Department over the last six or seven

19   years?

20   A.    I don't know if he did.

21   Q.    Okay.  You don't know?  That's your

22   testimony, you don't know?

23   A.    No, I don't know.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 208

1   Q.    Okay.  So you don't know if -- I'm sorry.

2   Forget that.

3         Do you know personally, yourself, of any of

4   the reasons why the Student Services Department

5   had been restructured several times?

6   A.    No, I don't know.  I would say because of

7   the resignation of the registrar in 1999 could be

8   a reason; also, the loss of a job placement

9   coordinator.  The loss of personnel.

10  Q.    Okay.  Ms. Owensby, let me ask you this:  Do

11  you recognize this document?

12  A.    It seems to be a review of applications for

13  the registrar's position.

14  Q.    And is Tim Robinson on that?

15  A.    Yes.

16  Q.    Is it your understanding that that document

17  reflects people who were competing for the

18  registrar job?

19  A.    Yes.

20  Q.    And I guess it's been your testimony today

21  that Tim Robinson was ultimately appointed to that

22  job?

23  A.    Apparently.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 209

1    Q.    So these were applicants for the registrar

2    position?

3    A.    I assume they were.

4    Q.    Okay.  And when you took over some of Mr.

5    Robinson's responsibilities, did you compete

6    against anyone for that position?

7    A.    No.

8    Q.    Okay.

9              MR. BEAM:  I want to mark that as

10   Defendants' Exhibit 32.

11              (Defendants' Exhibit No. 32 was

12              marked for identification and a

13              copy of the same is attached

14              hereto.)

15   Q.    Ms. Owensby, have you ever resigned your

16   position at J.F. Ingram?

17   A.    Yes.

18   Q.    When did you do that?

19   A.    2001.

20   Q.    Do you recognize that document right there?

21   A.    Yes.

22   Q.    What is that?

23   A.    It's my letter of resignation.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 210

1    Q.     Okay.

2           MR. BEAM:  I'm going to mark that as

3    Defendants' Exhibit 33.

4                (Defendants' Exhibit No. 33 was

5                marked for identification and a

6                copy of the same is attached

7                hereto.)

8    Q.     When was that, Ms. Owensby?

9    A.     April 18, 2001.

10   Q.     2001.  Okay.  What is this document?

11   A.     A letter from Mr. Chambers to me

12   acknowledging my resignation.

13   Q.     Okay.

14           MR. BEAM:  I'm going to mark that as

15   Defendants' Exhibit 34.

16                (Defendants' Exhibit No. 34 was

17                marked for identification and a

18                copy of the same is attached

19                hereto.)

20   Q.     Ms. Owensby, do you recognize this document?

21   A.     A letter from Mr. Wilson to me acknowledging

22   my resignation.

23   Q.     What did you think when you got that memo?

Page 211

1    A.    That he commended me for the work that I had

2    done and that he, in a way, hated to lose me.

3    Q.    What does it mean to be a keeper of the

4    springs?

5    A.    A person who is always there keeping

6    everything going when nobody else is really -- the

7    gist of the story was a man who lived in a town,

8    nobody paid much attention to him.  But he kept

9    the stream that flowed through the town clean,

10   always kept it up, and nobody had to worry about

11   it, until something happened to the man.  And the

12   town didn't really notice until they saw the

13   stream dirty, unkept.  And so they really realized

14   that this person was an important person to the

15   town.

16   Q.    So when Dean Wilson described you as a

17   keeper of the springs, that was a compliment?

18   A.    Yes.

19   Q.    And did you appreciate that compliment?

20   A.    Yes.

21          MR. BEAM:  I'm going to mark that as

22   Defendants' Exhibit 35.

23          (Defendants' Exhibit No. 35 was

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 212

1              marked for identification and a

2              copy of the same is attached

3              hereto.)

4    Q.    Ms. Owensby, did you request to rescind your

5    job resignation?

6    A.    Yes.

7    Q.    And do you know what that document is?

8    A.    That's a letter to rescind my job

9    resignation.

10   Q.    And why did you do that?

11   A.    Because when I got married -- I resigned

12   because I was getting married and had to relocate

13   to Georgia.  And when I got married, immediately

14   after that, a couple months after that, September

15   11th, my husband got activated in Operation

16   Enduring Freedom.

17         And he was going to be gone for a year, and

18   I was going to be in a new place, unfamiliar with

19   my surroundings for a year, alone.  And being that

20   he was going to be gone for a whole year, I asked

21   if I could just come back and work.

22   Q.    Who did you ask?

23   A.    President Chambers.

Page 213

1  Q.    And what did he say?

2  A.    He granted it.

3  Q.    Did he have to grant it?

4  A.    No.

5  Q.    Did he grant it -- it was within his

6  discretion whether to grant it or not, correct?

7  A.    Yes.

8  Q.    Why do you think he let you come back?

9  A.    Because I was a very, very vital asset to

10  the Student Services Department, versus going out

11  to hire a new person to train and to get familiar

12  with the process, why not?

13            MR. DEBARDELABEN:    Under the Alabama

14  state law, you can withdraw a resignation to a

15  state job up until the day it becomes effective.

16            (An off-the-record discussion

17            was held.)

18  (BY MR. BEAM)

19  Q.    Well, Ms. Owensby, your letter of

20  resignation, had it become effective when you

21  asked for your job back?

22  A.    I'd have to see what my effective date was.

23  Effective May 31, 2001, rescinded May 11, 2001.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 214

1    So it was...

2    Q.    Okay.  So you requested that it be rescinded

3    before it became effective?

4    A.    Yes.

5    Q.    Is it your testimony that Dr. Chambers could

6    have rejected your request?

7    A.    Yes.

8    Q.    Okay.  But he didn't choose to do that, did

9    he?

10   A.    No.

11   Q.    And why do you think he let you come back?

12   And I know I just asked you that question and you

13   said because you felt you were a good employee,

14   right?

15   A.    Yes.

16   Q.    Any other reason he let you come back?

17   A.    And I didn't leave with any type of bad

18   evaluation or -- I left up under these

19   circumstances.

20   Q.    There was no ill will?

21   A.    Right.

22   Q.    And he welcomed you back?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 215

1              MR. BEAM:  I'm going to mark this as

2      Defendants' Exhibit 36.

3              (Defendants' Exhibit No. 36 was

4              marked for identification and a

5              copy of the same is attached

6              hereto.)

7      Q.    What is this memo?  Is this a memo that you

8      sent out?

9      A.    Yes.

10     Q.    And what is the gist of that memo?

11     A.    Other employees had put together to give me

12     a farewell party.  And I wrote the letter to

13     inform them that I made the decision to continue

14     working at Ingram and thanked them for their

15     efforts in having a farewell.

16     Q.    Okay.

17             MR. BEAM:  I'm going to mark this as

18     Exhibit 37.

19             (Defendants' Exhibit No. 37 was

20             marked for identification and a

21             copy of the same is attached

22             hereto.)

23     Q.    Ms. Owensby, you testified earlier that

Page 216

1    after 1999, when you absorbed Mr. Robinson's

2    duties, it was at that point you felt that your

3    race and gender had become a factor in your

4    position on the pay scale and your annual salary.

5    A.    Uh-huh.

6    Q.    Can you tell me why you chose to come back

7    to Ingram if you feel that at the time you were

8    being discriminated against?

9    A.    Because I needed a job, and I had X number

10   of years with Ingram, so why not consider coming

11   back.

12   Q.    But you appreciated the fact that Dr.

13   Chambers welcomed you back, didn't you?

14   A.    Yes.

15   Q.    What about Dean Wilson?  Did he welcome you

16   back?

17   A.    Yes.

18   Q.    Okay.  Ms. Owensby, do you have a good

19   relationship with Dean Wilson?

20   A.    Pretty good.

21   Q.    Do you have a good relationship with Dr.

22   Chambers?

23   A.    Pretty good.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 217

1  Q.    Do you feel like if you need to talk to him,

2  you can talk to him?

3  A.    No.

4  Q.    Why not?

5  A.    Since this situation, there's been a lack of

6  trust.

7  Q.    Prior to the filing of your lawsuit, did you

8  have a good relationship with President Chambers?

9  A.    Pretty good.

10  Q.    When you -- prior to your lawsuit, did you

11  have a good relationship with James Wilson?

12  A.    Pretty good.

13  Q.    Can you describe your relationship with

14  James Wilson?

15  A.    I always tried to maintain a high level of

16  professionalism.  Sometimes it didn't go that way

17  because Dean Wilson tends to sometimes to be very

18  unprofessional.  And during that time is when our

19  relationship was not that good.

20  Q.    How would you describe your relationship

21  with President Chambers, beyond pretty good?

22  A.    Just that.

23  Q.    Same as James Wilson?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 218

1    A.    Different in a sense, because I didn't

2    interact with Mr. Chambers every day.

3    Q.    How is your relationship with President

4    Chambers different?

5    A.    The fact that I didn't interact with him

6    every day, I didn't experience some of the things

7    I experienced interacting with Dean Wilson every

8    day.  So I would say professional.  And that was

9    it when it came to Mr. Chambers.

10   Q.    Would you disagree with James Wilson if he

11   said that he liked you a lot?

12   A.    Yes.

13   Q.    You would disagree with that?

14   A.    Yes.

15   Q.    Why would you disagree with that?

16   A.    Because Dean Wilson has portrayed to me

17   people who you may say he liked a lot; but when

18   he's not around that person, it's a different

19   story.  So I feel that if he felt this way about

20   this person, he would feel the same way about me.

21   Q.    But when you resigned your position at

22   Ingram, didn't he write you a memo and say that

23   you were a keeper of the springs in a very

Page 219

1    complimentary way?

2    A.     Yes.

3    Q.     But you don't believe that reflects how he

4    felt about you?

5    A.     Maybe then, but not now.

6    Q.     You believe his feelings about you have

7    changed?

8    A.     Yes.

9    Q.     When did they change?

10   A.     After I filed this -- after he was named in

11   the lawsuit.

12   Q.     Okay.  Prior to the filing of the lawsuit,

13   do you think he liked you?

14   A.     He portrayed to like me.

15   Q.     You don't believe that he liked you?

16   A.     I'm not sure.

17   Q.     Okay.  What about President Chambers?  Do

18   you think he likes you?

19   A.     He portrayed to like me.

20   Q.     Would you disagree with President Chambers

21   if he said, "I like Bonita Owensby"?

22   A.     No, I wouldn't disagree.

23   Q.     Okay.  But you would concede that there have

Page 220

1    been times that James Wilson did things or said

2    things that reflected that he liked you?

3    A.    Yes.

4    Q.    Okay.  But despite the fact that you believe

5    that President Chambers and you have a pretty good

6    relationship, and that Dean Wilson has said some

7    very nice things about you, that they have

8    discriminated against you because you're black and

9    because you're a female?

10   A.    Yes.

11   Q.    So you have this belief, despite any

12   evidence or despite your belief that your

13   relationship with them is pretty good?

14   A.    Well, the evidence is in black and white.  I

15   was tasked with a job and the duties and

16   responsibilities of the job that once was

17   compensated on the C salary schedule at a C-1.

18   And the fact that in doing the job and proving

19   each year, even to the point where I'm finally

20   getting the title, it still wasn't enough to be

21   merited not only as C-1, where the person who had

22   the job, but nowhere on the C salary schedule,

23   which is where other coordinators were:  black

Page 221

1    males, while females, white males.

2    Q.    Ms. Owensby, do you know how many blacks

3    President Chambers has hired during his tenure at

4    J.F. Ingram?

5    A.    No, I don't know the exact count.

6    Q.    Do you know how many blacks President

7    Chambers has promoted during his tenure?

8    A.    I don't know.

9    Q.    Do you have any idea -- I'm sorry.  Scratch

10   that.

11        Ms. Owensby, have you ever been corrected

12   for being tardy?

13   A.    Yes.

14   Q.    Okay.  Do you recognize this document?

15   A.    Yes.

16   Q.    What is that document?

17   A.    It's a letter indicating that I arrived late

18   at work on five occasions, according to this.

19   Q.    And what was your response to that letter?

20   A.    I don't remember.

21   Q.    Okay.

22        MR. BEAM:  I'm going to mark this as

23   Defendants' Exhibit 38.

Page 222

1              (Defendants' Exhibit No. 38 was

2              marked for identification and a

3              copy of the same is attached

4              hereto.)

5    Q.    Ms. Owensby, this letter is dated

6    December 10, 1999.  You would concede that you

7    continued to get promotions and pay raises after

8    that memo; isn't that right?

9    A.    Let me see the date on the memo.

10   Q.    December 10, 1999.

11   A.    This was after I got the promotion.  I got

12   the promotion October, effective November.

13   Q.    My question is:  You continued to get

14   promotions and raises since that memo, right?

15   A.    No.  I got the promotion, yeah, after the

16   fact.

17   Q.    Yeah.  After you got this memo, you

18   continued to get promotions and raises, right?

19   A.    Yes.  That one promotion.

20   Q.    But you've gotten more than one promotion

21   since that?

22   A.    Yeah.  Two promotions.

23   Q.    Yeah.  I mean, you've gotten more than one

Page 223

1    promotion since 1999, right?

2    A.    Two.

3    Q.    And that was at the direction of President

4    Chambers, right?

5    A.    Yes.

6    Q.    So President Chambers was the president of

7    J.F. Ingram in 1999, right?

8    A.    Yes.

9    Q.    So despite a memo addressing your tardiness,

10   President Chambers has continued to promote you

11   and give you pay raises; isn't that right?

12   A.    Yes.

13   Q.    Ms. Owensby, have you ever been corrected or

14   admonished for talking on the telephone too much?

15   A.    Back in -- yes, one time.

16   Q.    Who talked to you about it?

17   A.    I'm not sure.  I think it was noted in one

18   of my evaluations.

19   Q.    Did anybody ever talk to you about it?

20   A.    I think I talked to Mr. Reeder about that.

21   Q.    Has Dean Wilson ever talked to you about too

22   many personal calls at work?

23   A.    No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 224

1    Q.      Only Mr. Reeder?

2    A.      Yes.

3    Q.      Okay.  And when was that?

4    A.      I think it was in 1996, the time I was going

5    through my divorce.

6    Q.      Okay.  Would you -- so you would disagree

7    with another supervisor's testimony that says they

8    have talked to you about your time on the phone?

9    A.      Yes.

10   Q.      Okay.  Fair enough.  Ms. Owensby, you

11   testified that since you absorbed Mr. Robinson's

12   responsibilities, you have been underpaid?

13   A.      Yes.

14   Q.      What do you believe you should have made, in

15   terms of salary?

16   A.      In terms of salary?  I believe I should have

17   made at least what -- I should have been paid at

18   least on the salary schedule according to the

19   years of experience I had at the institution, the

20   same salary level, same salary schedule, same

21   level at my years of experience at the

22   institution.

23   Q.      And I'm asking you to give me a number.

Page 225

1    A.    I can't give you an exact number, because I

2    would have to see the salary schedule for that

3    time to tell you exactly what the salary would

4    have been according to my years at the institution

5    at a C-1.

6    Q.    Okay.  But you can't tell me right now what

7    you believe you should have made immediately upon

8    absorbing some of Mr. Robinson's duties?

9    A.    Not right now.

10   Q.    Can you tell me how much you should be

11   making today?

12   A.    Thereto again, I would have to see the

13   current salary schedule at a C-1 for the amount of

14   years I've been at the institution.

15   Q.    Can you give me a number?

16   A.    I'm not sure what the salary is, according

17   to the current salary schedule.

18   Q.    I have right here the salary schedule that

19   is effective July 28, 2005.  It's the 2005-2006

20   salary schedule.  That's the E schedule and the C

21   schedule.

22        Can you tell me where on that schedule --

23   first, let me ask you if you recognize that

Page 226

1   document.   Does that look like the 2005 and 2006 C

2   and E schedule?

3   A.    Yes, it looks like.

4   Q.    Okay.  Well, there's the C salary schedule

5   for 05-06.  Can you tell me what's the number?

6   A.    Current, if I was being paid at C-1, which

7   is where he was being paid when he resigned --

8   Q.    When you say "he," who do you mean?

9   A.    Tim Robinson.

10  Q.    Okay.

11  A.    And with my years of experience, I would be

12  at 86,158.

13  Q.    Okay.  Do you know what Mr. Robinson made

14  when he retired?

15  A.    67-something.

16  Q.    So when Mr. Robinson retired after

17  20-something-odd years working --

18  A.    No, it wasn't 20-something-odd years.  It

19  was about ten years when he resigned.

20  Q.    Okay.  How long had Mr. Robinson been with

21  the Postsecondary Education Department?

22  A.    I'm not sure.

23  Q.    Okay.  You don't know.  Do you know how long

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 227

1    he was registrar?

2    A.     I think since 1989.

3    Q.     Okay.  So he was registrar for a decade.

4    And when he retired, he made $67,000 a year?

5    A.     Yes.

6    Q.     And your testimony to me today is that

7    today, six years after taking over some of his

8    responsibilities, you should make $86,000 a year,

9    give or take a few dollars?

10   A.     That's if I was being compensated at the

11   same level that he was when he resigned.

12   Q.     And that's the gist of your complaint, isn't

13   it?

14   A.     That's the gist of my complaint.

15   Q.     Okay.  So your testimony is today that if

16   you had been treated fairly and not discriminated

17   against, you would be making $86,000, give or take

18   a few dollars?

19   A.     Yes.

20   Q.     Okay.  And can you tell me from that chart

21   what you should have started making when you

22   absorbed some of his responsibilities?

23   A.     When I absorbed some of his responsibilities

Page 228

1    and was named coordinator, like the other

2    coordinators who were on C-3 at the time, I should

3    have at least been on C-3 with the amount of years

4    that I had been at the institution.   Not the

5    years.

6           Because according to the guidelines, an

7    employee in the two-year college system is

8    compensated for the years that they've been at the

9    institution, not in that particular job.

10   Q.    Ms. Owensby, all I'm asking you is,

11   according to that salary schedule, what should you

12   have made the day that you took over these

13   responsibilities and you claim you were

14   discriminated against?

15   A.    I'm not sure, because at C-3, C-3 has a

16   maximum.   I don't know what the maximum was back

17   in 1999.   Thereto again, you would have to have a

18   1999 salary schedule to see.

19   Q.    Okay.   That's fair enough.   Do you believe

20   that those numbers are drastically different than

21   the 1999 C salary schedule?

22   A.    Yes.

23   Q.    Okay.   You believe those numbers are higher?

Page 229

1    A.    They are higher.

2    Q.    Okay.  Do you have any idea, according to

3    the C salary schedule that would have been in

4    place in 1999, what you believe you should have

5    begun making?

6    A.    I'm not sure.

7    Q.    Okay.

8    A.    I'd have to see a C salary schedule.

9    Q.    Would it be about $60,000 a year?

10   A.    I'm not sure.

11   Q.    You have no idea?

12   A.    No.

13   Q.    Would it be more than $80,000 a year?

14   A.    No.  It wouldn't be that much.

15   Q.    Would it be more than $50,000 a year?

16   A.    Yes.

17   Q.    Less than $70,000 a year?

18   A.    Probably.

19   Q.    So, to your knowledge, you should have made

20   somewhere in the range of 50- to $70,000 when you

21   -- immediately upon absorbing some

22   responsibilities that were previously allocated to

23   Tim Robinson?

Page 230

1   A.    Yes.   According to being a coordinator and

2   on C-3, as other coordinators, with the amount of

3   years that I had at the institution.   Because at

4   the time, I would have been the only coordinator

5   with the most time at the institution.

6   Q.    You would have been the coordinator with the

7   most time at the institution?

8   A.    Yes, at that time.

9   Q.    And, Ms. Owensby, what does that say right

10  there at the top of the C schedule?

11  A.    "Professional Personnel."

12  Q.    It says "Professional Personnel for Fiscal

13  Year 2005-2006," right?

14  A.    Yes.

15  Q.    And so you believe that immediately upon

16  absorbing some responsibilities from Tim

17  Robinson's job description, you should have been

18  placed on the professional personnel schedule?

19  A.    Yes.

20  Q.    Okay.   So it's your belief that at J.F.

21  Ingram, as a per se rule, if there is a

22  resignation or retirement of someone on the C

23  salary schedule, and that someone on the E salary

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 231

1    schedule absorbs some of those responsibilities,

2    they are immediately on the wrong salary schedule?

3    A.    In my opinion.

4    Q.    Okay.  And you believe that in your case you

5    are on the wrong salary schedule as a result of

6    discrimination based on your sex and gender?

7    A.    Yes.

8    Q.    And so it's your testimony today that the

9    day that you began doing anything that Tim

10   Robinson ever did, and you were not on the C

11   salary schedule, you were being discriminated

12   against?

13          MR. DEBARDELABEN:  Object to the form.

14   She said the day she got the duties, and she named

15   the duties.  You're mischaracterizing what she

16   said.

17   Q.    The day that you began performing job

18   responsibilities that Tim Robinson had performed,

19   the day that you absorbed those duties, that's the

20   day that you should have started on the C salary

21   schedule?

22   A.    Actually, I absorbed those duties April of

23   '99.  The new fiscal year would have started in

**1933 Richard Arrington Jr. blvd, S*Birmingham, Al. 35209*www.merrillcorp.com**
**1-800-888-DEPO**

Page 232

1  September of '99.  I expected in September of '99

2  to be compensated according to the extra duties I

3  had assumed.  So not immediately when --

4  Q.    Okay.

5  A.    But I expected that contract year, which was

6  September of '99.

7  Q.    The beginning of the contract year?

8  A.    Yes, the beginning of the contract year.

9  Q.    And do you believe that that decision for

10  you to remain on the E salary schedule in

11  September of '99 was a direct result of

12  discrimination based on your sex and your race by

13  Dr. Chambers and Dean Wilson?

14  A.    Yes.

15  Q.    Okay.  And I know we've touched on this

16  already; I'd like to ask you a couple of follow-up

17  questions about it.

18      Immediately upon your appointment in 1999,

19  when you remained on the E salary schedule, did

20  you ever go and talk to President Chambers or

21  James Wilson at that time and say, "I don't think

22  this is fair"?

23  A.    You said immediately upon my appointment in

Page 233

1    1999?

2    Q.    Right.

3    A.    I didn't get appointed to the position until

4    2000.  I had to wait a whole year and a half.

5    Q.    And I understand that.  Just a second ago

6    you testified that in September of '99 you began

7    doing some work that Tim Robinson did, right?

8    A.    No.  April of '99.

9    Q.    Okay.  And then in September of '99 was the

10   new contract year?

11   A.    The new contract year.  And I felt that I

12   should have been appointed then; however, I was

13   not.  I had to wait until 2000 October.

14   Q.    Right.  Did you go and talk to them during

15   this time period and tell them that this isn't

16   fair?

17   A.    I submitted a letter to Mr. Chambers.

18   Q.    What was the date of that letter?

19              THE WITNESS:  Do you have that letter?

20              MR. DEBARDELABEN:  I don't know if I do

21   or not.

22   Q.    Well, my question is:  Did you go and talk

23   with them about it?

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 234

1          MR. DEBARDELABEN:  And I think her

2   answer was she submitted a letter.

3   Q.    Okay.  So you didn't go talk to them?

4   A.    No.

5   Q.    Why didn't you go talk to him?

6   A.    Because I submitted a letter.  And at the

7   time, his response was, "They were working on it."

8   And I didn't hear anything back for a whole year,

9   and I submitted another letter.

10  Q.    Is this the letter that you initially

11  submitted?  That's October 9, 2000.

12          MR. DEBARDELABEN:  Huh-uh.

13          MR. BEAM:  No?  Okay.

14  Q.    Can you tell me when the initial letter was

15  that you -- how about September 18, 2000?

16  A.    Can I see that one?

17          MR. BEAM:  Why don't we take a break,

18  and I'll get my documents in order and --

19          MR. DEBARDELABEN:  I think I might have

20  found some of the documents.

21          MR. BEAM:  Okay.  Well, I have a bunch

22  of memos here that are just in chronological

23  order.

**1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 235

1    A.      October 5, '99.

2    Q.      Yeah, okay.  We have that.

3            MR. BEAM:  Why don't we go off the

4    record and I'll get these organized, then we'll

5    resume.  Okay?  Why don't we take about ten

6    minutes.

7            (A brief recess was taken.)

8    (BY MR. BEAM)

9    Q.      Ms. Owensby, I just want to get these memos

10   on the record that you have.  Okay.

11           Ms. Owensby, can you tell me what that is?

12   A.      This looks like a committee appointment to

13   serve on the Ingram State Community College

14   Personnel Committee.

15   Q.      Okay.  Do you still serve on that committee?

16   A.      No.

17   Q.      When did you stop?

18   A.      I haven't served, I don't think, since -- I

19   think maybe 2004 was my last.  I'm not quite sure.

20   Q.      What did you do on that committee?

21   A.      We would review applications and --

22   Q.      Applications for what?

23   A.      Employment for the institution.

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 236

1    Q.    Oh, okay.

2    A.    And make sure the people met the minimum

3    qualifications, and get prepared to do an

4    interview process with the candidates.

5    Q.    Okay.

6              MR. BEAM:  I'm going to mark this as

7    Exhibit 39.

8              (Defendants' Exhibit No. 39 was

9              marked for identification and a

10             copy of the same is attached

11             hereto.)

12   Q.    So you continued to serve on that committee

13   under Dr. Chambers, right?

14   A.    Yes.

15   Q.    Is this a committee that requires your

16   analysis of what's good for the college?

17   A.    Yes.

18   Q.    So you helped the college decide who to

19   hire?

20   A.    Yes.

21   Q.    And Dr. Chambers relied on you to be part of

22   that committee?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 237

1    Q.      Okay.   What's this document?

2    A.      A Memorandum of Understanding.

3    Q.      And what is that pertaining to?

4    A.      This is when I was finally promoted to

5    Coordinator of Registration and Admissions.   And

6    this letter was an agreement that if I could not

7    perform the tasks and the job, that I would revert

8    back to being a secretary at secretary's pay, or

9    at the pay that I had when I was a secretary.

10              MR. DEBARDELABEN:   But I would point

11   out on this one that it's not signed by J. Douglas

12   Chambers as president.   Only Bonita's signature is

13   on it.   He didn't sign it.

14              MR. BEAM:   Okay.  So you're saying you

15   won't agree to this as an exhibit?

16              MR. DEBARDELABEN:   You can put it in.

17   I'm just pointing out that we don't agree that

18   that's a valid document.   It's only signed by one

19   party.

20              MR. BEAM:   I've got you.  Okay.

21              MR. DEBARDELABEN:   I'm reluctant for

22   things to go in and not put an objection because

23   you can be burnt:   Well, you had your chance to

Page 238

1    object, why didn't you object then?

2         And if I don't object then, I'm afraid I'll

3    waive it.

4              MR. BEAM:  This will be Defendants'

5    Exhibit 40.

6              (Defendants' Exhibit No. 40 was

7              marked for identification and a

8              copy of the same is attached

9              hereto.)

10   Q.   Okay.  Ms. Owensby, this is a -- I'm going

11   to turn your attention to 1999.  Okay?  We're

12   talking about your request for a salary increase.

13        Do you recognize that document?

14   A.   Yes.

15   Q.   Okay.  And was that document written to you

16   in response to your document here that is dated

17   October 5, '99?

18   A.   I assume it was.

19   Q.   Okay.

20              MR. BEAM:  Let's make the -- I'm going

21   to make the October 5th request Defendants'

22   Exhibit 41.

23              (Defendants' Exhibit No. 41 was

Page 239

```
 1              marked for identification and a

 2              copy of the same is attached

 3              hereto.)

 4              MR. BEAM:  And I'll make Dr. Chambers'

 5    response Defendants' Exhibit 42.

 6              (Defendants' Exhibit No. 42 was

 7              marked for identification and a

 8              copy of the same is attached

 9              hereto.)

10    Q.    And, Ms. Owensby, is that the first time

11    that you communicated to Dr. Chambers your

12    disagreement with your salary?

13    A.    Yes.

14    Q.    So previously when you testified that you

15    notified him in writing that you were unhappy with

16    your salary, this is the document that you were

17    talking about?

18    A.    Yes.

19    Q.    And this was his response?

20    A.    Yes.

21    Q.    Okay.  So that's 41 and 42.

22          And this is a document that is dated

23    October 9, 2000.  What is that?
```

Page 240

1    A.     This is a memo, a follow-up memo of a

2    meeting of September 20th.  And then another

3    meeting for October the 2nd.

4          For some reason there had to be a meeting, I

5    guess involving the department heads.

6    Q.     There had to be a meeting in response to

7    your request?

8    A.     Yes.

9    Q.     Okay.  There was a meeting in response to

10   your request for a position upgrade?

11   A.     Right.  September 20th.  And then there was

12   a group meeting October 2nd.  And even after this,

13   it was just me reiterating from the October '99,

14   because my salary had not changed.

15         And then about this time, which was October

16   2000, one month after the contract -- the

17   beginning of the contract year -- nothing had

18   changed.  And I felt we need to talk, because here

19   it is another year has passed and you still have

20   not compensated me for the extra duties I've

21   incurred.

22         So I felt the need to write the memo because

23   it had passed the contract year.  And generally,

Page 241

1    if you pass a contract year, you're working on

2    another year.

3    Q.    All right.

4              MR. BEAM:  We'll make that Exhibit 43.

5              (Defendants' Exhibit No. 43 was

6              marked for identification and a

7              copy of the same is attached

8              hereto.)

