IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BONITA J. OWENSBY

Plaintiff,

)  CASE NO.: 1:06cv796-WKW

J.F. INGRAM TECHNICAL COLLEGE, et al.

Defendants.

)
)
)
)
)
)

**BRIEF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Comes now Plaintiff, Bonita J. Owensby ( hereinafter "Owensby"), by and through her

counsel of record, and files the following Brief in support of her opposition to Defendants'

Motion For Summary Judgment.

**Facts**

This action was commenced by the filing of a Complaint in the United States District

Court for the Middle District of Alabama, Northern Division, on or about September 3, 2006.

In Count I of Owensby's Complaint, she alleged she had been discriminated against

because of her race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §2000(e) *et seq.* and the 1991 Civil Rights Act.

In Count II of Owensby's Complaint, she alleged that Defendant Douglas Chambers'

(hereinafter "President Chambers") and Defendant James Wilson's (hereinafter "Dean Wilson")

actions towards her violated her right to be free of race and sex discrimination in her

employment, in violation of 42 U.S.C. § 1983.

1

Owensby is a black female who began employment at J.F. Ingram Technical College (hereinafter "Ingram") in 1985. (Owensby depo. p.16, ll.3-6). In 1981 Owensby received a degree in legal stenography from Trenholm Tech. (Owensby depo. p.20, ll.8-20). In 1993 Owensby obtained an Associate in Arts degree from Central Alabama Community College. (Owensby depo. p.21, ll.14-23). After Owensby received her Associate in Arts degree, she took courses at Troy State in Montgomery (Owensby depo.p.22, ll.6-8) and Athens College (Owensby depo. p.23, ll.21-23). Owensby has also received training in computers. (Owensby depo, p.25, ll.13-23).

Owensby's first position held with Ingram was an Office Clerk. (Owensby depo. p.30, ll.12-12). Owensby's started on the E Salary Schedule with a starting salary of $10,272.00. (Owensby depo. p.31, ll.9-12). On July 20, 1987, Owensby was promoted and appointed to the position as Secretary to the Dean of Students and Student Services. (Owensby depo. p.39, ll.5-22).

In April 1999, Tim Robinson (hereinafter "Robinson"), the Registrar, resigned and Owensby took over many of his duties and responsibilities while maintaining her existing job duties. (Owensby depo. p.71, ll.9-23, p.72, ll.1-23, p.73, ll.1-23). After starting to perform the duties and responsibilities of the former registrar, Owensby estimated that 30% of her time was spent on her secretarial duties and 70% of her time was spent on the registrar's duties and responsibilities. (Owensby depo. p.84, ll.10-17). Owensby took over approximately 80% of the former registrar's duties and responsibilities. (Owensby depo. p.90, ll.4-6).

After performing 80% of the duties and responsibilities of the former registrar since his resignation in April 1999, Owensby received an undated memo confirming her appointment as

2

Secretary effective September 1, 1999 at the annual rate of $35, 970.00, which is Salary Schedule E3 Step 15. (Exhibit 1). On July 28, 2000, Owensby received an appointment letter confirming her appointment to the position of Secretary effective September 1, 1999 at the annual rate of $37,609.00, which is Salary Schedule E-3, Step 18, signed by President Chambers. (Owensby depo. p.92, ll.1-17).(Exhibit 2).

On October 13, 2000, Owensby was temporarily appointed Coordinator of Registration and Admission. (Owensby depo. 98, ll.3-13). (Exhibit 3). It is at that point Owensby claims she began to be discriminated against. In Owensby's deposition the following exchange took place:

> " Q. Ms. Owensby, can you tell me what you believe your title and your pay should have been at the time that- -at the time of this appointment letter?
>
> A. It should have either been registrar or been paid at this C salary schedule the same as the previous registrar. Or even if it remained coordinator, which is what it is now, being paid at, at least the C-3 salary schedule where other coordinators were being paid."
> (Owensby depo. p.103, ll.14-23).

The exchange continued as follows:

> "Q. So this appointment reflects you still being on the E salary schedule?
>
> A. Yes.
>
> Q. And you had started on the E salary schedule even going back to 1985?
>
> A. Yes.
>
> Q. Okay. Ms. Owensby, can you tell me precisely when you believe you should have been put on the C salary schedule?
>
> A. When my title was changed to Coordinator of Registration and Admission; and when I had assumed the added responsibilities of the

3

previous registrar.

Q. Do you believe you should have been named Coordinator of Registration and Admission immediately upon Mr. Robinson's retirement?

A. Yes.

Q. Do you believe you should have been immediately placed on the C salary schedule upon his retirement?
A. Yes.

Q. And given this title that we're talking about here?"
(Owensby depo. p. 104, ll.1-23).

"A. That title or title as registrar.

Q. Okay. And it's your testimony today that you believe that your race and your gender both played a role in the decision, from the time of Mr. Robinson's retirement until the time of this appointment letter?

A. Yes."
(Owensby depo. p.105. ll.1-7).

At the time of Owensby's appointment to the position of Coordinator of Registration and Admission, her secretarial duties did not diminish, in fact, her work load increased. (Owensby depo. p. 109, ll.2-23).

By letter dated August 17, 2001, Owensby was permanently appointed as Coordinator of Registration and Admission. (Exhibit 4). (Owensby depo. p.112, ll.1-23). However, she did not receive a pay raise from moving from a temporary appointment to a permanent appointment. (Owensby depo.112, ll.17-22).

The first written indication that Owensby was being treated differently and being discriminated against was Owensby's memorandum to President Chambers dated October 5, 1999.

4

(Exhibit 5). Ownesby pointed out that most of the former registrar's duties had been assigned to her and she requested a raise. By memorandum dated October 7, 1999, President Chambers acknowledged Owensby's request and informed her that full consideration would be given to her request as soon as possible. (Exhibit 6).

By memorandum dated October 8, 1999 from Dean Wilson to President Chambers, Dean Wilson recommended that Owensby's title be changed to "Administrative Assistant to the Dean of Students" and that her pay guide be changed to E-1. (Exhibit 7). In his October 8, 1999 memorandum, Dean Wilson pointed out that "Mr. Brock, Mr. Carter, Mrs. Cobum, Mr. Foshee, Mrs. Givens, Mrs. Garcia, Mr. Henderson, Mrs. Mullins, Mr. Prosser, Mrs. Romine, Mr. Walker and other have been promoted, had their title changed or had salary adjustments without having the benefit of open discussion in a cabinet meeting." Of the people named, only Mr. Carter is black and he is a male. Owensby is a black female.

No action was taken by President Chambers or Dean Wilson regarding Owensby's October 5, 1999, therefore on September 18, 2000, Owensby wrote President Chambers again concerning her salary. (Exhibit 8). Apparently in response to Owensby's September 18, 2000 memorandum, President Chambers and Owensby had a meeting on September 20, 2000. By memorandum dated October 1, 2000, Owensby memorialized the September 20, 2000 meeting. (Exhibit 9). By memorandum dated October 9, 2000 to President Chambers, Owensby detailed reasons why her position should be upgraded. (Exhibit 10).

On July 25, 2002, Owensby sent the Personnel Director, Dr. James T. Merk (hereinafter "Dr. Merk") a memorandum concerning her being placed on the E salary schedule. (Exhibit 11).

Still seeking adequate compensation for the duties she performed, Owensby sent Dean

5

Wilson a memorandum dated August 13, 2004 requesting a salary increase. (Exhibit 12). In the memorandum, Owensby pointed out "...My salary is far below others in the system with dual roles and same type titles...". President Chambers testified that Bill Griswold was Assistant to the Dean of Instruction. (Chambers depo. p.156, ll.19-22). President Chambers testified that Owensby was Assistant to the Dean of Students. President Chambers admitted that as for as titles were concerned, there was no difference between Owensby and Griswold. (Chambers depo. p. 157, ll.13-23; 158, ll.1-7). President Chambers testified that salary is set for the position, not by the person occupying the position. (Chambers depo. p.158, ll.19-22). However, President Chambers stated there was no salary schedule for assistants to the Deans. (Chambers depo.p.157, l. 23; p. 159, ll.1-9). The following question was asked concerning salaries:

> "Q. So how is it determined what the salary of Ms. Owensby and/or Mr. Griswold is that occupies those two positions?
>
> A. Well, they are usually looked upon as years at the college. That involves steps that they are placed on. And in particular cases, if its on a C scale, there's one scale that will allow for a negotiable salary based on duties, jobs, roles, and responsibilities.
>
> Q. What about an E scale?
>
> A. E scale has three levels. And its left up to the supervision to determine and evaluate the employees and recommend that they go up on the scale or whether they complete the three that are available for them."
> (Chambers depo. p.159,ll.10-23; p.160, ll.1-3).

President Chambers testified that prior to Owensby that Robinson, a black male, was the registrar. (Chambers depo.p.146, ll.2-12). In his deposition President Chambers stated the following:

> "Q. Does Ms. Owensby perform approximately the same job as Mr. Robinson as registrar?

6

A. She does some of the work. But to say that they did the exact same thing- -because Mr. Robinson also taught classes. He had other duties I know she's not doing.

Q. And Ms. Owensby is the assistant to the Dean of Students that Mr.- -

A. Wilson.

Q. Mr. Robinson wasn't?

A. Pardon me?

Q. Mr. Robinson was not the assistant to the Dean of Students, was she?

A. Was he.

Q. Was he.

A. Not to my knowledge, no.

Q. So they were both registrars and they have other jobs?

A. He was registrar and had other jobs.

Q. And she is registrar and has other jobs?

A. As assistant to the Dean, yes.

Q. All right. Are you aware that Ms. Owensby is paid substantially less now than Mr. Robinson was when he left the job?

A. Yes.

Q. And he left the job in 1999, didn't he?

A. Around that time, yes.

Q. And at that time, he was paid approximately sixty-seven thousand dollars, wasn't he?

A. I could not tell you. I don't know.

7

Q. And are you aware that Ms. Owensby is only paid sixty thousand dollars today?

A. Yes.

Q. And since 1999, which has been about seven years, there's been several pay increases by the State, hasn't there?

A. Yes.

Q. But she still is not as high as where Mr. Robinson was when he left the job, is she?

A. That's right.

Q. What's the reason for that?

A. I can't answer why she's not where he was. I can answer why where she is now.

Q. Who would be able to answer the question as to why she's not on the same pay scale as Mr. Robinson?

A. I don't know.

Q. You're the President, aren't you?

A. Yes, I am.

Q. And if you send Ms. Greene a memorandum to put somebody on a certain pay scale, she has to do that, doesn't she?

A. Yes. But I wouldn't be saying it because Mr. Robinson. I would be saying it because this is where the person is placed and this is the salary that goes with that placement."

(Chambers depo.p.147, ll.9-23; p.148, ll.1-23; p.149, ll.1-23; p.150, ll.1-3).

Chambers can give no reason for Owensby's salary not being the same as the previous registrars. The salary goes with the position, according to President Chambers, but it did not in this instance. Owensby, until 2006, was paid on the lower E Salary Schedule, while Robinson, a male,

8

was paid on the higher C Salary Schedule as registrar.

Dr. Merk testified that he is the Director of Personnel for Ingram. (Merk depo.p. 33, ll.11-22). Dr. Merk testified that Robinson as registrar was paid on the C-1 Salary Schedule. (Merk depo. p.184, ll.11-13). Dr. Merk testified that effective September 3, 2006, that Owensby began to be paid on the C-3 Salary Schedule. (Merk depo. p.184, ll.15-23). Not until after Owensby filed her EEOC Complaint did Dr. Merk try to find out if there were other people in positions similar to Owensby who were registrars.(Merk depo. p.185, ll.20-23; p.186, ll.1-3).

Dean Wilson admitted as of September 1, 2003 that Owensby was the Registrar and Assistant to the Dean of Students and Support Services. (Wilson depo. p.145, ll.10-20). When Robinson resigned as registrar he was on the C-1 Salary Schedule, but when Owensby became registrar she was paid on the E Salary Schedule, which is less money. (Wilson depo. p.161, ll.9-23; p.162, ll.1-11). Dean Wilson testified he began supervision of the registration in 1998. (Wilson depo. p.164, ll.1-23).

### Exception to Affidavit of J. Douglas Chambers

1. In paragraph 1 of President Chamber's affidavit, he states "...I am responsible for administrating the institution in accordance with the State Board's policies, legal institutional policies, and applicable federal, state and local laws..." (Exhibit 13). However, *§16-60-111.6, Code of Alabama, 1975* as amended provides:

> "Except where otherwise clearly indicated herein the Board will delegate to the Chancellor, authority for the Chancellor to act and make decisions concerning the management and operation of the junior colleges and trade schools. The President of each junior college and trade school shall be responsible to the Chancellor for the day to day operation of each school."

9

§16-60-111.2, Code of Alabama, 1975 as amended states:

"The authority and responsibility for the operation, management, control, supervision, maintenance, regulation, improvement, and enlargement of each of the junior colleges and trade schools shall be vested in the Chancellor, subject to the approval of the Board."

Thus, President Chambers' authority is not as broad as he states in his affidavit. (Exhibit 13).

2. President Chambers states "All statewide policies that apply to Ingram are adopted by the State Board at the recommendation of the Chancellor." (Exhibit 13). The Board may adopt policies applicable to Ingram without the recommendation of the Chancellor. In fact, under *§16-60-111.5, Code of Alabama, 1975* as amended, entitled Chancellor; duties; it is not even mentioned that the Chancellor recommends policies to the State Board of Education.

3. No exceptions.

4. Owensby withdrew her resignation before the effective date. Therefore, there was no break in service, she never left her job so she did not have to return to her job.