9    Q.    This is a memo from you to Dr. Chambers,

10   October 1, 2000.  What is that memo?

11   A.    I guess this, thereto again, because I felt

12   he was ignoring me; he had not made any changes.

13   And this was basically -- he had asked for

14   justification.

15        I had submitted that and I had submitted

16   everything that was requested of me, and still no

17   decision had been made at that time.  So this memo

18   was more or less asking him again what was he

19   going to do, to make a decision.

20              MR. BEAM:  And we'll make that Exhibit

21   44.

22              (Defendants' Exhibit No. 44 was

23              marked for identification and a

Page 242

1                copy of the same is attached

2                hereto.)

3    Q.    And I have another memo that you wrote here

4    September 18, 2000.  Can you tell me what that

5    memo is?

6    A.    Readdressing the October 5, 1999, memo,

7    where he asked for me to put in writing.  And I

8    think this was a result of talking with him in

9    that office that day.  And he said, "Well, put in

10   writing what you do."  And so I did.

11   Q.    What meeting are you talking about where he

12   said, "Put in writing what you do"?

13   A.    The one where he said that Wilson said I

14   didn't do anything.

15   Q.    Okay.  You're talking about the meeting

16   where you went to talk to Dr. Chambers about your

17   salary, and there was a disagreement ultimately

18   about whether James Wilson had recommended you for

19   a promotion?

20   A.    Right.

21   Q.    And this memo is when, in relation to that

22   conversation?

23   A.    This is -- apparently it was almost a year

Page 243

1    after the fact.

2    Q.    And I'm sorry if I've already asked you

3    this:  Did you tell me, or can you tell me, when

4    was the conversation that you had with Dr.

5    Chambers in which there was ultimately a

6    disagreement about whether James Wilson had

7    recommended you?

8    A.    I don't know.  I'm not sure of that date.

9    It was during this time.

10   Q.    Sometime when these memos were going back

11   and forth?

12   A.    Yeah, these memos and all the controversy.

13   Q.    Okay.

14         MR. BEAM:  I'm going to mark this

15   Defendants' Exhibit 45.

16              (Defendants' Exhibit No. 45 was

17              marked for identification and a

18              copy of the same is attached

19              hereto.)

20   Q.    Ms. Owensby, this is in the 2000 time frame,

21   and this is a dialogue between you and Dr.

22   Chambers with regard to your position and your

23   pay; is that correct?

Page 244

1   A.      Uh-huh.

2   Q.      Okay.  And can you tell me what you

3   articulated to Dr. Chambers during this time was

4   the justification for your complaint about your

5   pay?

6   A.      Well, at this time when he asked me to

7   submit to him in writing what I do, I added my

8   duties to the memo.

9   Q.      Ms. Owensby, was President Chambers willing

10  to engage in a dialogue with you about your

11  position?

12  A.      Not really.

13  Q.      Well, he certainly provided you with some

14  written responses?

15  A.      Yes, he did provide with written response.

16  Q.      But you don't believe all these memos that

17  we have from 2000, you don't believe that that was

18  an adequate response by him?

19  A.      No.  Because it took him over a year and a

20  half to make a decision, a simple decision from

21  what was supposed to have been recommended by my

22  boss.

23  Q.      It took him a year and a half to make what

Page 245

1    decision?

2    A.    Whether or not he was going to compensate me

3    for the extra duties, after my boss supposedly

4    recommended it.

5    Q.    So when did he make the decision that you're

6    talking about?

7    A.    When did he --

8    Q.    When did he make the decision that you just

9    talked about?  You said it was a year and a half

10   before he made the decision.

11   A.    October of 2000.

12   Q.    We're talking about the decision he made in

13   October of 2000?

14   A.    Right.

15   Q.    Okay.

16   A.    He finally decided to compensate me for the

17   extra duties up under Coordinator of Admissions

18   October of 2000.

19   Q.    Okay.  And I know we've kind of gone for

20   several hours here, and I know this may be a

21   little hard to follow.

22         These memos to and from you and Dr. Chambers

23   were in 2000.  I'm asking you what you feel was

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 246

1    inadequate about his response to your concerns

2    through these memos.

3    A.    What was inadequate was the fact that I

4    received one memo from him saying he was working

5    on it.  And having to conduct a group meeting in

6    reference to a pay upgrade for me, and I did the

7    work.

8    Q.    So you don't think Dr. Chambers should have

9    group meetings to evaluate responsibility

10   allocations?

11   A.    In this case, in my opinion, the only person

12   he should have consulted with was my immediate

13   boss because that was the only person who knew

14   what I was doing.

15   Q.    So you believe it was inappropriate?

16   A.    Yes.

17   Q.    And do you think it was unfair?

18   A.    Yes.

19   Q.    Do you think it was discriminatory?

20   A.    Yes.

21   Q.    That Dr. Chambers met with other people

22   besides your supervisor to evaluate your position?

23   A.    My supervisor was in the meeting with other

Page 247

1    deans and whoever else was in the meeting.

2    Q.    My question is:  Was it discriminatory for

3    him to meet with other people besides your

4    supervisor to evaluate your position?

5    A.    Yes.

6    Q.    Why is that?

7    A.    Other people didn't know what I do.

8    Q.    How do you know that?

9    A.    Because they didn't supervise me every day.

10   I wasn't in their department.  They didn't

11   supervise me.

12   Q.    Okay.  Just for clarity sake, it's your

13   testimony today that it was discriminatory by Dr.

14   Chambers and Dean Wilson, or just Dr. Chambers?

15         I'm sorry.  That was a horrible question.

16         Is it your testimony today that it was

17   discriminatory -- it was discrimination -- based

18   on your race and gender, for Dr. Chambers to meet

19   with people besides your supervisor to discuss

20   your job responsibilities?

21   A.    Yes.

22   Q.    And the basis of your belief is what?

23   A.    Only my supervisor, who supervised me every

Page 248

1    day, who knew my job responsibilities, would have

2    been able to provide the information he needed to

3    know.

4    Q.    Okay.  So only a supervisor -- it's your

5    testimony that only a supervisor can provide

6    relevant information to the president of the

7    college when he's considering the allocation of

8    responsibilities?

9    A.    Yes, correct information.  Supervisor of the

10   person that he's recommending.

11   Q.    At any time during this time frame that Dr.

12   Chambers was evaluating your position, did he ever

13   mention your race?

14   A.    No.

15   Q.    Did he ever mention your sex?

16   A.    No.

17   Q.    Has James Wilson ever mentioned your race?

18   A.    No.

19   Q.    Has James Wilson ever mentioned your sex?

20   A.    No.

21   Q.    In any conversation you've ever had with him

22   ever?

23   A.    No.

Page 249

1   Q.    So you were unhappy with the results of this

2   memo exchange.  And what did you do next as a

3   result?

4   A.    I more or less just didn't do anything after

5   that.  I waited.  Seems that that's what I had to

6   do anyway, so I waited.

7   Q.    I'm going to ask you to identify this

8   document for me.  And that's dated June 26, 2002.

9   A.    This is the memo I wrote to Dr. Merk in

10  2002.

11  Q.    Okay.  And what's the gist of that memo?

12  A.    Asking him to upgrade.  I felt that my

13  position as admissions coordinator should have

14  been compensable to E-1, Grade 1 status, and I

15  stated my reasons.

16  Q.    And what was the result of that memo?  Did

17  you get a reaction from anyone?

18  A.    I think Dr. Merk responded with a memo, I

19  think.

20  Q.    Okay.  Do you remember what that memo said?

21  A.    Something about three years exemplary

22  services in a position.

23          MR. BEAM:  We'll make that Defendants'

Page 250

1    Exhibit 46.

2                    (Defendants' Exhibit No. 46 was

3                    marked for identification and a

4                    copy of the same is attached

5                    hereto.)

6    Q.    Ms. Owensby, this is another memo from you

7    dated in '04.  What is that?

8    A.    This is the one where, after my title had

9    changed, I wrote to Dean Wilson in reference to.

10   Q.    Your title had changed to what?

11   A.    Registrar and Assistant to the Dean.

12   Q.    Okay.

13   A.    Giving him a detailed analysis of

14   improvements and increased duties that I had

15   performed under that title.

16   Q.    Okay.

17                   MR. BEAM:  I'm going to make that

18   Defendants' Exhibit 47.

19                   (Defendants' Exhibit No. 47 was

20                   marked for identification and a

21                   copy of the same is attached

22                   hereto.)

23   Q.    Ms. Owensby, what was the reaction that you

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 251

1   got from Dean Wilson to that memo?

2   A.    Actually, I didn't get any reaction from

3   Dean Wilson on that one.

4   Q.    Okay.  He never said one word about it?

5   A.    No.

6   Q.    Never gave you anything in writing?

7   A.    Nothing in writing.

8   Q.    Okay.  Ms. Owensby, I'm going to ask you to

9   look at this memo.  You don't have to read the

10  whole thing.  It's dated October 8, 1999.

11        Tell me what that is.

12  A.    It seems like it's a memo to Mr. Chambers

13  from Mr. Wilson asking him to consider his request

14  for an open discussion, I assume about my

15  position.

16  Q.    Okay.

17  A.    Recommendation that he made -- Wilson made

18  -- for me as Administrative Assistant to the Dean

19  of Students.

20  Q.    Okay.

21        MR. BEAM:  I'm going to mark this

22  Defendants' Exhibit 48.

23        (Defendants' Exhibit No. 48 was

Page 252

1              marked for identification and a

2              copy of the same is attached

3              hereto.)

4    Q.    Ms. Owensby, would you agree that this is a

5    document that reflects changes being considered in

6    the Student Services Department?

7    A.    Yes.

8    Q.    Do you believe that it's within this time

9    period, October 8, 1999, that the Student Services

10   Department began to change?

11   A.    No.

12   Q.    Okay.  It didn't begin to change in

13   October 8, 1999?

14   A.    It began to change after the resignation of

15   the registrar.

16   Q.    And you said that the resignation of the

17   registrar was a few months before this memo?

18   A.    Yes.  As a matter of fact, I thought it was

19   April, but it was March of 1999.

20   Q.    Okay.  Well, my question is:  Isn't this

21   memo basically within a few months of the

22   resignation of Tim Robinson?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 253

1   Q.    Okay.  And doesn't this memo reflect changes

2   being considered in the department in which you

3   worked?

4   A.    Yes.

5   Q.    Okay.  Do you have reason to believe that

6   the changes that were being considered as a result

7   of this memo were discriminatory against you,

8   based on your race and gender?

9   A.    When you say "changes" in the student

10  services division, the only thing that I -- well,

11  changes in the student services division, the

12  changes wouldn't be discriminatory.  Because, I

13  mean, it happened.  I mean, these things occurred.

14  Q.    Okay.  So these changes were not

15  discriminatory against you?

16  A.    Not the changes in the division.  I mean, it

17  changed because we got short of personnel; we had

18  to make accommodations.  We had to...

19  Q.    So the allocation of responsibilities during

20  this time within the Student Services Department

21  was not discriminatory against you, based on your

22  sex and your gender?

23  A.    Repeat that, please.

Page 254

1              MR. BEAM:  Would you read the question?

2              (The last question was read.)

3    A.    No.

4    Q.    Okay.  Ms. Owensby, you testified earlier

5    that President Chambers and Dean Wilson have to

6    consider what is the most efficient way for the

7    goals of the school, of Ingram, to be

8    accomplished; isn't that true?

9    A.    Yes.  Mr. Chambers, as being chief

10   executive, yes.

11   Q.    So efficiency matters?

12   A.    Yes.

13   Q.    And is it your belief that some of the

14   changes, or all of the changes, in the Student

15   Services Department since this memo have reflected

16   a commitment to efficiency?

17           MR. DEBARDELABEN:  Object to the form.

18   Q.    You can answer.  A commitment to the

19   efficiency of the department?

20   A.    I would say that would be the intent, if,

21   you know...

22   Q.    Okay.  So the intent is efficiency.

23           How do you know that the job

Page 255

1    responsibilities that you've been given since Tim

2    Robinson resigned were not based on efficiency?

3    A.    Because -- how would I know that they were

4    not based on efficiency?

5    Q.    Yes.

6    A.    They were based on what they felt was at the

7    best interest of the college.

8    Q.    And when you say the decisions, what

9    decisions are you talking about?

10   A.    The decision that President Chambers made,

11   and I guess Dean Wilson, to the restructuring or

12   whatever -- the changes in the Student Services

13   Department.

14   Q.    And would the changes in the Student

15   Services Department also include changes in your

16   responsibilities?

17   A.    Yes.

18   Q.    And would it also include the scope of your

19   duties?

20   A.    Yes.

21   Q.    And would the changes in the Student

22   Services Department also reflect who is on what

23   pay scale?

Page 256

1   A.    Yes.

2   Q.    And would those changes also reflect how

3   much people make?

4   A.    Yes.

5   Q.    Okay.  And, again, I have to ask you:  What

6   evidence do you have that your placement on the

7   salary schedule since 1999, since the resignation

8   of Tim Robinson, wasn't based on the best interest

9   of the college?

10  A.    The evidence I have is the fact that a

11  situation, a much similar situation, occurred

12  whereas the same judgment and the same discretion

13  was not used when the job placement position --

14  Q.    What same situation?

15  A.    You're saying that President Chambers was

16  looking after the best interest of the efficiency

17  of the college.

18  Q.    But you just made reference to a situation.

19  I'm asking you what situation.

20  A.    I'm trying to tell you the situation.

21  Q.    Okay.

22  A.    Where the job placement officer had

23  abandoned, I would say, his duties as job

Page 257

1   placement officer, and went on loan to another

2   dean.

3   Q.    Who are you talking about?

4   A.    William Griswold.

5   Q.    Okay.

6   A.    That job placement position was a C-2 salary

7   schedule position, which was in the Student

8   Services Department.  Job placement was a part of

9   the Student Services Department, under the

10  supervision of Mr. Wilson.

11       So after Mr. Griswold left his position to

12  go on loan to another dean, the duties and

13  responsibilities of that position was also

14  hampered, due to Griswold no longer functioning in

15  that position.  So that put a stress on the

16  existing student services employees.

17       Years after that, they decided to replace --

18  Q.    When was that?  What you just described,

19  when did that happen?

20  A.    In 19- -- I think Griswold left in 1999.  He

21  went on loan to Dr. Huffstutler, I believe in 1999

22  also.  That fall, later on.

23  Q.    And can you help me understand how is the

Page 258

1    situation that you just described -- the decisions

2    that you just described -- evidence that the

3    decisions that were made in your department since

4    1999 were discriminatory against you because of

5    your race and gender?

6    A.    Because that position was replaced at the

7    same salary schedule, the same level, with a white

8    female, the position that Bill Griswold left and

9    did not function in that area for a while.  So

10   they replaced that position with a white female at

11   the same salary schedule as Bill Griswold when he

12   had the position on the same level.

13   Q.    Okay.  And what did Bill Griswold do?

14   A.    At the time, he was the Job Placement

15   Coordinator, or Officer.

16   Q.    Did the person that took over, what was

17   their title?

18   A.    She was the Job Placement Officer.

19   Q.    Did she take over every single

20   responsibility that Bill Griswold had?

21   A.    I'm not sure.  But her position was Job

22   Placement Coordinator or Officer.  I'm not exactly

23   sure how it was worded.  But she served in that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 259

1   capacity.

2   Q.    Okay.  Just so I understand your testimony,

3   the woman who replaced Bill Griswold, you don't

4   know whether or not she took over his exact

5   responsibilities?

6   A.    No, because -- I don't know.

7   Q.    Okay.

8   A.    But I know she served up under that title.

9   And the purpose of that title was the same purpose

10  that it was when Bill Griswold had it.

11  Q.    So the basis of your belief that you were

12  discriminated against because of your race and

13  gender is that a woman was hired to take over Bill

14  Griswold's position and she got his title?

15  A.    She got his title, his same rate of pay at

16  the same level, same schedule at the same level.

17  Q.    But you don't know whether she took over his

18  exact responsibilities?

19  A.    No, I'm not sure.

20  Q.    Okay.  Ms. Owensby, are you familiar with

21  the Adult Education Test tape?

22  A.    Yes.

23  Q.    What is that?

Page 260

1  A.    It's the instrument we use for placement of

2  our students when they enroll in school.  It

3  determines what type of academics we're placing

4  the students in, whether they have to go into

5  developmental courses or whether they can go right

6  into the required academic courses.

7  Q.    Does that test have to be administered?

8  A.    Yes.

9  Q.    Did Tim Robinson ever administer that test?

10  A.    I'm not sure whether he did or not.

11  Q.    You don't know?

12  A.    No.

13  Q.    Have you ever administered that test?

14  A.    No.

15  Q.    Okay.  Let me ask you one other follow-up

16  question.

17        Can you tell me what other evidence you have

18  that Dr. Chambers' response to your concerns in

19  the 2000 time frame reflected discrimination

20  against you because of your race and because of

21  your sex?

22  A.    When other personnel in other departments --

23  supervisors -- had recommended a promotion, it was

Page 261

1    granted right then, or at least within the

2    contract year, whereas mine wasn't.  It took a

3    whole year and a half.

4    Q.    How do you know that was because of your

5    race and sex?

6    A.    Well, because the people in question, the

7    people who were granted these promotions and title

8    changes were all male or white female.

9    Q.    Okay.  Anything else?

10   A.    That's it.

11   Q.    Okay.  Ms. Owensby, I'm going to give you a

12   set of documents.  Take a few seconds to look

13   through them.  These are your evaluation forms

14   since '98.  And I think there's one missing.

15        If you would, take a quick look at those and

16   tell me if you would agree that those are your

17   evaluations since 1998, with the exception of one,

18   I'm sure.

19              (The witness examines the

20              document.)

21              MR. BEAM:  While y'all take a look at

22   that, we're going to step outside for second.

23              (A brief recess was taken.)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 262

1   (BY MR. BEAM)

2   Q.    Does that look right?

3   A.    The ones that have my signature, I can

4   attest to; but the ones that are not signed by me,

5   I can't.

6   Q.    Okay.  That's good enough.

7        MR. BEAM:  We're going to call that

8   Defendants' Exhibit 49.

9        (Defendants' Exhibit No. 49 was

10       marked for identification and a

11       copy of the same is attached

12       hereto.)

13  Q.    Ms. Owensby, would you agree that the

14  majority of these evaluations are positive?

15  A.    Yes.

16  Q.    And who has signed these evaluations besides

17  you?

18  A.    Dean Wilson.

19  Q.    So Dean Wilson has been giving you good

20  evaluations from 1998 through 2006; is that a fair

21  statement?

22        MR. DEBARDELABEN:  Object to the form.

23  I think we're missing some of them in there.  Of

Page 263

1    the ones that are there, they are all "Meets

2    Standards."

3              MR. BEAM:  That's right.  That's all

4    I'm saying.

5    Q.    Okay.  And do you know if any of the

6    evaluations that are missing, do you know if they

7    said you were not meeting standards?

8    A.    No.

9    Q.    Okay.  But you would agree that Dean Wilson

10   has generally, since 1999, given you good

11   evaluations?

12   A.    Yes.

13   Q.    Okay.  Ms. Owensby, what was the name of the

14   person that you told me about that took over Bill

15   Griswold's job?

16   A.    Melissa Wallace.

17   Q.    What happened to Melissa Wallace after she

18   took over that job?

19   A.    She worked for about two years, and she no

20   longer works for the institution.

21   Q.    Why not?

22   A.    I'm not sure.

23   Q.    You don't know?

Page 264

1    A.    No.

2    Q.    Okay.  Have you ever known Dr. Chambers to

3    promote other black females?

4    A.    There is a black female that was promoted,

5    Ms. Rosie Edwards.

6    Q.    Do you know if Dr. Chambers has promoted

7    more than one black female since he became

8    president of J.F. Ingram?

9    A.    No.

10   Q.    You don't know?

11   A.    No.

12   Q.    Do you know how many other black females

13   have been promoted to the C salary schedule?

14   A.    None.

15   Q.    Okay.  So your testimony --

16   A.    I mean, prior to now.  Prior to -- I mean,

17   at what time frame?

18   Q.    Ever.  Since he's been president of J.F.

19   Ingram, do you know if he's ever promoted black

20   females to the C salary schedule?

21   A.    Just this past contract year, August of

22   2006.

23   Q.    And who did he promote?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 265

1    A.    Me, Julie Givens, and I'm not sure about

2    Erica Turner.  I'm not sure.  Oh, I'm sorry.

3    Julie is white.  So it would be me and Erica

4    Turner.  But I'm not sure about Erica Turner.

5    Q.    Okay.  You're not sure if she's black or if

6    she was promoted?

7    A.    I'm not sure if she was promoted to the C

8    salary schedule, but I'm sure she's black.

9    Q.    Okay.  So you know that more than one black

10   female had been promoted to the C salary schedule

11   by Dr. Chambers?

12   A.    I'm not sure about Erica Turner, so it would

13   be one.

14   Q.    Okay.

15   A.    That I know of.

16   Q.    Ms. Owensby, let me ask you to take a look

17   at this personnel file.  I'd like to just get that

18   in the record.  If you will, take a look at it.  I

19   believe that's your entire personnel file.

20              (The witness examines the

21              document.)

22   Q.    Okay.  Let me ask you this:  Is that your

23   complete personnel file?

Page 266

1          MR. DEBARDELABEN: Let me say this:  We

2    don't know if it's complete or not.  It might be

3    the complete personnel file, but apparently

4    missing -- and she's not in the position to

5    testify -- apparently missing out of there that we

6    didn't see was evaluation 2004, 2001, 2000, 1999,

7    1996, and 1986.  It appears that those evaluations

8    are missing.  If they're in there, we didn't see

9    them.

10         There also appears a couple of documents in

11   there that has no relation to Ms. Owensby at all.

12   I mean, they just don't apply to her.  So we don't

13   know why they're in there.  And neither I nor Ms.

14   Owensby is in a position of saying that's her

15   complete personnel file.  It might be the complete

16   file they have, but it's not what we can say is

17   complete.

18         We don't dispute the personnel file; we just

19   can't say it's complete.

20         MR. BEAM:  Okay.

21   Q.    Well, given what you just told me --

22         MR. BEAM:  And I accept that there may

23   be some missing documents out of there -- there

Page 267

1    may not be; I don't know.  But I understand that

2    you're preserving your right to say that this is

3    not complete.  I understand that.

4    Q.    But given that, is that your personnel file?

5    A.    Yes.

6    Q.    Okay.  And, Ms. Owensby, does that personnel

7    file reflect your employment history at J.F.

8    Ingram, specifically with regard to your beginning

9    salary, your evaluations, and where you are, what

10   your appointment and position is today?

11   A.    It appears to be.

12   Q.    Okay.  Ms. Owensby, you testified earlier

13   that, I think, you started off in 1985 making

14   about $10,000 a year?

15   A.    Yes.

16   Q.    And as of today's date, how much money do

17   you make?

18   A.    60,000.

19   Q.    Okay.  And so what is the difference then?

20   How much has your salary gone up from 1985 through

21   today?

22   A.    About 50-.

23   Q.    $50,000?

Page 268

1   A.      About 45,000, 47-.

2   Q.      Okay.  Well, you made 10- when you started

3   and you make 60- now?

4   A.      10,272 when I started and 60,000 now.

5   Q.      So about $50,000?

6   A.      Approximately.

7   Q.      Approximately, give or take a few dollars,

8   about $50,000?

9   A.      Yeah.

10  Q.      And since you began working at Ingram, you

11  have received one associate's degree in, what,

12  1991?

13  A.      Yes.

14  Q.      You haven't gotten another degree since

15  then, right?

16  A.      No.

17  Q.      Okay.  And you've testified that your belief

18  that you deserve to be on the C salary schedule

19  began upon the resignation of Tim Robinson?

20  A.      Yes, the resignation of Tim Robinson.

21  Q.      And you said that you considered yourself a

22  professional?

23  A.      Upon being appointed as Coordinator of

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 269

1   Registration and Admissions.

2   Q.    Okay.  And when was that?

3   A.    That was October.

4   Q.    Of what year?

5   A.    2000.

6   Q.    Okay.  So just so we're clear, the

7   discrimination that is the basis of your complaint

8   began on what date?

9   A.    I would say October of 2000, when I was

10  given the title as Coordinator of Registration and

11  Admissions.

12  Q.    And you were given the title without the pay

13  that you feel that you deserved?

14  A.    Right.

15  Q.    Okay.  Ms. Owensby, the initial decision not

16  to put you on the C salary schedule when you were

17  given that appointment that you just referenced in

18  2000, that was one discreet decision that we're

19  talking about; is that right?  That appointment

20  was one decision, right?

21  A.    I assume it was.

22  Q.    And there have been subsequent decisions

23  made since that date with regard to your position

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 270

1    and your pay; isn't that right?

2    A.    Yes.

3    Q.    Is it your testimony today that each time a

4    decision has been made since October of 2000, that

5    discrimination has been a part of that decision,

6    based on your race and gender?

7    A.    Yes.

8    Q.    So each time that you've been given an

9    appointment since October of 2000, you feel that

10   race and gender were unfairly used against you?

11   A.    Yes.

12   Q.    Do you think that race and gender were

13   unfairly used against you or that you suffered

14   from discrimination, based on your race and

15   gender, when you were appointed to the C salary

16   schedule?

17   A.    Yes.

18   Q.    Why is that?

19   A.    Because I was appointed on the C-3 salary

20   schedule at 60,000.  And, in my opinion, with the

21   amount of years I had at the institution, it

22   should have constituted more than 60,000, when the

23   maximum of C-3 was 70-something.

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 271

1    Q.    So is it your testimony that that decision

2    that was made about a year ago reflected, or was

3    based upon the prior decisions that were

4    discriminatory?

5    A.    Yes.

6    Q.    Okay.  So because the decisions they made

7    prior to this most recent one were discriminatory,

8    you continued to suffer discrimination despite

9    your appointment to the C schedule?

10   A.    Yes.

11   Q.    Okay.  It's not -- you're not claiming that

12   where you were placed on the C schedule about a

13   year ago was wrong, are you?

14   A.    Yes, I'm complaining about it.

15   Q.    Okay.  Because you're saying you should have

16   been higher on the C schedule, by this date and

17   time, than you are now?

18   A.    Yes.

19   Q.    Okay.  Ms. Owensby, you've commented on two

20   conversations that you've had with Dr. Chambers

21   that you feel reflected the discrimination that

22   you've complained about.

23         The first one was when you went to talk to

Page 272

1    him about your pay.  And this is the conversation

2    where he said that Dean Wilson had not recommended

3    you for a promotion.

4         Have you told me everything else that you

5    can recall about that conversation?

6    A.    All that I can remember.

7    Q.    Okay.  So you walked in and you told Dr.

8    Chambers you're unhappy about your position and

9    your pay?

10   A.    Not in those words.

11   Q.    Tell me what you said.

12   A.    Basically, to follow up on the memos I had

13   written to him, to find out personally from him.

14   Q.    And I understand you were following up on

15   the written correspondence?

16   A.    Yes.

17   Q.    What did you tell him?

18   A.    That I was wondering why -- what was the

19   problem.  Why wasn't I granted a pay increase for

20   the extra duties I had incurred.  I asked him if

21   there was a specific reason why.

22   Q.    And what did he say?

23   A.    He said that he does not recommend.  I have

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 273

1    to follow proper protocol.

2          In other words, your supervisor "have" to be

3    the one to recommend; I only approve.  And that's

4    where he left it.

5    Q.    Okay.  And there seems to be a disagreement

6    during that conversation as to whether or not Dean

7    Wilson had recommended, right?

8    A.    I would say apparently Mr. Chambers was

9    unaware that Mr. Wilson had recommended, or he was

10   ignoring the fact that he had recommended; I don't

11   know.

12   Q.    But your belief was that Dean Wilson had

13   recommended you?

14   A.    Because that's what Dean Wilson told me.

15   Q.    And Dr. Chambers disputed whether or not the

16   recommendation was in place?

17   A.    He just said that he does not recommend.  I

18   needed to follow proper protocol.

19         And I told him, Well, I thought I followed

20   proper protocol.  Dean Wilson said that he had

21   recommended it to you.  And he left it at that.

22   Q.    So did you leave that meeting believing that

23   Dean Wilson had or had not recommended you?

Page 274

1    A.    I left it very confused.  I left that

2    meeting confused.  I didn't know who to believe.

3    Q.    Well, did you believe that you had been

4    recommended for a promotion by Dean Wilson prior

5    to that conversation?  I mean, when you went in

6    there, did you believe?

7    A.    When I went in there, I thought I had.  I

8    would not have gone in there had I -- I went in

9    there because Dean Wilson told me he had made the

10    recommendation.

11    Q.    And you left and you didn't know?

12    A.    No, I didn't know.

13    Q.    Okay.  During that conversation, did Dr.

14    Chambers ever mention your race or your sex?

15    A.    No.

16    Q.    Did he -- has he ever said to you, "I am not

17    going to promote you because you're a black

18    female"?

19    A.    No.

20    Q.    Okay.  Has he ever said anything similar to

21    what I just said?

22    A.    No.

23    Q.    The second conversation that you had -- I'm

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 275

1    sorry.  Can you think of anything else that Dr.

2    Chambers said during that first conversation that

3    we just talked about?

4    A.     No.

5    Q.     Okay.  You referenced a second conversation

6    that you had with Dr. Chambers.  And that was in

7    what time frame?  Can you place that for me

8    timewise?