5. President Chambers does not specify which times he "promoted" Owensby. Owensby's last promotion to registrar was approved by the Chancellor, so all President Chambers could do was recommend Owensby be appointed as Registrar. Prior to President Chambers becoming President, Owensby was already Secretary to the Dean of Students and Student Services. As shown in paragraph 7 of President Chambers' affidavit (Exhibit 13), Owensby was appointed as Secretary to the Dean of Students and Student Services on July 20, 1987.

6. In addressing her promotions, President Chambers states "These promotions, since

10

May 1, 1996, have all been internal adjustments and promotions made at the discretion of the

President of the College." Such is not necessarily the case. Owensby's appointment as registrar

was approved by the Chancellor. It is also pointed out that since they were hired, Dr. Merk's and

Dean Wilson's promotions have been internal adjustments, just as most of the promotions at

Ingram. Unfortunately, this is the way Ingram is operated by President Chmabers, which allows

for unfair and unequal treatment in salary.

7. No exceptions.

8. Owensby takes exception that she has been paid at a higher rate than she should have

been. Being generous does not mean there has been no discrimination. If salaries are determined

by the position, then when Owensby was promoted to registrar, she would have received the pay

of registrar according to the registrar's Salary Schedule.

9. Owensby did not devise a system where jobs were not competed for. President

Chambers devised this system and Owensby had to go through President Chambers' system to

receive promotions or salary increases. If Owensby did not meet the qualifications for the

registrar's position, she should have not been considered for that position or promoted to that

position. As President Chambers testified in his deposition "the salary is set by the position not

because of the person occupying the position. (depo. p.158, ll.19-22).

10. Dr. Merk did not investigate to see if people with similar duties as Owensby were

registrars and what their pay was until after Owensby had filed her EEOC Complaint. (Merk

depo. p.185, ll.20-23). Thus, no extensive investigation was made as indicated in President

Chambers affidavit. (Exhibit 13).

11. In paragraph 11 of his affidavit, President Chambers states "it is the President who

11

makes the decision" (Exhibit 13), but at his deposition President Chambers stated "and its left up to the supervisor to determine and evaluate the employees and recommend that they go up on the scale or whether they go to another step once they complete the three that are available for them. (Chambers depo. p. 159, ll.10-23; p.160, ll.1-3).

12.  No testimony or evidence from Dr. Murray Greg or anyone at Ingram at the time Robinson was made registrar was given as to the position of the Chancellor concerning whether or not Ingram should be a Community College or a Technical College. According to *§ 16-60-111.4, Code of Alabama 1975*, as amended, the Board prescribed qualifications for positions such as registrar.

13.  Seems to be a self serving statement without any evidence to back it up.

14.  Cannot comment on Robinson's other duties, but in addition to registrar, Owensby serves as Assistant to the Dean of Students and Support Services, in addition to being the Coordinator for the ACCESS software program.

15.  Paragraph 15 is mostly a self serving statement with no documentation to substantiate what is stated.

16.  Owensby coordinates the ACCESS software program and all of its updates.  So any decrease in her workload has been taken up by coordinating the ACCESS software program.

17.  Owensby took over approximately 80% of the registrar's duties and responsibilities. The decision to make promotions without a competitive search was the way President Chambers operated Ingram's promotional procedure.

18.  It seems as though Owensby was mis-classified since the Chancellor approved her promotion to Schedule C, although several years later.

19. Owensby's comparators held similar titles and positions, but not necessarily like duties but still held the same level of responsibilities.

20. Owensby never claimed she performed the same job duties, only similar levels of responsibilities.

21. According to paragraph 18, Owensby filed an internal grievance alleging race and sex discrimination. President Chambers obviously choose not to discuss the matter with Owensby after she filed a Complaint. Owensby followed procedure.

22. It is interesting that President Chambers does not deny discrimination against Owensby, only states that he never ***intentionally*** discriminated. This appears to be an admission of discrimination. Intentional discrimination can be determined from circumstantial evidence and it is clearly shown that females at Ingram are not paid on the same high salary schedule as males for similar positions.

### Title VII

On September 1, 2005, Owensby was promoted to Registrar and given the title of Director of Registration. Her pay was set at $50,379.00 on the E-1-01 Salary Schedule. On November 17, 2005, Owensby filed an EEOC Complaint alleging discrimination based on race, sex and equal pay. (Exhibit 14 ). The EEOC Complaint was filed well within the 180 day time limit from September 1, 2005 and thus, is timely filed.

An analysis of the Title VII claim reveals that the registrar before Owensby that was appointed to the Registrar position, was a black male, Robinson, who was paid on the C Salary Schedule. (Wilson depo. p.161. ll.9-23).

It is of interest to note that according to President Chambers' affidavit, paragraph 1, he

13

states "I am also given the authority to appoint the faculty and staff according to qualifications prescribed by the Board and such other regulations that may be adopted by the Board." (Exhibit 13). Therefore, the qualifications of registrar are the qualifications established by the Board, not the qualifications established by President Chambers or any other employee of Ingram.

What the evidence shows is that a black female was promoted to a position formerly held by a black male. According to Dean Wilson's testimony, and Dean Wilson is the registrar's supervisor, Robinson, a black male, was paid on the C Salary Schedule. According to Owensby, Robinson's salary when he resigned in 1999 was $67,000.00 per year. (Owensby depo. p.227, ll.3-5).

Owensby was apparently given most, if not all, of Robinson's job duties when she was promoted to Coordinator of Registration and Admissions on November 1, 2000. However, she was not appointed Registrar until September 1, 2005, and then paid on the E-1-01 Salary Schedule.

Finally, on August 31, 2006, Owensby was promoted to Director of Registration and Admissions and placed on the low end of the C Salary Schedule.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin..." 42 U.S.C. § 2000 e-2 (a)(1). In this instance Owensby, since this is a Title VII claim, is not required to prove directly that race or gender is the reason for the employer's decision. Rather, Owensby may rely on direct or circumstantial evidence of discrimination to show that Ingram discriminated against her. *St. Mary's Honor Center v. Hicks,*

14

509 U.S. 502, 526, 113 S. Ct. 2742, 125 L.Ed.2d. 407 (1993).

Direct evidence is defined as "evidence which is believed, proves the existence of the fact in issue without inference or presumption." *Merritt v. Dillard Paper Co.,* 120 F.3d. 1181, 1189, (11th Cir. 1987).

To prevail on a Title VII claim with circumstantial evidence, Owensby must show that:

1. She is a member of a protected class;
2. She was qualified for the position;
3. She suffered an adverse employment action; and
4. She was treated less favorably than a similarly situated individual outside her protected class.

See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L. Ed. 2d 688 (1973).

In this instance there is no doubt that Owensby, being a black female, is a member of a protected class. The very fact that she has been appointed as registrar proves she meet the Board's qualifications. Her adverse employment action was less pay and a different salary schedule than her male predecessor, Robinson. Owensby was treated differently because she was on a lower salary schedule and paid less money than her male predecessor.

The reasons given by Dean Wilson, Dr. Merk, and President Chambers for less pay do not apply to the lower salary schedule, as Owensby had to meet qualifications established for registrar by the State Board of Education to be considered and eventually appointed as registrar. No one was able to clarify why Owensby was paid less than Robinson or Griswold for performing substantially the same job.

Circumstantial evidence that shows gender discrimination occurs at Ingram is that all other Assistants to Deans are male and are paid on the C Salary Schedule, while Owensby, as

15

Assistant to the Dean of Students and Student Services, was paid on the lower E Salary Schedule. This occurred even though President Chambers testified in his deposition that salaries are set by the position, not because of the person in the position. This shows arbitrary and inconsistent treatment.

Owensby's Title VII claim is only against Ingram and not Chambers and Wilson since Ingram is the employer.

Based on the foregoing, Owensby's Title VII claim should survive Defendants' summary judgment motion.

<center>**42 U.S.C 1983 Claim**</center>

In Count II of Owensby's Complaint, she alleges that President Chambers' and Dean Wilson's actions toward her violated her right to be free of race and sex discrimination in her employment, in violation of 42 U.S.C. § 1983.

In *Vessels v. Atlanta Independent School System,* 408 F.3d 763 (11th Cir. 2005) the Court pointed out that "disparate treatment claims, brought under Title VII, §1981 and §1983, all require proof of discriminatory intent. In order to establish a prima facie case and raise the inference of discriminatory intent, Owensby must only demonstrate:

> 1. She is a member of a protected class;
> 2. She was qualified for the position;
> 3. She suffered an adverse employment action; and
> 4. She was treated less favorably than a similarly situated individual outside her protected class.
> See *McDonnell Douglas Corp., supra.*

In this instance, it is admitted that Owensby is a black female. According to President Chambers' affidavit, he can only appoint faculty and staff according to the qualification

<center>16</center>

prescribed by the State Board of Education. (Exhibit 13). Thus, the fact that Owensby is in the position clearly she is deemed qualified or she could not have even been considered.

This Count is different from Count I, in that Owensby's Complaint goes back to when she was made Registrar and Assistant to the Dean of Students and Support Services. President Chambers testified in his deposition that both Mr. Griswold and Ms. Owensby occupied the position of Assistant to the Deans, that the titles were the same, but duties were different. (Chambers depo. p.157, ll.11-23, p.158, ll.1-7). When asked "Is the salary set by position or is it set by the person occupying the position?" President Chambers responded, "for the position." (Chambers depo. p.158, ll.19-22). However, President Chambers then stated there was no salary schedule for Assistant to the Deans and went on to explain it was based upon the person, the duties, jobs, roles, responsibilities, which contradicted him earlier testimony that the salary is set by position. (Chambers depo. p. 159, ll.1-23). What President Chambers' response indicates is there is no formal procedure that established salaries for positions. The evidence shows that salaries are arbitrarily set and that male salaries are higher than female salaries for substantially equal jobs.

The Equal Pay Act of 1963, which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §206(d) (1976) as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et. seq.*, prohibits gender based discrimination in rates of pay to employees. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Circ. 1992). Owensby has established a prima facie case since she has shown that her job as registrar and Robinson's job as registrar are substantially equal. Additionally, Owensby has shown that her job as Assistant to the Dean and Griswold's job as Assistant to the Dean are also substantially equal. *Broch v.*

17

*Georgia Southwestern College,* 765 F.2d 1026, 1036 (11ᵗʰ Cir. 1985).  To establish a prima facie

case, the focus is solely on the primary duties of each job, not duties that are incidental or

insubstantial.  *Jones v. Western-Urban Health Center,* 760 F. Supp.1575 (S.D.Ga. 1991)(citing

*Goodrich v. International Brotherhood of Electrical Workers,* 815 F.2d 1519, 1524 (D.C. Cir.

1987).

Owensby is not required to prove that the job held by her male comparators is identical to

others, only demonstrate that the skill, effort and responsibility required in the performance of the

jobs were "substantially equal."  *Corning Glass Works,* 417 U.S. @ 204, 94 S. Ct. @ 2232-33;

*Broch v. Georgia Southwestern College,* 765 F.2d. 1026, 1032 (11ᵗʰ Cir. 1985).

In this situation, Owensby who is a black female, is paid on a lower salary schedule while

performing the same job, Assistant to the Dean, as a white male, Griswold.  Also, it is evident

that Owensby is performing substantially equal job that was being performed by Robinson, a

male, who was registrar, and Owensby was paid on a lower salary schedule.  There is no doubt

that Owensby has been discriminated against based on race and sex.

Are the Defendants entitled to immunity? No, it is clearly established law that one may

not be discriminated against in pay based on race and sex.  "Qualified immunity offers complete

protection for government officials sued in their individual capacities if their conduct does not

violate clearly established statutory or constitutional rights which a reasonable person would

have known."  *Vinyard v. Wilson,* 311 F.3d. 1340, 1346 (11ᵗʰ Circ. 2002)(quoting *Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738(1982).

It is admitted that both President Chambers and Dean Wilson are state officials.

However, it is undisputed that Title VII and the Equal Pay Act forbids discrimination based on

gender, sex, and race. The question is whether the state of the law gave President Chambers and/or Dean Wilson "fair warning" that the treatment of Owensby as concerns her pay was a violation of a clearly established statutory right. *Marsh v. Butler County*, 268 F.3d. 1014, 1031 (11th Cir. 2001).

Fair warning is given by case law existing at the time of the violation. *Vinyard v. Wilson*, 311 F. 3d @ 1351. It has long been held that gender based discrimination in pay rates is prohibited by the Equal Pay Act of 1963 and by Title VII of the Civil Rights Act of 1964. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d. 1518 (11th Circ. 1992); *Waters v. Turner*, 874 F.2d 797, 801 (11th Cir. 1989); *Beall v. Curtis*, 603 F. Supp. 1563, 1580 (M.D. Ga.), *aff'd without op.* 778 F.2d 791 (11th Cir. 1985).

## Conclusion

Owensby has been discriminated against on her salary schedule since 1999. She was paid on a lower salary than the white male Assistant to the Dean. When Owensby was appointed registrar in September 2005, she was paid on a lower pay scale than former registrar, who was a male. According to President Chambers' affidavit, he can only hire individuals who meet the qualifications established by the State Board of Education. Also, according to President Chambers, salaries are established by position, and are not based upon the person occupying the position. President Chambers' affidavit clearly shows Ingram has no formal system as Owensby kept the same duties and was given different titles over the years. If is extremely odd that no job descriptions have been provided for Owensby's position and her comparators' positions. One can only conclude, no such job description exist, which is circumstantial evidence of discrimination.

19

Owensby has clearly shown her salary for a like position is much lower than similarly

situated males and whites.  There is more than a genuine issue of material fact in this case.

Defendants' motion for summary judgment is due to be denied.


Respectfully submitted this the 27th day of September, 2007.