9    A.     It was during the time of that Memo of

10   Understanding.

11   Q.     And that was around 2000?

12   A.     Whatever date is on that one.

13   Q.     And can you tell me where that conversation

14   took place?

15   A.     In his office.

16   Q.     Did you go see him?

17   A.     Yes.

18   Q.     Did he ask you to come see him?

19   A.     I had to, in order to sign the Memo of

20   Understanding.

21   Q.     Okay.  And he had called you into his office

22   to sign the Memo of Understanding?

23   A.     Yes.

Page 276

1    Q.    And did you sign it?

2    A.    Yes.

3    Q.    Did you agree with it?

4    A.    To the fact that -- well, I wasn't

5    comfortable with it.  I didn't understand why

6    would you give me a Memo of Understanding that if

7    I can't perform this job I would revert back to

8    secretary with secretary pay.  But I signed it

9    because I was sure that I could perform the job.

10   Q.    Did you tell Dr. Chambers you disagreed with

11   that memo?

12   A.    No.

13   Q.    During that conversation, did Dr. Chambers

14   mention your race or your gender?

15   A.    No.

16   Q.    And I know you've testified about the memos

17   that we have.  Can you point -- can you cite me to

18   or point me to any other evidence that you have in

19   which it helps you form the basis of your belief

20   that Dr. Chambers has, in a discriminatory way,

21   considered your race and your gender in your

22   promotions?

23   A.    Other than what I said.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 277

1    Q.    Okay.  I just want to make sure we're clear.

2    This is your opportunity to tell me what Dr.

3    Chambers has said or done that's discriminatory.

4              MR. DEBARDELABEN:  Object to the form.

5    This is your opportunity to ask her questions.

6    It's not her opportunity to tell you or answer a

7    question.

8              MR. BEAM:  I understand.

9              MR. DEBARDELABEN:  It's not her

10   opportunity; it's your opportunity.  Don't phrase

11   it that way.

12             MR. BEAM:  I'm just telling her that

13   this is her opportunity.

14             MR. DEBARDELABEN:  It's not her

15   opportunity.

16             MR. BEAM:  To answer questions.

17             MR. DEBARDELABEN:  She can answer

18   questions.

19   Q.    This is your opportunity to answer

20   questions.

21        We've talked about the memos and we've

22   talked about these two conversations.

23        Are there any other conversations, any other

Page 278

1    documentation, that you have used to form your

2    belief that you've been discriminated against

3    based on your race and your gender?

4    A.    Other than what I mentioned earlier that,

5    according to my understanding of the guidelines as

6    it governs the salary schedules, I didn't see

7    where my education had a factor in me not being on

8    the C salary schedule, even at a C-1, according to

9    the guidelines.  I didn't see anything.

10   Q.    Well, Dean Wilson doesn't have the authority

11   to promote you, does he?

12   A.    No.

13   Q.    Has he ever had the authority to promote

14   you?

15   A.    He has the authority to recommend.

16   Q.    That's not my question.  Has he ever had the

17   authority to promote you?

18   A.    No.

19   Q.    Has he ever talked with you about when he

20   would recommend you and when he would not

21   recommend you for a promotion?

22   A.    He did, right after the EEOC Claim.  There

23   was a lot of talk leading up to that time.  I

Page 279

1   mean, after the EEOC had been filed and then the

2   response and my Right to Sue letter had come back,

3   he had talked.

4   Q.    And what did he say?

5   A.    He first had -- there was a meeting with me,

6   Malcolm Montgomery, Traywick, and Mr. Wilson.  A

7   budget meeting.  And he was going over the budget

8   for the new year that was coming up.

9         And he asked me what -- basically, what

10  would satisfy me.  Where on the C salary schedule.

11  Q.    When was this?

12  A.    This was, I think, June of 2006, I believe.

13  Q.    Okay.

14  A.    And I told him that I was not at liberty to

15  discuss that.  Because at the time nothing had

16  been final.  I was -- you know, we "was" still in

17  litigation, I guess, with EEOC and my lawyer.  So

18  I wouldn't give him a figure.

19        And several times leading up to August, when

20  I got appointed to C-3, he approached me to see if

21  I would just give him a figure.  And each time I

22  told him I wasn't at liberty to discuss that with

23  him.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 280

1    Q.    Okay, Ms. Owensby.  So you're telling me

2    about, I guess, more than one conversation you've

3    had since you filed your EEOC Complaint.

4    A.    Yes.

5    Q.    Prior to the filing of your EEOC Complaint,

6    can you tell me any other instances in which you

7    discussed whether or not Dean Wilson had or had

8    not recommended you for a promotion?

9    A.    During '99, during that whole controversy, I

10   did ask him; and he did say, "I recommended you."

11   Q.    Okay.  And do you know whether or not he did

12   or not?

13   A.    Well, that's when he showed me the letter

14   that he supposedly had submitted to Mr. Chambers.

15   Q.    Any other conversations you've had with Dean

16   Wilson about whether or not he recommended you for

17   promotions?

18   A.    No.

19   Q.    Okay.  So the only two conversations that

20   you've had with Dean Wilson regarding whether or

21   not he would recommend you for a promotion, he

22   said yes?

23   A.    No.

Page 281

1    Q.    Okay.  When did he say no?

2    A.    He didn't say no.  He responded in a memo

3    saying that nothing will be -- your salary will

4    not change at this time.

5    Q.    What memo was that?

6    A.    It was a 2004 memo.

7    Q.    Is it your testimony that that memo

8    reflected his communication to you that he was not

9    going to recommend you for a promotion?

10   A.    Yes.

11   Q.    Okay.  Anything else?

12   A.    That's it.

13   Q.    Okay.  So with regard to whether or not Dean

14   Wilson has or has not recommended you for a

15   promotion --

16   A.    He has verbally said something to me.

17   Q.    What did he say?

18   A.    During that, leading up to that contract

19   time of 2004 -- and generally a lot of other

20   employees would submit a request for increase in

21   salary or whatever -- but he -- I walked in and I

22   told him I wanted to give him this letter

23   requesting an increase in salary.  And he said,

Page 282

1    "Well, I don't want any letters.  Don't y'all give

2    me anything."  I gave it to him anyway.  I mean, I

3    just left it on his desk.

4    Q.    When was this?

5    A.    It was in 2004.  I think that was that

6    letter.

7    Q.    Has Dean Wilson ever mentioned your race or

8    gender when you have talked with him about a

9    promotion?

10   A.    No.

11   Q.    Has he ever mentioned your race or gender

12   when you have had written correspondence with him

13   about a promotion?

14   A.    No.

15   Q.    Ms. Owensby, what evidence do you have that

16   Dean Wilson has discriminated against you,

17   specifically with regard to promotions, because of

18   your race and gender?

19   A.    Promotionwise, since he does not have the

20   power to promote, I would say recommending.

21   Promotionwise, I have none because he has no power

22   to promote; he can only recommend.

23        As far as recommendation, the only thing

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 283

1    I've ever seen in writing in reference to a

2    recommendation was that memo that he submitted to

3    President Chambers, I think in --

4    Q.    What memo?

5    A.    -- October of '99.

6    Q.    And that memo said what?  You're talking

7    about the memo he said the Student Services

8    Department --

9    A.    Yeah.  He recommended me at an E-1 as an

10   administrative assistant.

11   Q.    Okay.  And what evidence do you have that

12   that decision was based on your race or your

13   gender?

14   A.    None.

15   Q.    Okay.  Can you point me to any other

16   evidence that you have since you've worked for

17   Dean Wilson that he has discriminated against you

18   because of your race or your gender?

19   A.    Well, I believe that Dean Wilson made the

20   recommendation for Melissa Wallace to be hired as

21   Job Placement Officer, which apparently was

22   approved.  She was hired.

23         And that was a position in his department at

Page 284

1   a salary schedule that was once held by a white

2   male, and a white female was recommended and came

3   in and was placed in the exact salary scale level

4   as a white male.

5   Q.    You're talking about the white female who

6   was fired after replacing Bill Griswold?

7   A.    Yes.

8   Q.    Any other evidence that you can point me to

9   that forms or helps you form the basis of your

10  belief that you have been discriminated against by

11  Dean Wilson because of your race and gender?

12  A.    Well, the fact that Dean Wilson had two

13  people in his department that worked under him.

14  Well, one that worked in Student Support Services,

15  and, of course, I worked in Student Services.

16  Both held coordinator titles.  Black male.  He

17  recommended him for the C-3 salary schedule but he

18  did not recommend me when I became coordinator.

19  Q.    And you know for sure or to the best of your

20  knowledge he didn't recommend you for the C salary

21  schedule when you became a coordinator?

22  A.    Yeah.

23  Q.    Do you know that for sure?

Page 285

1    A.    I don't have any evidence, but he didn't

2    submit anything in writing saying that he had

3    recommended me.

4    Q.    Do you know for sure whether he did or did

5    not?

6    A.    No, I don't know for sure.

7    Q.    Okay.  So when you became coordinator, when

8    you got the coordinator position, you don't know

9    what Dean Wilson recommended?

10   A.    When I got the coordinator's position, I

11   know that he recommended administrative assistant.

12   But instead the title was Coordinator of

13   Registration and Admissions, at E-2 instead of

14   E-1.

15   Q.    Do you know at that particular time what his

16   recommendation was as your supervisor?

17   A.    At that particular time, according to that

18   memo, his recommendation was Administrative

19   Assistant to the Dean of Students at a E-1 pay

20   scale.

21   Q.    Any other evidence that you can relate to us

22   today that you believe reflects discrimination on

23   the part of James Wilson against you because of

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 286

1    your race or your sex?

2    A.    No.

3    Q.    Do you know how often James Wilson has

4    recommended other females for promotions?

5    A.    I know two times.  No.  One was a promotion

6    and one was for an increase in salary.  So one

7    time for a promotion and one time for an increase

8    in salary.

9    Q.    So your knowledge of whether or not he has

10   recommended promotions for women is based on two

11   instances?

12   A.    Actually three.

13   Q.    Okay.  What is your knowledge of how many

14   times he has recommended blacks for promotion?

15   A.    I'm not sure.  I've counted seven, but it

16   could be more.

17   Q.    So you know of seven times when he has

18   recommended promotions for blacks?

19   A.    Blacks.

20   Q.    Okay.  Do you know how many times Dean

21   Wilson has refused to recommend blacks for

22   promotion?

23   A.    I don't know how many times he's refused.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 287

1   Q.    Do you know how many times he's refused to

2   promote or recommend promotions for women?

3   A.    How many times he refused to recommend

4   promotion?

5   Q.    Yeah.

6   A.    I would say he refused to recommend

7   promotion, I know, one time on my part.

8   Q.    Do you have any other knowledge of how often

9   he has refused to recommend females for promotion?

10  A.    No.

11  Q.    Okay.  Ms. Owensby, can you tell me any

12  other people employed at J.F. Ingram that you

13  would point to as people that have performed your

14  same job responsibilities and have been promoted

15  to the C salary schedule?

16  A.    Tim Robinson.

17  Q.    Okay.  And Tim Robinson was the registrar;

18  is that right?

19  A.    Yes.

20  Q.    And can you articulate for me what the basis

21  of your belief is that you are similarly situated,

22  as far as responsibilities, as Tim Robinson?

23  A.    Because of the job duties I was assigned

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 288

1    that Tim Robinson once had.

2    Q.    Okay.  Anybody else besides Mr. Robinson?

3    A.    No one else I can think of.

4    Q.    Okay.

5          MR. BEAM:  We'll make your personnel

6    file Defendants' Exhibit 50.

7               (Defendants' Exhibit No. 50 was

8               marked for identification and a

9               copy of the same is attached

10              hereto.)

11         MR. BEAM:  If you can, give me just

12   five minutes and let me gather my thoughts.  We

13   may be finished.

14              (A brief recess was taken.)

15   (BY MR. BEAM)

16   Q.    Ms. Owensby, I've got just a few more

17   questions.

18         Do you know what the mission of J.F. Ingram

19   was when Tim Robinson became the registrar?

20   A.    Not exactly.

21   Q.    Well, you were employed there at that time,

22   weren't you?

23   A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 289

1    Q.    When he came on as the registrar, was there

2    ever a plan for J.F. Ingram to be something

3    besides a school that served inmates?

4    A.    I think they were, at one time, had sought,

5    applied or something, to try to become accredited

6    as a community college.

7    Q.    Did you know that that plan was developed

8    while Tim Robinson was registrar?

9    A.    No.  I don't know when it was developed.

10   Q.    Do you have any knowledge as to how that

11   plan affected the hiring of Tim Robinson as

12   registrar?

13   A.    No.

14   Q.    Would you disagree with the statement that

15   there was a plan in place, or plans were developed

16   during the time that he was registrar, to change

17   the mission of the college?

18   A.    I don't know exactly when that plan was in

19   place.  I don't know whether it was during his --

20   I don't know exactly.

21   Q.    You don't know?

22   A.    When the plan was in place.

23   Q.    Did you know that that plan never happened?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 290

1    A.     I know it didn't happen.

2    Q.     Do you know why it didn't happen?

3    A.     No.

4    Q.     Okay.  Did you know that Tim Robinson was

5    made registrar as part of that plan?

6    A.     No.  I'm not sure whether he was or not.

7    Q.     And you don't know when that was decided

8    that that plan was not going to be happening?

9    A.     No.

10   Q.     Okay.  Would you disagree with the statement

11   that ultimately this plan that was in place when

12   Tim Robinson was registrar did not reach -- did

13   not happen?  The plan wasn't implemented, is what

14   I'm trying to say.

15   A.     No.  The plan was -- I mean, it didn't --

16   no.

17   Q.     Do you have any knowledge as to the role of

18   the registrar, when Tim Robinson was registrar, as

19   part of this plan?  And I'm sorry if I asked you

20   that before.

21   A.     No.  I don't know what the role of the

22   registrar was as part of that plan.

23   Q.     Did you know that the college was going to

Page 291

1   become a community college?

2   A.      I knew that they were trying to be.  I don't

3   know, you know...

4   Q.      Okay.  Would you disagree with the statement

5   that, once the plan for becoming a community

6   college was scrapped, that the role of the

7   registrar was changed?

8           MR. DEBARDELABEN:  I'm going to object.

9   She doesn't know there was a plan or what the plan

10  was.

11          MR. BEAM:  Okay.

12  Q.      You can answer the question.

13  A.      Will you repeat it, please?

14  Q.      Did you ever know that there was a plan for

15  the school to become a community college?

16  A.      I heard there was.

17  Q.      Okay.  Did you know that the role of the

18  registrar changed from the time that that plan was

19  not implemented until the present?

20  A.      I mean, as far as I'm concerned, it didn't

21  change.  I mean, the responsibilities and duties

22  didn't.  I don't know what the role, according to

23  what the institution had, I don't know.  But I

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 292

1    know the duties and the responsibilities didn't

2    change.

3    Q.    Did you know that as part of Tim Robinson's

4    duties that they were planning for him when he

5    became registrar was to serve as a registrar of a

6    community college?

7    A.    No.

8    Q.    But you've never served as the registrar of

9    a community college, have you?

10   A.    No.

11   Q.    And J.F. Ingram has never been a community

12   college while you have worked there, has it?

13   A.    No.

14   Q.    Ms. Owensby, you've pointed me today to

15   Julie Givens and Gene Bridgman and Tim Robinson as

16   people whose position and salary is evidence that

17   you have been discriminated against.  You've also

18   pointed me to Bill Griswold's replacement.  And we

19   know that she was ultimately fired.

20          MR. DEBARDELABEN:  Object to the form.

21   There's no evidence suggesting that anybody was

22   fired.

23   Q.    Ms. Owensby, do you know that?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 293

1    A.      I mean, I know she no longer works there.   I

2    don't know what happened.

3    Q.      You don't know whether or not she was fired?

4    A.      No.

5    Q.      Okay.  Do you know who her replacement was?

6    A.      No.

7    Q.      Do you know her replacement's race or

8    gender?

9    A.      No.

10   Q.      Okay.  Can you cite me to any other

11   evidence, besides these four people that we have

12   talked about or anything else that we've talked

13   about today, that is evidence that you have been

14   discriminated against based on your race and

15   gender?

16   A.      The fact that as Assistant to the Dean of

17   Students, and two Assistants to the Dean of the

18   College, those positions, the Assistant to the

19   Dean of the College positions were considered C

20   salary schedule positions; whereas mine, as

21   Assistant to the Dean of Students, along with

22   Registrar, was considered at the E salary

23   schedule.

Page 294

1    Q.    Okay.  And this position that you just

2    mentioned was what?  Assistant to what?

3    A.    Dean of the College.

4    Q.    Is that something that we have talked about

5    already today, to your knowledge?  Have you

6    already mentioned that?

7    A.    No.

8    Q.    Okay.  Tell me how that --

9    A.    Well, we did talk a little bit about it and

10   you showed me a job description of it.

11   Q.    Okay.  Well, tell me how that is evidence

12   that you have been discriminated against.

13   A.    Because if those two positions "was" merited

14   as a C-2 position on the C salary schedule, then

15   why wasn't mine merited on the C salary schedule,

16   period, as Registrar/Assistant to the Dean of

17   Students?

18   Q.    So as I understand your testimony, there

19   were other assistants to deans who were designated

20   on the C salary schedule when you were an

21   assistant to a dean and you weren't?

22   A.    Yes.

23   Q.    As assistant to the dean in your role, were

Page 295

1    your responsibilities different than those other

2    assistants?

3    A.    The responsibilities "wasn't" the exact same

4    responsibilities as far as the way they were

5    worded on the job description, but I recall

6    pointing out six that were similar to what I do in

7    my capacity as Assistant to the Dean of Students.

8    Q.    Any other evidence you can point me to?

9    A.    No.

10   Q.    Okay.  That's it.  Thank you.

11

12        FURTHER THE DEPONENT SAITH NOT

13

14

15

16

17

18

19

20

21

22

23

```
 1              C E R T I F I C A T E

 2   STATE OF ALABAMA      )

 3   COUNTY OF JEFFERSON )

 4

 5              I hereby certify that the

 6   above and foregoing proceeding was taken

 7   down by me by stenographic means, and that

 8   the content herein was produced in

 9   transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a

12   true and correct transcript of the

13   proceedings occurring on said date at said

14   time.

15              I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action; nor am I in anywise

18   interested in the result of said case.

19

20

21   _____CMNoakes_____

22        Court Reporter and Commissioner

23
```

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 1

---

**A**
abandoned 256:23
ability 160:7,7,9,10
able 25:5 27:18
29:9 40:20 85:12
109:2 133:23
173:21 248:2
absorbed 151:17
216:1 224:11
227:22,23 231:19
231:22
absorbing 163:20
225:8 229:21
230:16
absorbs 231:1
academic 24:13
260:6
academics 260:3
accept 266:22
acceptable 81:11
accepted 79:5,6,22
ACCESS 26:7 83:5
83:5,20,22
accident 14:19 15:5
accommodations
253:18
accomplished 254:8
accountable 135:13
135:16
accountant 200:1
200:11 201:6,7
accounting 200:6
accreditation 79:4
accredited 79:3
289:5
accurate 89:14
144:11,12 151:10
153:4 154:5
162:13 194:1
accurately 129:22
143:7 147:12
150:15 152:8
acknowledging
210:12,21
acting 7:23
action 296:14
activated 212:15
active 136:19
activities 148:14
actual 48:15 145:15
add 36:17 108:14
added 99:11 103:7
104:12 108:4
123:14 143:10

144:14 151:3,5,16
153:7 169:8 244:7
addition 158:12
additional 135:12
143:15 144:6,9
203:12
additions 152:11,12
153:7
address 12:9
192:16 194:21,22
addressed 204:21
206:4
addressing 223:9
adequate 244:18
adjustment 96:15
ADL 123:14,15
administer 260:9
administered 260:7
260:13
administration
138:2 183:15
administrative
113:17 114:15
199:3,11 251:18
283:10 285:11,18
administrators
157:9
admission 72:18
77:22 78:1 84:5
86:14 98:9 104:11
104:15 106:11
108:22 110:7
admissions 72:2,3
72:17,23 77:19
78:8 80:1 84:17
88:14 113:15
114:12 116:15
122:3 144:19,22
148:7,8,9,15,16
150:14,17 173:10
181:15 186:16,18
186:22 199:6
237:5 245:17
249:13 269:1,11
285:13
admit 134:3
admonished 223:14
Adult 259:21
advice 79:23 81:3,5
82:5
advise 72:22 79:16
81:6 88:3,13
advised 79:14 81:2
advising 78:7

Affairs 199:14,16
200:2,7,12
affect 95:14
afraid 28:12 238:2
agency 24:17
ago 36:14 80:7
117:7 204:5 233:5
271:2,13
agree 94:3 167:13
168:11,11 185:3
185:12,18 197:6
237:15,17 252:4
261:16 262:13
263:9 276:3
agreed 2:3,11,18
3:3 206:14,16,17
agreement 237:6
ahead 193:2
Alabama 1:2 2:9
7:7,17,23 8:2,6
12:11 13:1 21:5
21:12,14,22 22:6
24:4,17,22 26:11
158:8 159:6,8
160:14 162:7
164:16 184:14
185:5,10 213:13
296:3
Alabama's 25:20
allegedly 179:13
allergies 27:23
allergy 28:1,3
allocated 34:16
52:11 229:22
allocation 32:22
33:2 48:22 248:7
253:19
allocations 246:10
allow 27:12
allowed 9:4 49:15
52:13
allowing 183:21
amount 164:20
225:13 228:3
230:2 270:21
analysis 236:16
250:13
analyze 25:7
annual 31:12 39:18
42:5 45:21,23
46:3,3,7,10 98:12
111:19,21 112:5
128:18,20 131:11
131:19 133:6

141:4,18 142:5
216:4
answer 10:21 29:3
42:16 52:15 96:5
167:22,23 183:3
190:22 196:13
234:2 254:18
277:6,16,17,19
291:12
answered 31:1
196:12
answers 296:8
anybody 35:9 36:12
107:2 124:22
138:10 155:15
166:18 171:10
173:19 201:3
223:19 288:2
292:21
anymore 134:19,20
anyway 249:6
282:2
anywise 296:15
apart 75:15
apparently 47:4,6
57:8 96:11 169:6
206:14 208:23
242:23 266:3,5
273:8 283:21
**APPEARANCES**
7:1
appears 187:15
188:4 190:17
266:7,10 267:11
appeasement 126:2
Apple 26:5
applicable 29:14
applicants 36:7
209:1
application 35:19
applications 35:18
36:11 72:18
208:12 235:21,22
applied 24:21 35:14
35:21 97:12,13
289:5
apply 266:12
appoint 98:8
appointed 39:16
67:11 74:11,13,23
92:10 113:14
140:15 142:4
173:9,20 208:21
233:3,12 268:23

270:15,19 279:20
appointment 30:12
31:19,22 32:6
33:10,13,21 34:2
36:8 39:11,14,21
41:19 42:9,12,14
42:20,23 43:11,21
43:23 44:11,16,21
44:22 45:2,12
46:23 47:2 48:13
49:6,7 50:9 51:12
51:14,19 54:18
55:10 56:7,10,21
56:22 57:1,5,7,10
57:20 58:6,13,21
59:1,11 60:5,6,9
60:11,13,15 61:3
61:13,18,21 62:6
62:16 63:2 64:7
65:6,9,19 66:7,23
67:5,8,20,22
68:23 70:10,13,15
71:1 72:14 74:19
91:4,8,10,16,19
92:19 93:2,3,13
93:16 94:5 96:3
96:13,18,21 97:1
97:4,15,17,20
98:1,14,15,17
99:9,14,21 100:3
100:22 101:3,6,8
102:8,11,22
103:12,17 104:1
105:6,17 106:2,19
107:5,8 111:11,17
112:8,15 113:2
115:11 116:7
118:9 119:2,4,10
121:14,18,21
122:2,17,20 123:1
123:7,12 124:17
124:20,23 125:15
126:13,16 127:4
128:8 129:3,5,9
130:11 131:2
132:2,6,16 133:12
133:15 134:16
138:15,22,23
140:12 141:3,10
141:12 142:9
143:2,4,23 144:4
144:17 145:4
146:18 154:2,15
155:8 173:6,8

195:20 232:18,23
235:12 267:10
269:17,19 270:9
271:9
appointments
41:13 63:19 64:1
appreciate 211:19
appreciated 216:12
approach 27:8
approached 113:10
180:15 279:20
approaches 27:10
appropriate 193:11
approval 183:18
approve 273:3
approved 154:22
155:1 283:22
approves 179:19
approximately
89:21 118:5 268:6
268:7
April 71:18 101:10
117:12 210:9
231:22 233:8
252:19
area 16:14 136:16
136:18 169:20
258:9
areas 14:4 135:14
arrive 79:19
arrived 79:18
221:17
articulate 287:20
articulated 244:3
Arts 21:6,23 158:23
159:17
aside 33:16
asked 37:7 38:9,19
38:20,22 39:1
40:1,14 79:20
105:15 115:20
121:16 155:15
169:11 171:21
172:9 175:7
193:14 196:12
203:1,11,20 204:1
212:20 213:21
214:12 241:13
242:7 243:2 244:6
272:20 279:9
290:19
asking 28:12 38:16
42:12,17 45:20
74:22 162:1

170:23 172:17
190:8,12,13
191:15 195:18
196:8 197:6
224:23 228:10
241:18 245:23
249:12 251:13
256:19
aspect 157:20
asset 213:9
assign 2:23
assigned 101:11
129:16 151:7
163:4,12 169:3
200:8 287:23
assist 31:5 110:15
152:14,15
assistance 199:3
assistant 143:4
152:13 153:7
156:20 159:14
163:5 186:17,20
194:22 199:11
200:1,12 204:20
206:3 250:11
251:18 283:10
285:11,19 293:16
293:18,21 294:2
294:21,23 295:7
assistants 113:17
114:15 293:17
294:19 295:2
assisted 152:18
175:19 200:6
207:16
Associate 21:5,23
158:23 159:16
associated 77:18,22
83:12 84:2 148:21
196:10,18
associate's 200:14
268:11
assume 38:19 54:5
147:14 156:11
167:3 176:12
200:6 209:3
238:18 251:14
269:21
assumed 38:4 75:6
75:13 104:11
117:12 163:16
170:12 186:18
232:3
Assumes 151:7

assuming 60:7,10
AS/400 25:22 26:2
26:6,7 82:14
Athens 23:21 24:3,5
attached 30:19 33:8
37:20 39:9 41:10
43:8 44:8 45:9
50:5 51:9 55:7
56:18 59:8 60:23
62:13 65:16 67:17
92:4 94:1 105:13
112:22 126:22
132:12 140:5
142:18,21 143:22
147:3 150:9 152:2
153:19 154:1,4
158:4,17 161:1
187:22 209:13
210:6,18 212:2
215:5,21 222:3
236:10 238:8
239:2,8 241:7
242:1 243:18
250:4,21 252:2
262:11 288:9
attend 21:10
attention 30:3
153:21 211:8
238:11
attest 262:4
ATTORNEY 7:5
ATTORNEYS 7:14
August 32:7 33:22
41:20 43:12 44:13
50:11 51:20 55:11
57:8,21 59:12,14
61:4 63:3 64:8
65:20 67:21 70:22
93:8 98:3 100:9
100:20 106:3,5,9
118:8,11 121:14
122:5,7 127:1,7
128:6,9 132:19
140:14 144:20
177:12 189:7
264:21 279:19
AUM 19:8,10,14,19
20:8,11
Autauga 13:5
authority 137:3
166:6 167:1,4,6
278:10,13,15,17
automatic 38:14
53:2

automatically
54:16 86:13
automobile 14:18
available 35:16,22
81:16,18
Avenue 7:6
awarded 31:19,21
awards 22:1,3
24:13 73:16
a.m 8:7
A/B 54:1

_____
B
back 20:6 22:7,9
34:22 35:18 66:16
104:5 113:11
114:20 142:7
168:1 173:16,18
184:7 212:21
213:8,21 214:11
214:16,22 216:6
216:11,13,16
223:15 228:16
234:8 237:8
243:10 276:7
279:2
background 165:6
backwards 47:22
back-and-forth
180:7
bad 214:17
ballpark 142:8
Baptist 17:15
BARBOUR 296:4
based 31:19,22
52:18,20,21 53:15
53:20,22 91:20
94:7 103:8 131:3
138:19 142:10,12
171:18 172:8,13
173:3 174:5,14,19
175:20 177:8
178:8 181:20
182:22 184:2
192:18 207:1
231:6 232:12
247:17 253:8,21
255:2,4,6 256:8
270:6,14 271:3
278:3 283:12
286:10 293:14
basic 19:11,22 26:1
29:13 31:8 36:21
63:15 73:14

basically 14:2 25:8
26:3,5,9 27:1,4
29:20,23 31:1
35:1 36:1,5 40:16
57:3,4 63:4 73:12
83:17,19 85:1,9
85:23 86:2 93:5
109:9 159:10,11
159:14 160:1
163:13 201:2
241:13 252:21
272:12 279:9
basics 159:21
basis 16:10 115:21
168:23 169:16
173:1,11 177:16
178:7 192:21
205:23 206:12
207:5,6 247:22
259:11 269:7
276:19 284:9
287:20
bathroom 179:14
Beam 4:3 7:11 8:17
8:20,23 9:3,10,14
9:18 10:2,5,12,14
10:17,18 13:7,13
30:15 33:4 37:16
39:5 41:6 42:19
43:4 44:4 45:5,21
46:4,9 50:1 51:5
55:3 59:4 60:19
62:9 64:5 65:12
67:13 74:5 91:23
93:20 105:9
112:18 126:18
127:9,14,19 132:8
140:2 142:15
146:23 150:5
151:21 153:16
158:1 160:20
168:1 184:7
188:15,18 189:4,9
189:23 190:3
202:17,20,22
209:9 210:2,14
211:21 213:18
215:1,17 221:22
234:13,17,21
235:3,8 236:6
237:14,20 238:4
238:20 239:4
241:4,20 243:14
249:23 250:17