Jim L. DeBardelaben (DEB003)
Attorney for Plaintiff Owensby

**OF COUNSEL:**
Jim L. DeBardelaben
Attorneys At Law
Post Office Box 152
1505 Madison Avenue (36107)
Montgomery, Alabama   36101-0152
(334) 265-9206


## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document via U. S. Mail,
postage prepaid, upon the following on this the ___27th___ day of September, 2007:


Andrew W. Christman, Esq.
Matthew Y. Beam, Esq.
Gidiere, Hinton, Herndon & Christman
P.O. Box 4190
Montgomery, Alabama 36103


OF COUNSEL

20



Ingram
State
Technical
College
**ISTC**
• Developing Responsible Citizens •

**J. Douglas Chambers**
President


**Rickey A. Huffstutler, Ph.D**
Dean of the College


**Monica J. Greene**
Dean of
Fiscal Affairs


**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
## MEMORANDUM

**TO:**        **Bonita J. Lewis**

**FROM:**      J. Douglas Chambers

**SUBJECT:**   Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as Secretary, beginning effective September 1, 1999, for the period ending August 31, 2000.  Pay will be determined from Salary Schedule E at Rank E3, Step 15.  Annual salary for this twelve (12) month appointment is $35,970. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature _____     Date _____

cc:        Personnel file

**PLAINTIFF'S EXHIBIT**
**1**



**Ingram**
*State*
*Technical*
*College*

**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE
July 28, 2000

## MEMORANDUM

**TO:**          **Bonita J. Lewis**

**FROM:**        J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, "may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as Secretary, beginning effective September 1, 2000, for the period ending August 31, 2001. Pay will be determined from Salary Schedule E3 at Grade 03, Step 18. Annual salary for this twelve (12) month appointment is $37,409. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Lewis*          Date 8/16/00

cc:       Personnel file

*P.O. Box 220350 • Deatsville, Alabama 36022*
*Phone: 334-285-5177 • Fax: 334-285-5328*



PLAINTIFF'S
EXHIBIT
**2**



*Ingram
State
Technical
College*

**ISTC**

• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

October 13, 2000

## MEMORANDUM

**TO:**         Bonita J. Owensby

**FROM:**        J. Douglas Chambers

*J. Douglas Chambers*

**SUBJECT:**   Temporary Appointment

Sections 602 and 603 of the Alabama College System Policy Manual state, "The President is authorized to appoint all faculty and staff at the local level," and further, " may offer twelve, nine, or three month Contracts as appropriate...."

The purpose of this memo is to confirm your temporary appointment as Coordinator of Registration and Admission, beginning effective November 1, 2000, for the period ending August 31, 2001. Pay will be determined from Salary Schedule E2 at Grade 02, Step 15 (18). Annual salary for twelve (12) month appointments at this level is $41,047. MJG

This employment will be subject to all employment policies, conditions, and standards now or hereafter adopted by the Alabama State Board of Education, The Alabama College System, or J.F. Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature *Bonita J. Owensby*        Date *11/29/00*

cc:        Personnel file

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



**PLAINTIFF'S
EXHIBIT**

**3**



**Ingram
State
Technical
College**

**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

# INGRAM STATE TECHNICAL COLLEGE

August 17, 2001

**MEMORANDUM**

**TO:**          **Bonita J. Owensby**

**FROM:**        J. Douglas Chambers

**SUBJECT:**     Appointment

Sections 602 and 603 of the Alabama College System Policy Manual
state, "The President is authorized to appoint all faculty and staff at
the local level," and further, " may offer twelve, nine, or three month
Contracts as appropriate...."

The purpose of this memo is to confirm your appointment as
<u>Coordinator of Registration and Admission</u>, beginning effective
September 1, 2001, for the period ending August 31, 2002. Pay will
be determined from <u>Salary Schedule E2 at Grade 02, Step 15 (19)</u>.
Annual salary for this twelve (12) month appointment is <u>$41,047.00.</u> MJG

This employment will be subject to all employment policies,
conditions, and standards now or hereafter adopted by the Alabama
State Board of Education, The Alabama College System, or J.F.
Ingram State Technical College.

Please sign below to indicate your acceptance of this appointment.

Signature _Bonita J. Owensby_ Date _10/04/2001_

cc:          Personnel file

*P.O. Box 220350  •  Deatsville, Alabama 36022*
*Phone: 334-285-5177  •  Fax: 334-285-5328*



**PLAINTIFF'S
EXHIBIT
4**

October 5, 1999

## MEMORANDUM

TO:        Mr. J. Douglas Chambers
           President


FROM:      Bonita J. Lewis
           Secretary to the Dean of Students

RE:        Salary Increase

Mr. Chambers, I respectfully request an increase in salary because of the extra duties and responsibilities that have been added to my job since March of this year.

As you know, J. F. Ingram State Technical College has been without a Registrar and at the main campus, without a counselor. I am doing most of the duties that were assigned to the Registrar and Mrs. Toxey and Mr. Wilson do the others. These duties are being performed daily. I accepted the added responsibilities given to me out of cooperation and willingness to be a team player and feel that I have handled them quite well. Also, when the college underwent reorganization and Mr. Wilson assumed the Dean of Students position, the department assumed the Student Support Services Project. I was given added responsibilities and duties as Secretary for the project. In the absence of Mr. Wilson, I assist students, faculty and other departments with what is needed from the Student Services' office.

Mr. Wilson has submitted a copy of my new job description to your office for review. I believe that these additional duties amply support my request for a salary increase.

Your consideration in this matter will be greatly appreciated.


Respectfully submitted,

*Bonita J. Lewis*

cc:  Mr. James Wilson
     My personnel file



**PLAINTIFF'S EXHIBIT**

*5*



**INGRAM STATE TECHNICAL COLLEGE**

*Ingram*
*State*
*Technical*
*College*

**ISTC**
• *Developing Responsible Citizens* •

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D**
Dean of the College

**Monica J. Greene**
Dean of
Fiscal Affairs

**James E. Wilson**
Dean of Students
and Support Services

**MEMORANDUM**

**TO:**      Ms. Bonita J. Lewis

**FROM:**    J. Douglas Chambers, President

*J. Douglas Chambers*

**REFERENCE:**  Salary Increase

**DATE:**     October 7, 1999

       This correspondence is being sent to acknowledge receipt of your memorandum requesting a salary increase.

       I am presently working with college administrators to develop a new organizational structure to accommodate the loss of personnel. I will be meeting with your Dean to discuss your memorandum further. Full consideration will be given to your request as soon as possible.

JDC:shm

cc:   Dean Wilson
      Mr. Greg Wright



*P.O. Box 220350 • Deatsville, Alabama 36022*

*Phone: 334-285-5177 • Fax: 334-285-5328*



**PLAINTIFF'S EXHIBIT**

*6*



J. F. Ingram
State
Technical
College

*Developing Responsible Citizens*

# J. F. INGRAM STATE TECHNICAL COLL

October 8, 1999

**J. Douglas Chambers**
President

**Rickey A. Huffstutler, Ph.D.**
Dean of the College

**James E. Wilson**
Dean of Students &
Support Services

**Monica J. Greene**
Dean of Fiscal Affairs

TO:     Mr. J. Douglas Chambers
        President

FROM:   Mr. James E. Wilson, Dean of Students &
        Support Services

RE:     Student Services

This memorandum is presented to request that you reconsider your request for an open discussion in cabinet meeting as it relates to the upgrades and job changes for personnel in the Student Services Division. Though I felt it would be beneficial for the group to have a clear understanding of the services the division provides, and the role, duties and functions of all division personnel, I do not feel that it is a necessary evil.

Additionally, I can not remember attending any cabinet meeting to discuss changes in other departments' personnel though many changes have occurred. Personnel such as Mr. Brock, Mr. Carter, Mrs. Coburn, Mr. Foshee, Mrs. Givens, Mrs. Garcia, Mr. Henderson, Mrs. Mullins, Mr. Prosser, Mrs. Romine, Mr. Walker and others have been promoted, had their titles changed, or had salary adjusted without having the benefit of open discussion in a cabinet meeting. I have provided your office with numerous memos outlining department structure, personnel job descriptions, work process flow charts, and work overloads.

It is within every day reason to expect that with the resignation of the Registrar and Counselor of any college, the position would be filled and the work handled by a replacement. This was the case in the business office when Ms. Barbara Ackerman was replaced and Ms. Givens was promoted to the Administrative Assistant to the Dean of Business.

Personnel in both Student Services and Student Support Services have been very cooperative in doing the jobs of others when there are vacancies. Presently, I serve as Director of Student Support Services, Director of the N & D project, main campus Coordinator of Student Services/Counselor, Student Support Services advisor, and the Registrar for the College. Additionally, when Mr. Griswold was placed on loan to Dr. Huffstutler, his duties as Admission and Placement Officer were placed on other personnel. There is no question that people in this department do way more than their share of the college's work every day. The question is whether or not they receive fair compensation.

Phone: 334-285-5177     Fax: 334-285-5328
P. O. Box 220350  Deatsville, Alabama 36022



PLAINTIFF'S
EXHIBIT

7

Memorandum
October 8, 1999
Page 2

I recommend that Mrs. Bonita Lewis' title be changed to Administrative Assistant to the Dean of Students and her pay grade be changed to E 1. I also recommend that Mrs. Toxey's title be changed to Admissions Officer and her pay grade changed to E 2.

As Director of Student Support Services, I recommend that Mr. Hodge and Mr. Pace have their pay grades changed to E 2. This will help avoid legal liability as a result of Mrs. Ross' complaint, settled out of court in 1994.

September 18, 2000

MEMORANDUM

TO:        Mr. J. Douglas Chambers
           President

FROM:      Bonita J. Owensby
           Secretary to the Dean of Students

      I am presenting this memorandum to you in an effort to readdress my October 5, 1999 memo referencing a request for a salary increase to compensate for the extra duties that were assigned to me in March 1999 upon the resignation of the Registrar. You stated in your October 7, 1999 memo that you were working with college administrators to develop a new organizational structure to accommodate the loss of personnel. You also stated that you would meet with my supervisor to discuss my request further. To my knowledge, several issues have been discussed since that time. I recall you stating that the restructuring would begin in January, 2000. However, January has passed, the new fiscal year has begun, contracts have been presented, and my contract only reflected the 4% state raise. It disappointed me to find out that after over a year of discussing and considering, my E-3 status has not changed. Because of this, I find it necessary for me to personally provide you with a synopsis of the duties in which I perform under my official title as Secretary to the Dean of Students along with the extra duties that was assigned to me. In March 1999, my supervisor, Mr. James Wilson called a meeting with some of the Student Services staff. In that meeting, Mr. Wilson told us that the Registrar had resigned and the duties that was assigned to him had to assessed and distributed among the remaining staff. I was told by Mr. Wilson that he would recommend that I be compensated for the extra duties incurred. I took Mr. Wilson at his word and with my willingness to cooperated and my dedication in helping provide our students with every service obtainable from the Student Services department, I assumed the extra duties and did my best in performing the following duties.

Duties performed as Secretary to the Dean of Students:

1.   Compose, type, and prepare for Dean's signature all Student Services related institutional memos and outgoing correspondence.

2.   Review numerous incoming correspondences requesting information as it relates to transcripts, copies of award documents, and other inquiries concerning Student Services for both former and current students. Respond appropriately and expediently.

3.   Receive telephone calls for the department


PLAINTIFF'S
EXHIBIT
8

4. Provide secretarial support for Student Support Services and Neglected and Delinquent Projects by researching data from AS-400, typing statistical forms to be included in reports and grants.

5. Serve as back up for the Dean when he's not available dealing with issues from instructors, students, and outside agencies. Provide appropriate information.

6. When directed by the Dean, coordinate with DOC officials relative to student status.

7. Process Student Removal and Disciplinary Forms

Additional duties performed since March 1999:

1. Coordinate with Fiscal Affairs office regarding students who must their own tuition.

2. Assist in performing data entry duties relevant to student admission and registration as necessary.

3. Process change of major forms and coordinate with corrections ICS officials to make appropriate changes for the gate roster.

4. Process Transfer Credit Forms by listing courses comparable to Ingram's core curriculum and submit to Dean for final approval. These forms are processed in a timely manner.

5. Collect and correlate Intent to Graduate Forms upon receipt; produce a list of graduates and process award documents for each student; sort and prepare for distribution; and mail documents to students that are no longer in the system.

6. Post all graduation data to AS-400 as well as maintain database of all awards granted to include all Certificates of Employability Skills.

7. Prepare President's and Dean's List letters for appropriate signature, sort and distribute to DOC's classifications office.

8. Prepare Standard of Progress letters for appropriate signatures, sort and distribute to DOC's classifications office.

9. Provide students with unofficial transcripts, student schedules, and other information as needed.

I can attest to the fact that I am performing the above mentioned duties and that my performance of the said duties cannot be truthfully denied by anyone.

cc: Mr. James Wilson
    Personnel File
    Legal Representation

October 1, 2000

---

MEMORANDUM

TO:        Mr. J. Douglas Chambers
           President

FROM:      Bonita J. Owensby
           Secretary to the Dean of Students

This memo serves as a follow-up of our September 20th meeting as well as my final effort to convey to you "justification" for the Request for Salary Increase that was submitted to you by my supervisor in 1999.

I've been employed at J. F. Ingram since 1985. Since that time, I have worked in several capacities, all of which I have successfully carried out my duties and responsibilities. I am a diligent and competent worker who has continuously proven my ability to perform and produce in multiple task situations. My capabilities are not limited to just secretarial skills. My educational background enhanced my knowledge and provided me with skills. My overall work experiences provided the opportunities to use such skills and knowledge to be an effective employer. In many instances, I have gone beyond my initial duties and responsibilities.

Due to the March 1999 resignation of the Registrar, I was called upon to take on extra duties. I was told by my supervisor that he would recommend a pay increase to compensate for the extra duties incurred. Since that time, several issues derived from that matter. I have communicated with you verbally and in writing. I have also submitted to you a synopsis of what my job entails. However, a decision is yet to be made.

I have given you what you have asked of me, and having done so, I know ask you to be fair with me and follow-up with your decision. I look forward to hearing from you in the very near future. Your quickest response will be appreciated.