251:21 254:1
261:21 262:1,7
263:3 266:20,22
277:8,12,16 288:5
288:11,15 291:11
**becoming** 291:5
**began** 69:1,5,13
73:20 76:13
134:15 188:13
231:9,17 233:6
252:10,14 268:10
268:19 269:8
**beginning** 8:7 66:20
70:21 73:8 89:17
100:8 102:2 106:8
128:9 132:18
232:7,8 240:17
267:8
**begun** 229:5
**BEHALF** 7:3,10
**belief** 91:20 93:14
93:17 115:21
116:6 126:5
138:14,18 168:23
169:16 171:16
173:2 174:13
175:19 176:10,16
177:17 178:7
180:9,14 184:3
192:6,13,17,21
205:17,22 206:1
206:12,20 207:5,6
220:11,12 230:20
247:22 254:13
259:11 268:17
273:12 276:19
278:2 284:10
287:21
**believe** 12:4 14:9,20
21:14,15 24:2
27:8 42:20,23
43:20,23 44:22
45:2 47:1 51:11
51:14 54:19,22
56:11 58:21 59:1
60:12,15 61:15
62:17,19 63:18,20
63:23 65:5,9 66:7
66:9 67:5,8 71:18
74:23 91:7,10,14
94:9,23 96:16,20
97:3,15,19 101:1
102:14,15,21,23
103:6,11,15 104:8

104:14,18 105:3
113:3 116:1 117:2
117:11 118:1
120:12 121:3
122:22 125:7,22
126:4,12,15
128:23 130:11,16
130:20 131:2,17
131:20 137:21
142:9,12 145:16
146:15 147:15
152:17 171:7,9,12
172:11 173:1
174:4,18 176:4,13
177:7 179:7
181:19,23 183:14
187:10 188:18
194:4 197:21
204:15 205:3,22
206:8 219:3,6,15
220:4 224:14,16
225:7 228:19,23
229:4 230:15
231:4 232:9
244:16,17 246:15
252:8 253:5
257:21 265:19
274:2,3,6 279:12
283:19 285:22
**believed** 171:22
**believing** 273:22
**best** 11:19 138:3
167:23 255:7
256:8,16 284:19
**better** 18:8 109:9
**beyond** 13:22,23
20:23 23:19 24:10
143:16 169:11
172:23 193:9
203:8 206:22
217:21
**bias** 170:5
**Bill** 258:8,11,13,20
259:3,10,13
263:14 284:6
292:18
**bit** 20:2 36:15 77:15
294:9
**black** 130:21 166:4
169:15,22 170:6
171:8 176:9,12,13
176:15,18 177:1,2
177:4,9,12,13
180:18,22 181:7

182:2 220:8,14,23
264:3,4,7,12,19
265:5,8,9 274:17
284:16
**blacks** 221:2,6
286:14,18,19,21
**blatant** 180:17
**blatantly** 170:4
**board** 27:3 135:23
**bogged** 110:11
**Bonita** 1:7,23 2:5
8:7,11 11:22 12:5
12:5,6,7 158:13
219:21
**Bonita's** 237:12
**boss** 171:3 199:11
244:22 245:3
246:13
**bottom** 186:2
**break** 11:10,13 64:3
127:9,12,16,22
201:22 202:4,18
234:17
**breaks** 11:11
201:21
**Bridgman** 198:14
199:21 200:9,18
201:1 292:15
**brief** 9:17 64:4
202:21 235:7
261:23 288:14
**briefly** 17:5
**briefs** 159:12,12
**bring** 86:6
**broke** 128:6
**brought** 117:7,22
118:6 119:21
**budget** 279:7,7
**bumping** 110:8
**bunch** 22:19 234:21
**burnt** 237:23
**business** 28:23 76:2
80:23 201:4
**busy** 109:13,14,15
200:21
**B.S** 164:9,11

_____ C _____

C 35:5 103:19
104:9,19 116:1,2
116:8,11,17
130:21 131:5,21
141:17 145:6,9,11
164:16 165:2

169:18 177:11
220:17,22 225:20
226:1,4 228:21
229:3,8 230:10,22
231:10,20 264:13
264:20 265:7,10
268:18 269:16
270:15 271:9,12
271:16 278:8
279:10 284:20
287:15 293:19
294:14,15,20
296:1,1
**call** 17:22 27:9
36:23 148:7
149:17 169:11
170:7 262:7
**called** 35:16,19
36:10,11 275:21
**calling** 162:18
**calls** 223:22
**campus** 25:17,19,20
**candidate** 41:4
**candidates** 236:4
**capacity** 1:13,16
8:19 9:2,6,7,8,9
9:19,22 10:5
148:16 259:1
295:7
**car** 15:5
**care** 73:13 206:2
**cared** 193:20
**carefully** 172:20
**Carla** 12:19
**Carlton** 12:15
**carried** 166:4 190:7
**carrying** 114:12
**case** 1:5 14:22 15:2
15:15,17 168:21
184:2,10 231:4
246:11
**catch** 27:19
**cause** 8:8 296:16
**cc'd** 206:13,18
**Central** 21:4,12,14
21:21 22:6 24:3
25:20 26:11 158:7
159:8 160:14
162:7
**ceremonies** 124:7
152:16
**certain** 34:10,14
53:1 81:7,8,9
183:18,19 198:3

**certainly** 244:13
**certificate** 6:14
81:9
**certification** 16:14
134:1
**certify** 8:1 296:6,13
**CETA** 17:7
**chaired** 152:20
**Chambers** 1:11
61:8,14,19 62:16
64:20 67:12 68:1
70:17 90:17,21
96:22,23 98:5,17
100:2 105:18
107:6 111:10
113:10 114:9,10
115:15 117:10
118:12,16,18
119:3,9 120:6,16
122:21 124:18,19
129:4 138:6
141:11 145:5
154:23 166:21,23
170:3 171:11,16
172:4,10,23 173:4
174:4,11,14 176:3
176:11 177:15,20
178:10 179:13,17
180:6,15,20
181:10 183:5,14
184:3 203:9,19
204:9,17 205:12
205:18 206:13,22
207:17 210:11
212:23 214:5
216:13,22 217:8
217:21 218:2,4,9
219:17,20 220:5
221:3,7 223:4,6
223:10 232:13,20
233:17 236:13,21
237:12 239:4,11
241:9 242:16
243:5,22 244:3,9
245:22 246:8,21
247:14,14,18
248:12 251:12
254:5,9 255:10
256:15 260:18
264:2,6 265:11
271:20 272:8
273:8,15 274:14
275:2,6 276:10,13
276:20 277:3

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

280:14 283:3
chance 237:23
change 34:15 38:14
52:3 68:5,8 69:4
69:11,22 71:4,8
74:20 75:5 95:3
98:20,21,22 99:3
99:4,5,6,7,10,13
100:13 101:15
107:7,18,20
111:13 112:1
116:20 122:8,11
123:12 127:15
130:3,9 131:9
132:20,23 133:3
133:19 134:23
137:14 138:11
153:1 190:22
219:9 252:10,12
252:14 281:4
289:16 291:21
292:2
changed 11:23 12:3
12:5,6 48:22 65:1
70:5 73:19 74:10
75:21 93:10 94:23
97:9 104:10
107:19 116:19,21
117:19 129:22
136:10,11 154:10
166:12 186:16
219:7 240:14,18
250:9,10 253:17
291:7,18
changes 71:20,23
75:17 108:11
135:5,8 136:13,14
136:21 137:1,4,6
137:17 138:7,8
191:6 241:12
252:5 253:1,6,9
253:11,12,14,16
254:14,14 255:12
255:14,15,21
256:2 261:8
changing 137:10,11
charge 136:21
166:14
charged 200:18
chart 187:21,23
195:1,4 227:20
Chattahoochee
184:17
check 79:2,11

178:22
chief 254:9
child 12:17 23:13
23:23
children 12:16
child's 12:18
choose 22:11 214:8
chose 20:4 22:13
216:6
chosen 38:18
CHRISTMAN 2:8
7:13 8:5
chronological
234:22
circumstances
214:19
cite 276:17 293:10
cited 172:7
City 17:6
Civil 8:2
claim 182:22
228:13 278:22
claiming 271:11
clarification 73:23
clarifying 195:16
clarity 175:13
247:12
class 24:5,6,7 25:14
25:16,19,21 26:10
26:12 84:6 160:18
classes 20:9 21:2
22:18 23:3,6,8,9
23:18
classified 162:15
Classroom 23:23
classrooms 162:19
clean 211:9
clear 11:19 45:19
269:6 277:1
clerk 16:21 17:22
30:13 31:1,15
32:7,17 33:22
36:5,6,20 40:18
86:1,2,3 90:14
109:11 135:12
clerks 78:9,9
135:22 163:14,19
close 110:11 117:2
college 1:11,14,19
9:21 16:3 19:20
21:5,9,10,12,22
22:7 23:21 25:23
26:11 28:20 35:14
37:2 52:23 54:5

72:17 79:2,2
82:15 90:20 138:4
156:21 157:8
158:8 159:7,8
160:14 162:8
165:2 166:5 183:6
183:12 184:4,14
185:22 198:11
200:15 202:15
205:10,12,14
206:23 228:7
235:13 236:16,18
248:7 255:7 256:9
256:17 289:6,17
290:23 291:1,6,15
292:6,9,12 293:18
293:19 294:3
college's 189:21
come 9:5 25:16
81:17 89:7 192:14
192:19 194:6
212:21 213:8
214:11,16 216:6
275:18 279:2
comes 27:14 138:9
177:5 183:23
comfortable 276:5
coming 185:17,20
216:10 279:8
commended 211:1
commented 271:19
Commerce 2:8 7:15
8:5
Commissioner 7:23
296:23
commitment
254:16,18
committee 148:7,8
148:15,16 235:12
235:14,15,20
236:12,15,22
committees 147:23
148:1,3
communicate
149:16 160:10
communicated
239:11
communication
281:8
community 21:5,9
21:12,22 22:6
26:11 158:8 159:7
159:8 160:14
162:8 235:13

289:6 291:1,5,15
292:6,9,11
comparable 79:5
81:11 182:10
195:6
comparator 199:22
comparators
198:13
compare 72:20
comparison 162:16
compensable
249:14
compensate 101:14
126:3 245:2,16
compensated
101:21 113:15
168:19,22 170:13
178:23 220:17
227:10 228:8
232:2 240:20
compensating
177:5
compensation
117:15 177:8
182:10 203:21
compete 36:7 209:5
competed 161:4,8
competing 208:17
complained 271:22
complaining 271:14
complaint 182:13
182:16 192:5
227:12,14 244:4
269:7 280:3,5
complaints 121:2
139:10
complete 13:2
80:22 81:7 143:12
194:1 265:23
266:2,3,15,15,17
266:19 267:3
completed 53:16
completely 153:5
completion 87:9,12
87:14 150:2
compliance 2:15
compliment 211:17
211:19
complimentary
219:1
component 96:9
comprehend 160:7
computer 25:14,15
25:16,18 26:1,5

26:10 82:14,17
83:2,8,10,13 84:2
84:3 107:23
computers 25:12,13
26:8
computer-aided
296:9
concede 219:23
222:6
concepts 25:6
concern 115:14
117:8 139:16,17
concerned 291:20
concerning 14:18
concerns 118:13
119:11,22 120:2,9
121:13 124:19,22
131:23 138:21
139:20 189:12
246:1 260:18
conclusions 194:18
194:20
conduct 246:5
confused 11:18
274:1,2
confusing 46:5
conjunction 79:16
connection 54:9,13
54:16 95:21
Conrad 157:13
conscious 183:22
consider 29:5,7
38:23 40:8 80:3
120:23 162:22
163:21 164:1
176:8 216:10
251:13 254:6
consideration 63:21
considered 38:11
38:16 40:2 122:23
146:18,20 161:12
163:15 164:2
171:13,14 252:5
253:2,6 268:21
276:21 293:19,22
considering 163:2
164:3,5 248:7
constant 136:13,14
137:13
constitute 134:8
153:1 187:7,14
constituted 134:6
205:13 270:22
consultant 37:6,11

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 5

| | | | |
|---|---|---|---|
| consultants 37:3 | coordinator 98:9 | correspondence | 213:22 222:9 | 133:13 134:22 |

consultants 37:3
consulted 246:12
contact 89:5,9
    108:3
contents 139:5
context 185:4
continue 73:5
    100:10 125:2
    134:11 215:13
continued 5:1 6:1
    86:3 134:13 222:7
    222:13,18 223:10
    236:12 271:8
continues 137:14
contract 101:19,20
    101:23 102:4
    117:3,11,13,18
    118:2,4,22 119:1
    119:17,23 203:13
    232:5,7,8 233:10
    233:11 240:16,17
    240:23 241:1
    261:2 264:21
    281:18
controversy 113:4
    113:6 243:12
    280:9
conversation
    113:23 171:18,21
    172:3 175:3,6,14
    175:18 177:19
    178:6,9 179:11
    192:7,8,11,23
    193:2,4,10 194:2
    242:22 243:4
    248:21 272:1,5
    273:6 274:5,13,23
    275:2,5,13 276:13
    280:2
conversations
    117:6 172:10,17
    172:18,21,22
    174:3,10,17 175:1
    177:14 271:20
    277:22,23 280:15
    280:19
conveyed 175:11
cooperation 199:8
cooperative 136:8
coordinate 86:15
    89:8 152:16 157:6
    157:10
coordinated 89:3
    152:22

coordinator 98:9
    103:21 104:10,15
    106:11 113:14
    114:11 116:14
    122:3 131:5 148:9
    150:14,17 155:21
    155:23 169:21
    173:10 181:13,14
    186:16,18 191:9
    199:6 208:9 228:1
    230:1,4,6 237:5
    245:17 249:13
    258:15,22 268:23
    269:10 284:16,18
    284:21 285:7,8,12
coordinators
    103:23 116:2
    169:17,20 220:23
    228:2 230:2
coordinator's
    285:10
copies 151:12
copy 30:19 33:8
    37:20 39:9 41:10
    43:8 44:8 45:9
    50:5 51:9 55:7
    56:18 59:8 60:23
    62:13 65:16 67:17
    92:4 94:1 105:13
    112:22 126:22
    132:12 140:5
    142:18 147:3
    150:9 152:2
    153:19 156:12,12
    158:4 161:1
    209:13 210:6,18
    212:2 215:5,21
    222:3 236:10
    238:8 239:2,8
    241:7 242:1
    243:18 250:4,21
    252:2 262:11
    288:9
copying 31:7
Corporation 83:5
correct 13:13 66:12
    76:23 79:12
    131:13,16 175:14
    213:6 243:23
    248:9 296:11
corrected 221:11
    223:13
Corrections 157:10
correctly 39:23

correspondence
    73:12 80:9 272:15
    282:12
coughing 28:2
counsel 2:5,20,22
    8:3 88:8 296:14
Counseling 164:14
count 221:5
counted 286:15
county 13:5,5,6
    18:23 296:4
couple 62:22
    212:14 232:16
    266:10
course 11:12 19:12
    19:12 23:21,22
    26:13 49:15 81:11
    167:10 284:15
courses 19:11,13,22
    19:23 20:1 22:20
    79:4,5,6 81:12
    160:2 260:5,6
coursework 24:10
    159:23 160:3,13
court 1:1 2:6,16 3:5
    7:22 8:15 11:7
    15:3 85:19 159:13
    159:13 296:22
credits 79:21 81:6,8
    81:10
current 225:13,17
    226:6
CV-2:06-cv-796...
    1:5
Cynthia 2:6 7:22
    296:21
C-1 145:20 220:17
    220:21 225:5,13
    226:6 278:8
C-2 169:19 200:13
    257:6 294:14
C-3 103:22 145:3
    169:19 228:2,3,15
    228:15 230:2
    270:19,23 279:20
    284:17
C/D 54:1

───────── **D** ─────────

date 8:1 32:8,10
    55:12 57:22 66:6
    70:19 118:16
    121:11 146:10
    155:7 157:16

213:22 222:9
    233:18 243:8
    267:16 269:8,23
    271:16 275:12
dated 33:20 39:21
    41:22 43:13 44:14
    45:13 47:22 50:12
    51:21 59:13 61:5
    63:2 64:11 66:4
    66:10 70:18 92:8
    98:2 106:4 118:10
    118:17 121:14
    122:6 128:6
    188:14 222:5
    238:16 239:22
    249:8 250:7
    251:10
dates 89:8,10
daughter 18:7,18
Davis 184:18
day 2:10 18:9 87:9
    87:9 109:15 157:7
    213:15 218:2,6,8
    228:12 231:9,14
    231:17,19,20
    242:9 247:9 248:1
deal 27:1 160:12,15
    201:5
dealing 108:21
dealt 120:16
dean 1:16 10:4,6
    38:5 39:17 40:12
    40:12,13,22,23
    41:20 42:4 43:16
    44:12,18 45:16
    50:10,15 51:19
    52:1 55:15 57:20
    58:2 59:16 61:10
    64:10,22 68:6,20
    73:13 74:2,8,18
    74:21 75:10 76:2
    76:7,10 78:12
    82:1,8 86:18,20
    86:22 87:4,16,17
    87:18,20 88:1,7
    88:10,11,13,17
    89:16 90:8,22
    91:1 110:14,15
    113:13 115:14
    117:1,8,22 118:11
    118:15,18 119:3
    120:2,18 121:1
    127:5 128:11
    129:10 132:17

133:13 134:22
    135:4 136:6,23
    137:1,2,21,23
    139:2,16,20
    142:23 143:4
    144:7 149:6,11,22
    151:8 152:6,13,19
    152:19 153:7
    156:21 158:14
    163:5 166:17,22
    174:17,21 175:1
    175:18,23 176:14
    177:15 179:4,5,7
    180:10,12 181:3
    181:16 186:17,20
    192:2 194:22
    195:16,22 196:4
    200:2,7,12 203:9
    203:18 204:8,17
    204:20 205:19
    206:4,22 207:9,16
    211:16 216:15,19
    217:17 218:7,16
    220:6 223:21
    232:13 247:14
    250:9,11 251:1,3
    251:18 254:5
    255:11 257:2,12
    262:18,19 263:9
    272:2 273:6,12,14
    273:20,23 274:4,9
    278:10 280:7,15
    280:20 281:13
    282:7,16 283:17
    283:19 284:11,12
    285:9,19 286:20
    293:16,17,19,21
    294:3,16,21,23
    295:7
deans 157:9 247:1
    294:19
DEBARDELAB...
    7:4 8:18,21 9:1,4
    9:11,16,22 10:7
    10:11,13 13:9,17
    14:11 29:2 42:11
    45:19,23 46:6
    66:18 73:22 94:8
    94:16 95:23 96:10
    125:21 127:11,17
    167:15,21 168:4
    168:17 171:20
    183:2 184:9
    185:16 188:6,10

188:12,17,20
189:6 190:1
196:12 207:13
213:13 231:13
233:20 234:1,12
234:19 237:10,16
237:21 254:17
262:22 266:1
277:4,9,14,17
291:8 292:20
decade 227:3
**December** 20:12
222:6,10
decide 236:18
decided 20:3
101:13 125:15
129:19 245:16
257:17 290:7
decision 96:9 97:16
97:20 103:6 105:4
123:7 131:3 137:7
168:8 204:10
215:13 232:9
241:17,19 244:20
244:20 245:1,5,8
245:10,12 255:10
269:15,18,20
270:4,5 271:1
283:12
decisionmaker
166:22 168:7
decisions 138:3,11
160:9,10 168:10
172:8,12 177:7
181:20 183:23
255:8,9 258:1,3
269:22 271:3,6
decrease 173:17
**DED** 73:15
deemed 177:11
defendant 14:21
**Defendants** 1:20
4:6,7,8,9,10,11,12
4:13,14,15,16,17
4:18,19,20,21,22
4:23 5:3,4,5,6,7,8
5:9,10,11,12,13
5:14,15,16,17,18
5:19,20,21,22,23
6:3,4,5,6,7,8,9,10
6:11,12,13 7:10
30:16,17 32:10
33:5,6 37:17,18
39:6,7 41:7,8 43:5

43:6 44:4,6 45:5,7
47:13 50:2,3 51:5
51:7 55:4,5 56:16
59:5,6 60:19,21
62:9,11 65:13,14
67:14,15 69:1
92:1,2 93:21,22
105:10,11 112:18
112:20 126:20
132:10 140:3
142:16,21 147:1
150:5,7 151:21,23
153:17,23 158:2
160:21,22 209:10
209:11 210:3,4,15
210:16 211:22,23
215:2,3,19 221:23
222:1 236:8 238:4
238:6,21,23 239:5
239:6 241:5,22
243:15,16 249:23
250:2,18,19
251:22,23 262:8,9
288:6,7
defense 15:10
defined 136:3
definition 28:10
197:3
degree 20:19,21
21:6,21 23:15
24:8 26:23 28:9
28:11,17,20,22
29:6,7,13 81:9
158:7,18,19,22
159:1,2,6,16
162:6 164:9,11,13
164:19 165:2
200:14 268:11,14
delegated 80:4
denied 203:1,10,12
204:2
department 16:9,15
17:21 34:8 135:17
135:18 136:12,22
137:9 138:5,7,12
153:13 157:10
164:16 166:7,12
167:2,20 168:6,10
168:15 179:20
183:22 186:23
195:13,14 199:13
199:14,15,16
207:11,18 208:4
213:10 226:21

240:5 247:10
252:6,10 253:2,20
254:15,19 255:13
255:15,22 257:8,9
258:3 283:8,23
284:13
**departments**
199:19 202:7
260:22
**DEPONENT**
295:12
deposition 1:22 2:5
2:13,14 3:1,4 9:8
10:19 11:12 15:14
143:18 190:2
296:7
depositions 2:17
describe 79:8 88:20
217:13,20
described 29:16,17
76:5,18,22 77:3
82:12 91:5 117:23
157:5 162:10
172:23 179:12
201:16 211:16
257:18 258:1,2
description 72:5
142:22 143:20
147:10,12,20
149:3,6 150:13,16
151:17 152:5
154:1,5,13,14,19
156:17,20,22
157:1,2,12,13
196:22,23 197:12
230:17 294:10
295:5
descriptions 185:2
197:8,13
deserve 268:18
deserved 141:16
269:13
designated 9:5,6,9
64:22 68:5 74:6,7
74:17 294:19
designation 64:15
desire 193:9
desired 19:23
desk 155:10 156:12
282:3
despite 103:11
182:4 220:4,11,12
223:9 271:8
detailed 250:13

determine 13:4
determines 260:3
devalued 169:13,14
develop 29:19
developed 289:7,9
289:15
development 16:15
133:22 155:17
156:17 206:6
developmental
260:5
devoted 84:11
108:18
dialogue 243:21
244:10
difference 58:8
66:21,22 100:1
122:14,15 267:19
differences 69:14
69:16 150:19,23
151:1,2
different 83:18
111:21 125:5
144:3 184:23
185:14 199:19
218:1,4,18 228:20
295:1
difficult 23:10,12
191:14
diminish 134:15,18
diminishing 108:23
diploma 19:5 36:3
159:3
direct 28:6 95:21
232:11
directed 86:10
direction 90:16
137:21,23 223:3
directly 19:16
157:7
director 9:23 10:8
69:8,9 75:10
144:18,22 188:13
directors 157:8,8
dirty 211:13
disagree 167:13
218:10,13,15
219:20,22 224:6
289:14 290:10
291:4
disagreed 195:7
204:6 276:10
disagreement 190:6
190:10 191:16

194:15,17,19
239:12 242:17
243:6 273:5
discreet 269:18
discretion 213:6
256:12
discriminated
171:17 173:2
174:5,14,19
175:20 176:17,20
176:23 177:3
178:8 180:21
181:6,19 182:1
205:18 207:1
216:8 220:8
227:16 228:14
231:11 259:12
278:2 282:16
283:17 284:10
292:17 293:14
294:12
discriminating
180:17
discrimination
182:8 204:16
205:4 206:9 231:6
232:12 247:17
260:19 269:7
270:5,14 271:8,21
285:22
discriminatory
246:19 247:2,13
247:17 253:7,12
253:15,21 258:4
271:4,7 276:20
277:3
discuss 192:3 206:2
247:19 279:15,22
discussed 193:21
280:7
discussion 191:22
213:16 251:14
disparity 182:22
displeased 130:2
139:19,21,22
dispute 266:18
disputed 273:15
dissatisfaction 57:6
dissolved 148:6,14
148:19,20,22
distributed 71:6,10
168:5,19,20
distribution 90:15
167:14 168:14

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

district 1:1,2 13:1,3
  13:4
division 1:3 75:20
  87:17 157:22
  253:10,11,16
divorce 12:4 17:17
  224:5
DOC 149:16,17
doctorate 164:19
document 30:8,10
  31:17 32:2 33:18
  37:23 39:13 41:18
  43:10 44:10 45:11
  46:20 47:8 50:8
  51:17 52:2 55:9
  57:19 59:10 61:2
  64:6,9 65:18
  67:19 92:6 95:15
  97:22,23 106:1
  122:1 126:4 127:3
  128:5,13 132:15
  132:20 133:5
  140:8,11 142:20
  143:7 144:11,12
  147:6 150:12,15
  151:15 152:4,8
  153:4,22 154:2,4
  154:8,9,22 155:2
  155:4,13,18
  156:19 157:5
  158:10,17 186:6
  186:13 187:9,12
  208:11,16 209:20
  210:10,20 212:7
  221:14,16 226:1
  237:1,18 238:13
  238:15,16 239:16
  239:22 249:8
  252:5 261:20
  265:21
documentation
  57:11,13,16 278:1
documented 144:3
documents 31:3,7
  73:15 187:5,6,7
  187:13,17 189:18
  234:18,20 261:12
  266:10,23
dogmatic 27:9
doing 27:13 29:11
  29:14 47:5 71:10
  73:12 80:20 84:19
  86:6 115:8 124:6
  124:8 126:6,8

133:21 152:14
169:6 202:5
220:18 231:9
233:7 246:14
dollars 66:14
  183:10 227:9,18
  268:7
door 179:14 202:8
Doug 61:14 203:9
Douglas 1:11 61:8
  64:20 67:12 68:1
  70:17 96:22 98:5
  105:18 107:6
  122:21 124:18
  129:4 141:11
  145:5 237:11
Dr 9:18 10:2,4,10
  35:5,6 40:12,17
  61:19 62:16 90:16
  96:23 98:17 100:2
  111:10 113:7,8,9
  113:9,21,23 114:2
  114:3,10 115:15
  115:15 117:9,9
  118:12,12,17
  119:3,7,8,15
  120:6,16 121:8,9
  124:19 138:6
  170:3 171:11,16
  172:3,10,23 173:4
  174:3,10,13 176:2
  176:11 177:15,20
  178:10 179:13,17
  180:14,20 181:10
  183:5,14 184:3
  187:10,22 188:13
  191:9,11 194:18
  194:19 195:7
  205:8 206:13
  214:5 216:12,21
  232:13 236:13,21
  239:4,11 241:9
  242:16 243:4,21
  244:3 245:22
  246:8,21 247:13
  247:14,18 248:11
  249:9,18 257:21
  260:18 264:2,6
  265:11 271:20
  272:7 273:15
  274:13 275:1,6
  276:10,13,20
  277:2
drastically 228:20

dual 139:6
due 27:23 28:3
  48:22 75:7 107:12
  130:13 158:12
  179:1 257:14
duly 8:12
duties 64:23 71:9
  75:7.12.15 99:1
  101:11,12,14,21
  108:23 114:12,13
  114:15,16 116:3,4
  117:12,20 123:11
  125:3,5,13 129:18
  134:15 144:6,9,10
  144:13,14 147:13
  150:2 151:3,7
  157:5,18 163:4,5
  163:6,8,12 164:6
  165:16 169:4,5
  178:23 185:14
  186:19 197:12
  198:9 199:7,8
  200:7 203:12,21
  216:2 220:15
  225:8 231:14,15
  231:19,22 232:2
  240:20 244:8
  245:3,17 250:14
  255:19 256:23
  257:12 272:20
  287:23 291:21
  292:1,4
duty 169:11