PLAINTIFF'S EXHIBIT
9

October 9, 2000

# MEMORANDUM

**TO:**       Mr. J. Douglas Chambers, President
              J. F. Ingram State Technical College

**FROM:**     Bonita J. Owensby
              Secretary to the Dean of Students

**RE:**       Position Upgrade

    This memo serves as a follow-up of our September 20th meeting, the October 2nd group meeting, and to personally give you my reasons to upgrade my position.

    During the course of my tenure, I have acquired skills in various capacities to help me successfully carry out my duties and responsibilities. I am a competent worker who has continuously proven my dedication to perform and produce in multiple tasks. My duties and responsibilities have surpassed my secretarial skills. I have learned to communicate effectively in the absence of the Dean of Students and capable of facilitating the immediate needs for a day-to-day operation of the Office of Student Services/Support Services. I interact well with staff, faculty, administrators, and our unique student population. I am capable of analyzing situations and finding solutions. I am a paraprofessional with an Associate of Arts Degree in General Education, buffed with a diploma in Legal Stenography to enhance my educational and technical skills. My overall work experiences has allowed me the opportunity to use my skills and knowledge to be an effective employee. I've performed my duties without petty complaints.

    I understand your concerns regarding the upgrade of my position, however, I can assure you that I will accept my new responsibilities along with my already acquired responsibility as Secretary to the Dean of Students. I sincerely thank you for this opportunity of expressing myself and I look forward to hearing your decision regarding this matter.

/bjo



**PLAINTIFF'S EXHIBIT**
*10*

July 25, 2002

MEMORANDUM

TO:        Dr. James T. Merk
           Personnel Director


FROM:      Bonita J. Owensby
           Admissions Coordinator

RE:        Placement Status on E-Salary Schedule

        I am submitting this correspondence because I feel that my position as Admissions Coordinator should be compensable to an "E-1, Grade 1" status on the E-Salary Schedule. My reasons are as follows:

        This fiscal year begins my eighteenth year of employment at J. F. Ingram. For sixteen years, I have worked directly under the Dean of Students, administering support in various disciplines involved in the Student Services Division. My role in the department involves a significant amount of responsibilities that require in-depth knowledge of concepts, methods, and procedures to practical situations involved in Student Services. I effectively perform my tasks with initiative and a sense of urgency. I am fully able to comprehend and respond efficiently in all aspects of my job, to include admissions and records. A considerable portion of my job requires fast-paced performances of multiple tasks that usually compete for the same deadline. I have proven myself to be dependable in that area and all other areas inclusive of my duties and responsibilities.

        My past and present employee evaluations reflect approval of my job performance. I have also given myself a true assessment of my job performance and feel that I meet the standards. I have returned to college to finish required courses needed to obtain a Batchelor of Science degree in Management of Human Resources; and it is my plan to continue to contribute positive efforts towards the mission and goals of this institution.

        A favorable consideration of this matter will be appreciated.


BJO

cc:    Mr. James Wilson
       Mr. J. Douglas Chambers


PLAINTIFF'S
EXHIBIT

11



August 13, 2004

TO:        Mr. James E. Wilson
           Dean of Students and Support Services

FROM:      Bonita J. Owensby
           Registrar and Assistant to the Dean of Students

RE:        Request for Salary Increase

Last August, my job title changed from Admissions Coordinator to Registrar/Assistant to the Dean of Students. I assumed this position not by title only, but with increased efforts to handle that level of responsibility. This dual-role position constantly challenges my ability, knowledge, and skills to be effective and efficient in both areas.

The following is a detailed analysis of the improved and increased duties performed as Registrar/Assistant to the Dean of Students:

- Improved the procedure for tracking and processing paying student (copy of tuition policy is included in admissions packet and is explained during orientation, verify proof of completion and inform both student and business office by letter).
- Initiated a change in testing procedures (resulted improved assessment scores for FA0304 and SP0304 semesters and increased enrollment).
- Increased activity in transcribing and evaluating transcripts and conferring with other schools and former students regarding transcripts (due to more students enrolling with prior college credit and DOC transitions).
- Increased communications and transaction with DOC ICS officials involving testing, job board scheduling for special services, program placements, status changes to include withdrawals, suspensions, stop-ups, and student aide assignments.
- Increased activity in assisting students with admission related issues and with academic advisement.
- Increased contacting and consulting with faculty to secure correct and pertinent data for student records (due to additional ADL instructors and an ongoing effort with existing faculty).
- Helped to improve the method of securing follow-up and transitional data by getting information from former students who contact the school for transcripts, etc.
- Increased department management duties (assist with training new staff and student aides).
- Directed and provided assistance with improving existing admission office forms and publications and creating new forms and publications

Only the duties that were affected by improvements and increases were listed, however, the overall duties and responsibilities of my job play a key role within the student services department as well as this institution. Considering my years of experience, level of responsibility and workload, I deserve a pay increase. My salary is far below others in the system with dual roles and same type titles. It is my hope that I will be offered a salary increase that reflects these issues and my standing in the department.



PLAINTIFF'S EXHIBIT
12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BONITA J. OWENSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV 2:06 CV796-WKW |
| | ) | |
| J.F. INGRAM STATE TECHNICAL | ) | |
| COLLEGE; J. DOUGLAS | ) | |
| CHAMBERS INDIVIDUALLY | ) | |
| AND IN HIS OFFICIAL CAPACTIY | ) | |
| AS PRESIDENT OF J.F. INGRAM | ) | |
| STATE TECHNICAL COLLEGE; | ) | |
| AND JAMES WILSON, | ) | |
| INDIVIDUALLY AND IN HIS | ) | |
| OFFICIAL CAPACITY AS DEAN | ) | |
| OF STUDENTS AND SUPPORT | ) | |
| SERVICES AT J.F. INGRAM | ) | |
| STATE TECHNICAL COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF J. DOUGLAS CHAMBERS

Before me, the undersigned notary public in and for said county and state, personally appeared J. Douglas Chambers, who upon being duly sworn on oath deposed and said as follows:

1.    My name is J. Douglas Chambers. I have been President of J. F. Ingram State Technical College since May 1, 1996. In this capacity, I am responsible for administering the institution in accordance with the State Board's policies, local institutional policies and applicable federal, state and local laws. I am also given the authority to appoint the faculty and staff according to qualifications prescribed by the Board and such other regulations that may be adopted by the Board.



PLAINTIFF'S
EXHIBIT
13

2.    J. F. Ingram State Technical College is a two-year Alabama technical college located in Deatsville, Alabama that was established exclusively to provide occupations training to inmates, male and female, at the adult state correctional institutions in Montgomery and Elmore Counties. All of its students are adult inmates who have been convicted of one or more felonies and who are assigned by the Alabama Department of Corrections to be students at Ingram. In addition to occupations training at the associate degree level, and the certificate level, Ingram provides remedial education and special education services. It is the only college in Alabama whose student body is composed exclusively of student inmates. The State Board of Education serves as the Board of Control for Ingram, and the other community and technical colleges in the Alabama college system. The Chancellor of the Alabama Department of Post Secondary Education serves as the Chief Executive Officer for the system. All statewide policies that apply to Ingram are adopted by the State Board at the recommendation of the Chancellor. Once the state wide policies are adopted, the Chancellor is charged with the responsibility of interpreting and enforcing those policies.

3.    The State Board of Education has adopted a Salary Schedule policy for application at community and technical colleges in Alabama. These Salary Schedules are designated as "A," "B," "C," "D," "E," and "H." The A Salary Schedule is for college Presidents, the B Salary Schedule is for Deans and Dean-level administrator, the C Salary Schedule is designated for "Professional Personnel," D is for college instructors, and H is for part-time support employees and the E Salary Schedule is designated for "Full-time Support Personnel 40 Hours Per Week." The Salary Schedules which are at issue here are the "C" Salary Schedules, which are comprised of C-1, C-2, and C-3; and the E

Salary Schedule, which is divided into ranges 1 – 5, with 1 being the highest. Step

placement is based on years of employment already completed (during prior years) with

the respective college, and is based on an employee's having already completed at least 9

months of employment during a given academic year. The Salary Schedule designations

indicate the Salary Schedule ("E"), the range (i.e."7"), the Step placement, and, in

parentheses, the years of credit toward Step placement. Prior to 2000, the E Salary

Schedule had seven ranges. In 2000, the number of steps was reduced to five, but within

each range were added grades 01-03, with Grade 01 being the highest. In addition to

providing such Schedules, the State Board has adopted guidelines and procedures for

assigning personnel to the various Salary Schedules.

      4.      Ms. Owensby is a black female that has been employed at J.F. Ingram

State Technical College ("Ingram") continuously since February 13, 1985, except for one

brief instance in which she resigned for personal reasons and was allowed to return.

      5.      The record shows that in Owensby's case, she has been promoted by, and

received pay raises from, the President of Ingram on at least two occasions. She also

received three other pay increases from the President of Ingram in addition to the two

promotional increases and all the normal increases in pay that she would have otherwise

received based on years of service.

      6.      The first position Owensby held was Office Clerk, and her salary for that

appointment was $10,272. This position is in Range 7, Step 0 on the E Salary Schedule.

The initial hiring of Owensby was done through an advertised vacancy announcement.

Ingram's employment records indicate that every employment appointment for Owensby

since that date have been made without her having to compete against any other applicant

or interested party.  These promotions, since May 1, 1996, have all been internal

adjustments and promotions made at the discretion of the President of the College.

    7.     Owensby's history of job appointments is as follows:

## EMPLOYMENT HIRING CHART

| POSITION | EFFECTIVE DATE | SALARY PLACEMENT |
|---|---|---|
| Office Clerk | 2/13/85 | E-7, O(0), $10,272 |
| Office Clerk | 9/1/85 | E-7, 1(1), $11,256 |
| Office Clerk | 9/1/86 | E-7, 2(2), $11,718 |
| Secretary to the Dean of Students and Student Services | 7/20/87 | E-6, 2(2), $13,104 |
| Secretary to the Dean of Students and Student Services | 9/1/87 | E-6, 3(3), $13,566 |
| Secretary to the Dean of Students and Student Services | 9/1/88 | E-6, 4(4), $15,101 |
| Secretary to the Dean of Students and Student Services | 9/1/89 | E-5, 5(5), $18,077 |
| Secretary to the Dean of Students and Student Services | 9/1/90 | E-5, 6(6), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/91 | E-5, 6(7), $20,064 |
| Secretary to the Dean of Students and Student Services | 9/1/92 | E-5, 8(8), $20,600 |

Secretary to the Dean of
Students and Student
Services          9/1/93                    E-5, 8(9), $21,941

Secretary to the Dean of
Students and Student
Services          9/1/94                    E-3, 10(10), $30,633

Secretary to the Dean of
Students and Student
Services          9/1/95                    E-3, 10(11), $30,633

Secretary to the Dean of
Students and Student
Services          9/1/96                    E-3, 10(12), $31,860

Secretary to the Dean of
Students and Student
Services          9/1/97                    E-3, 10(13), $31,860

Secretary          9/1/98                   E-3, 15(16), $35,970

Secretary          9/1/99                   E-3, 15(17), $35,970

Secretary          9/1/00                   E-3-03, 15(18), $37,409

Coordinator of Registration
And Admissions     11/1/00                  E-2-02, 15(18), $41,047

Coordinator of Registration
And Admissions     9/1/01                   E-2-02, 15(19), $41,047

Coordinator of Registration
And Admissions     9/1/02                   E-1-01, 20(20), $47,527

Registrar and Assistant to
Dean of Students and
Support Services   9/1/03                   E-1-01, 20(21), $47,527

Registrar and Assistant to
Dean of Students and
Support Services   9/1/04                   E-1-01, 20(22), $47,527

Registrar          9/1/05                   E-1-01, 20(23), $50,379

Director of Registration

and Admissions        8/31/06              C-3, $60,000

8.      In accordance with the applicable Salary Schedules, Owensby has been

provided raises after 1, 2, 3, 4, 5, 6, 8, 10,15, 20 and 21 completed years of employment.

Owensby has, at times, been given credit for more years than she had, or has.  After only

seven months of employment, Owensby was moved from Step 0 to Step 1.  That meant

that for academic years 1985-86 through 1990-91, and in academic years 1992-93, and

1993-94, she was paid at one Step higher than she should have been.  When Owensby

was redesignated as a "Secretary" effective September 1, 1998, she was placed at Step 15

and given credit for sixteen years of service, even though she had actually completed

only 13 years of service.  As a result, during academic years 1998-99 and 1999-2000,

Owensby was paid at Step 15, when she should have been on Step 10; and during

academic years 2002-03 and 2003-04, Owensby was paid at Step 20 when she should

have been paid at Step 15.  Those extra Step increases demonstrate, once more, that over

the course of Owensby's employment, the college has been more than generous with

setting her salary levels.  Since Chambers became President of the College, Owensby's

pay has gone from $31,800.00 per year to $60,000.00 per year – nearly double.

9.      Owensby has, at times, had her various positions upgraded without having

to compete with any other applicants.  She received pay upgrades from E-7 to E-6 when

she was appointed to be Secretary to the Dean of Students and Student Affairs, and she

received upgrades from E-6 to E-3 while holding that position.  In addition, when she

was designated to be the Coordinator of Registration and Admissions (again without

having to compete for the position), her salary was upgraded from E-3 to E-2.  The re-

designation of Owensby's position to "Coordinator" was the result of an agreement

between Owensby and myself that included a provision that the redesignation was "a temporary assignment subject to modifications at the end of the fiscal year. . ." and that "[i]n the event that it is necessary, I may revert to my previous job title, duties, and salary placement." The position did not turn out to be temporary; and the title of that position was later changed to "Registrar/Assistant to Dean of Students and Student Services," without any significant change in duties. The position was initially temporary because Owensby had only secretarial experience. She was assuming some duties that were held by Robinson who had a Master's Degree and several years experience as an instructor. The temporary nature of the appointment had nothing to do with her gender or race.