_____

**E**

E 31:11 46:15,16,16
  46:18,21 47:9
  48:17 53:23 95:9
  96:15 97:7 104:2
  104:4 125:23
  163:16,18 225:20
  226:2 230:23
  232:10,19 293:22
  296:1,1
earlier 110:4
  136:19 158:7
  200:20 215:23
  254:4 267:12
  278:4
early 109:10 110:10
earned 21:7
east 13:10
Ed 23:22 107:23
  108:20 159:19

education 16:9 20:7
  20:23 23:17 24:9
  25:1,3,11 26:13
  26:16,17,19 27:17
  28:6 29:12,18
  36:2 107:22 157:6
  164:8,17 226:21
  259:21 278:7
educational 147:23
  148:3 165:5
Edwards 264:5
EEOC 278:22
  279:1,17 280:3,5
effect 2:14 71:2
  72:15 73:10 75:2
  76:20 89:19 91:4
  114:21
effective 70:21
  76:21 102:2,3
  106:8 122:4 127:6
  140:13 144:19
  158:15 165:10
  213:15,20,22,23
  214:3 222:12
  225:19
efficiency 254:11
  254:16,19,22
  255:2,4 256:16
efficient 183:6,10
  254:6
efficiently 25:10
efforts 215:15
eight 55:22 56:1
  123:15
either 19:21 90:13
  90:18 103:18
  128:23 133:9
  146:16 169:22
  174:20
Elaine 85:21,23,23
  86:3,5,8 87:12,14
  87:16,18,20,22
  88:3,5 89:15
  90:11
elected 38:18 82:9
electronic 151:12
Eleven 20:16
Elmore 13:5 18:22
  19:1,7
else's 42:17 95:5
emergency-type
  37:13
employed 109:23
  126:11 162:5

196:16 287:12
  288:21
employee 47:4
  56:22 57:2 95:16
  125:20 214:13
  228:7
employees 53:11
  166:11 185:13
  215:11 257:16
  281:20
employer 54:6
employment 17:12
  49:14 52:22 63:5
  63:8,17 235:23
  267:7
ended 19:23 137:7
  164:10
Enduring 212:16
end-of-semester
  151:11
end-of-the-semest...
  84:7
engage 244:10
English 160:1
enhanced 29:21
enroll 260:2
enrolled 20:8
ensure 148:1
entail 80:11
entailed 72:5
entails 201:3
entire 265:19
entities 69:18,19
  75:12
entitled 192:7
Erica 265:2,3,4,12
errors 83:14
especially 197:8
Eufaula 7:23
evaluate 78:23 88:5
  88:11 201:20,23
  246:9,22 247:4
evaluated 53:13
  72:21 78:22 96:11
  169:6
evaluating 78:6
  79:11 248:12
evaluation 53:13
  79:17 214:18
  261:13 266:6
evaluations 54:4
  82:5 139:11 163:7
  169:10 223:18
  261:17 262:14,16

262:20 263:6,11
266:7 267:9
**eveningtime** 23:13
134:1
**event** 152:20
**events** 117:10
152:17
**everybody** 27:3
49:16 53:22 95:5
97:12,13
**everyday** 25:16
**evidence** 3:1 170:1
172:7 200:9 206:8
220:12,14 256:6
256:10 258:2
260:17 276:18
282:15 283:11,16
284:8 285:1,21
292:16,21 293:11
293:13 294:11
295:8
**evolution** 196:23
197:7
**evolve** 75:3
**evolved** 65:3
**exact** 196:7,10,14
196:17 197:17
201:9 221:5 225:1
259:4,18 284:3
295:3
**exactly** 77:6 78:17
124:5 146:9 175:5
184:22 202:16
225:3 258:22
288:20 289:18,20
**examination** 4:2 8:8
10:16
**examined** 8:12
**examines** 30:9
187:11 261:19
265:20
**examples** 81:13
**exceeds** 198:11
**exception** 261:11
**Exceptional** 23:23
**exchange** 249:2
**executive** 254:10
**exemplary** 249:21
**exhibit** 4:6,7,8,9,10
4:11,12,13,14,15
4:16,17,18,19,20
4:21,22,23 5:3,4,5
5:6,7,8,9,10,11,12
5:13,14,15,16,17

5:18,19,20,21,22
5:23 6:3,4,5,6,7,8
6:9,10,11,12,13
30:16,17 32:11
33:5,6 37:17,18
39:6,7 41:7,8 43:5
43:6 44:5,6 45:6,7
47:13 50:2,3 51:6
51:7 55:4,5 56:16
59:5,6 60:20,21
62:10,11 65:13,14
67:14,15 69:1
92:1,2 93:21,22
105:10,11 112:19
112:20 126:18,20
127:13,15 132:9
132:10 140:2,3
142:15,16,21
146:23 147:1
150:6,7 151:22,23
153:16,17,23
158:1,2 160:21,22
187:6 189:14,17
189:22 209:10,11
210:3,4,15,16
211:22,23 215:2,3
215:18,19 221:23
222:1 236:7,8
237:15 238:5,6,22
238:23 239:5,6
241:4,5,20,22
243:15,16 250:1,2
250:18,19 251:22
251:23 262:8,9
288:6,7
**exhibits** 4:5 189:19
**exist** 195:1
**existing** 144:9
257:16
**exiting** 144:13
**expansion** 134:6
**expected** 232:1,5
**experience** 25:18
29:13 36:4,6
48:11 94:14,19
95:18 96:14
106:15 112:3
218:6 224:19,21
226:11
**experienced** 218:7
**experiences** 29:21
**explained** 58:9 62:4
99:8 139:5
**expressed** 193:17

**extended** 14:2
**extensive** 25:22
**extra** 75:6,13,15
99:1 101:14,21
178:23 203:21
232:2 240:20
245:3,17 272:20
**E-1** 113:17 114:16
122:15,16 126:12
128:14 130:14
141:2 162:20
199:4,12 249:14
283:9 285:14,19
**E-10** 63:15
**E-2** 113:16 114:14
115:9 122:16
162:21 169:20
198:20 199:4,5,9
285:13
**E-3** 58:4 59:18
61:12 62:1 64:14
92:17 162:20
198:20 199:4
**E-5** 46:11 47:11,14
47:15 48:1,1,19
48:19,21 49:13
50:17 55:17
158:15
**E-6** 47:12 48:21
63:13,13
**E-7** 34:11 47:11
**E-8** 63:14,15
**E2** 106:14
**E6** 53:5

---

**F**

**F** 296:1
**facility** 157:8
**fact** 91:14 101:8
103:11 164:18
172:14 177:8
191:4 216:12
218:5 220:4,18
222:16 243:1
246:3 252:18
256:10 273:10
276:4 284:12
293:16
**factor** 123:6 216:3
278:7
**faculty** 157:9
**fail** 174:1
**fair** 152:17 194:14
224:10 228:19

232:22 233:16
262:20
**fairly** 27:2 168:19
168:20,22 227:16
**fall** 19:18 185:21
257:22
**familiar** 164:22
194:8 213:11
259:20
**family** 22:19 23:11
**far** 81:16 123:5
148:17 154:18
175:1 183:18
198:11 282:23
287:22 291:20
295:4
**farewell** 215:12,15
**fast** 27:19
**favorably** 198:17
199:23 200:10
**favoritism** 27:3
**February** 32:12
**federal** 10:19 37:4
**feel** 13:7 27:17 28:5
128:1 165:8
169:14 170:22
171:1 172:6
173:23 200:16
216:7 217:1
218:19,20 245:23
269:13 270:9
271:21
**feeling** 127:22
**feelings** 27:12
193:17 219:6
**felt** 141:16 170:20
174:22 192:15
214:13 216:2
218:19 219:4
233:11 240:18,22
241:11 249:12
255:6
**female** 169:15
170:6 171:8 177:1
177:13 180:18,22
181:7 182:2 220:9
258:8,10 261:8
264:4,7 265:10
274:18 284:2,5
**females** 131:5
169:23 221:1
264:3,12,20 286:4
287:9
**figure** 279:18,21

**figured** 111:8
**file** 155:3 156:13
187:2 188:19,22
191:8 265:17,19
265:23 266:3,15
266:16,18 267:4,7
288:6
**filed** 31:3 159:13
177:23 178:5
186:5,10 187:14
189:15,20 190:11
190:15 191:18
192:9 194:16
203:8 204:16
205:15 219:10
279:1 280:3
**files** 151:12
**filing** 3:4 159:12,12
187:8 217:7
219:12 280:5
**final** 154:8,16,18
279:16
**finally** 129:20
181:13 220:19
237:4 245:16
**finances** 201:5
**find** 201:10 272:13
**findings** 194:18,20
194:23 195:8
204:6,11,19 205:7
206:14,15,16
**fine** 9:16 10:13
187:18
**finish** 21:18 23:6
127:12
**finished** 19:17 21:1
21:4 288:13
**fired** 284:6 292:19
292:22 293:3
**first** 8:12 16:7,8
36:19 61:13,18
63:4,7,17 119:20
124:13 145:6
157:21 177:19
188:7,8 225:23
239:10 271:23
275:2 279:5
**fiscal** 117:5 199:14
199:16 200:2,7,12
230:12 231:23
**fit** 47:5
**five** 16:16 23:5
34:20,21 60:3
157:21 221:18

288:12
**Florida** 13:11
**flowed** 211:9
**focus** 159:17,22
    196:7
**follow** 85:12 136:17
    136:18 190:15
    193:11 245:21
    272:12 273:1,18
**followed** 191:2,17
    191:21 192:23
    193:1 194:11
    273:19
**following** 8:9 94:13
    203:13 272:14
**follows** 8:13
**follow-up** 232:16
    240:1 260:15
**Foods** 17:9
**force** 2:14
**foregoing** 8:3 296:7
    296:10
**Forget** 208:2
**forgive** 115:20
**form** 2:21 29:2
    66:18 80:21,22
    94:8,16 95:23
    125:21 167:15
    168:17 171:20
    174:13 177:16
    178:7 183:2 184:9
    185:16 189:2
    207:6,13 231:13
    254:17 262:22
    276:19 277:4
    278:1 284:9
    292:20
**formed** 173:1
**former** 29:12
    130:20 145:19
    151:14 169:3
    195:21
**forming** 175:19
**forms** 207:5 261:13
    284:9
**forth** 113:12 243:11
**forward** 60:6
**found** 205:8 234:20
**four** 123:14,15
    293:11
**four-year** 28:19
    165:2
**frame** 93:11 99:18
    106:6 124:15

243:20 248:11
260:19 264:17
275:7
**Freddie** 35:10
    158:11
**free** 13:7 156:6
**Freedom** 212:16
**freshman** 19:20
**front** 9:13 118:10
**full** 2:15 11:21
**function** 46:1 258:9
**functioning** 148:1,4
    148:23 257:14
**functions** 197:16
**further** 2:11,18 3:3
    119:11 192:4
    206:2 295:12
    296:13

---
**G**

G 147:21,22 148:12
    148:22
**games** 170:19
**gather** 288:12
**gender** 31:22 33:14
    41:16 42:16 43:1
    44:1 45:3 51:15
    54:23 56:11,14
    59:2 60:16 62:20
    64:1 65:10 67:9
    91:11,20 93:17
    97:19 101:3
    102:10,12,18,20
    102:21,23 103:9
    105:3 112:14
    121:22 122:23
    123:6 126:16
    131:3,19 138:19
    142:12 146:20
    171:13,18 172:8
    172:13 173:3
    174:6,15,20,20
    175:21 178:9
    204:18 205:5,19
    206:10 207:2
    216:3 231:6
    247:18 253:8,22
    258:5 259:13
    270:6,10,12,15
    276:14,21 278:3
    282:8,11,18
    283:13,18 284:11
    293:8,15
**Gene** 198:14 199:21

200:1,9,12,23
    292:15
**general** 23:17 27:1
    31:8 54:16 63:9
    73:14 159:19
    160:13 202:5,9,14
**generally** 22:15
    149:16 201:7,8,9
    201:9 240:23
    263:10 281:19
**generated** 84:3
**Georgia** 13:12
    14:10,12 212:13
**getting** 23:12 34:22
    57:7 139:14
    152:22 169:9
    179:21 212:12
    220:20
**GIDIERE** 2:7 7:12
    8:4
**gist** 182:12,16
    186:13,15 211:7
    215:10 227:12,14
    249:11
**give** 15:14 79:23
    81:3,13 89:21
    96:9 97:16,20
    129:20 215:11
    223:11 224:23
    225:1,15 227:9,17
    261:11 268:7
    276:6 279:18,21
    281:22 282:1
    288:11
**given** 25:6 72:6
    94:9 104:22
    144:21 170:14
    182:9,10 255:1
    263:10 266:21
    267:4 269:10,12
    269:17 270:8
    296:12
**Givens** 198:15,16
    199:13 200:18
    201:1 265:1
    292:15
**giving** 82:5 250:13
    262:19
**go** 18:20 19:14 20:5
    20:6,15 21:13
    29:9 34:17 35:1
    48:16 49:4,22
    52:5 53:6,17
    58:10 66:16 92:21

178:3,11 181:5
    193:2 202:4
    217:16 232:20
    233:14,22 234:3,5
    235:3 237:22
    257:12 260:4,5
    275:16
**goal** 24:9
**goals** 25:7,8 254:7
**goes** 48:7,7 52:3
    127:1 133:1 140:7
    192:3
**going** 9:15 10:21
    24:3 29:23 30:3,7
    31:16 32:1 33:4
    33:16 37:16 39:5
    41:6 42:11 50:1
    54:17 55:3 59:4
    65:12 83:19 91:23
    96:1 104:5 105:9
    117:18 132:8
    147:5 160:20
    173:14,16,21
    174:1 191:13
    210:2,14 211:6,21
    212:17,18,20
    213:10 215:1,17
    221:22 224:4
    236:6 238:10,20
    241:19 243:10,14
    245:2 249:7
    250:17 251:8,21
    261:11,22 262:7
    274:17 279:7
    281:9 290:8,23
    291:8
**good** 12:8 41:4 64:3
    126:6 127:11,22
    139:11 160:10
    163:6 169:5,6,10
    184:3 200:17
    214:13 216:18,20
    216:21,23 217:8,9
    217:11,12,19,21
    220:5,13 236:16
    262:6,19 263:10
**gotten** 36:3 139:11
    183:1 222:20,23
    268:14
**governed** 63:9
**government** 17:7
**governs** 278:6
**grade** 34:10,11
    46:16 92:15,17

106:14 122:15
    128:14 140:23
    141:2 249:14
**grades** 34:9 110:9
**gradually** 137:11
**graduate** 19:2
    20:17 22:21 23:1
**graduated** 19:6
**graduation** 124:7
    149:8 152:15
**grant** 37:11 213:3,5
    213:6
**granted** 37:10 49:5
    176:8 213:2 261:1
    261:7 272:19
**grants** 37:4,4 75:23
**Gregg** 35:5,6 40:12
    40:17 61:16
**grievance** 174:22
    178:1,5 181:4
    186:4,9,10,14
    187:2,8,9,14
    188:19,21,22
    189:2,15,16,20
    190:7,11,16,18
    191:8,8,18 192:5
    192:10 193:11,18
    193:23 194:9,11
    194:16 203:5,8
    204:1,5,15,23
    205:14
**Griswold** 15:8
    157:14 257:4,11
    257:14,20 258:8
    258:11,13,20
    259:3,10 284:6
**Griswold's** 259:14
    263:15 292:18
**grounds** 2:23
**group** 83:6 187:6
    240:12 246:5,9
**growing** 29:21,22
**guess** 19:21 35:17
    58:18 66:13 87:7
    101:15,16 109:9
    136:2 138:1
    153:10 163:15,17
    166:7 168:13
    170:22 193:3
    207:15 208:20
    240:5 241:11
    255:11 279:17
    280:2
**guidance** 110:18,21

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 10

111:1,4
guidelines 228:6
278:5,9

**H**
half 16:16 233:4
    244:20,23 245:9
    261:3
hampered 257:14
hand 168:10
handed 138:4
handle 38:8 40:21
    109:3,8 110:1,19
    110:22 111:2,5,5
    173:15
handled 39:2
    190:11 193:10
handling 194:11
happen 257:19
    290:1,2,13
happened 211:11
    253:13 263:17
    289:23 293:2
happening 290:8
happy 141:12,18,22
    145:12,14 165:23
    187:17,19
hard 96:4 151:12
    196:6 245:21
Harvests 13:15,20
    13:22 14:8
hated 211:2
head 87:17 110:10
    138:4,5 166:8,22
    167:4 168:7,10
    179:20
heads 183:22 240:5
hear 28:1 175:8
    195:12 234:8
heard 170:3 291:16
hearing 296:12
held 152:9 195:11
    195:19 196:9,17
    213:17 284:1,16
help 37:8 152:16
    175:18 257:23
helped 29:18 85:18
    124:8 178:7 207:5
    236:18
helping 37:1 124:10
    152:22
helps 276:19 284:9
hereto 30:20 33:9
    37:21 39:10 41:11

43:9 44:9 45:10
    50:6 51:10 55:8
    56:19 59:9 61:1
    62:14 65:17 67:18
    92:5 94:2 105:14
    112:23 126:23
    132:13 140:6
    142:19 147:4
    150:10 152:3
    153:20 158:5
    161:2 209:14
    210:7,19 212:3
    215:6,22 222:4
    236:11 238:9
    239:3,9 241:8
    242:2 243:19
    250:5,22 252:3
    262:12 288:10
HERNDON 2:8
    7:13 8:5
he'll 175:7
hide 179:14
high 17:12 18:20,22
    19:17 21:1 23:19
    24:10 30:1 217:15
higher 30:1 137:6
    228:23 229:1
    271:16
HINTON 2:7 7:12
    8:4
hire 146:10 213:11
    236:19
hired 35:7 46:17
    161:3 221:3
    259:13 283:20,22
hiring 289:11
history 54:10 63:1
    195:2 267:7
hold 24:19
holds 164:19
home 156:5
honors 19:4 22:1,3
    24:13
horrible 27:23
    247:15
Hospital 16:19
    17:15 36:4
hours 17:23 21:7
    109:6 245:20
Huffstutler 257:21
Huh-uh 234:12
humiliated 170:20
husband 212:15
husband's 12:14

**I**
IBM 26:2,6
idea 42:16 85:9
    119:14 186:1
    202:5,9 221:9
    229:2,11
identification 30:18
    33:7 37:19 39:8
    41:9 43:7 44:7
    45:8 50:4 51:8
    55:6 56:17 59:7
    60:22 62:12 65:15
    67:16 92:3 93:23
    105:12 112:21
    126:21 132:11
    140:4 142:17
    147:2 150:8 152:1
    153:18 158:3
    160:23 209:12
    210:5,17 212:1
    215:4,20 222:2
    236:9 238:7 239:1
    239:7 241:6,23
    243:17 250:3,20
    252:1 262:10
    288:8
identify 33:18
    249:7
ignored 194:23
ignoring 241:12
    273:10
ill 214:20
immediate 169:4
    190:18 192:10
    193:18 246:12
immediately 77:11
    77:12 100:14
    101:12 104:16,19
    116:11 212:13
    225:7 229:21
    230:15 231:2
    232:3,18,23
impact 205:17
impacted 91:15
implement 25:8
    85:11
implemented 82:19
    82:20 290:13
    291:19
important 211:14
improvements
    250:14
inactive 148:20
inadequate 246:1,3

inappropriate
    246:15
Incarcerated
    185:10
incident 170:8,9
include 187:20
    255:15,18
incoming 72:21
incorporated 116:4
incorrect 115:12
increase 38:12,15
    42:7 47:9,20
    50:19 52:9,10,16
    52:18 53:7 55:18
    58:5,14 59:19
    61:22 62:7 63:14
    64:16 66:8 70:12
    92:18 94:11 95:14
    98:14 105:20,22
    106:16 107:12,13
    108:20 109:4,8,12
    109:19,20 122:18
    123:23 128:15
    133:6,20 134:8
    140:20 141:4
    153:2 161:21
    170:11 172:15
    189:8 238:12
    272:19 281:20,23
    286:6,7
increased 66:15
    76:15,17 107:9,10
    107:15 108:2,3,7
    108:8,12,15 110:1
    110:1 111:5
    123:16,17,17,20
    124:3 136:9,10
    250:14
increases 53:12,20
    181:17
increment 49:15
    58:11
increments 34:18
    35:1 49:2,5 52:12
    53:4 63:10
incurred 99:1
    101:15,21 179:1
    203:22 240:21
    272:20
INDEX 4:1 5:1 6:1
indicated 174:22
indicating 175:5
    221:17
Individually 1:12

1:15
inform 190:19
    215:13
information 57:2,4
    73:14 248:2,6,9
Ingram 1:10,14,18
    9:20 15:7 16:3
    17:2,13 18:2
    25:21 30:5,22,23
    35:3 46:17 54:10
    63:5,8 66:11
    68:11 73:20 79:4
    79:6 81:12,19
    91:13,15 95:16,18
    108:11 109:16
    125:20 130:6
    139:12 153:13
    161:9,19 162:5,15
    162:17 163:17
    166:5 185:3,13
    189:16 191:17
    192:18 194:5
    195:11,19 196:9
    196:16 197:7,18
    198:4 200:3,21
    209:16 215:14
    216:7,10 218:22
    221:4 223:7
    230:21 235:13
    254:7 264:8,19
    267:8 268:10
    287:12 288:18
    289:2 292:11
initial 36:8 77:16
    191:8 192:2,5,9
    234:14 269:15
initially 35:7 88:17
    113:13 116:23
    117:22 118:7
    234:10
inmates 289:3
input 155:17
inquire 170:10
instance 167:10
instances 280:6
    286:11
instate 80:20
institution 26:3
    53:17 81:10 85:2
    89:10 120:23
    167:5 201:5
    224:19,22 225:4
    225:14 228:4,9
    230:3,5,7 235:23

263:20 270:21
291:23
**institutions** 89:5
**Instruction** 10:4,6
**instructors** 31:6
108:3,4 123:17
**instrument** 260:1
**intellectual** 25:4
**intent** 254:20,22
**interact** 26:18
218:2,5
**interacting** 218:7
**interaction** 85:3
**interest** 255:7 256:8
256:16
**interested** 35:17,20
35:23 38:20
192:15 193:19
296:15
**interrogatory**
12:22 14:1 179:12
198:14
**interstate** 13:11
**interview** 35:6,9
36:13 38:4 40:6
40:11 236:4
**interviewed** 35:13
36:1 40:5
**interviews** 40:15
**Introductory** 23:22
**involved** 14:17 15:5
15:21 138:5
152:21 157:20
**involving** 15:7
240:5
**in-writing** 189:21
**IPEDS** 152:15
**issued** 34:8 154:15

───── **J** ─────
**J** 1:7,11,23 2:5 8:7
8:11 12:5,5,7 61:8
64:20 67:12 68:1
70:17 96:22 98:5
105:18 107:6
122:21 124:18
129:4 141:11
145:5 237:11
**Jackson** 11:22 12:6
**Jacksons** 14:9
**James** 1:15 68:12
68:15,18 76:10
217:11,14,23
218:10 220:1

232:21 242:18
243:6 248:17,19
285:23 286:3
**Jameses** 14:15
**Jefferson** 184:17
**Jim** 7:4 9:18 13:7
189:23
**Jim's** 159:15 187:5
**job** 16:7,8,18,19
18:9 20:4,6 27:5
27:13 29:10,10,14
41:4 47:5 72:5,7
72:10 126:6,9
135:14 139:7,8,13
142:22 143:1,3,20
147:10,12,19
149:2,5 150:2,13
150:16 151:17,18
152:5,17 154:1,3
154:12,14,19
156:5,17,20,22
157:1,2,12,13
160:4 166:3,4
169:5,6 173:22
182:19 184:4
185:1 186:15
196:10,22,23
197:7,7,12,13,16
201:2,12,18 208:8
208:18,22 212:5,8
213:15,21 216:9
220:15,16,18,22
228:9 230:17
231:17 237:7
247:20 248:1
254:23 256:13,22
256:23 257:6,8
258:14,18,21
263:15,18 276:7,9
283:21 287:14,23
294:10 295:5
**jobs** 17:1,3,13
84:23 136:2
**jointly** 158:13
**judgment** 256:12
**Julie** 198:15,16,20
199:2,13 201:1
265:1,3 292:15
**July** 2:10 39:22
92:9 118:8,20
225:19
**June** 188:14 249:8
279:12
**justification** 241:14

244:4
**justified** 163:17
**justify** 101:16
182:18
**J.F** 1:10,13,18 9:20
15:7 16:3 30:4
35:3 68:11 185:3
185:13 195:18
196:16 209:16
221:4 223:7
230:20 264:8,18
267:7 287:12
288:18 289:2
292:11

───── **K** ─────
**Katelyn** 12:19
**keep** 33:17 134:4
**keeper** 211:3,17
218:23
**keeping** 107:22
211:5
**kept** 73:16 75:23
159:11 211:8,10
**kin** 296:14
**kind** 23:10 80:18
81:3,14 84:4 96:4
113:11 136:15
148:3,6 163:14
245:19
**knew** 36:2 178:14
201:8 246:13
248:1 291:2
**know** 9:11 10:22
11:1,11,13,16,18
14:3 26:23 32:20
32:23 36:10,14
40:9,10 42:13,22
46:13 48:16 51:2
52:5 55:21 56:4
58:16 59:22 60:8
62:2 68:10 71:17
82:22 85:10 87:7
88:4,9,16 90:15
97:8 99:23 101:16
106:22 112:4
115:7,19 118:5,17
119:8 120:15
127:20,21 128:20
129:17 130:22
133:8,15 136:1,20
138:1,13 145:21
146:9,11,13
148:17 153:9

154:10,12,14,16
155:1,11,13
156:11 161:14,21
162:1 164:7,11,13
164:15,18 166:14
166:20,21,21,23
170:7,19 173:15
175:10 180:12
181:9,16 184:20
185:20 189:4,11
190:9 197:10
200:23 201:6
202:3,11 204:8
205:21 206:16,17
207:16,20,21,22
207:23 208:1,3,6
212:7 214:12
221:2,5,6,8
226:13,23,23
228:16 232:15
233:20 243:8
245:19,20 247:7,8
248:3 254:21,23
255:3 259:4,6,8
259:17 260:11
261:4 263:5,6,23
264:6,10,12,19
265:9,15 266:2,13
267:1 273:11
274:2,11,12
276:16 279:16
280:11 284:19,23
285:4,6,8,11,15
286:3,5,17,20,23
287:1,7 288:18
289:7,9,18,19,20
289:21,23 290:1,2
290:4,7,21,23
291:3,3,9,14,17
292:19,23 293:1,2
293:3,5,7
**knowing** 83:17
**knowledge** 29:13
42:15 50:22 63:6
83:18,20 88:7
91:19 94:17 95:7
95:14 96:8 97:4
100:23 101:2,5,7
102:7,11,22 112:4
112:7,14 121:18
121:22 123:6
138:10,14 164:21
165:1,4 187:16

196:16 202:14
229:19 284:20
286:9,13 287:8
289:10 290:17
294:5
**known** 264:2
**knows** 42:17 201:2

───── **L** ─────
**L** 2:1 7:4
**lack** 217:5
**Lassiter** 157:14
**late** 19:22 221:17
**law** 2:7 7:5,14 8:4
29:1 213:14
**laws** 2:15
**lawsuit** 10:20 14:18
15:6 217:7,10
219:11,12
**lawsuits** 14:17 15:4
15:22
**lawyer** 187:18
279:17
**lawyer's** 159:10
**lead** 172:11 174:18
**leading** 2:21 118:3
118:22 119:1
278:23 279:19
281:18
**learn** 26:4 29:22
85:6,8
**learned** 26:9,17
29:8
**learner** 27:20
**learning** 83:8
**leave** 19:19 200:3
214:17 273:22
**led** 173:1 174:4,13
177:16 188:20
**ledger** 73:16
**left** 16:17 20:8,11
22:6 69:5 70:6
133:11 181:14
214:18 257:11,20
258:8 273:4,21
274:1,1,11 282:3
**legal** 20:14,20 36:3
159:2,9,12
**letter** 30:12 32:6,8
32:13 33:21 34:2
39:14,21 41:19,22
43:11,13 44:11,14
44:17 45:12 48:13
49:7,7 50:9,12,18

51:19,21 55:10,12
56:21,22 57:1,5,7
57:10,20,22 58:6
58:13 59:11,13
60:5,6,9 61:3,5,7
61:13,18,21 62:6
63:2 64:7,11
65:19 66:1,8,23
67:20,22 68:23
70:10,13,16 71:1
72:15 73:9 75:1,2
76:20 89:18 91:4
92:11,19 93:2,4,7
93:11 94:5 96:18
98:1,15,18 99:10
99:14,18,21 100:6
100:18 103:12,17
105:6 106:2,4,20
111:18 114:2
118:16 119:4,10
120:16 121:10
122:2,6,8,17
123:7,12 125:15
127:4 128:8
132:16 133:16
140:12 141:3
142:3 143:4,23
144:4,5,7,13,17
146:18 154:3,15
155:8 158:11
173:6,8,13 174:22
178:19 188:7,8,13
188:23 189:1,7
192:2,9 193:18
203:18 209:23
210:11,21 212:8
213:19 215:12
221:17,19 222:5
233:17,18,19
234:2,6,9,10,14
237:6 279:2
280:13 281:22
282:6
**letters** 74:20 123:1
174:21 195:20
282:1
**let's** 71:4 127:16
140:2 158:1 186:4
188:2 191:23
192:3 196:11
238:20
**level** 46:16 49:11,11
115:7 120:21
131:22 166:2