10.     On or about October 12, 2004, Owensby filed a Grievance under Ingram's institutional grievance procedures. In accordance with college procedures, Owensby's Grievance was investigated by the College's Grievance Coordinator, who in that case was Dr. James Merk, Personnel Director. Dr. Merk thoroughly investigated Owensby's contentions and filed his Findings and Conclusions on October 25, 2004. Dr. Merk conducted an extensive review of her claims and found that her salary ranked her *above the average* when compared to other Alabama college system registrars. Thus, Dr. Merk determined that there was no evidence to support her claims that her salary does not commensurate with the average base salary.

11.     The C-3 Salary Schedule provides that the salary for any employee on that schedule is negotiable each year, up or down, so long as the salary does not exceed the maximum C-3 salary designated for the respective academic year. Note 4 of the Notes on the C Salary Schedule states that "Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination." An Ingram employee

can be placed on the C-3 Salary Schedule at a salary lower than what Owensby was receiving on the E Salary Schedule, with no guarantee of any increase (or even the same salary) for subsequent years. The President determines the salary level and whether to move an employee to the C Schedule at his sole discretion. Although recommendations are made by the employee's supervisor, the President may or may not follow those recommendations.

12.    Owensby's predecessor as Registrar, Mr. Timothy Robinson, a black male, was selected in 1989 after a competitive search, because the position of Registrar had been considered by the previous President of Ingram, Dr. Murray Gregg (a white male) to be a "professional" position at the Masters Degree level. A five-person search committee established pursuant to the Shuford Partial Consent Decree selected Mr. Robinson as a finalist for the position. Mr. Robinson had a Masters Degree and a teaching certificate. He had also been a full-time instructor at Ingram for five years prior to his appointment as Registrar. At the time of Mr. Robinson's appointment, President Gregg was in the process of seeking certification for Ingram to become a community college that would serve "free-world" students as well as student-inmates. After I was appointed, the Chancellor determined that the best and most cost-effective use of Ingram would be for it to remain a technical college serving only student-inmates.

13.    If Ingram had transitioned into a traditional community college, the position of registrar would have been more demanding and required a higher level of education and experience. A traditional community college would have a more diverse student population with a more diverse curriculum. A traditional community college Registrar would also have to oversee student transfers from other schools.

14.     In terms of compensation, Mr. Robinson's beginning salary as Registrar was $32,970 annually, which was only $393 a year more than he would have made that year had he continued as a full-time instructor.  While a full-time instructor, Mr. Robinson also served as Ingram's Coordinator of Displaced Homemakers (1988-89), Coordinator of Special Services (1984-86), and he developed the G.E.D. Testing Program at Ingram.  While serving as Registrar, Mr. Robinson also served on the Ingram Budget Planning Review Committee, the Ingram Administrative Council, and as Chairman of the Ingram Sick Leave Bank Committee.

15.     Even prior to Mr. Robinson's resignation from the Registrar position, I expressed dissatisfaction with the level of contributions made by the Registrar's position to the operations of the college.  When Mr. Robinson vacated the position, I determined that the position no longer needed to be a full-time professional position, because the duties could be handled within the Office of Dean of Students using existing employees.  That decision was made on the basis of what was best for the institution, and had nothing to do with anyone's race or sex.

16.     The implementation of the ACCESS software in 1998 reduced the administrative workload in the Student Services department and impacted my decisions with regard to the re-allocation of the Registrar duties after the retirement of Tim Robinson.  The ACCESS system automated many functions formerly performed "by hand" by the Registrar.

17.     As a result of the Office of Dean of Students having absorbed the Registrar duties, most of which were in essence divided between Owensby, Wilson (a black male), and Ms. Toxey (a black female).  I promoted Owensby to the position of

Coordinator of Registration and Admissions. Owensby's salary position was raised from

E-3 to E-2, effective November 11, 2000 (which included a $4,000 a year annual raise),

and then from E-2 to E-1 effective September 1, 2002. Those promotions were made

without a competitive search or anyone else being considered for the position. Effective

September 1, 2003, Owensby's title was changed to Registrar/Assistant to the Dean of

Students and Student Services. Her duties remained essentially the same, and her work

hours were not changed. In terms of duty hours, Owensby's present duties require forty

hours per week, which is the same schedule that she was working when she was a clerk,

then a secretary, and then Coordinator of Registration and Admissions.

18.     After Owensby filed an unsuccessful internal Grievance alleging race and

sex discrimination, I had the Dean of Students review her position to determine whether

it could, and should, be restructured into a professional position that could be placed on

the C Salary Schedule with the Chancellor's approval.

19.     Owensby's alleged comparators (Gene Bridgman, Julie Givens and Bill

Griswold) did not and have never had the same job responsibilities as Owensby.

20.     Bridgman and Givens worked in the Department of Fiscal Affairs.

Bridgman was a senior accountant with more than fifteen years experience, and Givens

assisted in all accounting and financial management functions of the fiscal department.

The staff in the Fiscal Department performs accounting, payroll, requisition, purchase

order, and other common fiscal functions. Owensby does not perform and has never

performed these functions. Owensby's duties relate to student registration and class

scheduling.

21.    Owensby has never had any discussion, or requested to have any discussion with me regarding conduct perceived by her as discrimination against her on the basis of her race or sex.

22.    I have never intentionally discriminated against Owensby because of her race or her gender regarding her pay or any other aspect of her employment.

*J. Douglas Chambers* (signature)

J. Douglas Chambers

STATE OF ALABAMA        )
                        )
COUNTY OF Montgomery     )

    I, the undersigned, authority, a notary public in and for said county and state, hereby certify that J. Douglas Chambers, whose name as President of J. F. Ingram State Technical College is signed to the foregoing and who is known to me, acknowledged before me on this day that the foregoing is true and correct to the best of his knowledge, information and belief and that he has executed the same as such officer and with full authority for and as the act of said corporation.

    Given under my hand and seal this 19th day of August, 2007.

*Erin G. Gross* (signature)

Notary Public

My Commission Expires 10|23|10

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | AGENCY<br>[ ]   FEPA<br>[X]  EEOC | CHARGE NUMBER<br>130-2006-01013 |
|---|---|---|

_____ and EEOC

State or local Agency, if any

| NAME (indicate Mr., Ms., Mrs.)  Mrs. Bonita J. Owensby | HOME TELEPHONE (include area code)  (334) 290-3642 |
|---|---|

| STREET ADDRESS                 CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 397 McKeithen Place, Millbrook, AL 36054 | 04/05/62 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| J. F. Ingram State Technical College | Greater than 15 employees | (334) 285-5177 |

| STREET ADDRESS            CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 5375 Ingram Road, Deatsville, AL 36022 | Elmore |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS            CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[x] RACE          [ ] COLOR          [x] SEX          [ ] RELIGION          [ ] AGE
[ ] RETALIATION   [ ] NATIONAL       [ ] DISABILITY   [x] OTHER (Specify)
                      ORIGIN                              Equal Pay

DATE DISCRIMINATION TOOK PLACE
EARLIEST                LATEST
On or about             Nov. 17, 2005
Oct. 2000

[x] Continuing action

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

The particulars of my charge are set forth in the attached affidavit.

RECEIVED
EEOC
NOV 2 8 2005
BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | _____ I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
|---|---|
| Date _Nov. 17, 2005_     Bonita J. Owensby<br>Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME ON<br>(DAY, MONTH, AND YEAR) |

EOC FORM 5 (Test 10/94)

PLAINTIFF'S EXHIBIT 14

STATE OF ALABAMA       )

COUNTY OF MONTGOMERY    )

## AFFIDAVIT OF BONITA J. OWENSBY

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, personally appeared Bonita J. Owensby, who being known to me and being first duly sworn, deposes and says as follows:

My name is Bonita J. Owensby. I am over the age of 19 years, I reside in Millbrook, Alabama, and this affidavit is given upon my personal knowledge.

1.      I am a black female who has been employed continually by J. F. Ingram State Technical College (hereinafter Ingram) for more than twenty (20) years, from February 1985 until the present. During my employment, I have been subjected to ongoing discrimination in pay, promotion, and other benefits of employment on the basis of my sex and race.

2.      During the more than 20 years I have worked for Ingram, I have officially held the following job titles:

     1)      Office Clerk to the Secretary to the President of Ingram (1985 to 1987);

     2)      Secretary to the Dean of Students and Support Services[1] (1987 to Sept. 2000);

     3)      The Coordinator of Admissions and Registration[2] (On or about Oct. 2000 - Aug. 2003); and,

     4)      Registrar and Assistant to the Dean of Students and Support Services (Sept. 2003-present).

---

[1]      As of 1998, the Dean of Students position was renamed Dean of Students and Support Services.

[2]      The Coordinator of Admissions and Registration was also known as Registration and Admissions Coordinator.

Page 1 of 8

However, regardless of my job titles and/or job responsibilities, *I have always been paid off of Schedule E*. Schedule E sets out the pay range for full-time Support Personnel. (See Schedules E in effect for 2000, 2002, and 2005 at Attachments 1, 2 and 3). However, beginning around October 2000, I should have been paid off of Schedule C which provides the pay range for professional personnel. It therefore provides a higher range of pay than Schedule E. (See Schedules C in effect for 2000, 2002, and 2005 at Attachments 4, 5 and 6).

3.     I was the secretary to the Dean of Students and Support Services from 1987 until on or about October 2000. During this time, around 1991, the position of Registrar was created at Ingram. Because of my experience in this area, I asked to be considered for this position but was told that Ingram had already hand picked one of the literacy instructors at Ingram, Timothy Robinson, to be promoted to the position of Registrar. (See Job Description at Attachment 7). I was, however, asked to perform a number of duties that were assigned to the Registrar (including training him for some of his duties) and to continue performing my duties as the secretary to the Dean of Students.

4.     In 1999, shortly after Mr. Robinson received a very negative performance review, he resigned from the position of Registrar. At that time, the vacated position of Registrar was not filled. Instead, I, along with others, received additional duties that had been previously assigned to the Registrar.

5.     In July 2000 I was performing some of the duties of the former Registrar while working as the Secretary to the Dean of Students and Support Services and being paid in accordance with Schedule E, Grade 3 Step 18 making $37,409.00. Around that time I learned that I was being paid less than a secretary who is white who works for one of the other deans. After I complained about the unjust disparity in pay, Ingram placed me in a job it had just created called Registration

and Admissions Coordinator. This newly created position of Registration and Admissions Coordinator was assigned all the duties of the former Registrar; however, it was not assigned the same pay.

6.    Meanwhile, the position of Registrar remained vacant. The pay scale for the Registrar had been Schedule C. However the pay scale for this newly created position was Schedule E. Schedule C provides a higher range of pay than Schedule E. (See Schedule C at Attachment 4).

7:    When I was promoted from the position of secretary to that of Registration and Admissions Coordinator my salary was increased from $37,409 (E3, Grade 3, Step 18) to $41,027.00 (E2, Grade 2, Step 18). I was still inexplicably paid less than the other secretary in issue. Moreover, my new salary of $41,027.00 was at least $25,973.00 less than the approximately $67,000.00 the male Registrar had been making at the time he resigned. In other words I was given the extra work and the responsibilities of the Registrar without receiving the job title or the pay. Clearly but for my race and gender, my salary would have been determined by Schedule C instead of Schedule E and my job title as of on or about October 2000 would have been that of Registrar.

8.    Approximately two (2) years later in October 2002 I received, along with other employees being paid in accordance with Schedule E, a raise of around $7,084.00 and my salary was increased from around $41,027 to around $47,527. Therefore, as of October 2002 I had topped out on the E salary schedule in effect at that time. (See the Schedule E in effect in 2002 at Attachment 2). However, I would note that, given my above referenced job responsibilities and my years of employment with Ingram, as of October 2002 my salary according to Schedule C should have been at a minimum $76,883.00. (See the Schedule C in effect in 2002 at Attachment 5).

9.    In August 2003, I was promoted to two (2) positions namely that of Registrar and Assistant to the Dean of Students and Support Services. (See Attachment 8). When I was promoted

to these two (2) positions, my job duties were expanded and I became responsible for, among other things, ensuring that the clerks assigned to my office performed their jobs. I did not however receive a pay increase of any kind with these promotions. Furthermore I remained on Schedule E. *The position of Registrar had been a Schedule C position when a male was the Registrar. The position of assistant to the deans has been and continues to be a Schedule C position at Ingram for employees other than Black females.* I am the only black female at Ingram to ever hold either one of these positions.

10.    The only other person to hold the position of Registrar at Ingram was a black male, Timothy Robinson.[3] He held the position of Registrar from around 1991 to 1999. In contrast to me, his salary was not based on Schedule E. Instead, his salary was based on the higher range of pay set out on Schedule C. Consequently, when he worked as Ingram's Registrar he was paid more than I have *ever* been paid.

11.    In particular, more than five (5) years ago, Mr. Robinson was being paid at least $16,621.00 more than I am being paid at this time. As Registrar, in 1999, Timothy Robinson, was being paid at a minimum approximately $67,000.00 off of Schedule C, while receiving a very poor performance evaluation. I, on the other hand, am now being paid $50,379.00 off of Schedule E for performing the job functions of three (3) jobs - the job of Registrar, the job of Assistant to the Dean of Students and Support Services and the job of performing secretarial duties for the Dean of Students and Support Services all the while receiving a positive performance evaluation.

12.    As noted, as of 2002, I had topped out on the support staff E salary schedule in effect at that time making $47,527.00. Although in September 2005 my salary was increased from

---

[3]    In March 1999, Mr. Robinson resigned as Registrar and is now deceased.