169:18 182:18
217:15 224:20,21
227:11 258:7,12
259:16,16 284:3
**Lewis** 12:5,7,19
38:7 158:14
**Lewises** 14:9
**liaison** 157:7
**liberty** 279:14,22
**licensee** 24:16
**licenses** 24:19
**licensure** 24:21
**life** 23:11 29:21
156:5
**liked** 218:11,17
219:13,15 220:2
**likes** 219:18
**line** 13:11
**lines** 79:3
**list** 12:23 13:2 89:6
149:12,14,19
150:2,19,20
157:21
**listed** 14:5 148:11
**listen** 172:19
**literature** 22:18
160:1
**litigation** 279:17
**little** 36:15 73:22
77:15 141:7 160:8
245:21 294:9
**live** 13:1,3 14:4
**lived** 211:7
**loan** 257:1,12,21
**long** 12:23 16:22
18:4,5,14 19:14
20:15 143:5 146:1
146:13 175:23
176:2 226:20,23
**longer** 109:6 257:14
263:20 293:1
**look** 27:18 30:8
31:17 32:1 48:6
53:8 114:20 128:3
147:6 187:4,18
226:1 251:9
261:12,15,21
262:2 265:16,18
**looked** 133:16
153:22 173:6
**looking** 67:3 70:10
93:4 256:16
**looks** 38:3 50:21
74:19 147:10

150:13 158:11
189:6 195:4 226:3
235:12
**Loretta** 15:7,12,13
**lose** 211:2
**loss** 208:8,9
**lot** 26:20 29:17,22
37:4,7,13 85:3,6,8
218:11,17 278:23
281:19
**lots** 168:9
**Lotus** 25:18,21 26:8
26:12
**lunch** 127:10,18
**lying** 180:6

_____

**M**

**M** 2:6 7:22 296:21
**mad** 136:7
**Madison** 7:6
**mail** 31:5
**mainframe** 26:3
**maintain** 18:9
23:11 217:15
**maintained** 109:2
**Maintains** 151:10
**major** 22:11,12,12
22:12
**majority** 152:21
195:3 262:14
**making** 225:11
227:17,21 229:5
267:13
**Malcolm** 279:6
**male** 91:12,15
130:22 166:4
261:8 284:2,4,16
**males** 169:23,23
221:1,1
**man** 211:7,11
**managed** 82:21,22
**management** 82:13
110:15
**manner** 148:2
**Marcella** 12:6
**March** 252:19
**Margaret's** 16:19
16:20,22 36:4
**Marie** 195:21
**mark** 30:15 33:4
37:16 39:5 41:6
43:4 44:4 50:1
55:3 59:4 60:19
62:9 65:12 67:13

91:23 93:20 105:9
112:18 126:18
132:8 150:5
151:21 160:20
209:9 210:2,14
211:21 215:1,17
221:22 236:6
243:14 251:21
**marked** 30:18 33:7
37:19 39:8 41:9
43:7 44:7 45:8
50:4 51:8 55:6
56:17 59:7 60:22
62:12 65:15 67:16
92:3 93:23 105:12
112:21 126:21
132:11 140:4
142:17 147:2
150:8 152:1
153:18 158:3
160:23 209:12
210:5,17 212:1
215:4,20 222:2
236:9 238:7 239:1
239:7 241:6,23
243:17 250:3,20
252:1 262:10
288:8
**market** 20:4
**marriage** 18:12
22:19
**married** 12:12 14:3
18:11,14,16
212:11,12,13
**master's** 26:23
164:10,13
**Matt** 10:18 45:19
**matter** 53:2 54:2,3
252:18
**matters** 254:11
**MATTHEW** 7:11
**maximum** 228:16
228:16 270:23
**ma'am** 8:17
**McKeithen** 12:10
**mean** 9:11 24:18
34:5 46:4,13,14
48:8,10 49:1,13
53:16 60:9 77:14
78:19 102:1
107:10,11 110:6
113:6 132:4
134:21 139:9,14
141:22 148:19

155:22 157:20
165:18 171:6
173:17 181:5
193:1 204:11
205:6,13,22 211:3
222:23 226:8
253:13,13,16
264:16,16 266:12
274:5 279:1 282:2
290:15 291:20,21
293:1
**meaning** 46:3
**means** 11:1 185:13
296:9
**meant** 175:5
**medication** 28:3
**medicine** 29:1
**meet** 156:7 198:10
247:3,18
**meeting** 240:2,3,4,6
240:9,12 242:11
242:15 246:5,23
247:1 263:7
273:22 274:2
279:5,7
**meetings** 246:9
**Meets** 263:1
**Melissa** 263:16,17
283:20
**memo** 80:14 115:3
139:4,5 210:23
215:7,7,10 218:22
222:8,9,14,17
223:9 240:1,1,22
241:9,10,17 242:3
242:5,6,21 244:8
246:4 249:2,9,11
249:16,18,20
250:6 251:1,9,12
252:17,21 253:1,7
254:15 275:9,19
275:22 276:6,11
281:2,5,6,7 283:2
283:4,6,7 285:18
**memorandum**
188:14 237:2
**memos** 80:12,13
134:13 162:12
172:14 189:5,11
234:22 235:9
243:10,12 244:16
245:22 246:2
272:12 276:16
277:21

men 176:18 177:3
185:10
mention 27:22
248:13,15 274:14
276:14
mentioned 80:17
143:17 248:17,19
278:4 282:7,11
294:2,6
merged 184:19
merit 49:9,18,20,21
49:21 52:18 53:2
94:7
merited 115:9
220:21 294:13,15
Merk 8:18 9:18
10:2,4,10 113:7,8
113:9,10,21,23
114:2,3 115:15
117:9 118:12,17
119:7,8,15 121:8
121:9 187:22
188:13 191:9
205:8 249:9,18
Merk's 187:10
191:11 194:18,20
195:8 206:14
met 155:19 236:2
246:21
Micromanaging
184:1
mid 30:4
middle 1:2 13:1,3,4
midst 201:15
Millbrook 12:10
17:6,9
Milt 35:11
mine 195:5 261:2
293:20 294:15
minimum 236:2
minutes 36:14
80:12 117:7 204:5
235:6 288:12
Mischaracterizat...
171:23
mischaracterizing
231:15
missing 187:17
261:14 262:23
263:6 266:4,5,8
266:23
mission 185:13
288:18 289:17
mistakes 183:15,17

183:20
modified 151:4,6,19
module 84:8
modules 82:19,20
83:18
moment 80:7
money 130:15
161:15 267:16
Monitor 147:23
monitoring 148:17
Montgomery 2:9
7:7,17 8:6 13:6,10
13:14 14:4 22:8,9
279:6
month 117:21
118:3 240:16
months 16:16 20:16
77:10 89:22
212:14 252:17,21
mouth 102:16
175:16
move 33:16
moving 57:3
Mulder 35:11 40:13
Murphree 35:10
37:9 38:6 40:12
Murry 35:5

_____
**N**
N 2:1
name 10:18 11:21
11:23 12:14,18
13:15,17,23 17:4
71:15 72:11
263:13
named 8:22 9:2
10:20 13:19 14:14
15:6,19,20 17:11
104:14 198:13,16
199:21 219:10
228:1 231:14
names 14:6,7
near 156:4 169:21
necessary 2:19
need 11:10 13:22
17:4 73:23 79:18
79:19 217:1
240:18,22
needed 31:6 80:2
81:6,8 82:22
216:9 248:2
273:18
needs 198:10
neither 48:14

266:13 296:13
never 15:21 129:12
153:10 175:14,17
180:12 193:13
251:4,6 289:23
292:8,11
new 32:14 38:19
58:13.13 72:20
73:2 78:2,4 81:19
82:14,16 83:8,10
98:21 103:3 110:7
110:19,22 111:2,5
117:5 129:6,15
135:1 136:10
151:16 212:18
213:11 231:23
233:10,11 279:8
nexus 130:16,19
131:17
nice 220:7
night 23:14
Noakes 2:6 7:22
296:21
nod 11:8
noon 127:10
Nope 65:4 107:1
NORTHERN 1:3
noted 40:19 223:17
notes 38:3,6 80:13
notice 3:4 211:12
noticed 12:22
notified 239:15
November 100:8
102:2,3,4 222:12
number 1:5 4:2
53:1 216:9 224:23
225:1,15 226:5
numbers 195:3
228:20,23
Nunnelly 25:19,20

_____
**O**
O 2:1
oath 10:23 11:2
object 29:2 42:11
66:18 94:8,16
95:23 96:10
125:21 167:15
168:17 171:20
183:2 184:9
185:16 207:13
231:13 238:1,1,2
254:17 262:22
277:4 291:8

292:20
objection 168:4
237:22
objections 2:19,22
observation 41:3
observe 8:20 9:5
201:17
observed 40:17
observing 201:11
201:12
obtain 81:8
obtained 21:5 25:3
25:4,5 26:15
occasions 221:18
occur 117:10
occurred 83:15
95:8 97:9 137:17
253:13 256:11
October 98:18 99:6
101:13 187:3
189:1,2 222:12
233:13 234:11
235:1 238:17,21
239:23 240:3,12
240:13,15 241:10
242:6 245:11,13
245:18 251:10
252:9,13 269:3,9
270:4,9 283:5
offer 191:4
offered 3:1 41:5
108:11
offering 192:3
office 30:13 31:1,3
31:8,15 32:7,17
33:22 36:19 40:18
73:14 79:20 80:23
170:10,21 178:12
242:9 275:15,21
officer 158:13
256:22 257:1
258:15,18,22
283:21
Offices 2:7 8:4
official 1:12,16 10:3
79:13 143:1
189:15,16,21
205:9,13 206:22
officials 157:11
off-the-record
213:16
Oh 42:2 178:2
236:1 265:2
okay 9:10,14,16

10:5,11,12,14
11:6,14,17,20
12:3,22 13:5,14
13:21 14:6,8,13
14:16 15:4,14,21
16:1 17:1,11,18
17:20 18:20 19:16
21:13 22:21 23:1
28:3,4,15,22 30:3
30:6,14 31:14,16
32:1,10,13 33:3
34:10 37:15,22
38:7 39:4 41:1
42:9 43:3,20 46:3
47:15 48:1,8
49:23 50:12,18
51:4,17 53:12
55:2 60:11,18
61:21 63:19 64:3
64:15,21 66:2,7
67:22 77:13 84:22
85:22 91:2,22
93:2,9,19 94:13
94:15 95:6 98:8
99:20 100:6,10,13
100:17,22 101:2,5
102:6,13 104:7
105:2,8 106:4,6
106:10,22 107:17
108:17 109:18
111:10 112:7,17
117:4 119:1,14,18
121:12,16 122:1
122:17,20 123:11
124:14,17 125:2
127:2,17,23 128:1
128:3,12,18,20
129:3,5,12 130:2
130:11,16 131:7
132:7 135:20
137:17 138:14,21
139:16,19 140:1,7
140:11,18 141:10
141:18 142:14
143:19 144:7
146:4,7,22 149:1
150:4 151:20
153:1,15 154:8,19
155:4 156:19
157:4,15,17,23
159:6,22 160:3,11
160:19 162:4
164:3,7 165:5
168:23 171:11

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 14

| | | | | |
|---|---|---|---|---|
| 173:12 174:8 | 275:21 277:1 | 51:11 54:18 55:9 | 164:20 200:13 | 103:15 105:20,22 |
| 175:13 177:14 | 279:13 280:1,11 | 56:7 57:19 59:10 | 211:8 224:17 | 106:12 111:19,22 |
| 178:3 179:11 | 280:19 281:1,11 | 61:2 62:15 64:6 | 226:6,7 | 111:23 112:5 |
| 182:20 184:2,13 | 281:13 283:11,15 | 65:18 67:4 68:4 | papers 159:13 | 114:1 115:11 |
| 185:20 186:4 | 285:7 286:13,20 | 80:7 84:22 92:6 | par 57:9 | 122:12 128:20,23 |
| 187:2,4,16,23 | 287:11,17 288:2,4 | 95:11 96:8 97:22 | paralegal 159:11 | 133:6 140:20 |
| 188:2,5,12,15 | 290:4,10 291:4,11 | 103:14 104:7 | paraprofessional | 141:22 145:2,15 |
| 189:22,23 190:12 | 291:17 293:5,10 | 106:1 116:16 | 162:11,23 163:3 | 145:16 170:11,23 |
| 191:1,3 192:1,21 | 294:1,8,11 295:10 | 122:1 126:12 | 163:11,22 164:4 | 172:12,13,15 |
| 193:7,9,13 194:14 | old 12:20 18:18 | 127:3,20 128:12 | paraprofessionals | 173:17,18 174:23 |
| 195:10 196:1,6,15 | once 9:6 27:20 | 132:14 140:8 | 162:14,18 163:13 | 176:18 178:4,12 |
| 196:22 197:21 | 80:21 145:11 | 142:20 144:15 | 163:18 | 178:15 181:17 |
| 199:1 201:15 | 190:11 191:18 | 146:17 147:5 | parent 18:8 | 185:22 189:12 |
| 202:6,20,23 203:6 | 220:16 284:1 | 150:11 152:4 | parole 156:4 | 216:4 222:7 |
| 203:17,20,23 | 288:1 291:5 | 153:21 156:19 | part 17:9,15 53:13 | 223:11 237:8,9 |
| 204:4,14,22 205:2 | ones 14:3 47:3 73:7 | 158:6 161:3,15 | 80:3 81:4 83:7 | 243:23 244:5 |
| 205:21,23 206:12 | 99:8 143:10,17 | 164:7 166:5 | 91:19 97:16 102:7 | 246:6 255:23 |
| 206:20 207:4,8,15 | 184:16 262:3,4 | 172:19 176:7 | 112:8 125:19 | 259:15 269:12 |
| 207:21 208:1,10 | 263:1 | 182:12 183:5 | 126:5 138:10,19 | 270:1 272:1,9,19 |
| 209:4,8 210:1,10 | one-step 47:9 | 185:20 187:4,13 | 142:10 181:14 | 276:8 285:19 |
| 210:13 214:2,8 | open 251:14 | 190:5,21 191:13 | 184:2 188:19,21 | paying 162:17 |
| 215:16 216:18 | operated 82:23 | 194:14 195:10 | 204:16 205:4 | Penal 185:11 |
| 219:12,17,23 | operation 82:13 | 198:13 200:16 | 206:20 236:21 | people 26:18 27:1,2 |
| 220:4 221:14,21 | 212:15 | 202:23 204:4 | 257:8 270:5 | 27:2,4,11,14 |
| 224:3,6,10 225:6 | opinion 26:22 | 207:8 208:10 | 285:23 287:7 | 29:17,19,20 40:8 |
| 226:4,10,13,20,23 | 183:21 193:19 | 209:15 210:8,20 | 290:5,19,22 292:3 | 81:21 82:4 83:21 |
| 227:3,15,20 | 231:3 246:11 | 212:4 213:19 | participate 133:23 | 89:9 160:12,15 |
| 228:19,23 229:2,7 | 270:20 | 215:23 216:18 | particular 34:16 | 162:19 169:22 |
| 230:20 231:4 | opportunity 277:2 | 219:21 221:2,11 | 35:20 49:11 53:9 | 183:18,23 193:10 |
| 232:4,15 233:9 | 277:5,6,10,10,13 | 222:5 223:13 | 53:17 97:1 116:6 | 195:3 197:16 |
| 234:3,13,21 235:2 | 277:15,19 | 224:10 228:10 | 121:14 167:9 | 201:3,17,23 202:4 |
| 235:5,10,15 236:1 | oral 8:8 | 230:9 235:9,11 | 228:9 285:15,17 | 208:17 218:17 |
| 236:5 237:1,14,20 | order 27:10 33:17 | 238:10 239:10 | particularly 29:10 | 236:2 246:21 |
| 238:10,11,15,19 | 53:7 80:23 81:7,8 | 243:20 244:9 | parties 2:4,22 | 247:3,7,19 256:3 |
| 239:21 240:9 | 156:6 199:5 | 250:6,23 251:8 | 296:14 | 261:6,7 284:13 |
| 242:15 243:13 | 234:18,23 275:19 | 252:4 254:4 | party 8:22 9:2 | 287:12,13 292:16 |
| 244:2 245:15,19 | organized 235:4 | 259:20 261:11 | 215:12 237:19 | 293:11 |
| 247:12 248:4 | orientation 72:23 | 262:13 263:13 | pass 241:1 | percent 32:23 58:20 |
| 249:11,20 250:12 | outside 261:22 | 265:16 266:11,14 | passed 240:19,23 | 84:16,18,19 90:6 |
| 250:16 251:4,8,16 | out-of-state 80:20 | 267:6,12 269:15 | Patterson 184:18 | 108:21 162:3 |
| 251:20 252:12,20 | overall 82:13 86:4 | 271:19 280:1 | 184:18 | percentage 33:1 |
| 253:1,5,14 254:4 | 183:21 186:22 | 282:15 287:11 | Paul 35:11 68:22 | 34:4,6 52:11 |
| 254:22 256:5,21 | oversee 78:21 | 288:16 292:14,23 | pay 20:7 42:7 43:17 | 84:10 90:4,11 |
| 257:5 258:13 | overseeing 137:1 | Owensby's 8:19,22 | 44:19,20 45:17,20 | 107:17 161:21,23 |
| 259:2,7,20 260:15 | overwhelming 20:2 | | 46:8 50:16 52:2,3 | percentages 34:15 |
| 261:9,11 262:6 | Owensby 1:7,23 2:5 | **P** | 52:9,9 53:12,20 | perform 80:18 |
| 263:5,9,13 264:2 | 8:7,11 10:18 | | 54:9,12,14 55:16 | 84:23 160:8 |
| 264:15 265:5,9,14 | 11:21,22,23 12:5 | **P** 2:1 | 56:5 57:16 58:3,5 | 173:22 201:12 |
| 265:22 266:20 | 12:12,15 14:16 | **PAGE** 4:2 | 58:14 59:17 61:11 | 237:7 276:7,9 |
| 267:6,12,19 268:2 | 16:1 18:20 24:16 | pages 140:9 | 61:22 62:2,7 63:6 | performance 53:14 |
| 268:17 269:2,6,15 | 28:8 30:7,21 | paid 101:12 103:19 | 63:9 64:13,15,16 | 53:18,19 54:2,3,9 |
| 271:6,11,15,19 | 31:16 33:10,18 | 103:21,23 114:14 | 66:2,8 70:9,12 | 54:13 57:8 94:10 |
| 272:7 273:5 | 37:22 41:12 43:10 | 114:16 120:22 | 92:13 95:14,18,22 | 95:6,13,15,17,21 |
| 274:13,20 275:5 | 44:10 45:11 50:7 | 125:23 130:14 | 96:9,13 103:2,7 | 96:8,16 107:9,10 |
| | | 162:19,20 163:16 | | |

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 15

| | | | | |
|---|---|---|---|---|
| 125:20 165:13,16 | pertaining 36:5 | plus 144:13 | 259:14 266:4,14 | 216:20,23 217:9 |
| **performances** | 69:23 81:5,6 | **point** 27:6 39:19 | 267:10 269:23 | 217:12,21 220:5 |
| 54:12 | 82:19 237:3 | 41:13 62:3 64:23 | 272:8 283:23 | 220:13 |
| **performed** 82:21 | **pertains** 70:20 | 68:10,12 100:14 | 285:8,10 292:16 | **prevent** 27:13 |
| 101:11 157:4,17 | 106:7 | 121:7 123:3 192:6 | 294:1,14 | **previous** 47:10 |
| 157:19 163:6,7 | **phone** 224:8 | 193:3 216:2 | **positioned** 48:21 | 50:19 55:19 58:6 |
| 165:8 169:5 | **phrase** 277:10 | 220:19 237:10 | **positions** 131:6 | 59:20 61:23 68:16 |
| 197:16 231:18 | **Ph.D** 26:23 | 276:17,18 283:15 | 156:9 183:19 | 70:13 71:14 74:14 |
| 250:15 287:13 | **place** 12:10 127:12 | 284:8 287:13 | 195:11,15,19 | 75:14 92:19 93:10 |
| **performing** 54:7 | 130:23 143:20,21 | 295:8 | 196:2 197:11 | 94:4 98:15 99:1,8 |
| 96:4 114:13 | 154:19 212:18 | **pointed** 292:14,18 | 293:18,19,20 | 103:20 104:12 |
| 129:18 139:6 | 229:4 273:16 | **pointing** 237:17 | 294:13 | 105:20 106:17 |
| 231:17 | 275:7,14 289:15 | 295:6 | **positive** 262:14 | 116:3,4 133:15 |
| **period** 43:12 57:21 | 289:19,22 290:11 | **policies** 192:18,22 | **possible** 20:4 82:4 | 140:20 141:8,9 |
| 59:11 61:3 63:3 | **placed** 104:19 | 194:5 | **posted** 79:6 | 142:5 182:11 |
| 64:7 65:19 67:20 | 116:11,17 158:15 | **policy** 95:3 193:4,6 | **Postsecondary** 34:8 | **previously** 77:7 |
| 69:13 70:20 73:9 | 230:18 271:12 | 194:9,10 | 151:13 164:17 | 93:3 96:3 117:23 |
| 73:21 74:12,16,22 | 284:3 | **poor** 96:17 126:9 | 226:21 | 125:6 229:22 |
| 76:21 89:18 91:3 | **placement** 119:12 | **population** 107:12 | **Powell** 35:10 40:13 | 239:14 |
| 100:6,8,9,17 | 119:21 132:1 | 108:2 123:16 | 158:12 | **primary** 30:1 36:21 |
| 106:2,9 109:20 | 135:14 136:17,17 | 185:8,9 198:5,9 | **power** 282:20,21 | **prior** 3:2 16:6 17:2 |
| 122:4 123:4,9,20 | 158:13 208:8 | 198:11 | **precise** 190:8 | 71:3 75:1 85:4 |
| 124:4 125:3 127:7 | 256:6,13,22 257:1 | **portrayed** 218:16 | **precisely** 104:8 | 109:12 163:11,20 |
| 128:8 132:19 | 257:6,8 258:14,18 | 219:14,19 | **prepare** 80:14,23 | 199:7 217:7,10 |
| 136:13 143:9 | 258:22 260:1 | **position** 30:13,21 | **prepared** 27:5 | 219:12 264:16,16 |
| 144:20 162:4,7 | 283:21 | 33:22 35:14,15,16 | 73:15 80:15 | 271:3,7 274:4 |
| 166:9,16 233:15 | **placing** 260:3 | 35:20,21 38:5,14 | 149:10 236:3 | 280:5 |
| 252:9 294:16 | **plain** 143:6 | 38:17,20 39:15,16 | **preparing** 80:13 | **probably** 9:7 22:14 |
| **Perkins** 14:8 | **plaintiff** 1:8 7:3 | 40:2,9 50:10 | **preregistration** | 23:17 48:21 56:1 |
| **permission** 31:6 | 10:20 14:21,23 | 67:11 99:2 106:13 | 78:3 110:8 | 56:2 58:19 60:2 |
| 37:9,10 187:5 | 15:9,11,12 | 111:19,21,23 | **present** 12:9 162:6 | 88:10 119:16 |
| **person** 49:10 60:1 | **plan** 11:4 152:16 | 114:1 115:11,22 | 291:19 | 188:21 195:2,4 |
| 82:7 85:10 86:18 | 156:5,5 289:2,7 | 115:23 122:2,11 | **presented** 173:5 | 229:18 |
| 96:6 164:19 201:2 | 289:11,15,18,22 | 127:5 128:10,12 | **presently** 145:9 | **problem** 27:7 86:5 |
| 211:5,14,14 | 289:23 290:5,8,11 | 130:20,21 131:14 | **preserving** 267:2 | 87:8 115:7 168:14 |
| 213:11 218:18,20 | 290:13,15,19,22 | 131:18 132:17,21 | **president** 1:13 35:3 | 168:18 191:20 |
| 220:21 246:11,13 | 291:5,9,9,14,18 | 139:6 140:12,18 | 64:18 90:19 | 199:12 272:19 |
| 248:10 258:16 | **planning** 109:9 | 140:19 141:22 | 113:10 121:4,5 | **procedure** 8:2 |
| 263:14 | 147:23 148:3 | 144:18 145:2 | 138:1 154:23 | 127:21 190:7,10 |
| **personal** 27:12 | 292:4 | 152:9 156:10 | 166:7,23 176:5 | 190:14,15 191:1 |
| 223:22 | **plans** 289:15 | 157:20 161:5 | 183:12 204:9,17 | 191:16,21 193:4,6 |
| **personally** 208:3 | **play** 101:6 102:10 | 172:12 173:14,20 | 205:12,18 206:21 | 193:11 |
| 272:13 | 112:8,14 138:10 | 174:23 177:6,10 | 207:16 212:23 | **procedures** 85:12 |
| **personnel** 9:23 10:8 | **played** 26:19 97:15 | 177:11 204:20 | 217:8,21 218:3 | 192:18,22 194:5 |
| 10:9 96:5 153:12 | 97:19 101:7,8 | 206:3 208:13 | 219:17,20 220:5 | 194:11 |
| 153:13 155:3 | 102:7,7,21 105:4 | 209:2,6,16 216:4 | 221:3,6 223:3,6,6 | **proceedings** 8:9 |
| 156:13 157:7 | 112:11 204:9,23 | 218:21 233:3 | 223:10 232:20 | **process** 25:9 29:23 |
| 188:14 197:14 | 206:5 207:10 | 240:10 243:22 | 237:12 244:9 | 72:3,19 73:16 |
| 208:9 230:11,12 | **playing** 170:19 | 244:11 246:22 | 248:6 254:5 | 78:1,3,4,21 79:8 |
| 230:18 235:14 | **please** 32:2 196:14 | 247:4 248:12 | 255:10 256:15 | 80:1 86:5,13,15 |
| 253:17 260:22 | 253:23 291:13 | 249:13,22 251:15 | 264:8,18 283:3 | 88:14 89:12 |
| 265:17,19,23 | **pleased** 130:2,4,5,8 | 256:13 257:6,7,11 | **president's** 31:2 | 108:22 109:10 |
| 266:3,15,18 267:4 | 131:9,11,14 | 257:13,15 258:6,8 | **pretty** 27:19 156:16 | 110:3,5,8 186:22 |
| 267:6 288:5 | 139:19 | 258:10,12,21 | 190:22 200:19 | 213:12 236:4 |

processed 73:15
processes 25:5 85:8
produce 151:12
productive 47:4
profession 28:23
professional 16:15
    24:19 28:8,10,17
    29:6 164:2,5
    218:8 230:11,12
    230:18 268:22
professionalism
    217:16
program 17:7 69:8
    69:15 81:7 107:22
    108:5 133:22
    134:1,2 156:1,2
    157:8 159:17
programs 107:13
    108:11 123:14,14
project 69:17
promote 223:10
    264:3,23 274:17
    278:11,13,17
    282:20,22 287:2
promoted 199:2
    221:7 237:4 264:4
    264:6,13,19 265:6
    265:7,10 287:14
promotion 161:9
    171:14 179:18,22
    181:12 222:11,12
    222:15,19,20
    223:1 242:19
    260:23 272:3
    274:4 278:21
    280:8,21 281:9,15
    282:9,13 286:5,7
    286:14,22 287:4,7
    287:9
promotions 161:12
    176:18 181:9,17
    182:4 222:7,14,18
    222:22 261:7
    276:22 280:17
    282:17 286:4,10
    286:18 287:2
Promotionwise
    282:19,21
prompted 71:20
proper 148:2 273:1
    273:18,20
properly 168:19
protocol 273:1,18
    273:20

provide 68:13 73:5
    110:18,21 111:1,4
    134:11 156:3,5
    195:5 244:15
    248:2,5
provided 8:1 70:15
    75:11 77:21 81:14
    88:17 195:1
    244:13
providing 76:5,22
    80:8 81:21,22
    195:13
proving 220:18
psychology 19:12
    22:17,20 160:2,18
pulled 35:18 36:11
purpose 259:9,9
purposes 175:13
pursued 21:1
pursuing 23:16
    24:8
push 190:21
put 46:1 83:17
    86:12 95:18
    102:15 104:9
    126:2 155:13
    173:14 175:9,15
    176:22 188:2
    190:4 199:3
    215:11 237:16,22
    242:7,9,12 257:15
    269:16

_____
           **Q**
_____
qualification
    167:22
qualifications 236:3
qualified 89:6
quarter 19:9,15
quarters 19:9
question 11:15
    13:21 28:14,19
    64:21 95:13 96:7
    100:18 167:22
    168:2,3,13 172:2
    184:8 190:8,23
    191:15 196:7
    203:7 205:16
    207:15 214:12
    222:13 233:22
    247:2,15 252:20
    254:1,2 260:16
    261:6 277:7
    278:16 291:12

questions 2:20,21
    10:22 28:13 62:23
    72:22 78:7 81:17
    172:20 232:17
    277:5,16,18,20
    288:17 296:8
quick 27:20,22
    127:15 261:15
quickly 56:20
    177:18
quite 136:3 235:19

_____
           **R**
_____
R 296:1
race 31:19 33:11
    41:14 42:10,15,21
    43:21 44:23 47:1
    47:2 51:12 54:20
    56:8,12 58:22
    60:13 62:17 63:21
    63:22 65:7 67:6
    91:8 93:14 97:5
    97:15 100:23
    101:6,7,8 102:6
    102:14,23 103:8
    105:3 112:8,11
    121:19 122:23
    123:5 126:13
    130:12,17 131:19
    138:16 142:10
    146:18 171:13,17
    172:8,13 173:3
    174:5,15,19,20
    175:21 176:8,10
    176:21 178:9
    204:18 205:5,19
    206:9 207:1 216:3
    232:12 247:18
    248:13,17 253:8
    258:5 259:12
    260:20 261:5
    270:6,10,12,14
    274:14 276:14,21
    278:3 282:7,11,18
    283:12,18 284:11
    286:1 293:7,14
radiology 16:21
raise 32:20 34:3,4,5
    48:12,18 49:8,9
    49:10,10,18,20,21
    49:21 50:23 53:2
    56:5 60:4,6 63:7,9
    63:11,16 94:3,4,7
    94:9,15,18,21