$47,527.00 to $50,379.00, it was due solely to a state wide across the board raise.[4]  I would note that under the Schedule E in effect since July 2005, a person working *only* as a secretary to one of the Deans and who had been an employee at Ingram for more than 20 years, like myself, could easily be paid the salary of $50,379.00 which I am now, as of September 2005, being paid.

13.    Clearly, I have not been properly compensated for my additional responsibilities following my promotions to the positions of Registrar and Assistant to the Dean of Students and Support Services; nor was I properly compensated for my work as the Registration and Admissions Coordinator from on or about October 2000 to August 2003.  Significantly it is up to the president of Ingram's, Mr. J. Douglas Chambers, discretion as to who will be paid off of Schedule C.  To my knowledge, no Black female employee at Ingram has ever been paid off of Schedule C.  I have been repeatedly denied the opportunity to be paid off of Schedule C.

14.    In addition to officially being the Registrar, I also have, since my promotion in August 2003, held the job title and performed the job duties of Assistant to the Dean of Students and Support Services.  I did not receive a pay increase with this promotion and expansion of my duties and I continue to be paid off of schedule E.  On the other hand all three males who have held the job title of assistant to one of the deans namely Conrad Lassiter, Bill Griswold and Gene Bridgeman have been paid off of Schedule C.  They too, just like Ingram's former Registrar Timothy Robinson, have received a much higher rate of pay than I for performing less work and having fewer job responsibilities than I.  Moreover, all three[5] were being paid off of Schedule C before they were

---

[4]    Due to a 6% across the state raise for all employees at 2 year colleges my salary was increased in September 2005 by $2,852.00 from $47,527 to $50,379.  This across the board raise went into effect in September 2005.

[5]    Mr. Bridgeman, who had received a 2 year associate degree from a junior college, held dual positions of accountant and Assistant to the Dean of Fiscal Affairs.  He retired in 2004. A white female who is being paid on Schedule C has assumed his job responsibilities. Other than

promoted to their respective positions of Assistant to the Dean of the College and Assistant to the Dean of Fiscal Affairs.

15.    I am the only black female to have held the position of Registrar and to have also held the position of Assistant to the Dean of Students and Support Services. Despite the fact that I hold two positions, namely the position of Registrar and the Assistant to the Dean of Students and Support Services, I have always been paid according to Schedule E. In contrast, the only other Registrar and the assistants to the other deans at Ingram have been male and have all been paid according to Schedule C. As noted above, the salary range allowed under Schedule C is much higher than the salary range allowed for Schedule E.

16.    As noted, I have never been compensated like my male counterparts in accordance with Schedule C. Therefore, in August 2004, October 2004 and August 2005, I sought an increase in pay commensurate with Schedule C. To date, my efforts have been unjustly denied.

17.    In particular, on or about August 13, 2004, I, as Registrar _and_ Assistant to the Dean of Students and Support Services, verbally and in writing requested a salary increase to Mr. James Wilson, the Dean of Student and Support Services, who has been my immediate supervisor since 1998. At that time, I had successfully worked officially as the Registrar[6] and as the Assistant to the Dean of Students and Support Services for approximately one year. In my August 13, 2004 memo, I stated that my salary is far below others in the system with dual roles and same type titles. (See memo dated August 13, 2004 at Attachment 9). My request for a raise was denied.

18.    After my supervisor, James Wilson, denied my request for a salary increase I filed a grievance with J. Douglas Chambers, the President of Ingram, on or about October 11, 2004.

---

me, Mr. Bridgeman was the only assistant to a dean who held dual positions at Ingram.

[6]    I had been performing the duties of the Registrar since 2000.

Therein, I stated that because of my gender and race, my work has been undervalued. (See Grievance Statement at Attachment 10). In my grievance statement, I pointed out, among other things, that my responsibilities as Assistant to the Dean of Students and Support Services are equivalent in value as other Dean's Assistants. My grievance was denied.

19.     In particular, on or about October 25, 2004, Ingram's Personnel Director and Grievance Coordinator, James Merk, denied my grievance. (See Memo from James Merk dated October 25, 2004 at Attachment 11). Significantly, nowhere in Mr. Merk's findings and conclusions, does he recognize that I am performing at least two different jobs and that I am not being paid for the job of Assistant to the Dean of Student and Support Services.

20.     On or about August 2005, I renewed my request for a merit raise to my immediate supervisor, Mr. James Wilson. I again asked to be paid off of Schedule C instead of Schedule E. Mr. Wilson asked me to prepare a list for him to give to the President for consideration, wherein I listed my duties and indicated therein what additional responsibilities I have had to perform since August of 2003. At his request, I gave him a list of my duties, which I understand he did submit to the President of Ingram. (See Duties and Responsibilities at Attachment 12). I also understand that my request for a merit increase and to be paid off of Schedule C, instead of Schedule E, was denied.

21.     I continue to hold the position of Registrar and Assistant to the Dean of Students and Support Services and have received positive feedback including a job evaluation reflecting the same. (See my Oct. 3, 2005 job evaluation at Attachment 13). I also continue to perform the secretarial duties for the Dean of Students and Support Services. To date, I continue to be paid according to Schedule E.

22.     Other Black female employees at Ingram have been discriminated against also. In light of all the foregoing, I believe I have been the victim of an ongoing practice of race and sex

discrimination in violation of Title VII.

DONE this the _17th_ day of November, 2005.

*Bonita J. Owensby*

**BONITA J. OWENSBY**

**STATE OF ALABAMA**          )

**MONTGOMERY COUNTY**     )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that **BONITA J. OWENSBY**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on this date.

SWORN TO AND SUBSCRIBED BEFORE ME, this _17th_ of November, 2005.

*Elizabeth Bern Spear*

NOTARY PUBLIC

My Commission expires: _Aug. 30, 2009_

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5     CASE NUMBER:   CV-2:06-cv-796MKW

6

7     BONITA J. OWENSBY,

8           Plaintiff,

9     vs.

10    J.F. INGRAM STATE TECHNICAL

11    COLLEGE; J. DOUGLAS CHAMBERS,

12    Individually and in his official

13    capacity as President of J.F.

14    INGRAM STATE TECHNICAL COLLEGE;

15    and JAMES WILSON, Individually and

16    in his official capacity as Dean

17    of Students and Support Services

18    at J.F. INGRAM STATE TECHNICAL

19    COLLEGE,

20          Defendants.

21

22          DEPOSITION TESTIMONY OF

23              BONITA J. OWENSBY

1933 Richard Arrington Jr. blvd, S*Birmingham, AL 35209*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 16

1  Q.     Okay.  Ms. Owensby, tell me where you work

2  now.

3  A.     J.F. Ingram State Technical College.

4  Q.     And what year did you start working there?

5  A.     1985.

6  Q.     Prior to 1985, could you tell me what's the

7  first job that you had?

8  A.     The first job I had was in 1981.  I went to

9  work for the state Department of Education

10  temporarily, on a temporary basis.

11  Q.     Tell me what you did there.  What did you do

12  for them?

13  A.     There, I started off working in the teacher

14  certification area.  From there, I went to the

15  professional development department; and I worked

16  there five and a half months.

17  Q.     So when you left there, where was your next

18  job?

19  A.     My next job was St. Margaret's Hospital.

20  Q.     What did you do at St. Margaret's?

21  A.     I was a radiology clerk.

22  Q.     And how long did you work at St. Margaret's?

23  A.     I worked there until 1985.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 20

1    having to take those three courses, and they were

2    a bit overwhelming.

3         And I decided that I really wanted to get in

4    the job market as soon as possible.  And I chose

5    to go to Trenholm to get a trade, so I could get

6    out and get a job, and then later go back to where

7    I could pay for my own education.

8    Q.    So after you left AUM, you enrolled in

9    classes at Trenholm?

10   A.    Yes.

11   Q.    Was that right after you left AUM?

12   A.    Yes.  That December.

13   Q.    And what did you study at Trenholm?

14   A.    Legal stenography.

15   Q.    And how long did you go to Trenholm?

16   A.    Eleven months.

17   Q.    Did you graduate from Trenholm?

18   A.    Yes.

19   Q.    What was your degree in from Trenholm?

20   A.    It was in legal stenography.

21   Q.    What year did you get that degree?

22   A.    In 1981.

23   Q.    Can you tell me what other education beyond

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 21

1    high school you have pursued?  After you finished

2    at Trenholm, did you take any more classes

3    anywhere else?

4    A.    After I finished Trenholm, I went to Central

5    Alabama Community College, obtained my Associate

6    in Arts degree there.  And from there, I went to

7    Troy State, and I earned about 30 semester hours

8    there.

9    Q.    And at the community college, when did you

10   attend that?  What was the college you said?  I'm

11   sorry.

12   A.    Central Alabama Community College.

13   Q.    Okay.  When did you go there?

14   A.    I started Central Alabama, I believe it was

15   in 1991.  I believe; I'm not sure.

16   Q.    You started in '91?

17   A.    Yes.

18   Q.    And when did you finish there?

19   A.    I think it was '93; I'm not sure.  It took

20   about two years.

21   Q.    And what was your degree in from Central

22   Alabama Community College?

23   A.    Associate in Arts.

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

Page 22

1    Q.    Did you receive any awards or honors?

2    A.    No.

3    Q.    Did you receive any awards or honors from

4    Trenholm?

5    A.    No.

6    Q.    After you left Central Alabama Community

7    College, you said you went to school back here in

8    Montgomery again?

9    A.    Went back to Troy State in Montgomery.

10   Q.    What did you study there?

11   A.    I -- what was my major?  Did I choose a

12   major?  I'm not sure what my major -- what major I

13   chose.  I'm trying to think.  I'm not sure.  I can

14   probably think about it later on.

15   Q.    Just generally, do you remember what you

16   studied?

17   A.    I had about three -- well, two psychology

18   classes, World Religion, World Literature,

19   sociology, Marriage in the Family, a bunch of

20   psychology courses.

21   Q.    Okay.  What year did you graduate from

22   Trenholm?

23   A.    1981.

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 23

1  Q.    Okay.  Did you graduate from Troy?

2  A.    No.

3  Q.    How many classes would you say you took at

4  Troy?

5  A.    I would say I took about five or six.

6  Q.    And what year did you finish taking classes

7  at Troy?

8  A.    My last classes were 2002.

9  Q.    Why did you stop taking classes at Troy?

10  A.    Well, it again got kind of difficult for me

11  to maintain family life and school and work all at

12  the same time.  It was getting difficult for me to

13  have someone to watch my child in the eveningtime

14  while I went to school at night, and I gave it up.

15  Q.    But you're not sure what degree you were

16  pursuing at Troy?

17  A.    Probably general education.

18  Q.    Are there any other classes that you've

19  taken beyond high school that you can remember

20  that you can tell me about?

21  A.    I took a course at Athens College.  It was a

22  Special Ed course:  Introductory to the

23  Exceptional Child in the Classroom.

Page 25

1  Q.     As a result of the education that you have

2  told me about, can you tell me what skills that

3  you obtained as a result of that education?

4  A.     Well, I've obtained intellectual skills;

5  I've obtained being able to understand processes

6  and concepts of, really, any given situation:  how

7  to analyze it, how to start goals, how to reach

8  goals.  Basically, how to implement any type

9  process that's before me.  How to do it

10  successfully, efficiently.  That's it.

11  Q.     As a result of your education, did you

12  receive training in computers?

13  A.     Yes, I received training in computers.  I

14  did have a computer class.  It was where we did

15  most of the computer work -- it wasn't like an

16  everyday computer class, because they would come

17  to the campus to teach it.

18       I had computer experience in Lotus.  This

19  class was taught from the Nunnelly campus --

20  Central Alabama's Nunnelly campus.  They came here

21  to Ingram and taught the Lotus class.

22       I've had extensive training with the AS/400,

23  which is the system that we use at the college

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 30

1   school from primary to high school and even higher

2   up.

3   Q.    Okay.  I'm going to turn your attention to

4   the mid '80s, when you went to work for J.F.

5   Ingram.

6   A.    Okay.

7   Q.    Ms. Owensby, I'm going to ask you to take a

8   look at this document.

9             (The witness examines the

10            document.)

11  Q.    Can you tell me what that is?

12  A.    This is an appointment letter for my

13  position as office clerk in 1985.

14  Q.    Okay.

15            MR. BEAM:  I would like to mark that as

16  Defendants' Exhibit 1.

17            (Defendants' Exhibit No. 1 was

18            marked for identification and a

19            copy of the same is attached

20            hereto.)

21  Q.    Ms. Owensby, what was your position when you

22  started at Ingram?

23  A.    When I started at Ingram, I started as an

Page 31

1  office clerk.  I basically answered to the

2  president's secretary.

3       I filed office documents for her; I typed --

4  I did typing for her; I was responsible for the

5  mail; and I would also assist, with her

6  permission, instructors if they needed something

7  typed or any type of documents done or copying or

8  whatever.  Just basic general office work.

9  Q.   And what salary schedule were you on when

10 you started?

11 A.   E.

12 Q.   And what was your annual salary?

13 A.   10,272.

14 Q.   Okay.  And your title was what?

15 A.   Office clerk.

16 Q.   Okay.  Ms. Owensby, I'm going to ask you to

17 take a look at this document.  I'm sorry.

18      Before I ask you that, do you think that you

19 were awarded that appointment based on your race?

20 A.   No.

21 Q.   Do you think you were awarded that

22 appointment based on your gender?

23 A.   No.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 39

1   A.     I told them yes.  They asked me if I thought

2   I could handled the responsibility, and I said

3   yes.

4   Q.     Okay.

5          MR. BEAM:  I'm going to mark that as

6   Defendants' Exhibit 4.

7          (Defendants' Exhibit No. 4 was

8          marked for identification and a

9          copy of the same is attached

10         hereto.)

11  Q.     And did you receive that appointment?

12  A.     Yes.

13  Q.     Do you recognize this document?

14  A.     This would be the appointment letter for

15  that position.