95:7,22 96:9
99:20,23 103:12
106:19,23 107:3
112:5 123:8
125:16,17,19
126:9 170:23
175:7 180:16
182:9.14.17.23.23
203:1,10,11 204:1
raises 54:10,12,14
    123:2 182:4 222:7
    222:14,18 223:11
ramifications 97:6
range 229:20
ranging 169:19
rate 43:17 44:19,20
    45:17,20 46:7
    50:16 52:2 55:16
    55:18 57:16 58:3
    58:5 59:17 61:11
    62:3 64:13,15
    66:2 70:9 92:13
    95:18 96:13
    145:15,16 259:15
reach 25:7 290:12
reached 56:1,3
    58:11 62:5
reacted 180:15
reacting 28:2
reaction 249:17
    250:23 251:2
read 27:18 85:11,11
    168:1,3 184:7,8
    251:9 254:1,2
Readdressing 242:6
reading 2:12
reads 186:15
real 127:14
realized 211:13
really 20:3 25:6
    27:22 110:17,20
    110:23 114:7
    120:22 148:18
    170:7 196:7 211:6
    211:12,13 244:12
reappoint 47:6
reason 130:22,23
    131:20 135:23
    147:15 177:10
    208:8 214:16
    240:4 253:5
    272:21
reasoning 42:18
reasons 208:4

249:15
recall 70:4 272:5
    295:5
receive 19:4 22:1,3
    25:12 39:11 60:5
    62:15 63:6,11
    65:5 67:4 93:13
    93:16 100:22
    101:2 112:5
    121:17,21 123:8
    125:19 182:5,13
    203:13
received 25:13
    41:14 61:14 63:20
    65:6,9 67:6 79:1
    91:7,10 96:12,17
    97:3 117:14 126:9
    126:12,15 154:11
    158:20 161:9,13
    162:6 180:1
    181:10 182:11
    246:4 268:11
receiving 123:1
    174:23
recess 9:17 64:4
    127:18 202:21
    235:7 261:23
    288:14
recitation 143:13
recognize 32:3
    37:23 38:1 39:13
    41:18 43:10 44:10
    45:11 55:9 57:19
    59:10 61:2 64:6
    65:18 67:19 92:6
    127:3 140:8 147:6
    186:6 208:11
    209:20 210:20
    221:14 225:23
    238:13
recommend 158:14
    272:23 273:3,17
    278:15,20,21
    280:21 281:9
    282:22 284:18,20
    286:21 287:2,3,6
    287:9
recommendation
    179:8 180:1
    199:12 251:17
    273:16 274:10
    282:23 283:2,20
    285:16,18
recommendations

179:6
recommended
179:10,18 180:7
180:10 181:17
199:10 242:18
243:7 244:21
245:4 260:23
272:2 273:7,9,10
273:13,21,23
274:4 280:8,10,16
281:14 283:9
284:2,17 285:3,9
285:11 286:4,10
286:14,18
recommending
248:10 282:20
recommends
179:20
record 189:13
235:4,10 265:18
records 107:23
134:4 151:10
redistribute 166:6
167:1,7
redistribution
166:15
Reeder 35:11 40:12
40:22 68:22 69:5
69:12 70:7 76:13
82:2 223:20 224:1
reference 113:4,11
118:19 121:10
172:15 246:6
250:9 256:18
283:1
referenced 269:17
275:5
referred 113:7,20
117:6,8
referring 74:14
refine 203:6
reflect 34:2 42:7
46:10 47:8,19
50:18 52:2 55:18
57:1 58:5,14
59:19 61:22 62:6
64:16 70:12 74:20
92:18 98:14 99:3
99:5,7 103:3,7
105:19,19 106:16
111:13 122:8,11
122:18 128:13
129:5,22 132:20
132:23 133:5

140:20 141:3
143:7 147:12
150:16 152:8
154:3 253:1
255:22 256:2
267:7
reflected 63:20
95:15 205:3 220:2
254:15 260:19
271:2,21 281:8
reflects 46:20 66:8
99:10 104:1
105:21,22 111:18
125:16 126:4
127:15 131:3
151:16 197:22
204:16 208:17
219:3 252:5
285:22
refused 286:21,23
287:1,3,6,9
regard 73:18 75:21
79:23 80:8,18
82:5,16 88:14
97:14 121:13
125:13 176:17
192:22 243:22
267:8 269:23
281:13 282:17
regarding 280:20
regardless 53:18,19
Regions 2:9 7:16
8:6
register 134:3
registered 19:21
registrar 71:5,14
75:7,14 101:9
103:18,20 104:13
105:1 116:3,5
129:19 130:21
137:12 140:13,17
142:4,5 143:6
145:19 146:14
151:14 158:12
163:5 169:3 179:2
182:11 186:16,19
186:20 195:23
196:4 199:7
207:12 208:7,18
209:1 227:1,3
250:11 252:15,17
287:17 288:19
289:1,8,12,16
290:5,12,18,18,22

291:7,18 292:5,5
292:8 293:22
registrars 184:20
185:21
registrar's 99:2
208:13
Registrar/Assistant
127:5 128:10
129:10 132:17
133:13 142:22
152:6 294:16
registration 72:3,17
77:19,23 78:4,8
84:5,16 86:15
98:9 104:11,15
106:11 108:22
113:15 114:11
116:15 122:3
144:18,22 148:10
150:14,17 173:10
186:23 199:6
237:5 269:1,10
285:13
registrations 72:19
regular 19:5 29:23
52:12 198:11
reimbursed 81:1
reiterating 240:13
rejected 214:6
relate 160:3 285:21
relating 2:16
relation 78:8
242:21 266:11
relationship 216:19
216:21 217:8,11
217:13,19,20
218:3 220:6,13
relatives 12:23 13:2
13:14,23 14:2
relevant 187:7
248:6
relied 236:21
Religion 22:18
relocate 212:12
reluctant 237:21
remain 232:10
remained 59:22
62:2 103:20
232:19
remedying 54:6
remember 22:15
23:19 35:12 40:14
70:3 78:14,16
94:20 100:4

113:19 114:17
115:5 116:23
120:14,18 121:9
121:10,12 124:2
124:10 139:23
155:7 175:22
221:20 249:20
272:6
renamed 148:7
repeat 196:14
253:23 291:13
rephrase 42:19
73:4
replace 257:17
replaced 258:6,10
259:3
replacement 292:18
293:5
replacement's
293:7
replacing 284:6
report 68:8,11,19
86:16 134:23
135:3 186:9 189:2
reported 68:12
86:18
reporter 2:7 3:5
7:22 8:15 11:7
85:19 296:22
Reporter's 6:14
reporting 110:13
reports 84:3,4,6,7,7
151:10,11
representative 9:20
represents 296:10
request 38:13
149:17 180:16
212:4 214:6
238:12,21 240:7
240:10 251:13
281:20
requested 203:10
214:2 241:16
requesting 38:11
189:7 281:23
required 84:8
192:13,17 260:6
requirement 165:1
requirements 149:8
164:15,18,22
requires 193:4
236:15
requisitions 73:14
76:1 80:16 134:19

rescind 212:4,8
rescinded 213:23
214:2
resignation 71:19
75:7 101:9 137:12
137:19,20 179:1
208:7 209:23
210:12,22 212:5,9
213:14,20 230:22
252:14,16,22
256:7 268:19,20
resigned 41:2 71:5
71:11,17 75:16
77:9,11,11 81:15
142:6 145:20,22
147:18 166:10
169:3 181:21,23
209:15 212:11
218:21 226:7,19
227:11 255:2
resolution 15:1
resort 173:17
respective 2:4
respond 114:3
responded 113:8
175:11 191:5
249:18 281:2
response 14:1 114:6
114:22 115:2
121:1 139:20
179:12 187:8,10
189:16,21 190:13
190:19 191:4,11
194:15,17 198:14
204:5,7,15,23
205:3,6,9,13,16
206:6,19,21,23
221:19 234:7
238:16 239:5,19
240:6,9 244:15,18
246:1 260:18
279:2
responses 12:23
244:14
responsibilities
36:15,18,21,23
65:3 68:4 69:4,11
69:22 70:5,23
71:6,7,8,9,21 72:1
72:4,8,10,13 73:2
73:5,10,19 74:10
75:3,13,17,19,22
76:4,14,17 77:2,7
77:16 78:11,17,20

82:10 83:7,12
84:1,11,12 85:7
85:14,17 86:17,21
87:1,3,10,13,15
88:21 89:15 90:1
90:5,8,12,16 91:2
93:10 98:20,22,23
99:4,6,11,13,15
99:16 100:11,14
103:3,8 104:12
107:7,18 108:8,12
108:15,18,19
109:5,13,21 110:2
110:19 111:2
116:13,18,20
117:20 123:11,18
123:22 124:3
125:12 129:23
133:20 134:6
135:6,9 136:9
139:14 143:8,11
143:13,16 144:2
147:19 148:11
149:6,19,21
150:20,21 151:5
151:16 152:9
153:2 154:5 160:4
163:21 165:9
166:6,11,15 167:1
167:7,14,16,17,18
167:19 168:6,15
169:9 170:12
185:14 196:10,18
197:8,17,22
199:15 200:17
201:16,18 209:5
220:16 224:12
227:8,22,23
228:13 229:22
230:16 231:1,18
247:20 248:1,8
253:19 255:1,16
257:13 259:5,18
287:14,22 291:21
292:1 295:1,3,4
**responsibility** 38:8
39:2 40:21 86:14
115:8 120:21
126:1 131:22
149:2 166:2,3
169:18 182:18
183:6,9 187:1
246:9 258:20
**responsible** 31:4

72:16 78:1,2,5,6
83:14 107:19
150:1 182:21
**restroom** 9:15
**restructured** 208:5
**restructuring** 156:9
207:10,17 255:11
**result** 25:1,3,11
26:15,17 28:6
33:11,13 41:14
43:1,21 44:1,23
45:3 46:23 47:2
51:12,15 54:19,20
54:22 56:8,10,12
58:22 59:2 60:12
60:13,16 64:1
65:6,10 67:5,6,9
81:19 91:8,11
93:14 94:11 97:4
99:14,20 100:23
101:3 109:4
121:13,18,22
130:12 138:15
143:2 182:7 231:5
232:11 242:8
249:3,16 253:6
296:15
**results** 190:13
195:8 249:1
**resume** 235:5
**retired** 78:18 86:21
89:22 99:17
100:15 226:14,16
227:4
**retirement** 85:4
87:5 88:18,22
103:4 104:16,20
105:5 116:12
137:18 207:11
230:22
**returned** 80:22
**returning** 78:3,5
**revealed** 170:5
180:16
**revert** 237:7 276:7
**review** 208:12
235:21
**revised** 156:11
**revision** 97:7
**rewarded** 165:12
165:15,20
**right** 8:23 9:3 10:2
13:15 17:17 20:11
28:18 42:2 44:3

46:9,21 70:10
74:15 93:5 100:16
111:14 116:20
118:14 119:23
128:1 132:3
133:17 137:11
141:8 142:1
143:14 144:15
154:3,13,14,20
156:22 161:6,7
162:8 165:21
166:1 167:11
177:21 179:18,19
182:14,14,15,16
188:3 191:15
193:21 194:7
200:21 202:8
205:11 209:20
214:14,21 222:8
222:14,18 223:1,4
223:7,11 225:6,9
225:18 230:9,13
233:2,7,14 236:13
240:11 241:3
242:20 245:14
260:5 261:1 262:2
263:3 267:2
268:15 269:14,19
269:20 270:1
273:7 278:22
279:2 287:18
**Robinson** 71:16
72:11,11 75:16
77:4 78:18 81:15
82:11 84:13,19,23
85:4 86:1 89:22
99:17 100:15
137:18,20 145:21
146:1,7,13 147:11
147:18 150:22
163:12 164:8
165:9 166:10
181:21,23 195:22
207:12 208:14,21
226:9,13,16,20
229:23 231:10,18
233:7 252:22
255:2 256:8 260:9
268:19,20 287:16
287:17,22 288:1,2
288:19 289:8,11
290:4,12,18
292:15
**Robinson's** 72:13

77:8,17 85:16
86:17,21,23 87:4
88:18,22 89:14
90:7,12 99:11
103:4 104:16
105:5 116:12
146:10 147:13
151:18 165:6
209:5 216:1
224:11 225:8
230:17 292:3
**role** 97:20 101:5,7
102:7,10,22 105:4
112:12,15 134:2
138:6,8 139:6
185:12 201:6,7
204:8,22 206:5
207:9 290:17,21
291:6,17,22
294:23
**rolls** 84:6
**Rosie** 264:5
**roster** 72:20
**rosters** 84:5,5
**rule** 230:21
**rules** 2:16 8:2
**run** 183:6
**runaround** 170:14
**running** 184:4
**runs** 205:12

_____
**S**
**S** 2:1
**SAITH** 295:12
**sake** 247:12
**salaries** 34:18 195:6
**salary** 31:9,12
32:18 33:23 34:7
34:13,14,14 38:12
38:14 39:18 42:5
45:22,23 46:1,3,7
46:10,12,18 47:9
48:6,15,17,20
49:1,16 52:7,8,12
52:13,16,18 53:3
53:8,15,20,22
55:23 58:11 59:23
63:10 66:15,20,22
66:23 67:2 92:21
94:23 95:3,9
96:15 97:7,8,11
98:10,12 103:19
103:22 104:2,4,9
104:19 106:13

111:20,21 113:16
115:22,23 118:13
119:12,22 122:18
125:23 128:13,18
130:17,21 131:5
131:12,15,18,19
131:21 132:1,21
141:4.17.19 142:5
144:23 145:7,9,11
163:16,18 164:16
165:3 166:3
169:18 177:11
189:8 195:2
200:13 216:4
220:17,22 224:15
224:16,18,20,20
225:2,3,13,16,17
225:18,20 226:4
228:11,18,21
229:3,8 230:23,23
231:2,5,11,20
232:10,19 238:12
239:12,16 240:14
242:17 256:7
257:6 258:7,11
264:13,20 265:8
265:10 267:9,20
268:18 269:16
270:15,19 278:6,8
279:10 281:3,21
281:23 284:1,3,17
284:20 286:6,8
287:15 292:16
293:20,22 294:14
294:15,20
**satisfaction** 165:19
**satisfactory** 96:12
**satisfied** 47:7 57:12
114:6,22 115:1
169:7
**satisfy** 279:10
**save** 128:4
**saw** 35:18 47:5
211:12
**saying** 11:8 28:16
38:17 46:3 74:13
80:14 84:20 95:12
102:21 103:2
107:14 137:15
141:21 175:17
180:1 191:6
195:12,15 197:10
201:13 237:14
246:4 256:15

263:4 266:14
271:15 281:3
285:2
says 65:23 66:1
179:19 224:7
230:12
scale 62:3 106:12
111:19,22,23
114:1 115:11,22
116:1 122:12
131:15,18 132:21
140:20 141:22,23
145:2 164:20
172:13 216:4
255:23 284:3
285:20
schedule 31:9 34:10
34:13 46:1,12,18
46:21 47:9 48:7
48:17,20 49:1,16
52:7,8,12,13 53:3
53:8,15,21,23
55:23 58:12 59:23
63:10 72:18 94:23
95:3,9 96:15 97:7
97:8,11 98:10
103:19,22 104:2,4
104:9,19 106:13
113:16 116:8,11
116:17 118:14
119:12,22 126:1
128:13,23 131:5
131:21 132:1
140:19 141:17
145:7,9,11 163:16
163:18 164:16
165:3 169:19
177:11 200:13
220:17,22 224:18
224:20 225:2,13
225:17,18,20,20
225:21,22 226:2,4
228:11,18,21
229:3,8 230:10,18
230:23 231:1,2,5
231:11,21 232:10
232:19 256:7
257:7 258:7,11
259:16 264:13,20
265:8,10 268:18
269:16 270:16,20
271:9,12,16 278:8
279:10 284:1,17
284:21 287:15

293:20,23 294:14
294:15,20
scheduled 89:3
schedules 34:7
278:6
school 17:12 18:21
19:17 21:1 22:7
23:11,14,19 24:10
30:1,1 64:18 89:7
138:9 183:15
184:13 185:4
197:23 254:7
260:2 289:3
291:15
schools 184:21
185:4,15 198:4
scope 107:17 108:7
123:22 125:12
133:20 153:2
197:17 255:18
scrapped 291:6
Scratch 221:9
se 230:21
second 32:2 121:2
233:5 261:22
274:23 275:5
seconds 261:12
secretarial 68:13
73:18 75:12 84:11
84:16,20 100:11
108:19,23 125:3,5
125:9,13 134:11
134:15 135:5
181:14 199:8
secretaries 91:12
91:15 120:23
163:14,19
secretary 31:2 38:5
39:17 40:19,23
41:1,20 42:4
43:16 44:12,18
45:16 50:10,15
51:19 52:1 55:15
57:20 58:2 59:16
61:10 64:10,22
65:22,23 68:3,5,6
68:17,20 73:6,11
73:20 74:1,2,3,5,6
74:8,8,9,11,14,17
74:18,21,21,23
75:3,8,18 76:7,15
92:12 93:1 114:13
114:13 159:10
173:16 195:16,21

196:4 198:19,20
199:2,10 237:8,9
276:8,8
secretary's 173:18
237:8
secretary-like
114:16
section 148:22
see 9:12 35:17,19
36:12 43:18 48:7
53:9 56:2 60:8
66:16 71:4 79:2,4
79:11 82:1,2,9
127:14 155:6
188:16 202:4
213:22 222:9
225:2,12 228:18
229:8 234:16
266:6,8 275:16,18
278:6,9 279:20
seen 155:4 185:1
283:1
semester 19:8 21:7
72:20 110:12,12
send 89:6
sense 160:5 218:1
sent 120:15 189:11
215:8
separate 69:17,19
75:15 155:8
189:18
September 32:9
33:20 41:23 43:14
44:15 45:14 50:13
51:22 55:13 57:23
59:14 61:6 64:12
70:21 102:5 106:8
117:14 122:4
127:7 128:9
132:18 140:13
144:19 158:16
188:23 189:1
212:14 232:1,1,6
232:11 233:6,9
234:15 240:2,11
242:4
sequence 117:10,23
serve 148:8,15
235:13,15 236:12
292:5
served 75:8 235:18
258:23 259:8
289:3 292:8
services 1:17 68:13

69:10,15,20,21
70:1 75:9,11,19
76:1,3,6,8,11,22
77:21 80:8,18
81:14,22 82:18,20
84:8 88:16 91:1
127:6 128:11
129:11 132:18
133:14 134:12
135:19 136:12
137:8,9 138:12
142:23 143:5
151:8 152:7,14
156:3 157:6,22
166:12 167:2,20
168:16 195:13,14
195:14 199:17
207:11,18 208:4
213:10 249:22
252:6,9 253:10,11
253:20 254:15
255:12,15,22
257:8,9,16 283:7
284:14,15
serving 75:10
123:15
set 14:9 53:4 164:20
261:12
setting 198:12
settled 15:3
seven 18:15 167:10
207:18 286:15,17
sex 231:6 232:12
248:15,19 253:22
260:21 261:5
274:14 286:1
shared 149:22
short 253:17
Shortly 77:9
short-term 133:23
shot 28:1
show 46:8
showed 120:20
180:13 280:13
294:10
shows 48:15 57:6
sic 38:7 41:23
side 13:10
sign 93:7 173:13
237:13 275:19,22
276:1
signature 2:12
80:15 237:12
262:3

signed 66:6 86:22
149:9 237:11,18
262:4,16 276:8
similar 165:6
197:13,15 256:11
274:20 295:6
similarly 287:21
simple 96:7 190:22
199:12 244:20
simply 68:17
single 18:7 258:19
sites 123:15,16
sitting 162:19
situated 287:21
situation 25:6 94:12
94:22 95:8 120:17
130:13 135:21
138:5 169:2 180:8
192:16 206:3
217:5 256:11,11
256:14,18,19,20
258:1
situations 37:13
54:6
six 23:5 48:11
167:10 207:18
227:7 295:6
sixth 49:14
skills 25:2,4 26:15
26:19 27:16 28:5
29:17,19,20 156:6
skipped 117:18
sociology 19:12,13
22:19
software 26:7 83:5
83:20,22
solely 150:1
somebody 42:13,17
199:22
somewhat 69:7
134:17 145:13
152:10 165:17,18
166:13
soon 20:4
sorry 21:11 31:17
42:2 44:21 46:4
47:1 56:11 59:14
60:12 85:19 94:13
102:19 105:16
121:17 137:20
140:19 203:6
208:1 221:9 243:2
247:15 265:2
275:1 290:19

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

sought 289:4
south 13:10
speak 11:6 96:23
speaking 113:5
special 23:22 26:15
  27:16 107:21,23
  108:20 157:6,22
  197:4
specific 97:14
  272:21
specifically 73:18
  178:3,11 202:11
  267:8 282:17
spend 183:9
spoke 119:14
spoken 118:11,15
  118:18 119:3,6,9
spread 89:15 90:1
spring 101:10
springs 211:4,17
  218:23
St 16:19,20,22 36:4
staff 157:9
stamped 79:12
standards 263:2,7
Stanfield 195:21
Stanhope 18:22
  19:7
start 9:13 16:4 25:7
  34:9,13,21 46:18
  76:5 110:10,10
  137:10 164:4
started 16:13 19:18
  21:14,16 30:22,23
  30:23 31:10 36:16
  37:10 47:11 63:12
  66:11 101:20
  104:4 107:21,22
  109:15 110:3
  117:5,13 124:5,6
  124:10,12 133:21
  135:13,15 137:11
  152:17 161:18
  164:9 190:17
  227:21 231:20,23
  267:13 268:2,4
starting 19:20,23
  66:22 67:2 109:10
starts 102:4
state 1:10,14,18
  9:20 11:21 16:3,9
  21:7 22:9 24:16
  32:22 33:2 34:4,5
  34:16 48:23 52:11

94:12,14,22 95:3
95:9 96:1 97:13
184:5 213:14,15
235:13 296:3
stated 41:1 144:13
  158:7 193:5
  249:15
statement 40:16
  181:4 189:3
  262:21 289:14
  290:10 291:4
STATES 1:1
stating 144:8
status 178:18,23
  199:9 249:14
stay 60:2
stayed 60:10 109:14
  128:21
stenography 20:14
  20:20 36:3 159:2
  159:9
stenotype 296:8
step 34:12,23 46:11
  46:14,15,16 47:17
  47:18,19,19,20
  48:1,1,2,3,5,9,9
  48:10,11,16,17,19
  48:19 49:2,13
  50:17 52:4,4,5,6
  53:6,17 55:17
  57:3 58:4,9,10,14
  59:18 60:8 61:12
  62:1,5 63:12
  64:14 92:15 94:11
  106:14,16 122:15
  128:14,22 133:9
  140:23 141:1,2
  158:15 191:7
  261:22
steps 34:9 129:1
  133:10,11
STIPULATED 2:3
  2:11,18 3:3
stipulation 8:3
stipulations 8:16
stop 23:9 49:3
  163:2 164:3
  191:13 235:17
stopped 76:13
story 211:7 218:19
straight 17:8
strategies 109:23
stream 211:9,13
Street 2:8 7:15 8:5

stress 257:15
structure 138:11
student 69:10,14,20
  69:20,23 75:9,11
  79:20,23 81:17
  82:1,9,18,20 84:8
  107:12 108:2
  123:16 135:19
  136:12 137:8,9
  138:12 166:12
  167:2,20 168:16
  185:8,9 195:13,14
  198:5,8,10 199:17
  207:10,17 208:4
  213:10 252:6,9
  253:9,11,20
  254:14 255:12,14
  255:21 257:7,9,16
  283:7 284:14,15
students 1:17 38:5
  39:17 41:20 42:4
  43:16 44:12,18
  45:16 50:10,15
  51:20 52:1 55:15
  57:21 58:2 59:16
  61:10 64:10,23
  68:6,20 72:19,21
  72:22 73:1,13
  74:9,18,21 75:10
  76:8,11 78:2,3,5,7
  79:14,16 81:2,4
  81:18,22 87:7
  88:3,8,10,13 89:6
  89:11 91:1 108:1
  108:21 110:7
  124:7 127:6
  128:11 129:10
  132:18 133:13,23
  142:23 143:5
  151:8 152:6,13,20
  153:8 156:4
  158:14 163:6
  186:17,21 194:23
  195:17,22 196:5
  204:20 206:4
  251:19 260:2,4
  285:19 293:17,21
  294:17 295:7
studied 22:16
studies 160:13
study 19:10 20:13
  22:10
stuff 159:13
submit 244:7

281:20 285:2
submitted 143:10
  144:5,7 233:17
  234:2,6,9,11
  241:15,15 280:14
  283:2
subordinates 184:1
subsequent 269:22
successfully 25:10
  29:10 173:22
Sue 279:2
suffer 271:8
suffered 270:13
sufficient 29:15
suggesting 292:21
suit 8:19,22
sum 167:19
summarizing 62:2
summer 17:3,7
summers 17:8
Super 17:9
superiors 130:9
supervise 86:8,10
  87:9,12,16,18
  89:1 247:9,11
supervised 72:2
  78:9 86:4 87:14
  87:19,20,22 88:1
  89:12 247:23
supervision 160:8
  181:11 257:10
supervisor 135:1
  137:3 168:9 169:4
  190:18 192:10
  193:18 246:22,23
  247:4,19,23 248:4
  248:5,9 273:2
  285:16
supervisors 113:2
  126:5 191:17
  260:23
supervisory 26:19
supervisor's 224:7
supplement 13:8
support 1:17 69:10
  69:15,20 70:1
  75:9,11,19 76:1,3
  76:8,11 91:1
  127:6 128:11
  129:11 132:18
  133:14 142:23
  143:5 151:8 152:7
  152:14 157:9
  284:14

supposed 244:21
supposedly 245:3
  280:14
sure 11:11 21:15,19
  22:12,13 23:15
  27:5 36:9 48:14
  56:6 61:15 66:16
  70:3 78:15 82:1,2
  87:6 88:9,15
  90:10,13,18 95:2
  97:6,10 109:18
  113:8 114:18
  115:3 118:2,16,17
  118:22 119:6,8,13
  120:17 121:4,6
  124:5,12 125:7
  129:2 131:7
  133:11 137:5
  138:13 139:4
  145:23 146:10,15
  156:15,16 157:16
  161:4 163:9
  164:12 166:19
  167:3 172:16
  174:8 176:5
  177:21 185:1
  188:17 190:17
  194:7,10 200:4
  204:22 206:5
  207:14 219:16
  223:17 225:16
  226:22 228:15
  229:6,10 235:19
  236:2 243:8
  258:21,23 259:19
  260:10 261:18
  263:22 265:1,2,4
  265:5,7,8,12
  276:9 277:1
  284:19,23 285:4,6
  286:15 290:6
surgery 17:21
surgical 17:22
  127:21
surroundings
  212:19
survey 185:21
sworn 8:12 10:23
Sylvia 35:10
system 25:23 26:2
  27:9 53:1 56:21
  62:14,17,23 83:2
  83:8,10,13,18
  84:9 106:17

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

| | | | |
|---|---|---|---|
| 184:14 185:11,22 | talking 53:10 66:19 | 234:14 235:11 | 207:22 208:20 | 210:23 213:8 |

184:14 185:11,22
228:7

**T**

T 2:1,1 296:1,1
take 9:7 10:19 11:7
11:8,10,11,12
20:1 21:2 24:1,7
30:7 31:17 64:3
72:7,14,18 78:17
85:13 86:20 89:22
90:8,12 127:22
128:3 147:5,18
148:19 149:7
176:7 187:18
202:17 227:9,17
234:17 235:5
258:19 259:13
261:12,15,21
265:16,18 268:7
taken 2:6 9:17
23:19 64:4 80:21
86:16 123:13
127:18 202:21
235:7 261:23
288:14 296:7
takes 198:10
talk 87:7 100:2
107:2 113:1 121:5
121:8 139:1
156:14 177:20
178:3,11,15 180:3
181:5 186:4 191:5
191:23 192:14,19
193:14 194:6
203:17 217:1,2
223:19 232:20
233:14,22 234:3,5
240:18 242:16
271:23 278:23
294:9
talked 35:12 36:1
36:21 40:19,22
88:21 93:3 100:4
113:3 116:23
117:9 120:14
121:6 123:4,9
156:10,16 170:15
177:14,19 223:16
223:20,21 224:8
245:9 275:3
277:21,22 278:19
279:3 282:8
293:12,12 294:4

talking 53:10 66:19
66:20 71:12 74:4
74:16 97:11
104:22 121:3
128:5 135:16
178:5,6 179:3
198:22 223:14
238:12 239:17
242:8,11,15 245:6
245:12 255:9
257:3 269:19
283:6 284:5
tape 259:21
tardiness 223:9
tardy 221:12
task 82:21
tasked 220:15
tasks 69:23 70:2
82:19 149:5 160:8
237:7
taught 25:19,21
84:22 85:1 160:14
tax 183:9
teach 25:17 83:21
teacher 16:13
Technical 1:10,14
1:18 9:20 16:3
teenager 17:3
telephone 223:14
tell 11:4 12:3,8 14:6
16:1,6,11 17:5
20:23 23:20 25:2
26:14 27:16 30:11
32:2,5 37:22 38:2
38:7,23 48:8 50:7
51:17 54:8 56:20
70:23 72:10 77:6
77:21 78:13 90:4
93:9 103:14 104:7
113:13 114:10,19
115:1 125:17
128:7 130:19
132:14 139:3,22
142:2 143:15
144:1,15 147:6
149:17 150:11
158:10 175:3,4,7
178:17 179:21,23
180:20 181:3,6
186:12 198:16
205:23 207:4,8
216:6 225:3,6,10
225:22 226:5
227:20 233:15