16  Q.     And what position were you appointed to?

17  A.     Secretary to the Dean of Students.

18  Q.     And what was your annual salary at that

19  point?

20  A.     13,104.

21  Q.     And what is that appointment letter dated?

22  A.     July 20, 1987.

23  Q.     So if I understand your testimony correctly,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 71

1    were during the time that this appointment letter

2    was in effect?

3    A.    During this time -- actually, prior to --

4    wait; let's see.  They did change.

5         The registrar had resigned at this time, and

6    responsibilities were distributed, and I took on

7    some of those responsibilities.

8    Q.    So how did your responsibilities change?

9    A.    Well, the duties and responsibilities that

10   he "were" doing had to be distributed.  He had

11   resigned.

12   Q.    And when you say "he," who are you talking

13   about?

14   A.    The previous registrar.

15   Q.    And what was his name?

16   A.    Tim Robinson.

17   Q.    Do you know when he resigned?

18   A.    I think it was April of 1999, I believe.

19   Q.    And his resignation, if I understand your

20   testimony, prompted changes in your

21   responsibilities?

22   A.    Yes.

23   Q.    And what were the changes in those

Page 72

1    responsibilities?

2    A.    Whereas he supervised the admissions --

3    registration and admissions process, I did; I took

4    on those responsibilities.    There were several

5    things that his job description entailed, and they

6    were given to me, and I did them.

7    Q.    Did you take on all of his job

8    responsibilities?

9    A.    Not all of them at that time.

10   Q.    Can you tell me which job responsibilities

11   of Tim Robinson -- his name is Robinson?

12   A.    Uh-huh.

13   Q.    Which of Tim Robinson's responsibilities did

14   you take on during the time that this appointment

15   letter was in effect?

16   A.    There again, I was responsible for all of

17   the admissions and registration for the college.

18   I would take admission applications, schedule

19   students for testing, process the registrations

20   for that semester, compare the roster for the new

21   incoming students; I evaluated the transcripts; I

22   would advise students when they had questions; I

23   did like an orientation, before admissions, with

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 73

1    the students.

2    Q.    Were these all new responsibilities?

3    A.    Yes.

4    Q.    Did you -- let me rephrase that.  What

5    responsibilities did you continue to provide as

6    secretary?

7    A.    All of them.  The ones I had from the

8    beginning.

9    Q.    During the time period that this letter was

10   in effect, what were the responsibilities that you

11   had as secretary?

12   A.    Basically, doing the correspondence for the

13   Dean of Students, taking care of his travel; I did

14   requisitions, basic general office information; I

15   processed the DED documents; I prepared the

16   awards; and I kept a ledger of the process of what

17   we did.

18   Q.    With regard specifically to your secretarial

19   responsibilities, had those changed from when you

20   began work as a secretary at Ingram until this

21   time period?

22         MR. DEBARDELABEN:  I'd like a little

23   clarification.  I think you need it, because we

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 84

1   Q.    Any other responsibilities you had

2   associated with the computer work?

3   A.    I generated reports from the computer.

4   Q.    What kind of reports?

5   A.    Admission rosters, registration rosters,

6   class rolls, withdrawal reports,

7   end-of-the-semester reports; all the reports that

8   were required from the student services module

9   from the system.

10  Q.    What percentage of your time would you say

11  was devoted to your secretarial responsibilities

12  versus your responsibilities that you took over

13  from Mr. Robinson?

14  A.    I would say about 70/30.

15  Q.    Which way?

16  A.    Secretarial 30, 70 percent registration

17  admissions.

18  Q.    So 70 percent of your time was what Mr.

19  Robinson had been doing and 30 percent was

20  secretarial; is that what you're saying?

21  A.    I would say.

22  Q.    Okay.  Ms. Owensby, who taught you how to

23  perform all these jobs that Mr. Robinson had?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 10

1   titles.

2          MR. BEAM:  That's right.  Dr. Merk,

3   what is your official title now?

4          DR. MERK:  Dean of Instruction.

5          MR. BEAM:  Okay.  In his capacity as

6   Dean of Instruction.

7          MR. DEBARDELABEN:  And under that,

8   you're personnel director, I think, or something.

9   You're over personnel?

10          DR. MERK:  Yes.

11          MR. DEBARDELABEN:  Okay.

12          MR. BEAM:  Okay?

13          MR. DEBARDELABEN:  Yeah, that's fine.

14          MR. BEAM:  Okay.

15

16              EXAMINATION

17   BY MR. BEAM:

18   Q.    Ms. Owensby, my name is Matt Beam, and I'm

19   here to take your deposition.  This is a federal

20   lawsuit and you are the named plaintiff.  And so

21   what I'm going to ask you to do today is to answer

22   my questions.  And, as you know, you've just been

23   sworn in and you're under oath.

Defendants' Exhibit 18.

(Defendants' Exhibit No. 18 was marked for identification and a copy of the same is attached hereto.)

Q. Ms. Owensby, do you recognize this document?
A. Yes.
Q. And when is it dated?
A. July 28, 2000.
Q. And what is the title that you are appointed to in that letter?
A. Secretary.
Q. And what is your pay rate?
A. 37,409.
Q. And what is the step and grade that you have there?
A. E-3, Grade 3.
Q. Does that reflect an increase of your previous appointment letter?
A. Yes.
Q. Did your salary go up?
A. Yes.
Q. And your title here is what?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 98

1    A.    A temporary appointment letter.

2    Q.    When is it dated?

3    A.    August 13, 2000.

4    Q.    And who is that from?

5    A.    J. Douglas Chambers.

6    Q.    And who is it to?

7    A.    It's to me.

8    Q.    Okay.  And what does it appoint you to?

9    A.    Coordinator of Registration and Admission.

10   Q.    And what is your salary schedule there?

11   A.    41,047.

12   Q.    And what is your annual salary?

13   A.    $41,047.

14   Q.    Does that appointment reflect an increase

15   over the previous appointment letter?

16   A.    Yes.

17   Q.    And Dr. Chambers gave you this appointment

18   letter, the October 13, 2000?

19   A.    Yes.

20   Q.    And did your responsibilities change?  We

21   have a new title change.  Did your

22   responsibilities change?

23   A.    Those are the responsibilities that I -- the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 109

1    during this time?

2    A.    No.  I just maintained.  I was able to

3    handle them both.  They were still there.

4    Q.    Were you -- as a result of this increase in

5    the volume of your work and your responsibilities,

6    did you have to work longer hours?

7    A.    No.

8    Q.    How did you handle the increase?

9    A.    I guess basically just better planning,

10   starting early with the process.  And I think

11   during that time one more clerk came on.

12   Q.    Prior to this increase in your work volume

13   and your responsibilities, were you busy?

14   A.    I stayed busy.

15   Q.    Have you been busy since the day you started

16   at Ingram?

17   A.    Yes.

18   Q.    Okay.  I just want to make sure I

19   understand.  You say you had an increase during

20   this period in the volume and an increase in the

21   responsibilities?

22   A.    Yes.

23   Q.    Any other strategies that you employed to

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 111

1    Q.    Did anyone provide you guidance as to how to

2    handle these new responsibilities?

3    A.    No.

4    Q.    Did anyone provide you guidance as to how to

5    handle this new -- how to handle this increased

6    work volume?

7    A.    No.

8    Q.    You figured it out by yourself how to do it?

9    A.    Yes.

10    Q.    Okay.  Dr. Chambers gave you this

11    appointment?

12    A.    Yes.

13    Q.    And it does not reflect a change in title;

14    is that right?

15    A.    This one is the same as that one, same

16    title.

17    Q.    That's the same title for this appointment

18    letter.  It reflects the same title, the same

19    position on the pay scale, and the same annual

20    salary?

21    A.    Same annual salary, different position on

22    the pay scale from 18 years to 19 years.

23    Q.    Why did your position on the pay scale

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

Page 112

1    change?

2    A.    Because I was within my 19th year of

3    experience.

4    Q.    To your knowledge, do you know why you did

5    not receive a raise in your annual pay?

6    A.    No.

7    Q.    Okay.  Did your -- to your knowledge, did

8    your race play a part in that appointment?

9    A.    It would have been the same because it's the

10   same title.

11   Q.    So your testimony is that your race played a

12   role?

13   A.    Yes.

14   Q.    And, to your knowledge, did your gender play

15   a role in that appointment?

16   A.    Yes.

17   Q.    Okay.  Thank you.

18        MR. BEAM:  We'll mark this Defendants'

19   Exhibit 21.

20        (Defendants' Exhibit No. 21 was

21        marked for identification and a

22        copy of the same is attached

23        hereto.)

Page 227

1    he was registrar?

2    A.    I think since 1989.

3    Q.    Okay.  So he was registrar for a decade.

4    And when he retired, he made $67,000 a year?

5    A.    Yes.

6    Q.    And your testimony to me today is that

7    today, six years after taking over some of his

8    responsibilities, you should make $86,000 a year,

9    give or take a few dollars?

10   A.    That's if I was being compensated at the

11   same level that he was when he resigned.

12   Q.    And that's the gist of your complaint, isn't

13   it?

14   A.    That's the gist of my complaint.

15   Q.    Okay.  So your testimony is today that if

16   you had been treated fairly and not discriminated

17   against, you would be making $86,000, give or take

18   a few dollars?

19   A.    Yes.

20   Q.    Okay.  And can you tell me from that chart

21   what you should have started making when you

22   absorbed some of his responsibilities?

23   A.    When I absorbed some of his responsibilities

# FREEDOM COURT REPORTING

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    BONITA J. OWENSBY,              )

6              Plaintiff,           )

7    vs                             ) CASE NUMBER:

8    J.F. INGRAM STATE              ) 2:06-CV-796-WKW

9    TECHNICAL COLLEGE; J.          )

10   DOUGLAS CHAMBERS,              )

11   Individually, and in his )

12   official capacity as          )

13   President of J.F. Ingram )

14   State Technical College; )

15   and JAMES WILSON,              )

16   Individually, and in his )

17   official capacity as Dean)

18   of Student and Support        )

19   Services at J.F. Ingram )

20   State Technical College, )

21              Defendants.         )

22

23        DEPOSITION OF JAMES EDWARD WILSON

## FREEDOM COURT REPORTING

Page 145

1    was a mistake.  Was that a mistake?

2        A.    In my opinion, yes, sir.

3        Q.    But President Chambers has the

4    right to make that appointment, doesn't he?

5        A.    Yes, sir.

6        Q.    To your knowledge, was that

7    appointment ever changed?

8        A.    According to the document, it did

9    not.

10       Q.    Okay.  So as of September 1st,

11   2003, was Ms. Bonita J. Owensby the

12   registrar or assistant to the Dean of

13   Students and Support Services?

14       A.    According to that document.

15       Q.    Well, what other document do you

16   have showing something different that you

17   know of?

18       A.    I don't have one.

19       Q.    Is there any document that shows

20   anything different?

21       A.    No, sir.

22       Q.    Okay.  I'm a little confused on

23   this document.  But this is the way I got

## FREEDOM COURT REPORTING

Page 161

1  six months left on his sentence?

2      A.   We don't encourage that.  But we

3  don't deny them.

4      Q.   All right.

5      A.   We have programs that are one

6  semester, if the student completes nine

7  hours, which is called a short term training

8  program.

9      Q.   Do you know if Mr. Robinson -- Do

10  you know how much money he was making when

11  he left J.F.I. in 1999?

12      A.   No.  I know he was on a C-1 salary

13  schedule.

14      Q.   He was on which salary schedule?

15      A.   C-1.

16      Q.   And which salary schedule is Ms.

17  Owensby on?

18          MR. CHRISTMAN:  Now?

19      Q.   When she became the registrar and

20  dean -- assistant to Dean of Student

21  Services?

22      A.   I don't know.  I think it was E.

23      Q.   E.  What's the difference between

# FREEDOM COURT REPORTING

Page 162

1  a C and an E salary schedule?

2      A.    Money.

3      Q.    The E salary schedule would be

4  higher than the C salary schedule, wouldn't

5  it?

6      A.    No, sir.

7      Q.    Is it right backwards?

8      A.    Yes, sir.

9      Q.    So the C salary schedule is higher

10 than the E salary schedule?

11     A.    Yes, sir.

12     Q.    Have you ever known a registrar

13 other than Ms. Owensby that was not on the C

14 salary schedule?

15     A.    Not personally knowing them.  But

16 with the evaluation we did in the two-year

17 college system, yes.  There were plenty.

18     Q.    Have you ever known one at J.F.I.

19 that wasn't on the C salary schedule?

20     A.    We've only had these two.

21     Q.    Mr. Robinson and Ms. Owensby?

22     A.    Yes, sir.

23     Q.    Okay.  And Mr. Robinson is a male,

## FREEDOM COURT REPORTING

Page 104

1        MR. CHRISTMAN:  Exhibit 1?

2        MR. DEBARDELABEN:  Yes, sir.

3    Q.  Would you agree with me, according

4  to Plaintiff's Exhibit 1, that if it was

5  drug use, that's criminal activity?  Would

6  drug use be criminal activity?  Maybe I

7  should ask it that way.

8    A.  In my opinion, it would be.

9    Q.  Okay.  And that would have been an

10  emergency procedure, wouldn't it?

11    A.  To some people.

12    Q.  When student behavior constitutes

13  criminal activity.  Under y'all's rules for

14  number one, that's an emergency procedure,

15  isn't it?

16    A.  Uh-huh.

17    Q.  And --

18    A.  A non-emergency really.  It could

19  be.

20    Q.  Well --

21    A.  She said in the memorandum she was

22  suspicious.