234:14 235:11
242:4 243:3,3
244:2 251:11
256:20 260:17
261:16 272:11,17
275:13 276:10
277:2,6 280:6
287:11 294:8,11
telling 26:10 277:12
280:1
temporarily 16:10
173:9
temporary 16:10
98:1 173:6,11,20
ten 34:17,18 49:3
56:1 63:4,7,17
226:19 235:5
tends 217:17
tenth 34:19 56:3
58:11
tenure 68:11 221:3
221:7
terms 185:22
224:15,16
test 259:21 260:7,9
260:13
tested 89:9
testers 89:8
testified 8:13 36:14
172:3 200:20
204:4 215:23
224:11 233:6
239:14 254:4
267:12 268:17
276:16
testify 15:17 42:14
266:5
testimony 1:22
36:18 39:23 53:19
71:20 76:12 91:18
95:20 99:9 102:6
102:17 103:1
105:2 108:6,10
112:11 113:20
115:10 116:10
119:20 123:19
129:21 131:8
134:5,14 137:2
139:13 143:12,19
149:1,18 151:15
161:11 163:10
172:1 174:9 177:2
182:7 193:23
196:1 205:2

207:22 208:20
214:5 224:7 227:6
227:15 231:8
247:13,16 248:5
259:2 264:15
270:3 271:1 281:7
294:18 296:11
testing 72:19 89:1,3
89:3,11
Thank 112:17
295:10
thanked 215:14
thereto 3:2 44:11
48:22 75:8,23
85:10 120:20
133:9 145:15
152:10 225:12
228:17 241:11
296:8
thing 53:10 191:3
191:11 204:19
251:10 253:10
282:23
things 72:5 136:15
198:3,6 218:6
220:1,2,7 237:22
253:13
think 9:23 10:8
13:19 14:4,19
17:9,13,17,19
18:5 21:19 22:13
22:14 24:11,12,14
26:19 29:13 31:18
31:21 34:10,17,19
34:20,21 37:2
41:17 42:1 46:6
47:12,21,22 49:2
55:22 61:16 63:13
71:18 73:23 74:3
74:7 102:12
109:10 113:7,8,10
114:9 115:3,4
117:16 118:20
120:5,16 124:14
125:15 126:8,10
128:5,22,22 129:1
129:1 133:2 146:2
146:17,20 156:8
161:4 164:9 165:5
165:12,15 173:19
173:21 176:22
180:10 181:6,12
183:1 187:21
188:1,6 203:4

210:23 213:8
214:11 219:13,18
223:17,20 224:4
227:2 232:21
234:1,19 235:18
235:19 242:8
246:8,17,19
249:18,19 257:20
261:14 262:23
267:13 270:12
275:1 279:12
282:5 283:3 288:3
289:4
thinking 53:5 59:23
87:6 172:16
thought 18:8 38:8
39:1 40:20 41:3
46:2,7 170:4
174:1 180:21
202:2 252:18
273:19 274:7
thoughts 288:12
thousands 66:14
three 20:1 22:17
29:8 90:2 195:11
195:15,19 249:21
286:12
Tim 71:16 72:11,13
75:16 77:3,7
145:21 181:20,23
195:22 207:12
208:14,21 226:9
229:23 230:16
231:9,18 233:7
252:22 255:1
256:8 260:9
268:19,20 287:16
287:17,22 288:1
288:19 289:8,11
290:4,12,18 292:3
292:15
time 2:23 3:1 17:9
17:15 18:6,7
19:21 23:12 24:4
35:4 37:2 38:12
46:15 69:13 70:20
71:1,3,5 72:9,14
73:9,21 74:11,11
74:13,16,22 75:1
75:6 81:20,23
82:6,11 84:10,18
85:15,23 89:2,18
90:19,22 91:3,15
93:11 95:19 97:8

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 22

99:17 100:6,8,17
101:18 102:12
103:16,16 105:4,5
106:6 108:16,17
109:1,11 110:8,13
114:16 115:10
116:6 117:3 118:2
118:5,9,23 119:1
119:2,21,23
120:19 121:2
122:22 123:4,8,20
124:4,14 125:3
130:17 132:2,2,3
132:3,4,6 133:21
136:2,19,20
138:22 139:11,18
143:8,13,20 144:1
145:6,19 148:5
152:18,21 155:19
156:4 159:18
162:4,7,17,20
166:9,16 169:9
170:12 173:5
186:18,19 191:9
198:19,20,21,21
200:11,23 201:17
201:22 202:7
203:23 216:7
217:18 223:15
224:4,8 225:3
228:2 230:4,5,7,8
232:21 233:15
234:7 239:10
240:15 241:17
243:9,20 244:3,6
248:11,11 252:8
253:20 258:14
260:19 264:17
270:3,8 271:17
275:7,9 278:23
279:15,21 281:4
281:19 285:15,17
286:7,7 287:7
288:21 289:4,16
291:18
timely 148:2
times 37:12 89:8,10
154:11 168:9
181:16 208:5
220:1 279:19
286:5,14,17,20,23
287:1,3
timewise 275:8
Timothy 147:10

title 10:3 31:14
32:14 42:3 43:15
44:16 45:15 50:14
51:23 55:14 57:14
58:1 59:15 61:9
64:9 65:21 68:2
74:15,20 90:23
92:10,23 98:21
99:3,5,10 101:15
103:2,7,15 104:10
104:22 105:1,1
106:10 111:13,16
111:17,18 112:10
116:14,19,20,22
120:21 122:9
127:16 129:6,8,12
129:15,16,20,21
130:3,9,14 131:9
131:21 133:12,17
133:19 134:23
136:10 140:15
143:1,3 144:21
186:15 194:22
220:20 250:8,10
250:15 258:17
259:8,9,14,15
261:7 269:10,12
285:12
titles 10:1 196:10
196:17 284:16
today 9:19 10:21
11:4 28:12 93:4
95:20 105:2
119:20 134:14
137:14 161:16
162:13 177:2
180:9 201:17
208:20 225:11
227:6,7,15 231:8
247:13,16 267:10
267:21 270:3
285:22 292:14
293:13 294:5
today's 267:16
told 25:2 26:14
38:10 39:1 78:16
94:20 114:17
115:5 120:18
136:5 150:21
170:16,16 178:7
178:17,22 179:3,7
179:9,17 197:4
263:14 266:21
272:4,7 273:14,19

274:9 279:14,22
281:22
top 186:2 230:10
topics 80:17
total 139:5 167:19
totally 184:8,23
touched 115:19
232:15
Tower 2:9 7:16 8:6
town 211:7,9,12,15
Toxey 85:18,21
89:16 90:1
149:14,22
trade 20:5
traditional 28:23
train 28:22 135:23
136:1,5 213:11
trained 82:18
training 25:12,13
25:22 26:7 83:1,4
83:20
transcribed 296:9
transcript 79:7,12
79:17,21 80:1
81:5 296:11
transcription
296:10
transcripts 72:21
78:6,22 79:1,9
82:6 86:22 88:5
88:11
transition 135:14
135:21,22 136:16
155:21,23 156:2
travel 73:13 76:2
80:16,19,20
134:20
traveler 81:1
Traywick 155:19
156:7,11,14 279:6
treated 198:17
199:22 200:10
227:16
treating 27:2,2
Trenholm 20:5,9,13
20:15,17,19 21:2
21:4 22:4,22 36:2
159:5 184:17,19
trial 2:23
tried 217:15
triggers 136:16
trip 80:21
troubleshooting
83:14

Troy 21:7 22:9 23:1
23:4,7,9,16
true 68:16 100:17
197:1,19 254:8
296:11
trust 217:6
truth 11:4
try 18:9 27:10,11
156:4 196:6 289:5
trying 9:1,13 13:4
22:13 37:3 110:11
170:22 190:21
191:14 256:20
290:14 291:2
turn 30:3 153:21
238:11
Turner 265:2,4,4
265:12
twice 27:21
two 15:22 17:8
19:12 21:20 22:17
34:20,20 36:19
40:18 53:6 58:10
69:17,19 78:9,9
140:9 146:3
174:10 176:18
177:2 196:2,3
198:13 222:22
223:2 263:19
271:19 277:22
280:19 284:12
286:5,10 293:17
294:13
two-year 52:23
184:14 185:22
228:7
Tymeses 14:14
type 25:8 31:7
40:21 81:9,9
115:7 126:1
134:13 152:20
166:3 182:19
198:5 201:4
214:17 260:3
typed 31:3,7 75:23
typing 31:4 37:5,7
37:10,13 80:12
———————
U
———————
U 2:1
uh-huh 11:9 32:16
45:21 72:12 89:23
95:5 128:2 216:5
244:1

ultimate 15:1 168:7
180:9 204:9
ultimately 117:9
208:21 242:17
243:5 290:11
292:19
unaware 273:9
underpaid 125:23
224:12
understand 9:14
11:15 25:5 28:13
28:16 39:23 46:2
71:19 76:12 85:11
95:2,11 102:16
103:1 109:19
115:6 131:7 163:9
168:13 174:8
197:15 233:5
257:23 259:2
267:1,3 272:14
276:5 277:8
294:18
understanding 54:8
173:13 200:17
207:9 208:16
237:2 275:10,20
275:22 276:6
278:5
understood 144:2
unfair 169:1 246:17
unfairly 270:10,13
unfamiliar 212:18
unhappy 141:13,14
141:15 142:2
239:15 249:1
272:8
unique 185:3,7,12
197:1,2,3,9
uniqueness 197:21
197:22 198:8
UNITED 1:1
unkept 211:13
unprecedented
197:18
unprofessional
217:18
updated 153:10
upgrade 240:10
246:6 249:12
use 9:15 25:23
83:21 158:13
260:1
Usual 8:15
usually 32:23

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 23

| | | | | |
|---|---|---|---|---|
| **V** | 209:9 235:9 277:1 | 44:4 45:5 51:5 | 192:2 203:9,18 | 57:12 63:1 69:2 |
| valid 237:18 | 282:1 | 64:3 112:18 | 204:8,17 205:19 | 69:13 70:6 73:20 |
| Valley 184:17 | wanted 20:3 159:18 | 114:20,20 126:18 | 206:22 207:9,16 | 84:2 86:2,3,7 89:4 |
| veer 159:18 | 192:16 193:5 | 142:15 146:23 | 210:21 211:16 | 96:12 107:14 |
| verbally 114:3 | 281:22 | 150:5 151:21 | 216:15,19 217:11 | 108:7 109:5,6,12 |
| 172:18 175:6 | wants 187:18 | 189:17,17,20 | 217:14,17,23 | 110:1,22 111:6 |
| 281:16 | Washington 15:7 | 190:3,4 235:4 | 218:7,10,16 220:1 | 115:8 123:13,19 |
| verbatim 197:11 | 15:12,13 | 241:4,20 249:23 | 220:6 223:21 | 125:9 134:8 |
| verification 79:9,10 | wasn't 18:6 25:15 | 288:5 | 232:13,21 242:13 | 148:21 168:12 |
| verified 149:8 | 49:9 101:11 | we're 70:10 104:22 | 242:18 243:6 | 197:23 198:9 |
| versa 198:7 | 131:20 136:3,19 | 132:8 238:11 | 247:14 248:17,19 | 211:1 212:21 |
| versus 84:12 108:18 | 144:12 148:4,23 | 245:12 260:3 | 250:9 251:1,3,13 | 221:18 223:22 |
| 213:10 | 182:17 191:3 | 261:22 262:7,23 | 251:17 254:5 | 233:7 246:7 |
| vice 198:6 | 193:1 204:21 | 269:6,18 277:1 | 255:11 257:10 | worked 16:15,23 |
| violation 194:4,9 | 206:4 220:20 | we've 63:1 74:1 | 262:18,19 263:9 | 17:6,8,8,15 36:19 |
| visit 172:16 | 226:18 247:10 | 123:4,9 153:22 | 272:2 273:7,9,12 | 52:23 69:12 85:8 |
| visited 184:13,16 | 256:8 261:2 | 177:14 232:15 | 273:14,20,23 | 86:1 139:12 |
| vital 213:9 | 272:19 276:4 | 245:19 277:21,21 | 274:4,9 278:10 | 175:23 176:2 |
| voice 115:17 119:11 | 279:22 290:13 | 293:12 | 279:6 280:7,16,20 | 181:10 193:22 |
| 120:8 124:19,22 | 294:15 295:3 | wheezing 28:1 | 281:14 282:7,16 | 201:4,4 253:3 |
| 130:5,8 131:23 | watch 23:13 | white 169:23,23 | 283:17,19 284:11 | 263:19 283:16 |
| 138:21 139:17 | watching 85:9 | 220:14 221:1 | 284:12 285:9,23 | 284:13,14,15 |
| voiced 115:14 120:2 | way 27:7,12 48:20 | 258:7,10 261:8 | 286:3,21 | 292:12 |
| 120:5 139:16 | 52:7,8,12 53:3,4 | 265:3 284:1,2,4,5 | Wilson's 90:22 | workforce 29:9 |
| voicing 121:13 | 53:15 54:5 84:15 | William 15:8 | 121:1 139:20 | 133:22 |
| volume 107:14,16 | 165:10,20 174:22 | 157:14 257:4 | 191:4 | working 16:4,13 |
| 108:6 109:5,12,20 | 176:22 180:14,17 | willing 244:9 | withdraw 213:14 | 17:2,21 18:6 27:4 |
| 110:1,22 111:6 | 183:7,10 190:2,6 | Wilson 1:15 68:12 | withdrawal 84:6 | 36:4 37:6 69:5,6 |
| 123:13,19 125:9 | 193:20 211:2 | 68:15,18 69:2,6,7 | witness 2:13 8:7 | 70:6 76:13,14 |
| 134:9 | 217:16 218:19,20 | 69:13 70:6 76:10 | 13:19 14:13 15:6 | 154:9 178:20 |
| volunteering 37:1 | 219:1 254:6 | 76:14 78:12 80:4 | 15:9,19,20 30:9 | 179:4 199:13 |
| vs 1:9 | 276:20 277:11 | 80:9 82:8 86:12 | 187:11 188:8,11 | 202:15 215:14 |
| | 295:4 | 86:19,20,22 87:4 | 202:19 233:19 | 226:17 234:7 |
| **W** | week 17:23 | 87:16,17,18,20 | 261:19 265:20 | 241:1 246:4 |
| wait 34:20 53:6 | welcome 216:15 | 88:1,7,11,13,17 | 296:12 | 268:10 |
| 58:10 60:1 71:4 | welcomed 214:22 | 89:16 90:8 100:5 | woman 259:3,13 | workload 110:16 |
| 203:14 233:4,13 | 216:13 | 110:14,15 113:3 | women 185:10 | works 49:17 198:6 |
| waited 249:5,6 | went 16:8,14 17:12 | 113:13 115:14 | 286:10 287:2 | 263:20 293:1 |
| waiting 174:2 | 19:8 21:4,6 22:7,9 | 117:1,8,22 118:12 | wondering 178:18 | world 22:18,18 |
| waive 238:3 | 23:14 26:5 30:4 | 118:15,18 119:3,9 | 272:18 | 156:6 201:4 |
| waived 2:13 3:5 | 35:17 48:9,19 | 120:3,15,17,18 | word 251:4 | worry 211:10 |
| walked 178:14 | 49:14 60:7 63:13 | 134:22 135:4 | worded 258:23 | worthless 170:22 |
| 272:7 281:21 | 70:5 74:2 82:1,2 | 136:6,23 137:1,2 | 295:5 | 171:2 172:6 |
| Wallace 263:16,17 | 113:9,9,11 114:9 | 137:21,23 139:2 | wording 74:15 | wouldn't 36:22 |
| 283:20 | 123:14 129:1 | 139:17 144:5,8 | words 38:19 102:16 | 110:11 130:23 |
| want 9:7,12 11:12 | 170:10,15 175:7 | 149:6,11,22 | 139:10 149:9 | 175:2,6 197:2 |
| 95:2 102:15 | 177:20 179:13 | 152:19 156:8 | 173:23 175:15 | 205:6 219:22 |
| 109:18 127:9,12 | 193:13 242:16 | 166:17,22 170:14 | 272:10 273:2 | 229:14 253:12 |
| 127:21 131:7 | 257:1,21 271:23 | 170:16 171:5 | work 16:1,9,22 | 279:18 |
| 153:21 168:12 | 274:5,7,8 | 174:18,21 175:1 | 17:12 18:2,2,4 | write 160:10 218:22 |
| 174:8 175:8,15 | weren't 115:1 150:1 | 175:18,23 176:14 | 23:11 25:15 27:14 | 240:22 |
| 176:7,22 177:18 | 161:4 288:22 | 177:16 179:4,5,8 | 29:9 30:4 31:8 | writing 37:4,11 |
| 179:14 190:2,9 | 294:21 | 180:2,3,10,12 | 36:6 40:17 47:7 | 114:4,5 121:9 |
| 196:6 202:17 | we'll 11:11 43:4 | 181:3,16 188:9 | 54:10 56:21 57:6 | 175:10 180:13 |

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

194:1 239:15
242:7,10,12 244:7
251:6,7 283:1
285:2
**written** 172:14
178:19 238:15
244:14,15 272:13
272:15 282:12
**wrong** 115:21,23
153:6 175:15
231:2,5 271:13
**wrote** 114:2 139:4
162:12 174:21
203:18 215:12
242:3 249:9 250:9

—————— **X** ——————
X 195:3 216:9

—————— **Y** ——————
Y 7:11
**yeah** 8:18 10:13
28:15 42:2 49:9
61:17 77:14 141:9
159:3 160:5
165:22 171:9
183:4 188:10
189:9 204:12
222:15,17,22,23
235:2 243:12
268:9 283:9
284:22 287:5
**year** 16:4 18:5 19:2
20:21 22:21 23:6
32:6,21 33:21
34:14,16,19 44:12
46:12 47:6,6,10
48:11 49:3,4,14
49:14 50:20 51:20
52:21 53:9,16
54:17 55:10,19,22
55:23 56:3 59:20
60:2,10 62:5 63:7
63:11,16 66:19
68:16 89:21 93:5
93:10 94:4 96:11
96:13 101:19,20
101:22,23 102:4
105:20 106:17
112:2 116:21
117:3,5,11,13,17
117:18,19,21
118:4,6 119:17
124:6,13 125:16

128:16 140:21
141:6,8,9 163:7
178:21 203:13,14
212:17,19,20
220:19 227:4,8
229:9,13,15,17
230:13 231:23
232:5,7,8 233:4
233:10,11 234:8
240:17,19,23
241:1,2 242:23
244:19,23 245:9
261:2,3 264:21
267:14 269:4
271:2,13 279:8
**yearly** 54:4
**years** 12:1 18:15
21:20 29:8 34:17
34:19,20,20,21
36:19 40:18 48:11
49:12 52:14,21
53:1,6 56:1 58:10
60:3 63:4,7,17
66:11 74:7 75:1
85:1 94:14,19
95:17 96:2,14
106:14 111:22,22
128:14 133:1,2
141:2 146:3,4,6,8
167:11 195:4
207:19 216:10
224:19,21 225:4
225:14 226:11,17
226:18,19 227:7
228:3,5,8 230:3
249:21 257:17
263:19 270:21
**y'all** 127:9 189:22
202:17 261:21
282:1

—————— **$** ——————
**$10,000** 267:14
**$4,000** 100:1
**$41,047** 98:13
**$50,000** 229:15
267:23 268:5,8
**$50,379** 142:4
**$60,000** 229:9
**$67,000** 227:4
**$70,000** 229:17,20
**$80,000** 229:13
**$86,000** 227:8,17

—————— **0** ——————
**04** 250:7
**05** 140:7
**05-06** 226:5

—————— **1** ——————
**1** 4:6 30:16,17 32:9
32:11 33:20 41:23
43:14 44:15 45:14
50:13 51:22 55:13
57:23 59:14 61:6
64:12 70:21 100:8
102:2,3 106:8
122:4,15 127:7
128:9,14 132:19
140:13 141:2
144:19 157:19
158:16 241:10
249:14
**10** 4:15 51:6,7 58:4
58:10 59:18 60:1
60:2,10 61:12
62:1 64:14 162:2
222:6,10 268:2
**10,000** 67:2 161:20
**10,272** 31:13 33:1
268:4
**10-295** 4:3
**105** 5:4
**11** 4:16 32:12 55:4
55:5 213:23
**11th** 212:15
**11,256** 32:19 33:1
**11,718** 34:1
**112** 5:5
**12** 4:17 12:21 18:19
56:16 66:11 187:3
**12th** 189:2
**126** 5:6
**13** 4:18 59:5,6 98:3
98:18 189:7
**13,104** 39:20
**13,566** 42:6
**132** 5:7
**14** 4:19 60:20,21
**140** 5:8
**142** 5:9
**146** 5:10
**15** 4:20 49:4 60:8
62:5,10,11 106:14
**15th** 34:22 60:2,10
62:5
**150** 5:11
**1505** 7:6

**151** 5:12
**153** 5:13
**158** 5:14
**16** 4:21 17:6,10
65:13,14 93:8
**160** 5:15
**17** 4:22 67:14,15
69:1 106:5 118:11
121:14
**18** 4:23 92:1,2
95:17 111:22
210:9 234:15
242:4
**19** 5:3 68:23 93:21
93:22 106:14
111:22 257:20
**19th** 112:2
**1980** 19:3
**1981** 16:8 20:22
22:23
**1983** 12:6
**1985** 16:5,6,23
30:13 32:9,12
54:10 57:7 66:17
104:5 161:3 162:5
267:13,20
**1986** 32:7 33:20
266:7
**1987** 33:22 39:22
42:1,2
**1988** 41:21 43:14
**1989** 43:12 44:15
49:6 158:16 227:2
**1990** 44:13 45:14
46:21 47:8 48:1
48:12,13 49:7
50:23
**1991** 21:15 50:13
50:23 268:12
**1992** 24:2 50:11
51:22 54:11,19
56:4
**1993** 51:20 55:13
56:4
**1994** 55:11 57:23
**1995** 57:21 59:14
**1996** 59:12 61:6
63:2 224:4 266:7
**1997** 12:4 17:18,19
41:23 61:4 63:3
64:12 68:21 69:2
176:4
**1998** 64:8 66:10,17
176:1 261:17

262:20
**1999** 65:20 70:21
71:18 76:20,21
101:10 142:7
146:9 166:9
196:11,19,20
197:9,18 203:16
203:17 208:7
216:1 222:6,10
223:1,7 228:17,18
228:21 229:4
232:18 233:1
238:11 242:6
251:10 252:9,13
252:19 256:7
257:20,21 258:4
263:10 266:6

—————— **2** ——————
**2** 4:7 33:5,6 106:14
188:14
**2nd** 240:3,12
**20** 5:4 12:1 18:1
39:22 105:10,11
122:15 128:14,22
129:1 133:9,10
141:2
**20th** 240:2,11
**20-something-odd**
226:17,18
**2000** 67:21 70:22
76:21 92:9 93:8
94:23 95:1 98:3
98:18 99:6 100:8
101:13 102:2,3
117:3 118:1,4,21
119:1,23 233:4,13
234:11,15 239:23
240:16 241:10
242:4 243:20
244:17 245:11,13
245:18,23 260:19
266:6 269:5,9,18
270:4,9 275:11
**2001** 100:9,20
106:5 118:11
121:14 209:19
210:9,10 213:23
213:23 266:6
**2002** 23:8 106:3,9
119:19 120:13
122:4,7 249:8,10
**2003** 122:5 127:1,7
128:6,9

—————— —————— ——————

| | | | |
|---|---|---|---|
| **2004** 127:8 128:10 | **3** 4:8 37:17,18 | **48** 6:11 251:22,23 | 146:15 |
| 132:19 187:3 | 92:17 157:11 | **49** 6:12 262:8,9 | |
| 188:14 189:7 | **3rd** 188:23 | _____ | **9** |
| 203:4 235:19 | **3,000** 141:7 | **5** | **9** 4:14 8:7 50:2,3 |
| 266:6 281:6,19 | **30** 4:6 5:14 21:7 | **5** 4:10 32:23 41:7,8 | 234:11 239:23 |
| 282:5 | 84:16,19 158:1,2 | 47:19 48:1,9,16 | **9/30/1998** 66:6 |
| **2005** 132:19 140:13 | **31** 5:15 32:7 33:22 | 48:19 49:13 | **90** 47:15,21 |
| 142:3,6 225:19 | 41:20 43:12 44:13 | 157:19 158:15 | **904** 2:8 7:16 8:5 |
| 226:1 | 50:11 51:20 55:11 | 235:1 238:17 | **91** 21:16 47:22 |
| **2005-2006** 225:19 | 57:21 59:12 61:4 | 242:6 | **92** 4:23 |
| 230:13 | 63:3 64:8 65:20 | **5th** 189:1 238:21 | **93** 5:3 21:19 |
| **2006** 57:8 140:14 | 67:21 70:22 100:9 | **50** 4:14 6:13 229:20 | **96** 176:5 |
| 144:19 226:1 | 100:20 106:3,9 | 267:22 288:6,7 | **97** 17:17 74:3 176:6 |
| 262:20 264:22 | 122:5 127:1,8 | **51** 4:15 | 198:23 |
| 279:12 | 128:9 132:19 | **55** 4:16 | **98** 261:14 |
| **2007** 2:10 144:20 | 140:14 144:20 | **56** 4:17 | **99** 94:23 101:10 |
| **209** 5:16 | 160:21,22 213:23 | **59** 4:18 | 117:11,13,14 |
| **21** 5:5 112:19,20 | **32** 5:16 209:10,11 | | 146:15 198:23 |
| 128:14 133:2 | **33** 4:7 5:17 210:3,4 | _____ | 231:23 232:1,1,6 |
| **210** 5:17,18 | **334** 7:8,18 | **6** | 232:11 233:6,8,9 |
| **211** 5:19 | **34** 5:18 210:15,16 | **6** 4:11 43:5,6 46:11 | 235:1 238:17 |
| **215** 5:20,21 | **35** 5:19 67:3 211:22 | 46:16 47:18,20 | 240:13 280:9 |
| **22** 5:6 126:19,20 | 211:23 | 48:2,9,11,17,19 | 283:5 |
| 133:1 146:5 | **35,970** 66:3 70:11 | 50:17 52:4,6 | |
| **221** 5:22 | **36** 5:20 26:2,6 | **6,000** 125:18 | |
| **23** 5:7 132:9,10 | 215:2,3 | **60** 2:8 4:19 7:15 8:5 | |
| 141:2 | **36104** 2:9 7:17 8:6 | 162:2,2 268:3 | |
| **236** 5:23 | **36107** 7:7 | **60,000** 145:1 | |
| **238** 6:3,4 | **37** 4:8 5:21 215:18 | 161:17 267:18 | |
| **239** 6:5 | 215:19 | 268:4 270:20,22 | |
| **24** 5:8 140:2,3 | **37,409** 92:14 | **62** 4:20 | |
| 146:6,7 | **38** 5:22 221:23 | **65** 4:21 | |
| **241** 6:6,7 | 222:1 | **67** 4:22 | |
| **243** 6:8 | **39** 4:9 5:23 236:7,8 | **67-something** 142:6 | |
| **25** 5:9 67:3 128:6 | **397** 12:10 | 145:23 226:15 | |
| 133:10 142:15,16 | _____ | _____ | |
| 142:21 | **4** | **7** | |
| **250** 6:9,10 | **4** 4:9 32:23 39:6,7 | **7** 4:12 44:5,6 58:20 | |
| **251** 6:11 | 58:19 141:7 | **70** 84:16,18 | |
| **26** 5:10 146:23 | 157:11 | **70-something** | |
| 147:1 153:23 | **40** 6:3 238:5,6 | 270:23 | |
| 249:8 | **41** 4:10 6:4 238:22 | **70/30** 84:14 | |
| **26th** 2:10 | 238:23 239:21 | _____ | |
| **262** 6:12 | **41,047** 98:11 | **8** | |
| **265-9206** 7:8 | **42** 6:5 239:5,6,21 | **8** 4:13 45:6,7 47:13 | |
| **27** 5:11 150:6,7 | **43** 4:11 6:6 241:4,5 | 52:4,6 53:6 55:17 | |
| **28** 5:12 92:9 122:7 | **44** 4:12 6:7 241:21 | 58:9 251:10 252:9 | |
| 151:22,23 225:19 | 241:22 | 252:13 | |
| **28th** 189:1 | **45** 4:13 6:8 243:15 | **80** 90:6 108:21 | |
| **288** 6:13 | 243:16 | **80s** 14:19 30:4 | |
| **29** 5:13 153:16,17 | **45,000** 268:1 | **834-9950** 7:18 | |
| **296** 6:14 | **46** 6:9 250:1,2 | **85** 17:13 63:2 | |
| _____ | **47** 6:10 250:18,19 | **86,158** 226:12 | |
| **3** | 268:1 | **87** 14:20 | |
| | | **88** 14:20 | |
| | | **89** 47:13,23 48:1,13 | |