23    Q.  Right.  And appropriate Department

# FREEDOM COURT REPORTING

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  BONITA J. OWENSBY,           )

6        Plaintiff,            )

                               ) CASE NUMBER:
7  vs

                               ) 2:06-CV-796-WKW
8  J.F. INGRAM STATE

9  TECHNICAL COLLEGE; J.        )

10 DOUGLAS CHAMBERS,            )

11 Individually, and in his )

12 official capacity as        )

13 President of J.F. Ingram )

14 State Technical College; )

15 and JAMES WILSON,            )

16 Individually, and in his )

17 official capacity as Dean)

18 of Student and Support      )

19 Services at J.F. Ingram )

20 State Technical College, )

21        Defendants.          )

22

23  DEPOSITION OF JOHN DOUGLAS CHAMBERS

## FREEDOM COURT REPORTING

Page 154

1    A.    A grievance to me or to the

2  college?

3    Q.    To the college.  I assume all

4  grievances go to you?

5    A.    But she also filed some other

6  issues, too.

7    Q.    Yes, sir.  But she filed an issue

8  on her pay.  Were you aware of that?

9    A.    Yes.

10    Q.    Tell me about this pay schedule.

11  I'm fairly confused about it.  You have an A

12  to E?

13    A.    Right.

14    Q.    And the E is the lowest and A is

15  the highest?

16    A.    Yes.

17    Q.    Okay.

18    A.    Full-time.

19    Q.    Okay.  Mr. Griswold, Bill

20  Griswold, what's his title?

21    A.    Assistant to the Dean of

22  Instruction.

23    Q.    Okay.  And that's Dean Merk;

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1      A.    Yes.

2      Q.    Medical reasons?

3      A.    Yes.

4      Q.    And you knew he has since

5  deceased?

6      A.    Right.

7      Q.    Who is Dean Wilson's assistant?

8  Does he have an assistant?

9      A.    No, he does not.  You mean as

10 assistant dean?

11     Q.    Yes.

12     A.    No.

13     Q.    But Ms. Owensby is assistant to

14 the Dean of Students, isn't she?

15     A.    Yes.  Assistant to the Dean of

16 Students, not assistant Dean of Students.

17 There's a difference.

18     Q.    Okay.  So what is the difference

19 between assistant to the dean and like Mr.

20 Griswold is?  Is he a dean's assistant or

21 assistant to the dean?

22     A.    Assistant to the dean.

23     Q.    So there's no difference?

# FREEDOM COURT REPORTING

Page 158

1     MR. CHRISTMAN:  Between the two of

2  them.

3     Q.    Between the two of them in the

4  position they hold?

5     A.    As far as titles, no.  But the

6  role in duties -- job duties and

7  responsibilities, they are different.

8     Q.    That's what I'm getting at.  On

9  salary scale, do you have a salary scale for

10  the assistant to the dean that all

11  assistants to the dean are on?

12     A.    No.

13     Q.    Is the salary scale of the person

14  for the position or for the person occupying

15  the position?

16     MR. CHRISTMAN:  I object to the

17  form of that question.  I don't understand

18  it.

19     Q.    Is the salary set by position or

20  is it set by the person occupying the

21  position?

22     A.    For the position.

23     Q.    Okay.  So do you have a salary

## FREEDOM COURT REPORTING

Page 159

1   scale for assistants to the deans?

2        A.    No.

3        Q.    Do you have a particular salary

4   scale for assistants to Dean of Students and

5   Support Services?

6        A.    No.

7        Q.    And you have no salary scale for

8   assistants to the Dean of Instruction?

9        A.    No.

10        Q.    So how is it determined what the

11   salary of Ms. Owensby and/or Mr. Griswold is

12   that occupies those two positions?

13        A.    Well, they are usually looked upon

14   as years at the college.  That involves

15   steps that they are placed on.  And in

16   particular cases, if it's on a C scale,

17   there's one scale that will allow for a

18   negotiable salary based on duties, jobs,

19   roles, responsibilities.

20        Q.    What about an E scale?

21        A.    E scale has three levels.  And

22   it's left up to the supervisor to determine

23   and evaluate the employees and recommend

## FREEDOM COURT REPORTING

Page 146

1    office.

2        Q.    Who was registrar before her?

3        A.    Mr. Tim Robinson.

4        Q.    And Ms. Owensby is a black female,

5    isn't she?

6        A.    Yes.  To the best of my knowledge,

7    yes.

8        Q.    Appears to be, doesn't she?

9        A.    Yes.

10        Q.    And Mr. Tim Robinson was a black

11    male?

12        A.    Yes.

13        Q.    And do you recognize this as a job

14    description for Mr. Robinson?

15            MR. CHRISTMAN:    Form.

16        A.    No, I do not.

17        Q.    Okay.  Who would be the best one

18    to ask about that?

19        A.    He's retired.  But it would be the

20    past Dean of Students.  What was his name?

21    I can't answer your -- Reeder.

22        Q.    Dean Reeder?

23        A.    Dean Reeder.

## FREEDOM COURT REPORTING

Page 147

1      Q.    And what about -- When did -- Who

2    was the personnel director before Dean Merk

3    became personnel director?  Was it Mr. Greg

4    Wright?

5      A.    Yes.

6      Q.    Would he have knowledge of that,

7    too, being a personnel director?

8      A.    He should.

9      Q.    Does Ms. Owensby perform

10   approximately the same job as Mr. Robinson

11   as registrar?

12     A.    She does some of the work.  But to

13   say that they did the exact same thing --

14   because Mr. Robinson also taught classes.

15   He had other duties I know she's not doing.

16     Q.    And Ms. Owensby is the assistant

17   to the Dean of Students that Mr. --

18     A.    Wilson.

19     Q.    Mr. Robinson wasn't?

20     A.    Pardon me?

21     Q.    Mr. Robinson was not the assistant

22   to the Dean of Students, was she?

23     A.    Was he.

# FREEDOM COURT REPORTING

Page 148

1       Q.    Was he.

2       A.    Not to my knowledge, no.

3       Q.    So they were both registrars and

4    they have other jobs?

5       A.    He was registrar and had other

6    jobs.

7       Q.    And she's registrar and has other

8    jobs?

9       A.    As assistant to the dean, yes.

10      Q.    All right.  Are you aware that Ms.

11   Owensby is paid substantially less now than

12   Mr. Robinson was when he left the job?

13      A.    Yes.

14      Q.    And he left the job in 1999,

15   didn't he?

16      A.    Around that time, yes.

17      Q.    And at that time, he was paid

18   approximately sixty-seven thousand dollars,

19   wasn't he?

20      A.    I could not tell you.  I don't

21   know.

22      Q.    And are you aware that Ms. Owensby

23   is only paid sixty thousand dollars today?

## FREEDOM COURT REPORTING

Page 149

1       A.    Yes.

2       Q.    And since '99, which has been

3  about seven years, there's been several pay

4  increases by the State, hasn't there?

5       A.    Yes.

6       Q.    But she still is not as high as

7  where Mr. Robinson was when he left the job,

8  is she?

9       A.    That's right.

10       Q.    What's the reason for that?

11       A.    I can't answer why she's not where

12  he was.  I can answer why where she is now.

13       Q.    Who would be able to answer the

14  question as to why she's not on the same pay

15  scale as Mr. Robinson?

16       A.    I don't know.

17       Q.    You're the president, aren't you?

18       A.    Yes, I am.

19       Q.    And if you send Ms. Greene a

20  memorandum to put somebody on a certain pay

21  scale, she has to do that, doesn't she?

22       A.    Yes.  But I wouldn't be saying it

23  because of Mr. Robinson.  I would be saying

## FREEDOM COURT REPORTING

Page 150

1   it because this is where the person is

2   placed and this is the salary that goes with

3   that placement.

4        Q.    Now, you would agree with me that

5   if Ms. Greene saw you doing something that

6   is improper or illegal, she should say no,

7   President Chambers, I'm not going to do

8   that, it could get us both in trouble?

9        A.    I would certainly hope so.

10       Q.    That's her job?

11       A.    Yes.  That's all employees job.

12       Q.    One of her main jobs, one of her

13  main jobs is to make sure that the money

14  expended by J.F. Ingram is properly

15  expended, isn't it?

16       A.    Yes.

17       Q.    And that's probably number one,

18  isn't it?

19       A.    Yes.

20       Q.    You can get in all kinds of

21  trouble if that money is improperly spent,

22  isn't it?

23       A.    Yes.

## FREEDOM COURT REPORTING

Page 160

1   that they go up on the scale or whether they

2   go to another step once they complete the

3   three that's available for them.

4        Q.   Have you ever had a budget meeting

5   with Ms. Greene?

6        A.   Yes.

7        Q.   And one of the things she has to

8   do besides pay the bills and keep up with

9   the money is to figure out what the budget

10  will be for the next year; correct?

11       A.   Yes.

12       Q.   Now, does J.F. Ingram have a

13  surplus budget?

14       A.   I don't know.

15       Q.   Would that be a good thing to

16  have?

17       A.   Yes.

18       Q.   Is that something that Ms. Greene

19  should strive to create for J.F. Ingram?

20       A.   Yes.

21       Q.   Have you ever asked her to strive

22  to keep a surplus budget for J.F. Ingram?

23       A.   Yes.

# FREEDOM COURT REPORTING

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3     NORTHERN DIVISION

4

5  BONITA J. OWENSBY,     )

6       Plaintiff,    )

7  vs           )  CASE NUMBER:

8  J.F. INGRAM STATE    )  2:06-CV-796-WKW

9  TECHNICAL COLLEGE; J.   )

10  DOUGLAS CHAMBERS,     )

11  Individually, and in his )

12  official capacity as    )

13  President of J.F. Ingram )

14  State Technical College; )

15  and JAMES WILSON,     )

16  Individually, and in his )

17  official capacity as Dean)

18  of Student and Support  )

19  Services at J.F. Ingram )

20  State Technical College, )

21      Defendants.    )

22

23     DEPOSITION OF JAMES THOMAS MERK

**367 VALLEY AVENUE**

(205) 397-2397 BIRMINGHAM

## FREEDOM COURT REPORTING

1   was the president?

2        A.    Murry Gregg.

3        Q.    Did you apply for that job?

4        A.    No.

5        Q.    It was appointed?

6        A.    Yes.

7        Q.    When were you appointed as

8   assistant to the president approximately?

9        A.    It had to have been sometime in

10  late 1994 or early 1995.

11       Q.    What was your next position?

12       A.    Personnel director.  And I

13  maintained my duties as assistant to the

14  president.

15       Q.    When did you become personnel

16  director?

17       A.    I don't remember.  It would be

18  after 1995.

19       Q.    How long were you personnel

20  director?

21       A.    I really don't remember.  I still

22  have duties.

23       Q.    Okay.  Sometime in that period, I

# FREEDOM COURT REPORTING

Page 184

1      Q.    I'm looking at your findings and

2   conclusions.  And at the bottom of the first

3   paragraph it says, in October of 2003, your

4   title was changed to registrar slash

5   assistant to the Dean of Students.

6           Your compensation remained the

7   same and no additional duties or

8   responsibilities were added.

9      A.    No additional duties or

10  responsibilities were added.

11     Q.    Was Mr. Robinson paid on the C

12  salary schedule or the E salary schedule?

13     A.    Robinson as registrar was paid on

14  the C-1 salary schedule.

15     Q.    Okay.  Which salary schedule is

16  Ms. Owensby paid on?

17     A.    She's paid on the C-3 salary

18  schedule.

19     Q.    Now?

20     A.    Yes.

21     Q.    But when was that changed?

22     A.    I believe it was effective

23  September 3rd, '06.

## FREEDOM COURT REPORTING

Page 185

1    Q.    '06.

2         MR. CHRISTMAN:  You mean effective

3    or when was it approved?  Does that make any

4    difference to you?

5         MR. DEBARDELABEN:  Huh-uh.

6    Q.    When you obtained information

7    concerning other registrar positions in the

8    Alabama College System --

9    A.    Yes.

10   Q.    -- did you try to obtain

11   information of other registrars who are

12   assistant to the Dean of Students or

13   assistant -- and also had the duties of the

14   assistant to the dean or did you just look

15   at the registrars salary?

16   A.    I asked that a query be written

17   that had as a key word registrar.  Anything

18   with the word registrar in it was sent back

19   to me.

20   Q.    Okay.  Did you try to find out if

21   there were other people, you know, in like

22   positions of hers as being an assistant to

23   the Dean of Students or the Dean of the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 186

1    College and also the registrar?

2          A.    Later I did.    After she filed an

3    EEOC complaint.

4          Q.    What did you find?

5          A.    I found that there were other

6    people doing registration functions.    But

7    they held other positions than assistant to

8    the dean.    They may have been the Dean of

9    Instruction or Dean of Students.

10              I can't remember all of the things

11   that were reported back to me.    Those that

12   had significant duties of high

13   responsibility, there were about two-thirds

14   more people than Bonita.

15         Q.    About two-thirds of the people had

16   duties with higher responsibilities?

17         A.    Yes.

18         Q.    And a third had duties of lower

19   responsibility?

20         A.    Or equal.

21         Q.    Or equal.    Did you find out a

22   salary range?

23         A.    Yes, it was there.    But I don't

## FREEDOM COURT REPORTING

Page 188

1    concerning Bonita Owensby?

2        A.    Yes.

3        Q.    Okay.

4            MR. CHRISTMAN:    Comparison data

5    would be fine.

6            MR. DEBARDELABEN:    Okay.

7        Q.    Do you know who Leo Miller is?

8        A.    Yes.

9        Q.    Who is Leo Miller?

10       A.    Leo Miller is a person who was

11   employed by Ingram both as a student and

12   later on as an instructor assistant.

13       Q.    He couldn't have been employed if

14   he went there as a student, could he?

15       A.    Well, we call it employment.    He

16   went there as a student.    But he was a

17   student aide.

18       Q.    Okay.    Now, do you know a Mr. Tim

19   Leonard?

20       A.    I know the name.    But I don't know

21   the man.

22       Q.    Okay.    Tell me, are you in charge

23   of live work at Ingram?